United State District Court
Southern District of New York
------------------------------------------------------------------------ x
United States of America,

                  -against-

Douglas Shyne,
Natasha Singh,
      AKA Beatris Rodrigues,
Christine Richardson,
      AKA Deokali C. Richardson,
Nathaniel Shyne,
Toybe Bennett,
      AKA Dmitriy Makarevich,
      AKA Dmitriy Makervich,
      AKA Eduardo Rodrigues,
      AKA Cecilio Pena,
Roberto Montgomery,
Ephraim Richardson,
Naresh Pitambar,
Jason Watler,
Steven Riddick,
Nathaniel Alexander, and
Timothy Montgomery,

      Defendants.

                                   **DEFENDANT'S OMNIBUS MOTION**

------------------------------------------------------------------------ x


TO THE HONORABLE JUDGE OF SAID COURT:

      COMES NOW, NATHANIEL ALEXANDER, a defendant herein, by and through his counsel of record, Michael Fineman, Esq., and moves this Court (**1**) under the Fifth and Sixth Amendments to the Constitution of the United States of America for suppression of all statements procured in violation of the defendant's right against self incrimination, the defendant's right to an attorney, and as a result of grave prosecutorial misconduct; (**2**) under the Fifth Amendment to the Constitution of the United State of America for dismissal of the indictment for violation of the defendant's fundamental right to due process of law as a result of grave prosecutorial misconduct; (**3**) under provisions of Fed. R. Crim. P. 6(e)(3)(C)(i) and (ii), to order the government attorney to disclose the grand jury testimony of Special Agent Erik Rosenblatt, ICE Office of investigations, Department of Homeland Security, other agents and witnesses; (**4**) under Fed. R. Crim. P. 12(3)(B) for dismissal of the indictment for failure to state a cause of action; (**5**) under Fed. R. Crim. P. 16(a)(1)(B)(ii) compelling the government attorney turn over any written record containing the substance of any relevant oral statement made before

or after arrest if the defendant made the statement in response to interrogation by a person the defendant knew was a government agent; **(6)** under Rule 104(a), Fed. R. Evid., moves this Honorable Court for a hearing to determine the existence of a conspiracy; and **(7)** to grant defendant's motion in limine precluding the government from asserting deliberate ignorance, or introducing evidence of the defendant's financial situation, for good cause would show unto the Court as follows:

I, Michael Fineman, an attorney-at-law and Attorney for the defendant, with offices at 305 Broadway, 7th Floor, New York, New York, hereby affirms the following under the penalties of perjury that:

## **FACTUAL BACKGROUND**

1.      Based upon information and belief, on or about February 9, 2006, at approximately 6:00 AM, federal agents appeared at the home of defendant Alexander, and pursuant to an arrest warrant based on an indictment that originated here in the Southern District of New York, defendant Alexander was placed under arrest. (See the memorandum of an unidentified federal agent, hereinafter referred to an the unidentified agent because his name has been redacted from the memorandum provided by the government, annexed hereto as **Exhibit A**)

2.      The three agents who arrested defendant Alexander identified themselves as federal agents, were wearing identifying outer garments, and were holding their unholstered firearms to their sides. (See defendant's affirmation annexed hereto as **Exhibit B**)

3.      One agent then proceeded to place handcuffs on defendant Alexander, then all three agents took defendant Alexander into his home. (See **Exhibit B**).

4.      The unidentified agent questioned defendant Alexander, while the other two agents proceeded to walk throughout the defendant's home, presumably searching the residence without asking permission to do so, and without a valid search warrant permitting such conduct. (See **Exhibit B**).

5.      The unidentified agent's own memorandum confirms defendant Alexander's affirmation. The unidentified agent stated in his memorandum, dated March 17, 2006, that a "security sweep of the residence" was conducted. (See **Exhibit A**). The unidentified agent's memorandum further states, "NATHANIEL ALEXANDER indicated that the agents had permission to look through the residence for any evidence of financial fraud." Defendant denies any such permission was ever sought or granted. (See **Exhibits A and B**).

6.      At no time was defendant Alexander read his Miranda Warnings, or given the opportunity to consult with counsel when he was being interrogated by the unidentified agent while in custody at his home. (See **Exhibit B**).

7.      After the unidentified agent had concluded his interrogation, defendant Alexander was taken to a federal building in Norfolk, Virginia, which serves as the RAIC/NORFOLK I.C.E. office, for processing and further interrogation. (See **Exhibits A and B**).

8.      At approximately 8:00 AM, the unidentified agent demanded that defendant Alexander assist the agents locate codefendant Steven Riddick. In order to assist the agents in this task, defendant Alexander was given his cellular telephone, which was taken by the agents from the defendant's home, and told to call codefendant Riddick to locate him. The defendant then made and received numerous calls on his cellular telephone starting at 8:05 AM and concluding at 9:06 AM. (See defendant's cellular telephone record for February 9, 2006, annexed hereto as **Exhibit C**).

9.      At approximately 9:00 AM, the unidentified agent presented the defendant with a document advising defendant Alexander of his Miranda Rights, and requested that the defendant sign it (annexed hereto as **Exhibit D**). Defendant Alexander signed the Miranda Waiver, as did two witnesses whose names are unknown. (The two witnesses to the Miranda Waiver are unknown because their names were redacted from the document provided by the government.)  At this time the unidentified agent presented defendant Alexander with a prepared statement to sign, which contained the sum and substance of the earlier interrogation at the defendant's home. However, now being apprised of his rights, the defendant requested permission to speak to his attorney. (See **Exhibit A and B**).

10.     Defendant Alexander was permitted to contact his attorney using his own cellular telephone. Defendant Alexander called his attorney's office at 9:05 AM, and briefly spoke to a member of his attorney's staff (See **Exhibit C** call number 656 to telephone number 757-461-4900; additionally, a facsimile cover sheet from the defendant's Virginia attorney's firm is also annexed hereto). At the conclusion of this conversation, the defendant refused to sign the prepared statement. (See **Exhibit A and B**).

11.     The documentary evidence establishes the final sequence of events and the existence of the prepared statement. The last two paragraphs of the unidentified agent's memorandum state, "[a]t this time (redacted) asked NATHANIEL ALEXANDER if he would sign a statement that included the sum and substance of his statement *** (redacted) placed NATHANIEL ALEXANDER in touch with his attorney and NATHANIEL ALEXANDER then <u>refused to sign the statement</u>." (See **Exhibit A**, <u>emphasis added</u>).

12.     The Miranda Waiver document has one troubling inconstancy and anomaly. It appears that the time initially entered in the space provided on the document as the time that Miranda Warnings were given was 9:00 AM; however, the time was then scratched out and re-entered as 8:30 AM below the appropriate space. (See **Exhibit D**). The document appears to have initials next to the change; however, they are not the initials of the defendant, and the change was made outside of the defendant's presence. (See **Exhibit D**, and **Exhibit B**).

13.     In any event, neither time (9:00 AM or 8:30 AM) squares with the unidentified agent's memorandum, which claims that Miranda Warnings were administered first at the time of arrest, and then again, prior to interrogation at the federal building.

14.     The third paragraph of the unidentified agent's memorandum states, "After a security sweep of the residence, (redacted) advised NATHANIEL ALEXANDER of his Miranda Rights." If this is accurate, then the time must have been shortly after 6:00 AM. (See **Exhibit A**).

15.     The fourth and fifth paragraphs of the unidentified agent's memorandum then state, "After a cursory search of the residence, NATHANIEL ALEXANDER was taken to the RAIC/NORFOLK I.C.E. office for processing and questioning. *** At this time (redacted) again advised NATHANIEL ALEXANDER of his Miranda rights, which he waived." (See **Exhibit A**, Emphasis added). When viewed in conjunction with the defendant's telephone records, this round of questioning began at approximately 8:00 AM when the defendant was helping the agents track down the location of codefendant Steven Riddick. (See **Exhibits B and C**).

16.     Your affirmant first appeared on behalf of defendant Alexander in the District Court for the Southern District of New York before the Honorable Judge Kevin Nathaniel Fox on February 14, 2006 for arraignment on the first superseding indictment that charged the defendant (annexed hereto as **Exhibit E**).

