UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-- - - - - - - - - - - - - - - - - - -x
UNITED STATES OF AMERICA　　　　　　:
　　　　　　　　　　　　　　　　　　　　:
　　　　　　　-v.-　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　:
DOUGLAS SHYNE,　　　　　　　　　　　: 　S4 05 Cr. 1067 (KMK)
NATASHA SINGH,　　　　　　　　　　　:
　a/k/a "Beatris Rodrigues,"　　　:
NATHANIEL SHYNE,　　　　　　　　　　:
TOYBE BENNETT,　　　　　　　　　　　:
　a/k/a "Dmitriy Makarevich,"　　 :
　a/k/a "Dmitriy Makervish,"　　　:
　a/k/a "Eduardo Rodrigues,"　　　:
　a/k/a "Cecilio Pena,"　　　　　　:
ROBERTO MONTGOMERY,　　　　　　　　:
EPHRAIM RICHARDSON,　　　　　　　　:
NARESH PITAMBAR,　　　　　　　　　　:
JASON WATLER,　　　　　　　　　　　 :
STEVEN RIDDICK,　　　　　　　　　　 :
NATHANIEL ALEXANDER, and　　　　　:
TIMOTHY MONTGOMERY,　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　Defendants.　　　:
- - - - - - - - - - - - - - - - - - - x

**GOVERNMENT'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANT
<u>NATHANIEL ALEXANDER'S OMNIBUS MOTION</u>**

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York

E. DANYA PERRY
Assistant United States Attorney

　　　- Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-- - - - - - - - - - - - - - - - - - -x
UNITED STATES OF AMERICA                 :
                                         :
          -v.-                           :
                                         :
DOUGLAS SHYNE,                           :    S4 05 Cr. 1067 (KMK)
NATASHA SINGH,                           :
  a/k/a "Beatris Rodrigues,"             :
NATHANIEL SHYNE,                         :
TOYBE BENNETT,                           :
  a/k/a "Dmitriy Makarevich,"            :
  a/k/a "Dmitriy Makervish,"             :
  a/k/a "Eduardo Rodrigues,"             :
  a/k/a "Cecilio Pena,"                  :
ROBERTO MONTGOMERY,                      :
EPHRAIM RICHARDSON,                      :
NARESH PITAMBAR,                         :
JASON WATLER,                            :
STEVEN RIDDICK,                          :
NATHANIEL ALEXANDER, and                 :
TIMOTHY MONTGOMERY,                      :
                                         :
          Defendants.                    :
- - - - - - - - - - - - - - - - - - - - x

     The Government respectfully submits this memorandum of law
in opposition to the Omnibus Motion of defendant Nathaniel
Alexander, dated June 1, 2006 ("Br."), requesting that the Court
(1) suppress all statements he has made to Government agents; (2)
dismiss the Indictment; (3) order the disclosure of grand jury
testimony; (4) order the production of all post-arrest
statements; (5) order a hearing to determine the existence of a
conspiracy; and (6) preclude the Government from asserting
deliberate ignorance or from introducing evidence of the
defendant's financial condition.  The defendant's motions are
singularly without merit, and for the reasons set forth below,

should be denied in their entirety.

**BACKGROUND**

**A.    The Charges[1]**

In the first Count of the sixteen-count Fourth Superseding Indictment (the "Indictment"), defendant Nathaniel Alexander, along with ten co-defendants, is charged with conspiring to commit bank fraud, in violation of Title 18, United States Code, Section 1349.  Alexander and certain of his co-defendants are charged in Count Five with a substantive charge of bank fraud, in violation of Title 18, United States Code, Sections 1344 and 2. Finally, Alexander and certain of his co-defendants are charged in Count Thirteen with conspiracy to launder funds, in violation of Title 18, United States Code, Section 1956(h).  The remaining counts relate to Alexander's co-defendants and do not name Alexander.

The Indictment alleges that Alexander was a member of a scheme run by Douglas Shyne and Natasha Singh, among others.  The conspirators were in the business of procuring fraudulent checks in several ways, including receiving stolen checks and arranging for such checks to be cashed; altering checks that they had legitimately received; and counterfeiting checks using

---

[1] The description of the charges contained herein is simply a summary and does not purport to describe the entirety of the Government's proof.  This description is meant as a guide to the Court and is not intended in any way to bind the Government or limit its proof at any hearing or at trial.

information provided by inside bank employees.  The conspirators were also in the business of laundering the proceeds of such checks, including by depositing fraudulently obtained checks into business or personal bank accounts and then funneling proceeds back to Shyne and Singh.

Central to the success of the scheme was the involvement of participants who were willing to deposit fraudulently obtained checks into their accounts to be cashed and laundered.  Through a co-conspirator identified in the Indictment as CC-1, Shyne and his conspirators in the New York area were able to find a group of willing conspirators in the Norfolk, Virginia area, including Nathaniel Alexander, Timothy Montgomery, and Steven Riddick.  CC-1 was acquainted with Timothy Montgomery, who himself caused bad checks to be deposited into several accounts, and also put Shyne in contact, for that purpose, with Riddick (Montgomery's track coach), and with Alexander (Riddick's officemate and friend). The evidence at trial – to include bank records, phone records, Federal Express records, documents recovered pursuant to search warrants, witness testimony, and the co-conspirators' own statements – will establish, <u>inter alia</u>, an explicit agreement with and amongst the Virginia-based conspirators to knowingly deposit and cause to be deposited numerous counterfeit checks into accounts associated with them, in order to launder the funds and reap the proceeds.

Alexander himself personally deposited at least two

counterfeit checks into his own accounts.  On April 26, 2005, Alexander opened a new business account for his defunct business, B&T Petroleum, at SunTrust Bank, into which he deposited one item – a counterfeit check for $850,000, drawn on an American Express account at Wachovia Bank.  The original of that check, in the amount of $31.40, was made out to New York Café Lounge, a business co-owned by Shyne and Singh.  The conspirators altered that check by changing the name of the payee from "New York Café Lounge Inc." to "B&T Petroleum," and the payment amount from $31.40 to $850,000.

Although the $850,000 counterfeit check initially cleared, the credit was reversed on or about May 3, 2005, when it was discovered to be counterfeit.  During the window of time in which the check appeared to have cleared, Alexander signed a number of starter checks drawn on the B&T account.  He then transferred certain of those checks to CC-1, who in turn, sent them by Federal Express to Shyne on April 27, 2005, to be distributed to, and laundered by, Shyne's designees.  Included amongst those checks was a $25,000 check deposited by Singh's brother, Ephraim Richardson, and a $60,000 check deposited by an associate of Shyne's, Jason Watler.  In addition, Alexander also wrote at least two other checks drawn on the B&T account, including a $25,000 check deposited by one of Riddick's close relatives and a $25,000 check deposited by one of Montgomery's close associates.

The $850,000 counterfeit check was not the only fraudulent

4

check negotiated by Alexander.  Shortly after the credit on the first check was reversed, Alexander deposited another counterfeit check into a personal bank account at BB&T Bank.  This check, for $150,000, was sent by Federal Express from Shyne to Alexander via CC-1 on May 9, 2005, and was deposited by Alexander shortly thereafter.  However, like the $850,000 check, the $150,000 counterfeit check failed to clear, and no proceeds were available to the conspirators.

### B.  Alexander's Arrest and Post-Arrest Statements[2]

#### 1.    Alexander's Post-Arrest Statements

Alexander was arrested on February 9, 2006 on the Second Superseding Indictment in this case.  After law enforcement agents advised him of his <u>Miranda</u> rights, Alexander made a number of statements to the agents.  In part, and in sum and substance, Alexander stated the following: in or about April 2005, he was approached by an individual (the "purchaser") with an offer to purchase Alexander's petroleum-related business.  The purchaser offered $150,000 for the business, to include equipment and Alexander's agreement to stay on as an advisor for a period of three months.  Alexander could not recall the name of the purchaser, and did not know a telephone number, company name,

---

[2] The description of Alexander's post-arrest and proffer statements contained herein is simply a summary and does not purport to describe the entirety of the statements made by Alexander.  This description is meant as a guide to the Court and is not intended in any way to bind the Government or limit its proof at any hearing or at trial.

address, or any other information about this would-be purchaser.
Alexander stated that there was no contract of sale or any other
paperwork associated with the deal.

Alexander stated that he agreed to sell his business and
accepted a $850,000 check for the transaction.  He explained
that, although the purchase price was to be only $150,000, the
balance of $700,000 was to be used towards fees for investors
unidentified by the purchaser.  Alexander stated that after he
accepted the check, he consulted an attorney about its validity,
but the attorney provided no advice on the transaction.
Alexander also stated that he asked the bank teller about the
validity of the check, and that the teller had stated that the
check was "ok."  Alexander then deposited the check.  Alexander
stated that, shortly after accepting the deal to purchase his
business, he recalled writing out one check for $60,000 and
another check for $25,000, at the direction of the purchaser.
Alexander stated that he had left the payee information blank.

Alexander stated that ultimately the check did not clear,
but that the purchaser later approached him again with a $375,000
check.  Alexander explained that the check was in a smaller
amount than the original check because the purchaser had to pay
fewer fees to fewer investors, as the purchaser had cut out the
middleman.

Alexander was further cooperative following his arrest.  He
consented to a search of his residence, and he agreed to help the

6

agents in their attempt to locate his co-defendant, Steven Riddick.   Toward that end, he placed several calls to Riddick over the course of the interview.

After making the statements described above, Alexander was asked if he would sign a written statement containing the sum and substance of his oral statements.   Alexander then asked to telephone an attorney; after doing so, he declined to sign a written statement.   The interview then concluded.

