MEMORANDUM

To: File

CC:

From: ICE Special Agent ▉▉▉▉▉▉

Date: 3/17/2006

Re: Summary of arrest and interview of NATHANIEL ALEXANDER

---

On 02/08/2006, at approximately 0600 hrs, Special Agent ▉▉▉▉▉▉ and members of the RAIC/NORFORK office of I.C.E. were present at the known residence of NATHANIEL ALEXANDER, 1000 Melvin Drive, Portsmouth, Virginia.

At this time agents knocked on the front door and identified themselves as Federal Agents. An individual answered the door and identified himself as NATHANIEL ALEXANDER. SA ▉▉▉▉ informed NATHANIEL ALEXANDER that there was an arrest warrant for him originating from the SDNY.

After a security sweep of the residence, ▉▉▉▉▉▉ advised NATHANIEL ALEXANDER of his Miranda Rights. NATHANIEL ALEXANDER waived his rights and stated that he would answer questions. After ▉▉▉▉▉▉ informed NATHANIEL ALEXANDER that he was being investigated for Bank Fraud, NATHANIEL ALEXANDER indicated that the agents had permission to look through the residence for any evidence of financial fraud.

After a cursory search of the residence, NATHANIEL ALEXANDER was taken to the RAIC/NORFORK I.C.E. office for processing and questioning.

At this time ▉▉▉▉▉▉ again advised NATHANIEL ALEXANDER of his Miranda rights, which he waived. ▉▉▉▉▉▉ then presented NATHANIEL ALEXANDER with several details of the indictment and asked him to give ▉▉▉▉▉▉ details of a transaction or transactions related to an $850K check that NATHANIEL ALEXANDER tried to negotiate in or about April 2005.

NATHANIEL ALEXANDER stated that in or about April 2005, an individual approached him and offered to purchase NATHANIEL ALEXANDER's business. ▉▉▉▉▉▉ understood NATHANIEL ALEXANDER's business to be in the petroleum or oil industry.

NATHANIEL ALEXANDER went on to explain that this individual offered to give him $150K for the business, which included equipment. The purchaser also required that NATHANIEL ALEXANDER would stay on as an advisor to the business for three months.

▉▉▉▉▉▉ asked NATHANIEL ALEXANDER for the identity of the purchaser but he could not remember his name. NATHANIEL ALEXANDER stated that he does not know the

NA-100

telephone number, company name, address or any other information about this person who offered to purchase his business.

NATHANIEL ALEXANDER continued and stated he agreed to sell his business to the purchaser and accepted an $850K check for the deal. ████ asked why he would accept an $850K check for a $150K business deal.

NATHANIEL ALEXANDER explained that the unidentified purchaser's plan was to cover the cost of the purchase and the remaining $700K would go toward fees. These fees are for investors unidentified by the purchaser.

NATHANIEL ALEXANDER stated that he accepted the check and went to his attorney to verify the validity of the check. NATHANIEL ALEXANDER explained that his attorney had no advice on the deal.

████ asked NATHANIEL ALEXANDER if he could provide copy of a contract of sale for the business. NATHANIEL ALEXANDER stated that there was no paperwork associated with the deal.

NATHANIEL ALEXANDER stated that he then went to his bank to cash the check and had asked the teller if the check was valid. NATHANIEL ALEXANDER stated that the teller told him the check was ok and attempted to deposit it.

NATHANIEL ALEXANDER stated that the check did not clear and at a later time, the same purchaser approached him again with a check for $375K.

████ asked NATHANIEL ALEXANDER why there was such a big difference in the purchase price this time and NATHANIEL ALEXANDER explained that the purchaser had to pay fewer fees to fewer investors. NATHANIEL ALEXANDER stated that the purchaser had "cut out the middleman."

NATHANIEL ALEXANDER then explained that shortly after accepting the deal to sell his business, he wrote two checks - one for 60K and the other for 25K. NATHANIEL ALEXANDER remembers that he wrote these checks as per the direction of the purchaser and left the Payee sections as blank.

At this time ████ asked NATHANIEL ALEXANDER if he would sign a statement that included the sum and substance of his statement to ████. NATHANIEL ALEXANDER asked if he could call his attorney to ask his advice.

████ placed NATHANIEL ALEXANDER in touch with his attorney and NATHANIEL ALEXANDER then refused to sign the statement.

End Memo -

NA-101

U.S. Immigration
and Customs
Enforcement

## STATEMENT OF RIGHTS

Before we ask you any questions, it is my duty to advise you of your rights.

You have the right to remain silent.

Anything you say can be used against you in court, or other proceedings.

You have the right to consult an attorney before making any statement or answering any questions.

You have the right to have an attorney present with you during questioning.

If you cannot afford an attorney, one will be appointed for you before any questioning, if you wish.

If you decide to answer questions now, you still have the right to stop the questioning at any time, or to stop the questioning for the purpose of consulting an attorney.

---

## WAIVER

I have had the above statement of my rights read and explained to me and I fully understand these rights. I waive them freely and voluntarily, without threat or intimidation and without any promise of reward or immunity. I was taken into custody at _0600_ (time), on _02/09/2006_ (date), and have signed this document at _0830_ (time), on _02/09/2006_ (date).

NATHANIEL ALEXANDER
Print Name                     Signature

WITNESS: _____      DATE: 02/09/2006

WITNESS: _____      DATE: 02/09/2006

NA-102

Per NATHANIEL

Riddick cell
(C) 757 237-3831
→ 757 237-3832
(H) (757) 598-0244

"Manny"
box coach

NA-103