REQUESTED BY:  ROSENBLATT, ERIK B
              O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY ICE | TECS ACCESS CODE 3 |
|---|---|
| R E P O R T   O F   I N V E S T I G A T I O N | PAGE  1 |
| | CASE NUMBER ████████7 |

TITLE: NATASHA SINGH ET AL.

CASE STATUS:    INTERIM RPT

| REPORT DATE 051106 | DATE ASSIGNED ████ | PROGRAM CODE ████ | REPORT NO. ████ |
|---|---|---|---|

RELATED CASE NUMBERS:

COLLATERAL REQ:

TYPE OF REPORT:
MEMO OF INTERVIEW

TOPIC: INTERVIEW OF NATHANIEL ALEXANDER ON MARCH 29, 2006

SYNOPSIS:

On March 29, 2006, SA Erik Rosenblatt, SA Ruben Correa and AUSA Danya Perry
met with Nathaniel ALEXANDER at the office of the United States Attorney for
the Southern District of New York.  Representing ALEXANDER at this meeting was
Michael Fineman, Esq.

The sum and substance of this interview is contained herein.

| DISTRIBUTION: SACNY | SIGNATURE: ROSENBLATT       ERIK      B   SENIOR SPEC AGENT |
|---|---|
| | APPROVED: HEYDWEILLER    LAURA    A   OI GRP SUPERVISOR |
| | ORIGIN OFFICE: NY NEW YORK, NY - SAC |  TELEPHONE: ████ |
| | TYPIST: ROSENBLATT |

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY
OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR
DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED
TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br><br>R E P O R T   O F   I N V E S T I G A T I O N<br>C O N T I N U A T I O N | PAGE    2 |
|---|---|
| | CASE NUMBER ████████████ |
| | REPORT NUMBER: ████ |

CASE PROGRAM CODES:

████████████████████████████████████         ████████████████████████████

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY
OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR
DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED
TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE   3 |
| --- | --- |
| | CASE NUMBER ██████████ |
| R E P O R T   O F   I N V E S T I G A T I O N  C O N T I N U A T I O N | REPORT NUMBER: ████ |

On March 29, 2006, SA Erik Rosenblatt, SA Ruben Correa and AUSA Danya Perry met with Nathaniel ALEXANDER at the office of the United States Attorney for the Southern District of New York.  Representing ALEXANDER at this meeting was Michael Fineman, Esq.

AUSA Perry explained the contents of a written agreement between the US Attorney's Office and ALEXANDER, advising that his statements could be used against him.  Each of the individuals present for this meeting signed the document dated March 29, 2006.

The following is the sum and substance of ALEXANDER's statements:

ALEXANDER joined B&T Petroleum Recovery ("B&T"), after Theron Atlas Bumpers, Jr. and James Thoragood-the original partners- recruited him.  Both reside in Norfolk, Virginia.

Previously, ALEXANDER and Bumpers were partners in a business named Mr. A's. According to ALEXANDER, the business had 170 employees and functioned as a cleaning and food service company for military shipyards. Mr. A's grossed $250,000 per year.  It was operational for twelve years and closed prior to the creation of B&T.

B&T provided fuel tank cleaning services to military carriers docked in Norfolk, VA. According to ALEXANDER, B&T (and Mr. A's) was part of the U.S. Small Business Administration's 8-A (section 8-A, Small Business Act)   A business development program created to help small disadvantaged businesses . B&T used ADT payroll services.

B&T was profitable until the Iraqi war, when most of the ships were deployed. After the ships later returned to port, bigger companies took the business away from the areas smaller companies such as B&T. Four years ago, both Bumpers and Thoragood left the business and all twenty employees were let go. ALEXANDER was left responsible for a $100,000 line of credit held by B&T at Resource Bank.

ALEXANDER estimates that he made a yearly salary of approximately $80,000 while at B&T.

