United State District Court
Southern District of New York
------------------------------------------------------------------------ x
United States of America,

        -against-                                      S4 05 Cr. 1067 (KMK)

Douglas Shyne,
Natasha Singh,                                          **ATTORNEY'S AFFIDAVIT IN**
    AKA Beatris Rodrigues,                    **FURTHER SUPPORT**
Christine Richardson,                             **DEFENDANT'S OMNIBUS**
    AKA Deokali C. Richardson,              **MOTION AND IN REPLY TO**
Nathaniel Shyne,                                       **THE GOVERNMENT'S**
Toybe Bennett,                                           **OPPOSITION**
    AKA Dmitriy Makarevich,
    AKA Dmitriy Makervich,
    AKA Eduardo Rodrigues,
    AKA Cecilio Pena,
Roberto Montgomery,
Ephraim Richardson,
Naresh Pitambar,
Jason Watler,
Steven Riddick,
Nathaniel Alexander, and
Timothy Montgomery,

        Defendants.


------------------------------------------------------------------------ x


TO THE HONORABLE JUDGE OF SAID COURT:

       I, Michael Fineman, an attorney-at-law and Attorney for the defendant, with offices at 305 Broadway, 7th Floor, New York, New York, hereby affirms the following under the penalties of perjury that:

1.    It is necessary to dispense with a few preliminary issues before addressing the substance of the government's opposition to defendant's motion. Firstly, Ms. Perry has incorporated into her opposition papers my complaint to the First Judicial Department Departmental Disciplinary Committee concerning her conduct. To be clear, New York State Disciplinary Rule § 1-103(A): states, "A lawyer possessing knowledge, (1) not protected as a confidence or secret, or (2) not gained in the lawyer's capacity as a member of a bona fide lawyer assistance or similar program or committee, of a violation of DR 1-102 that raises a substantial question as to another lawyer's honesty, trustworthiness or fitness as a lawyer **shall** report such knowledge to a tribunal or other authority empowered to investigate or act

upon such violation." (**Emphasis added**). Ms. Perry was admitted to the practice of law by the First Judicial Department for the State of New York; thus, my report was forwarded to them for their review. Ms. Perry does not cite to any case law, statute, or court rule which alleviates the mandatory nature of the rule. Furthermore, if I did not contact the disciplinary committee, I would be committing sanctionable conduct for failure to abide by the State Disciplinary Rules. Ms. Perry must be held to answer for her conduct not only in the context of this motion seeking to protect the defendant's Constitutional Rights, but also professionally in her capacity as an officer of the Court.

2. Secondly, Ms. Perry makes it a point to argue that if this Honorable Court concluded that there was in fact prosecutorial misconduct, that dismissal is inappropriate because the conduct was that of one attorney and not systemic.[1] I have not accused any other member of the United States Attorney's office of any misconduct, and despite Ms. Perry's conduct, I still hold the institution in high regard; however, as Ms. Perry stated in her letter to the Court requesting additionally time to respond to defendant's motion (annexed hereto as **Exhibit A**), "the government's response will be review at higher levels within the United States Attorney's Office." As a result, even if Ms. Perry's superiors had not been aware of her conduct before, they are on notice now, and they have adopted her position as their own in opposing the motion.

3. Ms. Perry claims that there was no prosecutorial misconduct in her opposition papers. To advance this claim, Ms. Perry makes a number of affirmative statements hoping to discredit the accusations, and to imply that she was not actively courting Mr. Alexander's cooperation.

4. Firstly, Ms. Perry affirms that "[n]ot long after Alexander's arrest on February 9, 2006, **I had a conversation** with Fineman in which the topic of Alexander's possible cooperation was raised." Perry affirmation, page 3, ¶ 5 (**emphasis added**). Ms. Perry further asserts that "[a]lthough I spoke with Fineman on several occasions, I do not recall speaking with him on "numerous" occasions about the defendant's post-arrest statements. In discussing the possibility of cooperation, I did mention to Fineman that Alexander had been cooperative and had made statements, and I informed him of the substance of those statements." Perry affirmation, pages 3 – 4, ¶ 6. Ms. Perry states in her affirmation that, "I have no recollection of Fineman raising the possibility of deferred prosecution for his client; I am certain that I did not promise it or even myself raise it in any way." Perry's affirmation, page 4, ¶ no. 7. Finally, Ms. Perry states that, "[a]bsolutely no promises were made to the defendant to 'entice' him into a meeting with the government." Perry's opposition, page 28. For clarity's sake, it is important to note that the final statement was only made in her memorandum of law; thus, is not a sworn statement.

