United State District Court
Southern District of New York
------------------------------------------------------------------------ x
United States of America,

        -against-                                    S4 05 Cr. 1067 (KMK)

Douglas Shyne,
Natasha Singh,                                          **ATTORNEY'S AFFIDAVIT IN**
    AKA Beatris Rodrigues,                         **FURTHER SUPPORT**
Christine Richardson,                              **DEFENDANT'S MOTION TO**
    AKA Deokali C. Richardson,                   **SUPPRESS THE POST**
Nathaniel Shyne,                                            **ARREST STATEMENT**
Toybe Bennett,
    AKA Dmitriy Makarevich,
    AKA Dmitriy Makervich,
    AKA Eduardo Rodrigues,
    AKA Cecilio Pena,
Roberto Montgomery,
Ephraim Richardson,
Naresh Pitambar,
Jason Watler,
Steven Riddick,
Nathaniel Alexander, and
Timothy Montgomery,

        Defendants.


------------------------------------------------------------------------ x


TO THE HONORABLE JUDGE OF SAID COURT:

       I, Michael Fineman, an attorney-at-law and Attorney for the defendant, with offices at 305 Broadway, 7th Floor, New York, New York, hereby affirms the following under the penalties of perjury that:

1.    On July 11, 2006 a suppression hearing was held before this Honorable Court. Based on the evidence adduced, the defendant's post arrest statement must be dismissed for violation of both his Sixth Amendment right to counsel and his Fifth Amendment rights against self incrimination and due process of law.

2.    At said hearing, the government called two witnesses, Special Agent Ruben Correa (hereinafter referred to as Correa), and Special Agent Peter Joseph (hereinafter referred to as Joseph). A brief summery of their testimony is necessary to discuss the constitutional issues presented.

3.  The first government witness was Correa. Correa testified that he has been a member of law enforcement since 1998, and has held positions as a New York State police officer, an investigator for the Bronx County District Attorney's Office, a deputy Unites States Marshal, a criminal investigator with the United States Attorney's Office for the Southern District of New York, and now as a special agent with the Department of Homeland Security Immigration and Customs Enforcement. (See the transcript of the hearing annexed hereto as **Exhibit A**, page 27).

4.  Mr. Alexander had been indicted prior to his arrest. (See **Exhibit A**, page 42, line 6-7). The first time that Correa ever heard of Mr. Alexander was at a preoperational briefing a day or two prior to affecting the arrest in this matter. (**Exhibit A**, page 29, line 12). At this briefing or a short time thereafter, Correa had a conversation with the case agent and was instructed to "take a statement if he [Mr. Alexander] wanted to give one." (**Exhibit A**, page 52, line 16), and Correa was informed by the case agent of some of the details of the case in order to assist him in that task of taking a statement (**Exhibit A**, page 52, line 19 – 23).

5.  At approximately 6:00 AM, on February 9, 2006 Correa went to the defendant's home in Virginia with a number of other members of law enforcement to affect the arrest. (**Exhibit A**, page 30, line 4 – 17). On direct examination Correa testified that Mr. Alexander "wasn't naked or in underwear" when he answered the door. (**Exhibit A**, page 31, line 25 – page 32, line 1). Correa testified that Mr. Alexander was "dressed somehow," but he was at some point allowed to change into street cloths. (**Exhibit A**, page 32, line 2 – 6). On cross examination, Correa testified that "it would have been a little demeaning to carry him in his underwear or sleeping attire to jail." (**Exhibit A**, page 59, line 18 – 19). When asked if the defendant's chest was bare, Correa stated "I don't think so." When asked if the defendant's legs were covered, Correa stated "I don't remember. I don't think so. They may have been long pajamas." (**Exhibit A**, page 60, line 17 – 21).

6.  Correa testified that when Mr. Alexander answered the door, he was standing in his doorway, and was approximately four to five feet away from Correa. (**Exhibit A**, page 57, line 2 – 11). Correa placed Mr. Alexander under arrest, entered the defendant's home, and took him to his living room. (**Exhibit A**, page 31, line 8 – 12). At this point a security sweep was conducted and Mr. Alexander's family was also instructed to go to the living room. (**Exhibit A**, page 31, line 12 – 14). Correa testified that after the security sweep, he "walked with Mr. Alexander to his dining room. At this point everybody was asking why we were there, so I was going to explain to them why we were there. So I pulled him [Mr. Alexander] to the side, into his dining room. (**Exhibit A**, page 32, line 11 – 15).

