67BUALE1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4          v.                              05 CR 1067(KMK)

5  NATHANIEL ALEXANDER,

6              Defendant.

7  ------------------------------x

8                                      New York, N.Y.
                                       July 11, 2006
9                                      10:35 a.m.

10
   Before:
11
                        HON. KENNETH M. KARAS
12
                                       District Judge
13

14                      APPEARANCES

15 MICHAEL J. GARCIA
       United States Attorney for the
16     Southern District of New York
   DANYA PERRY
17 LYNN A. NEILS
       Assistant United States Attorneys
18

19 MICHAEL FINEMAN
       Attorney for Defendant
20

21

22

23

24

25

67BUALE1

1          (Case called)

2          MS. PERRY:  Before we begin, two housekeeping matters.

3          For purposes of this motion, my supervisor Lynn Neils

4   is also sitting at counsel table.

5          THE COURT:  Good morning, Ms. Neils.

6          MS. NEILS:  Good morning.

7          MS. PERRY:  I also have a personal matter to take up

8   at sidebar with Mr. Fineman, if that is appropriate.

9          THE COURT:  Sure.

10          (Sidebar discussion off the record)

11          THE COURT:  Counsel came up to the sidebar to discuss

12   a matter.  Mr. Fineman was there and Ms. Perry and the Court,

13   and the Court has no problem with what was said off the record.

14          With respect to your motion, Mr. Fineman, I will note

15   that Mr. Fineman and his client are here as well.

16          With respect to the Miranda issue, the government

17   obviously agrees that there is a need for a hearing.

18          I don't know, are counsel prepared to go forward on

19   the Miranda portion of this?

20          MS. PERRY:  Absolutely.

21          THE COURT:  Mr. Fineman, are you prepared to go

22   forward?

23          MR. FINEMAN:  Absolutely.

24          THE COURT:  With respect to the other component of Mr.

25   Fineman's motion, Mr. Fineman, what is your view on a hearing

67BUALE1

1    with respect to the other component of your motion?

2              MR. FINEMAN:  With respect to the motion for a

3    dismissal as a result of prosecutorial misconduct, I don't

4    think that a hearing would be necessary and appropriate in the

5    event that the Court ordered the government to turn over the

6    grand jury transcripts, and I would have access to those

7    transcripts and the witnesses that testified at grand jury as

8    to the quality and quantity of their evidence at the time of

9    the first indictment.

10             THE COURT:  But there are other aspects to your motion

11   that go to Ms. Perry's alleged knowledge of the alleged Miranda

12   violation, the circumstances that led up to the so-called

13   innocence proffer.  And there are allegations that you make

14   that she contests.  So my question is, given that there appears

15   to be a factual dispute on that component of your motion, do

16   you agree that this hearing is necessary to flesh out some of

17   those other allegations that you made?

18             MR. FINEMAN:  I do agree that a hearing is necessary.

19   The only issue would be with the hearing is that I believe I

20   basically have made myself a witness.

21             THE COURT:  That's why I asked, because I understand

22   that everybody may be prepared to go forward with respect to

23   the Miranda component of this, and you obviously can conduct

24   that hearing on behalf of your client, but to the extent that

25   you need to testify -- and I am trying to ascertain whether I

67BUALE1

1    do think you need to testify -- there needs to be counsel who

2    can represent the client in connection with this and those

3    arrangements, I gather, have not been made?

4              MR. FINEMAN:  Not at this time.  But I do have counsel

5    in mind that could be available.

6              THE COURT:  But you think that there is a need for a

7    hearing with respect to some of your other allegations?

8              MR. FINEMAN:  I do.

9              THE COURT:  With respect to which allegations in

10   particular do you think that there is a need for a hearing?

11             MR. FINEMAN:  Well, there are so many.  I believe

12   there is a need for a hearing with respect --

13             THE COURT:  I am not sure I understand why you are

14   laughing, but go ahead.

15             MR. FINEMAN:  There is a need for a hearing with

16   respect to Ms. Perry's allegation that there was no promise

17   whatsoever made to my client with respect to the conversation

18   that led to his cooperation.

19             I think it is relatively clear from the motion papers

20   that very early on in this case the government has been seeking

21   my client's cooperation in this matter, and it is only at the

22   point at which my client informed me and I passed that

23   information on to the government that he could not cooperate as

24   a result of his innocence that Ms. Perry changed her tone and

25   said, Oh, let's do an innocence proffer and get that

67BUALE1

1    information and we will investigate it.

2             Well, I think that there needs to be a hearing as to

3    whether Ms. Perry actually conducted that investigation or

4    directed anybody to have an investigation.

5             THE COURT:  Hang on.

6             You think the first issue is Ms. Perry's statement

7    regarding her interest in your client's cooperation; I take it

8    that includes the alleged statement about consideration of a

9    deferred prosecution agreement?

10             MR. FINEMAN:  Yes.

11             THE COURT:  The second part of it is what, statements

12    leading up to the innocence proffer?

13             MR. FINEMAN:  Yes.

14             THE COURT:  And then the third part includes the

15    promise to do an investigation?

16             MR. FINEMAN:  And if the results of that investigation

17    were verified to the government's satisfaction, that the case

18    would be dismissed against my client.

19             THE COURT:  Dismissed if they determined that in fact

20    he was innocent?

21             MR. FINEMAN:  Yes.

22             THE COURT:  What else?

23             MR. FINEMAN:  Or if they didn't believe that they had

24    sufficient information to prosecute him as a result of the

25    information provided.

67BUALE1

1          THE COURT:  What else?

2          MR. FINEMAN:  I think that the hearing should discuss

3     when Ms. Perry became aware of the change in the Miranda

4     document, but that issue may be moot after this hearing, in

5     terms of the agent's testimony as to that document.

6          THE COURT:  And we will talk about all of that in a

7     little more detail, but starting with the last one, the change

8     in the Miranda document to you is important because you

9     attribute nefarious motives to the change.

10          MR. FINEMAN:  Yes, sir.

11          THE COURT:  So you would have to build into that the

12     assumption that Ms. Perry would have to also attribute

13     nefarious motives to the change as well, in order for her

14     awareness of this change to become meaningful in this case,

15     right?

16          MR. FINEMAN:  Yes.

17          THE COURT:  What is the evidence that you have that

18     she was aware that it was a nefariously motivated change in the

19     Miranda document?

20          MR. FINEMAN:  On its face, the Miranda document was

21     altered.

22          THE COURT:  Right.

23          MR. FINEMAN:  And that is a highly unusual

24     circumstance, to say the least, in terms of a Miranda document

25     where the most important issue in terms of Miranda is when the

67BUALE1

1  time of waiver was, and any conversation had before Miranda is

2  protected by Fifth Amendment privilege as opposed to after.

3         THE COURT:  But as I understand it, what the

4  government is saying is that your client waived at the house

5  before there is this written waiver, that the agents go to the

6  house at 6 in the morning or so and that your client is

7  Mirandized then, according to the agents.  He is orally

8  Mirandized and he orally waived.  I understand you contest

9  that.

10        I have to say, when I read your papers I understood

11 them to be saying that the first time your client is Mirandized

12 is when he gets brought to the ICE office and he executes the

13 form.  It was only when I read the government's response that

14 in their version of the events that he had already been

15 Mirandized and he already waived so that the statements that he

16 allegedly makes after the alleged waiver of his Miranda rights

17 is somewhere after 6 a.m. and before he gets to the office.

18 The government's view is those statements are admissible

19 because he waived.

20        I understand that you contest that.  I understand

21 that.

22        But my point is, I am not sure then, given that --

23 let's assume for the sake of argument that the government, and

24 from Ms. Perry's perspective, she does her own investigation

25 and she believes the agents when they say that your client was

67BUALE1

1    Mirandized and he waived.  What is nefarious about changing the

2    time on a waiver that ultimately he didn't do anything with?

3                He calls a lawyer, and the lawyer says, Don't talk.

4                And he says, I'm not talking.

5                And according to Ms. Perry, the agent stops.  So I am

6    not sure what is nefarious about that, given that set of

7    circumstances, if those are the facts as Ms. Perry believed

8    them to be.

9                MR. FINEMAN:  I would contest that Ms. Perry believed

10   that.

11               THE COURT:  What is your basis for that?

12               Why is this any different from any other case where

13   defense makes a motion saying, I was not Mirandized or

14   consented to the search, or any of the other motions that are

15   obviously very important that are done pretrial?

16               Prosecutor talks to agents.  Prosecutor believes the

17   agent's version.

18               Lawyer believes client's version.

19               And we have a hearing and I get paid a handful of

20   bucks to decide who I believe.

21               Why does that mean that either you or Ms. Perry is

22   wrong to believe the person that you believe?

23               MR. FINEMAN:  The reason, I submit, your Honor, is

24   that at the time of my client's first indictment under S2, the

25   government had insufficient evidence.

                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

67BUALE1

1           THE COURT:  What is your basis for that?

2           MR. FINEMAN:  The face of the indictment.  The

3    indictment says in its face that my client caused the check to

4    be deposited, however, they don't state how they had any

5    knowledge that my client caused the check to be deposited.

6           THE COURT:  They don't have to state that in the

7    indictment.  All that they have to do is track the language of

8    the statute.  They don't have to lay out the basis for the

9    allegation.  I don't understand.

10          MR. FINEMAN:  Based on the proffer, after the March 29

11   proffer, the types of questions that they were asking and the

12   types of information that was later included in the indictment

13   makes it clear that the indictment had changed.

14          THE COURT:  What is it about the questions that they

15   asked that leads you to believe that Ms. Perry didn't think

16   that she had enough to get an indictment?

17          MR. FINEMAN:  It is more than just having enough to

18   get an indictment.  It is also having enough to have proof at

19   trial.

20          THE COURT:  What is it about the questions that were

21   asked at the proffer that leads you to believe that this was a

22   bad faith prosecution?  That is what you are saying, that the

23   government not only brought the case knowing it didn't have a

24   triable case, but knew that at the time when they got the

25   indictment.

67BUALE1

1    MR. FINEMAN: Yes, sir.

2    THE COURT: What is your evidence to support that

3    allegation?

4    MR. FINEMAN: Well, the only witness that the

5    government can point to that had any information about this

6    case is the individual by the name of Anthony Prince. Anthony

7    Prince is a four-time convicted felon.

8    THE COURT: I got that. He has a rap sheet as long as

9    your arm. How do you know that he is the only basis that the

10    government had, first of all? Secondly, so what? He is a

11    cooperator with a criminal history. Name me a criminal case

12    that doesn't have that.

13    MR. FINEMAN: But the government even stated to me

14    that he never had any direct contact with my client.

15    THE COURT: So what? They can have a circumstantial

16    case against your client.

17    I am not sure I understand, other than your surmise as

18    to what evidence you have that Ms. Perry, where she sought the

19    indictment against your client, the first indictment, she knew

20    that she didn't have enough to bring the case to trial. That

21    is a very serious allegation, and I want to know what the basis

22    for that serious allegation is.

23    MR. FINEMAN: The basis is the fact that we looked at

24    that proffer and that they never conducted any investigation

25    about the information that we provided, and that after that

67BUALE1

1   proffer that additional information ended up in an indictment

2   which was served on us that exact date that we came for a

3   conference, and that I personally called the people that we

4   provided the government that had information about my client's

5   business operations, about the conduct of that business, that

6   it wasn't just some corporation set up for the purpose of money

7   laundering; it was an actual viable business that had employees

8   at one time.  We provided the government with that information

9   to speak to those people and they never did.

10          My client called his attorney before he made any

11  transactions in this case to find out, to seek legal counsel.

12          We were willing to allow the government to speak to

13  the Virginia attorney and discuss that issue, but they never

14  called the Virginia attorney --

15          THE COURT:  Proffer sessions happen all the time.

16  Sometimes people are believed.  Sometimes they are not.

17          Ms. Perry makes clear in her papers that the

18  statements that your client allegedly made the day of his

19  arrest, they didn't think were believable on the face.  She

20  says there is a different set of statements that are given.

21          She says that your client basically acknowledges what

22  he said to the agents on the day of the arrest weren't true.

23  He gives a new story that Ms. Perry and the agents don't

24  believe.

25          She said that they conducted some investigation, but

67BUALE1

1  just because they apparently didn't believe everything or maybe

2  even nothing that your client said, and therefore didn't call

3  the people that you wished them to call, why is that evidence

4  that when they brought the first indictment, they knew they

5  didn't have a triable case, or is it just not evidence, that

6  maybe they didn't believe your client?

7      I just don't know why that is evidence of a bad faith

8  prosecution that was brought here.

9      MR. FINEMAN:  I would submit that if your Honor were

10 to review the grand jury minutes from indictment No. 1 that

11 that question may be cleared up.

12     THE COURT:  No.  You are putting the egg before the

13 chicken or the cart before the horse.  You have it backwards,

14 because I don't start reviewing a grand jury transcript and you

15 don't, unless there is some basis to think something untoward

16 was done here.

17     And I am just not sure I understand why it is and what

18 your evidence is, what your proof is.  You are not happy that

19 the proffer happened.  We will get to that in a minute.  And

20 you are not happy that I guess that they didn't believe it or

21 didn't investigate it as much as you would like them to, but I

22 am not sure what that has to do with what was in their mind

23 when they originally brought the indictment.  I just don't

24 understand that.

25     MR. FINEMAN:  A lot of it has to do with our different

67BUALE1

1    versions of the facts.  If you credit my version of the facts,

2    then Ms. Perry had been seeking cooperation all along.

3            THE COURT:  Sure.  But that is not unusual.  But then

4    what happens, she says she is interested in your client's

5    cooperation.  Among other things, he doesn't have a criminal

6    record.  And she mentions time is of the essence.  Fine.

7            According to you, she says that she would even be

8    willing to consider a deferred prosecution agreement which she

9    says, in her words, "I am certain I did not."  That is a

10   factual dispute leading up to the cooperation discussion.

11           You report back that your client says no to

12   cooperation because he is innocent.  It makes sense, if he is

13   innocent, what is there to cooperate against, people that he

14   didn't commit a crime with?

15           So then Ms. Perry says fine.  So now there is a change

16   in the paradigm of the discussion.

17           And then Ms. Perry, according to you, says, Well, we

18   don't want to prosecute innocent people so if you want to bring

19   him in, bring him in.

20           So whatever promises were made, according to you,

21   about a deferred prosecution agreement in connection with

22   cooperation becomes moot, once the conversation changes to

23   whether or not your client is in fact innocent and therefore

24   did not want to cooperate.

25           MR. FINEMAN:  That's correct.

67BUALE1

1           THE COURT:  So I am not sure that I understand what

2    the purpose of going down the road of whether a DP was

3    discussed in the context of cooperation.

4           Let's assume that you are right.  Let's assume that we

5    have a hearing and I agree with you.  So what?  You said no to

6    cooperation.  What was the false pretense upon which your

7    client came into the innocence proffer?  It wasn't that he was

8    going to get a DP because a DP wasn't on the table for those

9    purposes, right?

10          MR. FINEMAN:  That's correct.

11          THE COURT:  Then what happens?

12          So what happens, you decide to bring him in?

13          MR. FINEMAN:  That's correct.

14          THE COURT:  You did.  Nobody put a gun to your head.

15          MR. FINEMAN:  Absolutely.

16          THE COURT:  Nobody put a gun to your head.

17          You are given an agreement that is in plain English,

18   and Ms. Perry says it is used for so-called innocence proffer.

19   It lays out what rights your client is waiving and you and your

20   client sign it, right?

21          MR. FINEMAN:  That's correct.

22          THE COURT:  So I am at a loss to understand, given

23   that sequence of events, what your proof is that there was any

24   bad faith decision by the government to initially indict your

25   client.  I am still looking for that evidence.

67BUALE1

1           MR. FINEMAN:  I would just defer to my papers.

2           THE COURT:  I have read your papers, and if they

3     bowled me over, I wouldn't be asking these questions.

4           You make an allegation.  You go to the grievance

5     committee and you accuse somebody of unethical conduct.

6           We have been going at it for about 10 or 15 minutes,

7     and I have not heard any evidence to support a single

8     allegation.  I want to know what the evidence is other than

9     your speculation.

10          MR. FINEMAN:  My evidence is that I had a conversation

11    with Ms. Perry as attorney to attorney, and she made certain

12    representations.  And then after that --

13          THE COURT:  We have covered that.

14          MR. FINEMAN:  And that conversation culminated in the

15    proffer where Ms. Perry made further representations that she

16    would investigate the information provided.

17          And at that proffer, Ms. Perry didn't ask very many

18    questions about the information that we wanted to provide.

19    Instead she went into a cross-examination about the underlying,

20    un-Mirandized statement.  She knew that statement was

21    un-Mirandized.

22          THE COURT:  How do you know that?

23          MR. FINEMAN:  She is a competent attorney.

24          THE COURT:  She said she talked to the agent and the

25    agent said, We Mirandized the defendant and he waived, and she

67BUALE1

1    believed the agent.  What is there extraordinary about that

2    fact scenario?

3           You believe your client.  She believes the agent.  OK.

4    We have a hearing.  I decide.

5           What is it about that scenario that makes this

6    different than any other case where there is a challenge to a

7    statement that is allegedly made?

8

9           (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

67brale2

1      MR. FINEMAN:  Because when the government understood

2  that you would not cooperate and they knew that this case

3  wouldn't be resolved without trial, they needed additional

4  evidence against my client.

5      THE COURT:  I'm still looking for the gun that said

6  you had to bring your client in for the proffer session.  If

7  you thought the government had half a case or less than half a

8  case, no case, and you didn't want to bring your client in for

9  an innocence proffer -- which is a decision that counsel make

10  all the time, because they don't want to have their client look

11  bad, they don't want to waive self-incrimination rights, they

12  don't want to show their cards.  The decision whether or not to

13  bring in a witness for an innocence proffer is a very delicate

14  decision.  Nevertheless, the agreement is in plain English.

15      You signed it.  You didn't have to bring your client

16  in, you didn't have to sign it.  To the extent you are saying

17  that Ms. Perry knew she had no case, I still haven't seen that

18  evidence yet; knew that your client's Fifth Amendment rights

19  were violated, I haven't seen that evidence yet.  So if the

20  whole proffer session was a ruse to get evidence, I still

21  haven't seen evidence for that yet either.

22      MR. FINEMAN:  Perhaps at the conclusion of the hearing

23  you may.

24      THE COURT:  Do you want to come take the stand and say

25  some of this stuff under oath?  Is that what you want to do?

67brale2

1  Are you going to give me facts?  Are you going to give me your

2  version of events that matters, or are you going to give me

3  your speculation?

4       MR. FINEMAN:  Your Honor, I would rather not

5  speculate.  I would rather say exactly what happened.

6       THE COURT:  When you get to the punch line here, if it

7  is that she had to have known X or she must have known Y or I

8  suspect she knew Z -- I haven't seen anything that tells me why

9  it is I can conclude that, I can decide that, other than your

10 speculation.  It is one premise based on another:

11      He was not Mirandised and Ms. Perry knew that;

12      And before that, by the way, before he was even

13 arrested, she knew she had no case, so she decided to indict

14 somebody she had no evidence on, she would go to trial with;

15      Then, she knows the agents violated your client's

16 Miranda rights, and then she tries to seek cooperation;

17      When she is rebuffed on that, she throws out the idea

18 of a proffer session, telling you in writing that anything your

19 client says can be used against him, not exactly a clever way

20 to get evidence, and you sign it;

21      Then, she doesn't believe your client any more than

22 the agents apparently believed him after he was arrested.

23      I am just trying to understand.  I am willing to

24 assume your version of the events, the actual facts:  That she

25 said she would consider a deferred prosecution agreement, that

67brale2

1    she said time was of the essence.  I think you have a hard time

2    with your allegation that the statements were buried in a mass

3    of discovery, because she produces a letter or she separately

4    produces the statements.  So that allegation has been rebuffed,

5    unless you want to press that.

6            MR. FINEMAN:  They were produced at the same time.

7    Discovery was in a box and the statement was in an envelope.

8    They were produced at the same time.

9            THE COURT:  Do you want me to go through the letters

10   with you?  There is a documentary trail on this one.

11           MR. FINEMAN:  I understand.  I have gotten the

12   documents.

13           THE COURT:  The statements were separately sent.

14           I didn't interrupt you.  Please don't interrupt me.

15           The statements were separately sent under a separate

16   cover letter.  In fact, the letter sent out the bulk of

17   discovery, let everybody know, not just you, let everybody know

18   that under a separate cover the statements, and so forth, will

19   be sent, which was what was done.  So I am not sure that that

20   squares with what was in your allegations.

21           Be that as it may.  If the government puts all this in

22   one box of discovery and doesn't identify any of the separate

23   stuff, presumably you have talked to your client, presumably

24   you have heard his version of the events, presumably you have

25   come to the conclusion that his rights were violated.  Fine,

67brale2

1   you can file a suppression motion.  But I still don't

2   understand how it is that anything was done to coerce or

3   mislead or your client, anything that happened at that

4   innocence proffer.

5           MR. FINEMAN:  Your Honor, Ms. Perry said that she

6   would conduct an investigation.  That investigation was never

7   conducted.  She ran directly to another grand jury to supersede

8   the indictment.  They added additional facts that were procured

9   at the proffer.  Ms. Perry from day one has been saying that he

10  cooperated when he was arrested, he made all these statements,

11  he has inculpated himself, how can he be innocent, he is not

12  innocent.  She had her opinion that he was not innocent.

13          THE COURT:  Then you say, Ms. Perry, I will see you at

14  trial, I'm not bringing him in.

15          MR. FINEMAN:  That's what I did.

16          THE COURT:  But you brought him in and you signed the

17  agreement.  You don't have to bring him in.  You are going to

18  have to be very careful about what she said she would

19  investigate.  She said she would investigate it to the extent

20  she thought your client was innocent.

21          What you are suggesting is that there has been

22  misconduct, so you can file a grievance against someone merely

23  because she decided not to believe your client and run down

24  leads she thought were pointless.  Is that what you are saying?

25          MR. FINEMAN:  That is not what I am saying.

67brale2

1          THE COURT:  Then I am not sure I understand where the

2     problem here is.

3          MR. FINEMAN:  Your Honor, I don't know how I can say

4     it any other way.

5          THE COURT:  I think what we are going to have to do is

6     do the Miranda hearing today, and then you are going to have to

7     get another lawyer and we will take testimony, if that is what

8     you want to do, Mr. Fineman.  If you want to take the stand and

9     come in and say this under oath, that's fine.  We will do that.

10          MR. FINEMAN:  OK.

11          THE COURT:  Ms. Perry, anything you want to say thus

12     far?

13          Have a seat, Mr. Fineman.

14          You don't have to stand.

15          MS. PERRY:  Thank you.  Your Honor, it seems clear to

16     the government that no hearing is necessary even if Mr. Fineman

17     does determine that it is in his interest or his client's

18     interest to take the stand.  There is no real factual dispute

19     here.  The only thing he has pointed to over the course of this

20     colloquy is that -- two things, I suppose.

21          The first is he points to a statement in the

22     government's brief where I stated that no promises were made

23     with regard to the defendant's cooperation.  He is misreading

24     what was stated in the brief.  That is not in the affidavit.  I

25     was simply rephrasing what was in the affidavit, which was I

67brale2

1   did not promise him deferred prosecution.  It seems that that

2   may be the only question, did I promise deferred prosecution.

