United State District Court
Southern District of New York
------------------------------------------------------------------------ x
United States of America,

        -against-

Douglas Shyne,
Natasha Singh,                                                    S4 05 Cr. 1067 (KMK)
    AKA Beatris Rodrigues,
Christine Richardson,
    AKA Deokali C. Richardson,
Nathaniel Shyne,
Toybe Bennett,
    AKA Dmitriy Makarevich,
    AKA Dmitriy Makervich,
    AKA Eduardo Rodrigues,
    AKA Cecilio Pena,
Roberto Montgomery,
Ephraim Richardson,
Naresh Pitambar,
Jason Watler,
Steven Riddick,
Nathaniel Alexander, and
Timothy Montgomery,

    Defendants.


------------------------------------------------------------------------ x


## MEMORANDUM OF LAW IN FURTHER SUPPORT DEFENDANT'S MOTION FOR SUPPRESSION OF POST ARREST STATEMENTS

                                        The Law Office of Michael Fineman, Esq.
                                        *Attorney for the Defendant*,
                                        Nathaniel Alexander,
                                        305 Broadway, 7th Floor
                                        New York, New York 10007
                                        (212) 897-5823

**PRELIMINARY STATEMENT**

This reply memorandum of law, accompanied by Michael Fineman's reply affirmation, is in further support of the defendant's motion for suppression of all statements procured in violation of the defendant's right against self incrimination, the defendant's right to an attorney, and as a result of grave prosecutorial misconduct under the Fifth and Sixth Amendments to the Constitution of the United States of America.

**STATEMENT OF FACTS**

Rather than reasserting the our factual allegations and the government's witnesses' testimony at length, the defendant respectfully request that this Honorable Court refer to the affirmation submitted with this memorandum of law.

**POINT I: THE GOVERNMENT'S CONDUCT AT THE TIME OF ARREST VIOLATED THE DEFENDANT'S SIXTH AMENDMENT RIGHTS**

As held by the Supreme Court of the United States in Fellers v. U.S., 540 U.S. 519, 124 S.Ct. 1019 (2004), "[t]he Sixth Amendment right to counsel is triggered 'at or after the time that judicial proceedings have been initiated ... whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" (Citations omitted). The Fellers Court further held that, "[w]e have held that an accused is denied 'the basic protections' of the Sixth Amendment 'when there [is] used against him at his trial evidence of his own incriminating words, which federal agents ... deliberately elicited from him after he had been indicted and in the absence of his counsel.'" Fellers, at 523, citing to Massiah v. United States, 377 U.S. 201, 206, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

In Maine v. Moulton, 474 U.S. 159, 106 S.Ct. 477 (1985), the Supreme Court reiterated this rule in holding that "'[w]hatever else it may mean, the right to counsel granted by the Sixth and Fourteenth Amendments means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him⋯' This is because, after the initiation of adversary criminal proceedings, 'the government has committed itself to prosecute, and ⋯ the adverse positions of government and defendant have solidified. It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law.'" Moulton, at 169-171, 483 - 484 (citations omitted).

The Moulton Court further held that the "Sixth Amendment also imposes on the State an affirmative obligation to respect and preserve the accused's choice to seek this assistance. We have on several occasions been called upon to clarify the scope of the State's obligation in this regard, and have made clear that, at the very least, the prosecutor and police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel. Id.

The Second Circuit in this context has held that "[a]lthough once the right to counsel has attached, the Sixth Amendment imposes on the government an **affirmative obligation** not to solicit incriminating statements from the defendant in the absence of his counsel, that obligation is not breached unless the government has taken some action '**that was designed deliberately to**

-1-

**elicit incriminating remarks**.'" U.S. v. Rosa, 11 F.3d 315 (2nd Cir., 1993 (citations omitted, **emphasis added**).

Essentially, there are only two questions for this Honorable Court to address with regard to the defendant's Sixth Amendment contentions. First, was a judicial proceeding initiated against the defendant? Second, did the government breach its affirmative obligation not to solicit incriminating statements by taking action designed deliberately to achieve that goal? To answer the first prong of the test, it is uncontested that the defendant had been indicted prior to his arrest; thus, the defendant's Sixth Amendment right to counsel had attached before the federal agents had even reached his front door.

