UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-- - - - - - - - - - - - - - - - - - - -x
UNITED STATES OF AMERICA                 :
                                         :
          -v.-                           :
                                         :
DOUGLAS SHYNE,                           :     S4 05 Cr. 1067 (KMK)
NATASHA SINGH,                           :
  a/k/a "Beatris Rodrigues,"             :
NATHANIEL SHYNE,                         :
TOYBE BENNETT,                           :
  a/k/a "Dmitriy Makarevich,"            :
  a/k/a "Dmitriy Makervish,"             :
  a/k/a "Eduardo Rodrigues,"             :
  a/k/a "Cecilio Pena,"                  :
ROBERTO MONTGOMERY,                      :
EPHRAIM RICHARDSON,                      :
NARESH PITAMBAR,                         :
JASON WATLER,                            :
STEVEN RIDDICK,                          :
NATHANIEL ALEXANDER, and                 :
TIMOTHY MONTGOMERY,                      :
                                         :
             Defendants.                 :
- - - - - - - - - - - - - - - - - - - - x


## GOVERNMENT'S POST-HEARING MEMORANDUM OF LAW
## IN FURTHER OPPOSITION TO DEFENDANT
## NATHANIEL ALEXANDER'S MOTION TO SUPPRESS


                              MICHAEL J. GARCIA
                              United States Attorney for the
                              Southern District of New York


E. DANYA PERRY
Assistant United States Attorney

     - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-- - - - - - - - - - - - - - - - - - -x
UNITED STATES OF AMERICA                :
                                        :
            -v.-                        :
                                        :
DOUGLAS SHYNE,                          :    S4 05 Cr. 1067 (KMK)
NATASHA SINGH,                          :
   a/k/a "Beatris Rodrigues,"           :
NATHANIEL SHYNE,                        :
TOYBE BENNETT,                          :
   a/k/a "Dmitriy Makarevich,"          :
   a/k/a "Dmitriy Makervish,"           :
   a/k/a "Eduardo Rodrigues,"           :
   a/k/a "Cecilio Pena,"                :
ROBERTO MONTGOMERY,                     :
EPHRAIM RICHARDSON,                     :
NARESH PITAMBAR,                        :
JASON WATLER,                           :
STEVEN RIDDICK,                         :
NATHANIEL ALEXANDER, and                :
TIMOTHY MONTGOMERY,                     :
                                        :
            Defendants.                 :
- - - - - - - - - - - - - - - - - - - x


     The Government respectfully submits this post-hearing
memorandum of law in opposition to the Memorandum of Law in
Further Support [Of] Defendant's Motion For Suppression of Post-
Arrest Statements, dated July 25, 2006 ("Br."), requesting that
the Court suppress "all statement procured in violation of the
defendant's right against self-incrimination, the defendant's
right to an attorney, and as a result of grave prosecutorial
misconduct under the Fifth and Sixth Amendments to the
Constitution of the United States."  (Br. 1).  This motion should
be soundly denied.

**BACKGROUND**

      **A.   The Suppression Hearing**

      On July 11, 2006, the Court held a hearing on the issue of the admissibility of Alexander's post-arrest statement.  At that hearing, the Government called two agents with the Department of Homeland Security, Bureau of Immigration and Customs Enforcement ("ICE").  The testimony of those agents, Special Agent Ruben Correa and Special Agent Peter Joseph, established that Alexander had been properly Mirandized on *three separate occasions* – one of those times *in writing* no less – and that Alexander knowingly and voluntarily waived his rights before making any statements.

      Special Agent Correa's law enforcement career spans some two decades: in 1988, he began his career with the New York State Police; from 1990 to 1994, he was an investigator with the Bronx District Attorney's Office; from 1994 to 2001, he was a deputy United States Marshal with the warrant and fugitive squad in the Southern District of New York; from 2001 to 2003, he was a criminal investigator with the United States Attorney's Office for the Southern District of New York.  (7/11/06 transcript hearing ("Tr.") RC 27).[1]  Special Agent Correa thereafter joined the Department of Homeland Security, Department of Immigration

---

[1]For ease of reference, citations to Special Agent Ruben Correa's testimony is preceded by the initials "RC," and citations to Special Agent Peter Joseph's testimony is preceded by the initials "PJ."

and Customs Enforcement, where he has been assigned, since 2003, to the New York El Dorado financial crimes task force. (Tr. RC 28). In his lengthy law enforcement career, Special Agent Correa has been involved in effecting hundreds of arrests, has administered Miranda warnings at least one hundred times, and has participated in "too many [post-arrest interviews] to count." (Id.).

### 1.    The Arrest

Along with several Virginia-based federal agents and one or two uniformed local officers, Special Agents Correa and Joseph participated in Alexander's arrest at Alexander's home in Portsmouth, Virginia in the early morning of February 9, 2006. (Tr. RC 28, 30, 34, PJ 125-26). At approximately 6:00 a.m., they knocked on the door of Alexander's home and identified themselves, and when Alexander opened the door and identified himself, they informed him of the arrest warrant. (Tr. RC 30, PJ 126). After Alexander was placed under arrest, the agents did a security sweep of the house, conducting a "quick search throughout the rooms of the house to make sure that there [were] no people in the house or any dangerous objects in plain view." (Tr. RC 31; see also PJ 128). Because Alexander was dressed only in "night attire," he was allowed to change into street clothes. (Tr. RC 32; see also PJ 128). Alexander and the other members of his household were directed to the living room area. (Tr. RC 31,

32).

## 2.   Alexander's First Waiver Of His <u>Miranda</u> Rights

Thereafter, Special Agent Correa and Alexander went into the dining room.  (Tr. RC 32).  Alexander "wanted to know what the charges were" and why he was under arrest, and Special Agent Correa explained to Alexander that the agent "could not speak to [Alexander] until [the agent] advised him of his rights first." (<u>Id.</u>).  Special Agent Correa's response was grounded in his "experience" that "whether you are going to ask questions or not, even if you are just going to explain the charges, as you are explaining them, they will start making statements" and that "[i]f you want to use those statements, their rights have to be waived voluntarily."  (Tr. RC 32-33).  Special Agent Correa then advised Alexander of each of his <u>Miranda</u> rights, and Alexander "indicated . . . that he fully understood each and every one of those rights."  (Tr. RC 33).  After indicating his full understanding of his rights and waiving them, Alexander proceeded to make statements for approximately 20 (but no more than 30) minutes.  (Tr. RC 35, 37; <u>see also</u> RC 90 (providing a "rough estimate" that the agents were in Alexander's home for a total of "20, 30 minutes")).  During this time, Alexander also freely consented to a search of his residence.  (Tr. RC 35-36, PJ 130 (testifying that when asked for consent to search, Alexander "said like sure, absolutely," without "any hesitation

4

whatsoever.")).  Indeed, Alexander assisted the agents by specifying where exactly they might find financial documents, if any, by directing them to the location of his briefcase and allowing them to search it.  (Tr. RC 36, PJ 131).

At no time in Alexander's presence did any of the agents unholster their guns.  (Tr. RC 31, PJ 127).  During the interview at his home, Alexander was fully clothed (Tr. RC 32, PJ 128), and, if he was handcuffed at all at that time (Tr. PJ 128; <u>but see</u> Tr. 132), he certainly "wasn't cuffed behind his back."  (Tr. RC 37).  While there were other agents in the vicinity, the only other agent at the dining room table with Alexander was Special Agent Correa.  (Tr. RC 34, PJ 129-30).  Alexander was "[v]ery cooperative," "wanted to tell his side" of the story relating to the charges (Tr. RC 35), and "wouldn't stop talking from the time [the agents] walked in the door to the time [they] took him to the marshals." (PJ 130).

