United State District Court
Southern District of New York
------------------------------------------------------------------------ x
United States of America,

               -against-

Douglas Shyne,
Natasha Singh,                                     S4 05 Cr. 1067 (KMK)
      AKA Beatris Rodrigues,
Christine Richardson,
      AKA Deokali C. Richardson,
Nathaniel Shyne,
Toybe Bennett,
      AKA Dmitriy Makarevich,
      AKA Dmitriy Makervich,
      AKA Eduardo Rodrigues,
      AKA Cecilio Pena,
Roberto Montgomery,
Ephraim Richardson,
Naresh Pitambar,
Jason Watler,
Steven Riddick,
Nathaniel Alexander, and
Timothy Montgomery,

      Defendants.


------------------------------------------------------------------------ x


<u>MEMORANDUM OF LAW IN FURTHER SUPPORT DEFENDANT'S MOTION FOR
SUPPRESSION OF POST ARREST STATEMENTS AND IN REPLY TO THE
GOVERNMENT'S OPPOSITION</u>


The Law Office of Michael Fineman, Esq.
*Attorney for the Defendant*,
Nathaniel Alexander,
305 Broadway, 7th Floor
New York, New York 10007
(212) 897-5823

## PRELIMINARY STATEMENT

This memorandum of law is in further support of the defendant's motion for suppression of the post arrest statements procured by Agent Correa, and in reply to the government's opposition papers.

## STATEMENT OF FACTS

The government alleges that the defendant was advised of his Miranda rights on three separate occasions, and that he voluntarily made statements after knowingly and voluntarily waiving those fundamental rights. The defendant contests this allegation, and submits that the testimony of the government's own witnesses disproves this assertion in addition to the defendant's sworn statement provided to the Court in the defendant's initial motion papers.

Firstly, the government claims that the defense has made "many mis-statements, mis-representations, and mis-citations in its submissions."[1] The defense submits that the Court is in possession of the entire record of the suppression hearing, and will determine if this is the case. Conversely, the defendant will not argue that the government is not within its right to make its arguments based on the testimony. Instead, the defendant submits that the government's interpretation of the testimony is simply wrong, with some exceptions, where the government has affirmatively mis-quoted the witnessed testimony.

The evidence shows that Agent Correa was selected to go to Virginia from New York to arrest the defendant. On direct examination, the witness was asked this question and gave this answer:

> Question: What was the context of first learning of Mr. Alexander's existence?

> Answer: It was in the preoperational briefing. We are required to have briefings where we are going to do things like search warrants. That is where you learn of your role and what you are going to do.[2]

Agent Correa was informed some of the factual allegations involved in this case with respect to the defendant, and was instructed to take a statement from the defendant. On cross examination, Agent Correa was asked these questions and gave these answers:

> Question: Do you know who the lead agent on this case is?

> Answer: Yes.

> Question: Who is that?

> Answer: Special Agent Eric Rosenblatt.

---

[1] See opposition papers page 22, footnote 6.
[2] Transcript page 29.

Question: Prior to going to Virginia to make this arrest, did you have a conversation with Mr. Rosenblatt?

Answer: Yes.

Question: Did you discuss this case at all?

Answer: Yes.

Question: Did he tell you the circumstances of the case, the allegations?

Answer: Yes.

Question: Did he tell you what the allegations were with respect to Mr. Alexander?

Answer: You mean besides bank fraud?

Question: No. Did he tell you what the allegations were in the indictment as against Mr. Alexander?

Answer: Not a lot of detail, but that they had to do with --

Question: You can just answer yes or no.

Answer: Yes.[3]

Then Agent Correa was asked these questions and gave these answers:

Question: Were you instructed to do anything besides arrest the defendant when you went to Virginia?

Answer: No, other than take a statement if he wanted to give one.

Question: So you were instructed to take a statement?

Answer: I wasn't discouraged from it.

Question: But you had discussed taking a statement?

Answer: Yes.[4]

Then Agent Correa was asked this question and gave this answer:

Question: Who asked you to take a statement from the defendant?

---

[3] Transcript page 51-52.
[4] Transcript page 52.

Ms. Perry: Objection.

The Court: Overruled.

Answer: That would be Eric Rosenblatt.[5]

The government claims that, "Alexander is forced to distort and indeed to wholly misrepresent the record. With respect to Special Agent Correa, Alexander first claims an alleged internal contradiction within his testimony. He argues that Special Agent Correa 'implied that he had no intention of interrogating the defendant' (Br. 4), but then testified on cross that 'he was instructed by the case agent, Agent Rosenblatt, to get a statement.' (Id.). That was not Special Agent Correa's testimony, either on direct or on cross."[6] I am not sure how the defense has misrepresented the record with respect to this issue. Agent Correa testified that Agent Rosenblatt asked him to get a statement from the defendant, and that he was supplied with the allegations in order to assist him in this task. The record is clear that before Agent Correa went to Virginia to make the arrest in this case, he was instructed to get a statement.

In fact, it is Agent Correa's untruthful, and inconsistent statement that he "wasn't discouraged" from taking a statement that the government has latched on to in order to disprove this fact. Firstly, the question, "Were you instructed to do anything besides arrest the defendant when you went to Virginia?" was an open ended question, not a leading question. Agent Correa could have said anything, but he said, "No, other than take a statement if he wanted to give one." Agent Correa, who has been a member of law enforcement for almost two decades, realized that the answer hurt the government's position, and he tried to take it back by saying that he "wasn't discouraged." However, he contradicted himself just a few questions later when he admitted that Agent Rosenblatt asked him to take a statement from the defendant. There is a difference between being affirmatively asked to do something rather than merely not being discouraged from doing it.

