```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-- - - - - - - - - - - - - - - - - - - -x
UNITED STATES OF AMERICA            :
                                    :
          -v.-                      :
                                    :
DOUGLAS SHYNE,                      :    S4 05 Cr. 1067 (KMK)
NATASHA SINGH,                      :
  a/k/a "Beatris Rodrigues,"        :
NATHANIEL SHYNE,                    :
TOYBE BENNETT,                      :
  a/k/a "Dmitriy Makarevich,"       :
  a/k/a "Dmitriy Makervish,"        :
  a/k/a "Eduardo Rodrigues,"        :
  a/k/a "Cecilio Pena,"             :
ROBERTO MONTGOMERY,                 :
EPHRAIM RICHARDSON,                 :
NARESH PITAMBAR,                    :
JASON WATLER,                       :
STEVEN RIDDICK,                     :
NATHANIEL ALEXANDER, and            :
TIMOTHY MONTGOMERY,                 :
                                    :
               Defendants.          :
- - - - - - - - - - - - - - - - - - - - x
```

## GOVERNMENT'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS'
## <u>MOTION FOR SEVERANCE</u>

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York

E. DANYA PERRY
Assistant United States Attorney

    - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-- - - - - - - - - - - - - - - - - - - -x
UNITED STATES OF AMERICA              :
                                      :
          -v.-                        :
                                      :
DOUGLAS SHYNE,                        :     S4 05 Cr. 1067 (KMK)
NATASHA SINGH,                        :
  a/k/a "Beatris Rodrigues,"          :
NATHANIEL SHYNE,                      :
TOYBE BENNETT,                        :
  a/k/a "Dmitriy Makarevich,"         :
  a/k/a "Dmitriy Makervish,"          :
  a/k/a "Eduardo Rodrigues,"          :
  a/k/a "Cecilio Pena,"               :
ROBERTO MONTGOMERY,                   :
EPHRAIM RICHARDSON,                   :
NARESH PITAMBAR,                      :
JASON WATLER,                         :
STEVEN RIDDICK,                       :
NATHANIEL ALEXANDER, and              :
TIMOTHY MONTGOMERY,                   :
                                      :
          Defendants.                 :
- - - - - - - - - - - - - - - - - - - - x


          The Government respectfully submits this memorandum of law in opposition to the Joint Motion For Severance of defendants Timothy Montgomery, Steven Riddick, and Nathaniel Alexander (jointly referred to hereinafter as the "Moving Defendants" or the "Defendants"), dated August 18, 2006 ("Br."), requesting that the Court sever the charges pending against them from those against the other defendants in this matter.  For the reasons set forth below, the severance motion should be denied.

**BACKGROUND**[1]

In the first Count of the sixteen-count Fourth Superseding Indictment (the "Indictment"), defendants Timothy Montgomery, Steven Riddick, and Nathaniel Alexander, along with eight co-defendants, are charged with conspiring to commit bank fraud, in violation of Title 18, United States Code, Section 1349. Each of the Moving Defendants, along with certain of their co-defendants, is charged in Count Five with substantive bank fraud, in violation of Title 18, United States Code, Sections 1344 and 2, and defendants Montgomery and Riddick, along with certain co-defendants (but not Alexander), are charged with same in Count Four. Finally, each of the three Moving Defendants, along with certain of their co-defendants, is charged in Count Thirteen with conspiracy to launder funds, in violation of Title 18, United States Code, Section 1956(h). The remaining counts do not name the Moving Defendants.

The Indictment alleges that the Moving Defendants were members of a scheme run by Douglas Shyne and Natasha Singh, among others. The conspirators were in the business of procuring fraudulent checks in several ways, including receiving stolen checks and arranging for such checks to be cashed; altering checks that they had legitimately received; and counterfeiting

---

[1] The description of the charges contained herein is simply a summary and does not purport to describe the entirety of the Government's proof. This description is meant as a guide to the Court and is not intended in any way to bind the Government or limit its proof at any proceeding or at trial.

checks using information provided by inside bank employees.
Critically to the success of the bank fraud conspiracy, the
conspirators also were in the business of laundering the proceeds
of such checks, including by depositing fraudulently obtained
checks into business or personal bank accounts and then funneling
proceeds back to Shyne and Singh.

Thus, central to the success of the scheme was the
involvement of participants who were willing to deposit
fraudulently obtained checks into their accounts to be cashed and
laundered. A number of the defendants in the Indictment –
including the Moving Defendants – served precisely this function.
Through a co-conspirator identified in the Indictment as CC-1,
Shyne and his conspirators in the New York area were introduced
to a group of willing conspirators in the Norfolk, Virginia area,
including Timothy Montgomery, Steven Riddick, and Nathaniel
Alexander. CC-1 had been acquainted with Timothy Montgomery, who
himself caused bad checks to be deposited into several accounts,
and who also put Shyne in contact, for that purpose, with Riddick
(Montgomery's former track coach), and with Alexander (Riddick's
officemate and friend). The evidence at trial – to include bank
records, phone records, Federal Express records, documents
recovered pursuant to search warrants, witness testimony, and the
co-conspirators' own statements – will establish, <u>inter alia</u>, an
explicit agreement with and amongst the conspirators for the
Moving Defendants to knowingly deposit and cause to be deposited

numerous counterfeit checks into accounts associated with them, in order to launder the funds and reap the proceeds.  The evidence will show that the Defendants, who were aware that they were a part of a larger scheme, had direct communications not only with one another and with CC-1, but also at least with Shyne, and that certain of the checks between New York and Virginia were routed through CC-1, Shyne, and co-defendant Toybe Bennett.  Each of the Moving Defendants himself personally deposited counterfeit checks into his own accounts or caused such checks to be deposited into accounts associated with him. Riddick and Alexander also wrote checks drawn from the counterfeit checks to certain others of their co-defendants and to individuals associated with the Moving Defendants.

