UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA                 :
                                         :
            -v.-                         :    S4 05 Cr. 1067 (KMK)
                                         :
ROBERTO MONTGOMERY,                      :
NARESH PITAMBAR,                         :
STEVEN RIDDICK,                          :
NATHANIEL ALEXANDER, and                 :
TIMOTHY MONTGOMERY,                      :
                                         :
            Defendants.                  :
- - - - - - - - - - - - - - - - - - - - x


### GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' IN LIMINE MOTIONS


                              MICHAEL J. GARCIA
                              United States Attorney for the
                              Southern District of New York


E. DANYA PERRY
DANIEL W. LEVY
Assistant United States Attorney

     - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA            :
                                    :
         -v.-                       :    S4 05 Cr. 1067 (KMK)
                                    :
ROBERTO MONTGOMERY,                 :
NARESH PITAMBAR,                    :
STEVEN RIDDICK,                     :
NATHANIEL ALEXANDER, and            :
TIMOTHY MONTGOMERY,                 :
                                    :
              Defendants.           :
- - - - - - - - - - - - - - - - - - - - x


     The Government respectfully submits this memorandum of law
in opposition to the in limine motions filed by defendants Naresh
Pitambar, Timothy Montgomery, and Steven Riddick.  For the
reasons set forth below, the defendants' _in limine_ motions should
be denied.

**I.**

**<u>Riddick's Suppression Motion Should Be Denied</u>**

     At the eleventh hour, Riddick moves for suppression of his
post-arrest statements on the ground that they were taken in
violation of his Sixth Amendment right to counsel.  Riddick is
mistaken both as a matter of law and a matter of fact.

**A.    <u>Riddick Did Not Invoke His Sixth Amendment
       Right By His Pre-Indictment Retainer Of An Attorney</u>**

     Citing <u>United States v. Harrison</u>, 213 F.3d 1206 (9th Cir.
2000) as a "new rule of law," Riddick argues that his pre-
indictment invocation of his right to counsel precludes his post-
indictment interrogation by law enforcement.  (Br. at 5).

However, far from the "new rule of law" pronounced by the defendant, <u>Harrison</u> appears to be an outlying case that has not been followed by other Circuit Courts.  As a general matter, a defendant's right to counsel must attach prior to his invocation of that right.

As even <u>Harrison</u> observes, attachment of the right to counsel and the invocation of that right are distinct legal events.  <u>Harrison</u>, 213 F.3d at 1209 (citing <u>Maine v. Moulton</u>, 474 U.S. 159, 170 (1985)).  As <u>Harrison</u> further acknowledges, attachment generally must precede invocation.  <u>Id.</u> at 1210 (citing <u>McNeil v. Wisconsin</u>, 501 U.S. 171, 175-176 (1991)).  In <u>McNeil</u>, the Supreme Court held that the Sixth Amendment right "cannot be invoked once for all future prosecutions, for it does not attach until a prosecution has commenced . . .".  501 U.S. at 175; <u>see also</u> <u>United States v. Gouveia</u>, 467 U.S. 180, 187-8 (1984) ("our cases have long recognized that the right to counsel attaches only at or after the initiation of adversary judicial proceedings against the defendant.") (collecting cases).  Citing <u>McNeil</u> and "a long line of Sixth Amendment cases decided by the Supreme Court," the Seventh Circuit has held that Supreme Court jurisprudence "forecloses the argument that the Sixth Amendment right to counsel may be invoked before indictment."  <u>United States v. Muick</u>, 167 F.3d 1162, 1165 (7th Cir. 1999) ("When Muick's attorney requested that he be involved in all contact between Muick and the Customs agents, Muick had not yet been

2

indicted.  As there was no prosecution at that time, Muick's Sixth Amendment rights could not yet be invoked."); <u>see also</u> <u>United States v. Avants</u>, 278 F.3d 510, 515 (5th Cir. 2002) (In discussing the application of <u>Michigan v. Jackson</u>, court held that "defendant must have asserted the right to counsel at some point after the right attached and before the interrogation began."); <u>United States v. Aparo</u>, 221 F. Supp. 2d 359, 369 (E.D.N.Y. 2002) ("the right to counsel cannot be invoked prospectively in contemplation of future prosecutions because the right does not attach until a prosecution is commenced.").

Accordingly, this Court should decline to follow the outlier Ninth Circuit rule and should instead apply the long line of Supreme Court and other Circuit Court cases to hold that the right to counsel cannot be invoked anticipatorily, prior to attachment of that right, and that Riddick therefore did not invoke his Sixth Amendment right to counsel by retaining an attorney prior to indictment.

###   B.   In Any Event, Riddick Waived His Sixth Amendment Rights

Even if the defendant's pre-indictment retainer of an attorney constituted a valid invocation of the right to counsel, his subsequent statements are admissible because the conversation was initiated by him.  The cases uniformly make clear that the prohibition in <u>Edwards v. Arizona</u>, 451 U.S. 477, 484-85 (1981), and <u>Michigan v. Jackson</u>, 475 U.S. 625 (1986), is against "police-initiated interrogation."  No such prohibition against

interrogating a represented and charged defendant exists if a dialogue is initiated by the defendant.  Indeed, as a matter of policy, it makes little sense that a defendant should be able to blurt out a falsely exculpatory story while having the Government muzzled and unable to interpose questions about that story.  In this case, Riddick's post-arrest statements were initiated by him.[1]  The Government expect to establish, at a hearing to be held on April 11, 2007, that Riddick was eager to speak and it was Riddick who initiated the conversation.

###    1.   **Applicable Law**

In Edwards, the Court held that:

> [W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights.  We further hold that an accused, such as [the defendant], having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversations with the police*.

451 U.S. at 484-85 (emphasis added); see also Michigan v. Jackson, 475 U.S. 625, 636 (1986) ("We thus hold that, if *police*

---

[1] Although Riddick has failed to submit an affidavit alleging facts sufficient to raise a factual question about the circumstances surrounding his statements, in an April 3, 2007, conference call with the Court, Riddick's attorney represented that he would do so.  Accordingly, the Government herein proffers facts that it will establish at a hearing scheduled by the Court for the morning of April 11, 2007, to resolve the limited factual question of the instigation of Riddick's post-arrest statements.