17.     The indictment, a twenty-four page document, charged defendant Alexander in Count One with the crime of a conspiracy to commit Bank Fraud as defined by Title 18 U.S.C. Section 1344. However, the indictment only specifically addressed defendant Alexander's alleged conduct in one paragraph on one page stating in sum and substance that on or about April 26, 2005, defendant Alexander caused and allegedly counterfeit check drafted in the amount of $850,000.00 to be deposited into the account of one of his businesses (B&T Petroleum). (See **Exhibit E**, ¶ 3(y), on page 8).

18.     Defendant Alexander was also charged under count five of the indictment with Bank Fraud with relation to two checks totaling 1.025 million dollars (the above-mentioned $850,000.00 check, and an unrelated $175,000.00 allegedly counterfeit check). However, no additional facts were included as to defendant Alexander's conduct with relation to this count, and the indictment is completely devoid of any information connecting defendant Alexander to the second check charged under this count.

19.     Shortly thereafter, Assistant United States Attorney Danya Perry contacted your affirmant and represented that she was interested in defendant Alexander as a cooperating witness in the case as against the other codefendants. AUSA Perry claimed that she was interested in the defendant as a cooperator as a result of his previously unblemished criminal record and his earlier cooperation in helping to locate codefendant Riddick. AUSA Perry represented that she would consider offering deferred prosecution in exchange for cooperation, and she also represented that "time was of the essence," with respect to the defendant's decision. AUSA Perry also repeatedly mentioned that the defendant had already made a statement to the government in her attempts to persuade your affirmant to speak with the defendant about cooperation.

20.     After numerous conversations with defendant Alexander concerning the advantages of cooperation, such as AUSA Perry's representation that it would result in a deferred prosecution, and defendant Alexander's constant declarations of his innocence in the matter for which he was indicted, your affirmant contacted Ms. Perry and informed her that defendant Alexander was not interested in cooperating with the government because he was not in possession of any information that he believed would assist the government in prosecuting the other defendants in this matter.

21.    AUSA Perry then suggested to your affirmant that defendant Alexander and I meet with her for a proffer because she "is not interested in prosecuting innocent people," that there were others involved with suspicious transactions but were not charged, and that she would investigate the matter to determine if it was appropriate to dismiss or defer prosecution with respect to defendant Alexander.

22.    On or about March 23, 2006, your affirmant received approximately 2,500 pages of discovery (in addition to the over 4,100 pages of discovery previously provided). Of the approximately 6,600 pages of discovery turned over by the government at this point, the only substantive documents relating in any way to defendant Alexander where the partially redacted memorandum of the unidentified agent (**Exhibit A**), the Miranda Waiver (**Exhibit D**), and a credit report. After many hours over the course of numerous days of reading the entire discovery provided, your affirmant was able to conclude that the remainder of the approximately 6,600 pages of discovery was primarily various financial documents relating to other codefendants.

23.    As a result of AUSA Perry's representations, your affirmant and defendant Alexander agreed to meet with AUSA Perry at her offices on March 29, 2006. At that time, your affirmant and defendant Alexander were confronted by Special Agent Erik Rosenblatt, AUSA Perry, and a federal agent that your affirmant presumes is the above-mentioned unidentified agent who placed defendant Alexander under arrest.

24.    At the March 29, 2006 proffer, AUSA Perry requested that the defendant sign an agreement before the proffer began. Unlike the customary agreement that your affirmant was familiar with, commonly referred to as a "Queen for a Day" agreement, which typically states that the information provided would not be used against the defendant but for the possibility of impeachment, this agreement required that defendant Alexander waive his rights against self incrimination.

25.    AUSA Perry stated that because this was an unusual situation where the proffer was for the purpose of investigating the matter to possibly dismiss the charges as against defendant Alexander, as opposed to the common situation where a defendant provides inculpatory information, the customary "Queen for a Day" agreement would not be offered. AUSA Perry then gave assurances that there would be a good faith investigation related to the information provided.

26.    Prior to the March 29, 2006 proffer, through conversation with the defendant, your affirmant was aware that defendant Alexander had made a statement to at the time of arrest, and your affirmant was informed by the defendant that he signed a Miranda Wavier. However, your affirmant had not become privy to the above-mentioned sequence of events, or had the opportunity to uncover all the circumstances under which the statement was procured; thus, your affirmant was not aware of the unconstitutionality of the February 9, 2006 statement. Additionally, AUSA Perry's numerous prior references to the statement seemed to imply that it had been procured properly.

27.    Your affirmant advised defendant Alexander to sign the agreement based on your affirmant's mistaken belief that the government attorney was acting in good faith in her role

as a quasi judicial officer with respect to her representations that she would investigate the information that defendant Alexander was prepared to provide, and in light that your affirmant was under the impression that a statement was previously constitutionally procured from the defendant. Your affirmant was never provided with a copy of the proffer agreement after it was executed.

28.     At the March 29, 2006 proffer, AUSA Perry asked defendant Alexander numerous questions concerning the circumstances of his involvement in the conduct that forms the basis for the allegations contained in the two indictments unsealed in this matter that address the defendant. Most AUSA Perry's questions were based on the statement procured by the unidentified agent on the date of defendant Alexander's arrest.

29.     Defendant Alexander provided AUSA Perry with financial records of the corporation connected to the conduct charged in the indictment, and documents stating the value of real property that defendant Alexander stated was part of the transaction which he believed involved the $850,000.00 allegedly counterfeit check. The government was also provided with the names (and subsequently the contact information) of various persons who could corroborate defendant Alexander's description of the type of business actives that the corporation was involved in, and the defendant's version of the events with respect to transactions which form the basis of the most recent charges included in the newest superseding indictment, including the defendant's Virginia Attorney and the bank employee involved in the transaction. Defendant Alexander also provided information about his relationship with codefendant Steven Riddick, a long time friend and business associate. Special Agent Erik Rosenblatt took copious notes during the proffer.

30.     Once the proffer concluded, AUSA Perry and the agents who attended again made assurances that the information provided would be investigated, and your affirmant would be contacted with the results of the investigation, or to set up another proffer if necessary.

31.     On April 28, 2006, your affirmant appeared before this Honorable Court for a conference, and was served with a superseding indictment (annexed hereto as **Exhibit F**) that included additional information as against defendant Alexander, and added an additional defendant to the case at bar. This additional information in the indictment was – in whole or in part – procured at the March 29, 2006 proffer, and/or through the February 9, 2006 statement.

32.     As a result of your affirmant's own investigation, neither the federal agents, nor the AUSA Perry ever made contact or interviewed the various people provided to the government by the defendant during the March 29, 2006 proffer, despite AUSA Perry's above-mentioned representations.

33.     Your affirmant has not been provided with any of the notes prepared by either Special Agent Erik Rosenblatt or the unidentified agent concerning the above-mentioned proffer or defendant Alexander's February 9, 2006 statement. Your affirmant has not been provided with the prepared statement which defendant Alexander refused to sign, but which was prepared by the unidentified agent on the date of the defendant's arrest. Finally, your affirmant has not been provided with the names of the agents who arrested the defendant or the names of the witnesses to the execution of the Miranda Waiver.

34.     It will be shown below that AUSA Perry misused her power as an Assistant United States Attorney in the grand jury in the first instance in order to indict the defendant with insufficient evidence. Ms. Perry then sent the unidentified agent to Virginia, not only to arrest the defendant, but to try to get the defendant to make an inculpatory statement so that she could re-indict the defendant based on his own words. When it became apparent that the statement was unconstitutionally procured, Ms. Perry was instrumental in suppressing and covering up that information. When Ms. Perry was informed by your affirmant that the defendant did not wish to cooperate with the government, Ms. Perry orchestrated the ruse that was the March 29, 2006 proffer. Ms. Perry then used the information in the March 29, 2006 proffer to fill in the holes in the first indictment charging the defendant by using this information in the subsequent grand jury presentation which culminated in the last superseding indictment.

## POINT I: <u>ALL STATEMENTS PROCURED BY THE GOVERNMENT WERE OBTAINED UNCONSTITUTIONALLY OR ARE FRUITS OF THE POISONOUS TREE; THUS, MUST BE SUPPRESSED AS A MATTER OF LAW</u>

35.     The right against self incrimination is one of the most fundamental and important rights that is conferred under the Constitution of the United States of America. The Founders of our free society included this right in the Fifth Amendment to the Constitution. (No person shall "be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law." U.S.C.A. Const. Amend. V.) The Supreme Court has held that, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." <u>Miranda v. Arizona</u>,  384 U.S. 436, 444, 86 S.Ct. 1602, 1612 (1966).