By letter dated March 21, 2006, the Government advised Alexander's attorney, Michael Fineman, Esq., that it would provide Alexander's statements the following day; on March 22, 2006, the Government sent a Federal Express package to Alexander's attorney, containing several pages of material specific to his client.   (<u>See</u> Affirmation of E. Danya Perry ("Perry Aff.") ¶ 4, and letters dated March 21, 2006 and March 22, 2006, attached to Perry Aff. as Exhibit A).[3]   Thus, on March 23, 2006, counsel received from the Government 22 pages of discovery materials, the first four of which consisted of his client's statements (as recorded by an arresting agent) and a written and signed <u>Miranda</u> waiver form.   (<u>See</u> Perry Aff. ¶ 4, and the latter documents, which were labeled NA-100 through NA-103, attached to Perry Aff. as Exhibit B).

_____

[3] Hereinafter, all citations to "Exh." refer to exhibits attached to the Perry Affirmation.

### 2.    Alexander's Proffer Statements

On March 29, 2006, one week after the production of his statements and <u>Miranda</u> waiver form, Alexander and his attorney met with the Government for a proffer meeting.  (The proffer agreement governing that meeting is attached to Perry Aff. as Exhibit C).  The meeting was held so that Alexander could attempt to persuade the Government of his claimed innocence of the charges against him.  (<u>See</u> Exh. C at 1: "[t]he Client [Alexander] has requested the opportunity to provide information to the Government about his involvement in the charges contained in S2 05 Cr. 1067 (KMK) and to respond to questions, so that the Government may be in a position to evaluate Client's information and responses in making prosecutive decisions."; <u>see also</u> Perry Aff. ¶¶ 8-9).  This standard agreement governing so-called "innocence proffer" meetings provides, in no uncertain terms, that "[i]n any prosecution brought against Client [Alexander], the Government may offer at any stage of the criminal proceeding for any purpose any statement made by Client during the meeting." (Exh. C at 1).  The agreement goes on to provide that "Client agrees that he shall assert no claim under the United States Constitution, any statute, Rule 11(e)(6) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that such statements or any leads therefrom should be suppressed.  Client understands that he is waiving any and all rights in the foregoing respects."  (<u>Id.</u>).

8

Counsel signed the agreement, which, as set forth in the agreement, "constitute[d his] acknowledgement of having explained the foregoing to Client," and Alexander signed the agreement, "evidenc[ing his] acknowledgement and understanding of the foregoing." (Id. at 2).

Prior to signing the proffer agreement, Alexander and his attorney were given ample time to discuss it (outside of the Government's presence), and the agreement and its ramifications were then explained to them in detail; both indicated that they fully understood the agreement, including that any statements made in, or leads developed from, the meeting could be used by the Government against Alexander in any way at any time and that he could not later move for suppression of those statements or that evidence. (See Perry Aff. ¶ 10; see also Exh. C at 2). The Government also signed the agreement, as did ICE Special Agents Erik Rosenblatt (the case agent) and Ruben Correa (one of the arresting agents), as witnesses that the agreement had been explained and signed in their presence. (Id.; see also Special Agent Rosenblatt's notes (both in the form of handwritten notes and a typed memorandum) of that meeting, at 3, attached to Perry Aff. as Exhibit D).[4]

_____

[4] Counsel complains that Special Agent Rosenblatt's notes have not been provided to him. (See Br. ¶¶ 33, 117). Not only has counsel failed to ask for it, as he is required to do under Local Criminal Rule 16.1, but he was himself at that meeting and cannot claim to have been unaware of the contents of these statements. In any event, it is attached hereto and is provided pursuant to Rule 16. Accordingly, Alexander's motion for an

At that proffer, Alexander made numerous additional
statements.  For the first long stretch of the meeting, Alexander
gave a considerable bit of background and then presented his
story as to how the events in question transpired.  Eventually,
Alexander was questioned about certain inconsistencies and
oddities in his story, and Alexander ultimately acknowledged that
his story was incredible and that he knew at the time of his
conduct that certain aspects of the occurrences were a "tip-off"
that a fraud was afoot.

In part, and in sum and substance, Alexander began by
explaining that he had a quasi-business relationship with his co-
defendant Steve Riddick.  Alexander stated that he and Riddick
had an arrangement with an entity called Beynon Sports, whereby
he and Riddick would locate sites to install running tracks and
would split a 10% commission (which they would receive up front,
prior to construction) for each contract awarded for a track at
one of their sites.  He stated that he did not have a formal
contract with either Beynon Sports or Riddick, and had not yet
received any payments.  Alexander stated that Riddick has been
using office space at Alexander's business address on Tait
Terrace in Norfolk for the past four years, free of charge.

Alexander stated that, prior to April 26, 2005, Riddick had
called him on his cell phone to inquire whether Alexander was

---

order requiring the production of these notes (<u>see</u> Br. Point V)
is moot.

interested in selling his fuel tank cleaning service, B&T
Petroleum. Riddick further stated said that he knew "business
people" who were interested in both (i) sponsoring ten athletes
to train in the United States and also (ii) purchasing B&T
Petroleum. Riddick told Alexander that these business people had
given Riddick a check for over $300,000 for the purpose of
coaching athletes. Riddick told Alexander that these individuals
are "the real deal" and have a lot of money. The would-be
purchaser or purchasers informed Riddick (who in turn informed
Alexander) that the purchase price would include the building,
equipment, pumps, hoses, and three months of Alexander's
services. Alexander and Riddick did not discuss the issue of any
commissions for the sale.

    Alexander stated that just a couple of days later, Riddick
called Alexander to inform him that a check was waiting for him.
Alexander believed that the check was from a group of investors.
Alexander picked up the check and, due to the large dollar amount
and possible paperwork involved, brought it to a personal injury
attorney, who advised him not to give up any of his personal
assets until he had a signed contract. Riddick also told
Alexander that the purchaser would not take possession of any
part of the business until the check had cleared.

    Alexander did not meet the investors or the unknown
purchaser, nor did he ask Riddick how Riddick knew the purchaser,
whose name Alexander believed may have been "Pete." Alexander

11

stated, at this point in the meeting, that he did not find it
strange that "Pete" was purchasing his business sight unseen. He
was concerned that the check would not clear and that the real
estate involved would be jeopardized, and he decided that he
would not turn over any equipment until the check had cleared.
Alexander stated that if he had turned over his equipment and the
check had later been returned – as Riddick's had been – he would
have lost the equipment. For this reason, he was worried about
relinquishing any equipment prior to the check's clearance.
Alexander was not concerned about the source of the check.

On the same day he received the check, Alexander brought it
to SunTrust Bank and presented it to the branch manager. At his
request, the manager called the issuing bank, who informed
Alexander that the funds were available. Because he did not want
to commingle his existing funds with this check, Alexander
decided to open a new account in which to deposit the check.

Alexander stated that he had never spoken to Riddick about
any fee due to Riddick. Riddick did explain to Alexander that
there would be broker fees, and so, at Riddick's request,
Alexander provided him with signed checks, with the payee
information left blank. Because he had opened a new account for
the purpose of depositing the $850,000 check, Alexander used
starter checks, on which he handwrote the name and address of his
company. Alexander stated that a check that had been issued to
Ephraim Richardson looked strange, and that the signature and

12

payee "looked crazy."

Alexander acknowledged that the version of events that he was then proffering to the Government was markedly different from the version of events he had told the agents following his arrest, and attributed the discrepancies to his surprise at the time of his arrest.  He further acknowledged that the statements he had made to the agents following his arrest did not make any sense (and that he had told the agents this at the time), and stated that it had taken him a while to piece the story together. Alexander further stated that he understood that the entirety of the deal does not make sense; that his story was strange; that it was not the way in which businessmen typically conduct business; and that it was unusual that he had opened a new account for the sole purpose of depositing the check.  He stated that, in the ordinary course of business, he should have received a certified check for such a deal.  He knew that he was going to write checks off the $850,000 check, and acknowledged that he thought it would be "stupid" to deposit the $850,000 check into his existing account, as that could jeopardize his funds there.  Alexander stated that he believes that Riddick made an error; Alexander stated that he continued to believe that he will get a percentage of any commissions involved in the construction of any running tracks.

Alexander admitted that he knew at the time he deposited the check that there were several "tip-offs" to fraud, including the

failure of the purchaser or investors to do even the slightest bit of due diligence, and the fact that the deal was initiated and the purchase price was set not by Alexander, but by the unknown purchaser, via Riddick.  In spite of these "tip-offs," Alexander deposited not only the first check for $850,000, but – after that check failed to clear – he deposited another check into another account.  Alexander stated that this check, in the amount of $150,000, was for the purchase of equipment and for his salary.  This check, which he deposited into a personal account at BB&T Bank, also was returned.

Later that same day, March 29, 2006, Fineman sent the Government a facsimile containing Alexander's BB&T Bank statement showing the deposit and return of a $150,000 check.  The Government further investigated this check and based upon this and other lines of investigation, the Government listed this additional check in the pre-existing charges in the Indictment; the $150,000 counterfeit check did not form the basis for any additional charges against Alexander.

**ARGUMENT**

**I.**

**ALEXANDER'S POST-ARREST STATEMENTS SHOULD BE
DEEMED ADMISSIBLE AFTER A HEARING**

Alexander has submitted an affidavit asserting that he made custodial post-arrest statements without having first been advised of his rights pursuant to <u>Miranda</u> v. <u>Arizona</u>, 384 U.S.