 AUSA Perry explained that his statements about other individuals couldn't be used directly against other individuals, although they could be used against him

ALEXANDER's current venture is the Vision Learning Center.  It was started six years ago and has 15 employees and 75 children attending. He says he earns $65,000 per year and says it's his sole source of income.  ALEXANDER said this

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

OFFICIAL USE ONLY

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE    4 |
|---|---|
| | CASE NUMBER ▓▓▓▓▓▓ |
| REPORT OF INVESTIGATION CONTINUATION | REPORT NUMBER: ▓▓▓ |

venture is paying off the debt incurred by B&T.

ALEXANDER is also working with "Mr. Simon", who owns a company named T2KW (Tires to Kilowatts). T2KW converts tire rubber to a fuel source. ALEXANDER says he was hired to collect rubber tires. ALEXANDER has not yet done any work for this venture.

ALEXANDER is also involved with Dr. Jerome Kennedy. Dr. Kennedy designed a medical device, and alleges that a foreign company stole its design. The case is in litigation, according to ALEXANDER. When the matter is settled, Dr. Kennedy would like to distribute his product from the former site of B&T at 3334 Tait Terrace, Norfolk, VA. Kennedy reportedly also has a distribution center in Hampton, VA.

ALEXANDER says he also works with Baynon Sports, a sports surface company, owned by John Baynon (telephone 410 935-4058). ALEXANDER is currently negotiating two contracts (City of Hampton, VA and the University of Pittsburgh), and Riddick is in contract with a site in St. Kitts and three in the Bahamas. The tracks in the Bahamas are scheduled to be built during the second week of April. The value of each of these Bahamian contracts is: $5 million, $2 million and $2 million.

ALEXANDER and Riddick agreed that they would split a 10% commission with every sale by either of them; they would be paid at the start of the project. ALEXANDER says that he doesn't have any formal agreement or contract with either Baynon Sports or Riddick. ALEXANDER met Baynon through Riddick, and hasn't spoken with Baynon in three months.

ALEXANDER met Riddick during the 1970's when they both ran track. They reacquainted during the 1990's when RIDDICK was coaching at Norfolk State University and ALEXANDER was on the campus. Soon after, ALEXANDER gave $100 cash gifts here and there to foreign athletes who weren't getting financial support from their respective countries.

Four years ago, ALEXANDER provided Riddick with office space at the Tait Terrace address when Mr. Bumpers left. Riddick has never paid rent for the space. The only occupants of the address are ALEXANDER, Riddick and Hockaday; however, since their arrests, ALEXANDER asked that Riddick not use the office. ALEXANDER believes that it is possible that Hockaday may be handling Riddick's books.

According to ALEXANDER, Riddick called ALEXANDER prior to April 2005, and inquired whether he was interested in selling his business (B&T) and about the asking price for the business and its assets, because he had someone interested in the company. Riddick said that he had "business people" who are

OFFICIAL USE ONLY
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

OFFICIAL USE ONLY

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE     5 |
|---|---|
| | CASE NUMBER ▓▓▓▓▓▓ |
| R E P O R T   O F   I N V E S T I G A T I O N C O N T I N U A T I O N | REPORT NUMBER: ▓▓▓ |

paying to train ten athletes, and are also interested in purchasing B&T.
Riddick received a check from them for over $300,000. ALEXANDER said the cost
of the business would include the warehouse, equipment, pumps, and hoses
(stored at an off-site facility). The building, willed to ALEXANDER by his
mother, has a $100,000 lien. A friend named Edward Johnson, who previously
sold janitorial supplies to Mr. A's, owns the lien. Johnson took the lien
because he was confident the building would be sold.

ALEXANDER assumed that this unknown source buying his company was competing
for a contract offered annually by Northshipco. ALEXANDER said that he would
continue to work in the office for three months, and the sale would include
the building and all equipment. ALEXANDER said that he and Riddick didn't
discuss any commission for the sale.

A couple of days later, Riddick called ALEXANDER to say that a check was
waiting for him. He picked up the check and brought it to Abe Kalfus, a
personal injury lawyer, because of the large dollar amount and because there
would be paperwork involved. Kalfus told him not to give up any of his assets
until he had a singed contract.

ALEXANDER believes the unknown person purchasing B&T may have been named
"Pete". ALEXANDER didn't ask Riddick how he knows "Pete". Riddick said the
buyers were the 'real deal' and they have a lot of money. ALEXANDER didn't
think it was weird that his company was being purchased sight unseen. He
wasn't going to turn over any equipment to "Pete" until the check cleared.