---

[1] "Fineman also argues that the Indictment must be dismissed 'because it is this Honorable Court's obligation to send a message to the United States Attorney that this type of conduct shall not be permitted by his assistants under the rational [sic] of Fields.' (Br. ¶ 90). But as Fineman alleges in the same paragraph, 'this is the most egregious conduct that [he] has every [sic] witnessed.' (Id.). Under his theory, this is the handiwork of one rogue Assistant United States Attorney; it is not alleged to be an institutional course of a 'demonstrated, long-standing' official misconduct, and therefore, under the rationale of Fields, dismissal would be a wholly inappropriate remedy." Perry's opposition, page 38.

5.  Ms. Perry makes reference to certain items of evidence in her attempt to make it appear that she was in possession of sufficient evidence to indict, try and convict Mr. Alexander at the time of his arrest, and to persuade the Court that she was not interested in procuring Mr. Alexander's cooperation prior to the March 29, 2006 meeting. First, Ms. Perry discusses the information procured from an unnamed coconspirator, and then she makes reference to certain bank records that she was in possession of before Mr. Alexander was arrested. We will examine each of these claims in turn.

6.  Finally, it is important to note what information is completely avoided by Ms. Perry's papers. Ms. Perry at no time mentions the manipulation of the time on the Miranda Waiver (attached to defendant's initial papers as **Exhibit D**). Ms. Perry make no attempt to explain when she became aware of this change, or what she did in her capacity as an officer of the Court to inquire why the change was made.

7.  Ms. Perry's above-mentioned statements concerning her conduct and promises in relation to her attempt to procure cooperation are complete fabrications or distortions of the truth, and her characterization of the evidence is a gross exaggeration. In the following paragraphs I will attempt to make this clear.

8.  Ms. Perry, in support of the proposition that the government has evidence, not withstanding Mr. Alexander's two statements (post-arrest and proffer), that ties Mr. Alexander, as well as Mr. Steven Riddick and Timothy Montgomery, to the alleged conspiracy relies on information provided by an unnamed co-conspirator (referred to in the indictment as CC-1).[2] During our conversations in February and March concerning this matter, Ms. Perry did affirmatively propose that she would offer deferred prosecution in exchange for Mr. Alexander's cooperation. In doing so, Ms. Perry informed me of the identity of CC-1, who is an individual by the name of Anthony Prince.[3]

9.  Ms. Perry then stated to me that there are certain issues concerning Mr. Prince that make him less than an ideal witness, and she implied that she may not be aware of Mr. Prince's location. Ms. Perry informed me that she was very interested in Mr. Alexander becoming a cooperator as a result of his previously unblemished record, and asked me to see if he would

---

[2] "Alexander has but to read the language of the Indictment, which alleges, for example, that CC-1 'arranged with each of TIMOTHY MONTGOMERY, STEVEN RIDDICK, and NATHANIEL ALEXANDER to deposit [fraudulently obtained] checks into their accounts.' (See Ind. at ¶ 7; see also, e.g., Ind. at ¶ 47 (charging that 'DOUGLAS SHYNE, STEVEN RIDDICK, NATHANIEL ALEXANDER, TIMOTHY MONTGOMERY and CC-1 agreed to transport from New York to Virginia at least approximately two counterfeit checks in the total aggregate amount of approximately $1,000,000, in order to deposit such checks into NATHANIEL ALEXANDER's bank accounts and to then split the proceeds of such checks.')." Government's opposition, Page 47.

[3] The Government, through Ms. Perry, provided the name of Mr. Prince to me freely, voluntarily and without a request for this information. A search of the documents filed in this action does not reveal any protective orders by this Honorable Court directing me or anyone else from disclosing information provided to the defense by the Government. Although I understand the sensitivity of such information, and that the under certain circumstances the government withholds information to protect the safety of their witnesses, but since Ms. Perry gratuitously informed me of Mr. Prince's identity, I have no reason to believe that she fears for his safety in this matter.

be willing to cooperate in exchange for deferred prosecution. A brief discussion about who Mr. Prince is will make these conclusions unavoidable.