7.  Correa testified that at this point he advised the defendant of his Miranda Rights orally. (See **Exhibit A**, page 33). When asked on direct examination if there was anyone else present in the dining room, Correa testified that there were other agents and at least one uniformed police officer in the home and that they were walking "back and forth." (**Exhibit A**, page 34, line 12 – 17). However, on cross examination, Correa acknowledged that he and Mr. Alexander were alone at the dining room table when he claims the Miranda warnings were administered. (See **Exhibit A**, page 67, line 20). When asked if Mr. Alexander appeared comfortable, Correa stated that he appeared "anxious." (**Exhibit A**, page 34, line 1

– 2). When asked if Mr. Alexander was dressed at this point, Correa stated that he believed he was. (**Exhibit A**, page 34, line 4 – 5).

8. On direct examination, Correa testified that he advised Mr. Alexander of his Miranda Rights after the security sweep (**Exhibit A**, page 32, line 11), and no more than ten minutes after entering the home (**Exhibit A**, page 35, line 1 – 3); however, on cross examination, Correa stated that the security sweep only took "a few minutes a couple of minutes." (**Exhibit A**, page 62, line 16). While at his home, Mr. Alexander was characterized as "very cooperative." (See **Exhibit A**, page 35, line 20). Correa stated that he asked for permission to search to search the home for evidence of financial fraud, and the defendant specifically directed Correa to a briefcase. (See **Exhibit A**, page 36, line 1 – 21). Correa testified that the agents who went to get the briefcase were specifically told where to go in order to find it. (**Exhibit A**, page 75, line 14 – 18). Correa testified that the other agents did not look through the briefcase, but brought it to him. (**Exhibit A**, page 75, line 19 – 21).

9. Correa testified that he and Mr. Alexander talked to 20 to 30 minutes in the defendant's home before leaving to go to the RAC office. (See **Exhibit A**, page 37, line 1 – 10). On the way back to the RAC office, Correa was informed that another arrest team was having difficulty locating Steven Riddick, Correa told Mr. Alexander of that difficulty and the defendant agreed to help locate Mr. Riddick. (See generally **Exhibit A**, page 38 – 39).

10. On direct examination, Correa testified that "there were several agents there" when asked if there were any other agents traveling in other cars back to the office. (**Exhibit A**, page 39, line 21 – 23). On cross examination, Correa testified that there was "one other agent there that I knew of," at the RAC office. (**Exhibit A**, page 79, line 2).

11. Correa testified that when they arrived at the RAC office, Mr. Alexander was placed in a cell in a small processing area. (See **Exhibit A**, page 40, line 18 – 20). Correa claims that Mr. Alexander wanted to continue to discuss the case, so he asked one of the other agents for a copy of the indictment, and was given said indictment. (See **Exhibit A**, page 41, line 22 – page 42, line 9). With indictment in hand, Correa claims that the advised the defendant of his Miranda Rights again, orally. (See **Exhibit A**, page 42, line 13 – page 43, line 10). Correa testified that no one witnessed this second alleged administration of Miranda to the defendant. (**Exhibit A**, page 84, line 18 – 22). Correa claimed that he had specifically requested a Miranda waiver prior to asking for a copy of the indictment; however, he was not provided with one at that time. (See **Exhibit A**, page 79, line 10 – 25; page 84, line 8 – 17).

12. Correa testified that he "didn't get into detail about his [Mr. Alexander's] account of what happened. I [Correa] wanted to get into better detail just to cover myself." (**Exhibit A**, page 42, line 21 – 23). Correa testified that the defendant continued to make statements while in the processing room. (See **Exhibit A**, page 43, line 9 – 13). On cross examination, Correa admitted that it was he who wanted to continue the conversation at the RAC office. (**Exhibit A**, page 85, line 21 – 23). Correa added that, "At some point – he was being very cooperative. There was rapport going on. I wanted to get more details of the story." (**Exhibit A**, page 86, line 1 – 2). Correa testified that, "Was there a time period where I stepped away and not talked to him? No, sir. I was with him the whole time." (**Exhibit A**, page 86, line 13

– 14). Correa testified that there was nothing to indicate to him that the defendant was about to stop cooperating. (See **Exhibit A**, page 88, line 14 – 16).