3          But it seems that in Mr. Fineman's reply affirmation

4   he agrees, as was just discussed, that by the time he came to

5   the innocence proffer, deferred prosecution was not on the

6   table anymore.

7          THE COURT:  I think the deferred prosecution issue is

8   a red herring.

9          MS. PERRY:  Then the only issue is my alleged failure

10  to do any investigation.  I don't think there is a factual

11  question about that.  I did state in my affidavit in paragraph

12  11 that the government did conduct a follow-up investigation.

13  That is unrefuted.  He may have talked to one or two people

14  whom the government did not contact, but that does not amount

15  to a failure to investigate.

16         Of course, there is a common sense proposition that,

17  given that the government did not believe Mr. Alexander and

18  that we believed that he in fact had made admissions, there was

19  no need to follow up on his so-called innocent explanation.

20         So I don't think there are any open factual questions,

21  and I don't think he has pointed to anything.  I don't think

22  that he gets a hearing just on a say-so even if he determines

23  that it is a good idea for him to proceed in that manner.

24         Maybe we can take that up following the hearing on the

25  Miranda issue, but it is the government's position that there

67brale2

1     are no open factual questions, that the question that will be

2     solved by your Honor on the question of Miranda will determine

3     all other corollary matters, and that no hearing will be

4     required.

5          THE COURT:  Mr. Fineman, do you want to respond to any

6     of that?

7          MR. FINEMAN:  No, your Honor.

8          THE COURT:  I will take the agent's testimony on the

9     Miranda issue and see if Mr. Alexander wants to testify.  That

10    is why I tried to go through, Mr. Fineman, point by point what

11    it is that you said.  Factually speaking, the dispute is

12    whether or not Ms. Perry promised consideration of a deferred

13    prosecution in the context of cooperation, which would only

14    matter if we are talking about a cooperation agreement or a

15    cooperation proffer, and that is not what happened.

16         You say that there were statements that Ms. Perry made

17    leading up to the innocence proffer regarding the investigation

18    and the case will be dismissed if they found your client to be

19    innocent.  You say they ran to the grand jury.  You can say

20    that that is misconduct, you have said that, which I think is a

21    rather extraordinary assumption, or you can say they didn't

22    find your client to be innocent.  A trial will sort out whether

23    they are right.

24         You said to Ms. Perry, this is a remarkable thing to

25    say, that she was aware of the violation of your client's

67brale2

1    Miranda rights, yet you haven't offered me a shred of proof of

2    that.  You said that she was aware that she filed this

3    indictment initially even before your client was arrested, in

4    bad faith.  There is not a shred of proof of that.  I

5    understand inferences and circumstantial proof, but this

6    doesn't even come close.  It is not even in the same ZIP code

7    as circumstantial proof.

8            I ask you again, if you take the stand, what is it you

9    are going to say that you think Ms. Perry needs to rebut?

10           MR. FINEMAN:  Your Honor, as to indictment number S2,

11   the grand jury charges my client with respect to a check for

12   $175,000.  This was Count Five in S2.  Now this check is Count

13   Seven in S4.  So the government had the grand jury vote a true

14   bill and indicted my client for a check which he had no contact

15   with.  Therefore, they indicted my client with respect to a

16   check they had no evidence against my client.

17           THE COURT:  This is the one we are going to go to

18   trial on?  The indictment we are going to go to trial on?

19           MR. FINEMAN:  Yes.  Indictment S4 at I believe it is

20   page 28 of indictment S4, Count Seven, is a check from Wachovia

21   Bank for $175,000.  The defendants charged are Douglas Shyne

22   and Natasha Shyne.

23           THE COURT:  Yes.

24           MR. FINEMAN:  Now if your Honor would look at

25   indictment S2 on page 14, Count Five, two checks totaling $1.25

67brale2

1   million.  One of those checks is that Count Seven check from

2   the newest indictment.  They had no evidence against my client

3   with respect to that check, and yet a grand jury voted a true

4   bill.

5          THE COURT:  Yes?  That is not the one we are going to

6   trial on.

7          MR. FINEMAN:  But that is what I have been saying all

8   along.  The government presented evidence against eleven

9   people, and mixed in with those eleven people they may have

10  mentioned my client's name, but they did not have any direct

11  evidence against him.

12         THE COURT:  Ms. Perry, do you want to respond?

13         MS. PERRY:  Yes, your Honor.  Mr. Fineman is objecting

14  that we actually --

15         THE COURT:  Made a correction to take an allegation

16  out against him.

17         MS. PERRY:  -- made a correction.  There is evidence

18  that that check, the $175,000 check, had the same MO as one of

19  the checks that Mr. Alexander deposited.  We initially

20  categorized that check with Mr. Alexander.  We subsequently

21  amended that and removed him from the charge.  So the

22  indictment on which he will go to trial does not charge him

23  with that $175,000 check.

24         THE COURT:  In any event, I am not sure how it is a

25  factual dispute.  The indictments speak for themselves.  What

67brale2

1    else is there that I need to resolve by way of a factual

2    dispute, Mr. Fineman?

3            MR. FINEMAN:  Besides what we have already discussed?

4            THE COURT:  I am not sure I would use the word

5    "besides."  I am looking for something, anything, any fact that

6    matters here that is in dispute.  I haven't heard one yet.

7            MR. FINEMAN:  Your Honor, based on the Court's

8    questions, I would withdraw my request for a hearing on that

9    issue.  I would just request that the Court decide the motion

10   on papers.

11           THE COURT:  Are you going to go to the grievance

12   committee with this?  With this?  There is not even a basis for

13   a hearing, and you go to the grievance committee?  I will

14   decide on the papers.  And maybe I'll be talking to the

15   grievance committee.

16           Are we prepared to go on the Miranda hearing?

17           MS. PERRY:  Yes, your Honor.  The government calls

18   Special Agent Ruben Correa.

19    RUBEN CORREA,

20       called as a witness by the government,

21       having been duly sworn, testified as follows:

22           THE CLERK:  State and spell your full name for the

23   record.

24           THE WITNESS:  My first name is Ruben, R-U-B-E-N, last

25   name Correa, C-O-R-R-E-A.

67brale2

1        THE COURT:  Ms. Perry, you may proceed.

2     DIRECT EXAMINATION

3     BY MS. PERRY:

4     Q.   How are you employed?

5     A.   I'm a special agent with the Department of Homeland

6     Security Immigration and Customs Enforcement.

7     Q.   How long have you been with ICE?

8     A.   Since June of 2003.

9     Q.   How were you employed prior to your employment with ICE?

10    A.   I was a criminal investigator with the U.S. Attorney's

11    office in the Southern District of New York from 2001 to 2003.

12    Q.   Did you have any law enforcement experience prior to that?

13    You can start at the beginning.

14    A.   From the beginning in 1988 I was with the New York State

15    Police until 1989.  From 1990 through '94 I was an investigator

16    with the district attorney's office in the Bronx.  From 1994

17    through 2001 I was a deputy United States Marshal in the

18    Southern District of New York.

19    Q.   What were your responsibilities with the marshal's office?

20    A.   Most of my time there was spent with the warrant squad,

21    fugitive squad.

22    Q.   Primarily conducting arrests?

23    A.   Executing arrest warrants and fugitive investigations.

24    Q.   From the marshal service you went to the Southern District

25    and from Southern District to ICE?

67brale2                          Correa - direct

1    A.  Correct.

2    Q.  Where are you assigned with ICE?

3    A.  I am currently with the Eldorado task force, which is a

4    financial crimes task force in New York.

5    Q.  Over the course of your nearly 20 years in law enforcement,

6    approximately how many arrests have you been involved in?

7    A.  Hundreds.

8    Q.  How many times have you had occasion to administer Miranda

9    warnings over this career?

10   A.  At least a hundred.

11   Q.  Have you also participated in post-arrest interviews?

12   A.  I have.

13   Q.  Numerous?

14   A.  Numerous, too many to count.

15   Q.  Directing your attention to February 9, 2006, did there

16   come a time when you spoke with an individual named Nathaniel

17   Alexander?

18   A.  There did.

19   Q.  Where did that occur?

20   A.  At his residence.  Initially at his residence in

21   Portsmouth, Virginia.

22   Q.  Why were you there at his residence in Portsmouth?

23   A.  To execute an arrest warrant issued in the Southern

24   District of New York.

25   Q.  Prior to that date, February 9, 2006, when was the first

67brale2                          Correa - direct

1   that you had heard of Mr. Alexander?

2   A.   Maybe a day or two before.

3   Q.   To your knowledge, did you have any prior involvement in

4   the investigation of the case prior to hearing of Mr.

5   Alexander?

6   A.   No.

7   Q.   When you first heard about Mr. Alexander, what was the

8   context?

9   A.   I'm sorry?

10  Q.   What was the context of first learning of Mr. Alexander's

11  existence?

12  A.   It was in the preoperational briefing.  We are required to

13  have briefings where we are going to do things like search

14  warrants, arrest warrants.  That is where you learn of your

15  role and what you are going to do.

16  Q.   Did you learn generally of the nature of the charges

17  against Mr. Alexander at that time?

18  A.   I believe it was bank fraud.

19  Q.   You are not the case agent in this case?

20  A.   I'm not.

21  Q.   Did anyone else from your office participate in any series

22  of arrests on February 9, 2006?

23  A.   I traveled to Virginia with another special agent from my

24  office.

25  Q.   Did that agent participate in Mr. Alexander's arrest?

67brale2                          Correa - direct

1    A.   No.

2    Q.   Was that the case agent?

3    A.   No.

4    Q.   Were you accompanied by anyone else to Mr. Alexander's home

5    on February 9, 2006?

6    A.   I was.   There were several members of our RAC office in

7    Norfolk, Virginia.

8    Q.   What is a RAC office?

9    A.   I believe it stands for resident agent in charge.   It is

10   sort of a suboffice.   In New York I work for a SAC office,

11   which is special agent in charge.   Then you have your

12   suboffices and we call those RACs.

13   Q.   A smaller satellite office?

14   A.   Right.

15   Q.   Approximately what time did you and these other agents

16   arrive at Mr. Alexander's home?

17   A.   Approximately 6:00 a.m.

18   Q.   What was the first thing that happened when you arrived

19   there?

20   A.   We knocked on his door and identify ourselves.   Mr.

21   Alexander opened the door.

22   Q.   What happened after he opened the door?

23   A.   He identified himself as Nathaniel Alexander, and I

24   informed him that there was an arrest warrant for him and that

25   he had to come down.

67brale2                        Correa - direct

1   Q.   Where was your gun when you knocked on the door?

2   A.   In my holster.

3   Q.   Did you ever take it out at any time when you were with Mr.

4   Alexander on February 9th?

5   A.   No.

6   Q.   Did any of the other agents take out their guns?

7   A.   Not that I saw.

8   Q.   So Mr. Alexander was then placed under arrest?

9   A.   Yes.

10  Q.   What happened after he was placed under arrest, immediately

11  thereafter?

12  A.   I walked with Mr. Alexander to his living room, and the

13  other agents or officers that were with me did a security sweep

14  of the house.

15  Q.   What do you mean by security sweep?

16  A.   A security sweep when you are executing an arrest warrant

17  is just a quick search throughout the rooms of the house to

18  make sure that there are no people in the house or any

19  dangerous objects in plain view.

20  Q.   After the area was secured and Mr. Alexander was in the

21  living room, what was the next thing that happened?

22  A.   Other members of his family were throughout the house and

23  they were all told to go into the living room.

24  Q.   Was Mr. Alexander dressed when he answered the door?

25  A.   I remember that he wasn't in underwear, he wasn't naked or

67brale2                        Correa - direct

1    in underwear.  He had night attire, but I can't remember if it
2    was a T-shirt or long pajamas.  He was dressed somehow, but I
3    can't remember exactly what he was wearing.
4    Q.  At some point was he allowed to change into street clothes?
5    A.  Yes.  We asked another member of his family to bring
6    clothes to him.
7    Q.  And he was allowed to dress, fully dress?
8    A.  Yes.  Shoes, pants.
9    Q.  After he was in the living room, was he placed somewhere
10   else?
11   A.  After the security sweep and everybody was brought into the
12   living room, I walked with Mr. Alexander to his dining room.
13   At this time everybody was asking why we were there, so I was
14   going to explain to them why we were there.  So I pulled him to
15   the side, into his dining room.
16   Q.  What happened when you got to the dining room with Mr.
17   Alexander?
18   A.  He wanted to know what the charges were, why we were
19   arresting him.  I told him that I could not speak to him until
20   I advised him of his rights first.
21   Q.  Why did you tell him that?
22   A.  It has been my experience whether you are going to ask
23   questions or not, even if you are just going to explain the
24   charges, as you are explaining them, they will start making
25   statements.  If you want to use those statements, their rights

67brale2                              Correa - direct

1    have to be waived voluntarily.

2    Q.   Did you in fact recite Mr. Alexander his Miranda rights at

3    that time?

4    A.   I did.

5    Q.   What did you say to him specifically?

6    A.   I explained to him that before I could speak to him, I

7    needed to advise him of his rights.  I said:  You have the

8    right to remain silent; anything you say can and will be used

9    against you in a court of law or other proceeding; you have the

10   right to an attorney and to have that attorney present before

11   or during any questioning; if you cannot afford an attorney,

12   one will be appointed to you at no cost; if you do decide to

13   speak to us now, you can at any time choose to exercise any of

14   the rights which I have just explained to you.  Then I asked

15   him if he understands, and if he does, which he did, I told him

16   if he is willing to waive his rights and speak to us now, and

17   he did.

18   Q.   So he indicated to you that he fully understood each and

19   every one of those rights?

20   A.   Yes.

21   Q.   Did you have any reason to believe that he did not

22   understand those rights?

23   A.   No.

24   Q.   Where were you physically when you Mirandized him?

25   A.   We were in the dining room seated at his dining room table.

67brale2                          Correa - direct

1   Q.   Did he appear comfortable at this time?

2   A.   Comfortable?  He was just anxious.  He wanted to know what

3   was going on.

4   Q.   Was he dressed at this point?

5   A.   I believe he was, yes.

6   Q.   You say you were at the dining room table.

7   A.   Yes.

8   Q.   Were you seated very close to him?  How were you seated?

9   A.   He has, from what I can recall, a long table, a fairly

10  large dining room.  He has a long table, and we were both

11  seated on the same side, in front of each other.

12  Q.   Was there anyone else present at that time in the dining

13  room?

14  A.   Yes.  There were other agents.  Actually, there was a

15  uniformed officer in the house, too.  I believe he was a local

16  officer.  I can't remember from what department, but he was in

17  the house.  They were walking back and forth.

18  Q.   To your letter any specific names of any of the other

19  agents that were there that day?

20  A.   No.  The only agent I can recall is from our RAC office,

21  another ICE agent, whose name is Pete.  I can't recall his last

22  name.

23  Q.   When was the first time you had met the agents that

24  participated in the arrest with you that day?

25  A.   That morning.

67brale2                          Correa - direct

1    Q.   If you could estimate, how soon after you entered Mr.

2    Alexander's house did you Mirandize him?

3    A.   I would say no more than ten minutes.

4    Q.   Did he make any substantive statements to you prior to

5    being Mirandized?

6    A.   No.   He just wanted to know what was going on.

7    Q.   After you had advised Mr. Alexander of his Miranda rights,

8    did he then begin making statements?

9    A.   Yes.   Well, I advised him -- first, I advised him -- after

10   his arrest, I told him what the arrest was for.   I told him it

11   was for bank fraud out of New York, specifically for something

12   that had to do possibly with check fraud.

13          He said, oh, I know what this is about, I know what

14   this is about, and started talking about --

15   Q.   Let me interrupt you.   I don't want to get into the

16   substance.   Your testimony is he began making statements after

17   he was Mirandized?

18   A.   Yes.

19   Q.   How would you describe his demeanor at this point?

20   A.   Very cooperative.   Once he realized what the charges were,

21   he wanted to tell his side of it.

22   Q.   While he was making statements to you, was he asked at any

23   time for consent to conduct a search of his home?

24   A.   Yes.

25   Q.   I'm sorry.   Continue.

67brale2                                    Correa - direct

1    A.   Because of what he told me, he told me he had a business, I

2    asked him if there were any financial papers in the house, any

3    financial documents.  I asked him for permission to search for

4    any evidence of financial fraud, if he had papers in the house.

5    Q.   Did he in fact consent to that search?

6    A.   He did.

7    Q.   Did he specifically tell you where you might search for

8    financial documents?

9    A.   Yes.  I told him instead of searching throughout his entire

10   house and everything, it would be easier if he just told me

11   where the papers, any financial papers were.  He said if there

12   were any financial papers, they would be in his briefcase.  So

13   we asked someone to bring the briefcase to the dining room.

14   Q.   He specifically told you where you could locate that

15   briefcase?

16   A.   Yes.  I'm not sure if I can remember, but it may have been

17   in the bedroom and someone brought it out.

18   Q.   Wherever it was, you recall that he told you where it was

19   and you or other agents in fact were able to locate it based on

20   that description?

21   A.   Exactly.

22   Q.   At some point clearly you left Mr. Alexander's home.  Where

23   did you go from there?

24   A.   We started to transport him back to the RAC office in

25   Norfolk.

67brale2                              Correa - direct

1   Q.  Let me back up for a moment.  Were you there for some
2   period of time while he was talking to you?
3   A.  Yes.
4   Q.  Could you give a rough estimate, if possible.
5   A.  20, it couldn't have been more than 30 minutes.
6   Q.  Was he making statements to you during this entire time?
7   A.  Yes.
8   Q.  After you left his home, where did you go?
9   A.  We took him out to the car and began transporting him to
10  the RAC office.
11  Q.  By the way, was he in handcuffs at this point during
12  transport?
13  A.  Yes.
14  Q.  Do you recall if he was in handcuffs while he was at his
15  home making statements?
16  A.  I don't remember.  I do remember that he wasn't cuffed
17  behind his back.  He wasn't cuffed behind his back in the car
18  either.
19  Q.  How do you recall that?
20  A.  I remember him speaking with his hands, and they were in
21  front of him.  Usually, especially in the car, if someone has
22  their hands behind their back they are very uncomfortable and
23  they lean forward.  I remember him speaking with his hands.
24  Q.  You said you went to the RAC office?
25  A.  Yes.

67brale2                        Correa - direct

1    Q.  Who is "we"?  Who transported Mr. Alexander?

2    A.  I was in the backseat with Mr. Alexander, and there was a

3    driver.

4    Q.  Another agent?

5    A.  Another agent.

6    Q.  Did you receive any phone calls while you were in transit

7    to the RAC office?

8    A.  Well, I was on the phone.  I don't know if I made a phone

9    call or received it.

10   Q.  Whose phone were you on?

11   A.  I was on mine.

12   Q.  Is that an office-issued phone, an official business phone?

13   A.  Yes.

14   Q.  By the way, do you receive phone records for that phone?

15   A.  I don't, no.

16   Q.  What did you do in response to that phone call?

17   A.  In that phone call I was informed that that day there were

18   two arrest warrants being executed in the same general area.  I

19   was advised that the other team had not made an arrest, they

20   were still at the residence of the subject, and apparently he

21   wasn't home and they couldn't locate him.

22   Q.  Who was that subject?

23   A.  Steve Riddick.

24   Q.  Who is Steve Riddick generally vis-a-vis the defendant, if

25   you know?

67brale2                          Correa - direct

1    A.   Who is he?

2    Q.   Were they acquaintances?

3    A.   Oh.   Friends.   I later learned that they were friends,

4    business associates.

5    Q.   What did you do in response to receiving that information?

6    A.   At that time I turned to Mr. Alexander and told him about

7    the other arrest warrant for Steve Riddick and asked him if he

8    knew where Steve was.

9    Q.   Did he agree to help you contact Mr. Riddick?

10   A.   Oh, yes.   He started to say he had contact numbers for

11   Steve but they were back at the house.

12   Q.   Did he place any phone calls from the car?

13   A.   He did.

14   Q.   Whose phone did he use?

15   A.   I don't remember.   From what I remember, there were two

16   phones in the car, at least two phones in the car.   There was

17   mine, there was the driver's.

18   Q.   So whether he used your phone or the driver's, you don't

19   recall?

20   A.   No.

21   Q.   Were there any other agents traveling in any other cars

22   back to the office?

23   A.   Yes.   There were several agents there.

24   Q.   When Mr. Alexander told you that he had the contact numbers

25   back at the home, at his residence, did you do anything in

67brale2                          Correa - direct

1   response to that information?

2   A.  Yes.  I let him call his residence.  I believe it may have

3   been his wife back home.  He had the contact numbers.  He

4   stated he had the contact numbers for Steve Riddick in his cell

5   phone.

6   Q.  Was that cell phone retrieved from the home?

7   A.  Yes.

8   Q.  Do you know by whom?

9   A.  Specifically, no.

10  Q.  It wasn't by you?

11  A.  No.

12  Q.  It would have been by another agent?

13  A.  Yes.

14  Q.  Did Mr. Alexander continue to make statements to you about

15  the case while you were in transit to the RAC office?

16  A.  No.  At that point we were concentrating on trying to find

17  Steve Riddick.

18  Q.  What happened when you got to the RAC office?

19  A.  There was a small processing area with a cell, a single-

20  person cell.  We placed him in the processing area in the cell.

21  Q.  Did you in fact process him?

22  A.  Yes, I began to process him.

23  Q.  Can you please describe where you were seated and where Mr.

24  Alexander was seated in that processing room.

25  A.  The processing room is a very small office-size room.  He

67brale2                        Correa - direct

1   was seated in the cell with the door open.  Maybe about four

2   feet away from the cell is a table with processing paperwork, a

3   fingerprinting station.

4   Q.  You stated he was seated in the cell with the door open?

5   A.  Yes.

6   Q.  Did he appear comfortable to you at that point?

7   A.  Very.

8   Q.  Was he in handcuffs?  You said he had been cuffed in

9   transit?

10  A.  Yes.

11  Q.  Were his cuffs removed at some point after you returned to

12  the RAC office?

13  A.  I don't remember.

14  Q.  Were there other agents in the processing room with you and

15  Mr. Alexander?

16  A.  The other agent that I knew as Pete would walk in and out.

17  It wasn't my office, so I didn't know where any of the

18  paperwork was or how to find fingerprint cards and things like

19  that.

20  Q.  What was the first thing that happened after he was

21  processed?

22  A.  During the time we were processing him, we were still

23  trying to find Steve Riddick.  But after we stopped talking

24  about that and he was processed, he wanted to continue talking

25  about the case.

67brale2                         Correa - direct

1    Q.   What did you do?

2    A.   I'm not the case agent.  During the operational briefing

3    and this whole arrest, I'm more concerned with the logistics of

4    the arrest rather than the details of the charges.  So I didn't

5    know much about the case myself.  So before I sat down to talk

6    to him again, I asked one of the agents to get me a copy of the

7    indictment.

8    Q.   Did you in fact receive a copy of the indictment?

9    A.   Yes.

10   Q.   What did you do once you had the indictment in hand?

11   A.   I sat down and I started reading, was going to read the

12   indictment to Mr. Alexander.

13   Q.   Did you do anything prior to going through the indictment

14   with him?

15   A.   Yes.

16   Q.   What was that?

17   A.   I advised him of his rights again.

18   Q.   Why did you advise him of his rights again?

19   A.   A considerable amount of time had passed since we last

20   talked about the case, which was at his residence.  This time I

21   had the indictment in hand.  At the residence we didn't really

22   get into details about his account of what happened.  I wanted

23   to get into better detail just to cover myself.  I advised him

24   of his rights again.