The second prong of the test is just as easy to answer. To begin with, Agent Correa was specifically instructed by the case agent, Eric Rosenblatt, to "take a statement if he [Mr. Alexander] wanted to give one," and Agent Correa was informed by the case agent of some of the details of the case in order to assist him in that task of taking a statement.[1] As a result, Agent Correa had went to Virginia with the task of not just to arrest the defendant, but also to solicit a statement from the defendant.

Even if Agent Correa had not admitted this in his cross examination, the surrounding circumstances make this agenda clear. Firstly, the agents here violated the defendant's and his family's Fourth Amendment Rights by staying in his home for any where between half an hour and one hour.[2] I have reviewed the relevant case law regarding security sweeps. As the Second Circuit held in U.S. v. Oguns, 921 F.2d 442 (2nd Cir., 1990), "[o]nce police eliminate the dangers that justify a security sweep – safety of police, destruction of evidence, escape of criminals – **they must, barring other exigencies, leave the residence**. Were this not the rule, searches begun as minor intrusions on domestic privacy would expand beyond their legitimate purposes. Oguns, at 447 (**emphasis added**). Additionally, the Second Circuit has held that "an officer effecting an arrest in a residence may, 'without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched.' Beyond that circumscribed inspection of the premises, however, the officer must reasonably believe, based on specific and articulable facts, that the area to be swept harbors a person posing a danger to those present before making the warrantless search. U.S. v. Blue, 78 F.3d 56 (2nd Cir., 1996 (citations omitted)).

As Agent Joseph testified, "Mr. Alexander gave us no indication that he was hostile or uncooperative."[3] However, despite that impression, the agents conducted a security sweep of the residence, and not just the area immediately adjoining the place of arrest, the defendant's home's foyer. Assuming that Agent Correa testified truthfully, there was no need to enter the defendant's home beyond the foyer, whereas on direct examination Correa testified that Mr. Alexander

---

[1] See hearing transcript attached to attorney's affirmation as **Exhibit A**, page 51, line 13 – 23; page 52, line 16; and page 52, line 19 – 23.
[2] See **Exhibit A**, page 37, line 1 – 10; page 151, line 10 – 14.
[3] **Exhibit A**, page 130, line 6 – 9.

"wasn't naked or in underwear" when he answered the door, and that Mr. Alexander was "dressed somehow," but he was at some point allowed to change into street cloths.[4]

Alternatively, should this Honorable Court credit Agent Joseph's testimony, which discredits Agent Correa's assessment of the defendant's attire, then the initial purpose to enter the home was to allow the defendant to get dressed. Agent Joseph specifically testified that the defendant was wearing nothing but his boxers.[5] Under this justification, the agents should have left the residence as soon as the defendant was dressed under the rational of Oguns, *supra*. However, they did not leave the residence. Instead, the agents kept the defendant's family in the living room, isolated the defendant in the dining room, and spoke to the defendant for a period of 20 minutes to 40 minutes in his home. This conduct was done with the specific intent to solicit a statement from the defendant as against his Sixth Amendment Right to an attorney. When asked why the defendant was segregated from his family, Agent Joseph testified that, "[t]ypically when we speak to a suspect they are isolated."[6] If all Agent Correa wanted to do was tell the defendant what he was charged with, there would have been no reason to "isolate" him from his family. The defendant was "isolated" so that the agents could procure a statement, just as instructed to do so by Agent Rosenblatt.