Alexander was then transported to ICE's small resident-in-charge ("RAC") satellite office in Norfolk (Tr. 36).  Special Agent Correa and Alexander rode in the back seat of one vehicle. (Tr. RC 38), and Special Agent Joseph drove separately.  (Tr. PJ 132).  En route to the RAC office, Special Agent Correa had a telephone conversation in which he was informed that the agents attempting to arrest Alexander's co-defendant and friend Steve Riddick were unable to locate him.  (Tr. RC 38-39).  Special

Agent Correa asked Alexander if he knew Riddick's whereabouts, and Alexander readily responded that he had contact numbers for Riddick on his cell phone at his home.  (Tr. RC 39, 40). Alexander then used one of the agent's phones to call his wife (Tr. RC 40), and Special Agent Joseph then was instructed to return to Alexander's residence to retrieve his cell phone, which Alexander's wife gave to Special Agent Joseph.  (Tr. RC 40, PJ 133).  While in transit, Alexander was no longer making statements about the case, as "[a]t that point we were concentrating on trying to find Steve Riddick."  (Tr. RC 40).

### 3. Alexander's Second Waiver Of His Miranda Rights

When Alexander arrived at the RAC office, he was placed in the processing room and processed by Special Agent Correa.  (Tr. RC 40).  Alexander was seated in an open cell and appeared "[v]ery" comfortable.  (Tr. RC 40-41).  The only agent present with Alexander for the majority of the time spent in the processing room was Special Agent Correa.  (Tr. RC 41).  While he was being processed, the focus was still on trying to locate Riddick, "[b]ut after we stopped talking about that and he was processed, [Alexander] wanted to continue talking about the case."  (Id.).  Because he was not the case agent and had been "more concerned with the logistics of the arrest rather than the details of the charges," Special Agent Correa asked one of the agents for a copy of the Indictment before resuming the

6

conversation with Alexander.  (Tr. RC 42).  Prior to reviewing

the Indictment with Alexander, Special Agent Correa verbally

Mirandized him once again.  (Id.).  He determined that this was

advisable because "[a] considerable amount of time had passed

since we last talked about the case, which was at his residence,"

and because Special Agent Correa now had the "indictment in

hand," he and Alexander could begin to get into more detail about

the case.  (Id.; see also Tr. RC 85 ("if you stop talking

specifically about the charges and want to continue in another

conversation, it is good practice to advise again")).  Special

Agent Correa then re-advised Alexander of each of his rights yet

again, and Alexander indicated that he understood those rights

yet again.  (Tr. RC 43).

Special Agent Joseph estimated that he arrived at the RAC

office sometime around 7:45 to 8:00 a.m. (Tr. PJ 133).  When he

arrived at the office, Special Agent Correa and Alexander were

speaking in the processing room, and Alexander appeared to be

making statements.  (Tr. PJ 135).  Special Agent Joseph gave

Alexander's cell phone to Special Agent Correa, and Alexander

thereafter began intermittently placing phone calls from that

phone in an effort to locate Riddick, while continuing to make

statements.  (Tr. PJ 135).

### 4.   Alexander's Third, Written Waiver Of His <u>Miranda</u> Rights

At approximately 8:30 a.m., Alexander was presented with a

7

written <u>Miranda</u> waiver form.  (<u>See</u> Government Exhibit ("GX") 1).
The ICE agency had recently changed the form, and so, although
Special Agent Correa had asked another agent for a written form,
it was difficult to retrieve a form earlier; in addition, the RAC
ICE agents were involved in a large controlled delivery that
morning and so the agents were otherwise very busy.  (Tr. RC 78-
80, PJ 136).  Special Agent Joseph retrieved a waiver form from
his car, and he and Special Agent Correa brought Alexander into a
conference room that had become available.  (Tr. RC 44-45, PJ
136-37).  Special Agent Correa explained to Alexander that the
form was a "formality" and something they had to "go over again"
(Tr. PJ 137),[2] and Alexander went through and read the form with
Special Agent Correa.  (Tr. RC 44-45).

Special Agent Joseph filled out the portion on the form
containing the date and time that the form was executed.  (Tr. PJ
137, 138; RC 46).  However, Special Agent Joseph – who had been
"up late the night before getting ready to take a controlled
delivery" in an unrelated case and who had gotten up very early
to make a 6:00 a.m. arrest (Tr. PJ 156) – made a mistake on the

---

[2]The transcript contains a syntactical error.  It reads that
Special Agent testified: "Agent Rubin showed him the form and
said this is just some like formality type thing, something we
have to go over. Again, just paper-wise, and they both -- I can't
remember if Agent Rubin read it but it was presented and looked
over."  (Tr. PJ 137).  The only reading that makes any
grammatical (and logical) sense is that the "again" is attached
to the end of the previous sentence, to read: ". . . something we
have to go over again, just paper-wise.  And they both . . .".

form: looking at his blank-faced, numberless analogue watch (Tr.
PJ 138, 141-42, 156), he incorrectly entered the time as 9:30
a.m., rather than the actual time of 8:30 a.m. (See, e.g., Tr. PJ
139-40, 156).  When Special Agent Joseph initially tried to
change the time on the proper line, he bungled it, so he then
crossed that out, initialing the amendment, and wrote in the
proper time underneath it (Tr. PJ 139-40).  This change was made
"immediately" and in Alexander's presence; no changes were made
to the document outside of Alexander's presence.  (Tr. PJ 140-41;
see also RC 47).  Alexander and Special Agents Correa and Joseph
signed the form at 8:30 a.m. (See Tr. PJ 143, RC 48).

    Alexander indicated that he understood the form and
expressly agreed to continue speaking after having read it.  (Tr.
RC 45, PJ 137-38).  Indeed, he reviewed and repeated the entirety
of his previous statements.  (Tr. RC 48, PJ 143).  While
Alexander went through his previous statements "beginning to
end," Special Agent Correa took general notes.  (Tr. RC 48).
When Special Agent Correa asked Alexander if he would sign the
written statement, Alexander "wasn't comfortable" signing it and
"wanted to speak to an attorney and ask him if he should sign
it."  (Tr. RC 49).  After speaking very briefly with an attorney,
Alexander stated that he had been advised not to sign anything;
at that point the interview concluded and Alexander was taken to
the Marshals to be arraigned.  (Id.).  This request to consult

with his attorney was "the first time that [Alexander] had asked to speak with an attorney[] that morning."  (Tr. RC 49; <u>see</u> <u>also</u> Tr. RC 115).

While Alexander was at the RAC office, the agents specifically tried to make him comfortable.  (Tr. PJ 135).  He was not handcuffed.  (Tr. PJ 134, 137; <u>see also</u> RC 45).  He was offered a beverage.  (Tr. PJ 135).  He was sitting primarily with Special Agent Correa alone.  (Tr. RC 41, PJ 133).  As he had been at his residence, Alexander was "very cooperative," "wanted to continue talking about the case," and "wanted to explain that this was a misunderstanding and wanted to explain the story of the checks." (Tr. RC 41, 44, 45, 118; <u>see also</u> PJ 128, 130 (Alexander generally very cooperative)).  And as he had been at his residence, Alexander was "[v]ery" "comfortable" during the time that Alexander was making statements at the RAC office (Tr. RC 40; <u>see also</u> PJ 135 ("Mr. Alexander appeared to be comfortable with us from really the time we were at his house until the time we took him to the marshals").  He was "even joking with [the agents] toward the end."  (Tr. PJ 135).