The government takes this series of questions and answers and says, "indeed, Special Agent Correa rejected counsel's use of the word "instructed", testifying instead that he 'wasn't discouraged' from taking a statement, 'if [Alexander] wanted to give one' (Tr. RC 52). To be sure, it is hard to imagine the arresting agent who would be 'discouraged' from taking the statement of a defendant who wishes to make one."[7] The defendant is not asking the Court to "imagine" anything. Agent Correa admits that he was asked to procure a statement from the defendant, and he contradicts himself within this line of questions. The government takes issue with the defendant's choice of words. The defense argued that Correa was instructed to take a statement, Agent Correa admitted that Agent Rosenblatt asked him to just that. The word "instruct" is defined: "to give orders to; direct," and one of the definitions of the word "ask" is: "to expect or demand."[8] Rather that addressing the actual issues presented, the government chooses to attack the defendant's choice of words. This speaks volumes as to the strength and

---

[5] Transcript page 54.
[6] Opposition page 17.
[7] Opposition page 18.
[8] The American Heritage Dictionary of the English Language, Fourth Edition Copyright © 2000 by Houghton Mifflin Company.

weaknesses of the government's position. Thus, it is clear that the government "deliberately elicited" statements from the defendant when they arrived at his home to take him into custody (see **Point I**).

Additionally, even if Agent Correa had not admitted that he was instructed or asked by agent Rosenblatt to take a statement from the defendant, the surrounding circumstances of the arrest make this contention clear.

The government argues that the agents who arrested the defendant were in his home for a period of 20 to 30 minutes; however, to do so, the government is forced to latch on to more inconsistent testimony. On direct examination, Agent Correa was asked these questions and gave these answers:

> Question: If you could estimate, how soon after you entered Mr. Alexander's house did you Mirandize him?

> Answer: I would say no more than ten minutes.

> Question: Did he make any substantive statements to you prior to being Mirandized?

> Answer: No. He just wanted to know what was going on.[9]

Then Agent Correa was asked the following questions on direct examination and gave the following answers:

> Question: Let me back up for a moment. Were you there for some period of time while he was talking to you?

> Answer: Yes.

> Question: Could you give a rough estimate, if possible?

> Answer: 20, it couldn't have been more than 30 minutes.

> Question: Was he making statements to you during this entire time?

> Answer: Yes.[10]

Based on these questions and answers, the agents were in the defendant's home for a period of no less than 30 minutes (ten minutes prior to taking statements, 20 minutes while taking statements), and as long a 40 minutes (ten minutes prior to taking statements, 30 minutes while taking statements). Additionally, on cross examination, Agent Joseph was asked these questions and gave these answers:

---

[9] Transcript page 35.
[10] Transcript page 37.

Question: How long were you in the home?

Answer: I can't really remember. Probably somewhere between a half hour to an hour, 45 minutes.

Question: Half hour to an hour?

Answer: Yes, sir.[11]

However, on cross examination, Agent Correa was asked this question and gave this answer:

Question: How long were you in my client's home?

Answer: I would give a rough estimate of 20, 30 minutes.[12]

This last estimate of time is the time frame that the government is willing to admit that the agents were in the defendant's home. Based on Agent Correa's testimony on direct examination, the minimum period of time that the agents could have been in the defendant's home is 30 minutes, and based on Agent Joseph's testimony, the agents were in the defendant's home for long as an hour. However, on cross examination, after numerous questions about the propriety of the government's conduct with respect to the unnecessary and unconstitutional security sweep (see **Point II**), Agent Correa contradicts himself, and is contradicted by the government's only other witness, by claiming that the total time that period that they were in the defendant's home was as little as 20 minutes.

Agent Joseph's testimony also provides ample information regarding the agents' intentions to interrogate the defendant in his home. On direct examination, Agent Joseph was asked these questions and gave these answers:

Question: Was he [Mr. Alexander] allowed to dress?

Answer: Yes, Agent Royster and I took him back to the bedroom. At that time the questions we asked is where are your socks and he indicated the drawers, and we asked if there were any weapons in those draws and he said no and we found no weapons. We also took his cuffs off so he could put on his shirt.

Question: So he was cuffed upon arrest?

Answer: He was.

Question: Did he speak to you while you were with him in the room?

---

[11] Transcript page 151.
[12] Transcript page 90.

Answer: He did. He kept asking -- and he was very surprised -- what the arrest was about and kept asking me to pretty much justify or inform him what was going on.

Question: What did you say to him?

Answer: I told him that another agent would sit him down shortly and discuss that with him.

Question: You stated that there was a security sweep?

Answer: There was.

Question: After the security sweep and after Mr. Alexander was dressed, what did you do next?

Answer: After he was dressed we went out to a dining room area of the house where Agent Rubin [Correa] was and there was a uniformed officer in the foyer. We placed Mr. Alexander down and I walked over to the family room to see if everything was okay with the wife and son. Again, my responsibility was the arrest.[13]

On cross examination, Agent Joseph was asked these questions and gave these answers:

Question: Is there a reason why they were separated from Mr. Alexander?

Answer: There was a reason they were sat down and congregated in one room.

Question: What was that reason?

Answer: It was their home. If there were any weapons or anything as far as that in the house they would know where they were.

Question: So, in other words, you wouldn't have let them walk around unattended?

Answer: Personally, no, sir.

Question: Is there a reason why they were being held in a different room from Mr. Alexander?

Answer: Typically when we speak to a suspect they are isolated.[14]

---

[13] Transcript page 128-9.
[14] Transcript page 153.

Clearly, from Agent Joseph's own words, it is easy to see that the agents intended to speak with the defendant in his home that morning. When the defendant wanted to know why the government was intruding in his home that morning and taking him into custody, certainly not an unusual request under the circumstances, Agent Joseph informed him that another agent would "sit him down shortly and discuss that with him." Then Agent Joseph took him into the dining room where Agent Correa was already waiting for him. Agent Joseph understood that the defendant was being isolated in order to take a statement from him.