## ARGUMENT

## I.

## THE MOVING DEFENDANTS ARE NOT ENTITLED TO A SEVERANCE BASED UPON CLAIMS OF PREJUDICE

The Moving Defendants fall far short in their efforts to win a severance.  Although they claim prejudice, none of their proffered bases for severance – multiple conspiracies, spillover prejudice, antagonistic defenses, or unique harm – has any merit. As the factual basis for their argument, the Moving Defendants have posited an imaginary world in which they could be tried separately, solely on evidence of their own acts, which would both cure the alleged "prejudice" of evidence of the acts of co-

defendants and result in great judicial economies.  This
alternative universe is entirely illusory.  What the Moving
Defendants conveniently ignore is that they and their co-
defendants are properly charged in a single conspiracy, which
forms the core of the Indictment.  Severance of the defendants
into grouped trials would simply result in the presentation of
nearly identical evidence all over.  The evidence that the Moving
Defendants point to as "prejudicial" is evidence of the
existence, scope, and object of the charged conspiracy, which the
Government is entitled and indeed, required, to present at the
trial of these Defendants, whether in a severed trial or in a
single joint trial.  The only individualized aspect of the
evidence goes to the element of each defendant's knowing
participation in the conspiracy.  The Moving Defendants have not
demonstrated – and can not demonstrate – how evidence that others
also participated in the same conspiracy could be so prejudicial
to the Defendants as to warrant the extraordinary remedy of
discretionary severance.  None of the asserted bases for
discretionary severance survives scrutiny or describes a
prejudice sufficiently severe to overcome the strong presumption
in favor of joint trials for defendants indicted together as part
of the same conspiracy.  Accordingly, the Defendants' motion for
severance under Rule 14(a) should be denied.

### A.    Legal Standards

Rule 8(b) of the Federal Rules of Criminal Procedure

provides:

> The indictment or information may charge 2 or
> more defendants if they are alleged to have
> participated in the same act or transaction,
> or in the same series of acts or
> transactions, constituting an offense or
> offenses.

Fed. R. Crim. P. 8(b).  The Second Circuit has interpreted the
rule to mean that offenses and defendants are properly joined
under Rule 8(b) where the criminal acts of two or more persons
are "unified by some substantial identity of facts or
participants or arise out of a common plan or scheme."  United
States v. Attanasio, 870 F.2d 809, 815 (2d Cir. 1989) (internal
quotations omitted).  Thus, where the acts of defendants are
connected, those acts, and the defendants who performed them, are
properly joined in a single indictment.

Federal Rule of Criminal Procedure 14(a) authorizes the
district court to grant a severance of defendants' joint trial
"[i]f it appears that a defendant or the government is prejudiced
by a joinder."  Fed. R. Crim. P. 14(a).  The Supreme Court has
instructed that severance is warranted only if "there is a
*serious risk* that a joint trial would compromise a *specific trial
right* of one of the defendants, or prevent the jury from making a
reliable judgment about guilt or innocence."  Zafiro v. United
States, 506 U.S. 534, 539 (1993) (emphasis added).

"For reasons of economy, convenience and avoidance of delay,
there is a preference in the federal system for providing

defendants who are indicted together with joint trials." United States v. Feyrer, 333 F.3d 110, 114 (2d Cir. 2003). Or, as the Supreme Court has put it, joint trials "play a vital role in the criminal justice system." Richardson v. Marsh, 481 U.S. 200, 209 (1987). They not only promote efficiency, but also "serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." Id. at 210.

The presumption in favor of joint trials is so strong that "[t]he principles that guide the district court's consideration of a motion for severance usually counsel denial." United States v. Rosa, 11 F.3d 315, 341 (2d Cir. 1993). This presumption is particularly strong where, as here, "the crime charged involves a common scheme or plan" among the defendants. United States v. Girard, 601 F.2d 69, 72 (2d Cir. 1979). Accordingly, the Second Circuit consistently has approved the joinder of defendants and charges where the acts of the defendants share some identity of facts or participants, or arise from a common plan or scheme. See, e.g., United States v. Cervone, 907 F.2d 332 (2d Cir. 1990) (proper joinder of eighteen defendants in 102-count indictment with a variety of labor racketeering charges, as well as related charges of obstruction of justice, bribery, and making false statements); Attanasio, 870 F.2d 809 (defendants charged with conspiracy to defraud IRS properly joined with defendants and charges relating to a separate conspiracy to defraud IRS because of common participants and because they were part of a series of

acts).

A defendant seeking severance therefore shoulders the "extremely difficult burden" of showing that he would be so prejudiced by joinder as to deny him a fair trial. United States v. Casamento, 887 F.2d 1141, 1149 (2d Cir. 1989) (internal quotations omitted).  As noted, the prejudice must be so "substantial" that there exists "a serious risk that a joint trial would compromise a specific trial right of the moving defendant or prevent the jury from making a reliable judgment about guilt or innocence." Rosa, 11 F.3d at 341.  It is not enough for a defendant to show that he "may have a better chance of acquittal in [a] separate trial[]." Zafiro, 506 U.S. at 540; see also United States v. Panza, 750 F.2d 1141, 1149 (2d Cir. 1984) (explaining that prejudice must be "sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials").

It is well settled that "differing levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials." United States v. Spinelli, 352 F.3d at 55 (2d Cir. 2003); United States v. Carson, 702 F.2d 351, 366-67 (2d Cir. 1983); United States v. Torres, 901 F.2d 205, 230 (2d Cir. 1990).  Similarly, "[t]he fact that evidence may be admissible against one defendant but not against others does not require separate trials." United States v. Rucker, 586 F.2d 899, 902 (2d Cir. 1978); see also United

8

States v. Zackson, 6 F.3d 911, 922 (2d Cir. 1993).

Moreover, "[t]he fact that . . . codefendants [are] tried for a crime not committed by another codefendant does not, without more, create the sort of miscarriage of justice that would require a new trial." United States v. Hernandez, 85 F.3d 1023, 1029 (2d Cir. 1996). Rather, a defendant must show that evidence introduced against his co-defendants would "in some way affect[] the jury's ability fairly and rationally to evaluate the evidence of [the defendant's] guilt." Id. at 1029. The Second Circuit has long held that "[e]vidence at the joint trial of alleged co-conspirators that, because of the alleged conspiratorial nature of the illegal activity, would have been admissible at a separate trial of the moving defendant is neither spillover nor prejudicial." Rosa, 11 F.3d at 341. See also Spinelli, 352 F.3d at 55-56 (upholding denial of severance motion and denying prejudicial spillover claim where "much of the evidence of [co-defendant's] crimes would have been admissible at a separate trial of [defendant], since it was relevant to proving the nature and the scope of the conspiracy"); United States v. Villegas, 899 F.2d 1324, 1347-48 (2d Cir. 1990) (rejecting claims that spillover evidence against co-defendants prejudiced moving defendants). Any potential for prejudice is diminished where the court instructs the jury to consider separately each individual and each charge. Spinelli, 352 F.3d at 55 (noting that spillover prejudice may be remedied by limiting instruction); United States

9

v. <u>Miller</u>, 116 F.3d 641, 679 (2d Cir. 1997) (same).