4

*initiate interrogation* after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid.) (emphasis added).  The Supreme Court has further clarified that "before a suspect in custody can be subjected to further interrogation after he requests an attorney there must be a showing that the "suspect himself initiates dialogue with the authorities." Wyrick v. Fields 459 U.S. 42 (1982) (per curiam); see also Oregon v. Bradshaw, 462 U.S. 1039 (1983).  It is by now well-settled that "nothing in the Sixth Amendment prevents a suspect charged with a crime and represented by counsel from voluntarily choosing, on his own, to speak with police in the absence of counsel." Michigan v. Harvey, 494 U.S. 344, 352 (1990).

Little is required for a finding that a conversation was initiated by a defendant.  A defendant "initiates" an interrogation if he "evince[s] a willingness and a desire for a generalized discussion about the investigation." Bradshaw, 462 U.S. at 1045-56 (accused's question, "Well, what is going to happen to me now?" constituted initiation); see also Pickens v. Gibson, 206 F.3d 988 (10th Cir. 2000) (accused's question as to what charges would be brought against him initiated conversation); Owens v. Bowersox, 290 F.3d 960, 964 (8th Cir. 2002) (finding that defendant initiated conversation through the medium of his mother, who indicated to police officer that

5

defendant wanted or was willing to speak); see also United States v. Montana, 958 F.2d 516, 519 (2d Cir. 1992) (interrogation permissible because defendant indicated willingness to be interviewed by shaking his head and saying that he could not believe he was in all this trouble for only $50).

Under this rule, once an accused initiates a conversation, it remains for the trial court to determine "whether the purported waiver was knowing and intelligent and found to be so under a totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities." Edwards, 451 U.S. at 486, n. 9. In Bradshaw, the Court found that in asking a police officer "Well, what is going to happen to me now?," the accused initiated the conversation by evincing "a willingness and a desire for a generalized discussion about the investigation." 462 U.S. at 1045-46. Having found that the conversation was defendant-initiated, the Bradshaw Court held that the next step was to analyze the validity of the waiver, along the traditional test of "the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused." Id. at 1046; see also Solem v. Stumes, 465 U.S. at 646 (once an accused has invoked his right to counsel no further interrogation is permitted until accused initiates a new dialogue with the authorities); United States v. Spencer, 955 F.2d 814, 818-19 (2d Cir. 1992) (once an accused invokes his right to

6

counsel, "courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked.").

### 2.   Discussion

The Government expects to prove at a hearing that Riddick affirmatively sought to speak with the Government, and that his post-arrest statements therefore should be held admissible.

### II.

### Riddick's Severance Motion Should Be Denied

Riddick next moves for a severance from the trial of his co-defendants.  The argument here, predicated on Bruton v. United States, is that admission at a trial of Alexander's statements at an innocence proffer would violate Riddick's rights.  Riddick's argument is simply wrong because Alexander's statements incriminate Riddick only inferentially, that is, based on the introduction of further independent evidence.  Thus, Riddick is entitled to no severance based on Bruton.

### A.   Applicable Law

In Bruton v. United States, the Supreme Court held that the Sixth Amendment prohibits the introduction in a joint trial of the confession of a non-testifying co-defendant that implicates the defendant in a crime.  391 U.S. 123, 126, 135, 141-42 (1968). Bruton's holding was narrowed by two subsequent Supreme Court cases.  Richardson v. Marsh holds that the Sixth Amendment is not

7

violated by the admission of a non-testifying co-defendant's confession, where the confession is redacted to eliminate reference to the defendant.  481 U.S. 200, 211 (1987).  Gray v. Maryland further modified Bruton by making clear that "Richardson placed outside the scope of Bruton's rule those statements that incriminate inferentially."  523 U.S. 185, 196 (1998) (emphasis added); see United States v. Wilkinson, 754 F.2d 1427, 1435 (2d Cir. 1985) ("A defendant's Bruton rights would be violated, however, only if the statement, standing alone, would clearly inculpate him without introduction of further independent evidence.").  "There is no [Bruton] error, however, when the confession does not facially incriminate the defendant and incriminates only when linked with other evidence introduced later at trial."  United States v. Alonso, 66 F. Supp. 2d 261, 265 (D. Puerto Rico 1999).

Consistent with Richardson and Gray, no Bruton problem exists when a defendant's statements mentioning a co-defendant are false exculpatory statements because such statements inculpate only inferentially.  See United States v. Tropiano, 418 F.2d 1069, 1080-81 (2d Cir. 1969) ("Pellegrino's statement was completely exculpatory as to him and in no way inculpatory as to his co-defendants.  As far as Pellegrino was concerned, the denials were offered not as hearsay for the truth of their contents but as a verbal act by Pellegrino contradicted by

8

evidence subsequently placed before the jury from which a guilty conscience might be inferred.  When proven to be false, such an exculpatory statement is 'circumstantial evidence of guilty consciousness and [has] independent probative force.")

(alteration in original); <u>see also</u> <u>United States v. Escobar</u>, 50 F.3d 1414, 1422 (8th Cir. 1995) (<u>Bruton</u> was inapplicable to defendant's statement because "the evidence that Escobar and Duarte object to is not inculpatory.  Keeper's statement was used only to show that he was acquainted with Escobar and Duarte and he lied about this fact; this statement by itself does not implicate Escobar or Duarte in any wrongdoing."); <u>United States v. Arias</u>, 984 F.2d 1139 (11th Cir. 1993) (admission of defendants' statements did not violate <u>Bruton</u> as "[t]he challenged post-arrest statements were not confessions, but attempts by the parties to exculpate themselves").

**B.   <u>Discussion</u>**

In this case, Alexander's statements are very far from implicating Riddick in the charged crimes.  They are exculpatory statements as to both Alexander and Riddick -- albeit exculpatory statements that the Government intends to prove to be false and the implausibility of which Alexander himself admitted at the meeting at which he made these statements.