36.     For the purposes of analysis of the Fifth Amendment violation against self incrimination, there is no question that defendant Alexander was in custody as of 6:00 AM. The defendant was placed in handcuffs, and the unidentified agent's own memorandum states that the defendant was informed "that there was an arrest warrant for him originating in the SDNY." (See **Exhibits A and B**).

37.     The question then rests on whether there was in fact an interrogation and if the questions were answered following a knowing waiver of Miranda. "Unless the prosecution can demonstrate the warnings and waiver as threshold matters, we held, it may not overcome an objection to the use at trial of statements obtained from the person in any ensuing custodial interrogation." <u>Withrow v. Williams</u>,  507 U.S. 680, 690, 113 S.Ct. 1745, 1752 (1993)

38.     It is necessary to review the documentary exhibits at this time. First, the Miranda Waiver, on its face indicates that the earliest time that it could have been executed is 8:30 AM. The defendant's cellular telephone bill shows a number of calls being placed and received between 8:05 and 9:06 on the morning of his arrest. These calls were the result of the federal agents' demands that defendant Alexander help them track down defendant Steven Riddick, and were all made while at the federal building in Norfolk, Virginia. (See **Exhibit B and C**). If the Miranda Warnings were administered and then waived as the unidentified agent's memorandum claims they were, why was the time not entered as 8:00 AM on the Miranda

Waiver? The agent's memorandum does not claim that Miranda Warnings were administered and waived again a third time. (See **Exhibit A**).

39.    Thus, the question then becomes, why did the unidentified agent not have defendant Alexander execute the Miranda Waiver at approximately 8:00 AM when the questioning began at the federal building as per the agent's own memorandum? (See **Exhibit A**, ¶ 5) The unidentified agent's memorandum, which is prepared almost a month and a half later, does not mention anything about the interrogation at the defendant's home, but coincidentally, the memorandum also fails to mention defendant Alexander's cooperation in attempting to locate codefendant Riddick, which is clearly substantiated by the defendant's telephone records. (See **Exhibits A, B, and C**).

40.    Now the question becomes when did the unidentified agent actually advise the defendant of his Miranda rights. The Miranda Waiver document has two times entered on it. Initially, the time for the waiver was entered as some time after 9:00 AM. (See **Exhibit D**). Defendant Alexander affirms in his affidavit that the time was not changed in his presence. (See **Exhibit B**). The document itself, which is signed by the defendant, and two witnesses whose names were conveniently redacted, bears what appears to be an unknown person's initials at the location of the change; however, does not bear the defendant's initials. (See **Exhibit D**).

41.    The inquiry then moves to the obvious questions, why and when was the time on the Miranda Waiver changed at all, and at whose direction? The answer as to the question why is easy, the remainder of the inquiry is far more difficult and troubling.

42.    The time on the Miranda Waiver was changed because it became obvious to those involved that there would be a record, outside of the government's control, as to the time of the conversation between the defendant and his Virginia attorney. If the Miranda Wavier was executed at 9:00 AM and the defendant called his attorney at 9:05, that leaves only five minutes for the agent to complete his questioning and to prepare a written statement for the defendant to sign. This is clearly impossible and is contradicted by the agent's own memorandum. (See **Exhibits A, C and D**).

43.    The unidentified agent's memorandum, clearly and unequivocally states, "NATHANIEL ALEXANDER was taken to the RAIC/NORFOLK I.C.E. office for processing and questioning. *** At this time (redacted) again advised NATHANIEL ALEXANDER of his Miranda rights, which he waived." (See **Exhibit A**, Emphasis added). The time for this round of questioning must be approximately 8:00 AM, and this is confirmed by the defendant's cellular telephone record. (See **Exhibit C**). Thus, the only explanation for the change of time on the Miranda Waiver is the willful and intentional acts of the government to deceive your affirmant and this Honorable Court as to the truth of the encounter between the defendant and the government.

44.    The time was changed to cover up the fact that the defendant had been intentionally questioned after being placed in custody and outside the presence of an attorney without a valid waiver of Miranda, and in clear violation of the Fifth and Sixth Amendments to the United States Constitution. The only way to make it appear that there was enough time to question the defendant and prepare a statement for him to sign would be to doctor the

Miranda Waiver to make it appear that there was at least half an hour to question the defendant before he called his attorney.

45.    The problem is that when the decision to doctor the Miranda Waiver was made, it was carried out sloppily. The parties involved chose 8:30, in all likelihood, because by the time the decision was made, the agent's memory had faded as to the actual time that they demanded that the defendant help them find codefendant Riddick. This leads one to believe that the change was made a considerable time after the arrest was made.

46.    In addition to the change on the Miranda Waiver, the unidentified agent's memorandum was also clearly prepared with the intention of deceiving your affirmant and this Honorable Court. The memorandum was prepared on March 17, 2006. It clearly and unequivocally states that the defendant was presented with a prepared statement to sign, and at this time he requested to speak to his attorney. (See **Exhibit A**, last two paragraphs). The defendant's cellular telephone records clearly indicate that the time of that call was 9:05 AM. (See **Exhibit C**). The Miranda Waiver initially indicates that the time of the waiver was 9:00 AM. Based on these two incontrovertible facts, the defendant's affirmation as to the timing of the waiver cannot be in doubt. The unidentified agent's memorandum is otherwise filed with untruths and deceptions, such as the statement that Miranda was administered at the time of arrest, and that defendant Alexander gave the agents permission to search his residence. This document was clearly prepared to deceive your affirmant and this Honorable Court about the constitutionality of the unidentified agent's conduct.

47.    At this point, the inquiry must change direction. The questions of when the change to the Miranda Waiver was made, and who was involved in that decision requires a hearing. Your affirmant respectfully requests that the government make available for examination under oath (1) the unidentified agent who took the defendant's statement and prepared the fraudulent memorandum, (2) the unidentified agents who assisted in the arrest, (3) the unidentified witnesses to the execution of the Miranda Waiver, and (4) AUSA Danya Perry. Your affirmant understands that this is an unusual and highly irregular request, but believes it necessary for the reasons which follow.

48.    From the beginning of your affirmant's involvement in this matter, AUSA Perry has been representing that she was interested in defendant Alexander as a cooperating witness as against the other defendants in this matter with the promise of deferred prosecution. AUSA Perry has made numerous representations that "time was of the essence" with respect to a cooperation agreement. AUSA Perry has been in control of the time, quantity and quality of discovery turned over to your affirmant. Your affirmant was provided with the aforementioned Miranda Wavier and unidentified agent's memorandum only days prior to the March 29th proffer, and it was provided contemporaneously with approximately 2,500 pages of discovery, none of which related in anyway to defendant Alexander. This was done to distract your affirmant and delay me from uncovering the truth about the February 9, 2006 encounter.

49.    The names of the witnesses to the Miranda Wavier are redacted from the document provided to your affirmant. The only justifiable purpose to redact the names of people involved in a criminal investigation is to protect the identity of a witness for the witness's

safety. See People v. Frost,  100 N.Y.2d 129, 790 N.E.2d 1182, 760 N.Y.S.2d 753 (N.Y., 2003); see also Garcia v. U.S. Dept. of Justice, Office of Information and Privacy, 181 F.Supp.2d 356, 378 (S.D.N.Y., 2002) [withholding of agents' identities proper where revelation of information could "unnecessarily jeopardize the agents' lives.]. The purpose for having someone witness the execution of any legal document is that the witness could be identified and called at a hearing to testify as to the voluntaries and propriety of the execution of the document. The purpose of having witnesses sign a Miranda Waiver is so that they could be called to testify as to the voluntariness of the waiver. See generally U.S. v. Nieves, 1992 WL 350787 (S.D.N.Y., 1992) [Officer Galvez testified that she explained in Spanish what "waiver" meant, and the defendants said that they understood the waiver forms. These copies were signed by each defendant, and by Officer Galvez and Agent Wight.].