14

436 (1966).  As the defendant has submitted such an affidavit, the Government agrees that a hearing is necessary.  See United States v. Manthurin, 148 F.3d 68, 69 (2d Cir. 1998).  At such a hearing, the Government intends to present proof that Alexander was twice Mirandized verbally; that Alexander in fact signed a written Miranda waiver form; that warnings were given prior to any statement being made; and that Alexander's statements were made voluntarily and with a full understanding of the rights being waived.

### A.    Legal Standards

It is axiomatic that, in order for a defendant's statements to be admitted at trial, he must have been advised of the rights specified in Miranda v. Arizona before being subjected to custodial interrogation.  384 U.S. at 479.  Statements made by a defendant in the course of custodial interrogation are inadmissible absent waiver of those rights.  Id.  A waiver of Miranda rights is valid if it was the product of a knowing and voluntary choice, that is, if the defendant understood his or her rights and chose to relinquish them without governmental coercion.  Colorado v. Spring, 479 U.S. 564, 572-75 (1987); Colorado v. Connelly, 479 U.S. 157, 169-70 (1986).

It is the Government's burden to establish by a preponderance of the evidence that a defendant's relinquishment of Miranda rights was voluntary and made with a full awareness of the rights being waived and the consequences of waiver.

15

Connelly, 479 U.S. at 168; Moran v. Burbine, 475 U.S. 412, 421
(1986).  A court may properly conclude that Miranda rights have
been validly waived "if the totality of the circumstances
surrounding the interrogation reveal both an uncoerced choice and
the requisite level of comprehension."  Id.  (internal quotations
omitted); see also United States v. Bye, 919 F.2d 6, 8-9 (2d Cir.
1990) (test is whether waiver was "product of an essentially free
and unconstrained choice," and reviewing court must consider
totality of the surrounding circumstances) (internal quotations
omitted).  A confession is "involuntary" within the meaning of
the Fifth Amendment if it is obtained by "techniques and methods
offensive to due process or under circumstances in which the
suspect clearly had no opportunity to exercise a free and
unconstrained will."  Oregon v. Elstad, 470 U.S. 298, 304 (1985)
(internal quotations omitted).  Thus, "coercive police activity
is a necessary predicate to the finding that a confession is not
'voluntary.'"  Connelly, 479 U.S. at 166-67.  Absent evidence of
governmental coercion, such a motion must fail.  See United
States v. Salameh, 152 F.3d 88, 117 (2d Cir. 1998) (hearing
unnecessary when affidavit provided no proof of governmental
coercion).

The Government intends to prove at a hearing that Alexander
received Miranda warnings on multiple occasions, both verbally
and in writing, that he understood those warnings and knowingly

waived his rights before making statements, and that his statements should therefore be deemed admissible.

## II.

### ALEXANDER'S STATEMENTS AT A GOVERNMENT PROFFER ARE ADMISSIBLE

Fineman also argues that the statements Alexander made at the March 29, 2006 proffer meeting with the Government should be suppressed as "fruits of the poisonous tree." (See, e.g., Br. ¶ 72).[5] The allegations made in support of these motions can only be described as breathtaking in both their baselessness and their viciousness. Fineman accuses the arresting agents and me personally of stunning violations of the Constitution, ethical canons, and even criminal law. The accusations are built largely upon two sets of unfounded allegations: (i) Alexander's post-arrest statements were taken in violation of his Miranda rights, a violation of which I was aware and then covered up; and (ii) I fraudulently "enticed" Fineman and his client to attend the March 29, 2006 proffer meeting, despite having knowingly violated Alexander's Miranda rights. Thus, at the very heart of Fineman's

---

[5] It is not clear how to stylistically characterize the defendant's strange hybrid of a submission. Although it is styled as a "motion," it also purports to be an "affirmation" submitted by Alexander's attorney, Mr. Fineman (see Br. at 2). While the submission advances certain arguments, Fineman also personally makes certain sworn allegations in the "factual background" section. Therefore, to the extent that the allegations are Fineman's (see Br. Points I-III) – rather than simply arguments advanced on behalf of a client (see Br. Points IV-VII) – they are responded to as such.

17

extraordinary motion lies his own facile conclusions regarding the very matter now pending before this Court – that is, that a <u>Miranda</u> violation has occurred.

**A.    The Motion Fails Because There Was No "Poisonous Tree"**

As set forth above, the Government submits that it will establish at a hearing that Alexander was Mirandized on several occasions, both verbally and in writing, and that his statements were lawfully obtained.  However, Alexander has a further, and potentially more vexing problem than his post-arrest statements: as set forth above, at a proffer with the Government scheduled at his request, Alexander made numerous statements that are both non-immunized and incriminating.  Fineman's strategic decision to demonstrate his client's "innocence" having failed, he now feels himself constrained to have those statements suppressed in the only way he can: that is, by charging "grave prosecutorial misconduct," making libelous accusations, and seeking to intimidate by referring this matter to at least the State disciplinary committee (and threatening to refer it to the federal grievance committee as well, <u>see</u> Br. ¶ 90).  Thus, not content to leave the matter <u>sub judice</u> to the Court, Fineman concludes that the arresting agent's "memorandum [memorializing Alexander's statements] and the Miranda Waiver is [sic] a fraud" and further concludes that I must have been aware of this fraud. (Br. ¶ 52).  He then argues from there that I withheld the

18

agent's notes and somehow lured or "enticed" him and his client to attend a proffer with the Government.

As a preliminary matter, as noted, it will be clear following the hearing that no <u>Miranda</u> violation occurred; thus, absent an underlying wrong, the "fruit of the poisonous tree" doctrine simply does not apply.  <u>See generally</u> <u>Elstad</u>, 470 U.S. 298 (further holding that even where a <u>Miranda</u> violation occurred, "fruit" of unwarned but voluntary statements need not be suppressed).  The tree was not poisonous, and the fruit is not tainted.  This should be the end of the analysis.

**B.    The Motion Fails Because Alexander
       Waived His Right To Make It**

The motion to suppress Alexander's proffer statements should further be dismissed on the ground that he has specifically waived any right to request such relief.  The proffer agreement explicitly provides that Alexander "agrees that *he shall assert no claim under the United States Constitution*, any statute, Rule 11(e)(6) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that such statements or any leads therefrom should be suppressed. Alexander understands that he is waiving any and all rights in the foregoing respects."  (<u>See</u> Exh. C at 1) (emphasis added). Fineman's signature on the agreement "constitute[d his] acknowledgement of having explained the foregoing to Client," and Alexander's signature "evidenc[ed his] acknowledgement and

understanding of the foregoing." (<u>Id.</u> at 2).  Prior to signing

it, Alexander and Fineman had ample opportunity to discuss the

proffer agreement and its terms and ramifications were then

explained to them in detail; both indicated that they fully

understood the agreement, including that any statements made by,

or leads developed from, the meeting could be used by the

Government against Alexander in any way at any time and that he

could not later move for suppression of those statements or that

evidence.  (<u>See</u> Exh. C at 2; Perry Aff. ¶ 10).

### C.   The Motion Fails Because It Is Grossly Deficient On Its "Merits"

Because of the gravity of the allegations, the Government

will also respond to their substance, such as it is.  Fineman

argues that I violated ethical canons and criminal law by

purportedly committing the following evils:

> (1) failing to disclose the constitutional
> violations committed by the unidentified
> agent, (2) failing to disclosed [sic] the
> statutorily required documents regarding the
> defendant's statement in order to frustrate
> [Fineman's] ability to uncover the
> constitutional violations, (3) intentionally
> redacting the names of the witnesses to the
> Miranda Waiver in order to prevent them from
> being called to testify at a suppression
> hearing, (4) deceiving [Fineman] – a member
> of the bar of the State of New York, and the
> Federal Courts for the Southern and Eastern
> Districts of New York, and a former Assistant
> District Attorney for the County of Kings –
> by making representations that [I am] "not
> interested in prosecuting innocent
> individuals," and [I] would investigate the
> information provided to [me] during the
> proffer knowing that [I] had not [sic] such

20

intention, and (5) using unconstitutionally
obtained information in the grand jury to
procure the last superseding indictment.

(¶ 63; <u>see also</u> ¶ 81).  These allegations, each more spurious

than the last, are addressed in turn.

### 1.   The Failure To Disclose The Agent's Alleged "Constitutional Violation"

The first allegation, that I failed to disclose the agent's

"constitutional violation,"[6] not only assumes that such a

violation occurred – which it emphatically did not – but

hypothesizes that I somehow knew it and covered it up.  (<u>See,</u>

<u>e.g.</u>, Br. ¶ 52).  This entire line of argument will be mooted by

the evidence presented at the hearing in this matter, which will

conclusively establish that Alexander had been Mirandized on

multiple occasions – including in written form – and that his

statements were lawfully obtained.  In any event, the Government

did not in any way use those statements in a judicial context,

and therefore there cannot have been any violation of Alexander's

---

[6] Fineman apparently believes that a mere failure to provide
<u>Miranda</u> warnings amounts to a "constitutional" violation and
repeatedly attacks the Government on that basis.  He is wrong.
<u>See, e.g.</u>, <u>United States</u> v. <u>Patane</u>, 542 U.S. 630, 641 (2004)
(plurality opinion) ("a mere failure to give <u>Miranda</u> warnings
does not, by itself, violate a suspect's constitutional rights or
even the <u>Miranda</u> rule. . . police do not violate a suspect's
constitutional rights (or the <u>Miranda</u> rule) by negligent or even
deliberate failures to" Mirandize suspect; "Potential violations
occur, if at all, only upon the admission of unwarned statements
at trial"); <u>Elstad</u>, 470 U.S. at 306-07 & n.1 (the "simple failure
to administer <u>Miranda</u> warnings is not in itself a violation" of
the Constitution).  That will not be at issue here as the
Government intends to prove at a hearing that <u>Miranda</u> warnings
were administered on multiple occasions.

rights in the form of a "cover up" or deceit.  <u>See generally</u>
<u>United States</u> v. <u>Patane</u>, 542 U.S. 630 (2004).