On the same day ALEXANDER brought the check to SunTrust Bank, and presented it
the branch manager, Joanne Burbage. "Her eyes got big" and, at his request,
Burbage contacted the issuing bank to see if the funds were available.
Burbage told him the funds were available, and concurred with ALEXANDER that
he should open a new account to deposit this check so it wouldn't be
commingled with the funds in his existing account. ALEXANDER wasn't sure of
the balance of this existing account.

ALEXANDER was concerned that the check wouldn't clear and that the real estate
involved would be jeopardized.

Riddick explained that there would be broker's fees, and so at Riddick's
request, ALEXANDER provided him with signed checks with the payee left blank.
Because he had opened a new account to deposit the $850,000 check, ALEXANDER
used starter checks. He wrote "B&T" on the top of the starter check and
signed them, leaving the payee blank. ALEXANDER said that a check that went
to Ephraim (Richardson) looked strange, and that the signature and payee
"looked crazy".

OFFICIAL USE ONLY

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY
OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR
DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED
TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br><br>R E P O R T   O F   I N V E S T I G A T I O N<br>C O N T I N U A T I O N | PAGE     6 |
|---|---|
| | CASE NUMBER ████████████ |
| | REPORT NUMBER: ████ |

AUSA Perry referred to excerpts of ALEXANDER's post-arrest statements

When arrested, ALEXANDER told agents he got a $375,000 check.  He said he gave
the interviewing agents the wrong amount and forgot to tell the agents about
the sale of the property because he was "blown away" when arrested. He said it
took a while to piece things together, and that's why he remembers the amount
now; what he told agents doesn't make any sense.

ALEXANDER called Ms. Burbage a few days later and learned that the check
hadn't yet cleared.

ALEXANDER believed that if he turned over the B&T equipment before the check
cleared, he was worried that the check would have later been returned-like the
one Riddick received-and he would have lost the equipment he may have turned
over.
ALEXANDER wasn't concerned about the source of the check.

ALEXANDER also said that this entire deal doesn't make sense and that opening
an account for the sole purpose of depositing the check was unusual.

ALEXANDER made the following statements about the check:

*  He thought that the check was from a group of investors.
*  He thought that the American Express Travel Service check was where the
   investment group had their account.
*  He couldn't read the signature, but figured it was a member of the
   investment group.

ALEXANDER deposited a $150,000 check, made payable ALEXANDER, in his BB&T
personal account a few weeks after the deposit of the $450,000 check.
ALEXANDER said the check was for the purchase of equipment and towards his
salary.  The check later came back returned.

Looking back, ALEXANDER sees how strange everything is.  He now believes he
should have got a certified check.

ALEXANDER knew prior to its deposit that checks were going to be written off
the account.

He believes that Riddick made an error, but still thinks he'll receive
commissions from Riddick's work with Baynon Sports.

ALEXANDER is asking $600,000 for 3334 Tait Terrace.

ALEXANDER knew that by not doing due-diligence, it was a tip-off.  And that he

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY
OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR
DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED
TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE 7 |
|---|---|
| R E P O R T   O F   I N V E S T I G A T I O N   C O N T I N U A T I O N | CASE NUMBER [redacted] |
| | REPORT NUMBER: [redacted] |

never quoted Riddick a figure for the sale of B&T prior to the check.

ALEXANDER hasn't had any direct telephone contact with Riddick other than a few occasions when he answered the phone at Tait Terrace when Riddick called for Hockaday.

ALEXANDER's cellular phone number is (757) 635-1770.

On March 29, 2006, Mr. Fineman sent both SA Rosenblatt and AUSA Danya Perry, at their respective offices, a facsimile containing the BB&T bank statement dated May 24, 2005, for account number 5135672744.