10. I have done a little research with the aid of the Federal Pacer system, and have uncovered exactly what Ms. Perry meant when she implied that Mr. Prince would make a less than ideal witness. Firstly, it should be very easy for Ms. Perry to locate Mr. Prince since he is currently in Federal custody in the Eastern District of Virginia. Secondly, Mr. Prince has been charged with, and it appears convicted of, various crimes related to narcotics distribution under case number 2:06-cr-00012 in the Federal District Court for the Eastern District of Virginia.

11. Based on information and belief, this is not Mr. Prince's first contact with the criminal justice system. Through the information available on Pacer, it appears that Mr. Prince has been charged by the Federal government on at least four separate occasions for narcotics related offenses. From the information derived from Pacer, it appears that in 1995 (under case number 2:95-cr-00176), Mr. Prince was charged with narcotics related offenses for which he was initially sentenced to **324 months** of imprisonment. Interestingly enough, **on the Government's motion**, Mr. Prince's sentence was subsequently reduced to **103 months**. For some reason, the Government moved the Federal District Court in Virginia to give Mr. Prince a discount of more than 18 years for reasons not ascertainable through Pacer. Clearly, Mr. Prince became a cooperating witness and derived a tremendous benefit as a result.

12. Another interesting discovery from the Pacer service is that in Mr. Prince's current legal matter, a case which appears to charge substantially the same crimes for which Mr. Prince was facing 324 months in 1995, it appears that Mr. Prince pled guilty and received a sentence of only 72 months. It is difficult to assess what Mr. Prince's true exposure was in this matter under the sentencing guidelines without additional information; however, there is a strong likelihood that Mr. Prince was facing a life sentence for this latest matter in light of number of convictions he has and the severity of punishment Mr. Prince almost received in 1995.

13. It should also be noted that in this most recent narcotics related matter, it appears that Mr. Prince was arrested on January 6, 2006, Mr. Alexander's arrest in the case at bar occurred on February 9, 2006, and Mr. Prince entered into plea agreement with the government on February 22, 2006.

14. Clearly, all this information falls under the gambit of Brady-Giglio material; however, no Brady-Giglio material has been provided by the government in this matter. Additionally, this information makes Mr. Prince an extremely untrustworthy and undesirable witness for the government in the case at bar. For Ms. Perry to suggest otherwise is disingenuous at best.

15. It will be difficult – to put it mildly – for the government to procure a conviction as against Steven Riddick and Timothy Montgomery, two former Olympic Gold Medalists, and Mr. Alexander, a respected member of his community with an unblemished criminal record, where the only witness who can allegedly testify as to their involvement in the alleged conspiracy is this drug dealer, who regularly cooperates with the government when facing lengthy prison sentences. Ms. Perry has not, and will not argue that Mr. Alexander had any direct dealings whatsoever with any of the New York codefendants. Ms. Perry has

acknowledged to me in our negotiations that she does not believe that Mr. Alexander has had any direct dealings with Mr. Prince.

16. As for the strength of the government's documentary evidence, Ms. Perry claims that she was in possession of bank records and a deposit slip which affirmatively demonstrate that Mr. Alexander made the deposit of the $850,000 check.[4] I have attached the aforementioned documents to this affirmation as **Exhibit B**. If the Government could direct me to additional SunTrust Bank documents which they claim demonstrate that "Alexander himself filled out the deposit ticket and opened the bank account," I would appreciate that very much; however, a quick examination of the deposit slip (stamped 8508) that I was able to locate in the government's discovery does not bear Mr. Alexander's name or signature. Of the remaining nine pages of bank records, three pages are a computer generated bank statement addressed only to B & T Petroleum, the $850,000 check in question, and the checks drawn on the account at issue.

17. How these documents make "clear on their four corners," that Mr. Alexander personally did anything with respect to the $850,000 check is a mystery to me. How can Ms. Perry even claim that any of the documents contain Mr. Alexander's handwriting without the information unconstitutionally procured through the two statements at issue? Is Ms. Perry a handwriting expert? Did she call a witness at the grand jury who actually accompanied Mr. Alexander to the bank when this deposit was made? I would gladly try this case where the government's only evidence was the testimony of Mr. Prince and these documents. This is the only evidence that the government would have without the two unconstitutionally procured statements, and should this Honorable Court choose not to dismiss the indictment in its entirety as against Mr. Alexander, then the government should be limited to trying this case on the evidence they so cavalierly tout. The government was not even aware of the $150,000 check that is described in indictment "S4" until after the March 29, 2006 meeting.[5]