13. At some point, Mr. Alexander was presented with a written Miranda waiver form (see **Exhibit A**, page 44, line 5 – 7), that Mr. Alexander was taken to a conference room, and at that time he did not believe that Mr. Alexander was handcuffed because he was being very cooperative. (See **Exhibit A**, page, 45, line 6 – 10).

14. Correa testified that he and the defendant went over the written Miranda waiver form together, but that Correa did not enter any information into the form with respect to the time or the date of the signatures. (See **Exhibit A**, page 45, line 11 – page 46, line 13). Correa testified that hand written time on the Miranda waiver appeared to be either 0900 or 0930, that the zero and the three are written over each other, and underneath that it says 0830. (See **Exhibit A**, page 46, line 18 – 23; see also Government's Exhibit 1 entered into evidence during the hearing). Correa testified that he does not "even remember the change being made at all," but then claims that any changes would have been made in the defendant's presence. (**Exhibit A**, page 47, line 18 – 25).

15. When Correa was asked if the hand written portion of the Miranda waiver was in his hand writing, he was unable to answer definitively. (See **Exhibit A**, page 92, line 22 – page 93, line 25). Correa testified that he would not have signed the document unless the information as to the time and date had already been entered into the document, but he does not have any recollection of the change in time. (See **Exhibit A**, page 94, line 10 – 24). Correa testified that the Miranda waiver document was always in his possession, but then stated that he could not remember where the document was after the interview. (See **Exhibit A**, page 95, line 17 – page 96, line 8). Correa went on to testify that he could not recall how his paperwork came to be in New York. (See **Exhibit A**, page 96, line 16 – 19; page 105, line 11 – 17). Correa testified that he turned over his paperwork from this arrest to the case agent. (See **Exhibit A**, page 102, line 9 – 17). Then, after writing the memorandum, Correa gave the case agent back his notes with the memorandum. (See **Exhibit A**, page 107, line 8 – 14).

16. Correa stated that he had never discussed the change of time on the Miranda waiver with anyone. (See **Exhibit A**, page 113, line 2 – 4). Then when asked if the Government Attorney had asked about the changed to the Miranda waiver prior to his conversations with her two to three weeks before the hearing, Correa stated that he had. (See **Exhibit A**, page 113, line 8 – 13). Correa was asked when he had that conversation, and the government objected. (See **Exhibit A**, page 113, line 14 – 24). Then after the objection was overruled, Correa contradicted himself and stated that he had not spoken with the government about the change of time on the Miranda Waiver. (See **Exhibit A**, page 113, line 25 – page 114, line 19). Correa was then asked if he had ever had a conversation concerning the substance of the defendant's statement or the circumstances of the arrest, and he stated that he had not. (See **Exhibit A**, page 114, line 20 – 25). On redirect examination Correa admitted that he did in fact speak to the government attorney prior to two to three weeks before the hearing. (See **Exhibit A**, page 119, line 11 – 20). Then on redirect, the government attorney asked Correa if he had conveyed the defendant's statement to any other agents, and he said no. (See **Exhibit A**, page 121, line 10 – 12). The government attorney repeated the questions, and

then asked a leading question, which was not objected to, and Correa admitted that he did in fact speak to the case agent about the statement. (See **Exhibit A**, page 121, line 13 – 20).

17. Correa testified that he generated a typed memorandum concerning this case. (See **Exhibit A**, page 70, line 3 – 21; see also Defense Exhibit A received into evidence at the hearing hereinafter referred to as the "memorandum"). Correa testified that he was trained to generate accurate paperwork as a federal agent. (See **Exhibit A**, page 74, line 9 – 14). This memorandum states that "after a cursory search of the residence, Nathaniel Alexander was taken to the RAC Norfolk ICE office for processing and questioning." (**Exhibit A**, page 73, line 19 – 23; see also the memorandum). Correa acknowledged that the memorandum does not state that the defendant was questioned in his home. (**Exhibit A**, page 78, line 8 – 10). Correa also claimed that the typed memorandum specifically discusses the two alleged oral Miranda warnings, but is devoid of any information concerning the written waiver. (See **Exhibit A**, page 104, line 23 – page 105, line 7).