25   Q.   You advised him verbally of his rights again?

67brale2                          Correa - direct

1    A.   Yes.

2    Q.   You went through each of the rights that you described

3    earlier?

4    A.   Yes.

5    Q.   Did he indicate he understood those rights?

6    A.   He did.

7    Q.   Did he agree to continue speaking with you?

8    A.   Yes.

9    Q.   And did he in fact speak with you?

10   A.   Yes.

11   Q.   During the time that you were in this processing room with

12   Mr. Alexander and he was making statements, was he also

13   continuing to place phone calls to attempt to find Mr. Riddick?

14   A.   Most of the phone calls that were placed were before that.

15   There may have been one or two after that.

16   Q.   Was he using his own phone at this point?

17   A.   I remember that he was, yes.

18   Q.   So in the interim someone had brought him his cell phone?

19   A.   Yes.

20   Q.   Do you know specifically how he was attempting to contact

21   Mr. Riddick?

22   A.   From what I can remember, he was calling either friends or

23   students of Mr. Riddick, friends or track students of Mr.

24   Riddick.

25   Q.   Did you describe Mr. Alexander's demeanor while he was at

67brale2                          Correa - direct

1    the RAC office.

2    A.  He was being very cooperative.  He wanted to explain that

3    this was a misunderstanding and wanted to explain the story of

4    the checks.

5    Q.  At some point was Mr. Alexander also presented with a

6    written waiver form?

7    A.  Yes.

8    Q.  Where did you get that form?

9    A.  Another agent at the RAC office brought the form to me.

10   Q.  Do you recall the name of that agent?

11   A.  Pete.

12   Q.  Do you know Pete's last name?

13   A.  No.

14   Q.  Had you ever met Pete before that day?

15   A.  No.

16   Q.  Since that day have you ever spoken with Pete?

17   A.  No.

18   Q.  Have you ever laid eyes on Pete again?

19   A.  I could pass him on the street and I wouldn't know him.

20   Q.  After Pete gave you the form -- were you still in the

21   processing room at this point?

22   A.  Yes.

23   Q.  At some point did you leave the processing room?

24   A.  Yes.  Throughout the process we were looking for an

25   available room, because the processing room is kind of small.

67brale2                              Correa - direct

1    So one became available, and we took the waiver form and Mr.

2    Alexander to an open conference room.

3    Q.  Was it in the conference room that you then presented him

4    with a written form?

5    A.  Yes.

6    Q.  Do you recall if he was handcuffed at this point while you

7    were in the conference room?

8    A.  I doubt it, but I don't recall.  I mean there was no reason

9    why he would be.  He was being very cooperative, and I felt no

10   security concerns with him.

11   Q.  After you presented the form to Mr. Alexander, did he go

12   through it and read it?

13   A.  He did.  We both did.

14   Q.  I'm sorry?

15   A.  We both did.

16   Q.  Did he indicate that he understood it?

17   A.  Yes.

18   Q.  Did he expressly agree to speak with you after reading it?

19   A.  Yes.

20   Q.  I would like to show you what I have marked for

21   identification as Government Exhibit 1 and ask you to describe

22   it to us.

23   A.  This is the statement of rights which he signed.

24   Q.  Did you sign that as well?

25   A.  Yes.

67brale2                          Correa - direct

1   Q.   Is that signed by anyone else?

2   A.   Pete, Peter.

3   Q.   Is that the agent that you were discussing earlier?

4   A.   Yes.

5          MS. PERRY:   The government offers Government Exhibit 1

6   at this time.

7          MR. FINEMAN:   No objection.

8          THE COURT:   Government Exhibit 1 is received.

9          (Government's Exhibit 1 received in evidence)

10  Q.   Special Agent Correa, who filled out the portion of the

11  form containing the dates and time of the signature?

12  A.   I didn't fill them out.   I believe that Peter filled them

13  out.

14  Q.   Do you see the area with the time of the signatures is

15  marked?

16  A.   I do.

17  Q.   What does that say?

18  A.   Originally it says 0900.   That is crossed out, and then

19  underneath it it says 0830.

20  Q.   Looking at the top line, are you clear that it says 0900?

21  A.   Well, it looks like either 0900 -- it looks like there was

22  an 0930 and 0900.   The 0 and the 3 are written over each other.

23  I can't tell which was written first.

24  Q.   Next to that initial time which is marked out, there is a

25  marking.   Do you know what that is?

67brale2                          Correa - direct

1    A.   Next to the --

2    Q.   Next to the 9?

3    A.   The first one?

4    Q.   0900.

5    A.   An initial.

6    Q.   Do you know whose initial that is?

7    A.   No.

8    Q.   Is that yours?

9    A.   No.

10   Q.   Underneath that change there is another time indicated.

11   A.   Yes.

12   Q.   Do you see that?  What does it say?

13   A.   0830.

14   Q.   Do you see next to that there is another marking?

15   A.   Another initial.

16   Q.   Do you know whose initials that is?

17   A.   I don't know.  I don't believe it's mine.

18   Q.   Do you recall why that change was made?

19   A.   No.  I don't even recall the change at all.

20   Q.   Did you make any changes to that form outside of Mr.

21   Alexander's presence?

22   A.   No.

23   Q.   Any changes were made in Mr. Alexander's presence or would

24   have been made in Mr. Alexander's presence?

25   A.   Yes.

67brale2                          Correa - direct

1   Q.  After signing the form, did Mr. Alexander continue to speak

2   with you?

3   A.  Yes, he did.  After signing the form, I told him that I

4   wanted to go through the whole story one more time while I took

5   notes, general notes.

6   Q.  Just to be clear, that is your signature on the bottom, the

7   first line?

8   A.  The top full signature.

9   Q.  The witness?

10  A.  The first witness.

11  Q.  That is Peter's underneath yours?

12  A.  That is Pete's underneath.

13  Q.  Mr. Alexander printed and signed his name above your two

14  names?

15  A.  Yes.

16  Q.  Can you just repeat your last answer.  I asked what

17  happened after he signed the form.

18  A.  I told him that I wanted to go through the whole story from

19  beginning to end one more time while I took notes.

20  Q.  Did he go through that story with you, beginning to end,

21  after this written form?

22  A.  Yes.

23  Q.  Did you in fact take some notes?

24  A.  I did.  While he was talking, I took general notes.

25  Q.  Did you then go through the statement that you had written?

67brale2                          Correa - direct

1   A.   Yes.

2   Q.   With him?

3   A.   I wrote it in a form so that he could sign it, he could

4   read through it and sign it.

5   Q.   Did you ask him to sign it?

6   A.   I did.

7   Q.   What did he say to you in response?

8   A.   At that time he was not comfortable, seemed like he wasn't

9   comfortable signing anything.  He wanted to speak to an

10  attorney and ask him if he should sign it.

11  Q.   Did he in fact have the opportunity to speak with an

12  attorney at that point?

13  A.   Yes.  As soon as he said that, we let him make a phone call

14  to his attorney.

15  Q.   Was this the first time that he had asked to speak with an

16  attorney, that morning?

17  A.   First time.

18  Q.   What happened after he placed that phone call?

19  A.   He was on the phone for a short period of time, maybe about

20  a minute.  After he was off the phone, he said he was advised

21  not to sign anything.

22  Q.   What happened at that point?

23  A.   At that point we concluded the interview and he was taken

24  to the Marshals Service to be arraigned.

25  Q.   From the time he signed the Miranda waiver form that is

67brale2                    Correa - direct

1   marked as Government Exhibit 1 until the time he called his

2   attorney, can you say approximately how much time went by?

3   A.   From the time he signed it to the time he called his

4   attorney?  I would say no more than 30 minutes.  That's rough.

5   Q.   Have you been shown any phone records in this case?

6   A.   No.

7              MS. PERRY:   I have no further questions, your Honor.

8              THE COURT:   Cross-examination.

9              MR. FINEMAN:   Thank you, your Honor.

10  CROSS-EXAMINATION

11  BY MR. FINEMAN:

12  Q.   Good morning, Agent Correa.  Is that how you pronounce your

13  name?

14  A.   Close enough.

15  Q.   I apologize.  I represent the defendant in this matter.  I

16  am going to be asking you a new number of questions.  If you

17  don't understand a question that I ask, ask me to repeat it and

18  I will do my best to make it so you understand it.

19  A.   OK.

20  Q.   Where do you work?

21  A.   I'm with Immigration and Customs Enforcement in New York.

22  Q.   When was the first time that you did any work with respect

23  to this case?  When were you first apprised of this case?

24  A.   It may have been a day or a few days before the actual

25  warrant.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

67brale2                        Correa - cross

1   Q.   Do you remember the date that you made the arrest?

2   A.   February 9th.

3   Q.   So it would have been February 8th or 7th?

4   A.   Thereabouts, yes.

5   Q.   You testified earlier that you were not involved in the

6   investigation of this case, you are just there to make the

7   arrest, is that true?

8   A.   That's true.

9   Q.   Do you know who the lead agent on this case is?

10   A.   Yes.

11   Q.   Who is that?

12   A.   Special Agent Eric Rosenblatt.

13   Q.   Prior to going to Virginia to make this arrest, did you

14   have a conversation with Mr. Rosenblatt?

15   A.   Yes.

16   Q.   Did you discuss this case at all?

17   A.   Yes.

18   Q.   Did he tell you the circumstances of the case, the

19   allegations?

20   A.   Yes.

21   Q.   Did he tell you what the allegations were with respect to

22   Mr. Alexander?

23   A.   You mean besides bank fraud?

24   Q.   No.  Did he tell you what the allegations were in the

25   indictment as against Mr. Alexander?

67brale2                          Correa - cross

1    A.   Not a lot of detail, but that they had to do with --

2    Q.   You can just answer yes or no.

3    A.   Yes.

4    Q.   Prior to going to Virginia, did you have any conversations

5    with anybody at the United States Attorney's office?

6    A.   No.

7    Q.   Were you informed who would be the Assistant United States

8    Attorney on this case was?

9    A.   Yes.

10   Q.   Who was that person?

11   A.   Danya Perry.

12   Q.   Who informed you of that?

13   A.   Eric Rosenblatt.

14   Q.   Were you instructed to do anything besides arrest the

15   defendant when you went to Virginia?

16   A.   No, other than take a statement if he wanted to give one.

17   Q.   So you instructed to take a statement?

18   A.   I wasn't discouraged from it.

19   Q.   But you had discussed taking a statement?

20   A.   Yes.

21   Q.   In order to assist you in that endeavor, you were told some

22   details about the case, isn't that true?

23   A.   Not a lot.

24   Q.   What you are saying is that you were to go to take a

25   statement about a case you didn't know anything about?

67brale2                         Correa - cross

1           MS. PERRY:  Objection.

2           THE COURT:  Sustained.

3   Q.  If you know, why didn't Agent Rosenblatt go to make the

4   arrest?

5   A.  I don't know.

6   Q.  You don't know?

7   A.  No.

8   Q.  How was it decided that you would be the one to go?

9           MS. PERRY:  I'm sorry.  I missed the question.

10          MR. FINEMAN:  How was it decided that this agent would

11  be the one to go to Virginia.

12  A.  I was available.

13  Q.  Did anybody discuss it with you prior?

14  A.  As far as my availability to go?

15  Q.  Yes.

16  A.  My supervisor.

17  Q.  I just want to get a little bit of background.  Did you

18  volunteer to go?  Did you ask to go?

19          MS. PERRY:  Objection, your Honor.  This is completely

20  irrelevant.

21          THE COURT:  What is the relevance of this?

22          MR. FINEMAN:  Your Honor, the agent testified before

23  that he had no knowledge about what the case was really about.

24  He didn't even read the indictment prior to getting to the RAC

25  office.  But he just testified that he was asked to take a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

67brale2                    Correa - cross

1    statement, if possible.

2         THE COURT:   I am still not sure why it matters as to

3    how he was selected.

4         MR. FINEMAN:   I will move on then.

5         THE COURT:   OK.

6    Q.   Who asked you to take a statement from the defendant?

7         MS. PERRY:   Objection.

8         THE COURT:   Overruled.

9    A.   That would be Eric Rosenblatt.

10   Q.   Were you instructed to try to find any physical evidence?

11   A.   Specifically, no.

12   Q.   Specifically?   Were you instructed to look for physical

13   evidence or were you not instructed to look for physical

14   evidence?

15   A.   There was no search warrant, so we didn't prepare for that.

16   But as a general rule, if you go to someone's house on charges,

17   you ask for consent to look through the house for anything that

18   has to do with the charges.

19   Q.   As a general rule, you ask for consent to search a person's

20   home, is that what you are testifying?

21   A.   Yes.

22   Q.   By whom is that rule promulgated?

23   A.   It is just a common practice.

24   Q.   Were you trained when you became an agent for the federal

25   government?

67brale2                          Correa - cross

1  A.  Was I trained?

2  Q.  Yes.

3  A.  Yes.

4  Q.  That training, did it include asking for permission to

5  search people's homes when you make arrests?

6  A.  Absent a search warrant, it is a requirement.

7  Q.  I understand it is a requirement that you have to ask for

8  permission.  Were you trained to ask for permission?

9  A.  Pursuant to search warrant, I was trained to ask permission

10  if I wanted to look in someone's house, yes.

11  Q.  But there was no search warrant in this case, is that

12  correct?

13  A.  Not that I was aware of, no.

14  Q.  What kind of search warrant did you have?  Excuse me.  What

15  kind of a warrant did you have?

16  A.  An arrest warrant.

17  Q.  Is it true that that warrant was based on an indictment?

18  A.  Yes.

19  Q.  February 9, that was the date that you actually made the

20  arrest?

21  A.  Correct.

22  Q.  What time did you get to my client's home?

23  A.  About 6:00 a.m.

24  Q.  You testified earlier that he answered the door?

25  A.  Yes.

67brale2                          Correa - cross

1   Q.  You then testified that you have to come inside, is that

2   what you said before?

3   A.  Yes.

4   Q.  Why did you have to come inside my client's home?

5   A.  He was inside the house and I needed to effect the arrest.

6   Q.  Wasn't he at the door?

7   A.  Yes.

8   Q.  You testified that he was dressed.

9   A.  He didn't have street clothes on.

10  Q.  But he was wearing clothing?

11  A.  He was wearing something.  I'm not sure if it was pajamas

12  or something.  I think I would have recollected if he were

13  naked or in skivvies or anything.

14  Q.  But he wasn't in his underwear, is that true?

15  A.  I don't remember him in underwear, no.

16  Q.  To the best of your recollection, he was dressed?

17          MS. PERRY:  Objection.

18          THE COURT:  He has already said what he thought he was

19  wearing.

20  Q.  He was at the door when you arrived there?  You knocked on

21  the door or rang the bell and he came to answer it, isn't that

22  true?

23  A.  That's true.

24  Q.  So you could have taken him with you to the federal

25  building at that point.  What was the purpose of going into the

67brale2                        Correa - cross

1    building?

2    A.  He was inside his doorway.  He answered the door inside his

3    doorway.

4    Q.  You had an arrest warrant.  How far away was he?  Was he

5    the distance between me and you right now, say approximately,

6    for the record, 15 feet?

7    A.  No, sir.

8    Q.  How close was he to you?

9    A.  I would say no more than from here to the machine.

10   Q.  To the court reporter, say, for the record, four feet?

11   A.  I would say four or five feet, yes.

12   Q.  Did he make it seem like he was going to run back into the

13   building?

14   A.  I had no idea.

15   Q.  Did you ask him to come outside?

16   A.  I did not.

17   Q.  You just walked into his home?

18   A.  Yes, sir.

19   Q.  You testified that you conducted a security sweep?

20   A.  Yes.

21   Q.  Did you personally conduct that security sweep?

22   A.  No.

23   Q.  Who conducted the sweep?

24   A.  Other agents.

25   Q.  How many other agents?

67brale2                          Correa - cross

1   A.   I don't remember.

2   Q.   Do you have a ballpark figure of how many agents were with

3   you that day?

4   A.   Ballpark?  Six.

5   Q.   Of those six, do you recall how many went into the house

6   with you?

7   A.   I think most went in.  I'm not sure who may have stayed

8   outside.

9   Q.   So you didn't go in alone?

10  A.   No.

11  Q.   You went in with at least two or three other people?

12  A.   Yes.

13  Q.   There were as many as six people there that day, yes?

14  A.   Well, yes, roughly.  I don't remember exactly, but yes.

15  Q.   Could there have been more than six people with you?

16  A.   Yes.

17  Q.   What is a security sweep?

18  A.   It is a quick look through the rooms to see if there are

19  people hiding or there is any dangerous objects in the room, a

20  gun laying on a bed or anything like that.

21  Q.   What is the purpose of a security sweep?

22  A.   To establish that the premises are secure before we feel

23  comfortable doing anything else.

24  Q.   What else were you supposed to do at my client's residence

25  that day?

67brale2                    Correa - cross

1   A.   Other than effect the arrest?

2   Q.   Yes.  Other than to effect the arrest, what else were you

3   supposed to do in his residence?

4   A.   That was the requirement.

5   Q.   That was it, right?

6   A.   That was it.

7   Q.   When you walked into his home, you became closer to him

8   physically.  As you were walking into his home, that distance

9   of four feet was shrinking?

10  A.   Yes, sir.

11  Q.   At that point when you came up to him, physically into his

12  home, you could have placed the cuffs on him and taken him out,

13  isn't that correct?  Isn't that true?

14  A.   He needed to get dressed.

15  Q.   He needed to get dressed?

16  A.   Yes.

17  Q.   Did the arrest warrant say that he needed to get dressed?

18  A.   It would have been a little bit demeaning to carry him in

19  his underwear or his sleeping attire to jail.

20  Q.   So which was it, his underwear or his sleeping attire?

21  A.   I'm not putting a definition on what the word "underwear"

22  or "sleeping attire," what the difference would be.  I remember

23  he had -- he was not in --

24  Q.   Take your time.

25  A.   -- Fruit of the Looms with no T-shirt.  That's what I

67brale2                        Correa - cross

1    remember.  I remember he had something on.

2    Q.  Just a moment ago you testified that he was wearing

3    something.

4    A.  Yes.

5    Q.  Now, when I asked you why you couldn't just take him, you

6    said he had to get dressed.  That's true?

7    A.  Yes.

8    Q.  You said he was wearing his underwear just a moment ago.

9            MS. PERRY:  Objection.

10           THE COURT:  Sustained.

11           MR. FINEMAN:  I can ask the court reporter to read it

12   back?

13           THE COURT:  You can save that for argument.  Ask

14   questions.

15   Q.  You are certain he was wearing underwear, not clothes?

16   A.  Not street clothes.

17   Q.  Was his chest bare?

18   A.  I don't think so.

19   Q.  Were his legs covered?

20   A.  I don't remember.  I don't think so.  They may have been

21   long pajamas.

22   Q.  They were covered or they weren't covered?

23   A.  I don't remember.

24   Q.  You don't remember.

25           THE COURT:  Agent Correa, can you tell me whether or

67brale2                    Correa - cross

1   not Mr. Alexander appeared to be just awakened or he appeared

2   to be alert?

3        THE WITNESS:  No, he definitely appeared to be just

4   awakened.

5   Q.  During that security sweep, was any contraband or gun

6   found?

7   A.  No, sir.

8   Q.  Where was Mr. Alexander taken during the security sweep?

9   A.  Everybody was in the living room.

10  Q.  Everybody?  Who is everybody?

11  A.  Family members.

12  Q.  What family members?

13  A.  There was his wife.  I remember at least one teenager, at

14  least one dog.

15  Q.  So the dog, the wife, the son, the teenager, everybody was

16  in the living room?

17  A.  Yes.

18  Q.  Was the wife under arrest?

19  A.  No.

20  Q.  Was the child under arrest?

21  A.  No.

22  Q.  I am not going to ask the next question.

23       Were these people permitted to walk around the house

24  while the security sweep was ongoing?

25  A.  No.

67brale2                         Correa - cross

1   Q.  They were not?

2   A.  No.

3   Q.  They were not free to move around?

4   A.  They were not.

5   Q.  For the period of time that the security sweep was ongoing,

6   they were in custody?

7            MS. PERRY:  Objection.

8            THE COURT:  Sustained.

9   Q.  Were they free to move around during the time the security

10  sweep was ongoing?

11           MS. PERRY:  Asked and answered.

12           THE COURT:  I will let him ask it again.  Go ahead.

13  A.  No, they were not.

14  Q.  Based on what authority did you restrain their movement?

15  A.  It was for everybody's safety involved.  The security sweep

16  took no more than a few minutes a couple of minutes.

17  Q.  How many minutes?

18  A.  I'm not sure.

19  Q.  Five minutes?

20  A.  I'm not sure.

21  Q.  What kind of house does Mr. Alexander live in?

22  A.  From what I can recall, it was a ranch.

23  Q.  One story?

24  A.  A one-story house.

25  Q.  Do you recall how many bedrooms?

67brale2                          Correa - cross

1   A.  I didn't go into the bedrooms, no.

2   Q.  You stayed with Mr. Alexander the entire time the security

3   sweep was ongoing, yes?

4   A.  Yes.

5   Q.  But other people were wandering about his home?

6          MS. PERRY:  Objection.

7          THE COURT:  Other agents were doing the sweep, right.

8          THE WITNESS:  Right.

9   Q.  You testified earlier there was a uniformed officer, is

10  that true?

11  A.  That's true.

12  Q.  That uniformed officer was also in the home?

13  A.  Yes.

14  Q.  So you had a number of federal agents and a uniformed

15  police officer from Virginia in his home?

16  A.  Yes.

17  Q.  Was the uniformed officer from Virginia conducting a

18  security sweep?

19  A.  I'm not sure.

20  Q.  Was he under your command?

21  A.  No.

22  Q.  Did you have authority over that officer?

23  A.  No.

24  Q.  Did you order him to conduct a security sweep?

25  A.  No.

67brale2                          Correa - cross

1   Q.  So as far as you know, he was in the home but you didn't

2   know what he was doing?

3            MS. PERRY:  Objection.

4   A.  I didn't know what he was doing, no.

5   Q.  How long was the security sweep again?

6   A.  I'm not sure.  Your average sweep is the amount of time it

7   takes to walk throughout the house and make sure that other

8   people aren't there.

9   Q.  Other people or property?  Do they look for weapons or

10  other physical tangible items?

11  A.  Only if they are in plain sight.

12  Q.  So they are looking for that, though?

13  A.  No.  Well, if they come across that in plain sight.  What

14  they are looking for is bodies or anything that maybe a danger.

15  So if you see a rifle in the doorway, it could be a concern.

16  Q.  When the person is conducting a security sweep, they move

17  around the house to determine if there are any people or

18  weapons in the home that can threaten the agent, isn't that

19  correct?

20  A.  Or anything else that would be of danger.

21  Q.  Or anything else?

22  A.  Yes.

23  Q.  That's correct?

24  A.  That's correct.

25  Q.  So it is a search for people and tangible items, is that

67brale2                        Correa - cross

1   correct?

2           MS. PERRY:  Objection.

3           THE COURT:  Sustained.  Rephrase it.

4   Q.  In other words, they were looking around the house?

5   A.  Yes.

6   Q.  During the security sweep, where are you?

7   A.  I was in the living room.

8   Q.  You testified earlier you were with the defendant and his

9   family?