The government then continued to deliberately to elicit incriminating remarks from the defendant when the defendant was taken to the RAC office in Virginia. Initially, Agent Correa claimed that the defendant wanted to continue to discuss the case at the RAC office, so he asked one of the other agents for a copy of the indictment, and was given said indictment.[7] However, Agent Correa contradicted himself on direct examination when he testified that he "didn't get into detail about his [Mr. Alexander's] account of what happened. I [Correa] wanted to get into better detail just to cover myself," and on cross examination when he stated that it was Agent Correa who wanted to continue the conversation at the RAC office.[8]

This Honorable Court does not even need to reach the issue of the defendant's Fifth Amendment Rights or the Miranda issue as the testimony of the government's witnesses establishes that there was a clear violation of the defendant's Sixth Amendment Rights. The Moulton Court, quoting Justice Douglas, held, "'what use is a defendant's right to effective counsel at every stage of a criminal case if, while he is held awaiting trial, he can be questioned in the absence of counsel until he confesses?'" Moulton, at 171.

Should the government argue that the defendant was advised of his Miranda Rights, and waived them; thus, also waiving his Sixth Amendment right to counsel, first I would respectfully submit that this Court should not consider this argument since there was deliberate conduct on behalf of the government seeking to elicit incriminating statements from the defendant. Secondly, if this Court was to hold that the government did not deliberately elicit incrimination statements under the Sixth Amendment analysis, then I would argue that the defendant made no

---

[4] See **Exhibit A**, page 31, line 25 – page 32, line 1; page 32, line 2 – 6.
[5] See **Exhibit A**, page 126, line 16 – 22; page 145, line 14 – 21.
[6] **Exhibit A**, page 153, line 15 – 17.
[7] See **Exhibit A**, page 41, line 22 – page 42, line 9.
[8] **Exhibit A**, page 42, line 21 – 23; see also page 85, line 21 – 23.

statements subsequent to a valid waiver of Miranda. (I will address this argument fully in Point II, below).

Wherefore, since the government deliberately elicited incriminating statements from the defendant after a criminal proceeding had been initiated by indictment, and in absence of the defendant's attorney, his Sixth Amendment right to counsel has been violated requiring suppression of the defendant's post arrest statement as a matter of law.

**Point II: THE DEFENDANT'S POST ARREST STATEMENT MUST BE SUPPRESSED AS A RESULT OF THE GOVERNMENT'S VIOLATION OF THE DEFENDANT'S FIFTH AMENDMENT RIGHTS**

As the Supreme Court of the United States held in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602 (1966), "our accusatory system of criminal justice demands that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth." Miranda, at 460.

The government bears a "heavy burden" of proof to show that defendant understood his Miranda Rights and that he knowingly waived those rights. See Tague v. Louisiana, 444 U.S. 469, 470-71, 100 S.Ct. 652, 62 L.Ed.2d 622 (1980); see also North Carolina v. Butler, 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). For the government to meet its burden and prove a valid waiver, "the government must show (1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right." United States v. Jaswal, 47 F.3d 539, 542 (2d Cir.1995).

In order to satisfy their burden, the government called two witnesses at the suppression hearing held before this Honorable Court. One witness, Agent Correa claimed that the defendant was advised of his Miranda rights three times, twice orally, and once in writing. The government's other witness, Agent Joseph, who was present at the defendant's home at the time of arrest, and was present in the RAC office processing room at or before 8:00 am, did not testify at all about any of the oral Miranda warnings, not on direct examination or on cross examination.