## ARGUMENT

### ALEXANDER VOLUNTARILY WAIVED HIS CONSTITUTIONAL RIGHTS

Alexander argues that his Fifth and Sixth Amendment rights were violated because (i) he was not advised of his <u>Miranda</u> rights prior to making statements and (ii) even if he was advised

of his rights and did waive them, such waiver was not voluntary.
The evidence presented at the hearing establishes that Alexander
was properly Mirandized on no fewer than three separate occasions
– one of those times in writing – and that he knowingly and
voluntarily relinquished his rights.  His motion should be
swiftly denied.

> **A.    Alexander Was Properly Mirandized
>         No Fewer Than Three Times**

>   **1.    Legal Standards**

As set forth in the Government's pre-hearing briefing, it is
axiomatic that, in order for a defendant's statements to be
admitted at trial, he must have been advised of the rights
specified in Miranda v. Arizona, 384 U.S. 436 (1966), before
being subjected to custodial interrogation.  Statements made by a
defendant in the course of custodial interrogation are
inadmissible absent waiver of those rights.  Id.  A waiver of
Miranda rights is valid if it was the product of a knowing and
voluntary choice, that is, if the defendant understood his or her
rights and chose to relinquish them without governmental
coercion.  Colorado v. Spring, 479 U.S. 564, 572-75 (1987);
Colorado v. Connelly, 479 U.S. 157, 169-70 (1986).  The
Government must establish by a preponderance of the evidence
that a defendant's relinquishment of Miranda rights was voluntary
and made with a full awareness of the rights being waived and the

consequences of waiver.  <u>Connelly</u>, 479 U.S. at 168; <u>Moran</u> v.
<u>Burbine</u>, 475 U.S. 412, 421 (1986).

      **2.  Discussion**

    As set forth above, the evidence presented at the hearing in
this case established that Alexander was Mirandized on three
separate occasions.  Shortly after the agents arrived at
Alexander's residence to arrest him, Special Agent Correa
administered the <u>Miranda</u> warnings for the first time.  Because it
was necessary to conduct a security sweep for officer safety and
because Alexander was not fully dressed (<u>see, e.g.</u>, Tr. PJ 148),
the agents entered his home in order to arrest him, conduct the
sweep, and allow him to dress.  Alexander was very cooperative
and indeed eager to speak with the agents from the moment they
arrived.  (<u>See, e.g.</u>, Tr. RC 35, PJ 129, 130, 135).  Accordingly,
Special Agent Correa sat down with Alexander at the dining room
table and, before discussing the charges with him, was careful to
administer Alexander's <u>Miranda</u> warnings.  Special Agent Correa
did this because, as a veteran agent who had made hundreds of
arrests, administered rights over a hundred times and taken
countless statements (Tr. RC 28), he was aware that defendants
often blurt out statements in response to learning of the
charges.  (Tr. RC 32-33 ("whether you are going to ask questions
or not, even if you are just going to explain the charges, as you
are explaining them, they will start making statements" and "[i]f

you want to use those statements, their rights have to be waived voluntarily.")). Special Agent Correa then advised Alexander of each of his Miranda rights, and Alexander "indicated . . . that he fully understood each and every one of those rights." (Tr. RC 33). After indicating his full understanding of his rights and waiving them, Alexander readily began making statements. (Tr. RC 35, 37).

Alexander was Mirandized a second time at the RAC office. Because there had been an interruption in Alexander's statements while he assisted the agents in locating Riddick (Tr. RC 40, 41), because he now had a copy of the Indictment in hand and could go through the charges in more detail (Tr. RC 42), and because Alexander "wanted to continue talking about the case" (Tr. RC 41), Special Agent Correa determined that it would be "good practice" to once again advise Alexander of his Miranda rights. (Tr. RC 85; see also at 42). Special Agent Correa had requested a written waiver form but because he was not in his home office, because the local agents were tied up with a large-scale controlled delivery, and because the form had recently been changed and was not easily located, it took a period of some time to retrieve one. (Tr. RC 78-80, PJ 136). Therefore, in the interim, Special Agent Correa administered the Miranda warnings verbally, once again, and Alexander indicated that he understood those rights once again. (Tr. RC 43).

13

At approximately 8:30 a.m., Alexander was Mirandized yet a third time, this time in writing.  Special Agent Joseph retrieved a waiver form from his car, and he and Special Agent Correa brought Alexander into a conference room that had become available.  (Tr. RC 44-45, PJ 136-37).  Special Agent Correa explained to Alexander that the form was a "formality" and something they had to "go over again" (Tr. PJ 137), and Alexander, reading the form with Special Agent Correa, was advised of his <u>Miranda</u> rights yet a third time.  (Tr. RC 44-45).

Special Agent Joseph filled out the portion on the form containing the date and time of its execution.  (Tr. PJ 137, 138; RC 46).  However, Special Agent Joseph – who had been "up late the night before getting ready to take a controlled delivery" in an unrelated case and who had gotten up very early to make a 6:00 a.m. arrest (Tr. PJ 156) – made a mistake on the form: looking at his blank-faced, numberless analogue watch (Tr. PJ 141-42, 156), he incorrectly entered the time as 9:30 a.m., rather than the actual time of 8:30 a.m. (<u>See, e.g.</u>, Tr. PJ 138-40).  Special Agent Joseph, an embarrassed junior agent, had good reason to have retained a specific recollection of having made this mistake:

> Because I messed up and I know that I messed
> up because I filled out the date and time an
> to sign and. . .  and handed it to Rubin on the bottom line.
> Usually the initiating officer signs the top line.  I
> gave it to Agent Rubin and he immediately looked at it
> and he goes, "No, you mean 8:30," and I went "of

course", and I felt like an idiot and I got a senior
agent there and it was a bonehead move and I looked at
my watch wrong.

(Tr. PJ 138) (also testifying that he "[a]bsolutely" had an

"independent memory of making that error" because he "felt like a

moron."). When Special Agent Joseph initially tried to change

the time on the proper line, he bungled it, so he then crossed

that out, initialing the amendment, and wrote in the proper time

beneath it:

> After I wrote 9:30 I signed it, handed it
> back to Rubin and he immediately told me that
> I made [a] mistake. I grabbed the form,
> started scribbling -- I don't know. I was
> flustered. I was a little embarrassed and
> after trying to make an effort I just started
> scratching it out and I put a clear line
> through it and put my initials and made a
> clear line underneath.

(Tr. PJ 139-40). Someone – presumably Alexander – wrote in their

initials next to the correct time of 8:30 a.m. (See Tr. PJ 141;

GX 1).[3] This change was made "immediately" and in Alexander's

---

[3] Special Agent Joseph testified that the initials next to
the correct time were not his own, and that they were either
Special Agent Correa's or Alexander's. (Tr. PJ 141). Special
Agent Correa testified that the initials were not his. (Tr. RC
47). Clearly, where an amendment such as this is made, it would
be logical for the defendant to initial the change – which is
exactly what Special Agent Joseph did have the defendant do in
another case in which he made an amendment to the waiver form.
(Tr. PJ 142; see also Tr. RC 109 ("It is . . . common just to
initial a mistake and move on.")). Significantly, as stipulated
by the parties (Tr. 168), the same pen used to write those
initials next to the correct time also was used by Alexander to
print and sign his name (this pen also was used by Special Agent
Correa; Special Agent Joseph used a different pen).

presence; no changes were made to the document outside of Alexander's presence.  (Tr. PJ 140-41; see also RC 47). Alexander and Special Agents Correa and Joseph signed the form at 8:30 a.m. (See Tr. PJ 143, RC 48).  After reading, understanding, and signing the form, Alexander continued to make statements. Indeed, he reviewed and repeated the entirety of his previous statements.  (Tr. RC 48, PJ 143).[4]