What else could have been the government's plan that morning? Agent Joseph knew at the time that he claims he was dressing the defendant that another agent [Correa], was waiting to speak with the defendant. Agent Joseph then led the defendant directly to Agent Correa for that very purpose. The government claims that at this time, the defendant was Mirandized; however, the government did not ask Agent Joseph a single question about this first set of Miranda warnings. Agent Joseph was in the home when this was alleged to happen; however, he offers no testimony about the issue of whether or not the defendant was advised of his rights and if he knowingly and voluntarily waived those rights.

Additionally, Agent Joseph testified that it is the practice in his office to have a defendant sign a written Miranda waiver when they intend to speak with an accused, and that the waiver forms were present and available at the defendant's home. On cross examination Agent Joseph was asked these questions and gave these answers:

> Question: Do you ever interview people away from your office?
>
> Answer: Yes, sir.
>
> Question: That is why you keep the Miranda document in your car?
>
> Answer: Yes, sir.
>
> Question: Did you drive your car to the time of arrest?
>
> Answer: I did.
>
> Question: So the Miranda waiver document was available at his home if you just went to the car, is that true?
>
> Answer: Yes, sir.
>
> Question: Did Agent Rubin [Correa] ever ask you to get a Miranda warning document?
>
> Answer: No, sir.
>
> Question: At the point in time in which you were at the ICE headquarters or facility for lack of a better word, did there come a time there that Agent Rubin [Correa] asked you specifically for a Miranda waiver card?

Answer: No, sir.

Question: No?

Answer: No.

Question: So why did you give it to him?

Answer: I asked Mr. Rubin [Correa] what time Mr. Alexander signed the waiver-of-rights form.

Question: What did he say?

Answer: He said Mr. Alexander did not sign a change waiver-of-rights form.

Question: What did you say?

Answer: Have him sign one.

Question: Was it your idea to have Mr. Alexander sign the waiver form?

Answer: In my our office -- different jurisdictions are different. As far as our practice, in our office our AUSAs typically like us to have these filled out if we are going to speak as a good practice. That is what I was used to and that is what I am used to doing over the last couple of years so I suggested it.

Question: What time did you suggest that?

Answer: I can't remember. Shortly after I got back to the office.[15]

Thus, even though it is clear that the agents intended to speak with the defendant at his home, and did in fact do so, the defendant was not provided with a waiver-of-rights form when the questioning began, which is a breach of Agent Joseph's internal office procedure. Perhaps the U.S. Attorney's Office in the Southern District of New York is more lax with respect to the documentation of waivers of fundamental rights; however, the procedure in the jurisdiction of arrest is the have written waivers executed, and here no waiver was executed until at least two and a half hours after arrest even though both agents testified that the defendant was "making statements" almost immediately after arrest.

The government contends that Agent Correa then advised the defendant once again of his Miranda rights at the RAC office in Virginia, orally. Based on the testimony of Agent Correa, this must have occurred after 8:07 AM. According to Agent Correa, he felt it was necessary to advise the defendant of his Miranda rights a second time because a considerable period of time

---

[15] Transcript page 161-2.

had passed since he spoke about the case with the defendant. On direct examination, Agent Correa was asked these questions and gave these answers:

Question: What was the first thing that happened after he was processed?

Answer: During the time we were processing him, we were still trying to find Steve Riddick. But after we stopped talking about that and he was processed, he wanted to continue talking about the case.

Question: What did you do?

Answer: I'm not the case agent. During the operational briefing and this whole arrest, I'm more concerned with the logistics of the arrest rather than the details of the charges. So I didn't know much about the case myself. So before I sat down to talk to him again, I asked one of the agents to get me a copy of the indictment.

Question: Did you in fact receive a copy of the indictment?

Answer: Yes.

Question: What did you do once you had the indictment in hand?

Answer: I sat down and I started reading, was going to read the indictment to Mr. Alexander.

Question: did you do anything prior to going through the indictment with him?

Answer: Yes.

Question: What was that?

Answer: I advised him of his rights again.

***

Question: During the time that you were in the processing room with Mr. Alexander and he was making statements, he was also continuing to place phone calls to attempt to find Mr. Riddick?

Answer: Most of the phone calls were placed before that. There may have been one or two after that.

Question: Was he using his own phone at this point?

Answer: I remember that he was, yes.[16]

According to Agent Correa, the defendant was processed after he started helping the government find Steve Riddick. Agent Correa stated, "During the time we were processing him, we were still trying to find Steve Riddick. **But after we stopped talking about that and he was processed**, he wanted to continue talking about the case (**emphasis added**)." Agent Correa testified that most of the phone calls were made before he was processed, and there "may have been one or two after that." According to the defendant's cellular telephone records (**Exhibit C**, annexed to defendant initial moving papers), the defendant made four outgoing calls from 8:05 AM until 8:07 AM. The defendant made one more outgoing telephone call after that at 8:32 AM to co-defendant Riddick.[17] Therefore, to credit Agent Correa's testimony would mean that from the time that he and the defendant arrived at the RAC office until 8:07 AM, they did not discuss the case, and that the defendant was held in the processing room, but not processed. Additionally, From 8:07 AM until 8:30 AM, the defendant was processed, Agent Correa was provided with the indictment, he advised the defendant of his Miranda rights, he moved the defendant to the conference room, and had the defendant execute the written waiver. This was all done in the span of 23 minutes. Interestingly enough, the last telephone call to Steve Riddick was made contemporaneously with the time that the government claims the defendant executed the written Miranda waiver.