A motion to sever is "committed to the sound discretion of the trial court." <u>United States</u> v. <u>Scarpa</u>, 913 F.2d 993, 1014 (2d Cir. 1990) (internal quotations omitted); <u>see also</u> <u>United States</u> v. <u>Beverly</u>, 5 F.3d 633, 637 (2d Cir. 1993); <u>Torres</u>, 901 F.2d at 230.  Indeed, given the strong preference for joint trials, a district court order denying a Rule 14 motion is considered "virtually unreviewable" and will be overturned "only if a defendant can show prejudice so severe that his conviction constituted a miscarriage of justice and that the denial of his motion constituted an abuse of discretion." <u>United States</u> v. <u>Diaz</u>, 176 F.3d 52, 102 (2d Cir. 1999) (internal quotations omitted).

**B.  Discussion**

The Moving Defendants argue that they are entitled to severance because they would otherwise suffer "substantial prejudice," which, they argue "operates on many levels."  (Br. at 5).[2]  Specifically, they argue that "[t]he allegations in the Indictment allege two distinct conspiracies, connected by a

---

[2] Although the Court long ago set a deadline for the filing of motions by June 2, 2006, the Defendants waited until August 18, 2006 to file the present severance motion.  This delay can be excused only to the extent that Defendants address their arguments in part to the delay until the trial date, which was not set until July 11, 2006.  However, having moved for a severance based upon this delay, the Defendants now belatedly also throw in the proverbial kitchen sink, claiming all the other types of garden-variety prejudice as well.  In judging the severity of the alleged "prejudice" in this case, the Court is entitled to take into account the fact that the Defendants apparently did not themselves initially perceive any prejudice in being joined with their co-defendants due to concerns about multiple conspiracies, spillover prejudice, antagonistic defenses, or unique harm.

single unnamed coconspirator" and that "the allegations against
the New York Defendants are substantially more serious than those
against the Virginia Defendants, creating a risk of spillover
prejudice." (Id.; see also Br. 7-9 and 9-12). They also argue
that possible inconsistencies in the defenses which may be
presented in this case will prejudice them. (Br. 12-14).
Finally, the Defendants argue that they are uniquely prejudiced
due to the professional and reputational consequences they have
suffered and will continue to suffer as a result of the pendency
of the criminal charges against them. (Br. 14-17). Each prong
of this prejudice argument should be rejected.

### 1.    The Indictment Properly
Charges A Single Conspiracy

The first, half-hearted prong of the Moving Defendants'
prejudice argument – that the evidence will establish two
distinct conspiracies with limited overlap – is frivolous.[3] The
Indictment charges, and the proof at trial will show, the
existence of one single bank fraud conspiracy involving many
members. A single conspiracy exists where there is "'mutual
dependence among the participants, a common aim or purpose or a
permissible inference from the nature and scope of the operation,
that each actor was aware of his part in a larger organization

_____

[3] In any event, the issue of "[w]hether the government has proved a
single or multiple other independent conspiracies is a question of fact for a
properly instructed jury," United States v. Sureff, 15 F.3d 225, 229 (2d Cir.
1994) (internal quotations omitted), and need not be resolved at this stage in
the proceedings.

where others performed similar roles equally important to the success of the venture.'" United States v. Williams, 205 F.3d 23, 33 (2d Cir. 2000) (quoting United States v. Vanwort, 887 F.2d 375, 383 (2d Cir. 1989)). "To prove a single conspiracy, the government must show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal." United States v. Sureff, 15 F.3d 225, 229 (2d Cir. 1994) (internal quotations omitted). A single conspiracy "may encompass members who neither know one another's identities, nor specifically know of one another's involvement." Id. at 230 (internal citations omitted).

Further, a "single conspiracy is not transposed into a multiple one simply by lapse of time, change in membership, or a shifting emphasis in its locale of operations." Williams, 205 F.3d at 33 (internal quotations omitted). The conspirators need not know the identities of all the other conspirators in order for a single conspiracy to be found, especially where the activity of a single person "was central to the involvement of all." United States v. Maldonado-Rivera, 922 F.2d 934, 963 (2d Cir. 1990) (internal citations and quotations omitted); see also United States v. Aracri, 968 F.2d 1512, 1522-23 (2d Cir. 1992) ("The jury need not have concluded that the same people were involved throughout the entire period of the conspiracy in order to find one conspiracy.") (internal quotations omitted). Nor is a single conspiracy transformed into multiple conspiracies

12

"merely by virtue of the fact that it may involve two or more phases or spheres of operation, so long as there is sufficient proof of mutual dependence and assistance." <u>Maldonado-Rivera</u>, 922 F.2d at 963.

The basis for the Moving Defendants' argument is the claim that they had "no association" with the "New York Defendants" – other than through CC-1. (Br. 8). This is wrong as a matter of fact and would in any event be of no moment as a matter of law. In this case, on scores of occasions, the Moving Defendants communicated both directly and indirectly with at least Shyne, as well as with CC-1 (and, of course, with one another). The eight checks which the Moving Defendants attempted to deposit and launder through their accounts all were obtained from Singh and Shyne – either directly from Shyne, through Toybe Bennett, or via CC-1. Checks drawn on the Moving Defendants' counterfeit checks were written to other co-defendants – most of whom also were involved in additional conduct involving other bad checks – including Cynthia Montgomery, Christine Richardson, Ephraim Richardson, Jason Watler, Roberto Montgomery, and Naresh Pitambar. Moreover, the conduct involving the Moving Defendants occurred during the same time period as the conduct alleged in the Indictment involving additional checks.