Primarily, Alexander's post-arrest statement purports to explain how it was that Alexander obtained an $850,000 check made

out to his company, B&T Petroleum. Alexander began by explaining
that he had a quasi-business relationship with his co-defendant,
Steve Riddick. Alexander stated that he and Riddick had an
arrangement with an entity called Beynon Sports, whereby he and
Riddick would locate sites to install running tracks and would
split a 10% commission (which they would receive up front, prior
to construction) for each contract awarded for a track at one of
their sites. He stated that he did not have a formal contract
with either Beynon Sports or Riddick, and had not yet received
any payments. Alexander stated that Riddick has been using
office space at Alexander's business address on Tait Terrace in
Norfolk for the past four years, free of charge.

        Alexander stated that, prior to April 26, 2005, Riddick had
called him on his cell phone to inquire whether Alexander was
interested in selling his fuel tank cleaning service, B&T
Petroleum. Riddick further stated said that he knew "business
people" who were interested in both (a) sponsoring ten athletes
to train in the United States; and also (b) purchasing B&T
Petroleum. Riddick told Alexander that these business people had
given Riddick a check for over $300,000 for the purpose of
coaching athletes. Riddick told Alexander that these individuals
are "the real deal" and have a lot of money. The would-be
purchaser or purchasers informed Riddick (who in turn informed
Alexander) that the purchase price would include the building,

10

equipment, pumps, hoses, and three months of Alexander's services.  Alexander and Riddick did not discuss the issue of any commissions for the sale.

Alexander stated that just a couple of days later, Riddick called Alexander to inform him that a check was waiting for him. Alexander believed that the check was from a group of investors. Alexander picked up the check and, due to the large dollar amount and possible paperwork involved, brought it to a personal injury attorney, who advised him not to give up any of his personal assets until he had a signed contract.  Riddick also told Alexander that the purchaser would not take possession of any part of the business until the check had cleared.

Alexander did not meet the investors or the unknown purchaser, nor did he ask Riddick how Riddick knew the purchaser, whose name Alexander believed may have been "Pete."  Alexander stated, at this point in the meeting, that he did not find it strange that "Pete" was purchasing his business sight unseen.  He was concerned that the check would not clear and that the real estate involved would be jeopardized, and he decided that he would not turn over any equipment until the check had cleared. Alexander stated that if he had turned over his equipment and the check had later been returned -- as Riddick's had been -- he would have lost the equipment.  For this reason, he was worried about relinquishing any equipment prior to the check's clearance.

11

Alexander was not concerned about the source of the check.

On the same day he received the check, Alexander brought it to SunTrust Bank and presented it to the branch manager. At his request, the manager called the issuing bank, who informed Alexander that the funds were available. Because he did not want to commingle his existing funds with this check, Alexander decided to open a new account in which to deposit the check.

Alexander stated that he had never spoken to Riddick about any fee due to Riddick. Riddick did explain to Alexander that there would be broker fees, and so, at Riddick's request, Alexander provided him with signed checks, with the payee information left blank. Because he had opened a new account for the purpose of depositing the $850,000 check, Alexander used starter checks, on which he handwrote the name and address of his company. Alexander stated that a check that had been issued to Ephraim Richardson looked strange, and that the signature and payee "looked crazy."

Alexander acknowledged that the version of events that he was then proffering to the Government was markedly different from the version of events he had told the agents following his arrest, and attributed the discrepancies to his surprise at the time of his arrest. He further acknowledged that the statements he had made to the agents following his arrest did not make any sense (and that he had told the agents this at the time), and

stated that it had taken him a while to piece the story together. Alexander further stated that he understood that the entirety of the deal does not make sense; that his story was strange; that it was not the way in which businessmen typically conduct business; and that it was unusual that he had opened a new account for the sole purpose of depositing the check. He stated that, in the ordinary course of business, he should have received a certified check for such a deal. He knew that he was going to write checks off the $850,000 check, and acknowledged that he thought it would be "stupid" to deposit the $850,000 check into his existing account, as that could jeopardize his funds there. Alexander stated that he "believe[s] that Riddick made an error"; Alexander stated that he continued to believe that he will get a percentage of any commissions involved in the construction of any running tracks.

Alexander admitted that he knew at the time he deposited the check that there were several "tip-offs" to fraud, including the failure of the purchaser or investors to do even the slightest bit of due diligence, and the fact that the deal was initiated and the purchase price was set not by Alexander, but by the unknown purchaser, via Riddick. In spite of these "tip-offs," Alexander deposited not only the first check for $850,000, but – after that check failed to clear – he deposited another check into another account. Alexander stated that this check, in the

13

amount of $150,000, was for the purchase of equipment and for his salary. This check, which he deposited into a personal account at BB&T Bank, also was returned.

These statements do not directly implicate Riddick in the commission of any crime. First and most important, Alexander statements are an attempt to provide the Government with an exculpatory explanation of how it was that an $850,000 and then a $150,000 check were deposited into accounts controlled by him. In doing so, Alexander indicates that Riddick was involved in the efforts to sell Alexander's business and explained how that came to be. Alexander simply makes no statement the incriminates Riddick directly. It is only by the force of <u>other evidence</u> that the Government seeks to admit that the Government will seek to incriminate directly.

Second, Alexander makes no statements regarding what Riddick thought or knew about the checks that were ultimately received and, therefore, Alexander's statement does not incriminate Riddick directly. Although Alexander admits that the entire transaction by which he received an $850,000 check did not make sense and that various other circumstances were unusual, Alexander suggests nothing about Riddick's state of mind -- the only issue likely to be contested in this case.[2]

---

[2] In this regard, there is one arguably incriminating statement as to Riddick. Alexander stated that Riddick "made an

For these reasons, there is simply no <u>Bruton</u> issue present as a result of the admission of Alexander's post-arrest statement.

**III.**

**<u>Pitambar's Severance Motion Should Be Denied</u>**

Pitambar seeks a severance under Federal Rule of Criminal Procedure 14, claiming, among other things, that the possible admission of evidence under Rule 404(b) as to defendants <u>other than him</u> prejudices him.  He also seeks a severance because of what he claims is the complexity of the case and his belief that there will be more evidence admitted as to his co-defendants than as to him.  None of these arguments satisfies the high standard necessary to overcome the preference for a joint trial.