50.     Additionally, the name of the agent that arrested and interrogated the defendant is also redacted from the memorandum provided by AUSA Perry. What conceivable purpose or rationale can justify the redaction of the name of this agent? Your affirmant is not aware of any protective order issued by this Honorable Court with respect to the identities of these individuals.

51.     The notes of the unidentified agent with respect to the interrogation of the defendant at the time of his arrest, and the prepared statement have been withheld from discovery in violation of Fed. R. Crim. P. 16(a)(1)(B)(ii). The rule "provides that, upon a defendants' request, the government must produce 'the portion of any written record containing the substance of any relevant oral statement made before or after arrest if the defendant made the statement in response to interrogation by a person the defendant knew was a government agent.' The rule plainly requires production of 'any written record' containing statements made during interrogation and is 'not limited to a typed, formalized statement' or 'a verbatim or near-verbatim transcription.'" U.S. v. Stein, 2006 WL 891111, 5 (S.D.N.Y., 2006). Your affirmant shall move this Honorable Court to order disclosure of these documents later in this motion. (See Point V, infra). Your affirmant respectfully requests that AUSA Perry be ordered to answer, under oath, why this information was withheld from the defendant.

52.     The unidentified agent's memorandum and the Miranda Waiver is a fraud. There is no other explanation in light of the documentary evidence provided with this motion and the sequence of events described above. Your affirmant respectfully submits that if I was able to uncover this deception through the same documents that AUSA Perry is in possession of (with the exception of the telephone record), how can AUSA Perry not have been aware of this conduct, especially since Ms. Perry has access to the agent who took the statement, and has been working with him throughout this investigation. Additionally, AUSA Perry has mentioned the statement numerous times in her attempts to procure cooperation prior to the March 29, 2006 proffer.

53.     As discussed above, AUSA Perry has been in control of the scope and timing of discovery, AUSA Perry has withheld the notes of the unidentified agent and the prepared statement which the defendant refused to sign, AUSA Perry has been seeking cooperation from the defendant from the beginning of your affirmant's involvement repeatedly claiming that "time was of the essence," and promising deferred prosecution in return for cooperation.

54.     When your affirmant informed AUSA Perry that there would be no cooperation, she suggested the March 29th proffer. AUSA Perry requested that the defendant sign the proffer agreement that waived all his rights against self incrimination, and enticed your affirmant to advise the defendant to do so by making representations that she "is not interested in prosecuting innocent people," and making representations that a good faith investigation would be conducted. No investigation of any sort was conducted, and a great deal of the information provided at the March 29th proffer has made its way into the new superseding indictment. (See **Exhibit F**, ¶ 3(j), 49, 50, 57, 86(j), 97(l))

55.     Your affirmant respectfully requests that this Honorable court take the totality-of-circumstances approach when addressing the defendant's claim that the introduction the statement procured at the March 29, 2006 proffer would violated due process. See Withrow v. Williams,  507 U.S. at 689, 113 S.Ct. at 1751.

56.     The information provided to the government during the March 29, 2006 proffer is fruit of unconstitutional conduct of the unidentified agent and the deceptive representations of AUSA Perry. In the context of a statement taken subsequent to an illegal seizure, the Supreme Court has looked to the "purpose and flagrancy" of governmental misconduct with relation to admissibility of a statement later procured. See Kaupp v. Texas,  538 U.S. 626, 633, 123 S.Ct. 1843, 1847 (2003). Under those circumstances, the Supreme Court has held, "[w]hen a police officer intentionally violates what he knows to be a constitutional command, exclusion is essential to conform police behavior to the law. Such a 'flagrant' violation is in marked contrast to a violation that is the product of a good-faith misunderstanding of the relevant constitutional requirements." New York v. Harris, 495 U.S. 14, 23-24, 110 S.Ct. 1640, 1646 (1990).

57.     Your affirmant respectfully requests that this Honorable Court expand the "purpose and flagrancy" analysis to this unusual and troubling situation. Here the purpose of the March 29, 2006 proffer was to deceive and entice your affirmant to persuade the defendant to speak to the government with the promise that it could result in a deferred prosecution or dismissal when AUSA Perry knew that no such outcome was available, and that she had no intention to direct the agents to conduct a good faith investigation of the information provided in the proffer.

58.     The flagrancy of this conduct is evidenced by the government's failure to disclose the unconstitutional conduct which procured the February 9, 2006, and the effort to cover up that conduct to prevent your affirmant and the defendant from making an informed decision whether or not to attend the March 29, 2006 proffer.

59.     Your affirmant will move this Honorable Court to order the disclosure of the grand jury testimony used to obtain the latest indictment (Point III, *infra*) later in this motion so that your affirmant can see to what extent the statement taken by AUSA Perry was used in that presentation, and to determine if AUSA Perry suborned perjury by allowing the unidentified agent to testify before the grand jury to the substance of the fraudulent memorandum. Your affirmant will also move this Honorable Court to order the disclosure of the grand jury testimony with respect to the previous indictment (Point III, *infra*) later in this motion in order to assist your affirmant in demonstrating that without the defendant's statement

procured at the March 29, 2006 proffer, the evidence was insufficient to charge the defendant in the first instance. (See Point IV, *infra*).

60.     Here, it is respectfully submitted that the defendant was indicted initially by insufficient evidence (see Point III, *infra*, and Point V, *infra*), and then through numerous attempts – first by the unidentified agent, and then by AUSA Perry – the government has sought the defendant to do their job for them by providing evidence to be used against him as opposed to conducting a full investigation. The Supreme Court has specifically held that such tactics are illegal. See Miranda v. Arizona, 384 U.S. at 460, 86 S.Ct. at 1620 (1966) [our accusatory system of criminal justice demands that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth.].

61.     While it may be constitutionally permissible for law enforcement officers to use deception to procure inculpatory statements from a person accused of a crime under certain circumstances, AUSA Perry is not a traditional law enforcement official. AUSA Perry is an attorney; thus, her conduct is governed by New York State law and Professional Ethics regulations.

62.     Your affirmant respectfully asserts that AUSA Perry's conduct has violated New York State Disciplinary Rule § 1-102 under four separate subsections. AUSA Perry has violated subsection (3), in that she engaged in illegal conduct that adversely reflects on her honesty, trustworthiness or fitness as a lawyer. She violated subsection (4), in that she engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation. She violated subsection (5), in that she engaged in conduct that is prejudicial to the administration of justice. Finally, AUSA Perry violated subsection (7), in that she engaged in any other conduct that adversely reflects on her fitness as a lawyer.

63.     AUSA Perry's conduct has also violated New York State Judiciary Law § 487(1). Judiciary Law § 487(1) states, "An attorney or counselor who is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party… is guilty of a misdemeanor…." AUSA Perry is guilty of deceit as against your affirmant, the defendant (who is a party to this action), and to this Honorable Court, and she is guilty of collusion with the unidentified agent by (1) failing to disclose the constitutional violations committed by the unidentified agent, (2) failing to disclosed the statutorily required documents regarding the defendant's statement in order to frustrate your affirmant's ability to uncover the constitutional violations, (3) intentionally redacting the names of the witnesses to the Miranda Waiver in order to prevent them from being called to testify at a suppression hearing, (4) deceiving your affirmant – a member of the bar of the State of New York, and the Federal Courts for the Southern and Eastern Districts of New York, and a former Assistant District Attorney for the County of Kings – by making representations that she is "not interested in prosecuting innocent individuals," and she would investigate the information provided to her during the proffer knowing that she had not such intention, and (5) using unconstitutionally obtained information in the grand jury to procure the last superseding indictment.

64.    Not only is Ms. Perry's conduct generally governed by the New York State Disciplinary Rules (incorporated by the Federal District Court for the Southern District of New York through local rule 1.5), as an Assistant United States Attorney, Ms. Perry is held to a higher standard with respect to her conduct. "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor-indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." Berger v. U.S.,  295 U.S. 78, 55 S.Ct. 629 (1935). See also People v. Brown, 66 A.D.2d 158, 412 N.Y.S.2d 522 (4th Dep't, 1979); People v. Castelo, 24 A.D.2d 827, 264 N.Y.S.2d 136 (4th Dep't, 1965) [A District Attorney owes more to cause of fairness and justice than to be motivated solely to obtain a conviction.]