### 2.    The Alleged Failure To Disclose Required Documents

Fineman also argues that I failed to disclose the
"statutorily required documents" regarding Alexander's statements
for the purpose of frustrating his ability to uncover the
"constitutional violations."  Parsing through the brief's
repetitive and nearly undecipherable prose, it appears that the
"statutorily required documents" to which Fineman refers may be
either (i) the defendant's statements and <u>Miranda</u> waiver form
(<u>see</u> ¶¶ 26, 48); and/or (ii) the "notes" and "prepared statement"
written by the agent at the time of the post-arrest interview
(<u>see</u> Br. ¶¶ 51, 53).

### i.    Alexander's Statements And The Waiver Form

With respect to Alexander's statements and the <u>Miranda</u>
waiver form, Fineman himself concedes that he did in fact receive
such documents.  He argues, however, that I provided the "Miranda
Wavier [sic] and unidentified agent's memorandum only days prior
to the March 29th proffer, and it was provided contemporaneously
with approximately 2,500 pages of discovery. . . " (Br. ¶ 48).
He concludes, of course, that "[t]his was done to distract
[Fineman] and delay [Fineman] from uncovering the truth about the
February 9, 2006 encounter."  (<u>Id.</u>).  In his "affirmation,"
Fineman further argues that he "had not become privy to the . . .
sequence of events, or had the opportunity to uncover all the

circumstances under which the statement was procured" and thus, he "was not aware of the unconstitutionality of the February 9, 2006 statement." (Br. ¶ 26).

This accusation is fantastical: by Fineman's own admission, the Government quickly informed him of the substance of Alexander's statements, and the week prior to the March 29, 2006 proffer, the Government notified Alexander that his statements would be sent separately and then separately produced a mere 22 pages of documents to Fineman, segregated out from the rest of the discovery – i.e., not commingled with 2,500 additional pages, or any other quantity, of discovery. (See Exh. A). The first three pages of this very slim batch of documents contained Alexander's statements and the Miranda waiver form. (See Exh. B). Particularly since Fineman argues that the very reason he allowed himself to be "enticed" to the United States Attorney's Office for a proffer meeting was based upon these statements, it would seem that Fineman would have focused particular attention upon these few pages. Thus, Fineman had only to open the Federal Express package that arrived at his office on March 23, 2006 and look at the first three pages in order to become "privy to" this information.

### ii.    The Agent's Notes

With respect to the "notes" or "prepared statement" written by the agent following Alexander's arrest, the Government preliminarily submits that Fineman's complaints regarding any

non-disclosure is not properly before the Court, since he has utterly failed to comply with the requirements of Local Criminal Rule 16.1.  That Rule states that

> [n]o motion addressed to a bill of particulars . . . or to discovery and inspection shall be heard unless counsel for the moving party files with the court simultaneously with the filing of the moving papers an affidavit certifying that said counsel has conferred with counsel for the opposing party in an effort in good faith to resolve by agreement the issues raised by the motion without the intervention of the court and has been unable to reach such an agreement.

Local Crim. R. 16.1.  See also United States v. Minaya, 395 F.Supp.2d 28, 31-32 (S.D.N.Y. 2005) (discovery requests procedurally barred for failure to comply with Local Crim. R. 16.1).  Fineman has not only failed to make a simple request for any such documents, but is not content to even simply make a motion to compel their production; rather, he instead uses their "non-production" as yet another basis for alleging fraud and deceit, and goes so far as to request that "AUSA Perry be ordered to answer, under oath, why this information has been withheld." (Br. ¶ 51).

As it happens, the only document which exists in response to Fineman's demand is a half-page of notes that Special Agent Correa wrote out in Alexander's presence during the post-arrest interview, and a half-sentence that the agent wrote following the interview (those documents are attached to Perry Aff. as Exhibit

24

E).[7]  The agent incorporated those notes into his typed memo, and the Government was not informed of the existence of those notes until after Alexander had filed his motion.  (See Perry Aff. ¶¶ 3, 12).  Had Fineman simply followed the Rule and asked the Government for such materials, the Government would have sought and obtained these notes and promptly produced them.  Although Fineman properly provides a recent example of a case in which a judge in this district very recently determined that both contemporaneously written notes and final memoranda should be produced in discovery (see Br. ¶ 51, citing United States v. Stein, 424 F. Supp.2d 720 (S.D.N.Y. Apr. 7, 2006)),[8] he attempts most improperly to blur that ruling into an allegation that the non-production of these duplicative sets of writings at this early stage in the proceedings amounts to grave prosecutorial misconduct.  A quick review of Stein reveals that this is a gross distortion of that ruling.

In any event, the agent's handwritten notes are produced herewith, and there is no prejudice flowing from production at a

---

[7] Because those handwritten notes are attached hereto, Alexander's motion for an order requiring their production (see Br. at Point V) is moot.

[8] As Judge Kaplan noted in Stein, there has been confusion in this Circuit as to the necessity of producing both handwritten notes and final memoranda — including a Second Circuit decision holding that such dual production was not necessary.  Stein, 424 F. Supp.2d at 728-29 (citing United States v. Koskerides, 877 F.2d 1129, 1133 (2d Cir. 1989)).  (It is also worth noting that the Stein decision was issued after the Government's production of Alexander's statements and after the March 29, 2006 proffer).

time when a trial date has not even yet been set, particularly given that the notes are wholly incorporated into the agent's memorandum.

### 3.  Redaction Of The Agents' Names

Fineman has correctly noticed that the "names of the witnesses to the Miranda Wavier [sic] are redacted" and "the name of the agent that [sic] arrested and interrogated the defendant is also redacted from the memorandum." (Br. ¶¶ 49, 50). With typical rhetorical flair, he then asks "[w]hat conceivable purpose or rationale can justify the redaction of the name of this agent?" (id.), and then answers his own question with typical deductive clarity, asserting that this was done "in order to prevent them from being called to testify at a suppression hearing." (See ¶¶ 63, 81). This, he argues, amounts to grave prosecutorial misconduct.

Once again, Fineman has failed to request the names of these agents and is once again in violation of Local Criminal Rule 16.1. And once again, he transposes his own professional lapses into ethical and criminal violations on the part of the Government. Notwithstanding this failure, Special Agent Ruben Correa was identified at the March 29, 2006 proffer, at which time he was also identified by the Government (and immediately recognized by the defendant) as one of the agents who had taken Alexander's post-arrest statements.

But even had he requested and been refused this information, Fineman can cite no authority for the false proposition that he was entitled to the names of Government witnesses prior to a hearing (or even to trial). Certainly there is nothing in Rule 16 or any other statute or rule that obligates the Government to disclose the identities of its prospective witnesses. As the Second Circuit has held, "Fed. R. Crim. P. 16 does not require the Government to furnish the names and addresses of its witnesses in general. " United States v. Bejasa, 904 F.2d 137, 139 (2d Cir. 1990). The Second Circuit's opinion in United States v. Cannone, 528 F.2d 296 (2d Cir. 1975), makes clear that a defendant is entitled to disclosure of the Government's witnesses only if he makes "a *specific* showing that [the] disclosure [is] both material to the preparation of his defense and reasonable in light of the circumstances surrounding his case." Id. at 301 (emphasis added); accord United States v. Rahman, No. S3 93 Cr. 181 (MBM), 1994 WL 533609, at *3 (S.D.N.Y. Sept. 30, 1994). A mere "abstract, conclusory claim that such disclosure [is] necessary to [the] proper preparation for trial" is insufficient. Cannone, 528 F.2d at 301-02 (abuse of discretion for the district court to grant defense motion for identity of witnesses supported by only general statement of need).

In this case, Fineman has not only failed to make a request of the Government, but he has made no showing whatsoever that the

27

pre-hearing disclosure of the Government's witnesses is both
material to the preparation of his defense and reasonable in
light of the circumstances surrounding this case.  Nor is there
any reason to believe that these law enforcement witnesses would
have chosen to speak with Fineman.  In any event, as noted,
Fineman already has been given the information of which he now
claims non-disclosure.  Once again, the accusations of ethical
and criminal conduct are without even the faintest connection to
law or fact.

    **4.   The Alleged "Enticement" Of Alexander
    Into Attending A Proffer Meeting**

Fineman also argues that I deceived him – a "member of the
bar of the State of New York, and the Federal Courts for the
Southern and Eastern Districts of New York, and a former
Assistant District Attorney for the County of Kings," no less –
into meeting with the Government for a proffer, and that I did
this by representing that I am "'not interested in prosecuting
innocent individuals,'" and that I "would investigate the
information provided to [me] during the proffer knowing that [I]
had not [sic] such intention." (Br. ¶¶ 63, 81).