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY
OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR
DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED
TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

3/29/06    NATHANIEL    Proffer    MICHAEL FINEMAN, ESQ
           ALEXANDER   #1        ALEXANDER
                                 S/A ROSENBLAT
                                 S/A CORREA

PENNY EXPLAINED AGREEMENT w/ Δ. Δ SIGNED AGREEMENT

RIDDICK CALLED AND ASKED IF Δ IS STILL IN SEAFOOD
         BUSINESS

**B+T**   B+T WORK ON CARRIERS. CLEANS THE FUEL TANKS
                    → PREVIOUS CO-OWNED w/o MR. A'S
                        ATLAS                              BOTH IN
          PARK Theron  BUMPERS, JR. ⟩ PARTNERS  NORFOLK, VA
          James Thorogood
                    → SBA program 7-9 YEARS STAY IN PROGRAM
          WERE IN THE 8-A PROGRAM: GRADUATED
          WORKED WITH BUMPERS & Thorogood IN BUSINESS
              IN  B+T.
**B+T**           BUSINESS SLOWED DOWN AFTER IRAQI WAR
                    20 EMPLOYEES
              SHIPS STARTED TO RETURN, BUT BIGGER
              COMPANIES TOOK THE BUSINESS

**Vision**    VISION CLEANING CENTER - STARTED 6 YEARS AGO
              75 CHILDREN - 15 EMPLOYEES

4 YEARS AGO Δ LET EMPLOYEES GO. PARTNERS LEFT
           BUSINESS. WITH DEBT. 100K - LINE OF CREDIT
                   PARTNERS  TOT SHARES          |
              HAD ADT PAYROLL              RESOURCE BANK
              Δ MADE APPROX $50K PER YEAR

**MR A'S**    MR A's - Δ PARTNERED w/ BUMPERS  250K/YEAR
              170 EMPLOYEES - WOULD CLEAN SHIPYARDS
         BUSINESS OPEN: 12 YEARS  CLOSED B/F  JOINING
                                                  B+T

**Hockaday**    VISION IS PAYING OFF DEBT
                Δ PAYS HOCKADAY. RIDDICK DOESN'T PAY

2 of 7
3/29/06
ALEXANDER
PROFFER

PERRY EXPLAINS THAT HIS STATEMENT ABOUT
OTHERS COULDN'T BE USED.

NEW VENTURES

① MR. SIMONS WANTS D TO COLLECT RUBBER TIRES
TO PRODUCE FUEL. — TZKW
(TIRES TO KNOWATTS)

② Dr JEROME KENNEDY CREATED JDCVISE URBAY (SK)
MAEDICAL
KENNEDY WANTED TO BUY BUILDING TO DISTRIBUTE
PRODUCT. KENNEDY ALREADY HIS OFFICE IN HAMPTON.

BUT, SOLE SOURCE OF INCOME IS VISION. APPROX $GJKM
③ BYNOM SPORTS —John BEYNOM RUNNING SURFACES
(910)935-4058 INSTALLATION
TAIT TERRPER

HOCKADAY, D + RIDDICK

D RAN TRACK. THEN D MET RIDDICK THEN
MID 90's THEN MET-UP AGAIN WHILE RIDDICK WAS COACHING
NORFOLK UNIV. & D WAS TAKING CLASSES

D GAVE FOREIGN ATHLETES $100 HERE & THERE TO SUPPORT
B'C COUNTRIES WOULDN'T PAY.
BECAME FRIENDS W/ RIDDICK.
4 YEARS AGO - OFFERED OFFICE SPACE TO RIDDICK
AFTER BUMPERS LEFT. NO RENT PAID
- RIDDICK & D WERE THINKING OF IDEAS OF HOW
(BAYMON)   TO GET D INVOLVED

BYMON   D MET THROUGH RIDDICK.
EVERY CONTRACTS ST K ITS, 3 BAHAMAS
D GOES OUT TO SELL TRACKS. MADE COMMISSIONS
D TALKS TO BYNOM.