18. The proposition that Ms. Perry was not actively seeking Mr. Alexander's cooperation is nonsensical, and would require one to completely suspend reality to believe. There can be no doubt that Mr. Riddick and Mr. Montgomery are the two most note worthy defendants in this case as former Olympic Gold Medalists in their own right, and in light of their relationships with track and field star Marion Jones, the only female athlete to ever win five medals in one Olympics.[6] There can be no doubt that Ms. Perry stands to gain significantly in a personal and professional context should she be able to procure convictions as against these world class, and world famous athletes.

---

[4] "Further, as is facially clear from the Second Superseding Indictment (under which Alexander was indicted), the Government was in possession of Alexander's SunTrust Bank records prior to the issuance of that indictment (and thus, prior to Alexander's arrest); those records make clear on their four corners that Alexander himself filled out the deposit ticket and opened the bank account for the purpose of depositing the check." Perry's opposition, page 33.

[5] See indictment S4, page 16, ¶ 56-7, annexed to the defendant's initial motion as Exhibit F.

[6] Based upon information and belief, Mr. Montgomery has a child in common with Ms. Jones, and Mr. Riddick is Ms. Jones' track and field coach. Additionally, one of the checks in the SunTrust Bank documents was made out to Ms. Jones.

19. Although she may deny it now, Ms. Perry knows Mr. Alexander is perhaps the least important and most difficult to link defendant in this case. However, it is undeniable, that if he were involved in the conspiracy (which we vehemently deny) he would have the most to offer with respect to procuring a conviction as against Mr. Riddick and Mr. Montgomery. The government may have a strong case as against the other codefendants here (e.g. Shyne, Singh, ect…); however, as against the three Virginia defendants, the government's only witness that they claim can tie the Virginia defendants to the New York conspiracy is Mr. Prince, a scourge to society. Ms. Perry is a skilled prosecutor and highly competent attorney. She must be able to see the strengths and weaknesses in her case, and would obviously attempt to improve her case by seeking out cooperation from the one defendant that could, in theory, provide information about Mr. Riddick and Mr. Montgomery, and that does not have the credibility issues that plague Mr. Prince.

20. Ms. Perry readily admits that the subject of cooperation was discussed.[7] However, Ms. Perry implies that there was only one such conversation, and she does not state what she was willing to offer in exchange for cooperation. Ms. Perry's claims in her affirmation that "I am certain that I did not promise it [deferred prosecution] or even myself raise it in any way."[8] This implies that this conversation about cooperation did not get very far, and in any event, Ms. Perry does not suggest what it was that she had offered in exchange for cooperation. Ms. Perry acknowledges that she spoke to me on several occasions, but does not state what the subject of those conversations was.[9] Ms. Perry's opposition papers are completely devoid of any information concerning what I was requesting in exchange for Mr. Alexander's possible cooperation. What was the substance of the one conversation that Ms. Perry concedes occurred where the subject of cooperation was discussed? If Ms. Perry never offered anything, and I never asked for anything, then what in the world were we discussing? It would be illuminating for Ms. Perry to inform the Court what she does recall about what was offered in exchange for Mr. Alexander's cooperation; however, inexplicably, Ms. Perry chooses not to provide the Court with this information. All this seems to imply that Ms. Perry was not very interested in procuring cooperation from Mr. Alexander.

21. If Ms. Perry was not actively courting Mr. Alexander as a cooperator, then why did she "mention to Fineman that Alexander had been cooperative and had made statements," in our conversations? There would be no purpose in stating that Mr. Alexander had been cooperative in the past if Ms. Perry had not been interested in procuring his cooperation in the future. What was the purpose to "mention" that Mr. Alexander had made prior statements and to inform me of the substance of those statements if not to "induce" further cooperation? Ms. Perry contradicts herself time and time again in her affirmation, and it is from these contradictions that the truth flows.

---

[7] "Not long after Alexander's arrest on February 9, 2006, **I had a conversation** with Fineman in which the topic of Alexander's possible cooperation was raised." Perry affirmation, page 3, ¶ 5 (**emphasis added**).

[8] Perry affirmation, page 4, ¶ 7.

[9] See Perry affirmation, pages 3 – 4, ¶ 6.