18. After Correa's testimony concluded, the Court took a lunch recess. During the lunch recess, the case agent, Eric Rosenblatt, who had been present for Correa's testimony at the hearing, had a conversation with the government's next witness, Peter Joseph. (See **Exhibit A**, page 164, line 13 – 15). During this conversation, agent Rosenblatt gave the witness a "hard time" saying "I [Joseph] was underestimating my role in the current case we are working." (**Exhibit A**, page 164, line 16 – 22).

19. After the lunch break, Joseph testified in the hearing. Joseph testified that in addition to himself and Correa, he was accompanied by two federal agents and two local police officers to the defendant's home. (See **Exhibit A**, page 125, line 20 – 25). Joseph testified that when the defendant answered the door he was wearing only his boxers, his chest was bare and he was not wearing pajamas. (See **Exhibit A**, page 126, line 16 – 22; page 145, line 14 – 21).

20. Joseph stated that when the defendant opened the door, he was in the foyer of his home approximately three feet away from Joseph. (See **Exhibit A**, page 146, line 25 – page 147, line 13). Joseph testified that he and the other agents needed to enter the home and conduct a security sweep because the defendant was not wearing any cloths. (See **Exhibit A**, page 148, line 15 – 22). Joseph testified that he had no indication that this would be a "violent arrest and Mr. Alexander was very cooperative from the very beginning…" (**Exhibit A**, page 128, line 1 – 5). Joseph testified that Mr. Alexander was asking why he was being arrested and what was going on, and that Joseph told him that "another agent would sit him down shortly and discuss that with him." (**Exhibit A**, page 129, line 1 – 6).

21. Joseph testified that after allowing Mr. Alexander to get dressed, he took the defendant to the dining room where Correa was waiting. (See **Exhibit A**, page 129, line 9 – 13). Mr. Alexander's family was kept what Joseph described as a "family room" while the defendant was taken to the dining room. (See **Exhibit A**, page 153, line 1 – 11). Joseph testified that the family was separated from the defendant because, "[t]ypically when we speak to a suspect they are isolated." (**Exhibit A**, page 153, line 15 – 17). Joseph testified that the defendant was making statements to Correa in the home. (See **Exhibit A**, page 131, line 17 – 20). Joseph then left the defendant with Correa with the defendant in the dining room, and

-5-

reiterated that "Mr. Alexander gave us no indication that he was hostile or uncooperative." (**Exhibit A**, page 130, line 6 – 9).

22. Joseph testified that at some point he reentered the dining room and asked Mr. Alexander for permission to search his home. (See **Exhibit A**, page 130, line 15 – 21). Joseph testified that he and another agent then started to search the home, but because they did not know what they were looking for, they asked the defendant for a more specific place to look. (See **Exhibit A**, page 131, 1 – 6). Joseph then testified that Mr. Alexander directed him and the other agent to his briefcase – which they found with ease – but because they had "no clue what [they] were looking for so at that point in time [they] kind of terminated the search of the house." (**Exhibit A**, page 131, line 3 – 14).

23. According to Joseph, he and the other agents spent from half an hour to an hour in the defendant's home. (See **Exhibit A**, page 151, line 10 – 14). Joseph stated that it takes 15 minutes to half an hour to travel from the defendant's home to the RAC office, depending on traffic conditions. (See **Exhibit A**, page 151, line 3 – 9). Joseph testified that Correa and another agent drove the defendant back to the RAC office. (See **Exhibit A**, page 131, line 21 – 25). While in transit back to the RAC office, agent Joseph was instructed to return to the defendant's home and retrieve his cellular telephone, and to bring that phone back to the office. (See **Exhibit A**, page 132 – page 133, line 8). Joseph returned to the RAC office at approximately 8:00 AM. (See **Exhibit A**, page 133, line 9 – 20).