10  A.  Yes.

11  Q.  Was anybody else with you, any other agents?

12  A.  Yes.

13  Q.  Is that when you advised my client of his Miranda rights?

14  A.  No.

15  Q.  That is not when you advised him of the Miranda rights?

16  A.  No.

17  Q.  At some point you advised my client of his Miranda rights,

18  that is what you testified earlier to, correct?

19  A.  Correct.

20  Q.  How long were you in his house at the point in time that

21  you advised him of his Miranda rights?

22  A.  A few minutes.

23  Q.  A few minutes.  So how many minutes after the security

24  sweep had ceased?

25  A.  It was right after the security sweep had ceased.

67brale2                              Correa - cross

1  Q.  You arrived at 6 o'clock.  You testified the security sweep

2  took a couple of minutes.  What is that, 6:02?

3          MS. PERRY:  Objection.

4          THE COURT:  Sustained.

5  Q.  Agent, if you know, what time, approximately, was it in the

6  morning?

7  A.  We arrived at the house at approximately 6:00 a.m.

8  Q.  That is not my question.  Approximately what time did you

9  advise him of his Miranda rights the first time?

10 A.  It was a few minutes after the security sweep.  I didn't

11 look at my watch.

12 Q.  Were you wearing a watch that day?

13 A.  Yes.

14 Q.  Was it a digital watch or an analog watch?

15 A.  Analog.

16 Q.  Analog?  Are you wearing that watch today?

17 A.  I'm not sure if it was the same watch.

18 Q.  Have you ever had any problems with your watch?  Did you

19 have to have it repaired?

20         MS. PERRY:  Objection.

21         THE COURT:  What the heck.  Go ahead, agent, answer

22 the question.

23 A.  I couldn't recall if I had the watch repaired, any watch

24 repaired between now and then.

25 Q.  Thank you.  You testified that after you read him his

67brale2                          Correa - cross

1    Miranda rights, he wanted to speak with you, is that true?

2              MS. PERRY:  Objection to form.

3              THE COURT:  Sustained as to the form.

4    Q.  Isn't it true that you earlier testified that after you

5    read my client his Miranda rights, he wanted to speak with you?

6              MS. PERRY:  Same objection.

7              THE COURT:  Same ruling.

8    Q.  Do you recall testifying earlier, when Ms. Perry was asking

9    you questions?

10   A.  Do I recall that?  Yes.

11   Q.  Do you recall answering a question that Mr. Alexander spoke

12   with you after the administration of Miranda rights?

13   A.  He did speak with me after.

14   Q.  That would be after?

15   A.  Yes.

16   Q.  Was anybody else present when you advised him of his

17   Miranda rights?

18   A.  There were people in the same room walking back and forth.

19   Q.  Was anybody standing with you?

20   A.  Seated at the table or standing with us?  I don't think so.

21   Q.  Were you seated at the table at the time you advised him or

22   were you standing?

23   A.  I was seated at the table.

24   Q.  Where was Mr. Alexander?

25   A.  Sitting across from me.

67brale2                        Correa - cross

1   Q.  This was at the living room or the dining room?

2   A.  The dining room.

3   Q.  At that point was he alone or still with his family?

4   A.  No, he was away from his family, who was apparently still

5   in the living room.

6   Q.  Who was with the family?

7   A.  I don't know.  Other agents.

8   Q.  So other agents were with the family in the living room?

9   Yes?

10  A.  Well, I'm assuming that, because I was in the dining room

11  with Mr. Alexander.

12  Q.  Do you know or do you not know, or are you just assuming?

13  A.  Do I know definitively, no.

14  Q.  You don't know?

15  A.  No.

16  Q.  At the conclusion of the security sweep, do you claim that

17  Mr. Alexander wanted to start talking to you pre-Miranda?

18  A.  Yes.

19  Q.  Yes?

20  A.  Yes.

21  Q.  What did he want to talk to you about?

22  A.  Why I was there, what the nature of the charges were.

23  Q.  At that point, that is when you decided that it was

24  necessary to advise him of Miranda?

25  A.  Yes.

67brale2                           Correa - cross

1   Q.  At that point you had him sign a written waiver of his

2   rights?

3   A.  No, sir.

4   Q.  Why didn't you have him sign a written waiver of his rights

5   at that point?

6   A.  I didn't have a written waiver with me.

7   Q.  Did you have any paperwork with you that day?

8   A.  No.  I may have had the warrant in hand.

9   Q.  But nothing else?

10  A.  No.

11  Q.  You had known what the case was about because you had

12  discussed it with Agent Rosenblatt, correct?

13  A.  Generally what the case was about.

14  Q.  Did he start talking, or are you the person who asked him

15  if he wanted to talk first?  Who was the first person who

16  wanted to discuss the case?

17  A.  When I described the charges to him, he said, I know what

18  this is about, and started telling the story about a check.

19              THE COURT:  This is after Miranda?

20              THE WITNESS:  After Miranda.

21  Q.  Do you recall it happening differently, that you advised

22  him that he was arrested and at that point you told him what he

23  was being arrested for, and then you asked him if he wanted to

24  answer questions?

25  A.  No, sir.

67brale2                    Correa - cross

1   Q.  That's not how it went?

2   A.  No.

3   Q.  Do you recall generating a typed memorandum for this case?

4   A.  Yes.

5           MR. FINEMAN:  May I approach the witness, your Honor?

6           THE COURT:  You may.

7   Q.  Do you recognize this document?

8   A.  Yes.

9   Q.  What is this document?

10  A.  It is a memo that I handed to the case agent detailing my

11  contact with Mr. Alexander.

12  Q.  Is it an original or a copy?

13  A.  This is a copy.

14  Q.  Is it a fair and accurate representation of the original?

15  A.  It is.

16  Q.  To the best of your knowledge, is it altered in any way?

17  A.  No.

18          MR. FINEMAN:  Your Honor, at this time I would like to

19  move that document into evidence as defense A.

20          MS. PERRY:  No objection.

21          THE COURT:  Defense A is received.

22          (Defendant's Exhibit A received in evidence)

23  Q.  Looking at the document defense A, your memorandum --

24          MS. PERRY:  I'm sorry.  For your Honor's sake, it is

25  3501-D.  I am sure yo know that.

67brale2                    Correa - cross

1      THE COURT:  I don't have the 3500 material, but I have

2   a copy from the exhibits.

3      MS. PERRY:  I'm sorry, your Honor.  I did produce the

4   3500 yesterday.  I can give you another copy.

5      THE COURT:  That's fine.  As I said, I have it.  I

6   have it from Mr. Fineman's motion papers.  Go ahead, Mr.

7   Fineman.

8   BY MR. FINEMAN:

9   Q.  Looking at the third paragraph of your memorandum, you

10  wrote, "After a security sweep of the residence, SA Correa

11  advised Nathaniel Alexander of his Miranda rights.  Nathaniel

12  Alexander waived his rights and stated he would answer

13  questions.  After SA3 had informed Nathaniel Alexander that he

14  was being investigated for bank fraud, Nathaniel Alexander

15  indicated the agents had permission to look through the

16  residence for evidence of financial fraud."

17      Is that what is written in your memorandum?

18  A.  It is.

19  Q.  That memorandum, when did you write this memorandum?

20  A.  The date on the memorandum is March 17th.

21  Q.  Was that closer in time to the date of arrest than today or

22  further away from the arrest than today?

23  A.  I'm sorry?

24  Q.  Was that more recent to the arrest when you wrote this?

25  A.  It was after the arrest.  I'm not sure I understand.  It

67brale2                          Correa - cross

1    was after the arrest.

2    Q.  Was it sooner after the arrest than today?  Is today

3    further away from the date of arrest, is what I am asking you.

4    A.  Oh, yes.

5    Q.  Your recollection, was it better then or is it better now?

6    A.  Was it better then?  Recollection on?

7    Q.  On the arrest.

8    A.  I don't really understand.

9    Q.  Would you say that you would have recalled the

10   circumstances and events that occurred on the day of arrest

11   better when you wrote the memorandum in March than today, with

12   the passage of time?

13   A.  One would assume that the further away you get from an

14   incident, the less memory you have of it, yes.

15   Q.  Prior to testifying here today, did you review your notes?

16   A.  Prior to testifying today?

17   Q.  Yes.

18   A.  Yes.

19   Q.  Did you read this memorandum?

20   A.  Yes.

21   Q.  What is in this memorandum is accurate?

22   A.  Yes.  Well, the -- yes.

23   Q.  What were you about to say?

24   A.  I thought you were referring to specifically the third

25   paragraph.

67brale2                          Correa - cross

1    Q.  Excuse me?

2    A.  I thought you were referring specifically to the third

3    paragraph.

4    Q.  Yes.  The third paragraph, is that accurate?

5    A.  Yes.

6    Q.  So after you informed him that he was being investigated

7    for bank fraud, he indicated that you had permission to look

8    through the residence for any evidence of financial fraud?

9    A.  He did.

10   Q.  But you testified earlier that you asked him specifically

11   where can we find it, and he told you in a briefcase.

12   A.  Exactly.

13   Q.  But you didn't write that you looked in a briefcase.  You

14   wrote you looked through the residence.

15           MS. PERRY:  Objection, your Honor.  This is argument.

16           THE COURT:  It's OK.  Go ahead.  Overruled.

17   A.  No.  I wrote that agents had permission to look through the

18   residence.

19   Q.  OK.  Then the next paragraph, read the next paragraph,

20   paragraph 4.

21   A.  "After a cursory search of the residence, Nathaniel

22   Alexander was taken to the RAC Norfolk ICE office for

23   processing and questioning."

24   Q.  Does that say after a search of a briefcase?

25   A.  No, sir.

67brale2                    Correa - cross

1   Q.   So you searched his residence?

2   A.   "Cursory search" is a term --

3   Q.   Were you talking about the security sweep or the search?

4   A.   No, I'm not referring to the security sweep in this

5   sentence.

6   Q.   So you are talking about the search?

7   A.   It was just a term that you write when you say that the

8   search was not in detail.

9   Q.   When you became a federal agent, were you trained to

10  generate paperwork?

11  A.   Yes, sir.

12  Q.   Were you trained the value of generating accurate

13  paperwork?

14  A.   Yes, sir.

15  Q.   So this is inaccurate?

16  A.   I don't believe so, sir.

17  Q.   So you did search the residence then, is that what you are

18  saying?

19  A.   I'm not sure what you are asking.

20  Q.   I'm asking you if you searched my client's residence or if

21  you merely searched a briefcase.

22  A.   Someone had to go get the briefcase and look for it.  And

23  then they brought me the briefcase and I looked through the

24  briefcase.

25          THE COURT:  Both the briefcase and the residence?

67brale2                        Correa - cross

1           THE WITNESS:  Yes, sir.

2    Q.  Who went to get it?

3    A.  Another agent.

4    Q.  Do you know who?

5    A.  No.

6    Q.  Was he told where to go?

7    A.  Yes.

8           THE COURT:  Mr. Fineman, help me out here.  I am

9    reading your notice of motion.  I don't see a motion to

10   suppress the contents of the briefcase, I so I am not sure why

11   we are talking about this.

12          MR. FINEMAN:  Credibility, your Honor.

13          THE COURT:  OK.  Go ahead.

14   Q.  The person was told where the briefcase would be, then?

15   A.  Yes.

16   Q.  They didn't have to search through the residence to find

17   it, they knew exactly where to go, right?

18   A.  Yes.

19   Q.  And they went and brought it to you, or did they look

20   through it?

21   A.  No, they brought it to me.

22   Q.  What exactly is evidence of financial fraud?

23   A.  He was speaking about a certain check and certain company,

24   so I was looking specifically for those names, having an idea

25   that those companies or that check might be fraudulent.

67brale2                         Correa - cross

1   Q.  You were looking for a specific check in his briefcase?

2   A.  Or a check with his company name on it, because he was

3   speaking about his company.

4   Q.  So you were looking more generally for documents with a

5   company name on it?

6   A.  It is hard to get into this without getting into the nature

7   of the conversation, but he was speaking of a specific check.

8   Q.  He was speaking of a specific check, and you wanted to look

9   for that check?

10          MS. PERRY:  Your Honor, I object to this as being way

11  outside the scope.

12          THE COURT:  I am not sure what this has to do with

13  credibility at this point.

14          MR. FINEMAN:  Your Honor, first, this memorandum was

15  generated well before my motion was made.  It was generated at

16  a time closer in time to the arrest.  The agent has testified

17  significantly differently from this paperwork.

18          THE COURT:  That is a matter of debate.  The agent is

19  testifying to follow-up he did based on statements your client

20  made.  You are trying to suppress the statements.  I get that.

21          MR. FINEMAN:  Yes.

22          THE COURT:  Since you are not looking to suppress the

23  fruits of the search of the briefcase, I'm not sure what

24  difference it makes as to what check was being looked for and

25  found, and so forth.

67brale2                    Correa - cross

1        MR. FINEMAN:  Your Honor, the importance is not what

2    check was being looked for, because no check was being looked

3    for.  This was a tactic employed for coercion.  There was no

4    permission to search the house.

5        THE COURT:  But you haven't moved to suppress the

6    search of the house, so I don't understand why we are going

7    through this now.

8        MR. FINEMAN:  The conduct of searching the home while

9    he is in custody and his family in custody in another room is

10   coercive conduct.

11       THE COURT:  Then the family can sue.  Lord knows, you

12   are not shy about making a motion in this case.  You haven't

13   moved to suppress the contents of the briefcase, so I don't

14   know why we are going through this.  The coercive conduct and

15   family, you might want to check the case law about what people

16   are allowed to do on security sweeps.  But I don't understand

17   what that has to do with anything either.

18       MR. FINEMAN:  It goes towards the voluntariness of the

19   statement.

20       THE COURT:  How is that?

21       MR. FINEMAN:  If the law enforcement conduct is

22   coercive, then there couldn't be a valid waiver of Miranda

23   rights.

24       THE COURT:  Then either ask about the family or move

25   on.  I don't understand why we are worried about what check was

67brale2                    Correa - cross

1  found in what briefcase.

2        MR. FINEMAN:  I will move on then.

3  Q.  In your memorandum you state that after a cursory search of

4  the residence, Nathaniel Alexander was taken to the RAIC

5  Norfolk ICE office for processing and questioning.  Is that

6  what the memorandum states?

7  A.  Yes, sir.

8  Q.  Prior to that paragraph in the memorandum, do you mention

9  that any questioning had taken place in his home?

10 A.  No.

11 Q.  So the memorandum is devoid of any information about

12 questioning in his home?

13 A.  Correct, other than stating he would answer questions.

14 Q.  Once you arrived back at the ICE office in Virginia, you

15 testified earlier that you advised him of his Miranda rights

16 again, is that true?

17 A.  That's true.

18 Q.  You did this verbally or using a document?

19 A.  Verbally.

20 Q.  But you were in the federal building at that point?

21 A.  Correct.

22 Q.  They do have waivers in that building, don't they?

23 A.  I couldn't get my hands on a written waiver at that time.

24 Q.  Were you alone in the federal building?

25 A.  No, sir.

67brale2                          Correa - cross

1    Q.   Were there other agents there?

2    A.   There was one other agent there that I knew of.

3    Q.   In the entire federal building?

4    A.   In the RAC office.  It is a suboffice.

5    Q.   There was another person there in that office?

6    A.   Yes.

7    Q.   Is that person an agent who works in Virginia or someone

8    from New York?

9    A.   Virginia.

10   Q.   But you didn't ask that person to get you a waiver?

11   A.   I believe I did, yes.

12   Q.   You did?

13   A.   Yes.

14   Q.   But they decided not to?

15   A.   They were running back and forth.

16   Q.   So they were too busy?

17              MS. PERRY:   Can the answer be obtained?

18              THE COURT:   Let him answer, and then you can ask a

19   follow-up.

20   A.   Basically, I was put in the processing room to process him.

21   Why he was going back and forth, I believe he had a court date

22   that he was running late for.  I was asking for things like

23   fingerprint cards, pedigree paperwork, including Miranda rights

24   waiver paperwork and other things.  I don't remember exactly

25   what the situation was, but one wasn't available to me at that

67brale2                           Correa - cross

1    time.

2    Q.  If you know, approximately how many people work in that

3    office?

4    A.  I don't know.

5    Q.  You don't know?

6    A.  No.

7    Q.  The agents that you were with that morning at Mr.

8    Alexander's home, were they all from Virginia?

9    A.  I don't know.

10   Q.  Before you went to my client's home at 6 o'clock in the

11   morning, is that the first place you went in the morning, or

12   did you go somewhere else?

13   A.  Yes.  We all met, several cars met in an open parking lot

14   near the home.

15   Q.  Where were you coming from?

16   A.  I don't remember.  I'm assuming it was -- I don't remember.

17   It may have been the hotel.

18   Q.  Did you go to Virginia the day before?

19   A.  Yes.

20   Q.  Presumably you stayed in a hotel?

21   A.  Yes.

22   Q.  When you arrived in Virginia the day before, did you meet

23   with anybody from the Virginia office?

24   A.  Yes.

25   Q.  Do you recall who you met with?

67brale2                    Correa - cross

1    A.    I can't remember his name.    There were two agents.    I met

2    with two agents.    One may have been Pete.

3    Q.    Where did you meet them?

4    A.    Where did we meet them?    They picked us up at the airport.

5    Q.    Where did they take you?

6    A.    I don't remember.

7    Q.    You don't recall?

8    A.    No.

9    Q.    Do you recall what time you arrived in Virginia that day?

10    A.    I remember it was nighttime.

11    Q.    Nighttime in that it was late in the evening?    Can you be

12    more specific?

13    A.    Late in the evening.    It was after sundown, late in the

14    evening.

15    Q.    That was on February 8th?

16    A.    That was on February 8th.

17    Q.    And you did meet with some agents from Virginia at that

18    point?

19    A.    Yes.

20    Q.    You don't know where they took you?

21    A.    I don't remember.

22    Q.    Did you discuss the arrest with them the day before in

23    terms of planning?

24    A.    Not that I can recall.    Not that I can recall.    I know they

25    were going to pick us up, someone was going to pick us up, and

67brale2                        Correa - cross

1    we were going to go to the staging location in the morning.

2    Q.  You were going to go straight to the location in the

3    morning?

4    A.  Staging location.

5    Q.  Staging location?

6    A.  Yes.

7    Q.  Where was the staging location?

8    A.  An open parking lot somewhere.

9    Q.  How far from my client's home?

10   A.  I don't remember.  It was a short drive.

11   Q.  Who decided on the staging location?

12   A.  One of the Virginia agents.

13   Q.  So you don't know how many people work in the Virginia

14   office?

15   A.  No.

16           MS. PERRY:  Objection.

17           THE COURT:  He said no.

18           MS. PERRY:  Asked and answered.

19   Q.  Is it your testimony that when you were there with my

20   client you were there with only one other person?

21   A.  In?

22   Q.  In the ICE office, the processing room.

23   A.  In the ICE office I remember only one other person, yes.

24   Q.  When you left my client's home and went back to the ICE

25   office, did you drive him by yourself?

67brale2                          Correa - cross

1   A.   No.   I was in the backseat and there was an agent driving.

2   Q.   That agent who drove you, that was the person who

3   refused -- excuse me.   Let me rephrase that.   The agent who

4   drove you back to the ICE headquarters, for lack of a better

5   word, that was the agent running back and forth that couldn't

6   assist you?

7   A.   I believe it was the same, yes.

8   Q.   It was the same person?

9   A.   I believe so.

10  Q.   Do you recall what he was doing that he couldn't assist

11  you?

12          MS. PERRY:   Objection to the form.

13          THE COURT:   I think the testimony was he had a court

14  date.

15  A.   I'm not sure.   I believe they were late for a court date.

16  Q.   They?   Who is they?

17  A.   I'm speaking in general.   I misspoke.   He was late for a

18  court date.

19  Q.   Are there secretarial staff at that office?

20  A.   I didn't see any that morning, no.

21  Q.   At some point somebody went to get you a copy of the

22  indictment, isn't that correct?

23  A.   Correct.

24  Q.   Who was that person?

25  A.   The same agent.

67brale2                          Correa - cross

1   Q.   The same agent that we have been discussing?

2   A.   Yes.

3   Q.   When he got you a copy of the indictment, he also gave you

4   a copy of the Miranda waiver?

5   A.   No.

6   Q.   No, he did not?

7   A.   No.

8   Q.   Did you ask him for a copy of the Miranda waiver before or

9   after you asked him for the indictment?

10  A.   It would have been before.

11  Q.   But he brought you the indictment first?

12  A.   At some point I specifically asked him for a copy of the

13  indictment.

14  Q.   Hadn't you specifically asked for a Miranda waiver early?

15  A.   Yes.

16  Q.   But he didn't bring it?

17  A.   No.

18  Q.   Did anybody else witness your second administration of

19  Miranda to my client?

20  A.   No.

21  Q.   So it was just you?

22  A.   Yes, sir.

23  Q.   You testified earlier that some time had passed and that's

24  why you felt it necessary to readvise him.  Is that what you

25  said earlier?

67brale2                              Correa - cross

1    A.   Correct.

2    Q.   You testified earlier that you had been in law enforcement

3    for many years.  Is that true?

4    A.   Yes, sir.

5    Q.   You worked for the New York State highway patrol or state

6    police?

7    A.   Yes, sir.

8    Q.   You worked for the Bronx County district attorney's office?

9    A.   Yes, sir.

10   Q.   You said that you had arrested people before and on at

11   least a hundred occasions advised them of Miranda?

12   A.   Correct.

13   Q.   Has anyone ever told you that at some point Miranda

14   expires?

15   A.   Yes.  Well, not that it expires, but if you stop talking

16   specifically about the charges and want to continue in another

17   conversation, it is good practice to advise again.

18   Q.   So if you wanted to reinitiate the conversation, you should

19   offer Miranda warnings again, is that what you are saying?

20   A.   Correct.

21   Q.   Then you wanted to continue the conversation at the ICE

22   headquarters in Virginia?

23   A.   Correct.

24   Q.   You couldn't wait until you got the physical Miranda

25   document, it was that important that you continue without one?

67brale2                    Correa - cross

1    A.  At some point -- he was being very cooperative.  There was

2    rapport going on.  I wanted to get more details of the story.

3    Q.  But you just testified that you had ceased talking to him

4    for an extended period of time.

5            MS. PERRY:  Objection.

6            THE COURT:  Rephrase, please.

7    Q.  Is it true that you stopped talking to him for an extended

8    period of time?

9    A.  It wasn't that we stopped talking.  It was that we were

10   talking about other things.  We were looking for Riddick,

11   basically, and we were doing the processing.

12   Q.  But there was a continuous conversation?

13   A.  Was there a time period where I stepped away and not talked

14   to him?  No, sir.  I was with him the whole time.

15   Q.  You testified earlier that it had been a long time and

16   therefore you needed to re-Mirandize him.

17   A.  It had been a long time since we talked about his specific

18   charges.

19   Q.  But you testified that he was helping you look for Mr.

20   Riddick, is that true?

21   A.  That's correct.

22   Q.  Directing your attention to Defense Exhibit A, your

23   typewritten statement, is that information included in your

24   statement, in your typewritten memorandum?