Additionally, the government's only witness who testified about the alleged oral Miranda warnings contradicted himself numerous times throughout his testimony, was contradicted by his paperwork, and was contradicted by the government's only other witness. When Agent Correa testified on direct examination, he implied that he had no intention of interrogating the defendant. He stated that "[i]ts been my experience whether you are going to ask questions or not, even if you are just going to explain the charges, as you are explaining them, they will start making statements."[9] On cross examination, Agent Correa admitted that he was instructed by the case agent, Agent Rosenblatt, to get a statement, and was apprised of at least some of the factual allegations in order to achieve this goal.[10] Furthermore, Agent Correa's typed memorandum

---

[9] **Exhibit A**, page 32, line 22 – 25.
[10] **Exhibit A**, page 51, line 13 – 23; page 52, line 16; and page 52, line 19 – 23.

betrays him on this point as well. Firstly, the memorandum is devoid of any information concerning the conversation between the agent and the defendant at the defendant's home, and secondly, the agent's memorandum specifically states that the defendant was taken to the RAC office for "processing and **questioning**."[11]

Furthermore, Agent Correa's testimony was contradicted on numerous occasions by Agent Joseph. Agent Correa testified that the defendant was somehow dressed when they arrived at his home. When asked if the defendant's chest was bare, Agent Correa stated "I don't think so." When asked if the defendant's legs were covered, Agent Correa stated "I don't remember. I don't think so. They may have been long pajamas."[12] Agent Joseph testified that when the defendant answered the door he was wearing only his boxers, his chest was bare and he was not wearing pajamas.[13] Agent Correa stated that **he** asked for permission to search to search the home for evidence of financial fraud, and the defendant specifically directed Agent Correa to a briefcase. Agent Correa testified that the agents who went to get the briefcase were specifically told where to go in order to find it.[14] On cross examination, Agent Correa insisted that the "search" was not of the whole residence, but only of a brief case.[15] On the contrary, Agent Joseph testified that **he and another agent started to search the home**, but because they did not know what they were looking for, they asked the defendant for a more specific place to look. Agent Joseph then testified that Mr. Alexander directed him and the other agent to his briefcase – which they found with ease – but because they had "no clue what [they] were looking for so at that point in time [they] kind of **terminated the search of the house**."[16] Correa claimed that he had specifically requested a Miranda waiver prior to asking for a copy of the indictment; however, he was not provided with one at that time.[17] Agent Joseph specifically testified that Agent Correa had never asked for a Miranda waiver document.[18] Agent Correa claimed to have absolutely no recollection of the change of time on the document.[19] However, Agent Joseph testified that Agent Correa was aware of the change in time on the Miranda Waiver. Agent Joseph referred to the error and change to the written Miranda Waiver "as far as significant events go that morning that was one of them."[20]

Finally, Agent Correa even contradicted himself from one question to the next. Agent Correa stated that he had never discussed the change of time on the Miranda waiver with anyone. Then when asked if the Government Attorney had asked about the changed to the Miranda waiver prior to his conversations with her two to three weeks before the hearing, Agent Correa stated that he had. Agent Correa was asked when he had that conversation, and the government

---

[11] See Defense Exhibit A received into evidence at the hearing hereinafter referred to as the "memorandum." (**Emphasis Added**).
[12] **Exhibit A**, page 60, line 17 – 21.
[13] See **Exhibit A**, page 126, line 16 – 22; page 145, line 14 – 21.
[14] See **Exhibit A**, page 36, line 1 – 21; see also page 75, line 14 – 18 (**emphasis added**).
[15] See generally **Exhibit A**, page 73 – 74.
[16] See **Exhibit A**, page 131, 1 – 6; see also page 131, line 3 – 14(**emphasis added**).
[17] See **Exhibit A**, page 79, line 10 – 25; page 84, line 8 – 17.
[18] See **Exhibit A**, page 161, line 15 – 17.
[19] See **Exhibit A**, page 47, line 18 – 25.
[20] See **Exhibit A**, page 165, line 1 – 3; page 163, line 20 – 21.

objected. Then after the objection was overruled, he contradicted himself and stated that he had not spoken with the government about the change of time on the Miranda Waiver.[21]

      Agent Joseph's testimony also left a lot to be desired from the prospective of truthfulness. Firstly, it is important to note that after agent Correa's testimony concluded, the Court took a lunch recess. During the lunch recess, the case agent, Eric Rosenblatt, who had been present for Agent Correa's testimony at the hearing, had a conversation with the government's Agent Joseph. During this conversation, agent Rosenblatt gave the witness a "hard time" saying "I [Joseph] was underestimating my role in the current case we are working."[22] Even if Rosenblatt did not attempt to influence the witness' testimony, this conduct created the appearance of impropriety.