### 3.    The Agents Were Truthful And Their Testimony Should Be Credited

If credited, the agents' testimony, as described above, firmly establishes that Alexander was fully, properly, and repeatedly Mirandized.  However, pointing to several alleged "contradictions" within their testimony, Alexander asserts that the agents perjured themselves on the stand, suggests that they obstructed justice by doctoring the Miranda waiver form, and argues that they should not be believed.  Alexander recklessly mis-states the record: there simply are no contradictions of any consequence whatsoever.  Of course, great deference is accorded a district court in its credibility determinations, as "only the

---

[4]Even if the Court were to discount the verbal Miranda warnings – which of course, the Government strongly submits there is no reason to do – Alexander nevertheless made a full statements after having signed the written waiver form.  Because statements that are given after warnings are admissible even if they were preceded by unwarned statements, see Oregon v. Elstad, 470 U.S. 298, 304 (1985), there is no basis to suppress, at the very least, the full statement Alexander provided after executing the written Miranda waiver form.

trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." <u>Anderson</u> v. <u>Bessemer City</u>, 470 U.S. 564, 575 (1985).  The Government submits that the agents were wholly credible, and that this Court should credit their consistent and believable testimony.

To make the argument that the agents lied on the stand, Alexander is forced to distort and indeed to wholly mis-represent the record.  With respect to Special Agent Correa, Alexander first claims an alleged internal contradiction within his testimony.  He argues that Special Agent Correa "implied that he had no intention of interrogating the defendant" (Br. 4), but then testified on cross that "he was instructed by the case agent, Agent Rosenblatt, to get a statement."  (<u>Id.</u>).  That was not Special Agent Correa's testimony, either on direct or on cross.  On direct, he did not "imply" anything about his intentions with regard to questioning Alexander, testifying only that, in his experience, "*whether you are going to ask questions or not*, even if you are just going to explain the charges, as you are explaining them, they will start making statements" and that "[i]f you want to use those statements, their rights have to be waived voluntarily."  (Tr. RC 32-33).  He certainly did not testify or even imply one way or another whether he had any intention to "ask questions or not."  Further, his actual

17

testimony on cross was not that he was "instructed" to take a
statement: indeed, Special Agent Correa rejected counsel's use of
the word "instructed", testifying instead that he "wasn't
discouraged" from taking a statement, "if [Alexander] wanted to
give one" (Tr. RC 52). To be sure, it is hard to imagine the
arresting agent who would be "discouraged" from taking the
statement of a defendant who wishes to make one.[5]

       Alexander also points to several niggling "contradictions"
between the testimony of the two agents. (Br. 5). Specifically,
although Special Agent Joseph testified that Alexander was
wearing boxer shorts when he answered the door, Special Agent
Correa testified that while he did not really remember, he

---

[5]On this same point, Alexander also argues that Special
Agent Correa is "betray[ed]" by his interview memo, which is
"devoid of any information concerning the conversation between
the agent and the defendant at the defendant's home," and which
also states that the defendant was taken to the RAC office for
"processing and questioning." (Br. 4-5). For the same reasons,
this is hardly a "contradiction." Alexander also argues that
Special Agent Correa "contradicted" himself in his testimony
about when he first had a conversation with the Government
regarding the change on the Miranda waiver form (Br. 5-6).
Alexander tries to capitalize on counsel's own confusing and
awkwardly worded question on cross examination (Tr. 113: "Up
until just a couple of weeks ago. . . has AUSA Perry ever asked
you any questions about the Miranda document?"; see also Tr. 114
(The Court: "Hang on. In fairness to the agent, people were
talking. Ms. Perry objected. I was talking. . ."")). Clearly,
the agent understood counsel to be asking whether that discussion
had occurred within the past few weeks. The alleged
"contradiction" was quickly cleared up within the very same
series of questions as soon as the agent understood the question
properly. (Tr. RC 113-14) (Special Agent Correa stating that he
now "underst[oo]d what you are asking differently, sir.").

believed that Alexander "may have been [wearing] long pajamas."
(Br. 5).  Special Agent Correa's candidly imperfect recollection
of the defendant's wardrobe does not amount to a "contradiction,"
and in any event, both agents were clear that Alexander was in
some sort of sleep attire rather than street clothes, and that he
had to get dressed before he could leave the residence. (<u>E.g.</u>,
Tr. RC 59-60, PJ 128).

As it did at the hearing (<u>see</u> Tr. 71 <u>et seq.</u>), the defense
also makes much of the chimerical inconsistency between the
search of a residence and the search of a briefcase.  (Br. 5).
It is difficult even to understand the argument, as the briefcase
was *in* the residence, and the agents necessarily had to look
within the residence in order to retrieve the briefcase.  (<u>E.g.</u>,
73-75).  In any event, the testimony of the two agents is not
contradictory: both agents discussed the issue of the consent
search with Alexander, and both testified that Alexander
consented to a search of the residence and then helped them
narrow the search of the residence by pointing them specifically
to where within the residence they might find financial documents
(i.e. in the briefcase).  (<u>E.g.</u>, Tr. RC 36, 73-75, PJ 130-31).

Alexander next seizes upon the fact that Special Agent
Correa testified that he had asked for a waiver form but that
Special Agent Joseph testified that Special Agent Correa had not
asked him for one (Br. 5) – blithely ignoring the testimony that

19

the agent from whom Special Agent Correa had requested the form was not Special Agent Joseph, but rather the agent who had driven him to the RAC office (an agent by the name of Royster). (Tr. RC 79, 83, PJ 131-32). Finally, Alexander believes there is some "contradiction" in the fact that, while Special Agent Joseph testified that Special Agent Correa was aware of the change in the time on the waiver form, Special Agent Correa testified that, at the time of the hearing, he did not remember the change. (Br. 5). That Special Agent Correa was contemporaneously aware of the change at the time, but had forgotten it in the intervening months is hardly contradictory (and is in fact, an obvious function of human memory that counsel went to lengths to establish on cross, see, e.g., Tr. 71-72): indeed, his testimony that he no longer remembered that change being made only underscores his credibility.

Having done no damage to Special Agent Correa's credibility, Alexander then points to three area of testimony to argue that Special Agent Joseph's testimony "also left a lot to be desired from the prospective [sic] of truthfulness." (Br. 6). First, he finds it somehow "important" (id.) that Special Agent Joseph had a conversation with Special Agent Rosenblatt at the lunch recess, in which the two agents discussed the cancellation of Special Agent Joseph's flight back to Virginia and all of the work that Special Agent Joseph had to do on the "current case" he was

working there, about which Special Agent Rosenblatt was giving
him a "hard time." (Tr. PJ 164). Special Agent Joseph did not
have "any conversation about the substance of the testimony" or
Special Agent Correa's testimony. (Id.). It is bewildering
(but, given the motions filed in this case, not surprising) that
this testimony about a completely unremarkable and unrelated
conversation could possibly tend to establish the case agent's
"attempt to influence the witness' [sic] testimony" or remotely
create the "appearance of impropriety." (Br. 6). Likewise, it
is also unclear how Alexander's second point – that Special Agent
Joseph's testimony about his failure to request that Alexander
sign a written Miranda waiver form at his residence (see Br. 6) –
might reflect in any way on Special Agent Joseph's
"truthfulness."