Furthermore, contrary to the government's position, Agent Joseph was present at the RAC office at the time that Agent Correa claims that he orally advised the defendant of his Miranda rights for the second time. The government completely mis-represents Agent Joseph's testimony with respect to this point. The government argues, "clearly, it might have been helpful had Special Agent Joseph testified that he was present for the two verbal administrations of Alexander's Miranda warnings, **but he stated that he was not present because he was not**."[18] I have searched the record and have not found a single question posed to Agent Joseph regarding his presence or absence during the two alleged oral Miranda warnings. In fact, there are no questions at all posed to this witness about any oral Miranda warnings or waivers.

Additionally, Agent Joseph was certainly present in the "small" field office at the time that Agent Correa claims that he administered the second oral Miranda warning. Additionally, agent Joseph completely contradicts Agent Correa about the whether or not Agent Correa was taking statements from the defendant prior to the second alleged Miranda waiver. On direct examination Agent Joseph was asked these questions and gave these answers:

Question: What did you do with his [Mr. Alexander's] cell phone?

Answer: I took it back to the RAC office in Norfolk.

Question: Can you say approximately what time you arrived at the RAC office?

---

[16] Transcript page 41 – 43.
[17] See Exhibit A, annexed hereto, co-defendant Riddick's telephone numbers.
[18] Opposition page 25.

Answer: Say probably around 8, 8-ish, give or take.

Question: Give or take?

Answer: Yes, ma'am. It was rush hour traffic, tunnels, things like that. I was almost at the office before I had to return to get the phone.

Question: Would 8 o'clock be the latest it would have been if you can say?

Answer: It probably could have been a little past 8.

Question: But anywhere within a half an hour.

Answer: I would say 7:45 to 8 o'clock.

Question: Where was Mr. Alexander when you got to the RAC office?

Answer: I got to the office and Mr. Alexander was sitting in a processing room in a containment cell and Agent Rubin was speaking with him.[19]

Then Agent Joseph was asked these questions and gave these answers:

Question: When you arrived in the processing room was Mr. Alexander speaking with Rubin [Correa] at that time?

Answer: He was.

Question: Did he appear to be making statements?

Answer: Yes, ma'am.

Question: What did you do with the cell phone when you returned to RAC?

Answer: I gave it to Agent Rubin [Correa].

Question: And while he was placing calls, did he also continue to speak with Rubin [Correa]?

Answer: Yes, ma'am.[20]

Based on the preceding questions and answers, it is clear that Agent Correa and the defendant were speaking about the case when Agent Joseph arrived at the RAC office. As per his testimony, Agent Joseph arrived at the RAC office between 7:45 AM and 8:00 AM, and in any event, he could not have arrived after 8:05 AM because that is when the first phone call was

---

[19] Transcript page 133.
[20] Transcript page 135.

placed by Mr. Alexander.[21]  According to Agent Correa, he felt it was necessary to advise the defendant of his Miranda rights a second time orally because a period of time had past since they spoke about the case; however this is specifically refuted by Agent Joseph's testimony. As discussed above, Agent Correa's testimony was that he advised the defendant of his Miranda rights for the second time after the defendant made a number of telephone calls. The defendant's telephone records conclusively establish that this could not have been any earlier than 8:07 AM, and according to Agent Joseph's testimony on direct examination, as early as 7:45 to 8:00 am, the defendant was "making statements" to Agent Correa. Thus, Agent Correa's reason for re-Mirandizing no longer makes any sense.

Additionally, Agent Correa was with the defendant in the processing room for at least an hour before Agent Joseph arrived with the defendant's cellular telephone. According to Agent Joseph, it takes 15 minutes to half an hour to travel from the defendant's home to the RAC office in Virginia.[22] Therefore, if Agent Correa left the defendant's home no later than 6:30 AM as the government contends, then the latest they could have arrived at the RAC office is 7:00 AM. If the defendant had not received his cellular telephone until approximately 8:00 AM, how was he helping to locate Mr. Riddick for that period of time, and what were he and Agent Correa discussing for this period of time?

The government then proceeds to argue that the defendant was advised of his Miranda rights for a third time, this time in writing. They claim that this occurred at approximately 8:30 AM. Agent Correa testified that he had specifically asked an agent from the Virginia RAC office for Miranda waiver document, but was not provided with one. The government claims that "Alexander next seizes upon the fact that Special Agent Correa testified that he had asked for a waiver form but that Special Agent Joseph testified that Special Agent Correa had not asked him for one (Br. 5) – blithely ignoring the testimony that the agent from whom Special Agent Correa had requested the form was not Special Agent Joseph, but rather the agent who had driven him to the RAC office (an agent by the name of Royster)." This is the testimony which the government has latched on to:

> Question: Is it your testimony that when you were there with my client you were there with only one other person?

> Answer: In?

> Question: In the ICE office, the processing room.

> Answer: In the ICE office I remember only one other person, yes.

> Question: When you left my client's home and went back to the ICE office, did you drive him by yourself?

> Answer: No. I was in the backseat and there was an agent driving.

---

[21] See Exhibit C, annexed to the defendant initial moving papers.
[22] See transcript page 151, lines 5 – 9.

Question: That agent who drove you, that was the person who refused -- excuse me. Let me rephrase that. The agent who drove you back to the ICE headquarters, for lack of a better word, that was the agent running back and forth that couldn't assist you?

Answer: I believe it was the same, yes.[23]

The government uses these questions and answers to give them the support to claim that it was Agent Royster who refused to provide Correa with the Miranda waiver form; however, both Agent Correa's and Agent Joseph's testimony reveal that he was in fact talking about Agent Joseph. On direct examination, Agent Correa was asked this question and gave this answer:

Question: Were there other agents in the processing room with you and Mr. Alexander?

Answer: The other agent that I knew as Pete [Joseph] would walk in and out. It wasn't my office, so I didn't know where any of the paperwork was or how to find fingerprint cards and things like that.[24]

On cross examination, Agent Correa was asked these questions and gave these answers:

Question: They do have waivers in that building, don't they?