Significantly, the purpose of the scheme and many of the participants remained consistent throughout the life of the conspiracy, and the evidence will establish that the Moving

Defendants were aware that their co-conspirators were in the
business of procuring and laundering bad checks, and that they
were performing functions similar to those performed by others in
the scheme.  The function performed by the Moving Defendants (as
well as by other, similarly situated co-defendants) was critical
to the success of the overall bank fraud scheme.  Without the
willingness of various of the co-conspirators (including the
Moving Defendants) to cash the fraudulently obtained checks and
launder the proceeds through their own accounts and those of
others, the scheme would have been fruitless.

In light of the foregoing, the factors necessary to a
determination of a single conspiracy are present in this case to
a much greater degree than is generally deemed sufficient.  See,
e.g., Williams, 205 F.3d 23 (defendant's efforts to import
narcotics over time, with different co-conspirators, at different
times, and employing different means nonetheless established a
single, ongoing importation conspiracy); Vanwort, 887 F.2d 375
(defendants who operated separate narcotics businesses properly
deemed parties to a single conspiracy where they had a common
source, had at least two overlapping employees, and enjoyed a
loose working relationship).  In contrast, the one 1988 Northern
District case cited by the Defendants (see Br. 7-8) is easily
distinguished.  In United States v. Moon, 88 Cr. 64, 1998 WL
88056 (N.D.N.Y. Aug. 23, 1988), the court severed an indictment
that charged three separate conspiracies that had but one common

14

denominator – the participation of one defendant.  <u>See</u> <u>Moon</u>, 1988 WL 88056, at *3.  As set forth above, that is a far cry from what the Indictment alleges - and what the proof will show – in this case.[4]

In short, there was clearly, at the very least, "mutual dependence" among the various conspirators and a "common aim or purpose" in their conduct.  <u>Williams</u>, 205 F.3d at 33.  As in <u>Williams</u>, "[a]lthough the details of the plan and the members of the conspiracy [may have] changed somewhat as time passed, the 'common aim or purpose' remained the same."  205 F.3d at 33.

Accordingly, there is no basis whatever for the argument that the Indictment charges two distinct conspiracies with limited overlap.

**2.    The Defendants Can Establish No "Spillover Prejudice"**

The second prong of the Moving Defendants' argument – that

---

[4] At the very least, this case can be compared to the "daisy chain" type of case which the Second Circuit has consistently upheld as a single conspiracy.  <u>See, e.g.</u>, <u>Aracri</u>, 968 F.2d 1512, 1521-22 ("there is ample evidence of a single conspiracy through which the [different entities used] in a 'daisy chain' changed but the conspiracy's goal of avoiding taxes did not."); <u>Alessi</u>, 638 F.2d at 474 (members of "single loose-knit multi-person conspiracy" to use lost or stolen credit cards to purchase airline tickets for resale at a discounted price were part of single conspiracy where "[t]he scheme depended for its success on a steady flow of recently stolen or lost cards, since a stolen or lost card may be successfully used for only a short time to unlawfully obtain tickets from airlines"); <u>United States</u> v. <u>Heinemann</u>, 801 F.2d 86, 91-92 (2d Cir. 1986) (in conspiracy involving sale of ministries in purportedly tax-exempt churches where defendants necessarily moved from church to church, there was ample evidence of a single conspiracy through which the churches changed "but the enterprise's goal of avoiding taxes and making money through the sale of ministries" did not).  In this case, in which the conspiracy necessarily depended upon a steady stream of willing conspirators to deposit and launder proceeds of bad checks, the conspiracy's goal remained consistent throughout and many of the same participants were involved throughout, including with the Defendants.

they will suffer spillover prejudice because the allegations against them are less serious than those against other defendants – is equally unavailing. The Moving Defendants apparently believe that because Shyne and Singh are the alleged ringleaders of the crimes charged, somehow the Defendants are "less culpable" than others in the conspiracy and therefore should not be tried jointly (Br. 9).

### i.   The Defendants' Marginality Claim Fails

As a preliminary matter, the factual premise – that the Moving Defendants are somehow "peripheral" to the conspiracy (see Br. 11) – is profoundly mistaken. The Moving Defendants are directly responsible for fraud involving at least eight checks and at least $3.23 million.[5]  In addition to their jointly undertaken activity, each of the Defendants was himself directly involved with multiple bad checks – at least three in Riddick's case (for a total of $905,000), three in Montgomery's (for a total of $1.325 million), and two in Alexander's (for a total of $1 million). Each of them not only was involved in depositing these checks into his accounts, but also in laundering and attempting to launder the proceeds. In these circumstances, they are hardly "peripheral" and can not seriously characterize their conduct as anything less than "serious" and integral to the

---

[5] Although the Indictment lists seven checks, in fact at least eight checks were deposited by the Defendants or their agents. Specifically, Montgomery attempted to deposit three separate checks; in addition to the two charged in the Indictment, he also caused yet a third counterfeit check, for $550,000, to be deposited into yet another bank account.

overall scheme.

In any event, as a matter of law, even accepting the Defendants' claims of marginality as true, relative culpability or level of engagement in a joint conspiracy simply is not a basis for severance. "*Different levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials*." United States *v.* Chang An-Lo, 851 F.2d 547, 557 (2d Cir. 1988) (emphasis added); see also Scarpa, 913 F.2d at 1015 (same); United States v. Ebner, 782 F.2d 1120, 1127 (2d Cir. 1986) (joinder proper even though moving defendant participated in conspiracy for shorter period of time than co-defendants); United States v. Stirling, 571 F.2d 708, 733 (2d Cir. 1978) (joinder proper even though moving defendant did not participate "in every detail of the conspiracy"). Indeed, the Second Circuit "has repeatedly recognized that joint trials involving defendants who are only marginally involved alongside those heavily involved are constitutionally permissible." United States v. Locasio, 6 F.3d 924, 947 (2d Cir. 1993); see also United States v. Joyner, 201 F.3d 61, 80 (2d Cir. 2000) (district court properly denied severance motion where two-month trial focused almost exclusively on narcotics conspiracy and defendant was only charged with committing a single act of arson on a single day); United States v. Carson, 702 F.2d 351, 366-367 (2d Cir. 1983) (fact that defendant played a less prominent role in the conspiracy than

17

many of his co-conspirators was not a sufficient ground for a separate trial); United States v. Aloi, 511 F.2d 585, 598 (2d Cir. 1975) (individual trials are not warranted merely because of "differences in degree of guilt and possibly degree of notoriety of defendants").