**A.    <u>Applicable Law</u>**

Federal Rule of Criminal Procedure 14(a) authorizes the district court to grant a severance of defendants' joint trial "[i]f it appears that a defendant or the government is prejudiced by a joinder."  Fed. R. Crim. P. 14(a).  The Supreme Court has instructed that severance is warranted only if "there is a <u>serious risk</u> that a joint trial would compromise a <u>specific trial right</u> of one of the defendants, or prevent the jury from making a

---

error."  The Government is prepared to not offer this statement in its case-in-chief, should the Court determine that this statement is directly incriminating as to Riddick.

15

reliable judgment about guilt or innocence." <u>Zafiro v. United States</u>, 506 U.S. 534, 539 (1993) (emphasis added).

"For reasons of economy, convenience and avoidance of delay, there is a preference in the federal system for providing defendants who are indicted together with joint trials." <u>United States v. Feyrer</u>, 333 F.3d 110, 114 (2d Cir. 2003). Or, as the Supreme Court has put it, joint trials "play a vital role in the criminal justice system." <u>Richardson v. Marsh</u>, 481 U.S. 200, 209 (1987). They not only promote efficiency, but also "serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." <u>Id.</u> at 210.

The presumption in favor of joint trials is so strong that "[t]he principles that guide the district court's consideration of a motion for severance usually counsel denial." <u>United States v. Rosa</u>, 11 F.3d 315, 341 (2d Cir. 1993). This presumption is particularly strong where, as here, "the crime charged involves a common scheme or plan" among the defendants. <u>United States v. Girard</u>, 601 F.2d 69, 72 (2d Cir. 1979). Accordingly, the Second Circuit consistently has approved the joinder of defendants and charges where the acts of the defendants share some identity of facts or participants, or arise from a common plan or scheme. <u>See</u>, <u>e.g.</u>, <u>United States v. Cervone</u>, 907 F.2d 332 (2d Cir. 1990) (proper joinder of eighteen defendants in 102-count indictment with a variety of labor racketeering charges, as well as related

charges of obstruction of justice, bribery, and making false statements); Attanasio, 870 F.2d 809 (defendants charged with conspiracy to defraud IRS properly joined with defendants and charges relating to a separate conspiracy to defraud IRS because of common participants and because they were part of a series of acts).

A defendant seeking severance, therefore, shoulders the "extremely difficult burden" of showing that he would be so prejudiced by joinder as to deny him a fair trial. United States v. Casamento, 887 F.2d 1141, 1149 (2d Cir. 1989) (internal quotations omitted). As noted, the prejudice must be so "substantial" that there exists "a serious risk that a joint trial would compromise a specific trial right of the moving defendant or prevent the jury from making a reliable judgment about guilt or innocence." Rosa, 11 F.3d at 341. It is not enough for a defendant to show that he "may have a better chance of acquittal in [a] separate trial[]." Zafiro, 506 U.S. at 540; see also United States v. Panza, 750 F.2d 1141, 1149 (2d Cir. 1984) (explaining that prejudice must be "sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials").

It is well settled that "differing levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials." United

17

States v. Spinelli, 352 F.3d at 55 (2d Cir. 2003); United States v. Carson, 702 F.2d 351, 366-67 (2d Cir. 1983); United States v. Torres, 901 F.2d 205, 230 (2d Cir. 1990).  Similarly, "[t]he fact that evidence may be admissible against one defendant but not against others does not require separate trials."  United States v. Rucker, 586 F.2d 899, 902 (2d Cir. 1978); see also United States v. Zackson, 6 F.3d 911, 922 (2d Cir. 1993).

Moreover, "[t]he fact that . . . codefendants [are] tried for a crime not committed by another codefendant does not, without more, create the sort of miscarriage of justice that would require a new trial."  United States v. Hernandez, 85 F.3d 1023, 1029 (2d Cir. 1996).  Rather, a defendant must show that evidence introduced against his co-defendants would "in some way affect[] the jury's ability fairly and rationally to evaluate the evidence of [the defendant's] guilt."  Id. at 1029.  The Second Circuit has long held that "[e]vidence at the joint trial of alleged co-conspirators that, because of the alleged conspiratorial nature of the illegal activity, would have been admissible at a separate trial of the moving defendant is neither spillover nor prejudicial."  Rosa, 11 F.3d at 341; see also Spinelli, 352 F.3d at 55-56 (upholding denial of severance motion and denying prejudicial spillover claim where "much of the evidence of [co-defendant's] crimes would have been admissible at a separate trial of [defendant], since it was relevant to proving

the nature and the scope of the conspiracy"); <u>United States v.</u>
<u>Villegas</u>, 899 F.2d 1324, 1347-48 (2d Cir. 1990) (rejecting claims
that spillover evidence against co-defendants prejudiced moving
defendants).  Any potential for prejudice is diminished where the
court instructs the jury to consider separately each individual
and each charge.  <u>Spinelli</u>, 352 F.3d at 55 (noting that spillover
prejudice may be remedied by limiting instruction); <u>United States</u>
<u>v. Miller</u>, 116 F.3d 641, 679 (2d Cir. 1997) (same).

    These principles apply equally when evidence of other "bad
acts" are to be admitted as to one defendant, but not another.
Under this circumstance, no severance is warranted.  "Simply put,
'[e]vidence of prior criminal offenses relating only to one
defendant does not generate prejudice rising to the level that
requires severance.'"  <u>United States v. Taveras</u>, 95 Cr. 173, 1995
WL 390167, *7 (S.D.N.Y. June 30, 1995).  "The appropriate remedy
for any possible prejudice in the event that Rule 404(b) evidence
is admitted relating to a co-defendant is a limiting instruction
concerning the use of Rule 404(b) evidence and an instruction
directing that the jury not consider the evidence of a
co-defendant's prior criminal conduct in determining the
defendant's guilt, not a severance." <u>Id.</u>; <u>see</u>, <u>e.g.</u>, <u>United</u>
<u>States v. Ramirez</u>, 426 F.3d 1344, 1352 (11th Cir. 2005) ("Ramirez
did not meet his burden to show compelling prejudice that the
judge's first limiting instruction to the jury, regarding the

19

evidence of Quinones's prior acts and their lack of relevance to
Ramirez, was ineffectual or that the jury could not make an
individualized determination as to his guilt or innocence");
United States v. Manner, 887 F.2d 317, 325 (D.C. Cir. 1989) ("we
find no undue risk, here, that the jury would unjustly impute
Leeper's subsequent bad act to Manner"); United States v.
Robinson, 774 F.2d 261, 266-267 (8th Cir. 1985) (denying
severance motion because "[t]he 'other crimes' and bad acts
evidence that was admitted against Wilson or Robinson only was
accompanied by the court's instructions to the jury that the
evidence was not to be considered against Milliken"); United
States v. Tuchow, 768 F.2d 855, 865 n.10 (7th Cir. 1985) ("we
hold that the court did not abuse its discretion in denying the
severance motion given the clear language contained in the
court's limiting instructions that the evidence as to Farina's
other acts was to be considered against Farina only"); United
States v. Wei, 862 F. Supp. 1129, 1136 (S.D.N.Y. 1994)
(defendants did not show "any reason why the potentially
prejudicial effect of evidence admissible against his
co-defendants could not be adequately mitigated by a limiting
instruction").