65.    As a result of the conduct of the unidentified agent, and the actions of AUSA Perry, the defendant's fundamental rights against self incrimination and to due process under the Fifth Amendment of the United States Constitution were violated; thus, all the defendant's statements must be suppressed.

66.    In addition to the protections against self incrimination guaranteed by the Fifth Amendment in the context of a custodial interrogation, "[t]he Sixth Amendment right to counsel is triggered 'at or after the time that judicial proceedings have been initiated ... whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" Fellers v. U.S.,  540 U.S. 519, 124 S.Ct. 1019 (2004) [quoting from Brewer v. Williams, 430 U.S. 387, 398, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977)]. The Fellers Court further held that, "[w]e have held that an accused is denied 'the basic protections' of the Sixth Amendment 'when there [is] used against him at his trial evidence of his own incriminating words, which federal agents ... deliberately elicited from him after he had been indicted and in the absence of his counsel.'" Fellers, at 523, citing to Massiah v. United States, 377 U.S. 201, 206, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

67.    In the case at bar, it is clear that the defendant was arrested subsequent to the being indicted. (See **Exhibits A and E**). There is no doubt that judicial proceedings had been commenced at the time of the defendant's arrest; thus, the defendant Sixth Amendment right to an attorney had attached, and had been violated by the unidentified agent's conduct.

68.    The unidentified agent's above-described conduct with respect to the manner in which he attempted to derive a statement from the defendant is not novel. This issue and type of conduct was specifically addressed by the Court in Fellers, *supra*. The following is a brief recitation of the factual circumstances in Fellers as provided by the Honorable Justice O'Connor:

> On February 24, 2000, after a grand jury indicted petitioner for conspiracy to distribute methamphetamine, Lincoln Police Sergeant Michael Garnett and

Lancaster County Deputy Sheriff Jeff Bliemeister went to petitioner's home in Lincoln, Nebraska, to arrest him. The officers knocked on petitioner's door and, when petitioner answered, identified themselves and asked if they could come in. Petitioner invited the officers into his living room.

The officers advised petitioner they had come to discuss his involvement in methamphetamine distribution. They informed petitioner that they had a federal warrant for his arrest and that a grand jury had indicted him for conspiracy to distribute methamphetamine. The officers told petitioner that the indictment referred to his involvement with certain individuals, four of whom they named. *Ibid.* Petitioner then told the officers that he knew the four people and had used methamphetamine during his association with them.

After spending about 15 minutes in petitioner's home, the officers transported petitioner to the Lancaster County jail. There, the officers advised petitioner for the first time of his rights under <u>Miranda v. Arizona</u>, and <u>Patterson v. Illinois</u>. Petitioner and the two officers signed a Miranda waiver form, and petitioner then reiterated the inculpatory statements he had made earlier, admitted to having associated with other individuals implicated in the charged conspiracy, and admitted to having loaned money to one of them even though he suspected that she was involved in drug transactions. <u>Id.</u>, at 521-2, citations omitted.

69.      The tactics employed in <u>Fellers</u> are virtually identical to the tactics employed by the unidentified agent in the case at bar. The only difference here is that Fellers was not in custody when the initial questioning took place.

70.     The Fellers court held that, "there is no question that the officers in this case 'deliberately elicited' information from petitioner. Indeed, the officers, upon arriving at petitioner's house, informed him that their purpose in coming was to discuss his involvement in the distribution of methamphetamine and his association with certain charged co-conspirators. Because the ensuing discussion took place after petitioner had been indicted, outside the presence of counsel, and in the absence of any waiver of petitioner's Sixth Amendment rights, the Court of Appeals erred in holding that the officers' actions did not violate the Sixth Amendment standards established in <u>Massiah</u>, *supra,* and its progeny." <u>Id.</u>, at 524-5, citations omitted.

71.     Furthermore, AUSA Perry's above-described deceitful conduct prevented the defendant from being able to make an informed decision with respect to the March 29, 2006 proffer. AUSA Perry's conduct affected your affirmant's ability to effectively counsel the defendant with regard to this decision; thus, de facto implicating the defendant's Sixth Amendment right to counsel with respect to the March 29, 2006 proffer.

72.     Your affirmant respectfully requests that this Honorable Court suppress all statements procured from the defendant, including the unconstitutionally procured statement on February 9, 2006 and the information procured at the March 29, 2006 proffer as a result of being fruits of the poisonous tree, and procured through fraud and prosecutorial misconduct, and for what additional relief the Court deems just and proper.

**Point II: THE SUPERSEDING INDICTMENT AGAINST THE DEFENDANT MUST BE DISMISSED FOR VIOLATION OF THE DEFENDANT'S FUNDAMENTAL RIGHT TO DUE PROCESS OF LAW AS A RESULT OF GRAVE PROSECUTORIAL MISCONDUCT**

73.     A defendant's remedy for prosecutorial misconduct in the pre-indictment stage is provided in the due process protections of the Fifth Amendment. U.S. v. Simmons, 536 F.2d 827, 830 n. 9 (9th Cir. 1976). "The Supreme Court has cautioned that district courts should not use their supervisory powers to dismiss indictments on the grounds of prosecutorial misconduct except in circumstances where the misconduct amounts to a violation of a clear rule that was drafted by Congress and approved by the Court to ensure the integrity of the grand jury's functions." U.S. v. Gibson, 175 F.Supp.2d 532, 534 (S.D.N.Y., 2001).

74.     The power of the Federal District Court to supervise and rule on the validity grand jury conduct is so old that it cannot be disputed. In U.S. v. Farrington, 5 F. 343 (D.C.N.Y. 1881), the Court held that, "[i]t is the duty of the court, in the control of its proceedings, to see to it that no person shall be subjected to the expense, vexation, and contumely of a trial for a criminal offence unless the charge has been investigated and a reasonable foundation shown for an indictment or information. It is due also to the government to require, before the trial of an accused person, a fair preliminary investigation of the charges against him." Farrington, at 345.

75.     The Farrington, Court went on to hold that, "It is not the province of the court to sit in review of the investigations of a grand jury as upon the review of a trial when error is alleged; but in extreme cases, when the court can see that the finding of a grand jury is based upon such utterly insufficient evidence, or such palpably incompetent evidence, as to indicate that the indictment resulted from prejudice, or was found in willful disregard of the rights of the accused, the court should interfere and quash the indictment." Id., at 348.

76.     A court may dismiss an indictment when "the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction…." U.S. v. Russell, 411 U.S. 423, 431-32, 93 S. Ct. 1637, 1643, 36 L. Ed. 2d 366 (1973); U.S. v. Simpson, 813 F.2d 1462, 1470-71 (9th Cir. 1987). To constitute a Fifth Amendment violation under Russell, the government conduct at issue must be fundamentally unfair and "'shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment." Russell, 411 U.S. at 432 (quoting Kinsella v. U.S. ex rel. Singleton, 361 U.S. 234, 246, 80 S. Ct. 297, 304, 4 L. Ed. 2d 268 (1960)).

77.     The appropriate remedy for a Fifth Amendment violation is generally suppression of the evidence. U.S. v. Rogers, 751 F.2d 1074, 1078 (9th Cir. 1985). However, dismissal of the indictment is appropriate where continuing prejudice from the constitutional violation cannot be remedied by suppression of the evidence. U.S. v. Morrison, 449 U.S. 361, 365-66 n. 2, 101 S. Ct. 665, 668, 66 L. Ed. 2d 564 (1981); United States v. Rogers, 751 F.2d at 1078.

78.     Suppression is an appropriate remedy only when the court can identify and isolate any evidence obtained in violation of the defendant's Fifth Amendment due process rights. The

prosecution is thus denied "the fruits of its transgression" and the due process right to a fair trial is preserved. In the case at bar, however, the fruit of the prosecutor's transgression is the last superseding indictment itself. As such, it is simply impossible to excise the taint of the government's constitutional transgressions from the prosecution of the defendant. The taint of the government's transgressions has infected all phases of the investigation and prosecution of defendant. See United States v. Marshank, 777 F.Supp. 1507 (N.D.Cal.,1991); see also U.S. v. Sabri,  973 F.Supp. 134, (W.D.N.Y., 1996) [Dismissal of an indictment for outrageous government conduct, although rare, is permissible.].