This half-cocked allegation is belied by common sense as
well as by the facts.  Absolutely no promises were made to the
defendant to "entice" him into meeting with the Government.
Fineman initially affirms that I "represented that [I] would
consider offering deferred prosecution in exchange for

28

cooperation," but later carelessly (or carefully) and repeatedly characterizes this alleged representation as a "promise" of deferred prosecution. (Compare Br. ¶ 19 with, e.g., ¶¶ 20, 53, 57). I have no recollection of Fineman raising the possibility of deferred prosecution for his client; I am certain that I did not promise it or even myself raise it in any way. Further, it is clear that Fineman was not even contemplating deferred prosecution, as he and his client came to the Government's offices for an "innocence proffer," and of course, Alexander's self-proclaimed innocence would have been inconsistent with prosecution of any kind, deferred or otherwise. To be eligible for deferred prosecution, a defendant must admit his guilt; the Government cannot consider a request for deferred prosecution unless and until a defendant is ready and able to admit his criminal culpability.

Rather, what did happen is that Fineman informed the Government that his client claimed innocence, and wished to persuade the Government of that fact. Truthfully responding that the Government is not interested in the prosecution of innocents, I provided Fineman and his client with the opportunity to proffer Alexander's claims of innocence. (Perry Aff. ¶ 8). It defies common sense and logic that somehow (it is not clear how) I could have tricked or "enticed" Alexander and an attorney – who is, by his own estimation, very able and experienced – into traveling to the United States Attorney's Office with all manner of

documentation that supposedly supported his claims of innocence. At the proffer, I explained that Alexander was more than welcome not to speak with the Government, but if he wanted the opportunity to attempt to persuade the Government of his innocence, the meeting would proceed under the Office's standard "innocence proffer" agreement.  (Perry Aff. ¶ 9).  Fineman informed me that he was a former prosecutor familiar with such arrangements, and, eager to establish Alexander's "innocence," Fineman and his client readily proceeded under that agreement, which was carefully reviewed and signed by all parties. (Perry Aff. ¶¶ 9-10).

Fineman's claim of "enticement" is further belied by the agreement itself, which explicitly provides that "*[t]he Client* [Alexander] *has requested the opportunity to provide information to the Government* about his involvement in the charges contained in S2 05 Cr. 1067 (KMK) and to respond to questions, so that the Government may be in a position to evaluate Client's information and responses in making prosecutive decisions."  (See Exh. C at 1.).  In short, Alexander was hardly lured in for a proffer; rather, that opportunity was given to him at his request.

Fineman also places great emphasis on the Government's alleged failure to investigate the information Alexander provided at the March 29, 2006 proffer.  The desperation and ferocity of this suppression motion are rooted in the fact that Alexander essentially has admitted criminal culpability – having admitted,

at the very least, to having consciously avoided knowledge of the fraud. (See, e.g., Exh. D). Given his admissions, it logically follows that there simply would have been no reason to "investigate" the patently (and admittedly) absurd claims he made while professing his innocence. In any event, the information he provided to the Government in no way would support a claim of innocence. Without providing great detail on the Government's deliberative process and prosecutive decisions, the Government did indeed investigate certain matters (contrary to Fineman's allegations, (see Br. ¶¶ 32, 54)), and it determined not to investigate other matters irrelevant to the charges. (Perry Aff. ¶ 11).

The source of this desperate motion is obvious: a defendant is ill-advised to appear for an innocence proffer meeting unless he is actually innocent. Fineman and his client are clearly disappointed that their strategic gambit foundered under light cross-examination. The only way to get out from under the damning admissions made at that proffer is to have those statements suppressed, and the only way to gain suppression is to shamelessly accuse the Government of "grave prosecutorial misconduct." The Government respectfully urges this Court to reject this transparent attempt to gain a litigation advantage through such tactics.

### 5.    The Alleged Improper Use Of The Grand Jury

Finally, Fineman also hazards the fanciful allegation that

unconstitutionally obtained information must have been used in the grand jury, because no rational grand jury could have returned a true bill absent such misconduct.[9]

To begin with, Alexander was indicted prior to any alleged misconduct. Nonetheless, Fineman argues that my deceitful conduct was done because I "[knew] that the first [sic] superseding indictment charging the defendant was insufficient." (Br. ¶ 82). He arrives at this conclusion by a jesuitical comparison of the language in the Second Superseding Indictment to that in the Fourth Superseding Indictment, astutely noting that the former charges that Alexander "caused the $850,000 Counterfeit Check to be deposited into the bank account for his business, B&T Petroleum," and the latter charges that Alexander "deposited the $850,000 Counterfeit Check was deposited [sic in Br.] into a new bank account for his business, B&T Petroleum, that he opened as [sic in Br.] SunTrust Bank for the purpose of depositing the $850,000 Counterfeit Check." (Br. ¶¶ 83, 85). There are several simple responses to Fineman's nonsensical exegesis of the charging language.

The change from "caused to be deposited" to "deposited" is stylistic, having no effect on criminal culpability. See, e.g., 18 U.S.C. §§ 2, 1349, 1956(h) (equal liability for committing act as for conspiring to commit substantive act, or aiding, abetting,

---

[9] Fineman folds this allegation into his later argument that the Indictment should be dismissed. For clarity's sake, the sufficiency argument is addressed below.

or causing an act to be done).  Further, as is facially clear from the Second Superseding Indictment (under which Alexander was indicted), the Government was in possession of Alexander's SunTrust Bank records prior to the issuance of that indictment (and thus, prior to Alexander's arrest); those records make clear on their four corners that Alexander himself filled out the deposit ticket and opened the bank account for the purpose of depositing the check.  Thus, any "new" (or differently worded) information contained in the Fourth Superseding Indictment was derived entirely independent of Alexander's proffer with the Government.

Fineman also alleges that there is an "abundance of information concerning the defendant's relationship with codefendant Steven Riddick, and other allegations that could only have come from the March 29, 2006 proffer."  (Br. ¶ 86).  It is entirely unclear to what "abundance" of information Fineman refers: the Indictment charges that the two were friends and shared office space, which is in part a matter of public record and in part available from other sources.  Fineman's choice to ignore the obvious possibility that the Government may well have additional sources for information should not translate into such scurrilous accusations of misconduct.

In any event, the Government would have been entirely entitled to use Alexander's proffer statements against him in any way it saw fit.  As the March 29, 2006 proffer agreement

explicitly provides: "[i]n any prosecution brought against Client, the Government may offer at any stage of the criminal proceeding for any purpose any statement made by Client during the meeting." (Exh. C at 1). Further, any leads that may have been derived from the proffer meeting could be used against Alexander, even if the statements themselves had been unlawfully procured (which, it is abundantly clear, they were not). Cf. Patane, 542 U.S. 630.

In short, Fineman's allegations of governmental misconduct are without any basis whatever, and his motion to suppress Alexander's statements at the March 29, 2006 proffer should be denied.

### III.

**THE MOTIONS FOR DISMISSAL OF THE INDICTMENT AND DISCLOSURE OF GRAND JURY TESTIMONY ON THE GROUNDS OF PROSECUTORIAL MISCONDUCT SHOULD BE SOUNDLY REJECTED**

Fineman argues that not only should all of Alexander's statements be suppressed, but indeed the Indictment should be dismissed as against Alexander because the alleged misconduct deprived him of his Fifth Amendment due process rights. Fineman also requests the disclosure of grand jury testimony on similar grounds. Although he can take out his thesaurus and list a great many synonyms for "deceit," Fineman is utterly unable to substantiate his claims in any way (see Point II above).

### A.    There Was No Misconduct Of Any Kind

As noted, Fineman's accusations are necessarily built upon a

foundation of quicksand.  At their core, once again, is the
allegation that the agents lied and that no Miranda warnings were
administered.  Fineman's own mistaken analysis of the written
Miranda warnings aside, he is unable to contemplate the
possibility that the Court may choose to credit the agents'
testimony that Miranda warnings were administered on several
occasions, both verbally and orally.  His inability to
contemplate such a result is in spite of the facts that he has
been presented with a written Miranda form, signed by his client,
and that his client clearly did not share with him the story of
these alleged Miranda violations until at least some two months
after his arrest.  Nor is he able to conceive that a prosecutor
would credit the representations of well-respected arresting
agents, particularly when those representations are backed up by
a written waiver form.  Rather, Fineman attempts to fill gaping
holes in substance by launching an assault upon the very values
most cherished by an Assistant United States Attorney for the
Southern District of New York – integrity, honesty, decency, and
moral probity.  To make such accusations against an Assistant's
reputation without the slightest foundation in law, fact, or
logic goes well beyond zealous advocacy and treads into the realm
of bald-faced calumny.  The Government takes these matters very
seriously, and – particularly in light of the fact that *these
accusations already have been referred to the State disciplinary
committee* – the Government will respectfully request specific

35

findings from the Court regarding these grave allegations, and any other remedies the Court deems appropriate.

In short, because there was no misconduct of any kind, the motions for dismissal of the Indictment and for disclosure of grand jury materials should be denied.

### B.    Dismissal Of The Indictment Is An Inappropriate Remedy In Any Event

For all the reasons set forth above (see Point II), to call Fineman's allegations of misconduct unfounded is to greatly overstate their merit, and they should be denied on that ground alone.  However, while it is difficult to dignify such allegations and painful to argue in the alternative, it must be noted that, in any event, dismissal of the Indictment would be a wholly inappropriate remedy in this case.  The very cases cited in Fineman's brief make this clear.  In United States v. Morrison, 449 U.S. 361, 365-66 (1980) (cited at Br. ¶¶ 77, 80), the Supreme Court held that "[a]bsent demonstrable prejudice . . . dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate . . . the remedy in the criminal proceeding is limited to denying the prosecution the fruits of its transgression."  Here, even if, against all evidence, there were some misconduct, the appropriate remedy would be suppression of the defendant's statements – not dismissal of the Indictment. See United States v. Rogers, 751 F.2d 1074, 1077 (9th Cir. 1985) (reversing district court's

dismissal of indictment and noting that "an indictment may not be dismissed for governmental misconduct absent prejudice to the defendant") (cited at Br. ¶¶ 77, 80); <u>United States</u> v. <u>Fields</u>, 592 F.2d 638, 648 (2d Cir. 1978) (reversing as abuse of discretion district court's dismissal of indictment for governmental misconduct and noting that "[e]ven when a Prosecutorial arm of the government unlawfully obtains evidence, we normally limit the permissible sanction to suppression of the illegally obtained evidence.") (cited at Br. ¶¶ 88, 90). In <u>Fields</u>, the Second Circuit held that the Government's actions had been "improper," but noted that no prejudice flowed from such impropriety, as the Government had sufficient evidence to charge defendant prior to the misconduct.  <u>Id.</u> at 647.