- D STOPPED RIDDICK FROM COMING TO OFFICE POST- ARREST
HOCKADAY MAY BE DOING RIDDICKS BOOKS

3 OF 7   3/29/06   ALEXANDER #1

2ND WEEK IN APRIL, BAHAMAS IS ASCEDULED TO BUILT APRIL
D GOT TWO CONTRACTS:   3 TRACKS: $5 million, $2 million, 2 million
① CITY OF HAMPTON -
② UNIV. PITTSBURGH

NO FORMAL AGREEMENT W/ RIDDICK OF BYNUM
D HASN'T TALKED W/ BYNUM IN 3 MONTHS
         10% FEE
A$50K   RIDDICK IS GET PAID AT START OF PROJECT

RIDDICK CALLED D ON CELL ASK IF D LOOKING
TO SELL BUSINESS. RIDDICK SAYS HE HAS SOMEONE

⇒ D CELL (757) 635-1770

WHO WILL BUY HIS COMPANY. RIDDICK ASKED
HOW MUCH.
    RIDDICK SAID THEY ARE BUSINESS PEOPLE
  & HAVE  10 ATHLETES $300,000 SOMETHING
      TOLD RIDDICK THAT IT WOULD INCLUDE
      BUILDING, EQUIP (PUMPS & HOSES)
TAIT TERRACE WAS IN THE FAMILY, WILLED TO D
  100,000 LIEN ON BUILDING
OWES LIEN → EDWARD JOHNSON. USED TO SUPPLY D
    WITH JANITOR PRODUCTS. JOHNSON TOOK
    LIEN B/C HE KNEW D WOULD SELL BUILDING

    HOSES ARE OFF-SITE ON PROPERTY OWNED BY D

NORSHIPCO. OFFERED YEARLY CONTRACT.
    THOUGHT RIDDICK'S GUYS WERE GOING
    AFTER THIS CONTRACT. D WOULD WORK FOR
  3 MONTHS & WOULD INCLUDE BUILDING & EQUIPMENT
    NO DISCUSSION W/ RIDDICK ABOUT COMMISSION.

A COUPLE OF DAYS LATER, RIDDICK CALLED ⇒
    ABE KAUFUS - PERSONAL INJURY ATTORNEY

3/29/06  ACCELEROMETER # 1

1 of 7

APD SAID THERE IS A CHECK WAITING FOR HIM.
D TOOK CHECK TO KALFAS, B/C IT WAS A LARGE
CHECK. + B/C OF PAPERWORK INVOLVED

RIDDICK SAID THE UNKNOWN GUY BUYING
BUSINESS, MAYBE "PETE". D DIDNT ASK HOW HE
KNEW HIM.

RIDDICK SAID THIS PERSON APPROACHED D TO
COACH ATHLETES. AND RIDDICK SAID THEY ARE
THE REAL DEAL + HAVE ALOT OF MONEY.

D DIDNT THINK IS WAS WEIRD. D WASNT GOING
TO GIVE ANYTHING AWAY UNTIL CHECK CLEARS

RIDDICK SAID THE GUY WOULDNT TAKE POSSESSION
OF ANYTHING UNTIL HIS CHECK CLEARS

D'S LAWYER SAID NOT TO

D BROUGHT CHECK TO JOANNE BURBAGE, SUNTRUST
BRANCH MANAGER. HER EYES GOT BIG + D ASKED
HER TO SEE IF FUNDS ARE AVAILABLE.
D OPENED ANOTHER ACCOUNT SO CHECK WOULDNT
CO-MINGLE WITH CHECK. BURBAGE AGREED.
D NOT SURE HOW MUCH $ WAS IN B+T ACCOUNT

D WAS WORRIED THAT THE CHECK WOULDNT CLEAR
D FEARED OWN CHECKS WOULDNT CLEAN + THE
REAL ESTATE INVOLVED WOULD BE JEOPARDIZED

D DEPOSITED CHECK SAME DAY

D WENT BACK TO OFFICE        RIDDICK SAID THERE
NEVER TALKED TO RIDDICK      WILL BE BROKEN FEES
A/B HIS FEE                  D TO FILL OUT CHECKS
                             BLANK

5 o⁻ 7    3/24/06    SUPPLEMENT #1

D GOT STARTED CHECKS
    D SIGNED THREE CHECKS + SIGNED + WROTE
    BUT ON TOP. NO PAYEE

WAITED FOR CHECK TO CLEAR, TOLD RUDDICK & HE
SAID IT DIDNT CLEAR. RUDDICK

NEVER/TAP DIDNT HAVE CONTRACT BUT WASN'T WORRIED
KNEW IF HE DIDNT TOT BUSINESS, WOULD GET SUED.