22.  Ms. Perry cannot have it both ways, either she wanted Mr. Alexander's cooperation and she was willing to offer something of value in exchange, or she was not interested in cooperation and would not have engaged in the "several" conversations that she meagerly acknowledges occurred.

23.  Ms. Perry claims that I informed her that Mr. Alexander was asserting his innocence, and claims that it was at my request that she agreed to have the March 29, 2006 meeting.[10] Under what possible circumstance would a defendant need to call a prosecutor to inform her of his innocence where there was apparently no significant plea bargain negotiation on going. It is obvious through Ms. Perry's own affirmation that there had been serious negotiations on going with respect to cooperation. It is only when those negotiations broke down, and Ms. Perry knew that she would be unable to prove this case as against Mr. Alexander, and possibly the other two Virginia defendants, that Ms. Perry hatched this ruse which culminated with the March 29, 2006 meeting.

24.  Ms. Perry would have this Honorable Court believe that my legal strategy was to take Mr. Alexander to the offices of the U.S. Attorney, with no promises or assurances made by her, to attempt to convince the prosecutor of Mr. Alexander's innocence, and then I advised Mr. Alexander to waive his rights against self incrimination without any promises made by the government in return.[11] As stated above, this claim was only made in Ms. Perry's opposition memorandum of law, and not sworn to in her affirmation.

25.  Ms. Perry very properly corrected me in her opposition papers when she stated that the March 29, 2006 meeting was not for the purposes of procuring deferred prosecution.[12] The promise made by Ms. Perry was that the purpose for the meeting was for Mr. Alexander to provide the government with information which tended to show that he was not involved in the alleged conspiracy, for the government to investigate the information provided, and if the information provided was accurate, to dismiss the charges as against Mr. Alexander.

26.  As yet another example of contradicting herself, after asserting that no promises were made, Ms. Perry claims to have conducted some type of investigation.[13] Rather than simply stating what investigative methods were used, Ms. Perry makes vague references to some

---

[10] "Rather, Fineman informed me that his client claimed innocence, and wished to persuade the Government of that fact. Truthfully responding that the Government is not interested in the prosecution of innocents, I provided Fineman and his client with the opportunity to proffer Alexander's claims of innocence to the Government at a meeting scheduled for March 29, 2006." Perry affirmation, page 4, ¶ 8.

[11] "Absolutely no promises were made to the defendant to 'entice' him into a meeting with the government." Perry's opposition, page 28.

[12] "Further, it is clear that Fineman was not even contemplating deferred prosecution, as he and his client came to the Government's offices for an "innocence proffer," and of course, Alexander's self-proclaimed innocence would have been inconsistent with prosecution of any kind, deferred or otherwise." Perry's opposition, page 29.

[13] Without providing great detail on the Government's deliberative process and prosecutive decisions, the Government did indeed investigate certain matters (contrary to Fineman's allegations, (see Br. ¶¶ 32, 54)), and it determined not to investigate other matters irrelevant to the charges. (Perry's opposition page 32).

cerebral "deliberative process" on the part of the government. Ms. Perry calls the information provided "irrelevant;" however, she does not discuss the substance of the information.

27. Ms. Perry's claims that she made no promises to entice Mr. Alexander to attend the March 29, 2006 meeting are absurd. What would the purpose of providing the government with exculpatory information if the government made no representations that they would do anything with that information. When I informed Ms. Perry that there could be no cooperation as a result of Mr. Alexander's repeated declarations of innocence, Ms. Perry is the one who proposed the "innocent proffer." In doing so, she also asserted that there were other individuals who appeared to have received checks from the Shyne group of defendants that were not being prosecuted as a result of the government's belief that they were merely victims of fraud in this matter. Although Ms. Perry has never told me the names of these people, I did see the names of a number of individuals in the discovery provided by the government which were not named in the indictment, and this lead me to believe that Ms. Perry was being sincere in her representations that she would investigate the information provided in the meeting.[14]

28. It would be useful to compare the government's case as against the other conspirators with the information provided by Mr. Alexander to help illuminate the Court as to the information's relevance. It appears clear from the indictment, as well as from the voluminous discovery, that the modus operandi of the Shyne group in a number of transactions was to deposit counterfeit checks into accounts of shell corporations that had no legitimate business dealings, and/or using false names to disguise the true identity of the actors of the conspiracy.