24. When Joseph arrived at the RAC office, Correa was speaking to Mr. Alexander in the processing room in a confinement cell. (See **Exhibit A**, page 133, line 22 – 24; page 135, line 5 – 9). Joseph testified that he provided Correa with the Miranda waiver document, which he retrieved from the search kit in his vehicle. (See **Exhibit A**, page 136, line 11 – 17). Joseph testified that Correa had never asked for a Miranda waiver document. (See **Exhibit A**, page 161, line 15 – 17). Joseph stated that he asked Correa if the defendant had signed a waiver form, and Correa said that he had not, so Joseph suggested that he do so because, as Joseph testified, "In my our office – different jurisdictions are different. As far as our practice, in our office our AUSAs typically like to have these filled out if we are going to speak as good practice." (**Exhibit A**, page 161, line 18 – page 162, line 19). Additionally, since the Miranda Waiver was in Joseph's vehicle, it was available at the inception of the arrest encounter. (See **Exhibit A**, page 161, line 8 – 14).

25. Joseph testified that when Correa advised Mr. Alexander about the written Miranda waiver, he said "this is just a formality type thing, something we have to go over." (**Exhibit A**, page 137, line 11 – 12). Joseph stated that he was the one to enter the time on the Miranda waiver. (**Exhibit A**, page 138, line 11 – 12). Joseph claimed that he inadvertently wrote the time as 9:30 AM, and Correa immediately noticed the error and had him correct it. (**Exhibit A**, page 138, line 15 – 22). Joseph stated that he remembered this error because, "At least as far as significant events go that morning that was one of them." (**Exhibit A**, page 163, line 20 – 21). However, Joseph claimed that rather than changing the 9 in the 9:30 to an 8 when correcting his mistake on the document to reflect a time of 8:30 instead of 9:30, he started to change the 3 to a 0, which would have indicated a time of 9:00 AM. (See **Exhibit A**, page 157, line 3 – page 158, line 5). Joseph testified that Correa was aware of the change in time on the Miranda Waiver. (See **Exhibit A**, page 165, line 1 – 3).

-6-

26. The Sixth Amendment right to counsel is triggered at or after the time that judicial proceedings have been initiated, whether by way of formal charge, preliminary hearing, indictment, information, or arraignment. Here, the defendant was arrested subsequent to being indicted; therefore, his Sixth Amendment right to counsel attached before the agent even knocked on his door. (See **Point I**, Memorandum of Law).

27. Additionally, once the right to counsel has attached, the Sixth Amendment imposes on the government an **affirmative obligation** not to solicit incriminating statements from the defendant in the absence of his counsel, and that obligation is breached when the government has taken some action that was designed deliberately to elicit incriminating remarks. Here, Correa was specifically instructed by the case agent to obtain an incriminating statement; thus, violating the defendant's Sixth Amendment rights. (See **Point I**, Memorandum of Law).

28. The government bears a heavy burden of proof to show that defendant understood his Miranda rights and knowingly waived those rights. To prove a valid waiver of Miranda, the government must show (1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right. Here, the government has failed to even establish that the defendant was even advised of his rights until the altered Miranda waiver was executed. The only government witness who testified about oral Miranda, Correa, was contradicted by his own paperwork, contradicted himself several times during the hearing, and was contradicted on several issues by the government's only other witness. Additionally, Correa failed to recall many critical facts concerning the administration of Miranda. Correa's credibility has been tainted to the point of unbelievability. (See **Point II**, Memorandum of Law).

29. Additionally, the government's conduct at the time of arrest was coercive; thus, if the Court finds that Miranda was administered orally, any waiver of the defendant's Fifth Amendment rights was involuntary. (See **Point II**, Memorandum of Law).

WHEREFORE, it is respectfully requested that this Honorable Court suppress all illegally procured evidence, because the Government violated the defendant's Sixth Amendment right to counsel but deliberately eliciting incriminating statements from him after a criminal proceeding had commenced, and the government has failed to carry their burden of proof to show that the defendant made a knowing and voluntary waiver of his Fifth Amendment rights prior to questioning him.

Dated: New York, New York,
       July 25, 2006

                    Law Office of Michael Fineman, Esq.

                    By: _____/s/_____
                        Michael Fineman, Esq. (MF 0282)
                        *Attorney for Defendant,*
                        Nathaniel Alexander,
                        305 Broadway, 7th Floor
                        New York, New York 10007
                        (212) 897-5823