25   A.  On the search for Riddick?

67brale2                          Correa - cross

1   Q.   Excuse me?

2   A.   The information on search for Riddick?

3   Q.   Yes.

4   A.   No, it is not.

5   Q.   So this document is devoid of that information?

6   A.   Correct.

7   Q.   Looking at that document one more time, where it says at

8   the fifth paragraph down, "At this time SA Correa again advised

9   Nathaniel Alexander of his Miranda rights," you are talking

10  about the verbal rights we have been just been discussing for

11  the past few minutes?

12  A.   Correct.

13  Q.   Earlier, during your direct examination, you were asked a

14  number of times about whether or not Mr. Alexander was in

15  handcuffs.  At some point that morning he was in handcuffs?

16  A.   Correct.

17  Q.   Is it true that when you arrived at his home and you

18  advised him that you were there with an arrest warrant, he was

19  not free to leave?

20  A.   That's correct.

21  Q.   Back to talking about his continued conversation with you

22  at the ICE headquarters.  You had been having a conversation

23  with him about finding Riddick.

24  A.   Yes.

25  Q.   He had been very cooperative in helping you find, trying to

67brale2                          Correa - cross

1    help you find Riddick?

2    A.   Yes.

3    Q.   Did you actually find Riddick through his help?

4    A.   Yes.

5    Q.   While you were going through that exercise of trying to

6    locate Stephen Riddick, did the conversation cease?  Did you

7    just stop talking?

8    A.   About anything?

9    Q.   About anything.

10   A.   No.

11   Q.   So he had been helping you do your job in terms of finding

12   Mr. Riddick?

13   A.   Yes, sir.

14   Q.   Was there anything that would have indicated that he was

15   about to stop cooperating?

16   A.   None whatsoever.

17   Q.   And you felt compelled to Mirandize him a second time?

18   A.   Yes, sir.

19   Q.   But nobody besides you was present?

20   A.   No.

21   Q.   And there is no document to show that he was actually

22   Mirandized a second time?

23   A.   No.

24   Q.   And there is no document to show he was Mirandized the

25   first time?

67brale2                          Correa - cross

1    A.   No.

2    Q.   And nobody else was present when he was Mirandized the

3    first time, to your recollection?

4    A.   Well, there were people in the same room.  There was no one

5    sitting down next to us.

6    Q.   When you left my client's home on your way back to the ICE

7    headquarters, did he have a cell phone with him?

8    A.   Did he have his cell phone with him?

9    Q.   Yes.

10   A.   No.

11   Q.   But once he was in your custody at the ICE headquarters, at

12   some point he did get his cell phone?

13   A.   Yes.

14   Q.   How did he get his cell phone?

15   A.   I'm not sure.  I don't recall.  Apparently, someone brought

16   it in.  I know that when we were in the car he wanted his

17   contact numbers from his cell phone.

18   Q.   Did you promise anything in return for his help in finding

19   Mr. Riddick?

20   A.   No.

21   Q.   What time was his cell phone procured?

22   A.   I'm not sure.

23   Q.   Do you know what time he started making phone calls on his

24   cell phone?

25   A.   No.

67brale2                          Correa - cross

1   Q.  What time was it that you arrived at the federal building?

2   A.  I'm not sure.

3   Q.  How long were you in my client's home?

4   A.  I would give a rough estimate of 20, 30 minutes.

5   Q.  How long did it take to travel from his home to the federal

6   building?

7   A.  I don't know.  It wasn't a very long ride, but it wasn't

8   around the corner either.  I don't remember.

9   Q.  At some point you decided to move him from the processing

10  room to a conference room, is that true?

11  A.  Correct.

12  Q.  At what time did you move him from the processing room to

13  the conference room?

14  A.  I don't remember.

15  Q.  Were there any other agents in the building at that time?

16  A.  The same agent that was there before.  Peter was in the

17  conference room with us.

18  Q.  Pete was in the conference room?

19  A.  Pete.

20  Q.  Do you know when Pete arrived at the federal building?

21  A.  It may have been Pete was with me the whole time.  Pete may

22  have been the driver.

23  Q.  Pete may have been the driver?

24  A.  Yes.

25  Q.  So it might have been Pete the whole time, even the agent

67brale2                         Correa - cross

1    we were talking about before that didn't get you that Miranda

2    warning?

3    A.   Yes.

4    Q.   But you're not sure?

5    A.   I'm not sure.

6    Q.   I would like to direct your attention to the document in

7    evidence which is Government's 1, I believe, the Miranda

8    waiver.

9    A.   Yes, sir.

10   Q.   Eventually, you got ahold of this document, right?

11   A.   Yes.

12   Q.   Was it blank or was there information written in the spaces

13   provided for writing?

14   A.   No.  It was originally blank.

15   Q.   It was what?

16   A.   Originally blank.

17   Q.   It was originally blank.  So who filled out that

18   information?

19   A.   The hours and the dates?

20   Q.   Yes.

21   A.   I don't know.

22   Q.   Was Mr. Alexander your prisoner?  Were you the one in

23   charge of him from the moment you arrested him to the point you

24   got him to the conference room?

25   A.   I was the one escorting him.

67brale2                          Correa - cross

1   Q.  Were you the person sent to get him from New York?

2   A.  Yes, sir.

3   Q.  So he was your prisoner?

4   A.  You could say that, yes.

5   Q.  You had been talking to him the whole morning, yes?

6   A.  Correct.

7   Q.  You had Mirandized him twice before?

8   A.  Correct.

9   Q.  Once you get into the conference room, you get ahold of

10  this waiver?

11  A.  Yes.

12  Q.  How do you get ahold of the waiver?

13  A.  I don't remember if I had it in hand before I went in, but

14  when we sat down, the first thing we did was go through the

15  waiver form.

16  Q.  It was definitely blank when you got it?

17  A.  Yes.

18  Q.  But you didn't fill it out?

19  A.  Not all of it, no.

20  Q.  What did you fill out?

21  A.  That's my signature.

22  Q.  Other than your signature, you didn't write anything else

23  on this document?

24  A.  I don't think so.

25  Q.  That is not your handwriting where it says, "I was taken

67brale2                          Correa - cross

1   into custody at 6:00 a.m."?

2          THE COURT:  Just for the record, it is the 0600 that

3   is in handwriting.

4          MR. FINEMAN:  I apologize.  Thank you.

5   A.  I don't think so.

6   Q.  It is not your handwriting where it says on 02 slash 09

7   slash 2006?

8   A.  No, I don't think so.

9   Q.  And that is not your handwriting where it says 0900 or

10  0930?

11  A.  I don't think so.

12  Q.  That is not your initial?

13  A.  Either one, I don't know, I don't think so.

14  Q.  You don't think so or it's not?

15  A.  I'm not sure.  It doesn't look like my initial at all.

16  Q.  You initialed things in the past outside of your capacity

17  as a law enforcement officer?

18  A.  Yes.

19  Q.  Has your initial ever looked like this?

20  A.  No.

21  Q.  But you're not sure if this is it?

22  A.  I don't think so.

23  Q.  Can you commit that it is not your initial?  Can you commit

24  to that?

25  A.  It does not look like my initial, no.

67brale2                              Correa - cross

1    Q.  I didn't ask you if it looked like it.

2           MS. PERRY:  Objection, your Honor.  He has answered.

3    Q.  Is it your initial or isn't it your initial?

4           THE COURT:  One more try.  Go ahead.

5    A.  I'm sorry?

6    Q.  Is it your initial or is it not your initial?

7    A.  I don't think it's my initial.

8    Q.  So you signed this document at some point?

9    A.  Correct.

10   Q.  Was it blank or did it have that information filled in when

11   you signed this?

12   A.  It would have to be afterward, because I signed it as a

13   witness.

14   Q.  So the information would have been written into the

15   document before you signed it?

16   A.  Well, I am witness of the fact that he printed his name and

17   signed it and that it was written on this date and time.  So

18   apparently it was written afterward.

19   Q.  Say that again.

20   A.  Apparently I signed it afterward.

21   Q.  I am not asking if you apparently.  Do you remember if you

22   signed it while it was blank or if there was information on the

23   document?

24   A.  No, sir.  I wouldn't sign it while it was blank.

25   Q.  You wouldn't sign it while it was blank.  So you would have

67brale2                          Correa - cross

1   read the information on the document?

2   A.   That's correct.

3   Q.   You would have seen that the time was crossed off from

4   sometime at 9:00 or after and changed to 8:30?

5   A.   I don't remember the changing of the time at all.

6   Q.   You don't remember the time being changed?

7   A.   No, sir.

8   Q.   So it is possible that at the time this was executed the

9   time was 0930 or 0900?

10  A.   No.  What looks like happened was an initial time was put

11  in and then it was agreed that that was not the correct time

12  and the correct time was put underneath.

13  Q.   It was agreed by whom?

14  A.   Whoever those initials are.

15  Q.   You don't know who those initials belong to?

16  A.   No.

17  Q.   Let me ask you another question.  After my client signed

18  this document, did you ever lose possession of it?

19  A.   No.

20  Q.   It was always in your possession?

21  A.   Yes.

22  Q.   Somebody couldn't have taken it from you and altered it

23  afterwards?

24  A.   Could someone have taken the document and altered it

25  afterwards?

67brale2                          Correa - cross

1    Q.   Yes.

2    A.   I don't remember if the document was in my possession after

3    the interview.

4    Q.   You just said that it was.

5    A.   You asked me during the interview.

6    Q.   After the interview.

7    A.   I don't remember where the document was after the

8    interview.

9    Q.   This document made its way back to New York, isn't that

10   correct?

11   A.   That's correct.

12   Q.   How did it make its way back to New York?

13   A.   I don't remember.

14   Q.   You don't remember how it got back to New York?

15   A.   No, sir.

16   Q.   Did you bring it back to New York?

17   A.   I don't recall bringing it back to New York.

18   Q.   You don't remember?

19   A.   No.

20   Q.   Did you come back to New York?

21   A.   Yes, sir.

22   Q.   Did you bring him back to New York?

23   A.   No, sir.

24   Q.   But you brought paperwork with you to New York?

25   A.   I don't know if I brought paperwork related to this case

67brale2                          Correa - cross

1    back to New York.

2    Q.  You don't know?

3    A.  No.

4    Q.  Let me ask you another question.

5           MR. FINEMAN:  May I approach the witness, your Honor?

6           THE COURT:  You may.

7    Q.  Do you recognize this document?  It is a two-page document.

8    A.  No.

9    Q.  You do not?

10   A.  I do not.

11   Q.  Could I have that back.

12          MS. PERRY:  Your Honor, it is 3501-E and F.

13          THE COURT:  If you have an extra set.  Did you drop it

14   off by hand, Ms. Perry?

15          MS. PERRY:  I did, your Honor, yesterday.

16          MR. FINEMAN:  Your Honor, I can give you this one.  I

17   have an extra one.

18          THE COURT:  Thank you very much.

19   Q.  I am going to give you back my other copy.

20          MR. FINEMAN:  May I approach, please?

21          THE COURT:  You may.

22   Q.  It is your testimony that you don't recognize what that is?

23   A.  No, sir.

24   Q.  Does it look like your handwriting?

25   A.  No, not at all.

67brale2                    Correa - cross

1    Q.  It doesn't?

2    A.  No.

3    Q.  So it is not your note?

4    A.  No.

5    Q.  OK.  I will take it back.  Do you remember filling out a

6    Federal Bureau of Investigation United States Department of

7    Justice fingerprint request document?

8    A.  Fingerprint request?

9    Q.  A document related to fingerprints when you took my

10   client's fingerprints.

11   A.  I remember filling out the fingerprint cards.

12   Q.  Let me show you another two documents marked -- this one is

13   not marked at all.  This one is marked 3501-B.

14            MR. FINEMAN:  May I approach?

15            THE COURT:  You may.

16   Q.  Is this your handwriting?

17   A.  Yes, sir.

18   Q.  That is your handwriting.  But the earlier document I

19   showed you isn't?

20            THE COURT:  3501-E for the record?

21            MR. FINEMAN:  Yes, 3501-E.

22   A.  No, it is not.

23            MR. FINEMAN:  Can I ask to clarify, your Honor?  If it

24   is helpful to Mr. Fineman, those are my notes.

25            THE COURT:  3501-E?

67brale2                    Correa - cross

1          MS. PERRY:  And F.

2          THE COURT:  E and F are your notes?

3          MS. PERRY:  Yes.

4    Q.  I will take that.

5          MS. PERRY:  Sorry to interrupt.  I would like to hand

6    up a complete set of 3500 to your Honor.

7          THE COURT:  Thank you.

8    Q.  Do you recall writing out a one-page statement?

9    A.  Yes, sir.

10   Q.  For my client to sign?

11   A.  I'm sorry?

12   Q.  That you wanted my client to sign?

13   A.  Yes, sir.

14         MR. FINEMAN:  May I approach, your Honor?

15         THE COURT:  You may.

16         MR. FINEMAN:  For the record, this is 3501-C.

17   Q.  Do you recognize that document?

18   A.  Yes.

19   Q.  Whose handwriting is that document?

20   A.  That is my handwriting.

21   Q.  What is this document?

22   A.  This is what I was writing down as he was speaking, as Mr.

23   Nathaniel was speaking.

24         THE COURT:  This is where?

25         THE WITNESS:  In the conference room.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

67brale2                         Correa - cross

1    Q.  Is this an original or a copy?

2    A.  This is a copy.

3    Q.  Is it a fair and accurate representation of the original?

4    A.  Yes.

5            MR. FINEMAN:  I would like to move that into evidence

6    as defense C.

7            MS. PERRY:  No objection.

8            THE COURT:  Defense 3501-C is defense B, I think,

9    right?

10           MR. FINEMAN:  Didn't I move something in before as B?

11           THE COURT:  I only have A as being entered.

12           MR. FINEMAN:  Then it would be B.  I think I tried to

13   move something in and didn't.

14           THE COURT:  I think you were probably going to.  I

15   don't think anything was marked even for identification as B.

16           MR. FINEMAN:  No.

17           THE COURT:  All right.

18           (Defendant's Exhibit B received in evidence)

19   Q.  Is that your handwriting?

20   A.  Yes, it is.

21   Q.  Is that entire document your handwriting or is anybody

22   else's handwriting on it?

23   A.  No.  It's all -- well, except for the at the very top,

24   someone wrote the name Alexander on top.  That is not mine.

25   Q.  Who wrote that?

67brale2                              Correa - cross

1    A.   I don't know.

2    Q.   You don't know?

3    A.   No.

4    Q.   Was it there when you generated this document?

5    A.   No.

6    Q.   Where did you possess this record?

7    A.   After I wrote it?

8    Q.   Yes.

9    A.   When was the next time?

10   Q.   No.  Did you keep it as your record or did you just hand it

11   off to someone?

12   A.   I don't know.  I may have.  It may have been included with

13   some of the other paperwork which I'm not sure if I physically

14   brought back from Virginia.

15   Q.   It might have been physically included in some other

16   paperwork that you are not sure ever left Virginia?

17   A.   Yes, sir.  What happens is it may have been put in a file.

18   I'm not sure.  I'm just speculating.  It may have been put in a

19   file at the Virginia office as things were being filled out.

20   I'm not sure if I physically took that paperwork with me to New

21   York or it was sent to New York.  I'm not sure.

22   Q.   This is a New York case?

23   A.   Yes, sir.

24   Q.   The defendant is charged here in the Southern District?

25   A.   Correct.

67brale2                        Correa - cross

1    Q.   You work in the Southern District?

2    A.   Yes, sir.

3    Q.   Did you possess that document in your office at some time

4    before today?

5    A.   Yes.

6    Q.   Where was that document?

7    A.   I remember referring to this document when I was writing

8    the typed statement.

9    Q.   Did there come a time recently that you provided the

10   government with this document?

11              THE COURT:   Forget recently.  Did there come a time

12   you provided it to the U.S. Attorney's office?

13              MR. FINEMAN:   Yes.  Thank you, your Honor.

14              THE WITNESS:   I remember providing it to the case

15   agent.

16   Q.   To the case agent?

17   A.   Yes, sir.

18              MR. FINEMAN:   Your Honor, may we approach?

19              THE COURT:   Sure.

20              (At the sidebar)

21              THE COURT:   Mr. Fineman?

22              MR. FINEMAN:   The agent has been here the entire

23   hearing.  If I wanted to call him as a rebuttal witness now, he

24   is tainted.  He has heard the person's testimony.

25              THE COURT:   I am not sure what the purpose of the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

67brale2                    Correa - cross

1    sidebar is, since you have now said it loud enough for the

2    whole courtroom to hear.  He is the case agent.  He is allowed

3    to be around.  Also, what is the mystery of the handwriting at

4    the top "Alexander"?  What is the concern here that you have?

5              MR. FINEMAN:  I want to establish that the document

6    had never been altered, that that is his paperwork.

7              THE COURT:  He said that.

8              MR. FINEMAN:  I guess we will just move on then.

9              THE COURT:  What would be the good-faith basis to

10   believe that the document has been altered?

11             MR. FINEMAN:  I don't think it has been altered.  I

12   want to establish that it hasn't been.

13             THE COURT:  You can ask the agent if it is his notes.

14   He said that his handwriting at the top is not his.  I'm not

15   sure what it matters whose handwriting it is.  Do you have a

16   theory as to why that matters?

17             MR. FINEMAN:  No.

18             THE COURT:  All right.  By the way, Mr. Fineman, how

19   much longer do you think you are going to be with the witness?

20             MR. FINEMAN:  It is getting towards the end.

21             THE COURT:  Thanks.

22             MS. PERRY:  Just so your Honor is aware, we have just

23   one more witness.

24             THE COURT:  OK.  I have something on this afternoon,

25   and then we have to be conscious of the lunch break for Tom

67brale2                    Correa - cross

1    here.

2              MS. PERRY:  He is in from Virginia.

3              THE COURT:  We will get him done today.  We will work

4    around the other thing.

5              (In open court)

6    Q.  You testified earlier that you used that document, that

7    handwritten statement in preparing your typewritten memorandum?

8    A.  Yes, sir.

9    Q.  Would you please refer back to your typewritten memorandum.

10   What was the date at the top of that?  The first paragraph,

11   what is the date?

12   A.  The first paragraph is February 8, 2006.

13   Q.  But that is incorrect?

14   A.  That's incorrect.

15   Q.  You did not arrest him on February 8, 2006?

16   A.  No, sir.  It was February 9th.

17   Q.  The document that is handwritten has the date on it?

18   A.  Yes, sir.

19   Q.  In this typewritten memorandum, 3501-D for the record,

20   where do you write that you had my client sign a written

21   Miranda waiver form?  It is not there, is it?

22   A.  No, sir.

23   Q.  So you specifically write in your typed memorandum about

24   two Miranda warnings that are not at all documented, but the

25   one Miranda warning that is documented you don't even mention

67brale2                    Correa - cross

1    in your memorandum?

2    A.   That's correct, sir.

3    Q.   Isn't it a fact that in your memorandum, when you said that

4    you again advised him of Miranda when returned to the federal

5    building, you were not talking about oral Miranda, you were

6    talking about this signed waiver?

7    A.   No, sir.

8    Q.   Do you specifically recall advising him of his Miranda

9    rights three times, twice orally and once written?

10   A.   Oh, yes.

11   Q.   You testified earlier there came a time that you handed

12   over all your paperwork on this arrest to Agent Rosenblatt, is

13   that true?

14   A.   That's true.

15   Q.   You don't recall that that paperwork followed you from

16   Virginia or if you brought it with you?

17   A.   That's correct.

18   Q.   So you remember advising my client of his Miranda rights

19   three distinct times but you don't even remember if you brought

20   your notes home with you?

21   A.   Yes, sir.

22   Q.   That would be correct?

23   A.   That's correct.

24   Q.   In any event, you testified you wouldn't sign a document

25   that had not been fully completed, is that true?

67brale2                        Correa - cross

1    A.   That's true.

2    Q.   So this change from 9:00 or 9:30 to 8:30 would have been

3    present at the time you signed the document?

4    A.   I don't remember the changing of the document.

5    Q.   You don't remember a change being made to it?

6    A.   No, sir.

7    Q.   But you don't know if the document could have been altered

8    outside of your possession?

9    A.   I'm not sure that I physically had the document with me

10   from the trip to Virginia to here.

11   Q.   It may have been in Virginia and some agent from Virginia

12   could have just picked it up and changed the time?

13   A.   I'm not suggesting that, sir.  I don't remember the

14   changing of the document when we were at the table.

15   Q.   But you see that it is changed now?

16   A.   Yes.

17   Q.   Are you saying it was changed after you came back to New

18   York?

19   A.   No, sir.  It was not changed.

20   Q.   Have you ever seen the document since you have been back in

21   New York?

22   A.   Yes.

23   Q.   When was the first time you recall seeing this document in

24   New York?

25   A.   When Ms. Perry showed it to me.

67brale2                      Correa - cross

1    Q.   When did she show it to you?

2    A.   In her office.  I don't recall the date.

3    Q.   Approximately.

4    A.   Two, three weeks ago.

5    Q.   Two, three weeks ago is the first time you have seen this

6    document since Virginia?

7    A.   Yes, sir.

8    Q.   You testified earlier that you gave your paperwork to Agent

9    Rosenblatt though.

10   A.   When I was writing the memo, I gave him back my notes and

11   the written memo.

12   Q.   When you were writing the memo, you gave him back the

13   written notes and what else?

14   A.   And the typed memo.

15   Q.   Did you have this Miranda waiver form at that time when you

16   drafted your memorandum?

17   A.   I don't think so.

18   Q.   Do you know how this form came from Virginia to New York?

19            MS. PERRY:   Objection.

20            THE COURT:   I think he has answered that question a

21   number of times.

22   Q.   When Ms. Perry showed you this form two or three weeks ago,

23   was that change there?

24   A.   Yes, sir.

25   Q.   But you don't recall that change being there at the time

67brale2                    Correa - cross

1    you signed it?

2                MS. PERRY:  Objection.

3                THE COURT:  Overruled.

4    A.  I don't recall changing the time on the document, no.

5    Q.  You don't recall changing the time.  Do you recall anyone

6    else changing the time?

7    A.  No, sir.

8    Q.  As far as your recollection is concerned, at the time it

9    was signed it was not changed?

10   A.  No, sir.  I'm saying I don't remember the change.  It could

11   have happened, apparently it happened while we were there, but

12   I don't remember it.

13   Q.  In your years of experience as a law enforcement officer,

14   are you allowed to question a person before Miranda?

15   A.  In custody?

16   Q.  Yes.

17   A.  No, sir.

18   Q.  You are allowed to ask them questions if they waive

19   Miranda, right?

20   A.  Correct.

21   Q.  So the time of that waiver is important, yes?

22   A.  Correct.

23   Q.  When you signed this document, if there had been a

24   deviation to the time, you would have noticed it?

25   A.  Would I have noticed it at the time?

67brale2                    Correa - cross

1    Q.   Yes.

2    A.   Yes, sir.

3    Q.   Based on that, either the time had been changed and you

4    ignored it or the time had not been changed when you signed it,

5    is that fair to say?

6    A.   No, sir.

7    Q.   It is not fair to say?

8    A.   No, sir.

9    Q.   It is clear on its face that it has been changed, right?

10   A.   Correct.

11   Q.   Would you have signed a document that was altered this way?

12   A.   Yes, sir.

13   Q.   You would have signed a document altered this way?

14   A.   Yes, sir.

15   Q.   Why?

16   A.   It's common to make mistakes and cross them out and initial

17   them on any document.