      Secondly, Agent Joseph states that he suggested that Agent Correa should have the defendant sign a written Miranda waiver because, as Agent Joseph testified, "[i]n my our office – different jurisdictions are different. As far as our practice, in our office our AUSAs typically like to have these filled out if we are going to speak as good practice."[23] However, Agent Joseph testified that the defendant was making statements to Correa in the home, and since the Miranda Waiver was in his vehicle, it was available at the inception of the arrest encounter at the defendant's home.[24] Although the waiver was available as of the first conversation with the defendant at his home, it should have been executed at that time, but it was not.

      Finally, Agent Joseph's explanation about how the time on the written waive was changed is completely nonsensical. Agent Joseph claimed that he inadvertently wrote the time as 9:30 AM, and that Agent Correa immediately noticed the error and had him correct it.[25] However, Agent Joseph then claimed that rather than changing the 9 in the 9:30 to an 8 when correcting his mistake on the document to reflect a time of 8:30 instead of 9:30, he started to change the 3 to a 0, which would have indicated a time of 9:00 AM.[26]

      Although the defendant has no burden of proof at the suppression hearing, it is submitted that this contention has been proven untrue with circumstantial evidence. As the defendant has alleged from the first motion paper filed in this matter, the time that he called his attorney was shortly after 9:00 AM. The government's witnesses claim that the defendant was "very cooperative" the entire morning; however, suddenly at about 9:00 AM when he choose to contact his attorney and stop cooperating. When Agent Joseph described how the written Miranda waiver was explained to the defendant, he stated that Agent Correa said, "this is just a formality type thing, something we have to go over."[27] He did not state that Miranda had been previously explained to the defendant. It is far more likely that the correct time on the Miranda waiver was 9:00 AM, just as the defendant has claimed from the beginning. That who ever tried to alter the Miranda waiver, initially tried to change the first zero after the nine to a three in order to reflect

---

[21] See **Exhibit A**, page 113, line 2 – page 114, line 19.
[22] See **Exhibit A**, page 164, line 13 – 22.
[23] **Exhibit A**, page 161, line 18 – page 162, line 19.
[24] See **Exhibit A**, page 131, line 17 – 20; see also page 161, line 8 – 14.
[25] **Exhibit A**, page 138, line 15 – 22.
[26] See **Exhibit A**, page 157, line 3 – page 158, line 5.
[27] **Exhibit A**, page 137, line 11 – 12.

the bottom half of the hour, but when it became obvious to that person that this was starting to look very sloppy, they just crossed out the time and re-entered 8:30 beneath the line.

Based on the foregoing, Agent Correa's version of the events was extremely unreliable either because he was contradicted by his paperwork, he was contradicted by the government's only other witness, was contradicted by his own testimony, and as a result of his inability to remember many important circumstances about the arrest including, but not limited to the change of time on the Miranda waiver. Therefore, not only has the government failed to carry their burden to show a knowing waiver of Miranda, but the defendant submits that this proposition was successfully refuted using the testimony of the government's own witnesses, and the paperwork provided by the government prior to the defendant's motion.

Should this Honorable Court choose to credit Agent Correa's assertions that he advised the defendant of his Miranda Rights orally, the question then becomes, was the waiver was made voluntarily? The issue of a knowing and intelligent waiver differs from the question of voluntariness. See Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986); see also Coronado v. Lefevre, 748 F.Supp. 131, 138-39 (S.D.N.Y., 1990). "The requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry." Dickerson v. U.S., 530 U.S. 428, 444, 120 S.Ct. 2326, 2336 (2000).