Third and finally, Alexander argues that Special Agent
Joseph's "explanation about how the time on the written waive
[sic] form is completely nonsensical." (Br. 6). This is so, he
seems to argue, because Special Agent Joseph made a further error
in trying to fix the initial time error. Yet the error itself
does make "sense": Special Agent Joseph had been up very late the
night before on an unrelated case and had been up very early that
morning for Alexander's arrest, and he quickly glanced at a
blank-faced, numberless analogue watch before getting the time
off by one hour. (Tr. PJ 138, 141-42, 156). Then, "flustered,"

21

"embarrassed," and feeling like a "moron" at having been alerted
to a "bonehead" mistake by a "senior agent" (Tr. PJ 138-40),
Special Agent Joseph started "scribbling" and further bungled it.
(Tr. PJ 139-40).  After "trying to make an effort," he just
"scratch[ed] it out" and started again. (Tr. PJ 140).  To the
extent his further error does not make "sense," that is often the
very nature of an error.[6]

Thus, the explanation for the change of time on the form is
as simple as it is innocent.  Alexander's argument that this form
was doctored by the agents or some unknown person (Br. 6-7) not
only is incorrect as a factual matter, but the argument itself is
illogical.  If the agents had actually signed the form at 9:00
and then later conspired to change the time, surely they would
have entered the time as 6:00 a.m., or even 8:00 a.m.  Further,
without access to Alexander's cell phone records, they would have

---

[6]Amazingly – given the many mis-statements, mis-
representations, and mis-citations in its submissions – the
defense has been unable even to conceive of the possibility for
human error.  That not only is just what happened in this case,
but it is an offense of which Fineman himself is repeatedly
guilty.  To take just one example, in his own affidavit of
service to his post-reply briefing, Fineman, "being duly sworn,
deposes affirms, and says" that he served the Government with his
post-hearing briefing on a date prior to the hearing – June 30,
2006.  Fineman also repeatedly mis-cites the record in the sworn,
post-hearing submission that he calls an "affidavit."  Rather
than accusing Fineman of "lying" or of "nefarious conduct," the
Government instead recognizes the possibility that human error
occurs and that, at times, it may not make sense.

had difficulty putting together a time line that would have
caused them to realize that they had to alter the form.

Alexander's own cell phone records give the lie to the
defense's theory.[7]  The form could not have been executed either
at 9:00 or at 9:30, as argued the defendant.  The parties agree
that questioning ended when he called his attorney at 9:05 a.m.
Alexander was then immediately whisked off to the Marshals (Tr.
RC 49) and thus could not have signed the form at 9:30 a.m.
Further, it makes no sense whatever that the form could have been
signed at 9:00 a.m., as a defendant would be unlikely to sign a
form one minute waiving his right to consult an attorney and then
turn around just moments later and ask to speak with an attorney.
What does make sense is that, as the agents testified, Alexander
signed the form, once again gave a full statement, and then

---

[7]Conversely, those same records support the testimony of the
agents – who have never seen those records.  (See Tr. RC 50).
The records show intermittent calls from Alexander to Riddick
from 8:05 a.m. to 8:53 a.m., a phone call to Alexander's attorney
at 9:05 a.m., and no further outgoing calls thereafter.  (See
cell phone records, attached to defendant's pre-hearing brief as
Exh. C).  The testimony established that Special Agent Joseph had
brought Alexander's cell phone to him at approximately 8:00 a.m.
(Tr. PJ 133, 135); that some time later, he retrieved a waiver
form that was then executed by Alexander and the agents (e.g.,
Tr. PJ 136); that the waiver form was signed at 8:30 a.m. (e.g.,
Tr. PJ 143; GX 1); that Alexander continued to make a full
statement for approximately one half hour after signing the form,
at which time he then called his attorney, thereby terminating
the interview (Tr. RC 49-50, PJ 143); and that Alexander was on
the phone intermittently during this period (i.e., from
approximately 8:00 a.m. until approximately 9:00 a.m.) (Tr. PJ
135, 143).

approximately one half hour later, balked (as many defendants do) only when presented with a written statement to sign.  The only explanation that makes sense is the truth, and that is that Alexander signed the form at 8:30 a.m., as stated by Special Agent Joseph and as stated on the form.

Significantly, Alexander can not and does not ascribe any possible motivation for either Special Agent Correa or Special Agent Joseph to alter an important document, obstruct justice, and perjure himself.[8]  Prior to and subsequent to this arrest, neither agent had any involvement in the investigation of this case, and had first heard of Alexander only very shortly before the arrest, at the preoperational briefing.  (Tr. RC 28-29, PJ 125, 126).  Their sole function in this case was to act as bodies making a safe arrest.  (Tr. RC 42 ("I'm more concerned with the logistics of the arrest rather than the details of the charges"), PJ 126 ("my sole responsibility was just [to] initiate a safe arrest")).  Further, they had never met or spoken prior to that time, and have not met or spoken since.  (Tr. RC 34, 44, PJ 125-26).  It would be an extraordinary thing for two agents to collaborate and conspire to doctor an important form as a <u>Miranda</u>

---

[8]Perhaps precisely because he can conceive of no motive, Alexander now appears to argue that some mysterious third party (Br. 6-7) – who, oddly enough, included his initials on the alteration, has the same handwriting and used the same pen as Special Agent Joseph – must have altered the document.

24

waiver; it would be an unimaginable thing for two agents with no stake in the case who do not even know each other to do so.

Finally, were the agents willing to obstruct justice and perjure themselves, surely they would have supplied even more useful testimony.  Clearly, it might have been helpful had Special Agent Correa remembered Special Agent Joseph getting the time wrong, but he said he did not because he honestly did not. And clearly, it might have been helpful had Special Agent Joseph testified that he was present for the two verbal administrations of Alexander's <u>Miranda</u> warnings, but he stated that he was not present because he was not.

Special Agent Correa is an experienced agent whose law enforcement career spans some two decades, including many years at the offices of the United States Attorney and the District Attorney, three years with the Department of Homeland Security and seven years on the fugitive squad with the United States Marshal's Office.  (Tr. RC 27-28).  He has arrested hundreds of defendants and has administered Miranda warnings and taken statements countless times (Tr. RC 28); he can easily (and did at the hearing) recite the <u>Miranda</u> warnings by rote. (Tr. RC 33). He has a method and a reason for administering the warnings before advising defendants of the details of the charges against them: in his experience, he is aware that – as happened in this case – defendants often blurt out spontaneous statements when

confronted with the charges against them, and he is careful to ensure that such statements are protected and useable.  (Tr. RC 32-33).  In addition, as a belt and suspenders, he is careful to re-administer warnings where – as there was here – there has been any break in the conversation.  (Tr. RC 42-43, 85).  Thus, Special Agent Correa's testimony about his verbal administration of Alexander's <u>Miranda</u> warnings on two occasions is wholly credible: it is what he *does* as a matter of course and good practice, and it is what he did in this instance.

Further, Special Agent Correa was searching for yet another pair of suspenders – a written waiver form.  But because he was in a foreign office, because the agents were preoccupied with a large-scale controlled delivery, and because the RAC office had recently changed its forms, such a form was hard to come by and he did not receive one until Special Agent Joseph provided him with one shortly before 8:30 a.m.  (Tr. RC 78-80, PJ 136).  At that point, Alexander was again Mirandized, again indicated he fully understood his rights and voluntarily waived them, and he and the two agents signed the form.

In short, the Government respectfully submits that the Court should credit the believable testimony and demeanor of the agents to find that Alexander was properly advised of his <u>Miranda</u> rights.