Answer: I couldn't get my hands on a written waiver at that time.

Question: Were you alone in the federal building?

Answer: No, sir.

Question: Were there other agents there?

Answer: There was one other agent there that I knew of.

Question: In the entire federal building?

Answer: In the RAC office. It is a suboffice.

Question: There was another person there in that office?

Answer: Yes.

Question: Is that person an agent who works in Virginia or someone from New York?

Answer: Virginia.

---

[23] Transcript page 82-3.
[24] Transcript page 41.

Question: But you didn't ask that person to get you a waiver?

Answer: I believe I did, yes.

Question: You did?

Answer: Yes.[25]

Agent Joseph testified that he was the agent that brought the defendant's cellular telephone to Agent Correa in the processing, that he went to get Agent Correa a cup of coffee, and that it was he who ultimately provided the written Miranda waiver. Taken together with Agent Correa's above-cited testimony, it was Agent Joseph who was going in and out of the processing room because he had a reason to do so. Agent Joseph was the lead agent with respect to the arrest, and it was his responsibility to assist Agent Correa, an agent from a SAC office. What reason would there be for Agent Royster to go in and out of a processing room while he was preparing for a controlled narcotics delivery? Agent Correa believed that it was Agent Joseph, and Agent Joseph said that he had gone in and out of the processing room. For the government to say that the defendant has ignored the testimony is completely disingenuous.

Furthermore, when viewed in light of the time line which is established by the government's witnesses, Agent Joseph was indeed present at the RAC office at the time Agent Correa claims that he was trying to get a hold of the Miranda waiver document, which occurs contemporaneously with the processing of the defendant.

Then, the government completely mis-characterizes Agent Joseph's testimony with respect to the manner in which the written Miranda waiver was explained to the defendant. The government argues, "Special Agent Joseph retrieved a waiver form from his car, and he and Special Agent Correa brought Alexander into a conference room that had become available. (Tr. RC 44-45, PJ 136-37). Special Agent Correa explained to Alexander that the form was a "formality" and something they had to "**go over again**" (Tr. PJ 137), and Alexander went through and read the form with Special Agent Correa. (Tr. RC 44-45)."[26] What the government attempts to do is simply to re-write the record in order to fit their position. The actual question and answer from Agent Joseph's direct examination is as follows:

Question: What was Mr. Alexander told when the form was presented to him?

Answer: Agent Rubin [Correa] showed him the form and said this is just some like formality type thing, something we have to go over. Again, just paper-wise, and they both -- I can't remember if Agent Rubin [Correa] read it but it was presented and looked over. Mr. Alexander signed it at which time I grabbed it, signed it, and filled in the information regarding the date and time.[27]

---

[25] Transcript page 78-9.
[26] Opposition Page 8 (**emphasis added**).
[27] Transcript page 137.

This is the answer the witness gave on direct examination. Just because the government does not like it, does not give them the authority to re-write the transcript. This is not the only time in the transcript that Agent Joseph started a sentence with the word "again."[28] What the government is attempting to do is corroborate Agent Correa's version of the events with Agent Joseph's testimony; however, there is no such corroboration. In fact, Agent Joseph's testimony belies the government's contention that Agent Correa was so thorough in his approach to advising the defendant of his Miranda rights. The government's blatant mis-representation of the witness' testimony further demonstrates how weak the government's position is. There would be no need to go to these lengths of intellectual dishonesty if the evidence presented at the hearing supported the government's position.

As for the government's explanation for the change of time on the Miranda document, not only does it make no sense, but it must be examined as tainted by the government's conduct at the hearing. It is established through the testimony of Agent Joseph, Agent Rosenblatt had a conversation with him over the lunch break, giving him a "hard time," saying that he was underestimating his role in the case at bar. On cross examination, Agent Joseph was asked these questions and gave these answers:

> Question: Just after the lunch break, isn't it a fact that you were having a conversation with agent Rosenblatt?

> Answer: Yes, sir.

> Question: What was the subject of that conversation?

> Answer: During lunch?

> Question: Yes.

> Answer: I had to cancel my flight to get home and I was claiming that I had a lot of work to do and he was giving me a hard time saying I was underestimating my role in the current case we are working.[29]

Firstly, the government mis-represents Agent Joseph's testimony by claiming, "Special Agent Joseph had a conversation with Special Agent Rosenblatt at the lunch recess, in which the two agents discussed the cancellation of Special Agent Joseph's flight back to Virginia and all of the work that Special Agent Joseph had to do on the 'current case' he was working there, about which Special Agent Rosenblatt was giving him a 'hard time.'"[30] Agent Joseph did not say that he needed to get back to Virginia because of a "current case" he was working on over there. He said he had a lot of work to do in Virginia. It is this case that he characterized as the current case

---

[28] Agent Joseph also testified that, "After he was dressed we went out to a dining room area of the house where Agent Rubin [Correa] was and there was a uniformed officer in the foyer. We placed Mr. Alexander down and I walked over to the family room to see if everything was okay with the wife and son. Again, my responsibility was the arrest." Transcript page 128-9.

[29] Transcript page 164.

[30] Opposition page 20-21.

they are "working." Perhaps it is telling that he would characterize his testimony at an evidentiary hearing as "working" a case.

Additionally, the reason Agent Rosenblatt was giving Agent Joseph a "hard time" is irrelevant. The fact that the case agent, a person who was present during Agent Correa's testimony, would give the government's only other witness a hard time about testifying at a hearing is telling in and of itself. Even if it was a completely innocent exchange of heated words, it certainly creates an appearance of impropriety. To avoid impropriety, all Agent Rosenblatt had to do was inform the U.S. Attorney that the witness was threatening to leave without testifying, and the U.S. Attorney could have simply asked the Court to order the witness stay, on the record in open Court. That is what I was trained to do as an Assistant District Attorney for Kings County, but perhaps I am holding the U.S. Attorney's office to a higher standard than necessary. Perhaps in the Kings County District Attorney's Office, we were trained to conduct ourselves above and beyond the minimum standards of prosecutorial integrity.