It is therefore immaterial that the Moving Defendants may not have been involved in certain of the bad checks contained in the Indictment, as it is hornbook law that conspirators need not be aware of all the identities of the co-conspirators or all the acts taken in furtherance of the conspiracy. See Vanwort, 887 F.2d at 383 (member need not "conspire directly with every other member of it, or be aware of all acts committed in furtherance of the conspiracy, or even know every other member") (citations omitted); United States v. Cirillo, 468 F.2d 1233, 1239 (2d Cir. 1972) ("conspiracies are most often agreements in flux, and . . . a defendant, once found to have been a member of the conspiracy, whatever his level of participation, may be criminally responsible for the acts of persons of whose existence he is unaware.").[6]

---

[6] The cases cited by Defendants in support of their motion are readily distinguished, as each involved much greater prejudice than mere disproportionality of culpability or proof. In United States v. Carrasco, 968 F. Supp. 948 (S.D.N.Y. 1997), in which the defendant initially was indicted separately from his co-defendants, id. at 951, a denial of the defendant's severance motion would have resulted in (i) lengthy pre-trial incarceration; (ii) preclusion of exculpatory testimony by a co-defendant; (iii) admission of an incriminating co-defendant statement that would otherwise be inadmissible; and (iv) prejudicial spillover stemming from the "mountain of evidence" against the co-defendants, including wiretap evidence, seizures, and post-arrest statements. Id. at 952. Likewise, in United States v. Gilbert, 504 F. Supp. 565, 566 (S.D.N.Y. 1980), the court held that severance was justified where much of the evidence would implicate only a co-defendant and that co-

Thus, the Defendants simply cannot meet their burden to show any "spillover prejudice" from differing levels of culpability that would create a serious risk that a joint trial would compromise a specific trial right, or would prevent the jury from making a reliable judgment about their guilt. See Rosa, 11 F.3d at 341.

### ii. There Is No "Spillover Prejudice" In Any Event

As noted above, the assertion of incurable "spillover prejudice" is entirely illusory in this case. Spillover prejudice of the sort warranting severance can occur only "when proof inadmissible against a defendant becomes a part of his trial solely due to the presence of co-defendants as to whom its admission is proper." Salameh, 152 F.3d at 115. However, a "defendant's claim that he was prejudiced by the admission of evidence at a joint conspiracy trial is insupportable when the evidence would have been admissible against him in a separate

---

defendant's exculpatory testimony would be otherwise unavailable to a moving defendant whom the court described as an "innocent dupe." Id. (noting that "[w]hen a continuing, chain-relationship between all defendants is proven, and the evidence against the particular defendants who request severance is not so little or so vastly disproportionate in comparison to that admitted against the remainder of the defendants, severance is not required.") (internal quotations omitted). Finally, in United States v. Gallo, 668 F. Supp. 736, 753-54 (E.D.N.Y. 1987), where there was tremendous disparity and severity between the evidence to be offered against the most central of the (violent) defendants and the more peripheral (non-violent) defendants, the judge found that this disparity was not dispositive; rather, the court severed the trials for reasons of judicial economy to avoid months-long "monster" trials. Not only are none of the additional compounding factors present in these cases at issue in the instant case, but as set forth herein, Defendants' claims of disproportionality and marginality fail in any event. Simply put, the Government's case will not consist of a disparity of any significance in the quantum of evidence against the Moving Defendants and their co-defendants.

trial alone as a member of the conspiracy." Id.

The Moving Defendants argue that they "have a specific right to be tried without the risk of the jury being tainted by prejudicial spillover from the evidence admitted against co-defendants that would not be admissible against them if tried alone." (Br. 9). It is noteworthy that the Defendants do not specify the type of evidence that would be inadmissible against them at a severed trial. This is likely so because all of that evidence would be admissible against the Moving Defendant even if they were tried separately. As set forth above, the Indictment properly charges all of the defendants with being members of a single conspiracy that engaged in a large-scale bank fraud scheme. At a severed trial, the Government would be required to prove the existence of that conspiracy as an element of the charge. Evidence of all of the various activities of co-conspirators will be highly relevant to establishing the existence, scope, and object of the charged conspiracy, regardless of whether any particular defendant participated in or was even aware of those acts. To take an example, it will be relevant to the Government's case against the Defendants to establish that they served precisely the same function as numerous other knowing participants in the scheme.

It follows that there can be no "prejudicial spillover" where the proof that allegedly would prejudice the Defendants would be introduced even in a trial against them alone. See

20

Salameh, 152 F.3d at 116; United States v. Villegas, 899 F.2d 1324, 1347 (2d Cir. 1991) (severance properly denied where "all of the evidence as to each of the other defendants' acts in furtherance of the conspiracy" would be "admitted at a single-defendant trial because of the alleged conspiratorial nature of the illegal activity"); Casamento, 887 F.2d at 1153 (activities of alleged co-conspirators would have been admissible in single-defendant trials and thus severance properly denied); United States v. Nersesian, 824 F.2d 1294, 1304 (2d Cir. 1987) (where evidence was sufficient to support conclusion that defendants participated in single conspiracy, Government was "entitled to show the entire range of evidence of the conspiracy against each appellant" and separate trials were unwarranted); Bari, 750 F.2d at 1178 (even "least active" member of conspiracy rightly denied severance, because as "fully implicated conspirator," "acts of co-conspirators in the furtherance of [the charged] conspiracy" would have been admissible "against him in a separate trial").[7]

---

[7] Nor are the acts of the Defendants' co-conspirators in this case so provocative or outrageous as to potentially inflame a jury. Indeed, the well-settled principles regarding prejudicial spillover have been applied in cases involving much more significant potential prejudice than the Defendants assert is present here, such as when only certain co-conspirators are alleged to have committed extremely violent acts. See, e.g., Rosa, 11 F.3d 315, 342 (affirming denial of severance motion of two non-violent defendants, reasoning that each "was an integral part of the conspiracy" and "[e]vidence of the [murderous and violent] workings of the conspiracy would therefore have been admissible at the individual trials of [the two drug defendants] had they been tried separately."); United States v. Diaz, 176 F.3d 102 (2d Cir. 1999) (admission of evidence of eight murders in which moving defendant did not participate did not cause him substantial spillover prejudice).