A motion to sever is "committed to the sound discretion of
the trial court." United States v. Scarpa, 913 F.2d 993, 1014
(2d Cir. 1990) (internal quotations omitted); see also United

20

States v. Beverly, 5 F.3d 633, 637 (2d Cir. 1993); Torres, 901
F.2d at 230.  Indeed, given the strong preference for joint
trials, a district court order denying a Rule 14 motion is
considered "virtually unreviewable" and will be overturned "only
if a defendant can show prejudice so severe that his conviction
constituted a miscarriage of justice and that the denial of his
motion constituted an abuse of discretion."  United States v.
Diaz, 176 F.3d 52, 102 (2d Cir. 1999) (internal quotations
omitted).

   B.   **Discussion**

      None of the various reasons for a severance cited by
Pitambar satisfies his heavy burden of showing that "there is a
serious risk that a joint trial would compromise a specific trial
right of one of the defendants, or prevent the jury from making a
reliable judgment about guilt or innocence."  Zafiro, 506 U.S. at
539.

      First, the admission of evidence pursuant to Rule 404(b) as
to other defendants simply does not justify a severance.  Far
from having a "devastating" effect on Pitambar, the evidence
sought to be admitted has absolutely nothing to do with Pitambar.
A limiting instruction is sufficient to ensure that the jury
considers this evidence only as to the defendant against whom it
is admitted.  Given the strong presumption that juries follow
limiting and other instructions, United States v. Snype, 441 F.3d

119, 129-30 (2d Cir. 2006), Pitambar cannot fall back on the specious claim that "the jury would not be able to follow [a limiting instruction]." The 404(b) evidence that the Government seeks to admit is discrete, compartmentalized to defendants Riddick and Montgomery, and unsensational. Severance on this ground is unwarranted.

Pitambar's other arguments (all of which he could have made at the time the Court required pre-trial motions to be filed) fare no better. The claim that this is a particularly complex case, justifying severance because Pitambar believes only a small portion of the evidence will be admitted against him does not remotely justify a severance.

Relative culpability or level of engagement in a joint conspiracy simply is not a basis for severance. "Different levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials." United States v. Chang An-Lo, 851 F.2d 547, 557 (2d Cir. 1988) (emphasis added); see also Scarpa, 913 F.2d at 1015 (same); United States v. Ebner, 782 F.2d 1120, 1127 (2d Cir. 1986) (joinder proper even though moving defendant participated in conspiracy for shorter period of time than co-defendants); United States v. Stirling, 571 F.2d 708, 733 (2d Cir. 1978) (joinder proper even though moving defendant did not participate "in every detail of the conspiracy"). Indeed, the

22

Second Circuit "has repeatedly recognized that joint trials
involving defendants who are only marginally involved alongside
those heavily involved are constitutionally permissible." United
States v. Locasio, 6 F.3d 924, 947 (2d Cir. 1993); see also
United States v. Joyner, 201 F.3d 61, 80 (2d Cir. 2000) (district
court properly denied severance motion where two-month trial
focused almost exclusively on narcotics conspiracy and defendant
was only charged with committing a single act of arson on a
single day); United States v. Carson, 702 F.2d 351, 366-367 (2d
Cir. 1983) (fact that defendant played a less prominent role in
the conspiracy than many of his co-conspirators was not a
sufficient ground for a separate trial); United States v. Aloi,
511 F.2d 585, 598 (2d Cir. 1975) (individual trials are not
warranted merely because of "differences in degree of guilt and
possibly degree of notoriety of defendants").

     Furthermore, Pitambar cannot seriously argue that there is a
great amount of evidence that will not be admitted as against
him, but only as against his co-defendants.  A large portion of
the proof that the Government will seek to admit will be of the
existence and scope of the two conspiracies charged in Count One
(the bank fraud conspiracy) and Count Thirteen (the money
laundering conspiracy).  All of this evidence will be admitted as
against Pitambar, contrary to Pitambar's claim that a trial just
as to him would last two to three days.  Under these

circumstances, there is no prejudice to Pitambar from a joint trial.  Salameh, 152 F.3d 88, 115 (2d Cir. 1998) ("defendant's claim that he was prejudiced by the admission of evidence at a joint conspiracy trial is insupportable when the evidence would have been admissible against him in a separate trial alone as a member of the conspiracy").

**IV.**

**Pitambar's Request For Additional Peremptory Challenges Should Be Denied Or, In The Alternative, Conditioned <u>On Granting The Government Additional Challenges</u>**

Pitambar next seeks to multiply the number of peremptory challenges to be exercised by the defendants.  Pitambar seeks either twenty peremptory challenges to be jointly exercised by the defendants (thereby doubling the number normally provided to defendants) or five peremptory challenges to be separately exercised (thereby increasing by 250% the number normally provided to defendants).  The Court should deny this request.

In general, defendants in multi-defendants trial are not normally entitled to any more peremptory challenges than the number prescribed in Rule 24(b), even when they disagree about how to exercise them, as long as they are given a trial by an impartial jury.  United States v. Hueftle, 687 F.2d 1305, 1309 (10th Cir. 1982); United States v. Crutcher, 405 F.2d 239, 245 (2d Cir. 1968).  The Court does, however, have discretion to grant or deny requests for additional peremptory challenges,

pursuant to Rule 24(b).  It is also within the Court's broad discretion to determine whether peremptory challenges should be exercised jointly or separately.  United States v. Blouin, 666 F.2d 796, 797 (2d Cir. 1981).