79.    As described by the Court in Sabri, *supra*, "the Marshank case 'is a shocking tale of a criminal defense attorney who was oblivious to the professional norms of ethical behavior and a cast of overzealous government agents and prosecutors who facilitated the attorney's unethical conduct in an attempt to catch 'a bib [sic] fish.'" Sabri,  at146 (fn 12) citing to Marshank, 777 F.Supp. at 1512. Here, it is not the conduct of a private individual which is so shocking, but that of the government's own attorney.

80.    In this case, the defendant's due process right to a fair trial has been compromised by AUSA Perry's dishonest, willful, malicious and unethical conduct. There is no means other than dismissal of the indictment to remedy the due process violation. United States v. Morrison, 449 U.S. at 366 n.2, 101 S. Ct. at 668 n.2; United States v. Rogers, 751 F.2d at 1078. The government's actions in this case are far more egregious than simple "passive tolerance" of impropriety. See Marshank, at 1523.

81.    As discussed above (Point I, *supra*) AUSA Perry has (1) failed to disclose the constitutional violations committed by the unidentified agent, (2) failed to disclosed the statutorily required documents regarding the defendant's statement in order to frustrate your affirmant's ability to uncover the constitutional violations, (3) intentionally redacted the names of the witnesses to the Miranda Waiver in order to prevent them from being called to testify at a suppression hearing, (4) deceived your affirmant by making representations that she is "not interested in prosecuting innocent individuals," and she would investigate the information provided to her during the proffer knowing that she had not such intention, and (5) used unconstitutionally obtained information in the grand jury to procure the last superseding indictment.

82.    This conduct was done deliberately, knowing that the first superseding indictment charging the defendant was insufficient. This can be ascertained merely by examining the language of the two indictments.

83.    In the first indictment, the facts alleged state that, "On or about April 26, 2005, NATHANIEL ALEXANDER caused the $850,000 Counterfeit Check to be deposited into the bank account for his business, B&T Petroleum," at SunTrust Bank. (See Exhibit E, ¶ 3(y), page 8, emphasis added).

84.    Your affirmant respectfully submits that the minutes of the first grand jury presentation as against defendant Alexander are devoid of any direct testimony from any witnesses who were able to state that the defendant had any contact with any of the other codefendants other

than defendant Steven Riddick, or that the $850,000 allegedly counterfeit check was ever even possessed, let alone deposited by the defendant.

85.     The last superseding indictment states, "On or about April 26, 2005, NATHANIEL ALEXANDER deposited the $850,000 Counterfeit Check was deposited into a new bank account for his business, B&T Petroleum, that he opened as SunTrust Bank for the purposes of depositing the $850,000 Counterfeit Check…. (See Exhibit F, ¶ 49, page 15).

86.     Your affirmant respectfully submits that the source of this information was the March 29, 2006 proffer, and an examination of the grand jury minutes will confirm this. Additionally, there is an abundance of information concerning the defendant's relationship with codefendant Steven Riddick, and other allegations that could only have come from the March 29, 2006 proffer in the last superseding indictment.

87.     It is clear that AUSA Perry misused her power as an Assistant United States Attorney in the grand jury in the first instance in order to indict the defendant with insufficient evidence. Ms. Perry then sent the unidentified agent to Virginia, not only to arrest the defendant, but to try to get the defendant to make an inculpatory statement so that she could re-indict the defendant based on his own words. When it became apparent that the statement was unconstitutionally procured, Ms. Perry was instrumental in suppressing and covering up that information. When Ms. Perry was informed by your affirmant that the defendant did not wish to cooperate with the government, Ms. Perry orchestrated the ruse that was the March 29, 2006 proffer. Ms. Perry then used the information in the March 29, 2006 proffer to fill in the holes in the first indictment charging the defendant.

88.     In U.S. v. Fields, 592 F.2d 638 (2nd Cir., 1978), the Second Circuit stated that, "[t]he extreme sanction of dismissal of an indictment is justified in order to achieve one or both of two objectives: first, to eliminate prejudice to a defendant in a criminal prosecution; second, to "help to translate the assurances of the United States Attorneys into consistent performances by their assistants." Fields, at 647. Both prongs of the Fields test are satisfied here.

89.     First, as your affirmant is confident will be demonstrated by review of both grand jury presentations in this matter, the government could not have established even a prima facie case with the information in the government's possession prior to the defendant's arrest on February 9, 2006. The government was not even able to show that the defendant ever had any contact with the $850,000 allegedly counterfeit check as evidenced by the language of the first indictment. As noted above, "our accusatory system of criminal justice demands that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth. Miranda v. Arizona, supra. Clearly, AUSA Perry's conduct has prejudiced the defendant, and that prejudice is codified in the last superseding indictment itself.

90.     Secondly, this is the most egregious conduct that your affirmant has every witnessed with respect to the proper conduct of an attorney, specifically a public prosecutor. In all likelihood, there will be grave consequences for Ms. Perry when this matter is addressed by the grievance committees of both the Federal and State bars; however, the punishment that

Ms. Perry will receive personally is insufficient. Under these circumstances, it is respectfully submitted, that it is this Honorable Court's obligation to send a message to the United States Attorney that this type of conduct shall not be permitted by his assistants under the rational of <u>Fields</u>, *supra*.

91.    In <u>U.S. v. Hogan</u>, 712 F.2d 757, (2nd Cir., 1983), the Second Circuit dismissed an indictment based on prosecutorial misconduct. In that decision, the Court held, "In summary, the incidents related are flagrant and unconscionable. Taking advantage of his special position of trust, the AUSA impaired the grand jury's integrity as an independent body. Thus, based on the particular facts of this case, we believe that the indictment below must be dismissed." <u>Hogan</u>, at 762. As in Hogan, the deceitful conduct of AUSA Perry has impaired the integrity of the grand jury; thus, dismissal is necessary.

92.    As a result of the government's intentional, deceitful and unconscionable misconduct, which has deprived the defendant of his constitutional right to Due Process under the Fifth Amendment to the United States Constitution, your affirmant respectfully requests that this Honorable Court dismiss the indictment in its entirety as against defendant Alexander.

**Point III: <u>DEFENDANT RESPECTFULLY REQUEST THE DISCLOSURE OF GRAND JURY TESTIMONY</u>**

93.    Fed. R. Crim. P. 6(e), provides 2 exceptions for disclosure of grand jury testimony: Rule 6(e)(3)(C)(i) and Rule 6(e)(3)(C)(ii). These provisions will be discussed and then applied to the facts underlying these indictments.

94.    Fed. R. Crim. P. 6(e)(3)(C)(i) permits disclosure of grand jury testimony "when so directed by a court preliminarily to or in connection with a judicial proceeding." The court may direct the manner, time and conditions of such disclosure. There are two related but independent prerequisites to disclosure under the (C)(i) exemption. First, there is a court-imposed "criterion of degree" called the particularized need test. <u>Dennis v. U.S.</u>, 384 U.S. 855, 870-875, 86 S. Ct. 1840, 1849-51, 16 L. Ed. 2d 973 (1966). Second, "the 'judicial proceeding' language of (C)(i) imposes an additional criterion governing the kind of need that must be shown" <u>U.S. v. Baggot</u>, 463 U.S. 476, 480, 103 S. Ct. 3164, 3167, 77 L. Ed. 2d 785 (1983).

95.    The two requirements, though related in some ways, are independent prerequisites to (C)(i) disclosure. The particularized-need test is a criterion of degree; the "judicial proceedings" language of (C)(i) imposes an additional criterion governing the kind of need that must be shown. It reflects a judgment that not every beneficial purpose, or even every valid governmental purpose, is an appropriate reason for breaching grand jury secrecy. Rather, the Rule contemplates only uses related fairly directly to some identifiable litigation, pending or anticipated. Thus, it is not enough to show that some litigation may emerge from the matter in which the material is to be used, or even that litigation is factually likely to emerge. The focus is on the actual use to be made of the material. <u>U.S. v. Baggot</u>, 463 U.S. 476, 480, 103 S. Ct. 3167, 77 L. Ed. 2d 785 (1983).