Here, Alexander was indicted *prior* to having made any statements.  Having voted to indict Alexander before the occurrence of any alleged "constitutional violations," the grand jury clearly could not have been influenced by any alleged misconduct.  Accordingly, dismissal is an inappropriate remedy. <u>See, e.g.</u>, <u>Bank of Nova Scotia</u> v. <u>United States</u>, 487 U.S. 250, 261 (1988).  Faced with this insurmountable problem, Fineman simply offers the bald conclusion that "[i]t is clear that AUSA Perry misused her power as an Assistant United States Attorney in the grand jury in the first instance in order to indict the defendant with insufficient evidence."  (Br. ¶ 87, <u>see also</u> ¶ 82).  Of course, as set forth below (<u>see</u> Point IV), this absurd

37

allegation is the very opposite of "clear," and he does not even seriously argue how the allegations in the earlier indictment are "insufficient."

Fineman also argues that the Indictment must be dismissed "because it is this Honorable Court's obligation to send a message to the United States Attorney that this type of conduct shall not be permitted by his assistants under the rational [sic] of <u>Fields</u>." (Br. ¶ 90). But as Fineman alleges in the same paragraph, "this is the most egregious conduct that [he] has every [sic] witnessed." (<u>Id.</u>). Under his theory, this is the handiwork of one rogue Assistant United States Attorney; it is not alleged to be an institutional course of a "demonstrated, long-standing" official misconduct, and therefore, under the rationale of <u>Fields</u>, dismissal would be a wholly inappropriate remedy. <u>Fields</u>, 592 F.2d at 648 ("We have approved this extreme sanction [dismissal of an indictment] only when the pattern of misconduct is widespread or continuous.").

In short, there demonstrably and emphatically has been no governmental misconduct of any kind, nor would dismissal of the Indictment be an appropriate remedy in any event. Fineman's motion should be denied.

### C.    There Has Been No Showing Of Any Particularized Need For Grand Jury Minutes

Fineman requests disclosure of grand jury testimony pursuant

to Rule 6(e)(3) of the Federal Rules of Criminal Procedure.[10]
Once again, this motion is based upon the infirm foundation that
misconduct occurred in the first instance (see Point II), and it
should be denied on that ground.  In any event, Fineman fails to
make the requisite particularized showing, and his utterly
speculative request should be denied on this additional ground.

As Fineman suggests, in order for the 6(e)(3)(E)(i)
exception to apply, there is a common law standard requiring a
particularized need for the disclosure.  The particularized need
test was introduced in United States v. Procter & Gamble Co., 356
U.S. 677, 682 (1958) (the secrecy of grand jury proceedings "must
not be broken except where there is a compelling necessity. There
are instances when that need will outweigh the countervailing
policy. But they must be shown with *particularity*.") (emphasis
added).  The Supreme Court has repeatedly held that defendants do
not have any absolute right to grand jury minutes, maintaining
the importance of secrecy in those proceedings.  "There is a
long-established policy of secrecy, older than our Nation itself"
which protects the integrity of the grand jury.  Pittsburgh Plate
Glass Co. v. United States, 360 U.S. 395, 399 (1959) (internal
quotations omitted).  Thus, the particularized interest test

---

[10] True to form, Fineman mis-cites the law by relying upon
an outdated Rule book and making his request pursuant to Rule
6(e)(3)(C)(i) and (ii).  Rule 6(e)(3)(C) was amended in 2002, and
currently provides only that "[a]n attorney for the government
may disclose any grand-jury matter to another federal grand
jury."  Instead, what Fineman is looking for is Rule
6(e)(3)(E)(i) and (ii).

maintains this country's long-held principle of grand jury
secrecy while ensuring that the "ends of justice" are achieved if
disclosure is necessary.  Id. at 400.  However, it is the
defense's burden "to show that "'a particularized need' exists
for the minutes which outweighs the policy of secrecy."  Id.  In
order to establish a particularized need, the defendant must
demonstrate three things: that "the material [he] seek[s] is
needed to avoid a possible injustice in another judicial
proceeding, that the need for disclosure is greater than the need
for continued secrecy, and that [the] request is structured to
cover only material so needed."  Douglas Oil Co. v. Petrol Stops
Northwest, 441 U.S. 211, 222 (1979).

    In attempting to meet this burden, Fineman fails to show any
such particularized need.  In order to satisfy the first prong of
the particularized need test, he offers an argument that is based
purely on an allegation of prosecutorial misconduct that is
flatly wrongheaded to begin with, and speculates from there that
this misconduct was essential in procuring the Indictment.
Specifically, he alleges that, "[u]pon information and belief,"
the Government may have called witnesses to the grand jury who
may have given "false, deceptive, and incomplete" testimony
concerning the defendant's involvement in the conspiracy.  (See
Br. ¶ 101; see also Br. ¶ 102 ("If Ms. Perry presented testimony
from the unidentified agent which is substantially the same as
the unidentified agent's memorandum, Ms. Perry introduced perjury

40

to the grand jury . . . ")).  Thus, Fineman now goes even further

afield from his initial accusations to argue that any testimony

regarding the defendant's statements was perjurious.  This is

even more incomprehensible than the earlier accusations that the

statements were improperly obtained, as even Fineman does not and

– given Alexander's statements at the March 29, 2006 proffer –

cannot argue that Alexander did not actually make the statements

contained in the agent's memorandum; he has simply argued that

they were unlawfully obtained.  Nor does he explain how any such

testimony might have been "perjurious" other than to speculate

that perhaps the agents' "malfeasance" and my own "nefarious

conduct" might not have been divulged to the grand jury.  (Br. ¶

102).[11]

There is thus layer upon layer of specious allegation and

gross supposition within this argument: this is the very

definition of rank speculation and is contrary to a showing of a

particularized need.  Courts have consistently held that

"conjecture that the [grand jury] minutes might reveal grounds

_____

[11] Even if Fineman could come close to showing that the
evidence had been improperly obtained, and even if he could offer
more than rank speculation that such evidence was presented to
the grand jury, his motion should still be denied.  Even
improperly obtained evidence may be used in the grand jury, an
investigative body unconstrained by the rules of evidence.  See,
e.g., United States v. Calandra, 414 U.S. 338 (1974).  Moreover,
an otherwise valid indictment may not be dismissed even where the
Government fails to disclose to the grand jury "substantial
exculpatory evidence" in its possession.  See United States v.
Williams, 504 U.S. 36 (1992).  Thus, an alleged failure to
Mirandize the defendant need not be disclosed.

for motions to dismiss" fails to "establish a particularized
need." United States v. Ammons, 464 F.2d 414, 417-18 (8th Cir.
1972). See also United States v. Stein, No. S1 05 cr. 0888
(LAK), 2006 WL 1119193, at *4 (S.D.N.Y. Apr. 28, 2006)
(defendants' "concern," garnered from public statements made by
Government, of the occurrence of prosecutorial misconduct before
the grand jury amounts to "unsupported and speculative
assertions" which "are not sufficient to overcome the presumption
of regularity afforded to grand jury proceedings."); United
States v. Jailall, No. 00 Cr. 069 (EWS), 2000 WL 1368055, at *2
(S.D.N.Y. Sept. 20, 2000) ("[S]peculation and surmise as to what
occurred before the grand jury are not sufficient to overcome
this presumption.") (internal quotations omitted); United States
v. Tochelmann, No. 1998 Cr. 1276 (JFK) 1999 WL 294992, at *3
(S.D.N.Y. May 11, 1999) ("Allegations based on belief . . .
provide no reason to disregard the presumption of regularity of
grand jury proceedings, and do not even warrant an in camera
review of the grand jury minutes.") (internal quotations
omitted); United States v. Bennett, No. 97 Cr. 289 (RWS) 1997 WL
633458, at *2 (S.D.N.Y. Oct. 10, 1997) ("This secrecy is central
to our criminal justice system, and therefore the standard
applied to disclosure is stringent.  It may not be met by
speculation or conclusory statements.") (internal quotations
omitted).  Cf. United States v. Bin Laden, 116 F. Supp.2d 489,
494 (S.D.N.Y. 2000) (mere speculation about motives for

prosecutor's actions insufficient to warrant finding of bad faith).  The Bennett court noted that if a defendant could obtain grand jury minutes simply by "surmis[ing] that misrepresentations occurred because there [was] a discrepancy between [the defendant's] version of the facts and the version set forth in the indictment," then "every defendant pleading not guilty would have access to the secret proceedings.  [The defendant's] supposition that facts were misrepresented does not rise above the level of speculation and surmise, and therefore cannot support disclosure of the minutes." Id. at *3 (internal quotations omitted).  So too here.  The first prong for particularized need decidedly is not met.