D WASN'T AWARE, PRIOR TO READING
D KNEW ABOUT $35 K CHECK FOR TRAINING ATHLETES.
    KNEW PETE WANTS GAVE 37.5K CHECK.

ONE OF THE CHECKS TO EPHRAIM LOOKED
    STRANGE. SIGNATURE + PAYEE LOOKED "CRAZY"

D CHECKED WITH BANK. CHECKED BOUNCED AND D
    WAS TOLD THE CHECKS WOULD GO TO THE PERSON
    WHO'S ACCOUNT

D WAS SURPRISED CHECK WAS CAME IN
D DIDNT TELL AGENT A/B BULLING SAKE B/C
    HE WAS BLOWN AWAY AND COULDNT REMEMBER
    ANYTHING. TOOK A WHILE TO PIECE TOGETHER.

D DIDNT KNOW ABOUT 150K CHECK THAT RUDDICK
    GOT UNTIL THE INDICTMENT. D DOESNT THINK ITS

STEVE CALLED AFTER THE CHECK WENT BAD
    D THOUGHT IT WAS THE 37TK CHECK. HE TOLD AGENT
    150K CHECK WAS FROM MADE OUT TO D BBUT
- A COUPLE    D DEPOSITED THE CHECK INTO ACCOUNT &    BANK
OF WEEKS    IT BOUNCED -FOR EQUIP, HIS TIME

Δ THOUGHT HE GOT A CHECK FOR 375K. THAT'S
WHAT HE TOLD THE AGENTS. Δ GAVE AGENT
WRONG DOLLAR AMOUNT.

AGAIN Perry READ NOTES OF AGENT REGARDING WHAT HE
ABOUT 850K CHECK.

Δ MEANS TO SAY 150K CHECK
Δ SAYS HE TOLD AGENT THAT WHAT HE IS
SAYING DOESN'T MAKE ANY SENSE.

Δ's ONLY CONCERN WAS THAT HIS EQUIP NOT GET TOUCHED.

Δ KNEW IT WAS STRANGE. AND AGREES THAT
OPENING AN ACCOUNT WAS UNUSUAL.

Δ WASN'T WORRIED ABOUT THE SOURCE OF CHECK

Δ and BURBAS TO ASK IF THE CHECK CLEARED. SHE SAID
IT DIDN'T YET.

IF CHECK HAD CLEARED, LIKE RIDDICK'S CHECK,
AND HE GAVE EQUIPMENT, HE WOULD HAVE BEEN
IN TROUBLE.

Δ THOUGHT CHECKS CAME FROM A GROUP OF INVESTORS
Δ THOUGHT THE CHECK FROM AMEX WAS AN ACCOUNT
HE had THERE.
Δ NEVER FIGURED CHECKS CAME OUT OF AMEX
Δ HAD AN ACCOUNT AT AMEX.
Δ COULDN'T READ THE SIGNATURE
Δ DOESN'T REMEMBER WHERE THE 150,000 CHECK
CAME FROM.

Branov

LOOKING BACK, Ω SEE HOW STRANGE EVERYTHING
IS. BELIEVES HE SHOULD HAVE GOT A
CERTIFIED CHECK.

Ω KNEW HE WAS GOING TO WRITE CHECK
WHEN HE DEPOSITED CHECK.

Ω KNEW IT WAS STUPID TO PUT THE CHECK IN
THE EXISTING ACCOUNT b/c THE CHECKS

Ω TRUSTED Deddick to HOLD THE CHECKS UNTIL
CHECK 8 CLEANS & THEN THOSE CHECKS WOULD
BE ISSUED

Ω BELIEVES Deddick MADE AN ERROR.
STILL BELIEVES THAT HE'LL GET HIS
PERCENTAGE

$600+K FOR BUILDING

Ω KNEW THAT NOT DOING DUE-DILIGENCE WAS
A TIP-OFF. AND HE DIDN'T QUOTE Deddick
ANY FIGURE

THERE ARE NO OTHER CHECKS DEPOSITED IN
HIS ACCOUNT

FUD