29. Mr. Alexander provided the government with financial records for B & T Petroleum which demonstrated that this was a legitimate corporation which had employees and paid taxes until the Iraq war began and the corporate opportunity ceased to exist. Mr. Alexander provided the government with the names and contact information of the individuals that were his partners in the enterprise so that the government could verify the veracity of the business records and Mr. Alexander's explanation of the type of enterprise B & T Petroleum was. No one was contacted to verify this information.

30. In Mr. Alexander's case, the checks were not deposited into accounts which were difficult to trace back to him, in fact they were deposited into his accounts at the banks that he has utilized for years. Mr. Alexander provided the government with the name and contact information of the bank employee who handled the transaction. She would have told the government – had they simply asked – that she made an attempt to verify the validity of the check at Mr. Alexander's behest prior to depositing it into an account. She would have also informed the government that to her – a trained bank employee – the check appeared to be a valid instrument on its face.

---

[14] Some names of individuals not named in the indictment, but who appear to have received checks from this alleged conspiracy are Ada Margoshes, Romell Cook, Vanessa Dutchin, Athony Venture, to name a few. I do not know how these individuals were involved, or even if these are real people and not more false identities allegedly used by the other codefendants; however, it was my awareness of these names that caused me to believe that Ms. Perry was dealing with me in good faith.

31. Mr. Alexander had agreed to allow the government to speak with his attorneys in Virginia that handle his business dealings to demonstrate that he sought legal counsel in a transaction which he believed to be unusual, but had no reason to believe was criminal. The government chose to ignore all this information, failed to conduct any meaningful investigation. Instead, Ms. Perry choose to use the opportunity provided by the March 29, 2006 meeting to fill wholes in the first indictment (S2) that they would otherwise have been unable to fill, use this information in the subsequent indictment (S4), and ultimately present this evidence against Mr. Alexander at a trial.

32. If I had known that Ms. Perry had no intention to live up to her end of the bargain and investigate the information provided in good faith, I would never have advised Mr. Alexander to provide the government with this information until this matter was before a trial jury. This information is clearly relevant to the question of guilt or innocence in that it is the difference between being an active participant in a criminal enterprise and being taken advantage of by a sophisticated group of criminals without knowledge or acquiescence. Additionally, without the information provided at the March 29, 2006 meeting, the government would not have been able to even present any evidence at the trial that Mr. Alexander had any direct contact with the $850,000 check. Ms. Perry's reliance on the above-mentioned deposit slip affirmatively disposes of that contention.

33. To sum up, Ms. Perry was actively seeking Mr. Alexander's cooperation in this matter because she knew that Anthony Prince was the weakest link in her case as against the Virginia defendants, and if Mr. Alexander agreed to cooperate, she would have a much stronger case against two world famous athletes. The government's case against Mr. Alexander was and is wholly insufficient without using his own words against him; simply looking at the documents which Ms. Perry so highly touts demonstrates her disingenuousness with respect to this point. (See **Exhibit B**). It was Ms. Perry who suggested the "innocent proffer," not me as she would have this Honorable Court believe, and the reason is obvious. Ms. Perry knew that Mr. Alexander's post arrest statement was unconstitutionally procured, and that it might be suppressed should its unconstitutionality come to light; therefore, the only way to enhance her case was to perpetrate this ruse and have Mr. Alexander provide information – while not directly inculpating himself – that allowed the government to fill in certain deficiencies in their case. Finally, Ms. Perry has continued her dishonesty by submitting an affirmation which is riddled with exaggeration and perjury in opposition to this motion.

    WHEREFORE, it is respectfully requested that this Honorable Court suppress all illegally procured evidence, dismiss the indictment as against defendant Alexander, sanction Ms. Perry, and for such other as is just and necessary. In light of the Court's requested page limits on reply memorandum, it is respectfully request that the Court consider the defendant's remaining contentions as addressed in the initial moving papers, and should this Court find necessary, allow the defendant to submit additional briefs in the future.

Dated: New York, New York,
       June 30, 2006

                                                  Law Office of Michael Fineman, Esq.

                                                  By:            /s/           
                                                        Michael Fineman, Esq. (MF 0282)
                                                        *Attorney for Defendant,*
                                                        Nathaniel Alexander,
                                                        305 Broadway, 7th Floor
                                                        New York, New York 10007
                                                        (212) 897-5823