18   Q.   On Miranda waivers?

19   A.   Yes, sir.

20   Q.   Is there a shortage of Miranda waivers at the federal

21   building in Virginia?

22   A.   I have no idea, sir.

23   Q.   If you made a mistake on the document before it was

24   executed, couldn't you just have gotten another document?

25   A.   It is also common just to initial a mistake and move on.

67brale2                        Correa - cross

1   Q.  That is not what I am asking you.  I am asking you, if you

2   had made a mistake on a document --

3   A.  Yes, sir.

4   Q.  -- could you have asked for a fresh document?

5   A.  Yes, sir.

6   Q.  But you never asked for a fresh document in this case?

7   A.  Never.

8   Q.  You continued to use this document whether or not it was

9   altered at the time you signed it?

10  A.  Correct.

11  Q.  And you have no personal recollection of it ever being

12  changed?

13  A.  No, sir.

14  Q.  In looking at that document, you earlier testified that it

15  appears that it was 0900 or 0930.  Is that what you testified

16  to earlier?

17  A.  Yes, correct.

18  Q.  So it was either entered 9:30 or 9 o'clock?

19          MS. PERRY:  Objection, your Honor.  It is not his

20  handwriting and he has no recollection.

21          THE COURT:  That has been asked and answered.  Go

22  ahead, try again, Mr. Fineman.  Try a different route on it.

23  Q.  Were you wearing a watch on that day?

24  A.  I usually wear a watch.  Do I specifically remember wearing

25  a watch?  I don't specifically remember, no.

67brale2                              Correa - cross

1   Q.  Do you recall, in the conference room did you have that

2   watch?

3   A.  I don't remember.

4   Q.  Did you have your cell phone in the conference room that

5   day?

6   A.  Yes, sir.

7   Q.  Did it have a clock on it?

8   A.  Yes.

9   Q.  You don't know who filled out this document other than your

10  signature?

11  A.  I'm sorry?

12  Q.  You don't know who filled this document out other than your

13  signature, is that what you are saying?

14  A.  I remember Mr. Alexander signing it.  I remember I signed

15  it.  And I remember that the other agent signed it.

16  Q.  Were you present when the time was entered on the document?

17  A.  Yes, sir.

18  Q.  Was anybody else present when the time was entered on the

19  document?

20  A.  No.  It was just the three of us.

21  Q.  You, Mr. Alexander, and Peter Joseph?

22  A.  Peter, yes.

23  Q.  The person you know as Peter?

24  A.  Yes.

25  Q.  Yes?

67brale2                          Correa - cross

1    A.  Yes, sir.

2    Q.  So either you entered the time on the document, Pete

3    entered the time on the document, Mr. Alexander entered the

4    time on the document, would that be accurate?

5    A.  That would be accurate, yes, sir.

6    Q.  Do you allow defendants to enter the time on documents?

7    A.  It is not common practice, no, sir.

8    Q.  In your experience, would you allow a defendant to write

9    the time of Miranda on a document?

10   A.  That's not my practice, sir, no.

11   Q.  Then it is fair to say either you or Mr. Joseph entered the

12   time on the document?

13   A.  Yes, sir, although that's not my handwriting.  I don't

14   believe I entered the time.

15   Q.  Do you recall having a conversation with Mr. Joseph

16   discussing a change of time?

17   A.  No, sir.

18   Q.  If you had filled out a Miranda waiver for another officer

19   or, excuse me, another agent, and you had made a mistake, would

20   you have called that mistake to that other agent's attention?

21   A.  Yes, sir.

22   Q.  Do you recall any other agent calling to your attention the

23   change of time on the Miranda card?

24          MS. PERRY:  Objection.

25          THE COURT:  Overruled.

67brale2                         Correa - cross

1   A.  Do I recall?  No, sir.

2   Q.  Do you recall ever having a conversation with anybody about

3   the change of time on this Miranda document?

4   A.  No, sir.

5   Q.  When you gave your paperwork to Agent Rosenblatt, did he

6   ever call to your attention the change on the Miranda document?

7   A.  No, sir.

8   Q.  Up until just a couple of weeks ago, two or three weeks

9   ago, has AUSA Perry ever asked you any questions about the

10  Miranda document?

11  A.  Yes.

12  Q.  She has?

13  A.  Yes.

14  Q.  When?

15        MS. PERRY:  I am going to object, your Honor.  I don't

16  see how this is relevant?

17        THE COURT:  Overruled.  I will give him some leeway.

18  But do be conscious of the time, Mr. Fineman.

19        MR. FINEMAN:  I apologize, your Honor.  I do tend to

20  be long-winded sometimes.

21        THE COURT:  It is not a question of that.  I am just

22  giving you a heads-up, because your back is to the clock.  Go

23  ahead.

24        Do you remember the question, Agent?

25  Q.  You had discussed this document with Ms. Perry prior to two

67brale2                         Correa - cross

1   or three weeks ago?

2   A.  About two or three weeks ago.

3   Q.  Before that?

4   A.  Before that, no.  No, I don't recall, no.

5   Q.  I just specifically asked you, did you ever discuss this --

6          THE COURT:  Hang on.  In fairness to the agent, people

7   were talking.  Ms. Perry objected.  I was talking.  His answer

8   was given.  I think maybe we just didn't focus on it.  Go

9   ahead.

10          MR. FINEMAN:  Can we ask the court reporter to read

11   back the answer?

12          (Record)

13   Q.  So you had had a conversation with her prior to a few weeks

14   ago?

15   A.  No.  I understand what you are asking differently, sir.

16   She had a conversation with me about this document two or three

17   weeks ago, is that what you are looking for?

18   Q.  No.  Did you ever talk to her before that?

19   A.  Before two or three weeks ago, no, sir.

20   Q.  Before two or three weeks ago, did you ever have a

21   conversation with Ms. Perry concerning the substance of my

22   client's statement?

23   A.  No, sir.

24   Q.  Or the circumstances of the arrest?

25   A.  No.

67brale2                         Correa - cross

1    Q.   And no one until two or three weeks ago has brought this

2    issue of the Miranda document to your attention?

3    A.   That's correct, sir.

4    Q.   Is it true that at some point Mr. Alexander requested to

5    speak to an attorney?

6    A.   He did.

7    Q.   What time was that?

8    A.   I don't know.  It was after we had gone through the story

9    and I wrote my notes and I asked him to sign it.

10   Q.   At the point that you asked him to sign your notes, he

11   asked for an attorney?

12   A.   Yes.

13   Q.   He had already signed the Miranda waiver earlier, without

14   asking for an attorney?

15   A.   Yes, sir.

16   Q.   The entire morning that you had been speaking to him and

17   constantly readvising him of his right to an attorney, he had

18   not been asking for one?

19   A.   Not once.

20   Q.   It was only at the point at which you asked him to sign the

21   statement that he wanted to speak to his lawyer?

22   A.   Yes.  He wanted specific advice as to whether he should

23   sign anything, a statement or anything.

24   Q.   You testified earlier he had already signed something,

25   anything, a Miranda card.

67brale2                            Correa - cross

1   A.  Yes, sir.

2   Q.  Now he wanted to ask his attorney if he should sign this

3   document?

4   A.  Yes, sir.

5   Q.  Is that what you are saying?

6   A.  Yes, sir.

7   Q.  As soon as he asked to speak to his lawyer, you gave him

8   that opportunity?

9   A.  Yes, sir.

10  Q.  How did he get in contact with his lawyer?

11  A.  It was via telephone call.  I'm not sure whose phone was

12  used, but it was via telephone call.

13  Q.  Isn't it a fact that he had spoken using his own cell

14  phone?

15  A.  He had been using his own cell phone all morning, yes,

16  after getting into the building, after getting into the

17  processing area.

18  Q.  So he called his lawyer from his own cell phone, isn't that

19  true?

20  A.  No, it's not true.  I don't know what phone was used.

21  Q.  You don't know?

22  A.  No.

23  Q.  You answered it twice.  Do you know or is it not true?

24  A.  We were in the conference room.  He asked to speak to his

25  lawyer.  You asked me is it true that he used his phone?

67brale2                    Correa - cross

1   Q.   Did he use his cell phone to call his lawyer?

2   A.   I don't know.

3            THE COURT:   Did you see him make the phone call?

4            THE WITNESS:   Yes, sir.  He was right in front of me.

5            THE COURT:   There when he had a conversation with his

6   attorney?

7            THE WITNESS:   Yes.

8            THE COURT:   Do you remember what phone he used?

9            THE WITNESS:   No.

10           THE COURT:   Was there a telephone in the conference

11  room?

12           THE WITNESS:   I don't remember.

13  Q.   Isn't it true that that known call happened around 9

14  o'clock?

15  A.   I don't know.

16  Q.   How long had you been in the federal building at that

17  point?

18  A.   I don't know.  It would be a very, very rough estimate that

19  I would give you.

20  Q.   At some point somebody filled out the Miranda card and

21  entered the time.

22  A.   Yes.

23  Q.   Is it customary to check your watch when you are entering

24  the time on a Miranda card to verify that the time is in fact

25  accurate?

67brale2                         Correa - cross

1  A.  Yes, sir.

2  Q.  So it had to have been after 8:30?

3  A.  Yes, sir.

4  Q.  You said that you were talking to him for about half an

5  hour, is that true?

6  A.  At most a half hour, right, yes, sir.

7  Q.  So that would put him around 9 o'clock?

8  A.  Yes, sir.

9  Q.  As soon as he had gotten in contact with his lawyer, he

10  decided to cease cooperating with you and did not want to sign

11  any statements?

12  A.  Correct.

13  Q.  He had been cooperative all morning helping you find Mr.

14  Riddick, answering all of your questions, is that true?

15  A.  Very cooperative.

16  Q.  It is your testimony that you read him Miranda at his

17  home --

18             THE COURT:  We are regurgitating.

19             MR. FINEMAN:  All right, your Honor.

20  Q.  The bottom line is a short time after he signed a written

21  Miranda waiver is when he called his lawyer, is that true?

22             MS. PERRY:  Objection.

23             THE COURT:  Sustained.  He has given a time estimate.

24  To rephrase it as "a short time" is inappropriate.

25  Q.  Isn't it a fact that only after signing the Miranda waiver

67brale2                          Correa - cross

1    he asked to call his attorney?

2    A.   That's correct.

3              MS. PERRY:  Objection to form.

4              THE COURT:  Overruled.  The answer was?

5    A.   That's correct.

6              MR. FINEMAN:  No further questions.

7              MS. PERRY:  Just one moment, your Honor.  One very

8    brief line of redirect, your Honor.

9    REDIRECT EXAMINATION

10   BY MS. PERRY:

11   Q.   Special Agent Correa, at some point after the arrest you

12   came into the U.S. Attorney's office for a proffer on Mr.

13   Alexander, correct?

14   A.   Correct.

15   Q.   Surrounding that proffer, did you have discussions with me?

16   A.   Yes.

17   Q.   Were those conversations generally -- did you describe the

18   substance of Mr. Alexander's statements at the time of his

19   arrest?

20   A.   Yes.

21             MS. PERRY:  No further questions.

22             THE COURT:  Do you remember when that was, roughly,

23   what month?

24             THE WITNESS:  I'm afraid I don't.

25             THE COURT:  Do you remember how long after the arrest

67brale2                    Correa - redirect

1    this was when you came to the proffer?

2                THE WITNESS:  It was months.  As a matter of fact, I

3    was out of the country for almost two months.  Your Honor, it

4    was months.  I'm not sure.

5                THE COURT:  Did the subject of the time change in the

6    Miranda form come up during that meeting with Ms. Perry?

7                THE WITNESS:  No, sir, I don't think so.  We were

8    there for the proffer.

9                MS. PERRY:  May I show one document to the witness,

10   your Honor, to attempt to refresh his recollection?

11               THE COURT:  Sure.  What are you showing, for the

12   record?

13               MS. PERRY:  This is 3501-G.

14               THE COURT:  OK.

15   Q.  Do you recognize what has been marked for identification as

16   3501-G?  Turn to the second page.  Do you recognize your

17   signature on that page?

18   A.  Yes, I do.

19   Q.  Do you recognize what that is?

20   A.  It was a document that was signed at the proffer agreement.

21   Q.  Do you see the date on that proffer agreement?

22   A.  March 29, 2006.

23   Q.  Does that refresh your recollection that you may have had

24   discussions with the government about Mr. Alexander's

25   statements sometime around that time?

67brale2                    Correa - redirect

1    A.   Yes.

2    Q.   When you testified earlier on cross that you hadn't had

3    discussions with the government about the substance of Mr.

4    Alexander's statements, were you referring specifically to

5    directly following Mr. Alexander's arrest, or what were you

6    referring to?

7    A.   I wasn't referring to the proffer.

8    Q.   So at some point you did have discussions with her?

9    A.   I did.

10   Q.   Did you convey the substance of Mr. Alexander's statements

11   to anybody following Mr. Alexander's arrest, any other agents?

12   A.   No.  Did I?  I'm sorry.

13   Q.   Let me repeat the question or rephrase it.  After Mr.

14   Alexander made statements, did you have any discussions with

15   anybody to convey what Mr. Alexander had told you?

16   A.   Discussing the statements he made at the proffer or --

17   Q.   I'm sorry.  No, no.  After Mr. Alexander's post-arrest

18   statements, did you have a discussion with Special Agent

19   Rosenblatt about the substance of those statements?

20   A.   Oh, yes.

21            MS. PERRY:  No further questions.

22            MR. FINEMAN:  I will be brief.

23            THE COURT:  Go ahead.

24   RECROSS-EXAMINATION

25   BY MR. FINEMAN:

67brale2            Correa - recross

1  Q.  You did have a conversation with somebody about his

2  statements at the time of arrest?

3  A.  Yes, sir.

4  Q.  Who did you have those conversations with?

5  A.  The case agent.

6  Q.  That is Mr. Rosenblatt?

7  A.  Yes, sir.

8  Q.  Did you ever have that conversation with the AUSA?

9  A.  No, sir, only at this proffer and after.

10  Q.  Earlier, on my original cross-examination, I had asked you

11  if you had had a conversation and you said no.  Now, after Ms.

12  Perry had an opportunity to redirect you, that is not true, you

13  did actually have an opportunity to speak with Ms. Perry at

14  some point about the substance of my client's statement?

15  A.  Yes, sir.  I assumed -- what I remember from this proffer

16  is his statement from the proffer.  I didn't equate this with

17  relaying what I found out at the statement, reporting it to

18  someone.  But I did speak to her regarding it.

19  Q.  You did speak to her regarding the subject of his post-

20  arrest statement?

21  A.  Yes, sir.

22  Q.  Then it was untrue when you said you had not?

23  A.  Yes, sir.

24          MR. FINEMAN:  Thank you.

25          MS. PERRY:  No further questions, your Honor.

67brale2

```
1              THE COURT:  Anything further, Mr. Fineman?

2              MR. FINEMAN:  No, your Honor.

3              THE COURT:  Agent Correa, you are excused.  Thank you.

4              (Witness excused)

5              THE COURT:  We are not going to do it now, but how

6    long is your direct of this next witness?

7              MS. PERRY:  My direct, maybe ten minutes.

8              THE COURT:  Why don't we come back at 2:15.  Does this

9    person have a flight or a train to catch?

10             MS. PERRY:  He does, but it is a government witness.

11             THE COURT:  I have a 2:30.  We will see if we can get

12   this done, at least this witness done, before I take that

13   matter.  Mr. Fineman, do you anticipate calling anybody?

14             MR. FINEMAN:  No, your Honor.

15             THE COURT:  Then I think we should be able to get this

16   done.  I will apologize profusely to the lawyers in the civil

17   case.  We will see you at 2:15.

18             (Luncheon recess)

19

20

21

22

23

24

25
```

67BSALEX2                         Joseph - cross

1          AFTERNOON SESSION

2          2:25 p.m.

3          THE COURT:  Ms. Perry, your next witness.

4          MS. PERRY:  The government calls Special Agent Peter

5    Joseph.

6     PETER JOSEPH,

7          called as a witness by the Government,

8          having been duly sworn, testified as follows:

9    DIRECT EXAMINATION

10   DIRECT EXAMINATION

11   BY MS. PERRY:

12   Q.  How are you employed?

13   A.  I work for the United States Immigration and Customs

14   Enforcement.

15   Q.  How long have you been with ICE?

16   A.  2-1/2 years now.

17   Q.  Where are you located, which field office?

18   A.  I work out of the resident-agent-in-charge office in

19   Norfolk, Virginia.

20   Q.  That is a small satellite office?

21   A.  It is.

22   Q.  What are your primary responsibilities with ICE there?

23   A.  The group I am in right now, we currently try to disrupt

24   and dismantle international drug smuggling organizations.

25   Q.  Directing your attention to February 9, 2006, did there

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

67BSALEX2                    Joseph - direct

1   come a time when you met an individual named Nathaniel

2   Alexander?

3   A.  Yes, ma'am.

4   Q.  Where was that?

5   A.  That was at his residence in Portsmouth, Virginia.

6   Q.  Why did you go to his residence?

7   A.  I went to his residence to arrest him.

8   Q.  And prior to that date, when was the first you heard of Mr.

9   Alexander?

10  A.  The name -- I think I might have heard it a week before but

11  it didn't mean anything to me until the day before.  My partner

12  Eric Jones handed me his name and said you are going to be

13  leader of this arrest team tomorrow.

14  Q.  So prior to that you had no involvement whatsoever in this

15  case or in the investigation of this case?

16  A.  No, ma'am.

17  Q.  Have you had any subsequent involvement whatsoever in this

18  case following February 9, 2006?

19  A.  No, ma'am.

20  Q.  Were you accompanied by anyone else to Mr. Alexander's home

21  on February 9, 2006?

22  A.  Yes.

23  Q.  Who was that?

24  A.  That is an FDA special agent, Tim Royster, Jason Wood, an

25  ICE agent, and two uniformed officers, as well as a SAC agent

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

67BSALEX2                    Joseph - direct

1    from ICE.  His name is Rubin.  That is all I know him as.

2    Q.  Had you spoken to Rubin prior to that day?

3    A.  I met Rubin the night before at the airport.

4    Q.  And how about subsequent to that February 9, had you spoken

5    with Rubin?

6    A.  No, ma'am.

7    Q.  Do you know his last name?

8    A.  No.

9    Q.  Approximately what time did you arrive at Mr. Alexander's

10   home?

11   A.  I would say probably a little after 6.

12   Q.  What was the first thing that happened when you arrived

13   there?

14             THE COURT:  6 in the morning I take it?

15             THE WITNESS:  Yes, sir.

16   A.  As head of the arrest team, which was my sole

17   responsibility was just initiate a safe arrest, I went up to

18   the door, knocked and Mr. Alexander came to the door after

19   several knocks.  It was very early, which is the point of going

20   at 6 a.m.  Mr. Alexander was clearly sleeping.  He was dressed

21   in just his boxers, very surprised to see us, and he answered

22   the door.

23             I asked him who he was and he said his name was Nate,

24   Nat Alexander, something to that extent, and I informed him we

25   had an arrest warrant for him, stepped into the foyer of the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

67BSALEX2                          Joseph - direct

1    house and placed handcuffs on him.

2    Q.   Where did you have your gun when you knocked on the door?

3    A.   The gun was on my hip.

4    Q.   Did you ever take it out of the holster at any time?

5    A.   No, ma'am.

6    Q.   By "any time" I mean any time that day in the presence of

7    Mr. Alexander.

8    A.   No, ma'am.

9    Q.   Do you know if any of the other agents unholstered their

10   guns?

11   A.   No, ma'am.  Not that I no of.

12   Q.   You did not see any agents?

13   A.   I didn't see any agents do that, no.

14   Q.   Was there anyone else present in the home?

15   A.   Yes, Mr. Alexander's wife and son, I believe.

16   Q.   How did you find that out?

17   A.   We walked in the door.  Mr. Alexander asked why we were

18   there and at that point in time as far as my responsibilities

19   was I wanted to know if there are weapons in the house and how

20   many bodies were in the house.

21        Mr. Alexander was forthright from the second I started

22   talking to him and told me his wife and son were in the house

23   and of course there were no weapons.  At that point in time we

24   allowed -- from what little I knew about the case is it was a

25   white collar case.  Most warrants I do are drug related.  Up to

1    knocking on the door there was no indication that there would

2    be a violent arrest and Mr. Alexander was very cooperative from

3    the very beginning so we tried to allow him to call his wife

4    out of the bedroom in case maybe she wasn't dressed and tried

5    to be respectful in that way.

6    Q.   Was there anyone else home besides his wife?

7    A.   His son.

8    Q.   Where were his son and his wife?

9    A.   They were each sleeping in their respective bedrooms at

10   which time we called them out and placed them in a family room.

11   Q.   And where did you place Mr. Alexander?

12   A.   At that point in time I think we placed him in the family

13   room while the rest of the agents swept the house for bodies.

14   Q.   You mentioned Mr. Alexander was undressed at the time that

15   you arrived.

16   A.   Right.

17   Q.   Was he allowed to dress?

18   A.   Yes, Agent Royster and I took him back to the bedroom.  At

19   that time the questions we asked is where are your socks and he

20   indicated the drawers, and we asked if there were any weapons

21   in those drawers and he said no and we found no weapons.  We

22   also took his cuffs off so he could put on his shirt.

23   Q.   So he was cuffed upon arrest?

24   A.   He was.

25   Q.   Did he speak to you while you were with him in the room?

67BSALEX2                    Joseph - direct

1    A.  He did.  He kept asking -- and he was very surprised --

2    what the arrest was about and kept asking me to pretty much

3    justify or to inform him what was going on.

4    Q.  What did you say to him?

5    A.  I told him that another agent would sit him down shortly

6    and discuss that with him.

7    Q.  You stated that there was a security sweep?

8    A.  There was.

9    Q.  After the security sweep and after Mr. Alexander was

10   dressed, what did you do next?

11   A.  After he was dressed we went out to a dining room area of

12   the house where Agent Rubin was and there was a uniformed

13   officer in the foyer.  We placed Mr. Alexander down and I

14   walked over to the family room to see if everything was okay

15   with the wife and son.  Again, my responsibility was the

16   arrest.

17   Q.  So when you put him in the dining room he was there with

18   Rubin and you stated there was a uniformed officer?

19   A.  Yes, ma'am.  That is why I would never have left Agent

20   Rubin, officer safety issues, but a uniformed officer was

21   standing there so I felt fine to walk about the house.

22   Q.  You said the uniformed officer was standing right there.

23   Where exactly was he?

24   A.  From what I remember the foyer is adjacent to the dining

25   room and it's open.  The officer stood by the door.

67BSALEX2                    Joseph - direct

1    Q.  Mr. Alexander and Rubin -- how were they situated in the

2    dining room?

3    A.  From what I can remember it was like a long oval table.  It

4    was a long table and they were seated on the same side of the

5    table facing each other with no table between them.

6    Q.  You stated you left the dining room and you felt that the

7    situation was safe and you left the dining room?

8    A.  Right.  Like I said, Mr. Alexander gave us no indication

9    that he was hostile or uncooperative.

10   Q.  How would you describe his demeanor?

11   A.  He wouldn't stop talking from the time we walked in the

12   door to the time we took him to the marshals.

13   Q.  Did he appear cooperative?

14   A.  Very.

15   Q.  At some point did you reenter the dining room?

16   A.  I did.

17   Q.  For what purpose?

18   A.  I walked back in and asked Mr. Alexander if we could search

19   his house.