In assessing the validity of a waiver, This Honorable Court must examine the totality of the circumstances surrounding the interrogation. See Fare v. Michael C., 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979). In order to determine whether a statement was made voluntarily, this Honorable Court must first determine whether the statement was the product of coercion on the part of law enforcement. See Colorado v. Connelly, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); United States v. DiLorenzo, 1995 WL 366377, at 6 (S.D.N.Y., 1995). Then, this Honorable Court must look to the defendant's mental state and other factors to determine if his will has been overborne by the actions of the law enforcement officers. See Green v. Scully, 850 F.2d 894, 902 (2d Cir.), cert. denied,488 U.S. 945, 109 S.Ct. 374, 102 L.Ed.2d 363 (1988).

"For a waiver to be 'voluntary,' the waiver must have been 'the product of a free and deliberate choice rather than intimidation, coercion, or deception.' Resolution of this issue requires inquiry into 'the totality of all the surrounding circumstances,' including a defendant's background and experience, the conditions of the interrogation and the conduct of the officers." United States v. Amry, 2003 WL 124678, 2 (S.D.N.Y., 2003) citing to Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986); and United States v. Burrous, 147 F.3d 111, 116 (2d Cir.1998).

The factors which weigh against a finding a voluntariness in this case are very similar to the factors that were considered by the District Court, and approved of by the Second Circuit in the case of United States v. Isiofia, 370 F.3d 226 (2nd Cir., 2004), in determining the issue of voluntariness. In Isiofia, the Second Circuit upheld the District Court's decision to suppress physical evidence because the defendant's consent to search his residence was not voluntary.

In Isiofia, shortly after entering the defendant's home, the agents conducted a protective sweep which lasted approximately two minutes. After the protective sweep, the defendant was

handcuffed to a chair at a table near the entrance to the apartment. While at the defendant's home, the agents asked if they could open the briefcase and retrieve the defendant's identification from it. See Isiofia, at 229. The officers then completed arrest-related paperwork, a task that took approximately thirty minutes. The agents claimed they completed the paperwork in his home, as opposed to a police station, out of convenience. After they completed the paperwork, one of the agents read Miranda warnings to the defendant from a waiver-of-rights form, and the defendant executed a written waiver of those rights. The defendant also signed a consent-to-search form, permitting the agents to search his apartment and car. Id.

     The District Court in Isiofia, concluded that the defendant's waiver of his Fourth Amendment rights in the written waiver form was involuntary for the following reasons. (1) The time that elapsed between the arrest and his consent was given only minutes after the initial entry by the agents. The District Court stated that this was "close in time to what must have been a very startling, to say nothing of harrowing, series of events." (Citation omitted). (2) The District Court found that the time that elapsed between the agents' entry and the defendant's consent to search his apartment and car, which was between 30 minutes to one hour and 15 minutes, "tend[ed] toward a finding of coerciveness" because "all the while there were eight agents in his living room with him and he was handcuffed to the table." (Citation omitted). (3)The District Court found it was important that the defendant was an immigrant whose native language was not English. (Citation omitted). (4) In addition to some other factors, the District Court considered the legality of the warrantless entry, finding that the agents "should have known that their entry into and search of the defendant's apartment was illegal." (Citation omitted).

     The Second Circuit, in upholding the District Court's determination that consent to search was involuntary held that, "even assuming *arguendo* that the officers' warrantless entry and protective sweep were not illegal, we agree with the Court that the agents improperly remained in the apartment after completing the sweep. We have explained, in clear terms, that [o]nce police eliminate the dangers that justify a security sweep-safety of police, destruction of evidence, escape of criminals-they must, barring other exigencies, leave the residence." Isiofia, at 234.