26

**B.     Alexander Waived Both His Fifth
         And His Sixth Amendment Rights**

Alexander devotes nearly half of his brief to the argument
that his post-arrest statements should be suppressed pursuant to
the Sixth Amendment because "the government deliberately elicited
incriminating statements from the defendant after a criminal
proceeding had been initiated by indictment, and in [sic] absence
of the defendant's attorney."  (Br. 4).  This claim apparently is
grounded in the misapprehension that Sixth Amendment rights
automatically and irrevocably attach to every charged defendant
and cannot be waived.  The defendant is wrong.[9]

Contrary to the defendant's blinkered understanding of Sixth
Amendment jurisprudence, it is well-settled that a suspect's
waiver of his right to counsel after receiving <u>Miranda</u> warnings
suffices to establish a knowing and intelligent waiver of the
Sixth Amendment right to counsel for purposes of post-indictment
questioning.  <u>See</u> <u>Patterson</u> v. <u>Illinois</u>, 487 U.S. 285, 295-98

_____

[9]Although the defendant is wrong as a matter of law under
the <u>Patterson</u> line of cases, as set forth <u>infra</u>, and it is thus
irrelevant to the analysis, the Government nonetheless takes
issue as a factual matter with the defendant's assertion that
"the government deliberately elicited incriminating statements."
(Br. 4).  As set forth <u>supra</u>, the defendant affirmatively wished
to speak with the agents from the moment of their arrival and did
his best to be cooperative from the very beginning.  (<u>E.g.</u>, Tr.
PJ 130).  Further, while Special Agent Correa "wasn't
discouraged" from taking a statement, "if [Alexander] wanted to
give one," it is clear that the agent went down for the single
purpose of effecting the arrest, without any detailed
understanding of the specifics of the case or the charges.  (Tr.
RC 42, 52).

(1988) (rejecting notion that Sixth Amendment right to counsel is "superior" to or "more difficult" to waive than its Fifth Amendment counterpart and holding that "it is our view that whatever warnings suffice for <u>Miranda</u>'s purposes will also be sufficient in the context of postindictment questioning"); <u>Michigan</u> v. <u>Harvey</u>, 494 U.S. 344, 352 (1990) (citing <u>Patterson</u>'s holding that "a defendant whose Sixth Amendment right to counsel has attached by virtue of an indictment may execute a knowing and intelligent waiver of that right in the course of a police-initiated interrogation"); <u>United States</u> v. <u>Scarpa</u>, 897 F.2d 63, 68 (2d Cir. 1990) (both Fifth and Sixth Amendment "rights can be waived. . . This standard for finding a waiver is the same under the fifth and sixth amendments.") (citations omitted).

In this case, as set forth above, the defendant was repeatedly advised of each of his <u>Miranda</u> rights – including that he had "the right to remain silent;" that any statements he made "can and will be used against [him] in a court of law or other proceeding; that he had "the right to an attorney and to have that attorney present before or during any questioning;" that if he could not "afford an attorney, one will be appointed [for him] at no cost;" and that "if [he did] decide to speak to [the agents] now, [he could] at any time choose to exercise any of the [above] rights" (Tr. RC 33) – and he waived those rights.  Those

warnings are sufficient as a matter of law for the purposes of a
Sixth Amendment waiver.  Patterson, 487 U.S. at 293 ("By telling
petitioner that he had a right to consult with an attorney, to
have one present while he was questioned, and even to have a
lawyer appointed for him if he could not afford to retain one on
his own," petitioner was informed of "the sum and substance of
the rights that the Sixth Amendment provided him"); United States
v. Charria, 919 F.2d 842, 848 (2d Cir. 1990) (even where a
defendant has not been informed that he has been charged, "[o]nce
an accused understands that he is under arrest and, after
receiving the Miranda warnings, understands his right to remain
silent, the potential consequences of speaking, and his right to
counsel, including during interrogation, he is fully apprised of
the information needed to make a knowing waiver of the sixth
amendment right.").  Under Alexander's interpretation of the
Sixth Amendment, a charged but unrepresented defendant could not
choose to relinquish his rights by responding to questions and
making a statement: yet, "[a]lthough a defendant may sometimes
later regret his decision to speak with police, the Sixth
Amendment does not disable a criminal defendant from exercising
his free will."  Michigan v. Harvey, 494 U.S. at 352.
Accordingly, Alexander waived his rights under the Sixth

Amendment just as surely as he waived his rights under the Fifth Amendment.[10]

## C.  Alexander's Repeated Waivers Were Voluntary

Alexander argues that "[s]hould this Honorable Court choose to credit Agent Correa's asserions [sic] that he advised the defendant of his Miranda Rights orally, the question then becomes, was the waiver was [sic] made voluntarily?" (Br. 7). The Government submits that this question should be resoundingly answered in the affirmative.

---

[10]Alexander's relies upon <u>Maine</u> v. <u>Moulton</u>, 474 U.S. 159 (1985) and <u>United States</u> v. <u>Rosa</u>, 11 F.3d 315 (2d Cir. 1993) to argue that the Government is under "an **affirmative obligation** not to solicit incriminating statements from the defendant in the absence of his counsel." (Br. 1-2) (emphasis in Br.).  Those cases have no application to this one: in those cases, the defendant had not only been charged, but was *represented* by counsel – which profoundly alters the analysis, <u>see, e.g.</u>, <u>Harvey</u>, 494 U.S. at 352 ("once a defendant obtains or even requests counsel . . . analysis of the waiver issue changes"): the Supreme Court has held that, after a defendant receives or requests the assistance of counsel, any waiver of Sixth Amendment rights given in a police-initiated discussion is presumed invalid, and evidence obtained pursuant to such a waiver is inadmissible in the prosecution's case in chief.  See <u>Michigan</u> v. <u>Jackson</u>, 475 U.S. 625, 636 (1986); <u>see also</u> <u>Patterson</u> 487 U.S. at 290 n.3 ("We note as a matter of some significance that petitioner had not retained, or accepted by appointment, a lawyer to represent him at the time he was questioned by authorities. Once an accused has a lawyer, a distinct set of constitutional safeguards aimed at preserving the sanctity of the attorney-client relationship takes effect.") (citing <u>Moulton</u>, 474 U.S. at 176).  Of course, in this case, the defendant was not represented by counsel at the time he waived his <u>Miranda</u> rights, and therefore the cases cited by the defendant (and the lengthy, factually incorrect and completely irrelevant side note about alleged Fourth Amendment violations, <u>see</u> Br. 2-3) do not apply.

### 1.    Applicable Law

A confession is "involuntary" if it is obtained through "'techniques and methods offensive to due process' or under circumstances in which the suspect lacked an opportunity to exercise 'a free and unconstrained will.'"  Oregon v. Elstad, 470 U.S. 298, 304 (1985) (quoting Haynes v. Washington, 373 U.S. 503, 515 (1963)).  In determining whether a confession is the product of coercion, courts must consider "the totality of all the surrounding circumstances, including the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials."  United States v. Anderson, 929 F.2d 96, 99 (2d Cir. 1991); see also United States v. Bye, 919 F.2d 6, 8-9 (2d Cir. 1990).

The Supreme Court has held that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'" within the meaning of the Due Process Clause. Colorado v. Connelly, 479 U.S. at 167 (confession motivated by defendant's psychosis admissible where not causally related to police coercion).  Because "[t]he purpose of excluding evidence seized in violation of the Constitution is to substantially deter future violations of the Constitution," Connelly, 479 U.S. at 166, suppression is improper where law enforcement did not use coercive tactics.  Id. at 168.  See also United States v. Cristobal, 293 F.3d 134, 141 (4th Cir. 2002) (coercive police

activity is a necessary predicate to a finding that either a confession was not voluntary or a waiver of <u>Miranda</u> rights was not voluntary); <u>United States</u> v. <u>Genao</u>, 281 F.3d 305, 310 (1st Cir. 2002) ("police overreaching" required for a holding of coercion; only confessions procured by coercive official tactics are excluded as involuntary); <u>United States</u> v. <u>Lawal</u>, 231 F.3d 1045, 1048-49 (7th Cir. 2000) ("Lawal fails to allege any misconduct, abuse, or physical or mental coercion by the police who questioned him; instead Lawal builds his entire argument on his unique personal characteristics.  Without showing some official coercion, Lawal's argument fails."); <u>United States</u> v. <u>Rohrbach</u>, 813 F.2d 142, 144 (8th Cir. 1987) (incriminating statement cannot be found "'involuntary' in the constitutional sense unless it is established that the police extorted it from the accused by means of coercive activity.").