In any event, the explanation for the change of time is absurd. The fact is that Agent Joseph, a junior agent from a small satellite office in Virginia fell on the sword at the hearing at the behest of the government. Agent Joseph was asked these questions and gave these answers on cross examination:

Question: The third number is where you had a 3?

Answer: It originally was a 3.

Question: And you had to change that from 9:30 to 8:30, is that true?

Answer: That is right.

Question: So the first number you tried to change is the number that is the 3 indicating 30, not the 9 which was the mistaken number?

Answer: Right.

Question: So you decided to rather than making the 9 into an 8, you would make the 3 into a zero?

Answer: I just made a mistake. I was a little embarrassed to make a mistake and I started scratching down and realized a simple X would do with my initials and the correct time.

Question: First you made a mistake by writing 9:30 and then you made a mistake by correcting the part that was right, the fact that it was the bottom half of the hour. So you made two mistakes in filing out this document.

-16-

Answer: Yes, sir.[31]

It must be noted that the government's only other witness could not corroborate this truly absurd explanation for the change of time on the Miranda waiver document. As discussed above, according to the government's witnesses' testimony, this error occurred no more than 23 minutes after the earliest possible time that Agent Correa allegedly Mirandized the defendant for a second time. Agent Correa was able to remember that there were a number of telephone calls made by the defendant prior to processing, and one or two made after processing. This sequence of events is corroborated by the defendant's cellular telephone records. However, Agent Correa's recollection from that point forward completely fails him. Agent Correa has absolutely no recollection of an event that Agent Joseph classifies as, "At least as far as significant events go that morning that was one of them."[32]

Furthermore, Agent Correa's testimony is also contradicted by his own memorandum. Despite the fact that the government has gone to great lengths to avoid characterizing the conversations between the defendant and Agent Correa as questioning, that is exactly how he characterized those conversations in his memorandum. Agent Correa's memorandum says, "[a]fter a cursory search of the residence, NATHANIEL ALEXANDER was taken to the RAIC/NORFOLK I.C.E. office for processing and questioning."[33] Agent Correa wrote that the defendant was questioned, not that he spoke to the defendant because the defendant wanted to tell his side of the story. Additionally, the memorandum discusses the conversation that was had once Agent Correa was in possession of the indictment, and the memorandum is devoid of any information about the questioning that occurred at the defendant's home, which lasted for approximately 20 to 30 minutes. Finally, the memorandum mentions only two alleged Miranda waivers, but at the hearing, the government has tried to prove that there were three Miranda waivers. Perhaps if we conducted the hearing again, there would be four or five Miranda waivers.

Finally, it is the government's burden to prove a knowing and voluntary waiver of the defendant's fundamental rights. To use the old defense analogy, we could have sat through the hearing like a potted plant, and if the government failed to carry their burden, then suppression would still be required. However, the defense has aggressively and zealously attempted to provide the Court with evidence of misconduct. The defense respectfully submits that the government's evidence not only fails to carry their burden, but was successfully refuted with the use of documents and through thorough cross examination.

**POINT I: <u>THE GOVERNMENT HAS FAILED TO PROVE THAT THE DEFENDANT WAS ADVISED OF HIS FIFTH AND SIXTH AMENDMENT RIGHTS, LET ALONE WAIVED THEM</u>**

The defendant is in complete agreement with the government as to the legal standard applicable to the issue presented. The Supreme Court has held that, "the prosecution may not use

---

[31] Transcript 157-8.
[32] Transcript page 163, lines 20 – 21.
[33] Defense Exhibit A, received into evidence at the hearing.

statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." <u>Miranda v. Arizona</u>, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612 (1966).

As the government has correctly noted, "It is the Government's burden to establish by a preponderance of the evidence that a defendant's relinquishment of Miranda rights was voluntary and made with a full awareness of the rights being waived and the consequences of waiver."[34] Here the government has failed to prove that the defendant made any statements prior to being advised of his Miranda rights. In its vain attempt to prove that the defendant was advised of his Miranda rights, the government asks this Court to accept the testimony of Agent Correa that he orally advised the defendant of his rights twice. As discussed above – ad nauseam – Agent Correa's testimony was internally inconsistent, contradicted by the testimony of Agent Joseph, and contradicted by his own memorandum, which was prepared long before these allegations of prosecutorial misconduct were interposed.

The government's only other witness did not corroborate either alleged oral Miranda warning or waiver despite being present at both locations where these warnings were administered. Additionally, Agent Joseph's description of how the written Miranda warnings were explained to the defendant speaks volumes about how diligent Agent Correa was with respect to advising the defendant of his rights. As Agent Joseph testified, Agent Correa "showed him [Mr. Alexander] the form and said that this is just some like formality type thing, something we have to go over." Contrary to the government's desperate attempt to bolster Agent Correa's testimony, he did not advise the defendant that this is something we have to "go over again." Agent Correa was absolutely correct in describing the written waiver a just a "formality," because the defendant had already been interrogated on and off for almost three hours (from approximately 6:00 AM until 9:00 AM).