Moreover, even if there *were* some evidence (unidentified by the Defendants) that would not be admissible in a severed trial, "the fact that evidence may be admissible against one defendant but not another does not necessarily require a severance." Carson, 702 F.2d at 367.  A defendant is not entitled to a separate trial merely because evidence of criminal activities of his co-defendants will be admitted at the joint trial, even where, unlike here, that evidence may be wholly unrelated to any charges in which that particular defendant is named.  See United States v. Cardascia, 951 F.2d 474, 483 (2d Cir. 1991) (no due process violation where defendants forced to sit through a month of unrelated evidence of a separate conspiracy involving only co-defendants); Casamento, 887 F.2d at 1153, 1167-68 (minor defendants, against whom the direct evidence consisted of only a few tape recorded telephone calls, properly tried as part of multi-defendant trial that lasted seventeen months); United States v. Barton, 647 F.2d 224, 241 (2d Cir. 1981) (defendant charged only with obstruction of justice was properly denied a severance from co-defendants charged with bombings, attempted bombings, and racketeering).  The Moving Defendants here, apparently objecting to evidence regarding the acts of their co-conspirators taken in furtherance of the same conspiracy in which the Defendants themselves are charged, are even less entitled to a severance.

The above discussion makes clear that separate trials in

22

this case would result in an enormous duplication of efforts. The Government would be required to call and subject to cross-examination many of the same accomplice witnesses, law enforcement personnel, and other witnesses that it intends to call at the trial of the remaining defendants.  In these circumstances, a severance would be extremely burdensome and needlessly disadvantage the public, the Court, and the Government with lengthy, duplicative trials, with no lessening of "prejudice" to the defendants.  See Rahman, 854 F. Supp. 254, 262 (S.D.N.Y. 1994) ("Once such proof is shown to be admissible, there is no potential prejudice to be avoided by severing the charges [or, in this case, defendants] to which that proof relates.").  Thus, any theoretical prejudice that would be suffered by the Defendants as a result of a joint trial is far outweighed by the prejudice that would be suffered by the Government in this matter if their trial were to be severed from that of their co-conspirators.

Further, the alleged prejudice, if any, resulting from proof of acts committed by co-conspirators is properly mitigated not by a severance, but by appropriate limiting instructions on particular pieces of evidence and jury instructions that guilt is individual, and that the jury should decide the guilt of a particular defendant based on the evidence pertaining to that defendant only.  See Zafiro, 506 U.S. at 538-39; United States v. Romero, 54 F.3d 56, 60 (2d Cir. 1995).  Even in extreme

circumstances involving egregious acts by co-defendants presented as proof on entirely separate counts of the indictment, the Second Circuit has held that proper limiting instructions can cure or sufficiently limit any prejudice from evidence related to co-defendants.  See Rosa, 11 F.3d at 342 (despite evidence of violent acts, including murder, committed by non-moving defendants, joinder was proper where court gave appropriate limiting instructions); United States v. DeVillio, 983 F.2d 1185 (2d Cir. 1993) (upholding denial of severance motion where appellants, who were charged in one burglary, moved to sever from defendants charged with racketeering, racketeering conspiracy, six other burglaries and an attempted murder and citing district court's "explicit limiting instruction that testimony [concerning violence] could not be used against" appellants).

### 3.    The Defendants' Claim of "Antagonistic Defenses" Does Not Justify Severance

The Moving Defendants also claim that the possibility of mutually antagonistic defenses among the co-conspirators creates sufficient prejudice to warrant severance.  (Br. 12).  This argument is simply presented as a possibility in the case of the Moving Defendants and as a guess as to what their co-conspirators may argue in their own defense; but even assuming these defenses are actually presented at a joint trial in this matter, they do not meet the standard for "mutually antagonistic" defenses requiring severance.

Although courts, including the Second Circuit, once adhered to the view that the existence of defenses that could not both be credited justified a severance (<u>see</u> cases cited in Br. 12-14), the Supreme Court's decision in <u>Zafiro</u> v. <u>United States</u>, 506 U.S. 534, operated to overrule these cases. <u>United States</u> v. <u>Haynes</u>, 16 F.3d 29, 32 (2d Cir. 1994). Under <u>Zafiro</u>, the existence of mutually antagonistic defenses — even wholly irreconcilable ones — is not prejudicial in and of itself, nor does it afford a freestanding basis for a severance. Rather, under <u>Zafiro</u>, the party seeking severance on account of mutually antagonistic defenses must show not only that he and his co-defendant have antagonistic defenses, but also that the antagonism deprives him of a specific trial right or that simultaneous presentation of the defenses will somehow prevent the jury from reliably evaluating the evidence. <u>Zafiro</u>, 506 U.S. at 539-40; <u>Haynes</u>, 16 F.3d at 31-32. As the Second Circuit has noted, "an adversarial stance by a codefendant clearly does not, alone, require trials to be severed. Were this true, a virtual ban on multidefendant conspiracy trials would ensue since co-conspirators raise many different and conflicting defenses." <u>Cardascia</u>, 951 F.2d at 484.

Accordingly, a defendant seeking a severance on the ground of mutually antagonistic defenses satisfies his burden of showing substantial prejudice only if "the jury, in order to believe the core of testimony offered on behalf of [one] defendant, must necessarily disbelieve the testimony offered on behalf of his co-

defendant." Haynes, 16 F.3d at 31 (internal quotations omitted); see also Salameh, 152 F.3d at 115 ("In order to make a showing of 'mutually antagonistic' or 'irreconcilable defenses,' the defendant must make a factual demonstration that acceptance of one party's defense would tend to preclude the acquittal of [the] other.") (internal citation and quotations omitted). In other words, mere "fingerpointing" by one defendant seeking to shift the blame to his co-defendant is not the sort of antagonism that commands a severance. Casamento, 887 F.2d at 1154.

The type of purported conflict among defenses hypothesized by Defendants in their motion simply does not satisfy the requirement that accepting one defense theory of the case necessarily precludes the acquittal of the other defendants. Indeed, under the scenario posited by the Defendants, a jury could just as easily conclude that all (or none, if the jury were to find that the Government had not met its burden) of the defendants knowingly participated in a conspiracy to commit the charged conduct. Further, the Defendants' argument – that "[t]hey may actually affirm the existence of a New York based conspiracy of which they, like others, were unknowing victims" (Br. 13) – logically would not prejudice the Moving Defendants at all.