In this case, the Court should not permit the defendants to inordinately prolong jury selection by requiring that the Court qualify an additional ten or fifteen jurors.  Pitambar's argument is that there may be publicity and, therefore, jurors who seek to sit on a case that may attract media attention.  The normal ten peremptory challenges to be jointly exercised is sufficient to ensure that an impartial jury is selected.  After all, the defendants will have an unlimited ability to challenge jurors for cause, which much more directly goes towards eliminating jurors who may be seeking to sit on a jury involving defendants of public notoriety.  Although peremptory challenges "reinforc[e] a defendant's right to trial by an impartial jury," "such challenges are auxiliary; unlike the right to an impartial jury guaranteed by the Sixth Amendment, peremptory challenges are not of federal constitutional dimension."  United States v. Martinez -Salazar, 528 U.S. 304, 311 (2000).

If the Court is willing to entertain an increase in the number of peremptory challenges for the defense, then it should be conditioned on giving the Government a proportionate increase in peremptory challenges.  United States v. Davidson, 92 Cr. 35,

25

1992 WL 402959 (N.D.N.Y. Dec. 16, 1992) ("the court may condition its award of additional peremptory challenges to the defendants upon their stipulating that the United States also receive additional challenges"); see also United States v. Bruno, 873 F.2d 555, 561 (1989).

**V.**

**Timothy Montgomery's Motion For Pre-Trial Discovery And Adjudication Of Co-Conspirator Statements Should Be Denied**

Defendant Timothy Montgomery seeks pretrial disclosure of all statements the Government intends to offer as co-conspirator statements under Fed. R. Evid. Rule 801(d)(2)(E), and the pretrial adjudication as to the admissibility of those statements.

Defendant asks the Court, based on the holdings of United States v. Murgas, 967 F. Supp. 695 (N.D.N.Y. 1997), and United States v. Gallo, 654 F. Supp. 463 (E.D.N.Y. 1987), to order pretrial disclosure of any co-conspirator's statements.  In relying on these two cases, the motion omits the fact that Gallo was explicitly overruled with respect to its holding that co-conspirator statements are discoverable, and also ignores the wealth of precedent in this district disagreeing with the reasoning and holding of Murgas.

In Gallo, the defendants sought the pretrial disclosure of statements made by unindicted co-conspirators.  654 F. Supp. at

26

465.  Although the district court in that case required the
Government to produce all memorialized "statements made by
defendants and co-conspirators that the government plans to offer
at trial as admissions of a defendant," it specifically exempted
statements made by co-conspirators who were prospective
witnesses. Id. at 480.  The Government sought a writ of mandamus
to prevent disclosure preventing disclosure and the Second
Circuit overruled Gallo, holding that "as to the district court's
order for the production of statements of government witnesses,
the Jencks Act controlled, and the district court had no inherent
power to modify or amend the provisions of that Act." In re
United States, 834 F.2d 283, 287 (2d Cir. 1987). In response to
the exception carved out for prospective Government witnesses the
Second Circuit characterized this as "a limited concession at
best . . . because in many cases it will be the undercover agent
or informer rather than the coconspirator who is the prospective
witness." Id. at 286.  In a footnote following this statement,
the Second Circuit stated: "We are not concerned here with a
demand for disclosure under Brady v. Maryland, 373 U.S. 83, 87,
83 S. Ct. 1194, [] (1963).  Accordingly, if the Government did
not intend to call anyone to testify concerning coconspirators'
statements, [the statements] were not discoverable at all." In
re United States, 834 F.2d at 286 n.2.  In short, even the
limited authority supplied by the defendant has been overruled.

Likewise, the precedential value of Murgas is dubious at best.  In United States v. Nachamie, 91 F. Supp. 2d 565, 577-578 (S.D.N.Y. 2000), the court held that the Murgas court read the decision of In re United States too narrowly, noting that the Second Circuit's holding established that "the statements of nontestifying co-conspirators are not discoverable absent a requirement that they be produced under the Brady doctrine."  Id. at 578 (collecting cases); see also United States v. Palermo, 99 Cr. 1199, 2001 WL 185132, *5 (S.D.N.Y. Feb. 26, 2001); United States v. Tochelmann, 98 Cr. 1276, 1999 WL 294992, *4 (S.D.N.Y. May 11, 1999) ("It is well settled that co-conspirator statements are not discoverable under Fed. R. Cr. P. 16(a) and (c) (governing governmental disclosure), and that such statements are not considered 3500 material under the Jencks Act"); United States v. McDougall, 97 Cr. 406, 1998 WL 160834, 2 (N.D.N.Y. Apr. 3, 1998); United States v. Zhang, 94 Cr. 21, 1994 WL 141960, *2 (S.D.N.Y. Apr. 20, 1994);  United States v. Piedrahita, 91 Cr. 652, 1992 WL 58857, *5 (S.D.N.Y. Mar. 19, 1992).  "Indeed the Murgas Court is the only court in this Circuit to have adopted its reading of In re United States." Nachamie, 91 F. Supp. 2d at 578 n.15.

In any event, the defendant is not entitled to a pretrial hearing regarding the admissibility of co-conspirator statements under Fed. R. Evid. Rule 801(d)(2)(E).  "[A]ny dispute concerning

28

the admissibility of a co-conspirator statement offered by the Government under Fed. R. Evid. 801(d)(2)(E) is to be resolved at trial and no pre-trial ruling or conference is necessary." Tochelmann, 1999 WL 294992 at *4; see, e.g., United States v. Coffey, 361 F. Supp. 2d 102, 124 (E.D.N.Y. 2005) ("The Court will resolve any dispute concerning the admissibility of a co-conspirator statement offered by the Government under Fed. R. Evid. 801(d)(2)(E) at trial, consistent with its well-established practice.  The Second Circuit expressly has approved the practice of admitting such statements at trial subject to the Government's introduction of evidence which will support the findings required by *Bourjaily. . . "*); United States v. Paredes, 176 F. Supp. 2d 183, 188-89 (S.D.N.Y. 2001) ("[T]he hearsay statements are conditionally admitted into evidence during the government's case-in-chief."); United States v. Labate, 00 Cr. 632, 2001 WL 533714, at *21 (S.D.N.Y. May 18, 2001) ("The Second Circuit has expressly approved the practice of conditionally admitting [801(d)(2)(E)] statements at trial, subject to the later submission of evidence necessary to make the preliminary pre-requisite findings.... [And defendant] has provided no convincing reason to depart from this well-settled practice."); United States v. Nunez, 00 Cr. 121, 2001 WL 91708, *7 (S.D.N.Y. Feb.1, 2001) ("The Court will resolve any dispute concerning the admissibility of a co-conspirator statement offered by the