96.    Since a criminal proceeding is pending, the sole issue regarding disclosure is whether the "particularized need" requisite has been satisfied. To obtain a court order under the (C)(i) exception for "particularized need" a three part balancing test has been delineated in Douglas Oil Co. of California v. Petrol Stops Northwest, 441 U.S. 211, 222, 99 S. Ct. 1667, 1674, 60 L. Ed. 2d 156 (1979) as follows:

>    (1) Parties seeking grand jury transcripts under Rule 6(e) must show that the material they seek is needed to avoid a possible injustice in another judicial proceeding,

>    (2) that the need for disclosure is greater than the need for continued secrecy, and

>    (3) that their request is structured to cover only material so needed.

97.    The need for the material is justified by the defendant's right to be free from being tried on the basis of an indictment which was procured through prosecutorial misconduct; alternatively, but for the misconduct, the evidence presented to the grand jury would be insufficient to charge the defendant with a crime. (See Point IV, *infra*).

98.    Here the need for secrecy is outweighed by the defendant's need to be free from unconstitutional behavior by the government. Additionally, once a grand jury has completed its work and an indictment has been returned, the need for secrecy is less compelling and disclosure may be more freely given. State of Wis. v. Schaffer, 565 F.2d 961, 967 (7th Cir. 1977); U.S. v. Sobotka, 623 F.2d 764, 767 (2d Cir. 1980).

99.    Finally, the defendant only requests the grand jury materials as they apply to him, and does not wish to breach the grand jury's secrecy with respect to any of the other defendant's indicted in this matter, to the extent possible under the circumstances.

100.    Additionally, Fed. R. Crim. P. 6(e)(3)(C)(ii) also permits disclosure "upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury."

101.    Upon information and belief, while testifying before the grand jury, Special Agent Erik Rosenblatt and possibly others made material statements about defendants' participation in the alleged conspiracy which were false, deceptive and incomplete, and known to the government to be false, deceptive and incomplete. (See Point I and Point II, *supra*). Under U.S. v. Basurto, 497 F.2d 781 (9th Cir. 1974), the government has a constitutional obligation to inform the court, counsel and the grand jury about the statements, and its failure to do so requires dismissal of the indictment. In Basurto, the Ninth Circuit held that:

>    The Due Process Clause of the Fifth Amendment is violated when a defendant has to stand trial on an indictment which the government knows is based partially on perjured testimony, when the perjured testimony is material, and when jeopardy has not attached. Whenever the prosecutor learns of any perjury committed before the grand jury, he is under a duty to immediately inform the court and opposing counsel -- and, if the perjury may be material, also the grand jury -- in order that appropriate action may be taken. U.S. v. Basurto, 497 F.2d 781, 785-86 (9th Cir. 1974).

102.    If Ms. Perry presented testimony from the unidentified agent which is substantially the same as the unidentified agent's memorandum, Ms. Perry introduced perjury to the grand jury. If Ms. Perry only introduced testimony concerning the statement given to her at the March 29, 2006 proffer, she provided the grand jury with evidence obtain through grave prosecutorial misconduct. In any event, Ms. Perry in all likelihood, withheld information from the grand jury concerning the above-described malfeasance effectuated by the agents involved in the investigation and arrest of the defendant, and her own nefarious conduct.

103.    If there is withholding of information vital to the grand jury's ability to make an informed and independent judgment of the fact situation before it, then dismissal of the indictment is appropriate. U.S. v. Martin, 480 F. Supp. 880, 886 (S.D. Tex. 1979). If there is actual prejudice caused by prosecutor misconduct, then a dismissal of the indictment is appropriate, but there must be a showing of actual prejudice. U.S. v. McKenzie, 678 F.2d 629, 631 (5th Cir. 1982). Prosecutorial misbehavior, even if unintentional, can cause an improper influence on the grand jury's role; in that regard, the prosecutor has a duty of good faith to the Court, the grand jury and the defendant. U.S. v. Samango, 607 F.2d 877, 884 (9th Cir. 1979); U.S. v. Hogan, *supra*, at 761.

104.    Furthermore, if only Special Agent Erik Rosenblatt testified before the grand jury, there may be an issue of excessive or improper use of hearsay testimony. Excessive use of hearsay evidence in a grand jury proceeding may violate the defendant's Fifth Amendment rights. U.S. v. Flomenhoft, 714 F.2d 708, 712 (7th Cir. 1983); U.S. v. Estepa, 471 F.2d 1132, 1136 (2d Cir. 1972) [When the framers of the Bill of Rights directed in the Fifth Amendment that `no person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury,' they were not engaging in a mere verbal exercise.]. If the hearsay testimony was represented in any way as reliable, the integrity of the grand jury proceedings may have been impaired, particularly if Special Agent Erik Rosenblatt testified as to the sum and substance of the unidentified agent's memorandum.

105.    In U.S. v. Mechanik, 475 U.S. 66, 106 S. Ct. 938, 89 L. Ed. 2d 50 (1986) and Midland Asphalt Corp. v. U.S., 489 U.S. 794, 109 S. Ct. 1494, 103 L. Ed. 2d 879 (1989), the Supreme Court effectively eliminated any post conviction review of grand jury abuse.

106.    It is because of this dilemma in which the defendant finds himself that he request that the United States Attorney's Office be compelled to provide your affirmant or this Honorable Court, for in camera review, the grand jury transcripts of Special Agent Erik Rosenblatt and other agents and witnesses, if any, upon which the previous and present indictment were based in order for this Court or your affirmant to make a determination pre-trial as to whether or not the defendant's constitutional rights have been violated. Any other approach would forever bar the defendants from litigating such a contention. Moreover, by the filing of the present motion, defendant is diligently attempting to protect and exercise his rights.

107.    Based on the foregoing authorities, grounds for a motion to dismiss the indictment may exist in the transcripts of grand jury proceedings. Thus, a particularized need for disclosure of such proceedings has been shown. Therefore, the Court should order disclosure of the transcripts to defendants or the Court in camera and grant defendants' motion.

**Point IV: <u>THE INDICTMENT FAILS TO STATE A CRIME AGAINST DEFENDANT ALEXANDER</u>**

108.    The defendant has been charged with the following substantive offenses, to wit: Bank Fraud and Conspiracy to commit Bank Fraud under Title 18, U.S.C. § 1344, and Conspiracy to commit Money Laundering under Title 18 U.S.C. §1956(a)(1)(B)(i). Defendant moves pursuant to Fed. R. Crim. P. 12(3)(B) for dismissal of the indictment for failure to state a crime for which he can be prosecuted.

109.    Bank Fraud under Title 18, U.S.C. § 1344 is defined: Whoever knowingly executes, or attempts to execute, a scheme or artifice: (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises.

110.    Money Laundering under Title 18 U.S.C. §1956(a)(1)(B)(i) is defined: Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity, knowing that the transaction is designed in whole or in part, to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

111.    Here, the government has charged the defendant with one count of Bank Fraud, and two conspiracy counts in relation to Bank Fraud and Money Laundering as defined above. Presumably, the government is relying upon a line of cases commencing with <u>Pinkerton v. U.S.</u>, 328 U.S. 640, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946) for the proposition that once a conspiracy is established, each conspiracy is responsible vicariously for substantive offenses committed by a coconspirator if said offense was committed by his coconspirators. Under Pinkerton, a conspirator may be held responsible for the substantive offense is committed in furtherance of the conspiracy and was a foreseeable consequence of the conspiratorial agreement.

112.    It has been noted that the <u>Pinkerton</u> doctrine may have due process limitations. <u>See Park v. Huff</u>, 506 F.2d 849, 864 (5th Cir. 1975) (Thornberry, J. dissenting); <u>U.S. v. Moreno</u>, 588 F.2d 490, 493 (5th Cir. 1979). In the case at bar, the defendant has been denied due process. The government has not pleaded and likely will be unable to prove that the defendant knew of a bank fraud conspiracy or a money laundering operation. More specifically, there is no allegation that the defendant knew about or even could foresee the existence of the Bank Fraud which is described in Counts one, or five, or the money laundering scheme which is described in Count 13. Yet the government, through its imaginative drafting of the indictment, would hold the defendant liable for crimes committed by the other defendants' Bank Fraud and Money Laundering group. In this instance Pinkerton has been stretched beyond its rational limits.