Fineman also does nothing to demonstrate how the second prong of the particularized need test is satisfied.  He makes a vague allegation that the defendant's rights trump the need for secrecy, since the defendant has a "right to be free from unconstitutional behavior by the government." (Br. ¶ 98).  The Supreme Court underscored the considerations that must be taken when granting disclosure of grand jury minutes, stating:

> the courts must consider not only the
> immediate effects upon a particular grand
> jury, but also the possible effect upon the
> functioning of future grand juries. Persons
> called upon to testify will consider the
> likelihood that their testimony may one day
> be disclosed to outside parties. Fear of
> future retribution or social stigma may act
> as powerful deterrents to those who would
> come forward and aid the grand jury in the
> performance of its duties.

43

Douglas, 441 U.S. at 222.

There is no showing here that the defendant's rights outweigh these considerations and the need for secrecy. Fineman has failed to establish any unconstitutional behavior or how Alexander would be "free from unconstitutional behavior by the government" through the disclosure of the grand jury minutes, and he has not explained why this freedom should override the historic need for secrecy of grand jury proceedings. Moreover, this is an ongoing grand jury investigation, and the need for secrecy is thus heightened. Id.

Finally, as noted above, Fineman apparently forgets that Alexander was indicted before the occurrence of any alleged "unconstitutional behavior." He tries to gloss this problem by arguing that "but for the misconduct, the evidence presented to the grand jury would be insufficient to charge the defendant with a crime" (Br. ¶ 97); as set forth below (see Point IV), that argument is farcical in light of the evidence against Alexander.

In sum, Fineman has not come close to establishing any prosecutorial misconduct, and he has not come close to showing a particularized need for the disclosure of grand jury minutes. Accordingly, his request should be denied.

## IV.
### THE INDICTMENT IS MORE THAN SUFFICIENT AGAINST ALEXANDER AND SHOULD NOT BE DISMISSED

Alexander moves pursuant to Federal Rule of Criminal Procedure 12(3)(B) for dismissal of the Indictment "for failure

to state a crime for which he can be prosecuted." (Br. ¶ 108).
Black-letter law requires the denial of this motion. The Supreme
Court has explained that "an indictment returned by a legally
constituted and unbiased grand jury . . . is enough to call for
trial of the charge on the merits," Costello v. United States,
350 U.S. 359, 363 (1956), and is not subject to challenge based
on the sufficiency of the evidence presented to grand jurors.
See United States v. Calandra, 414 U.S. 338, 344-345 (1974) ("an
indictment valid on its face is not subject to challenge on the
ground that the grand jury acted on the basis of inadequate or
incompetent evidence or even on the basis of information obtained
in violation of a defendant's Fifth Amendment privilege against
self-incrimination.") (citations omitted); Bank of Nova Scotia,
487 U.S. at 261 (1988) (holding that "the mere fact that evidence
itself is unreliable is not sufficient to require a dismissal of
the indictment," and that "a challenge to the reliability or
competence of the evidence presented to the grand jury" will not
be heard); United States v. Contreras, 776 F.2d 51, 53-54 (2d
Cir. 1985) (collecting cases); see also United States v. Torres,
901 F.2d 205, 228 (2d Cir. 1990).[12] To allow such a challenge

---

[12] As set forth above (see Point III), a court may, on rare
occasion, dismiss an indictment obtained through prosecutorial
misconduct or error, but it may not do so unless errors in the
grand jury proceeding prejudiced the defendant by "substantially
influenc[ing] the grand jury's decision to indict" or by creating
"grave doubt that the decision to indict was free from such
substantial influence." Bank of Nova Scotia, 487 U.S. at 261.
As established above, there was neither misconduct nor error, and
certainly no prejudice to the defendant.

45

would "run counter to the whole history of the grand jury institution." United States v. Williams, 504 U.S. 36, 50-54 (1992) (citations omitted).  The Indictment is, at the very least, facially sufficient.

Alexander ignores the black-and-white language of the Indictment in describing what the Government has not alleged, and ignores the relevant case law when he hypothesizes what he believes the Government will be unable to demonstrate at trial. Inexplicably, Alexander argues that "[t]he government has not pleaded and likely will be unable to prove that the defendant knew about a bank fraud conspiracy or a money laundering conspiracy."  (Br. ¶ 112).  Yet that is precisely what the Indictment does allege. (See, e.g., Ind. at ¶¶ 84, 85, 95, 96) (charging that Alexander "unlawfully, willfully and knowingly" entered into the conspiracies charged).

Alexander then argues that "[e]ven with the unconstitutionally derived information, the government can show no more than the defendant deposited checks in his business's account, which the government asserts were forgeries."  (Br. ¶ 113).  Of course, that is not what is alleged, as the checks in question were counterfeit, and that is far from all that the Government's proof will show.  He argues that "[t]he government cannot even allege that the defendant had any contact with any codefendant other than defendant Steven Riddick . . ."  (Id.). Alexander cannot seriously argue that an allegation of contact

46

with only one co-defendant would be insufficient to establish his participation in a conspiracy; but, in this case, Alexander has but to read the language of the Indictment, which alleges, for example, that CC-1 "arranged with each of TIMOTHY MONTGOMERY, STEVEN RIDDICK, and NATHANIEL ALEXANDER to deposit [fraudulently obtained] checks into their accounts." (See Ind. at ¶ 7; see also, e.g., Ind. at ¶ 47 (charging that "DOUGLAS SHYNE, STEVEN RIDDICK, NATHANIEL ALEXANDER, TIMOTHY MONTGOMERY and CC-1 agreed to transport from New York to Virginia at least approximately two counterfeit checks in the total aggregate amount of approximately $1,000,000, in order to deposit such checks into NATHANIEL ALEXANDER's bank accounts and to then split the proceeds of such checks."), ¶ 50 (charging that Alexander transferred checks to CC-1)). The litany of assertions as to what the Government "cannot and will not be able to demonstrate" continues. (See Br. ¶¶ 113-115). Such assertions not only fly in the face of what the evidence will show, but have no bearing on the dismissal of an Indictment. See, e.g., United States v. Cassese, 273 F. Supp.2d 481, 484-85 (S.D.N.Y. 2003)("While legal issues can be resolved by the court, fact questions raised by an Indictment are the province of the jury . . . [A] defendant may not challenge a facially valid Indictment prior to trial for insufficient evidence. Instead, a defendant must await a Rule 29 proceeding or the jury's verdict before he may argue evidentiary sufficiency.") (internal quotations omitted). As noted, it is sufficient that

47

the Indictment alleges the necessary elements of the crimes charged and states legally sufficient charges against the defendant.[13]   See, e.g., Calandra, 414 U.S. at 344-345; Bank of Nova Scotia, 487 U.S. at 261.

In short, to the extent Alexander argues that the Indictment fails to state a claim, a simple review of the Indictment shows otherwise; to the extent he argues that the Government will be unable to establish its case, such an argument has no bearing on a dismissal motion and should abide the stage of the trial proceedings when the Government rests its case.

## V.
## ALEXANDER'S MOTION FOR THE PRODUCTION OF DISCOVERY MATERIALS IS MOOT

As set forth above, Alexander's request that the Court

---

[13] To the extent that Alexander hangs his argument on the Government's putative reliance upon, and the putative "due process limitations" in, Pinkerton v. United States, 328 U.S. 640 (Br. ¶ 112), the Government notes that it certainly has not at this point requested a Pinkerton charge.  Pinkerton relates to vicarious liability for *substantive* counts, see, e.g., United States v. Miley, 513 F.2d 1191, 1208 (2d Cir. 1975), and the Government has charged Alexander only with his own conduct in the substantive count charged against him (see Ind., Count Five). Further, a quick review of Second Circuit case law establishes that the Pinkerton standard of liability remains sound. Alexander's claim of "due process limitations" is derived from two Fifth Circuit cases from the 1970s.  However, one case he cites concerning skepticism regarding Pinkerton supports his claim only in the *dissenting* opinion. Park v. Huff, 506 F.2d 849, 864 (5th Cir. 1975) (Thornberry, J., dissenting).  The other case he cites, United States v. Moreno, 588 F.2d 490 (5th Cir. 1975), simply acknowledges the dissenting opinion in Park v. Huff, stating that although some Fifth Circuit judges have "noted their concern that vicarious guilt may have due process limitations . . . . "[t]his concern need not trouble us here."  Id. at 493 (citations omitted).

compel the Government to produce certain discovery materials is inappropriate, due to his failure to comply with the requirements of Local Criminal Rule 16.1, and is mooted in any event by their production.  See, e.g., United States v. Gustus, No. 02 Cr. 888 (LTS) 2002 WL 31260019, at *3 (S.D.N.Y. Oct. 8, 2002) (Rule 16 request denied as moot where Government already had produced requested materials).

VI.