20   Q.  What did he say?

21   A.  He said yes, sure.

22   Q.  He said what?

23   A.  He said like sure, absolutely.

24   Q.  Did he have any hesitation whatsoever?

25   A.  No, ma'am.

67BSALEX2                    Joseph - direct

1   Q.   Did he tell you specifically where you could look for

2   documents?

3   A.   He did.   After Agent Royster and I started to look we

4   really didn't know what we were looking for due to us not

5   having any knowledge of the case and we asked Mr. Alexander if

6   he had an office or briefcase that we could look at.

7   Q.   And did he tell you where specifically to look?

8   A.   He directed us to where his briefcase was.

9   Q.   Were you able to locate the briefcase easily enough?

10  A.   Easily.

11  Q.   What did you do with the briefcase?

12  A.   We looked in it and we had no clue what we were looking for

13  so at that point in time we kind of terminated the search of

14  the house.

15  Q.   Did Rubin also look in the briefcase, if you recall?

16  A.   I can't remember.

17  Q.   Do you know whether Mr. Alexander -- you said he was

18  talking constantly.   Do you know whether he made statements to

19  Rubin in the home?

20  A.   He was making statements to Rubin, yes, ma'am.

21  Q.   Now, at some point you left Mr. Alexander's home and where

22  did you go?

23  A.   We transported -- well, Agent Royster and Agent Rubin

24  transported Mr. Alexander back to the resident-agent-in-charge

25  office, the ICE office in Norfolk.

67BSALEX2                          Joseph - direct

1    Q.  What did you do?

2    A.  I went back by myself at which point in time Agent Royster

3    called me and asked me if I could return to Mr. Alexander's

4    home and retrieve his telephone.

5    Q.  Let me back up for one moment.

6            I know you stated that Mr. Alexander's cuffs were

7    removed when he dressed himself.  Do you recall whether he was

8    in handcuffs for the duration of the period in which he was in

9    his home or not?

10   A.  I can't remember.  I believe him to be cuffed during the

11   duration in the home.

12   Q.  Do you recall when he was transported if he was in cuffs or

13   not?

14   A.  I don't know for sure but I would say almost definitively

15   he was cuffed during transport.

16   Q.  Now, you said that you had a conversation with Agent

17   Royster while in transit back to the RAC office?

18   A.  Yes, ma'am.

19   Q.  What was the substance of that conversation?

20   A.  Agent Royster asked me if I could return to Mr. Alexander's

21   home and retrieve his cell phone.

22   Q.  And what was the purpose for retrieving the cell phone, if

23   you know?

24   A.  At that point in time I knew that the other arrest team had

25   not identified Mr. Riddick, his location.  I think I just

67BSALEX2                    Joseph - direct

1   assumed it was for that purpose.

2   Q.   When you returned to Mr. Alexander's home how did you

3   retrieve the cell phone?

4   A.   I knocked on the door and his wife presented it to me.

5   Q.   She gave it to you?

6   A.   Yes, ma'am.

7   Q.   What did you do with his cell phone?

8   A.   I took it back to the RAC office in Norfolk.

9   Q.   Can you say approximately what time you arrived at the RAC

10  office?

11  A.   Say probably around 8, 8-ish, give or take.

12  Q.   Give or take?

13  A.   Yes, ma'am.  It was rush hour traffic, tunnels, things like

14  that.  I was almost at the office before I had to return to get

15  the phone.

16  Q.   Would 8 o'clock be the latest it would have been if you can

17  say?

18  A.   It probably could have been a little past 8.

19  Q.   But anywhere within half an hour.

20  A.   I would say 7:45 to 8 o'clock.

21  Q.   Where was Mr. Alexander when you got to the RAC office?

22  A.   I got to the office and Mr. Alexander was sitting in a

23  processing room in a containment cell and Agent Rubin was

24  speaking with him.

25  Q.   Do you know if he had been processed already?

67BSALEX2                        Joseph - direct

1   A.   I am not sure if he had.

2   Q.   Can you describe the processing room?

3   A.   It's just a regular small room and it has a containment

4   cell and fingerprint equipment.

5   Q.   Let me back up for a moment.

6        Were you present while Mr. Alexander was processed?

7   A.   No, ma'am.

8   Q.   You said it's a small room and can you describe it?

9   A.   It's a small room with fingerprint equipment.  Really Mr.

10  Alexander was in the cell and Agent Rubin pulled a chair in

11  from the hallway and sat across from him while the cell door

12  was open.

13  Q.   So they were sitting --

14  A.   Across from each other.

15  Q.   Did Mr. Alexander appear comfortable at this time?

16       MR. FINEMAN:  Objection.

17       THE COURT:  Why don't you rephrase it.

18  Q.   Was Mr. Alexander in handcuffs at this point?

19  A.   I don't believe he was.  Or, at some point in the near

20  future they came off because they were my cuffs.  They were a

21  gift and in our line of business handcuffs walk away so I

22  wanted to get them back.

23  Q.   So you did get them back at some point?

24  A.   I did.

25  Q.   Did you ask Mr. Alexander at any point if he wanted

1  anything, anything to drink?  Did you try to make him

2  comfortable?

3  A.  Yes, ma'am.  I offered to get him some sort of beverage and

4  I went and got Agent Rubin a cup of coffee.

5  Q.  When you arrived at the processing room was Mr. Alexander

6  speaking with Rubin at that time?

7  A.  He was.

8  Q.  Did he appear he was making statements?

9  A.  Yes, ma'am.

10 Q.  What did you do with the cell phone when you returned to

11 RAC?

12 A.  I gave it to Agent Rubin.

13 Q.  And during the time you were in the processing room was Mr.

14 Alexander placing any phone calls from that cell phone?

15 A.  He did make some calls from that cell phone while in the

16 processing room, yes, ma'am.

17 Q.  And while he was placing calls, did he also continue to

18 speak with Rubin?

19 A.  Yes, ma'am.

20 Q.  Can you describe Mr. Alexander's demeanor at the office?

21 A.  Mr. Alexander appeared to be comfortable with us from

22 really the time we were at his house until the time we took him

23 to the marshals.  And he was even joking with us toward the end

24 so he seemed to be very comfortable.

25 Q.  By the way, were there any other ICE agents in the office

67BSALEX2                    Joseph - direct

1  at that point when you arrived at the processing room?

2  A.  When I arrived in the processing room there were probably

3  some agents around the office.

4  Q.  Did you have any other business that day other than Mr.

5  Alexander's arrest?

6  A.  Yes, ma'am.  As I said earlier, we have a smaller office

7  and we were delivering I think around 2000 pounds of marijuana

8  for the Arizona office on a controlled delivery and that kind

9  of weighed.  Logistics are pretty severe.  I was running around

10  all over the place making phone calls and making arrangements.

11  At some point was Mr. Alexander presented with a written

12  Miranda waiver form?

13  A.  Yes, ma'am, he was.

14  Q.  And who retrieved that form?

15  A.  I went and got the form.

16  Q.  Where did you get it from?

17  A.  From my search kit in my vehicle.

18  Q.  Is there any reason you went down to the vehicle to get it?

19  A.  There was.  We had a new form that had just come out and I

20  knew for a fact that I made copies of it and it was in my

21  search kit.  I wasn't sure where they were stored in the office

22  so I went down to get it.

23  Q.  What happened when you returned with that written waiver

24  form?

25  A.  We either transported Mr. Alexander to the conference room

67BSALEX2                    Joseph - direct

1    or he was already placed in the conference room.

2    Q.  So when you returned with the form you went to the

3    conference room with Mr. Alexander?

4    A.  Yes, ma'am.

5    Q.  Was anyone else there as well?

6    A.  Agent Rubin.

7    Q.  And he was not in handcuffs at this point, Mr. Alexander?

8    A.  No, I don't think he was.

9    Q.  What was Mr. Alexander told when the form was presented to

10   him?

11   A.  Agent Rubin showed him the form and said this is just some

12   like formality type thing, something we have to go over.

13   Again, just paper-wise, and they both -- I can't remember if

14   Agent Rubin read it but it was presented and looked over.  Mr.

15   Alexander signed it at which time I grabbed it, signed it, and

16   filled in the information regarding date and time.

17   Q.  Did Mr. Alexander go through the form and did he indicate

18   that he understood it?

19   A.  It was my feeling that he did understand his rights.

20   Q.  Did you have any doubts about his understanding of those

21   rights whatsoever?

22   A.  Not at all.

23           THE COURT:  How long did he look at it?

24           THE WITNESS:  I can't remember, sir.

25           THE COURT:  Do you know that he read it?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

67BSALEX2                          Joseph - direct

1        THE WITNESS:  I don't know that he read it.  I know it

2    was presented to him and he looked it over and Agent Rubin

3    asked him if he understood his rights.

4        THE COURT:  What did he say?

5        THE WITNESS:  He indicated yes, he had.

6    Q.  You don't recall specifically whether he read it outloud?

7    A.  I can't remember.

8    Q.  But you do recall you didn't have any question about his

9    understanding?

10   A.  No, ma'am.

11   Q.  You stated that you filled out the dates and the time?

12   A.  I did.

13   Q.  How do you recall that you were the individual that filled

14   out the date and time?

15   A.  Because I messed up and I know that I messed up because I

16   filled out the date and time an hour off.  I handed it to Rubin

17   to sign and I signed as a witness on the bottom line.  Usually

18   the initiating officer signs the top line.  I gave it to Agent

19   Rubin and he immediately looked at it and he goes, "No, you

20   mean 8:30," and I went "of course", and I felt like an idiot

21   and I got a senior agent there and it was a bonehead move and I

22   looked at my watch wrong.

23   Q.  So you have an independent memory of making that error?

24   A.  Absolutely because I felt like a moron.

25   Q.  I would like to show you now what has been admitted into

67BSALEX2                         Joseph - direct

1    evidence as Government Exhibit 1 and ask you if you recognize

2    this document.

3    A.   Yes, ma'am, I recognize the document.

4    Q.   What is that?

5    A.   It's statement of rights Mr. Alexander signed.

6    Q.   Did you sign that as well?

7    A.   I did.

8    Q.   Where is your signature?

9    A.   On the bottom line under witness.

10   Q.   Did anyone else sign that form?

11   A.   Mr. Alexander and Rubin.

12   Q.   Turning to the handwritten portion under the word waiver,

13   there is some typewritten portion on this and there is a

14   handwritten portion.

15            Whose handwriting is that?

16   A.   That is my handwriting.

17   Q.   Can you -- and you can take the form out if it helps to

18   look at the ink more directly and I know it's through plastic

19   so you can take it out.  Can you read the time as it was

20   originally written?

21   A.   It was originally written as 9:30.

22   Q.   And what happened after you wrote 9:30?

23   A.   After I wrote 9:30 I signed it, handed it back to Rubin and

24   he immediately told me that I made mistake.  I grabbed the

25   form, started scribbling -- I don't know.  I was flustered.  I

67BSALEX2                          Joseph - direct

1    was a little embarrassed and after trying to make an effort I

2    just started scratching it out and I put a clear line through

3    it and put my initials and made a clear line underneath.

4    Q.   Directly to the right of where it says that crossed-out

5    time there is a marking.  Those are your initials?

6    A.   Those are my initials.

7    Q.   Do you see underneath it says 0830?

8    A.   Yes, ma'am.

9    Q.   Is that your handwriting?

10   A.   It is.

11   Q.   Next to that there is a marking.  Do you recognize what

12   that is?

13   A.   No, ma'am.

14   Q.   Those are not your initials?

15   A.   No, ma'am.

16   Q.   Did Rubin tell you almost immediately that you had made

17   that error?

18   A.   Immediately.

19   Q.   And did you make that correction as soon as he informed

20   you?

21   A.   Yes, ma'am.

22   Q.   And did you initial that as soon as he informed you?

23   A.   I did.

24   Q.   Did you make any change to this document outside of Mr.

25   Alexander's presence?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

67BSALEX2                       Joseph - direct

1    A.  No, ma'am.

2    Q.  That change was done in Mr. Alexander's presence?

3    A.  Yes, ma'am.

4    Q.  Do you know whose initials those are next to 0830?

5    A.  No, ma'am.

6    Q.  They are either Mr. Alexander's or Special Agent Correa?

7    A.  Yes, they were the only people in the room.

8            THE COURT:  Also known as Special Agent Rubin for

9    these purposes.

10   Q.  Just take your time.  I know you are nervous about

11   testifying.  Just wait until I finish the question.

12   A.  Okay.

13   Q.  Can you please describe the watch that you were wearing at

14   the time you filled out this form?

15   A.  It's a Kenneth Cole, white-faced, and I have it right here.

16   It's the same watch I have had for a couple of years now.

17   Q.  Are you wearing it right now?

18   A.  Yes, ma'am.

19   Q.  Can you please describe the face?  Is it digital or

20   analogue?

21   A.  Analogue.

22           MS. PERRY:  I would like to make that available to the

23   court and Mr. Fineman if desired.

24           THE COURT:  Free advertising for Kenneth Cole.

25   Q.  Can you take it off?

67BSALEX2                        Joseph - direct

1   A.   Absolutely.

2            THE COURT:   All right, Mr. Fineman, at your leisure,

3   do you want to come up now and take a look at it?

4            MR. FINEMAN:   Can I take a look?

5            THE COURT:   Sure.   It has been offered.   A free look

6   at a Kenneth Cole watch.

7   Q.   That is the watch you were wearing at the time of the

8   signing of that Miranda waiver form?

9   A.   Yes, ma'am.

10  Q.   At any other time in your career have you made any other

11  amendments to any Miranda waiver forms?

12  A.   Yes, ma'am, I have.

13  Q.   Can you please describe the circumstances of that change?

14  A.   It was prior to this year we had a gentleman who requested

15  counsel and then asked to speak with law enforcement at which

16  time we re-initialed a second waiver-of-rights form and

17  indicated at the bottom something along the lines of "I

18  previously requested counsel but now wish to speak to law

19  enforcement," and I note he initialed it.   I am sure my name is

20  on the sheet.

21  Q.   So you believe he initialed that change?

22  A.   I know he initialed the change.   I believe mine was on

23  there also.

24  Q.   After signing this form, did Mr. Alexander continue to make

25  statements?

67BSALEX2                    Joseph - direct

1   A.  He did.

2   Q.  Do you know whether he went through the entirety of his

3   statement?

4   A.  Agent Rubin told him since we had this form signed along

5   with whatever we discussed earlier that we were going to go

6   over all his prior statements.

7   Q.  By the way, can you please describe briefly the conference

8   room, the layout of the conference room?

9   A.  It's a square room.  We have a long oval table.  Mr.

10  Alexander and I were sitting across from each other at one end

11  of the table and Rubin was at the head.

12  Q.  Were you in pretty close proximity?

13  A.  We were all very close.

14  Q.  During the time that you were in the conference room did

15  Mr. Alexander also continue to place any phone calls?

16  A.  He did.

17  Q.  And, again, what was the purpose of these calls?

18  A.  I believe he was trying to locate Mr. Riddick.

19  Q.  Were you present for the entirety of the remainder of the

20  interview with Mr. Alexander?

21  A.  No, ma'am.

22  Q.  Special Agent Joseph, at what time did Mr. Alexander sign

23  the Miranda waiver form that has been marked as Government

24  Exhibit 1?

25  A.  He signed the form at 8:30 a.m.

67BSALEX2                        Joseph - direct

1              MS. PERRY:  No further questions, your Honor.

2              THE COURT:  Mr. Fineman, cross examination.

3              MR. FINEMAN:  Can I ask for a very, very brief recess?

4              THE COURT:  How brief are we talking about?

5              MR. FINEMAN:  Less than a minute.

6              THE COURT:  That is brief, sure.

7              (Recess)

8              MR. FINEMAN:  May I proceed, your Honor?

9              THE COURT:  You certainly may.

10             MR. FINEMAN:  I apologize for the brief delay.

11             THE COURT:  Not a problem.

12    CROSS EXAMINATION

13    BY MR. FINEMAN:

14    Q.  Agent Joseph, I am going to ask you a few questions.  I

15    represent Mr. Alexander.  If there is anything that you don't

16    understand or if you would like me to repeat a question let me

17    know and I will try to do my best?

18    A.  Yes, sir.

19    Q.  You testified earlier that you first heard of Mr.

20    Alexander's name about a week prior to the arrest, is that

21    true?

22    A.  Just as much -- yes, sir, it was.

23    Q.  And in what context was that?

24    A.  We were just trying to identify where he lived.

25    Q.  At whose direction?

67BSALEX2                    Joseph - cross

1    A.   I think Agent Rosenblatt sent down a collateral request to

2    my office and my partner, Agent Jones, received it and we did

3    some drive-bys of some addresses.

4    Q.   Have you ever met with Agent Rosenblatt before today.

5    A.   We talked on the phone a lot.

6    Q.   You have?

7    A.   Yes, sir.

8    Q.   February 9 you went to my client's home to effect the

9    arrest, is that true?

10   A.   Yes, sir.

11   Q.   And when you arrived there you knocked on the door or rang

12   the bell and eventually my client came to the door?

13   A.   That is correct.

14   Q.   And it's true that he was wearing nothing but underwear?

15   A.   Correct.

16   Q.   So it would be fair to say his chest was exposed?

17   A.   Yes, sir.

18   Q.   And it would be accurate his legs were exposed?

19   A.   Yes, sir.

20   Q.   He wasn't wearing pajamas?

21   A.   Not what from what I can recall, sir.

22   Q.   And you entered his home?

23   A.   Yes, sir.

24   Q.   Who were you with?

25   A.   FDA Special Agent Tim Royster, ICE Agent Jason Wood, two

67BSALEX2                    Joseph - cross

1     uniformed officers, and Agent Rubin.

2     Q.   So that would be five law enforcement officials?

3     A.   Yes, sir.

4     Q.   And everybody entered the home?

5     A.   I believe maybe one of the uniformed officers stayed

6     outside.

7     Q.   So at least four people entered the home?

8     A.   Yes, sir.

9     Q.   And then you conducted a security sweep?

10    A.   Yes, sir.

11    Q.   Was that at your direction or at Agent Rubin's direction?

12    A.   It was probably -- I was in charge of the arrest so it was

13    at my direction.

14    Q.   You were in charge of the arrest?

15    A.   Yes, sir.

16    Q.   Even though this case originated in the New York?

17    A.   My responsibility was the arrest itself, a safe arrest.

18    Q.   Did you have a search warrant?

19    A.   No, sir.

20    Q.   How was a security sweep conducted?

21    A.   Mr. Alexander was in his home.  It was winter.  He wasn't

22    wearing any clothes.  He identified himself.  I had the arrest

23    warrant, went in and put cuffs on him in the immediate area.  I

24    needed the area to be searched as far as bodies were concerned.

25    Q.   When Mr. Alexander opened the door he was in the foyer?

67BSALEX2                    Joseph - cross

1    A.  Yes, sir.

2    Q.  Was there anybody else in the foyer?

3    A.  No, sir.

4    Q.  Did you need to search anywhere beyond the foyer at that

5    point?

6    A.  At that point, no, sir.

7    Q.  Why did you need to enter the home?

8    A.  To apprehend Mr. Alexander.

9    Q.  But he was at the door.

10   A.  Right.

11   Q.  How far away was he from you when you were standing at the

12   door?

13   A.  I don't know, 2, 3 feet.

14   Q.  Could you reach out and touch him?

15   A.  Can I reach out and touch him?

16   Q.  Yes.

17   A.  Once I opened the door and could reach inside the house.

18   Q.  And you did in fact touch him by placing handcuffs on him

19   right away.

20   A.  Yes, sir.

21   Q.  At that point the arrest was complete, is that true?

22   A.  It was.  We had Mr. Alexander but, like I said, it was his

23   home.  From an officer safety standpoint we needed that house

24   to be cleared.

25   Q.  You needed that house to be cleared because you needed to

67BSALEX2                          Joseph - cross

1    go inside?

2    A.    I needed the house to be cleared because it was dark.

3    There is a lot of rooms in the house.  I didn't know.  When we

4    were at the door we announced our presence.  In our line of

5    work, you know, bad things can happen in those circumstances.

6    Q.    But if you didn't need to go inside why would you have to

7    clear the home?

8              MS. PERRY:   Objection.

9              THE COURT:   Overruled.

10   A.    Please repeat the question.

11   Q.    If you didn't have to go inside why would you have to sweep

12   the home?

13   A.    I had to go inside to grab Mr. Alexander, put cuffs on him.

14   Q.    You testified he was only 3 feet away from you.

15   A.    The way I was thinking, sir, it was winter.  We try to

16   treat people we apprehend with a certain amount of respect.  It

17   was cold.  He wasn't wearing any clothes.

18   Q.    He wasn't wearing any clothes.  You went in and handcuffed

19   him.  And at that point you conducted the search?

20   A.    The sweep, yes, sir.

21   Q.    The sweep, I apologize.

22   A.    Yes, sir.

23   Q.    And when you conducted the sweep are you the agent who

24   conducted it or somebody else?

25   A.    No, sir, I stayed with Mr. Alexander.

67BSALEX2                        Joseph - cross

1    Q.  So who conducted the sweep?

2    A.  The other agents.

3    Q.  The FDA special agent?

4    A.  Yes, sir.

5    Q.  And another agent from your office?

6    A.  Yes, sir.

7    Q.  What about Agent Rubin?

8    A.  I can't remember.  I think he probably participated.  I am

9    not sure.  I stayed with Mr. Alexander.

10   Q.  You think he probably participated in the security sweep?

11   A.  I am not sure.

12   Q.  You are not sure.

13   A.  No.

14   Q.  And who else was in Mr. Alexander's home?

15   A.  It was --

16   Q.  I am talking about his family.

17   A.  His wife and I believe his son.

18   Q.  Do you know where they were?

19   A.  They were in their bedrooms.

20   Q.  Do you know where their bedrooms were?

21   A.  Down the hallway.

22   Q.  Down the hallway in what direction?

23   A.  I am sorry, I don't understand your question.

24   Q.  When you walk into the house are the bedrooms right there

25   or do you have to walk some distance?

67BSALEX2                    Joseph - cross

1   A.   There is the foyer and then there is hallway that goes left

2   and I remember Mr. Alexander's room is to the right.  I don't

3   know where the other body was.

4   Q.   Is there a home office in this house?

5   A.   There was.

6   Q.   There was.  Where was it?

7   A.   Or at least a place where there was I believe a desk.  It

8   was off to the dining room.

9   Q.   Off to the dining room?

10  A.   Yes, sir.

11  Q.   Not in the basement?

12  A.   I didn't know there was a basement.

13  Q.   You didn't know there was a basement?

14  A.   No, sir.

15  Q.   So there was no security sweep there?

16  A.   There was a sweep of the immediate area.

17  Q.   If somebody was hiding in the basement you wouldn't find

18  them?

19  A.   They would have got us.

20  Q.   Excellent.

21          MS. PERRY:  Objection, your Honor.

22          THE COURT:  What is the point of that, Mr. Fineman?

23          MR. FINEMAN:  I apologize.  It has been a rough

24  morning.

25  Q.   At some point my client was taken out of the home, is that

67BSALEX2                    Joseph - cross

1   correct?

2   A.   Yes, sir.

3   Q.   And where was he taken?

4   A.   He was taken to our ICE office in Norfolk.

5   Q.   How far away from that is his home?

6   A.   Mile-wise or minute-wise?

7   Q.   Minute-wise.

8   A.   Minute-wise, no traffic probably 15, 20 minutes.  With

9   traffic probably 30-ish.