     In determining if the defendant made a voluntary waiver of his Miranda Rights, assuming arguendo that those rights were actually administered, the government's conduct requires a finding that the waiver was involuntary. (1) The agents here came to the defendant's home at 6:00 AM, while he was dress in sleeping attire (boxer shorts as per Agent Joseph). (2) The agents conducted a security sweep of the defendant's entire residence, even though they were unable to articulate that there was any perceived danger. (3) The defendant was segregated from his family, and his family was not permitted to move about their own home during the entire encounter. (4) The agents stayed at the defendant's residence for a period of 30 minutes to one hour without being able to articulate any exigency. (5) The agents conducted a meaningless search of the defendant's residence, even though they acknowledged that they did not know what they were looking for. (6) Unlike in Isiofia, the agents did not have the defendant execute any waiver of rights form (Fifth Amendment or Fourth Amendment) when these forms were available to the agents in Agent Joseph's "search kit" in his vehicle. (7) There were at least five agents and uniformed police officers walking back and forth through the defendant's residence. (8) When asked by the government attorney if the defendant appeared comfortable when the "discussion" began, Agent Correa stated that he appeared "anxious." (9) There was no point in

time that Agent Correa stopped speaking to the defendant, from the time he was "sat down" in the dining room of his own home, until he was taken into the conference room of the RAC office; thus, there was no attenuation of the coercive conduct. (10) The defendant was required to help the agents track down his co-defendant. (11) This conduct all occurred after the case agent had directed Agent Correa to get a statement from the defendant. (12) Only after the execution of the written Miranda Waiver did the defendant stop "cooperating" and refused to sign a statement.

      Here, there is no question that the agents exceeded their authority by conducting an over broad security sweep, and then by remaining in the defendant's home long after the need to be there had ended. The agents here stated, he had no indication that this would be a "violent arrest and Mr. Alexander was very cooperative from the very beginning…"[28] Neither of the government's witnesses stated that they had a reason to believe that any member of the defendant's family was a danger to them. Additionally, the agents both testified that the defendant was allowed to get dressed immediately after the security sweep concluded.

      As the Court in U.S. v. Ali, 2006 WL 929368 (E.D.N.Y., 2006), recently held, "[e]ven if the officers suspected that *** someone else might be present, they had no basis to believe that the individual was dangerous. As noted above, before conducting the second type of *Buie* protective sweep, law enforcement officers must reasonably believe 'that the area to be swept harbors an individual *posing a danger.*'" Id., citing to U.S. v. Blue, 78 F.3d 56 (2nd Cir., 1996) (*emphasis in the original*). Everything the government did on the morning of the arrest can be construed as coercive conduct, particularly in light of the Second Circuit's approval of the District Court's reasoning in Isiofia, *supra*. Finally, the most important factor is that only once the government had the defendant execute a document waiving his rights, he chose instead to exercise those rights and contact his attorney. Based on the foregoing, it is respectfully submitted that even should this Honorable Court find that Agent Correa did administer Miranda Warnings to the defendant twice orally, any waiver of those rights was involuntary.

---

[28] **Exhibit A**, page 128, line 1 – 5.

**CONCLUSION**

      The Government violated the defendant's Sixth Amendment right to counsel but deliberately eliciting incriminating statements from him after a criminal proceeding had commenced, requiring this Honorable Court to suppress the post arrest statements as a matter of law. Additionally, the government has failed to carry their burden of proof to show that the defendant made a knowing and voluntary waiver of his Fifth Amendment rights prior to questioning him, also requiring this Honorable Court to suppress the post arrest statements as a matter of law.

Dated: New York, New York,
       July 25, 2006

                                                  Law Office of Michael Fineman, Esq.

                                                  By: _____/s/_____
                                                      Michael Fineman, Esq. (MF 0282)
                                                      *Attorney for Defendant,*
                                                      Nathaniel Alexander,
                                                      305 Broadway, 7th Floor
                                                      New York, New York 10007
                                                      (212) 897-5823