### 2.  Discussion

The circumstances surrounding Alexander's arrest were nothing short of routine and were nothing remotely close to coercive.  What is most notable about the defendant's claim is that he makes no allegation that the agents used any of the host of potentially "coercive" tactics often raised in similar motions, nor that any such tactics resulted in his providing a statement.  For example, Alexander does not allege any misconduct on the part of the agents such as physical force or injury,

32

psychological duress, threats of harm, deception, or even promises of leniency.  The defendant claims nothing about his physical safety (e.g., the brandishing of weapons) or his physical comfort (e.g., the deprivation of food, water, sleep, or restroom facilities, or an unattended injury).  Nor does he make any claim that the agents were in any way hostile or abusive.  Finally, Alexander – a successful, English-speaking businessman – makes no claims that he was unable to understand the Miranda warnings.  As noted, it is well established that a statement (or a waiver of Miranda rights) is not involuntary unless it is the product of official coercion.  Connelly, 479 U.S. at 164, 167.  Far from the presence of the "crucial element of police overreaching," id. at 163, in this case – very much to the contrary – the agents went out of their way to make the defendant feel "comfortable" and to treat him and his family with "respect."  (Tr. PJ 128, 148; see also Tr. RC 59).

At no time in Alexander's presence did the agents unholster their guns.  (Tr. RC 31, PJ 127).  During the interview at his home, Alexander was fully clothed (Tr. RC 32, PJ 128), and, if he was handcuffed at all for most of that time (Tr. PJ 128; but see Tr. PJ 132), he certainly "wasn't cuffed behind his back."  (Tr. RC 37).  Nor was he confronted by a battery of agents: while there were other agents in the vicinity, the only other agent at the dining room table with Alexander was Special Agent Correa.

33

(Tr. RC 34, PJ 129-30).  Alexander, who was "very cooperative,"
"wanted to tell his side" of the story relating to the charges
(Tr. RC 35), and "wouldn't stop talking from the time [the
agents] walked in the door to the time [they] took him to the
marshals" (PJ 130), certainly did not have to be coerced in any
way to speak.

     Likewise, Alexander was under no coercion at the RAC office.
While there, the agents specifically tried to make him
comfortable.  (Tr. PJ 135).  He was not handcuffed.  (Tr. PJ 134,
137; see also RC 45).  He was offered a beverage.  (Tr. PJ 135).
Again, he was sitting primarily with Special Agent Correa alone,
rather than up against a panel of agents.  (Tr. RC 41, PJ 133).
As he had been at his residence, Alexander was "very
cooperative," "wanted to continue talking about the case," and
"wanted to explain that this was a misunderstanding and wanted to
explain the story of the checks." (Tr. RC 41, 44, 45, 118; see
also PJ 128, 130 (Alexander generally very cooperative)).  And as
he had been at his residence, Alexander was "[v]ery"
"comfortable" during the time that he was making statements at
the RAC office (Tr. RC 40; see also PJ 135 ("Mr. Alexander
appeared to be comfortable with us from really the time we were
at his house until the time we took him to the marshals").  He
was "even joking with [the agents] toward the end."  (Tr. PJ
135).  In short, the evidence makes clear that Alexander was

treated with dignity and "respect," and that his statements were
the product of an affirmative desire to tell a story, rather than
a by-product of any coercive conduct.

In spite of what the evidence actually establishes,
Alexander, however, lists twelve factors that he claims supports
a finding "that the waiver was involuntary." (Br. 8). He grasps
at straws, by once again mis-stating the facts and making simple
declarations without attaching any legal significance to them.
Alexander first simply lists several practices that are necessary
and routine parts of making an arrest, based in sound policy,
practicality, and safety. That the agents "came to the
defendant's home at 6:00 AM, while he was dress [sic] in sleeping
attire" (Point 1) is a mere recitation of fact; this is simply
what agents do as a matter of course, in order to maximize the
likelihood that the defendant will be home; there is not even the
most remote suggestion of what could conceivably be unusual or
coercive about this practice. Similarly, the security sweep
conducted by the agents (Point 2) is absolutely routine and is
necessitated by the unfortunate fact that, as Special Agent
Joseph put it, "[i]n our line of work, you know, bad things can
happen in those circumstances." (Tr. PJ 148). It was dark, the
agents had announced their presence, and the agents had no idea
in the world who or what might be lurking inside the home (see,
e.g., id.); again, there is no articulable reason in the world

35

why this practice can be deemed coercive.  There is also nothing coercive or unusual in the fact that the "defendant was segregated from his family" (Point 3): as Special Agent Joseph testified, "[t]ypically when we speak to a suspect they are isolated" (Tr. PJ 153).  Clearly, there are sound reasons why a suspect may speak more freely when outside the presence of others, such as loved ones (in whose presence he may feel too ashamed to speak honestly) or co-conspirators (in whose presence he may be too frightened to speak honestly).  Further, not only was there no testimony (see Tr. RC 68, PJ 152) that Alexander's family "was not permitted to move about their own home during the entire encounter" (Point 3), but there is also nothing about that fact, even if true, that would tend to establish any coercive conduct with regard to Alexander.

Alexander also asserts that the "agents stayed at the defendant's residence for a period of 30 minutes to one hour without being able to articulate any exigency."  (Point 4). Whatever the duration of time spent at the residence (see Tr. RC 90 (providing a "rough estimate" that the agents were in Alexander's home for a total of only "20, 30 minutes")), it is clear that the reason the agents remained there for some period after they conducted the security sweep and allowed Alexander to dress was due solely to the fact that Alexander consented to a search and affirmatively wished to speak with the agents from the

moment they walked in.  (E.g., Tr. RC 36, PJ 130).  Alexander can
not use his own eagerness to speak as both a sword (to try to
convince the agents of his innocence) and a shield (to claim
coercion now that he has been unable to do so).  Further, as set
forth above, the totality of circumstances makes clear that there
was nothing coercive about this.

Alexander also argues that the agents conducted a
"meaningless search" of his residence, even though "they did not
know what they were looking for."  (Point 5).  Contrary to
Alexander's allegation, Special Agent Correa did indeed have a
good idea of what he was looking for (Tr. RC 75-76), and the
agents indeed specifically asked Alexander to narrow the location
of where they might find it.  (Tr. RC 36, PJ 131).

Alexander can point to no authority for the bizarre
proposition that agents are required to present a defendant with
a written waiver of rights form at any time, and that the failure
to do so tends to establish coercion.  (Point 6).  Alexander's
claim that "[t]here were at least five agents and uniformed
police officers walking back and forth throughout the defendant's
residence" (Point 7), not only is unsupported by the evidence,
but it does not establish coercion.  As noted, Special Agent
Correa was the only agent involved in taking Alexander's
statement at that time.  To the extent any agents were "walking
around," it was in order to conduct a necessary security sweep

37

for officer safety and then to retrieve a briefcase from the
location where Alexander had informed them it would be.