Rather than asking the Court to accept an absurd explanation for why the only documentary evidence that shows a waiver of the defendant's fundamental rights is altered, the defendant submits that his explanation, which is sworn to in his affirmation, is far more simple and easy to accept. The defendant was questioned without ever being advised of his Miranda rights until approximately 9:00 AM when, for the first time, he was advised of his right to counsel, which he immediately asserted. There is no question that whether intentionally or accidentally, at some point the time on the Miranda waiver was entered as 9:00 AM, and the defendant's cellular telephone records show that he called his attorney at 9:05 AM. As the Supreme Court has held in <u>Withrow v. Williams</u>, 507 U.S. 680, 113 S.Ct. 1745 (1993), this Court must examine "the totality of circumstances to determine whether a confession had been 'made freely, voluntarily and without compulsion or inducement of any sort.'" <u>See</u> <u>Withrow v. Williams</u>, 507 U.S. at 689, 113 S.Ct. at 1751 (citations omitted).

Here, the totality of the circumstances can only lead to the conclusion that there were no Miranda warnings until 9:00 AM. Agent Joseph's explanation for the change of time makes no sense. If he had truly made a mistake by entering the time as 9:30 instead of 8:30, then why not

---

[34] Government's initial opposition papers at page 15.

simply change the 9 to an 8 correcting the error. Instead, after being given a hard time by the case agent about underestimating his role in the current case they were working, Agent Joseph claims that he made not just one error, but two errors in entering the time on the document. The alternative explanation that the time was initially entered as 9:00 AM, and then only after failing to effectively change the zero to a three, the time was crossed out and re-entered as 8:30 AM is the more likely sequence of events, especially when viewed in light that the defendant actually exercised his rights at or shortly after 9:00 AM.

**Point II: <u>SINCE THE GOVERNMENT NEVER ADVISED THE DEFENDANT OF HIS SIXTH AMENDMENT RIGHT TO COUNSEL, THEY VIOLATED HIS RIGHTS BY DELIBERATELY ELICITING STATEMENTS FROM HIM IN ABSENCE OF COUNSEL</u>**

The government claims that the defense has a "blinkered understanding of Sixth Amendment jurisprudence," and that "it is well-settled that a suspect's waiver of his right to counsel after receiving Miranda warnings suffices to establish a knowing and intelligent waiver of the Sixth Amendment right to counsel for purposes of post-indictment questioning."[35] It appears that it is the government that is the one with blinders on with respect to the argument put forth concerning the defendant's Sixth Amendment rights.

There is no question that "an accused who is admonished with the warnings prescribed by this Court in *Miranda,* 384 U.S., at 479, 86 S.Ct., at 1630, has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one." <u>Patterson v. Illinois</u>, 487 U.S. 285, 108 S.Ct. 2389 (1988). However, the defendant has consistently maintained that he was not advised of his constitutional rights at all until 9:00 AM. If the defendant was not advised of his right to counsel, then he cannot possibly waive that right.

Since the defendant did not waive his right to counsel, then the inquiry must switch to the question of whether or not the government deliberately elicited incriminating remarks. There can be no question that if the defendant volunteered information to the government without being asked any questions, the government cannot be held to have violated any of the defendant's rights. Thus, the issue whether or not the Agents' conduct here can be construed as deliberately eliciting incriminating remarks. See <u>U.S. v. Rosa</u>, 11 F.3d 315 (2nd Cir., 1993).

In one of its most recent decisions concerning a defendant's Sixth Amendment right to counsel, a unanimous Supreme Court in <u>Fellers v. U.S.</u>, 540 U.S. 519, 124 S.Ct. 1019 (2004), held that statements taken by law enforcement officers at a defendant's home in absence of counsel were inadmissible against him. The <u>Fellers</u> Court held, "[b]ecause the ensuing discussion took place after petitioner had been indicted, outside the presence of counsel, and in the absence of any waiver of petitioner's Sixth Amendment rights, the Court of Appeals erred in holding that the officers' actions did not violate the Sixth Amendment standards established in <u>Massiah</u>, *supra,* and its progeny." <u>Fellers</u>, at 524-5.

---

[35] Opposition page 27.

The government takes the position that the deliberate elicitation standard only applies where the defendant "not only been charged, but was *represented* by counsel – which profoundly alters the analysis."[36] This is not the case, in Fellers, *supra*, the defendant was indicted, but not yet arraigned.[37] Clearly, the defendant's Sixth Amendment right to counsel had attached prior to the Agents' arrival at his home that faithful morning.

The issue is whether or not the government deliberately elicited statements from the defendant. As discussed above, the agents entered the defendant's home that morning with the plan to take a statement from him, and they followed through with that plan. Agent Correa even admitted on cross examination that he was instructed to get a statement from the defendant by the case agent before he left New York to go to Virginia. Thus, as a result of the government's violation of the defendant's Sixth Amendment rights, the post arrest statements must be suppressed.

**Point III: <u>THE DEFENDANT'S STATEMENTS WERE NOT VOLUNTARILY PROVIDED, AND AS A RESULT OF THE VIOLATION OF THE DEFENDANT'S FOURTH AMENDMENT RIGHTS, THE POST ARREST STATEMENTS MUST BE SUPPRESSED</u>**

The government claims that the actions of the agents at the time of arrest cannot be deemed coercive.  By the government's understanding of coerciveness, no defendant could establish coercive conduct without alleging physical injury or threat of physical injury. As discussed in the defendant's initial moving papers after the evidentiary hearing, this Honorable Court must examine the totality of the circumstances surrounding the interrogation. <u>See</u> Fare v. Michael C., 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979). In order to determine whether a statement was made voluntarily, this Honorable Court must first determine whether the statement was the product of coercion on the part of law enforcement. <u>See</u> <u>Colorado v. Connelly</u>, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); <u>United States v. DiLorenzo</u>, 1995 WL 366377, at 6 (S.D.N.Y., 1995).