In any event, the Court need not find a total harmony among possible defense arguments to deny a motion for severance. In Zafiro itself, the denial of severance in the face of

26

antagonistic defenses was affirmed even though one defense lawyer argued that his client was innocent and unaware that his girlfriend, a co-defendant, was "distributing drugs."  506 U.S. at 536.  Furthermore, as with other asserted grounds for prejudice from a joint trial, the Court in <u>Zafiro</u> emphasized that severance is not required even where (unlike here) a defendant is able to demonstrate some prejudice from a joint trial involving antagonistic defenses.  Rather, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice."  506 U.S. at 539 (citing <u>Richardson</u> v. <u>Marsh</u>, 481 U.S. at 211).

Accordingly, the Defendants have not come close to meeting their burden to establish mutually antagonistic defenses of the type to justify the requested severance.

### 4.    The Defendants' Claim Of "Unique Harm" Is Meritless

The Moving Defendants – each of whom is released on bail – also argue that they will suffer some sort of "unique harm" by virtue of purported consequences to their careers and reputations.  Riddick and Montgomery argue that they are "public figures whose reputations have been besmirched and livelihoods impinged by the mere allegation of criminal activity," and Alexander argues that he is "a government contractor who cannot conduct his business with the pending criminal charges against him."  (Br. 14).  First, as a legal matter, this argument is

27

unavailing.  In their lengthy discussion of reputational and
professional prejudice (Br. 14-17), Defendants have not cited to
a single case – and the Government is aware of none – for the
novel theory that they will be uniquely or inordinately
prejudiced by the trial schedule by virtue of their professions
or celebrity.[8]

In any event, the Defendants' argument is far-fetched as a
factual matter.  Montgomery – self-described as "an
internationally renowned track-and-field athlete who for many
years has competed at the pinnacle of his sport (Br. 14) –
retired from the sport when he was suspended in December 2005 for
doping; as dictated by common sense and confirmed by Government
witnesses, he was not and would not be bringing in lucrative
endorsement deals quite apart from these criminal charges and the
trial schedule.  As far as the Government is aware from witnesses
and other sources, Riddick, who has been previously convicted of
fraud charges, has not lost any of his coaching business as a
result of the present charges.  (See also Br. 15 ("Riddick
continues to coach world class sprinters, including Olympian
Marion Jones").  Finally, Alexander's claim of financial harm due
to the allegations against him is dubious, at best, in light of

---

[8] Indeed, the contrary appears to be the case.  In Flowers v. Warden,
853 F.2d 133-34 (2d Cir. 1988), the court catalogued a number of cases in
which the Second Circuit has found no prejudice (in the context of Sixth
Amendment speedy trial arguments) where defendants claimed prejudice from loss
of their jobs, damage to their reputations, and other, much more substantial
consequences.

the fact that, by his own admission, he has not had Government contract work in years and instead operates a child care service. (See Exh. D, attached to Govt's Br. In Opp. To Alexander's Omnibus Motion).  In short, Defendants are no differently situated than the "normal defendant" and should not be treated differently than any other defendant awaiting trial.

**II.**

**THE SCHEDULED TRIAL DATE DOES NOT**
**IMPLICATE THE DEFENDANTS' SPEEDY TRIAL RIGHTS**

The Defendants contend that awaiting a joint trial would infringe upon their right to a speedy trial under the Sixth Amendment and the Speedy Trial Act, Title 18, United States Code, Section 3161 <u>et seq.</u>  (Br. at 21).  The Defendants' argument should be rejected.

**A.    There Is No Speedy Trial Act Violation**

The Defendant's Speedy Trial Act objection fails alongside their severance motion.  Should the Court decline to grant severance, the Speedy Trial Act time as to the Moving Defendants is properly excluded even over their objection.  The Speedy Trial Act provides, in relevant part, that the trial of a charge "shall commence within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs."  18 U.S.C. § 3161(c)(1).  The running of the Speedy Trial Act's 70-

day clock, however, is subject to the exclusions of time set forth in Section 3161(h) of the Act.  See 18 U.S.C. § 3161(h); 18 U.S.C. § 3164(b) ("The periods of delay enumerated in section 3161(h) are excluded in computing the time limitation specified in this section.").  Section 3161(h) provides for the automatic exclusion of certain periods of delay, including "[a] reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted."  18 U.S.C. § 3161(h)(7).

It is well settled that, under Section 3161(h)(7), "cases involving multiple defendants are governed by a single speedy trial clock . . . [and] delay attributable to any one defendant is charged against the single clock, thus making the delay applicable to all defendants."  United States v. Pena, 793 F.2d 486, 489 (2d Cir. 1986); accord United States v. Piteo, 726 F.2d 50, 52 (2d Cir. 1983); United States v. Barton, 647 F.2d 224, 230 n.5 (2d Cir. 1981); United States v. McGrath, 613 F.2d 361, 366 (2d Cir. 1979).  Under the unitary clock concept, courts routinely reject co-defendants' individualized objections to exclusions.  See, e.g., United States v. Edwards, 627 F.2d 460, 461 (D.C. Cir. 1980); United States v. Jarrell, 147 F.3d 315, 316 (4th Cir. 1998).

Accordingly, should the Court decline to sever the case, a single clock applies to all of the defendants.  All of the non-moving defendants have consented to the exclusion of time until

30

April 2, 2007 from Speedy Trial Act calculations, and thus the time will be properly excluded as to the Moving Defendants as well.[9]

### B.    There Is No Sixth Amendment Violation

The Defendants' invocation of their Sixth Amendment rights is likewise unavailing.  They are, of course, correct that the Supreme Court, in <u>Barker</u> v. <u>Wingo</u>, 407 U.S. 514 (1972), outlined a four-part test to evaluate Sixth Amendment speedy trial claims. <u>See</u> <u>Barker</u>, 407 U.S. at 530 (instructing courts to balance four factors, including "[l]ength of delay, the reason for delay, the defendant's assertion of his right, and prejudice to the defendant").  But they are wrong that balancing the factors weighs in favor of a more immediate trial (and, hence, a severance).

"Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other

---

[9] In addition to the automatic exclusions, the Speedy Trial Act also grants a district court the discretion to exclude, prospectively, additional periods if it determines that "the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial," 18 U.S.C. § 3161(h)(8)(A).  In this case, the ends of justice will be served by the exclusion of time, because, among other reasons, it will allow the other defendants in this relatively complicated case to enjoy continuity of their counsel.  18 U.S.C. § 3161(h)(8)(B).  Taking all of the above into account, the Court also would be well within its discretion if it prospectively excluded the time from its decision on the present motion until April 2, 2007 in the interests of justice.  18 U.S.C. § 3161(h)(8)(A).  <u>See, e.g.</u>, <u>United States</u> v. <u>Butz</u>, 982 F.2d 1378, 1381 (9th Cir. 1993) (time properly excluded under § 3161(h)(8)(A) in complex case where five of the nine co-defendants agreed that a continuance was necessary); <u>United States</u> v. <u>Fogarty</u>, 692 F.2d 542, 546 (8th Cir. 1982) (time properly excluded against objecting defendant where trial court excluded time in the interests of justice due to complexities of case and unavailability of co-defendant's counsel, which necessitated a continuance to assure continuity of counsel).

factors that go into the balance." Barker, 407 U.S. at 530.
Here, there is no such prejudicial delay.  A trial date has been
scheduled for some eleven months after the filing of the most
recent Indictment.  The Defendants either have not objected to an
exclusion of time until September 15, 2006 (in the cases of
Montgomery and Riddick) or can not complain of that exclusion due
to their filing of motions (in the case of each Defendant): thus,
the period of time from September 15, 2006 until the trial date
is some six and a half months, and the period from November 20,
2006 (the date on which the defendants calculate that the Speedy
Trial Clock expires, see Br. 21-24) is only some four and half
months.

    With respect to the first factor, the length of the delay is
much shorter in this case than has been held acceptable in other
cases under a Barker analysis – even where the defendants, unlike
the Moving Defendants, were incarcerated.  See United States v.
Vasquez, 918 F.2d 329, 338 (2d Cir. 1990) (26-month delay "less
extensive than that tolerated in other cases"); Flowers v.
Warden, 853 F.2d 131, 133-34 (2d Cir. 1988) (17-month delay
"considerably shorter than those in other cases where we have
found no speedy trial violation"; United States v. McGrath, 622
F.2d 36, 41 (2d Cir. 1980) (24-month delay is "considerably
shorter than that of other cases in which no Sixth Amendment
violation has been found"); United States v. Teyibo, 877 F. Supp.
846, 858-59 (S.D.N.Y. 1995) ("an eighteen-month delay is

32

considerably shorter than the delays in other cases in which courts have found no Sixth Amendment violation"). <u>Cf.</u> <u>Barker</u>, 407 U.S. at 534 (considering a ten-month period of incarceration to constitute "minimal" prejudice). The reason for the delay – the second <u>Barker</u> factor – is due to the inability of co-counsel to try the case earlier. Such a delay – where "[t]here is no evidence of bad faith or deliberate delays" – weighs less heavily than "deliberate delays or delays related to inexcusable inefficiency." <u>United States</u> v. <u>McGrath</u>, 622 F.2d 36 at 41.[10]

The final factor – the need to show prejudice – cuts strongly against the Defendants. As set forth above, Defendants have identified no prejudice that they will suffer under the Court's present schedule. They do not explain how the delay might "hinder their ability to effectively prepare for and participate in their criminal defense" other than to argue, once again, that Montgomery and Riddick are public figures. (Br. 28). This fact, even if accepted, does not implicate their ability to prepare their defense and participate in their trial. <u>McGrath</u>, 622 F.2d at 41 ("The professions of anxiety and concern, and of loss of witnesses' memory, are ephemeral. Absent specific assertions of such prejudice, it cannot tip the balance here"). The charged conspiracy spans until August 2005. With the

---

[10] The Government submits that the third <u>Barker</u> factor does not cut in favor of either party. While the Defendants did not (or due to the pendency of motions, could not) object to the delay between the time that they were indicted and September 15, 2006, the Defendants did make objections at the time that the trial date was scheduled.

conspiracy having ended just over one year ago, the Defendants can not (and do not) argue that witnesses might die, disappear, or forget the facts, or that documents are approaching extinction.  See, e.g., Flowers v. Warden, 853 F.2d 133-34 (collecting cases in which the Second Circuit consistently has found no constitutional speedy-trial violations despite such circumstances as death or unavailability of witnesses, lapses in witnesses' memories, and destruction of records).

The appropriate recognition is that some "pretrial delay often is both inevitable and wholly justifiable," Doggett v. United States, 505 U.S. 647, 656 (1992), as it reflects the reality of prosecuting multiple defendants for a conspiracy spanning a lengthy period of time and entailing extensive, interrelated criminal conduct.  Cf. Barker, 407 U.S. at 531 (recognizing that "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge").  There is no basis to conclude that a Sixth Amendment violation will occur and the Defendant's motion for severance should be denied on this ground as well.

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that the severance motion brought by defendants Montgomery, Riddick, and Alexander should be denied.


Dated:     New York, New York
           August 31, 2006


                        Respectfully submitted,

                        MICHAEL J. GARCIA
                        United States Attorney
                        Southern District of New York


               By:  _____
                        E. DANYA PERRY
                        Assistant United States Attorneys
                        (212) 637-2434

<u>CERTIFICATE OF SERVICE</u>

I, E. Danya Perry, affirm under penalty of perjury as follows:

1.   I am an Assistant United States Attorney in the Southern District of New York.

2.   On August 31, 2006, I caused a copy of the foregoing Government's Memorandum Of Law In Opposition To Defendants' Motion For Severance to be served via Clerk's Notice of Electronic Filing upon the following attorneys, who are filing users in this case:

        Robert W. McFarland, Esq.
        McGuire Woods, LLP
        World Trade Center
        101 West Main Street, Suite 9000
        Norfolk, VA 23510
        757-640-3716

        Bryan H. Hoss, Esq.
        Davis & Hoss, PC
        508 E. 5th Street
        Chattanooga, TN 37403
        423-266-0605

        Michael Fineman, Esq.
        305 Broadway, 7th Floor
        New York, NY 10007
        (212) 897-5823

I declare under penalty of perjury that the foregoing is true and correct.  28 U.S.C. § 1746.


                        _____
                        E. Danya Perry
                        Assistant United States Attorney
                        Telephone:  (212) 637-2434