Government under Rule 801(d)(2)(E) of the Federal Rules of
Evidence at trial, and denies Defendant Thomas' request for a
pre-trial ruling or conference to make such determination");
United States v. Belin, 99 Cr. 214, 2000 WL 679138, *5 (S.D.N.Y.
May 24, 2000) (denying defendant's motion for a pretrial hearing
regarding the admissibility of co-conspirator statements, "as
these issues of evidence shall be addressed by the Court, if
necessary, during the course of the trial."); United States v.
Wang, 98 Cr. 199, 1998 WL 556160, *5 (S.D.N.Y. Aug. 31, 1998)
("[C]o-conspirator statements may be admitted in evidence on a
conditional basis, subject to the later submission of the
necessary evidence."); United States v. Cordero, 97 Cr. 63, 1998
WL 52034, *2 (N.D.N.Y. Jan. 30, 1998) (characterizing defendant's
argument that the prosecution should be required to prove the
existence of the conspiracy at a pretrial hearing rather than
through its case-in-chief at trial as "frivolous").

Accordingly, defendant Timothy Montgomery's request for the
pret-trial discovery and adjudication of co-conspirator
statements should be denied.

## VI.

## Pitambar's Motion To Preclude The
## Admission Of Evidence Should Be Denied

Defendant Pitambar moves to preclude the admission of three
checks issued to him by co-conspirator Christine Richardson.

This motion should be denied, as this evidence – i.e., a series of checks between the same two co-conspirators, during the same time frame charged in the Indictment – is simply part of the conspiracy.  At the very least, this evidence provides important background to the relationship between the two.  Such background evidence is routinely admitted to explain the prior relationship and trust between two conspirators.  See, e.g., United States v. Williams, 205 F.3d 23, 33-34 (2d Cir. 2000); United States v. Pitre, 960 F.2d 1112, 1119-20 (2d Cir. 1992); United States v. Kalaydjian, 784 F.2d 53, 56 n.3 (2d Cir. 1986) ("We have held that a trial court has the discretion to admit prior act evidence in order to establish the background of the conspiracy or to show the basis of the trust relationship between the informant and the defendant."); see also Araujo, 79 F.3d at 7 ("Steadfast behavior in carrying out another – albeit different – crime would tend to show the basis for [a relationship of] trust" between two conspirators.).  Accordingly, no further proffer is necessary as to these three checks, and they should be deemed admissible at trial.

## VII.

### Proof of Riddick's Prior Forgery
### Conviction Should Be Admitted At Trial

Riddick objects to the admission of his 2001 forgery conviction of the grounds that (i) the Government allegedly

31

failed to provide notice of this conviction to the defendant;
(ii) it is not similar or relevant to the current charges and
will unfairly prejudice him at trial; and (iii) intent will not
be at issue in this case.  None of these contentions has merit.

### A.    The Defendant Had Proper Notice Of His Criminal History

The NCIC criminal history report provided by the Government
in discovery inexplicably fails to list Riddick's 2001 forgery
conviction.  It does, however, list his arrest on those charges,
and lists the "disposition" as "not received."  At no time did
Riddick ever request that the Government provide or seek further
clarification regarding the disposition of this case, as he is
required to due under the Rule.  See Fed. R. Cr. P. 16(a)(1)(D)
("*Upon a defendant's request*, the government must furnish the
defendant with a copy of the defendant's prior criminal record
that is within the government's possession, custody, or control .
. .") (emphasis added).  It seems absurd to have to point out
that Riddick was well aware that he had been convicted of a
felony forgery count some five years prior to his arrest and that
his two year suspended sentence had expired some three years
prior to his arrest.  (Indeed, while Riddick was aware of his own
conviction, the Government was not aware of it until the
publication of a June 26, 2006 front page article in Riddick's
local newspaper, The Virginian-Pilot, in which Riddick himself

was quoted and in which his May 2001 forgery conviction is noted.
Surely, if he had forgotten his recent conviction, he was
reminded of it at that point).  Under these circumstances, it is
a stretch, to say the least, for Riddick to accuse the Government
failing to meet its Rule 16 obligations of adequately notifying
him of his criminal history.  Under the Sixth and Tenth Circuit
case law cited by the defendant (see Br. 2), there can be (i) no
accusation of bad faith by the Government in producing the
automated NCIC report; (ii) no prejudice "as a result of the
government's delay" in producing evidence of Riddick's conviction
more than three weeks prior to trial;[3] and (iii) there is no need
for a continuance given the lack of prejudice.

   **B.    Riddick's Prior Forgery Conviction Is
          Far More Probative Than It Is Prejudicial**

     In connection with his May 2001 guilty plea to a felony
forgery count, Riddick entered into a Stipulation of Facts.

---

[3] Riddick also accuses the Government of failing to supply
him with a copy of the judgment.  (Br. at 2).  However, the
Government attached to its March 19, 2007 motion a copy of the
final judgment and sentencing order, dated June 29, 2001.  In any
event, the Government was under no obligation to produce any
information regarding the underlying facts of Riddick's
conviction.  See United States v. Hourihan, 66 F.3d 458, 463 (2d
Cir. 1995) (noting that there is "no authority for placing such
an intolerable burden on the prosecution").  In any event, there
can be no prejudice (and none has been cited) in the production
of these materials more than three weeks in advance of trial.
See, e.g., United States v. Ojeikere, 299 F. Supp. 2d 254, 257
(S.D.N.Y. 2004) ("Courts in this Circuit have routinely found
that at least ten business days provides reasonable notice to a
defendant under Rule 404(b).").