113.    Even with the unconstitutionally derived information, the government can show no more than the defendant deposited checks in his business's account, which the government asserts were forgeries. The government cannot and will not allege that the checks in question

appeared to be forgeries on their faces. Additionally, the defendant's financial institution went forward with the transaction, which further shows that, on its face, the check appeared to be a valid instrument. The government cannot even allege that the defendant had any contact with any codefendant other than defendant Steven Riddick, who is a long time friend and business associate of the defendant's. Finally, the government cannot and will not be able to demonstrate that the defendant made any statements to any of the other defendants with respect to the transactions in question to come to an agreement or in furtherance of the conspiracy.

114.    All the crimes that the defendant is currently accused require that the defendant committed the acts knowingly in order to satisfy the mens rea requirement. As will be discussed later (see Point VII, *infra*), through your affirmant's conversations with AUSA Perry, and based on the type of questions asked at the March 29, 2006 proffer, it appears that the government is attempting to prove the defendant's guilt based on a theory of "deliberate ignorance." Your affirmant shall move this Honorable Court to preclude the government from asserting deliberate ignorance, as it is incompatible with the mens rea required for these crimes. (See Point VII).

115.    Additionally, to charge the defendant with conspiracy, the government must prove that the defendant was knowingly involved in the conspiracy. Without the defendant's unconstitutionally procured statements, the government would be forced to try to prove the defendant's participation through the theory of deliberate ignorance. As the Second Circuit held in U.S. v. Reyes, 302 F.3d 48 (2nd Cir., 2002), "[w]hen a defendant has been charged with conspiracy, however, the jury may use the conscious avoidance doctrine to establish the defendant's knowledge of the aims of the conspiracy but, as just noted, may *not* use it to establish the defendant's intent to participate in the conspiracy. Reyes, at 55, *emphasis in the original*.

116.    For the reasons stated herein, the defendant respectfully requests this Honorable Court to enter an order dismissing the indictment against him for failure to state a crime.

**Point V: <u>PURSUANT TO FED. R. CRIM. P. 16(A)(1)(B)(II), THE DEFENDANT DEMANDS THAT THE GOVERNMENT TURN OVER ANY WRITTEN RECORD CONTAINING THE SUBSTANCE OF ANY RELEVANT ORAL STATEMENT MADE BEFORE OR AFTER ARREST</u>**

117.    As discussed above, your affirmant has not been provided with any of the notes prepared by either Special Agent Erik Rosenblatt or the unidentified agent concerning the above-mentioned proffer or defendant Alexander's post arrest statements. Your affirmant has not been provided with the prepared statement which defendant Alexander refused to sign, but which was prepared by the unidentified agent on the date of the defendant's arrest.

118.    Fed.R.Crim.P. 16(a)(1)(B)(ii) provides that, upon a defendants' request, the government must produce "the portion of any written record containing the substance of any relevant oral statement made before or after arrest if the defendant made the statement in response to interrogation by a person the defendant knew was a government agent." The Court in U.S. v.

Stein, 2006 WL 891111 (S.D.N.Y., 2006), held that, "[t]he rule plainly requires production of 'any written record' containing statements made during interrogation and is 'not limited to a typed, formalized statement' or 'a verbatim or near-verbatim transcription.' As the Advisory Committee Notes make clear, the record requested 'must only be some written reference which would provide some means for the prosecution and the defense to identify the statement.' The rough notes defendants request clearly fall within this definition." Stein, *supra*.

119.    Based on the forgoing, your affirmant respectfully requests that this Honorable Court grant the defendant's motion and compel the government to turn over the requested documents.

## Point VI: MOTION FOR SEPARATE HEARING TO DETERMINE EXISTENCE OF CONSPIRACY

120.    The Court should conduct a separate hearing out of the presence and hearing of the jury to determine the admissibility of any co-conspirator's statements which the Government intends to introduce under the "co-conspirator's exception" to the Hearsay Rule (Rule 801(d)(2)(E), Fed. R. Evid.).

121.    At said hearing out of the presence and hearing of the jury, the Government should have the burden of establishing by competent credible evidence, independent of any hearsay declarations sought to be admitted under Rule 802(d)(2)(E), Fed. R. Evid., the following by a preponderance of the evidence:

(1)      That a conspiracy in fact existed;
(2)      That this defendant voluntarily joined said conspiracy, and;
(3)      That said statement(s) sought to be admitted were, at the time they were made, in fact made "during the course" and "in furtherance of" the conspiracy. Furthermore, defendant requests that the Court instruct the Government and its witnesses to refrain from eliciting, volunteering or referring to any such hearsay statements until the Court makes such a determination or such hearing is conducted out of the presence of the jury and this Court has had an opportunity to rule on same.

122.    Defendant respectfully prays that this Honorable Court conduct a hearing outside the presence of the jury pursuant to Rule 104(a) and (c), Fed. R. Evid., to determine whether a conspiracy actually existed, that this defendant was a willing participant, and that the statements were in fact made "during the course" and "in furtherance" of that conspiracy before admitting any statements of co-conspirators before the jury pursuant to Rule 801(d)(2)(E), Fed. R. Evid.

## Point VII: MOTION IN LIMINE PRECLUDING THE GOVERNMENT FROM ASSERTING DELIBERATE IGNORANCE, OR INTRODUCING EVIDENCE OF THE DEFENDANT'S FINANCIAL SITUATION

123.    A theory of deliberate ignorance is clearly incompatible with the theory advanced by the government. Defendant could not have committed the fraud, yet at the same time have been

"deliberately ignorant" of such fraud. Secondly, the Government will not be entitled to a jury instruction on "deliberate ignorance" because the evidence in this case will show either that defendant knew about the fraud, or that defendant did not know. In such a case, a "deliberate ignorance" charge is not proper. United States v. Lara-Velasquez, 919 F.2d 947, 951 (5th Cir. 1990).

124.    There is no evidence that the defendant deliberately ignored anything. Rather, the evidence only supports, at most, a finding of negligence. In addition, the instruction may be given only if it is supported by evidence other than that used to show the defendant's actual knowledge of the fact. U.S. v. de Francisco-Lopez, 939 F.2d 1405 (10th Cir. 1991). Clearly there is no separate evidence in this case indicating that defendant was deliberately ignorant. Furthermore, the Tenth Circuit has recently cautioned trial courts that instructions on deliberate ignorance are rarely appropriate, and should be given with care to avoid suggesting to the jury that a lesser degree of mens rea than knowledge would be sufficient for a conviction. Id. at 1412. Actual knowledge and deliberate ignorance are mutually exclusive ideas; evidence supporting one will not support the other. Id. at 1410.

125.    If the Government is permitted to use evidence of direct knowledge to show deliberate ignorance, the jury may convict the defendant based on the assumption that he should have known, which is a negligence standard. Id. A defendant cannot be convicted for a criminal offense requiring knowledge based on an objective "should have known" negligence standard; rather, the question of knowledge must be judged by a subjective standard. U.S. v. Jewell, 532 F.2d 697, 704 n. 21 (9th Cir. 1976). Additionally, as the Second Circuit held in U.S. v. Reyes, supra, the government cannot establish participation in a conspiracy with the use of the theory of deliberate ignorance. Reyes, at 55.

126.    Furthermore, the government should be precluded from arguing or offering evidence of defendant's financial situation, civil suits, bankruptcy, and whether any pecuniary losses were suffered. U.S. v. Tidwell, 559 F.2d 262, 266-67(5th Cir. 1977); cert denied 435 U.S. 942, 98 S.Ct. 1520 (1978). Said evidence is irrelevant and prejudicial.

WHEREFORE, the defendant respectfully requests that this Honorable Court grant his motion suppressing the evidence procured unconstitutionally and as a result of prosecutorial misconduct, and dismissing the indictment in its entirety as against defendant Nathaniel Alexander, or in the alternative, to order the government attorney to disclose the grand jury testimony of Special Agent Erik Rosenblatt, and other agents; compel the government attorney turn over any written record containing the substance of any relevant oral statement made before or after arrest, order a hearing to determine the existence of a conspiracy; and to grant defendant's motion in limine precluding the government from asserting deliberate ignorance, or introducing evidence of the defendant's financial situation.

Dated: New York, New York,
        June 1, 2006

Law Office of Michael Fineman, Esq.

By: _____/s/_____
    Michael Fineman, Esq. (MF 0282)
    *Attorney for Defendant,*
    Nathaniel Alexander,
    305 Broadway, 7th Floor
    New York, New York 10007
    (212) 897-5823