ALEXANDER'S "IN LIMINE" MOTIONS SHOULD BE DENIED

**A.    Admissibility of Co-Conspirator Statements**

Alexander submits that "[t]he Court should conduct a separate hearing out of the presence and hearing of the jury to determine the admissibility of any co-conspirator's statements which the Government intends to introduce" in order to establish the admissibility of such statements. (See Br. ¶ 120).  Under Bourjaily v. United States, 483 U.S. 171, 175-76 (1987), the trial court must determine, by a preponderance of the evidence, whether statements of a co-conspirator are admissible under Rule 801(d)(2)(E) of the Federal Rules of Evidence.  In making this determination, the court must find that a conspiracy existed, that its members included the declarant and the party against whom the statement is offered, and that the statement was made during the course of and in furtherance of the conspiracy. Bourjaily, 483 U.S. at 175; United States v. Maldonado-Rivera, 922 F.2d 934, 958 (2d Cir. 1990).  The Second Circuit expressly

49

permits the practice of conditionally admitting such statements at trial, subject to the later submission of evidence necessary to make the preliminary pre-requisite findings.  <u>United States</u> v. <u>Tracy</u>, 12 F.3d 1186, 1199-1200 (2d Cir. 1993).  Alexander has provided no convincing reason to depart from this well-settled practice.  <u>See</u> <u>United States</u> v. <u>Labate</u>, No. S1 00 Cr. 632 (WHP), 2001 WL 533714, at *21  (S.D.N.Y. May 18, 2001) (noting that a request such as Alexander's "would require this Court to undertake a mini-trial, significantly prolonging the proceedings in this case and affording the defendants a complete preview of the government's evidence.") (internal quotations omitted). Accordingly, Alexander's request for a hearing to determine the admissibility of any co-conspirators' statements should be denied.

**B.    Conscious Avoidance**

Alexander argues that "[a] theory of deliberate ignorance is clearly incompatible with the theory advanced by the government," and asserts that "[t]here is no evidence that the defendant deliberately ignored anything."  (Br. ¶ 123).  Citing a "recent" Tenth Circuit case, he seems to argue that the Government should be prohibited from using "evidence of direct knowledge to show deliberate ignorance" or to request a jury instruction on deliberate ignorance.  (Br. ¶¶ 123-25) (citing <u>United States</u> v. <u>Francisco-Lopez</u>, 939 F.2d 1405 (10th Cir. 1991)).  Alexander's motion is premature, but in any event, he simply is mistaken.

50

In this Circuit, a conscious-avoidance instruction is commonly given "'when a defendant claims to lack some specific aspect of knowledge necessary to conviction but where the evidence may be construed as deliberate ignorance.'" <u>United States</u> v. <u>Reyes</u>, 302 F.3d 48, 55 (2d Cir. 2002) (quoting <u>United States</u> v. <u>Gabriel</u>, 125 F.3d 89, 98 (2d Cir. 1997)).  Such an instruction is appropriate because "in addition to actual knowledge, a defendant can also be said to know a fact if he 'is aware of a high probability of its existence, unless he actually believes it does not exist.'" <u>Id.</u> at 54 (quoting <u>Leary</u> v. <u>United States</u>, 395 U.S. 6, 46 n.93 (1969)).

Thus, an instruction on conscious avoidance is proper:

> (i) when a defendant asserts the lack of some specific aspect of knowledge required for conviction, and (ii) the appropriate factual predicate for the charge exists, i.e., the evidence is such that a rational juror may reach the conclusion "beyond a reasonable doubt that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact."

<u>United States</u> v. <u>Aina-Marshall</u>, 336 F.3d 167, 170 (2d Cir. 2003) (quoting <u>United States</u> v. <u>Rodriguez</u>, 983 F.2d 455, 458 (2d Cir. 1993) (internal citations omitted)); <u>see also</u> <u>United States</u> v. <u>Svoboda</u>, 347 F.3d 471, 477-78 (2d Cir. 2003) (same); <u>United States</u> v. <u>Gabriel</u>, 125 F.3d 89, 98 (2d Cir. 1997) ("'A conscious-avoidance instruction is appropriate when a defendant claims to

lack some specific aspect of knowledge necessary to conviction but where the evidence may be construed as deliberate ignorance.'") (quoting <u>United States</u> v. <u>Beech-Nut Nutrition Corp.</u>, 871 F.2d 1181, 1195-96 (2d Cir. 1989); citations omitted in <u>Gabriel</u>)).  The second requirement, a factual predicate, "may be established where '[a] defendant's involvement in the criminal offense may have been *so overwhelmingly suspicious* that the defendant's failure to question the suspicious circumstances establishes the defendant's purposeful contrivance to avoid guilty knowledge.'"  <u>Svoboda</u>, 347 F.3d at 480 (quoting <u>United States</u> v. <u>Lara-Velasquez</u>, 919 F.2d 946, 952 (5th Cir. 1990); emphasis in <u>Lara-Velasquez</u>).  Indeed, permitting a conscious-avoidance charge in such cases "is a practical necessity given the ease with which a defendant could otherwise escape justice by deliberately refusing to confirm the existence of one or more facts that he believes to be true." <u>Reyes</u>, 302 F.3d at 54.

Furthermore – completely contrary to Alexander's assertions (<u>see</u> Br. ¶ 123) – a conscious-avoidance instruction "is not inappropriate merely because the government has primarily attempted to prove that the defendant had actual knowledge, while urging in the alternative that if the defendant lacked such knowledge it was only because he had studiously sought to avoid knowing what was plain." <u>United States</u> v. <u>Hopkins</u>, 53 F.3d 533, 542 (2d Cir. 1995); <u>see also</u> <u>United States</u> v. <u>Zedner</u>, 401 F.3d 36, 50-51 (2d Cir. 2005).  Indeed, "[i]t will almost inevitably

52

be the case that a prosecutor seeking a conscious avoidance charge will contend, in the alternative, that the defendant's culpable knowledge has been directly established." <u>United States</u> v. <u>Wong</u>, 884 F.2d 1537, 1542 (2d Cir. 1989).

Alexander argues that in <u>Reyes</u>, 302 F.3d at 55, the Second Circuit held that "the government cannot establish participation in a conspiracy with the use of the theory of deliberate ignorance."  (<u>See</u> Br. ¶ 125, citing <u>Reyes</u>, 302 F.3d at 55). Alexander completely mis-cites dictum in <u>Reyes</u>; what <u>Reyes</u> actually "stands for [is] the proposition that the conscious avoidance doctrine may be invoked to satisfy the requirement that a defendant know of the unlawful aims of the conspiracy." <u>Svoboda</u>, 347 F.3d at 478-79 (citing <u>Reyes</u>, 302 F.3d at 55).  As the Second Circuit made clear in <u>Svoboda</u>, the language in <u>Reyes</u> cited by Alexander does "*not* mean that conscious avoidance cannot be used to prove any aspect of intent to participate [in a conspiracy]; it simply means that just as actual knowledge of the illegal purpose of a conspiracy is insufficient to prove a defendant's joinder in a conspiracy, so conscious avoidance of such knowledge is also insufficient," as "[t]here must be further proof that the defendant joined in the illegal agreement with the intent of helping it succeed in its criminal purpose."  347 F.3d at 479 (emphasis added).

Despite knowing at the time that there were several obvious "tip-offs" of fraud, Alexander nevertheless personally deposited

at least two counterfeit checks into his own accounts.  Even
without his incriminating statements, his conduct in this case
was "so overwhelmingly suspicious" as to establish, at the very
least, his "purposeful contrivance to avoid guilty knowledge."
Svoboda, 347 F.3d at 480.  It is plain that argument and a jury
instruction on conscious avoidance will be classically
appropriate in this case.  As set forth above, this is so even
thougoh the Government's primary argument is that Alexander had
an explicit agreement with others to engage in the schemes
charged.  Accordingly, Alexander's motion to preclude the
Government from arguing deliberate ignorance should be denied.

### C.    The Defendant's Financial Situation

Alexander tepidly argues that the Government "should be
precluded from arguing or offering evidence of defendant's
financial situation, civil suits, bankruptcy, and whether any
pecuniary losses were suffered."  (Br. ¶ 126).  In support of
this argument, he cites yet another superannuated Fifth Circuit
case, United States v. Tidwell, 559 F.2d 262, 266-67 (5th Cir.
1977).  To read the Tidwell case is to distinguish it; in any
event, the language of the case states that the "trial judge has
broad discretion to exclude evidence where it [sic] probative
value is substantially outweighed by such dangers as confusion of
issues, misleading the jury, or needless presentation of
cumulative evidence."  Id. at 267.  Alexander has not articulated
how the introduction of his financial records falls under the

umbrella of this discretion.  In any event, his sweeping motion
to preclude any and all evidence of his financial records, civil
suits, bankruptcy, and any pecuniary losses incurred is
premature, as it necessarily involves a balancing of the
probative value of relevant evidence against the prejudicial
impact of such evidence (both as yet unidentified by Alexander),
and should await trial.

## CONCLUSION

For the foregoing reasons, the Government respectfully
submits that defendant Nathaniel Alexander's motions should be
denied, except that the Court should hold a hearing on the issue
of whether defendant received the <u>Miranda</u> warnings to which he
was entitled.  In addition, the Government will request explicit
factual findings from the Court regarding the allegations of
governmental misconduct.

Dated:    New York, New York
          June 21, 2006

                         Respectfully submitted,

                         MICHAEL J. GARCIA
                         United States Attorney
                         Southern District of New York


            By:  _____
                         E. DANYA PERRY
                         Assistant United States Attorneys
                         (212) 637-2434

<u>CERTIFICATE OF SERVICE</u>

I, E. Danya Perry, affirm under penalty of perjury as follows:

1.   I am an Assistant United States Attorney in the Southern District of New York.

2.   On June 21, 2006, I caused a copy of the foregoing Government's Memorandum Of Law In Opposition To Defendant Nathaniel Alexander's Omnibus Motion to be served by United States mail, postage pre-paid, by depositing same into the outgoing mailbox at the United States Attorney's Office for the Southern District of New York, on:

> Michael Fineman, Esq.
> 305 Broadway, 7th Floor
> New York, NY 10007
> (212) 897-5823

I declare under penalty of perjury that the foregoing is true and correct.  28 U.S.C. § 1746.


_____
E. Danya Perry
Assistant United States Attorney
Telephone:  (212) 637-2434