10  Q.   How long were you in the home?

11  A.   I can't really remember.  Probably somewhere between a half

12  hour to an hour, 45 minutes.

13  Q.   Half hour to an hour?

14  A.   Yes, sir.

15  Q.   And what was going on during that half hour to an hour

16  other than a security sweep?

17  A.   Agent Rubin was speaking with Mr. Alexander.

18  Q.   And that was in the dining room?

19  A.   Yes, sir.

20  Q.   Were you present for the entire time they were having a

21  conversation?

22  A.   No, sir.

23  Q.   And at that point was Mr. Alexander still in his underwear

24  or was he dressed?

25  A.   No, we allowed him to be clothed.

67BSALEX2                          Joseph - cross

1   Q.   Was he clothed in your presence?

2   A.   Yes, sir.

3   Q.   Who else was there when he was getting dressed?

4   A.   Agent Royster.

5   Q.   And where was Agent Rubin?

6   A.   Agent Rubin -- I don't know.  I was with Mr. Alexander.

7   Q.   Did you take Mr. Alexander's family anywhere?

8   A.   Yes, sir.

9   Q.   Where did you take them?

10  A.   To like a den, a family area of the house.

11  Q.   Was anybody standing with them?

12  A.   Yes, sir.

13  Q.   Were they permitted to walk around the home?

14  A.   I don't know.

15  Q.   Would you have permitted them to walk around the home?

16  A.   Would I have --

17            MS. PERRY:   Objection.

18            THE COURT:   Sustained.

19  Q.   Were you the agent in charge of the arrest?

20  A.   Yes, sir.

21  Q.   And were you the agent who had the authority to tell other

22  agents what to do?

23  A.   Yes, sir.

24  Q.   And under your authority did you allow Mr. Alexander's

25  family to walk around the home?

67BSALEX2                    Joseph - cross

1   A.   It was never asked.   They were seated in the family room.

2   They appeared to be comfortable.

3   Q.   But they were separated from Mr. Alexander?

4   A.   They were.

5   Q.   Is there a reason why they were separated from Mr.

6   Alexander?

7   A.   There was a reason they were sat down and congregated in

8   one room.

9   Q.   What was that reason?

10   A.   It was their home.   If there were any weapons or anything

11   as far as that in the house they would know where they were.

12   Q.   So, in other words, you wouldn't have let them walk around

13   unattended?

14   A.   Personally, no, sir.

15   Q.   Is there a reason why they were being held in a different

16   room from Mr. Alexander?

17   A.   Typically when we speak to a suspect they are isolated.

18   Q.   Before going to my client's home that morning, did you meet

19   with Agent Rubin?

20   A.   We all congregated at the same parking lot.

21   Q.   Where is that?

22   A.   I don't know the road.   It was like an Office Depot parking

23   lot.

24   Q.   How far away is that from my client's home?

25   A.   I would say less than -- I really can't remember.   Not very

67BSALEX2                    Joseph - cross

1    far.

2    Q.  And at that meeting was it discussed about the procedure

3    that would be taken to effect the arrest?

4    A.  I am sorry?

5    Q.  Did any procedural conversation come up about how you would

6    effect the arrest?

7    A.  Not --

8    Q.  Let me rephrase the question.

9             Was there a conversation had where you discussed your

10   plan on effecting the arrest?

11   A.  I mean, not really from what I can remember.

12   Q.  Was there a plan?

13   A.  It was known I was going to be the one knocking on the

14   door.

15   Q.  Beyond that?

16   A.  Beyond that, no, sir, not that I can remember.

17   Q.  Did anybody discuss taking Mr. Alexander's statement at

18   that morning meeting in the garage?

19   A.  Not that I remember.

20   Q.  You can't remember?

21   A.  No, sir.

22   Q.  Did anybody discuss searching for evidence at that

23   pre-arrest meeting?

24   A.  Not that I can remember, sir.

25   Q.  Is it possible it was discussed?

67BSALEX2                    Joseph - cross

1          MS. PERRY:  Objection.

2          THE COURT:  Overruled.

3   A.   It was 5:30 in the morning, 6 months ago, on a case that I

4   was not the case agent on nor had any involvement in so

5   anything is possible.

6   Q.   So as you just said, this is a case that you were not

7   involved in, you were not the case agent for, yet you

8   specifically recall the time that you had my client sign a

9   Miranda waiver.

10  A.   Right.

11  Q.   And you recall that because you made a mistake on that

12  document?

13  A.   Yes, sir.

14  Q.   Did you make that mistake before or after he signed it?

15  A.   I am saying it was made after he signed it.

16  Q.   So the document in terms of where the lines are for the

17  handwritten portion where you would put in the time and the

18  date, those lines were empty?

19  A.   Yes, sir.

20  Q.   And you signed a document without any information being put

21  in there?

22  A.   Mr. Alexander signed it, and then I signed it, and then I

23  filled in the information.

24  Q.   Did Agent Rubin sign it before or after you filled in the

25  information?

67BSALEX2                    Joseph - cross

1   A.  I made the mistake.  I handed it to Agent Rubin to sign and

2   Agent Rubin handed it back to me and I corrected the mistake

3   and Agent Rubin signed it.

4   Q.  So you made the mistake and Agent Rubin saw the mistake,

5   corrected you, and you corrected the mistake, and then you

6   signed it.  That is the correct sequence of events?

7   A.  Yes, sir.

8   Q.  What did Agent Rubin say to you when he noticed the

9   mistake?

10  A.  He said, "You mean 8:30."  And I said, "Of course."

11  Q.  How did you make that that mistake?

12  A.  I just made a mistake.  My watch doesn't have numbers on

13  it.  Like I said, we were up late the night before getting

14  ready to take a controlled delivery, up early, and I made a

15  mistake.  I read the watch incorrectly.

16  Q.  You just read the watch incorrectly?

17  A.  Yes, sir.

18  Q.  And you wrote 9:30 when you should have written 8:30?

19  A.  Yes, sir.

20  Q.  Please take a look at that document if you still have it.

21  The third number in at the point where you write -- it says, "I

22  have signed this document at."

23  A.  Right.

24  Q.  The numbers as I see them are 0, is that correct?

25  A.  Yes, sir.

67BSALEX2                          Joseph - cross

1    Q.   And then there is a 9.

2    A.   Right.

3    Q.   And then the third document, is that where the 3 was where

4    it said 9:30?

5              MS. PERRY:   Objection to the form.   Third document?

6              MR. FINEMAN:   We are talking about the waiver.

7              MS. PERRY:   You said third document.

8    Q.   The third number.

9    A.   Yes, sir.

10   Q.   The third number is where you had a 3?

11   A.   It originally was a 3.

12   Q.   And you had to change that from 9:30 to 8:30, is that true?

13   A.   That is right.

14   Q.   So the first number you tried to change is the number that

15   is the 3 indicating 30, not the 9 which was the mistaken

16   number?

17   A.   Right.

18   Q.   So you decided that rather than making the 9 into an 8, you

19   would make the 3 into a zero?

20   A.   I just made a mistake.   I was a little embarrassed to make

21   a mistake and I started scratching down and realized a simple X

22   would do with my initials and the correct time.

23   Q.   First you made a mistake by writing 9:30 and then you made

24   a mistake by correcting the part that was right, the fact it

25   was the bottom half of the hour.   So you made two mistakes in

67BSALEX2                           Joseph - cross

1  filling out this document.

2  A.  Yes, sir.

3  Q.  And then you gave up on trying to alter the number and you

4  wrote 8:30 underneath.

5  A.  Yes.

6  Q.  And that was after Mr. Alexander signed it?

7  A.  That was after Mr. Alexander signed it, yes, sir.

8  Q.  And you initialed the change?

9  A.  I initialed the change.

10  Q.  Once or twice?

11  A.  My initials are on the sheet one time.

12  Q.  So do you know what that squiggly line next to 8:30 is?

13  A.  The first time I saw that was yesterday.

14  Q.  That is the first time you ever saw it?

15  A.  Yes, sir.

16  Q.  It wasn't there when you originally changed the document?

17  A.  I don't know what that is.  Not that I can remember, sir.

18  Q.  You didn't put it there?

19  A.  The one next to 8:30?

20  Q.  Yes.

21  A.  That is not my initials.

22  Q.  As far you know it wasn't done in your presence?

23  A.  Not that I can remember, sir.

24  Q.  Did you ask Mr. Alexander to initial the change?

25  A.  Not that I can remember.

67BSALEX2                          Joseph - cross

1    Q.  Did you ask Agent Rubin to initial the change?

2    A.  I don't remember, sir.

3    Q.  Now, at the point at which Agent Rubin pointed out to you

4    your error, were there any other blank Miranda sheets

5    available?

6    A.  There was.  It was down in my car.

7    Q.  So you brought one sheet up with you from the car?

8    A.  Yes, sir.

9    Q.  Do they have these sheets in your facility, in your office?

10   A.  Right.  Like I stated previously, a new form had come out

11   with our top letterhead and it had just come out and I think

12   there were revisions in the statement.  It came down from

13   headquarters.  I didn't know if they had been replaced yet in

14   the file but I knew for a fact I had them in my search kit in

15   the car.

16   Q.  Is there a file where these documents would be held if they

17   had replaced it?

18   A.  Sometimes.

19   Q.  What do you mean?

20   A.  I mean sometimes we are not the most organized office.

21   Q.  So there is a specific place that these documents would be

22   held and what you are saying is sometimes they are there and

23   sometimes they are not or there is no specific place where you

24   keep them?

25   A.  I never pulled a document from the file.  I know there is a

1    file where we keep ICE forms.

2    Q.  And in that file where they keep ICE forms do they keep

3    these Miranda waiver documents?

4    A.  I would think so.  I don't know that for a fact.

5    Q.  How long have you been an agent?

6    A.  A couple of years.

7    Q.  2 years?

8    A.  Yes, sir.

9    Q.  Have you arrested people before?

10   A.  I have.

11   Q.  Have you questioned people before?

12   A.  Yes, sir.

13   Q.  Have you administered Miranda warnings to people before?

14   A.  Yes, sir.

15   Q.  Have you done written Miranda warnings before like this?

16   A.  Yes, sir.

17   Q.  And where do you normally get the document that you have

18   the person sign?

19   A.  From my search kit that I keep in my car.

20   Q.  Do you have an office at your building?

21   A.  I do.

22   Q.  Do you have a desk?

23   A.  Yes, sir.

24   Q.  File cabinet?

25   A.  Yes, sir.

67BSALEX2                    Joseph - cross

1   Q.  And you don't keep any of these documents in your office?

2   A.  No, sir.

3   Q.  Do you ever interview people in your office?

4   A.  Rarely.  Mostly it's just according by plea agreements and

5   things of that nature.

6   Q.  Do you ever interview people away from your office?

7   A.  Yes, sir.

8   Q.  That is why you keep the Miranda document in your car?

9   A.  Yes, sir.

10  Q.  Did you drive your car to the time of arrest?

11  A.  I did.

12  Q.  So the Miranda waiver document was available at his home if

13  you just went to the car, is that true?

14  A.  Yes, sir.

15  Q.  Did Agent Rubin ever ask you to get a Miranda warning

16  document?

17  A.  No, sir.

18  Q.  At the point in time in which you were at the ICE

19  headquarters or facility for lack of a better word, did there

20  come a time there that Agent Rubin asked you specifically for a

21  Miranda waiver card?

22  A.  No, sir.

23  Q.  No?

24  A.  No.

25  Q.  So why did you give it to him?

67BSALEX2                          Joseph - cross

1   A.   I asked Mr. Rubin what time Mr. Alexander signed the

2   waiver-of-rights form.

3   Q.   What did he say?

4   A.   He said Mr. Alexander did not sign a change

5   waiver-of-rights form.

6   Q.   What did you say?

7   A.   Have him sign one.

8   Q.   Was it was your idea to have Mr. Alexander sign the waiver

9   form?

10  A.   In my our office -- different jurisdictions are different.

11  As far as our practice, in our office our AUSAs typically like

12  us to have these filled out if we are going to speak as a good

13  practice.   That is what I was used to and that is what I am

14  used to doing over the last couple of years so I suggested it.

15  Q.   What time did you suggest that?

16  A.   I can't remember.   Shortly after I got back to the office.

17  Q.   So Agent Rubin never asked for one?

18  A.   No, sir.

19  Q.   Okay.

20  Q.   And it's your testimony that the waiver was signed at

21  approximately 8:30 in the morning?

22  A.   Yes, sir.

23  Q.   Did you stay in the room the entire time that Mr. Alexander

24  was being questioned?

25  A.   No, sir.

1   Q.   Did there come a time that you came back to the room?

2   A.   I came back to the room and I believe there was a certain

3   time when Agent Rubin had to speak with the case agent, and of

4   course he had to do that privately, and for officer safety we

5   keep at least one person with the body in the office.  So I sat

6   in there with Mr. Alexander.

7   Q.   What time was that?

8   A.   I can't remember.

9   Q.   You don't recall?

10  A.   No, sir.

11  Q.   Did you ever take any notes in this case?

12  A.   No, sir.

13  Q.   Do you have any memoranda that you prepared?

14  A.   No, sir.

15  Q.   And you are not the case agent on this case?

16  A.   No, sir.

17  Q.   But you specifically remember it was 8:30 that you had him

18  sign the Miranda waiver?

19  A.   Simply because I made an error and I was embarrassed about

20  it.  At least as far as significant events go that morning that

21  was one of them.

22  Q.   Since that day have you ever had a conversation with Agent

23  Rubin?

24  A.   No, sir.

25  Q.   And did there come a time that you ever spoke to the

1    Assistant United States Attorney in this case?

2    A.   Yes, sir.

3    Q.   When was the first time?

4    A.   I probably first spoke with her roughly about a month ago.

5    Q.   Did she ask you about the change of time on the Miranda

6    card?

7    A.   She did.

8    Q.   And you explained to her you made a mistake?

9    A.   I did.

10   Q.   Prior to about a month ago you had never heard from anybody

11   in New York asking you about this document?

12   A.   No, sir.

13   Q.   Just after the lunch break, isn't it a fact that you were

14   having a conversation with Agent Rosenblatt?

15   A.   Yes, sir.

16   Q.   What was the subject of that conversation?

17   A.   During lunch?

18   Q.   Yes.

19   A.   I had to cancel my flight to get home and I was claiming I

20   had a lot of work to do and he was giving me a hard time saying

21   I was underestimating my role in the current case we are

22   working.

23   Q.   Did you have any conversation about the substance of the

24   testimony or the agent who preceded you?

25   A.   No, sir.

67BSALEX2                         Joseph - cross

1   Q.  It's your testimony that Agent Rubin was aware of the

2   change of time?

3   A.  Yes, sir.

4              MR. FINEMAN:  Thank you.

5              No further questions.

6              THE COURT:  Redirect.

7              MS. PERRY:  One moment, your Honor.

8              (Pause)

9              MS. PERRY:  No redirect, your Honor.

10             THE COURT:  Agent, you are done.

11             You can go back to Virginia and do your work.

12             (Witness excused)

13             THE COURT:  Anybody else you are going to call, Ms.

14  Perry?

15             MS. PERRY:  No, your Honor.

16             THE COURT:  Mr. Fineman, you say you are not calling

17  anybody?

18             MR. FINEMAN:  No, I am not, your Honor.

19             THE COURT:  Mr. Fineman, what do you want to do?

20             Do you want to submit something and tell me why you

21  think you should win this motion?  Do you want to argue it now?

22             MR. FINEMAN:  I can have an opportunity to submit

23  papers?

24             THE COURT:  Yes.

25             MR. FINEMAN:  I would like the opportunity.

67BSALEX2

```
 1              THE COURT:  When can you have your papers in?

 2              MR. FINEMAN:  In two weeks, your Honor.

 3              THE COURT:  All right, I will get your papers July 25

 4    and, Ms. Perry, your response, how much time do you think you

 5    need?

 6              MS. PERRY:  One week, your Honor.

 7              THE COURT:  You think you only need a week?

 8              MS. PERRY:  Yes.

 9              THE COURT:  So that takes you to August 1st.

10              MS. PERRY:  There is one small caveat.  I may be

11    beginning a three-day trial beginning on July 24 before Judge

12    Berman.  In the event that that happens --

13              THE COURT:  Write me a letter.

14              MS. PERRY:  Thank you.

15              THE COURT:  I assume within reason Mr. Fineman won't

16    have a problem with it.

17              MR. FINEMAN:  Ms. Perry starts a trial she needs

18    additional time I am already consenting to it.

19              THE COURT:  Mr. Fineman, I will look for your papers

20    the 25th.  Ms. Perry, yours on the 1st, and only on the

21    question of the Miranda issue.

22              MS. PERRY:  Your Honor, I would like to just, even

23    though I just asked the agent to hand it back to me, to hand

24    back to your Honor and ask your Honor to keep the original

25    because I think it's instructive that Special Agent Joseph --
```

1   there are two different pens which I think is important.  One

2   of them is Special Agent Joseph's handwriting which is in one

3   pen and the other is Mr. Alexander and Special Agent Correa is

4   in a different pen, and the second set of initials next to 8:30

5   is in the pen that Mr. Alexander and Special Agent Correa used.

6   That is not clear from the copy so I would like to obviously

7   show the original to Mr. Fineman.

8           MR. FINEMAN:  We haven't had testimony about this.

9           MS. PERRY:  It's on the document.

10          MR. FINEMAN:  I was never provided with the original.

11          MS. PERRY:  It's available.  I showed it to him.

12          THE COURT:  Why don't we do this:  Why don't you make

13  a color photocopy.

14          MS. PERRY:  They are both in black.  It's clearly a

15  different type of pen.  Your Honor can take judicial notice

16  it's different or not, but I just wanted your Honor to have the

17  original.

18          THE COURT:  I am happy to have the original as long as

19  Mr. Fineman has a chance to take a look at it.

20          MS. PERRY:  I provided it to him before giving it to

21  the agent, but Mr. Fineman can look at it now.  Perhaps he

22  would even stipulate they are different pens.

23          MR. FINEMAN:  I would stipulate they are different

24  pens but I don't know what effect that has about who used it.

25  There is no testimony about who used different pens or if this

1  agent used one pen in one opportunity and used a different pen

2  in a different situation.  I wouldn't stipulate to anything

3  other than there was two different pens.

4           THE COURT:  You have to have evidence to make certain

5  conclusions, don't you?

6           I will hear argument and you can put whatever argument

7  you want.

8           MS. PERRY:  We can do that in the papers.  The

9  stipulation is simply that the one pen was used to fill in the

10 blanks on the time and date and Special Agent Joseph's name and

11 date, and then another pen was used both by Mr. Alexander and

12 Special Agent Correa and also the initial next to 8:30, and

13 that is the stipulation.

14          THE COURT:  Fine.  Whatever you want to argue from

15 that you can, and of course Mr. Fineman can tell me why he

16 thinks you are wrong.

17          MR. FINEMAN:  Do I have an opportunity to make reply?

18          THE COURT:  Sure.

19          MR. FINEMAN:  Can I have a week?

20          THE COURT:  We will assume given the current schedule

21 your reply comes in the 8th.  If Ms. Perry needs more time you

22 get a week from whatever she gets.

23          Ms. Perry, if you want to give me that, is there any

24 other originals you think I need to see?

25          MS. PERRY:  No, your Honor.

1      THE COURT:  Anything else that we need to take up from

2   your standpoint today?

3      MS. PERRY:  No, your Honor.  As I stated earlier, I

4   think certainly Mr. Fineman's motion is founded in large part,

5   if not in whole, on his piecing together this -- on the Miranda

6   issue without getting into characterizing it, and so depending

7   on your Honor's ruling, it is certainly important I will say to

8   me personally that specific findings be made on the further

9   allegations that I believe are obviously extraordinary and

10  certainly very personally damaging to me and my reputation.

11  Therefore, once the the court has decided the issue I don't

12  know if we are going to be brought back, if there is a written

13  opinion.

14      THE COURT:  I intend to write an opinion on this.

15      MS. PERRY:  Does your Honor want to be heard on

16  further issues now or should we just wait?

17      THE COURT:  That is what I was trying to do this

18  morning.  I am happy to hear you on the other issues.  I have

19  read the papers as I think you all can tell.  I have read the

20  papers very carefully.  I am happy to hear you now and if I

21  think I need further argument I am happy to hear you all after

22  I get the written submissions.  But regardless of when I hear

23  you all I do intend to issue an opinion and I intend to issue

24  it expeditiously.

25      MS. PERRY:  Your Honor, I won't belabor it then.  I

67BSALEX2

1   just will say that given that the entirety of this motion
2   obviously there are some questions about my redaction of
3   agents' names and few little other items raised, and I believe
4   each of those are responded to and I don't think they are
5   replied to in the reply brief.  But basically the allegations
6   are based upon the allegation that there were no Miranda
7   warnings issued.

8       THE COURT:  I think you are being chartitable.  I
9   think it's not only that there was a Miranda violation here but
10  that the allegations of misconduct predate the alleged Miranda
11  violations and so the theory is that you brought a bad-faith
12  indictment.  You were somehow made aware of the Miranda
13  violation that you should have investigated or weren't aware or
14  should have been patently obvious and because you brought a
15  bad-faith indictment you covered this up by covering the
16  agent's names and you conned Mr. Fineman and his client to an
17  innocence proffer and, using the English language, you tricked
18  them into signing what they signed.

19      MS. PERRY:  Correct.  I believe this is all back
20  pedalling from the fact that Mr. Fineman and his client entered
21  into an innocence proffer with the government and were not
22  pleased with the results of that and all of this is meant to
23  suppress those statements and necessarily, then, the story has
24  to be made about how it was that violations occurred in the
25  first instance.  All of this was done I think quite

67BSALEX2

1   precipitously and the fact that there was a referral made at

2   this point, that is really the issue and I think your Honor

3   understands that.  That is the issue that the government

4   requests specific factual findings on.

5          THE COURT:  I intend to, as I say, issue a thorough

6   written opinion on this.

7          Mr. Fineman, anything you want to say in response to

8   what Ms. Perry said?

9          MR. FINEMAN:  No, your Honor.

10          THE COURT:  And I thought I made pretty clear that it

11   may be that you may need to be heard from but not for the

12   reasons given originally.

13          I will look forward to the written submissions.  If I

14   need further argument I will let you know.

15

16

17                             - - -

18

19

20

21

22

23

24

25

```
 1                      INDEX OF EXAMINATION

 2   Examination of:                              Page

 3   RUBEN CORREA
                                                    .
 4   Direct By Ms. Perry  . . . . . . . . . . .    27

 5   Cross By Mr. Fineman . . . . . . . . . . .    50

 6   Redirect By Ms. Perry  . . . . . . . . . .   119

 7   Recross By Mr. Fineman . . . . . . . . . .   121

 8   PETER JOSEPH

 9   Direct   . . . . . . . . . . . . . . . . .   124

10   Cross By Mr. Fineman . . . . . . . . . . .   144

11                     GOVERNMENT EXHIBITS

12   Exhibit No.                              Received

13    1  . . . . . . . . . . . . . . . . . . .    46

14                     DEFENDANT EXHIBITS

15   Exhibit No.                              Received

16   A   . . . . . . . . . . . . . . . . . . .    70

17   B   . . . . . . . . . . . . . . . . . . .   100

18

19

20

21

22

23

24

25
```