That Alexander may have appeared "anxious" when the
discussion with Special Agent Correa began (Point 8) is
meaningless; nor, as usual, does Alexander cite any law to attach
meaning to that fact.  To begin, it would be the rare defendant
who was not "anxious" when first arrested and confronted with the
charges against him; that alone does not rise to the level of
establishing involuntariness.  See, e.g., United States v. Ford,
No. 96 Cr. 672 (LBS), 1997 WL 538813, at *10 (S.D.N.Y. Aug. 29,
1997) (that defendants "may have been nervous and frightened,"
totality of circumstances did not establish coercion or
involuntariness).  As noted, the agents repeatedly testified that
Alexander was comfortable and affirmatively wished to speak to
the agents in an attempt to convince them of his story.  In any
event, given that there is simply no evidence of any coercive
techniques on the part of the agents, Alexander's subjective
state of mind alone is irrelevant.  Connelly, 479 U.S. at 165,
167 ("mere examination of the confessant's state of mind can
never conclude the due process inquiry . . . coercive police
activity is a necessary predicate to the finding that a
confession is not 'voluntary'"); see also United States v.
Salameh, 152 F.3d 88, 117 (2d Cir. 1998) ("one's mental state
does not become part of the calculus for the suppression of

38

evidence unless there is an allegation that agents of the United States engaged in some type of coercion").

Alexander's argument that there was "no attenuation of the coercive conduct" (Point 9) is meaningless in light of the fact that he has pointed to no coercive conduct in the first instance.

Alexander once again mis-states the record in claiming that he "was *required* to help the agents track down his co-defendant" (Point 10) and "[t]his conduct all occurred after the case agent had *directed* Agent Correa to get a statement from the defendant" (Point 11) (emphasis added). Instead, like most agents, Special Agent Correa "wasn't discouraged" from taking a statement, "if [Alexander] wanted to give one." (Tr. RC 52). Further, Alexander was not "required" to do anything; en route to the RAC office, Special Agent Correa "turned to Mr. Alexander and told him about the other arrest for Steve Riddick and *asked* him if he knew where Steve was"; Alexander readily agreed to assist. (Tr. RC 39). Indeed, Alexander informed Special Agent Correa that he had contact numbers for Riddick stored in his cell phone (id.), and he in fact telephoned his wife to ask her to provide the cell phone to the agents. (Tr. PJ 133). It is difficult to conceive of how Special Agent Correa could have possibly strong-armed Alexander into volunteering where the contact information was and providing it to the agents via his wife.

Finally, Alexander did not stop cooperating "[o]nly after the execution of the written Miranda Waiver" (Point 12); rather, he asked to speak with an attorney only after being asked to sign a written statement, approximately one half hour after signing the written waiver form.

In short, Alexander's argument that "[e]verything the government did on the morning of the arrest can be construed as coercive conduct" (Br. 9) is somewhat weakened in light of the fact that he can point to *nothing* that was in fact coercive in any way, either as a matter of fact or as a matter of law.[11] From the moment of his arrest, Alexander was affirmatively cooperative (<u>e.g.</u>, Tr. PJ 130, 135) and, although none was promised to him (<u>e.g.</u>, Tr. RC 89), clearly saw some benefit in speaking to the agents and trying "to explain that this was a misunderstanding and . . . to explain the story of the checks." (Tr. RC 44). Alexander waived his <u>Miranda</u> rights knowingly,

---

[11]The only case which the defendant cites in support of his argument is <u>United States</u> v. <u>Isiofia</u>, 370 F.3d 226 (2d Cir. 2004). To read that case is to distinguish it: in addition to the fact that the context of that Fourth Amendment case is completely different, in <u>Isiofia</u>, the district judge found that the defendant – who had very limited command of English – had consented to a search only after being handcuffed to a table for over thirty minutes in the presence of eight agents, who extracted information from him, demanded that he consent upon pain of never seeing his family again, threatened him with deportation, yelled at him and used abusive language, and neglected to inform the defendant of the nature of the charges or that he had the right to refuse consent. <u>See</u> <u>Isiofia</u>, 370 F.3d at 232-33. As set forth above, none of those factors are present in this case.

intelligently, and voluntarily, and his argument to the contrary
should be rejected.

*          *          *

In its post-hearing briefing, the defense has renewed its
motion for "suppression of all statements . . . as a result of
grave prosecutorial conduct."  (Br. 1).  This is so despite
Fineman's utter inability to articulate even the slightest
suggestion of misconduct.  (See, e.g., Tr. 3-26).  It should by
now be abundantly clear even to Fineman that – at an absolute
minimum – the Government relied in good faith on the agents'
representations that Alexander had been thrice Mirandized prior
to making statements.  Yet before barreling forward with such
serious accusations, Fineman never hesitated for one moment to
consider the possibility of the agents' innocent mistake on the
waiver form or the Government's good faith in relying upon those
agents.

As the Court has remarked, Fineman's motion is nothing short
of extraordinary.  Fineman is hardly the first attorney to have
filed a motion to suppress post-arrest statements based upon an
allegation that the arresting agents failed to properly Mirandize
the defendant – even in the face of a written Miranda waiver
form.  But he is surely unique in hatching such a far-fetched
theory to explain away his client's waivers; presuming to himself

41

decide the very matter <u>sub judice</u>; and precipitously referring the matter to the disciplinary committees.

Unconstrained by any concern with legal authority or factual reality, Fineman has felt himself free to casually toss about accusations and allegations with impunity and with apparent amusement.[12]  The Government respectfully submits that Fineman's grievous accusations should not be without consequence, and urges the Court to fashion any appropriate remedy that it deems fit.

---

[12]It should be noted that Fineman's accusations of misconduct have been calculated for maximal sensational value.  In addition to his public filings about my deceitful, perjurious, obstructive, and otherwise criminal conduct, Fineman has specifically proclaimed to the media that this prosecution is a "malicious" one.  <u>See</u> <u>Virginian Pilot</u>, "Former track Olympians accused in counterfeit-check scheme," June 26, 2006.  He also attached to his motion papers – with no legitimate reason supplied or apparent – a copy of a check given by Alexander to uncharged party Marion Jones, a five-time Olympic gold medalist. <u>See</u> Exh. B, attached to Fineman's Reply Affirmation.  Somehow alerted to this, the mainstream press picked up the story, and I have had to suffer the humiliation of having to field numerous inquiries from the media, adversaries, colleagues, and supervisors about the misconduct motion.

## <u>CONCLUSION</u>

For the foregoing reasons, the Government respectfully submits that defendant Nathaniel Alexander's motions should be denied in their entirety.

Dated:     New York, New York
           August 7, 2006

                        Respectfully submitted,

                        MICHAEL J. GARCIA
                        United States Attorney
                        Southern District of New York


           By: _____
                        E. DANYA PERRY
                        Assistant United States Attorneys
                        (212) 637-2434

43

<u>CERTIFICATE OF SERVICE</u>

I, E. Danya Perry, affirm under penalty of perjury as follows:

1.   I am an Assistant United States Attorney in the Southern District of New York.

2.   On August 7, 2006, I caused a copy of the foregoing Government's Post-Hearing Memorandum Of Law In Further Opposition To Defendant Nathaniel Alexander's Motion To Suppress, to be served via Clerk's Notice of Electronic Filing upon the following attorney, who is a filing user in this case:

>       Michael Fineman, Esq.
>       305 Broadway, 7th Floor
>       New York, NY 10007
>       (212) 897-5823

3.   I expect to send a courtesy hard copy to Mr. Fineman via Federal Express on August 8, 2006.

I declare under penalty of perjury that the foregoing is true and correct.  28 U.S.C. § 1746.

_____
E. Danya Perry
Assistant United States Attorney
Telephone:  (212) 637-2434

44