The government does not address the defendant's contentions that the conduct of the agents in this case caused any waiver, should the Court choose to find that there was one, was involuntary. As discussed in the defendant's initial moving papers after the evidentiary hearing, the factors which weigh against a finding a voluntariness in this case are very similar to the factors that were considered by the District Court, and approved of by the Second Circuit in the case of <u>United States v. Isiofia</u>, 370 F.3d 226 (2nd Cir., 2004), in determining the issue of voluntariness. In <u>Isiofia</u>, the Second Circuit upheld the District Court's decision to suppress physical evidence because the defendant's consent to search his residence was not voluntary.

If the same or similar factors in <u>Isiofa</u> could lead that Court to find a lack of voluntariness in the Fourth Amendment context, then there is no reason to believe that this conduct cannot cause a waiver of Fifth and Sixth Amendment rights to be involuntary.

---

[36] Opposition page 30, footnote 10 (*emphasis in original*).

[37] "On February 24, 2000, after a grand jury indicted petitioner for conspiracy to distribute methamphetamine, Lincoln Police Sergeant Michael Garnett and Lancaster County Deputy Sheriff Jeff Bliemeister went to petitioner's home in Lincoln, Nebraska, to arrest him." <u>Fellers</u>, at 521.

Additionally, the government, in its opposition papers, blithely ignores the fact that the agents' conduct at the time of arrest violated the defendant's and his family's Fourth Amendment rights. As discussed in the defendant's initial moving papers after the evidentiary hearing, the agents violated the defendant's Fourth Amendment rights by remaining in the defendant's home after the need to be there expired, and by conducting a security sweep which was overbroad under the circumstances.

The government claims "[s]imilarly, the security sweep conducted by the agents (Point 2) is absolutely routine and is necessitated by the unfortunate fact that, as Special Agent Joseph put it, '[i]n our line of work, you know, bad things can happen in those circumstances.'" This completely ignores the case law on the issue of security sweeps. As the Second Circuit held in U.S. v. Oguns, 921 F.2d 442 (2nd Cir., 1990), "[o]nce police eliminate the dangers that justify a security sweep – safety of police, destruction of evidence, escape of criminals – **they must, barring other exigencies, leave the residence**. Were this not the rule, searches begun as minor intrusions on domestic privacy would expand beyond their legitimate purposes. Oguns, at 447 (**emphasis added**).

Furthermore, as held in U.S. v. Blue, 78 F.3d 56 (2nd Cir., 1996), "an officer effecting an arrest in a residence may, 'without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched.' Beyond that circumscribed inspection of the premises, however, the officer must reasonably believe, based on specific and articulable facts, that the area to be swept harbors a person posing a danger to those present before making the warrantless search." Blue, at 59 (citations omitted)).

Firstly, according to Agent Joseph's testimony, "Mr. Alexander gave us no indication that he was hostile or uncooperative."[38] Since there was no articulable reason to conduct a full search of the residence, this conduct violates the Fourth Amendment. Secondly, according to both agents, the defendant was dressed prior to being "sat down" in the dining room and being "spoken" to; therefore, the reason for entering the home – to allow the defendant to dress – had expired.

When the government violates a defendant's Fourth Amendment rights, and in the process procures a statement, that statement must be suppressed under a poisonous fruits analysis. In Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254 (1975), the Supreme Court held:

> Although, almost 90 years ago, the Court observed that the Fifth Amendment is in 'intimate relation' with the Fourth, the Miranda warnings thus far have not been regarded as a means either of remedying or deterring violations of Fourth Amendment rights. Frequently, as here, rights under the two Amendments may appear to coalesce since 'the 'unreasonable searches and seizures' condemned in the Fourth Amendment are almost always made for the purpose of compelling a man to give evidence against himself, which in criminal cases is condemned in the Fifth Amendment.' The exclusionary rule, however, when utilized to

---

[38] Transcript page 130.

effectuate the Fourth Amendment, serves interests and policies that are distinct from those it serves under the Fifth. It is directed at all unlawful searches and seizures, and not merely those that happen to produce incriminating material or testimony as fruits. In short, exclusion of a confession made without Miranda warnings might be regarded as necessary to effectuate the Fifth Amendment, but it would not be sufficient fully to protect the Fourth. Miranda warnings, and the exclusion of a confession made without them, do not alone sufficiently deter a Fourth Amendment violation. Brown, at 601 (citations omitted).

In Oregon v. Elstad, 470 U.S. 298, 105 S.Ct. 1285 (1985) the Supreme Court held that, "[w]here a Fourth Amendment violation "taints" the confession, a finding of voluntariness for the purposes of the Fifth Amendment is merely a threshold requirement in determining whether the confession may be admitted in evidence. Beyond this, the prosecution must show a sufficient break in events to undermine the inference that the confession was caused by the Fourth Amendment violation. Elstad, at 306. Here there is no break in the events to undermine the inference that the statement taken from the defendant was caused by the Fourth Amendment violation. As Agent Correa stated on cross examination, "Was there a time period where I stepped away and not talked to him? No, sir. I was with him the whole time."[39]

Clearly, if this conduct could rise to the level of a Fourth Amendment violation, then it too can be deemed coercive in light of the Fifth Amendment analysis. Furthermore, the Fourth Amendment provides the Court an independent ground for suppression in addition to the violation of the defendant's Fifth and Sixth Amendment rights.

## <u>CONCLUSION</u>

For the reasons discussed above, the defendant respectfully requests that this Honorable Court suppress the post arrest statement procured from him in violation of his Fourth, Fifth and Sixth Amendment rights.

Dated: New York, New York,
        August 14, 200606

                                    Law Office of Michael Fineman, Esq.

                                    By: _____/s/_____
                                         Michael Fineman, Esq. (MF 0282)
                                         *Attorney for Defendant,*
                                         Nathaniel Alexander,
                                         305 Broadway, 7th Floor
                                         New York, New York 10007
                                         (212) 897-5823

---

[39] Transcript page 86, lines 13 – 14.