(attached to Govt's motion as Exh. A).  A quick review of those
facts makes clear that the two schemes bear many significant
similarities.  In the earlier scheme, Riddick submitted receipts
forged by a co-conspirator in order to split proceeds with that
co-conspirator, and claimed that he had not known that certain of
the receipts had been forged.  Indeed, even where he admitted
that his handwriting appeared on certain of the altered and
forged receipts, he nonetheless claimed ignorance that the
signature had been forged (although he could provide no
explanation for how that forged signature appeared on his altered
receipt).  The two schemes thus relate to an agreement to alter
and forge documents for the purpose of obtaining and sharing
proceeds.  The Government of course does not dispute that the
amounts in the two schemes are quite different, but the means,
modalities, and intent are the same.[4]

### C.    Riddick's Prior Conviction Should Be Admitted Because It Goes To His Knowledge and Intent

Riddick argues that "the defense in the case is not intent

---

[4] Riddick also appears to attach some significance – albeit
no legal authority – that the criminal act for which he had
earlier been convicted is 11 years old.  However, there is no
time limitation on evidence introduced under Rule 404(b), see,
e.g., United States v. Mahler, 579 F.2d 730, 736 (2d Cir. 1978)
(convictions outdated under Rule 609(b) was nevertheless properly
admitted under Rule 404(b)).  In any event, only approximately
four years passed between the time of Riddick's conviction in May
2001 and the time of his criminal conduct in this case, between
March and May 2005.

34

and knowledge . . . but rather the credibility of the
government's chief witness, Anthony Prince, and whether the
defendant conspired with Prince to commit the crimes of bank
fraud and money laundering."  (Br. at 7).  This tortured attempt
to re-characterize the only possible defense he can mount should
fail.

Riddick posits that the "government's only proof linking
Riddick to the counterfeit nature of these three (3) checks is
Prince."  (Br. 9).  That is far from the case; indeed, as the
defendant is by now aware, the Government does not even intend to
call Prince as a witness at trial.  Instead, the Government
intends to call numerous other cooperating, law enforcement, and
lay witnesses who will testify to that link, and it intends to
introduce voluminous documents and other evidence establishing
the same.  The Government will present testimony that Riddick
directly conspired with individuals other than Prince, including
Tim Montgomery, Nathaniel Alexander, and Douglas Shyne.  Thus,
the credibility of Anthony Prince will not be an issue at trial.[5]

---

[5] The defendant cites <u>United States v. DeCicco</u>, 435 F.2d 478
(2d Cir. 1970), in support of his motion for the exclusion of
this 404(b) evidence.  However, the defendants in <u>DeCicco</u> were
seeking to "avoid conviction on the narrow ground that they did
not intend to transport the property in interstate commerce."
<u>DeCicco</u>, 435 F.2d at 483. In ruling that the admission of the
404(b) evidence was an abuse of discretion, the Second Circuit
relied on that the fact that "almost the entire defense was the
attempted impeachment of the Government's principal witness, Paul
Parness", and that none of the defendants even claimed that they

If accepted, Riddick's argument that his defense will be not intent, but merely lack of agreement with Anthony Prince, effectively would concede guilt as to the substantive bank fraud counts against him. It also would mean that he effectively will not present or argue a defense, given the Government's decision not to call Prince. It is hard to believe that this is Riddick's true intention; however, if, as in the case cited by Riddick, he is willing to stipulate to knowledge and intent, then the Government will withdraw its 404(b) motion. See Br. at 7.

For the foregoing reasons, and for the reasons stated in the Government's March 19, 2007 motion, the Government respectfully submits that evidence of Riddick's May 2001 felony forgery conviction should be admitted at trial.

---

did not know that the paintings were stolen. Id. at 483-484. Therefore, the 404(b) evidence relating to a prior scheme to sell stolen goods, which was admitted by the trial court to show intent, was not highly probative given the fact that the defendants sought to disprove only the intention to transport the stolen goods in interstate commerce. See id. Unlike the defendants in DeCicco, Riddick is not seeking to avoid conviction on such a narrow ground. It is clear from his post-arrest statements, his statements to bank investigators, and his production to the Government that Riddick's defense will have to turn on his knowledge and intent in causing the checks at issue to be deposited.

**<u>CONCLUSION</u>**

For the foregoing reasons, the Government respectfully submits that the defendants' in limine motions should be denied.

Dated:    New York, New York
          April 4, 2007

                        Respectfully submitted,

                        MICHAEL J. GARCIA
                        United States Attorney
                        Southern District of New York


              By:    _____/s/_____
                        E. DANYA PERRY/DANIEL W. LEVY
                        Assistant United States Attorneys
                        Telephone:  (212) 637-2434/-1062

<u>CERTIFICATE OF SERVICE</u>

I, Daniel W. Levy, affirm under penalty of perjury as follows:

1.    I am an Assistant United States Attorney in the Southern District of New York.

2.    On April 4, 2007, I caused a copy of the foregoing Government's Memorandum of Law in Opposition to Defendants' *In Limine* Motions to be served via Clerk's Notice of Electronic Filing upon the following attorneys, who are filing users in this case:

> Denis P. Kelleher, Jr., Esq.
> Kelleher & Dunne LLP
> 17 Battery Place, 11th Floor
> New York, NY  10004
>
> Thomas H. Nooter, Esq.
> Freeman Nooter & Ginsberg
> 30 Vesey Street, Suite 100
> New York, NY  10007
>
> Bryan H. Hoss, Esq.
> Davis & Hoss, PC
> 508 E. 5th Street
> Chattanooga, TN  37403
>
> Bruce A. Barket, Esq.
> Bruce A. Barket, P.C.
> 666 Old Country Road, Suite 600
> Garden City, NY  11530
>
> Robert W. McFarland, Esq.
> McGuire Woods, LLP
> World Trade Center
> 101 West Main Street, Suite 9000
> Norfolk, VA  23510

Timothy J. Heaphy, Esq.
McGuire Woods LLP
One James Center
901 East Cary Street
Richmond, VA  23219-4030

I declare under penalty of perjury that the foregoing is true and correct.  28 U.S.C. § 1746.

_____/s/_____
Daniel W. Levy
Assistant United States Attorney
Telephone:  (212) 637-1062