UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    -v-

DOUGLAS SHYNE,
NATASHA SINGH,
  a/k/a "Beatris Rodrigues,"
NATHANIEL SHYNE,
TOYBE BENNETT,
  a/k/a "Dmitriy Makarevich,"
  a/k/a "Dmitriy Makervish,"
  a/k/a "Eduardo Rodrigues,"
  a/k/a "Cecilio Pena,"
ROBERTO MONTGOMERY,
EPHRAIM RICHARDSON,
NARESH PITAMBAR,
JASON WATLER,
STEVEN RIDDICK,
NATHANIEL ALEXANDER, and
TIMOTHY MONTGOMERY,

               Defendants.

Case No. S4 05-CR-1067 (KMK)

OPINION and ORDER

Appearances:

Michael J. Garcia, Esq.
United States Attorney
E. Danya Perry, Esq.
Assistant United States Attorney
U.S. Attorney's Office, Southern District of New York
*Counsel for the Government*

Michael Fineman, Esq.
The Law Office of Michael Fineman, Esq.
New York, New York
*Counsel for Defendant Nathaniel Alexander*

KENNETH M. KARAS, District Judge:

      In a Fourth Superseding Indictment (S4 05 Cr. 1067), a grand jury charged Defendant

Nathaniel Alexander ("Alexander" or "Defendant") with three counts, including: conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349 (Count One); bank fraud, in violation of 18 U.S.C. § 1344 (Count Five); and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956 (Count Thirteen). On June 1, 2006, Alexander made an "omnibus motion" to: (1) suppress the statements he made to the Government because they are the fruits of a custodial interrogation that was conducted in violation of his Fifth and Sixth Amendment rights; (2) dismiss the Superseding Indictment against him due to "grave prosecutorial misconduct;" (3) obtain a copy of the grand jury testimony to expose additional prosecutorial misconduct and perjury; (4) dismiss the Superseding Indictment against Alexander for failure to state a crime; (5) require production of any written records containing the substance of any oral statements made by Alexander prior to or after his arrest; (6) request a hearing outside the presence of the jury on the existence of a conspiracy and whether Alexander voluntarily joined that conspiracy; and (7) preclude the Government from asserting deliberate ignorance or introducing evidence of the Defendant's financial situation at trial. The Government opposed the motion. For the reasons stated herein, Alexander's omnibus motion is DENIED in its entirety.

## I.  Background

####      A.  The February 8, 2006 Superseding Indictment

On August 5, 2005, the Government filed a complaint alleging violations of 18 U.S.C. § 1349 against four of the Defendants. On October 12, 2005, the Government filed the Initial Indictment, and superseding indictments were filed on November 9, 2005, February 8, 2006, and April 26, 2006. The February 8, 2006 Superseding Indictment (S2 05 Cr. 1067) charged Alexander with one count of conspiracy to commit bank fraud and one count of bank fraud

2

(Counts One and Five of the February 8, 2006 Superseding Indictment).  Count One of this

Superseding Indictment alleged that Alexander deposited a counterfeit check into the bank

account of his business, B&T Petroleum, in the amount of $850,000.00, as part of a conspiracy to

deposit fraudulent checks and distribute funds drawn on those checks to other members of the

conspiracy.  (Feb. 8, 2006 Superseding Indictment ¶ 3(dd).)  The original check was issued in the

amount of $31.40, but the amount was altered to the much larger sum deposited by Alexander.

(*Id.* ¶ 3(cc).)  Alexander allegedly then wrote additional checks on that account which were sent

to other members of the conspiracy.  In addition to the conspiracy count, Count Five of the

February 8, 2006 Superseding Indictment charged Alexander with bank fraud for depositing the

counterfeit $850,000.00 check.  (*Id.* ¶ 5.)

     B.  The Arrest

     Alexander was arrested on February 9, 2006.  The Parties agree on little else that occurred

that day; indeed, much of Alexander's motion relies on his version of how the arrest was carried

out and the sequence of events on the day of his arrest.  The Court held a suppression hearing

regarding Alexander's arrest, his post-arrest statements, and the search of his home.  At that

hearing two agents who participated in the arrest of Alexander, took his post-arrest statements,

and searched his home testified regarding the events of that day.  Alexander did not testify at the

hearing, but he submitted a sworn affidavit describing his version of that day's events.  In short,

the Court finds the agents' testimony credible.  The following facts are drawn from their accounts

of the events that occurred on that day and represent the Court's findings of fact regarding

Alexander's arrest.

     At approximately 6:00 a.m. on February 9, 2006, five or six federal agents went to

Alexander's home in Norfolk, Virginia, to arrest him. They were accompanied by one or two

uniformed officers from local law enforcement agencies. The agents knocked on the door, and

when Alexander opened it, the agents informed him that they had a warrant for his arrest.

Alexander was then placed under arrest by Special Agent Peter Joseph of the Immigrations and

Customs Enforcement ("ICE") component of the Department of Homeland Security. The agents

then took Alexander into the living room of his home. At this time, Special Agent Ruben

Correa, an ICE agent who had flown in from New York City to participate in this arrest,

remained with Alexander while the accompanying agents performed a "security sweep" of his

home. During the security sweep, the agents moved Alexander's wife and child to the living

room.

When Alexander was arrested, he was not fully clothed. The arresting agents allowed

Alexander to go to his bedroom to put on appropriate attire. While Alexander was dressing, he

began to ask the agents questions about the arrest and why they were in his home. Special Agent

Correa took Alexander into the dining room to discuss the reasons for his arrest. Special Agent

Correa and Alexander sat down at the dining room table, and Special Agent Correa verbally

advised Alexander of his *Miranda* rights. Special Agent Correa, a nearly twenty-year veteran of

law enforcement, did this because, "[i]t has been my experience whether you are going to ask

questions or not, even if you are just going to explain the charges, as you are explaining them,

[defendants] will start making statements. If you want to use those statements, their rights have

to be waived voluntarily." (Suppression Hr'g Tr. 32:22-33:1, July 11, 2006.) Special Agent

Correa told Alexander: "You have the right to remain silent; anything you say can and will be

used against you in a court of law or other proceeding; you have the right to an attorney and to

4

have that attorney present before or during any questioning; if you cannot afford an attorney, one will be appointed to you at no cost; if you decide to speak to us now, you can at any time choose to exercise any of the rights which I have just explained to you." (*Id.* at 33:6-17.) Special Agent Correa asked Defendant if he understood and was willing to waive these rights, and Alexander said that he both understood his rights and that he was willing to waive them. (*Id.*)

After Alexander was advised of his rights, Special Agent Correa then informed him about the substance of the charges levied against him. Special Agent Joseph asked Alexander for permission to search his home, which was granted. This search terminated shortly, however, as the agents were uncertain of what they were looking for. (*Id.* at 130:18-131:10.) Alexander then began to make statements regarding the charges to Special Agent Correa, including a statement that he owned a business. Special Agent Correa asked for permission to search the house for financial documents related to the business, and Alexander granted permission. Alexander also told the agents that they could find financial documents in his briefcase, and he told them the location of the briefcase. Alexander proceeded to discuss his version of the events for approximately the next thirty minutes. The agents quickly located the briefcase and terminated the search of the residence. At approximately 6:45 a.m., after the search for the documents was completed, the agents transported Alexander to their office in Norfolk, Virginia. While Alexander was seated in the back of the agents' car, he continued to make statements.

The ride from Alexander's residence to the ICE office in Norfolk took approximately thirty minutes. During Alexander's transport, another arrest team contacted Special Agent Correa. That team had been dispatched to arrest another Defendant in this case, Steven Riddick ("Riddick"). The arrest team was unable to locate Riddick and sought assistance from Special

Agent Correa. Special Agent Correa asked Alexander if he would provide assistance in locating Riddick. Alexander stated that he would, but he indicated that his contact information for Riddick was back at his home. Special Agent Correa allowed Alexander to call his home to notify his wife that an agent would be returning to his home to retrieve his personal cell phone, and then Special Agent Correa dispatched Special Agent Joseph back to Alexander's residence to retrieve the phone.

When Special Agent Correa and Alexander arrived at the ICE office in Norfolk, Special Agent Correa took Alexander to a small room to be processed. Special Agent Joseph returned to the ICE office with Alexander's cell phone at approximately 8:00 a.m. While he was being processed, Alexander continued to assist the agents in locating Riddick by making calls from his personal cell phone. Cell phone records of Alexander's personal phone show a series of telephone calls were made from his phone that morning, beginning at 8:05 a.m. (Def.'s Omnibus Mot. Ex. C.)

After Alexander was processed, Special Agent Correa sat down with him to read him the indictment and discuss the charges. Special Agent Correa again orally advised Alexander of his *Miranda* rights, and asked him if he understood those rights and if he was willing to waive them to speak with Special Agent Correa. Alexander indicated that he was, and began to make statements. According to Special Agent Correa, Alexander "was being very cooperative," as he "wanted to explain that this was a misunderstanding and wanted to explain the story of the checks." (Suppression Hr'g Tr. 44:2-4.) At the same time, Special Agent Joseph went to retrieve a written form which included a statement of Defendant's rights and an area to be signed if Alexander chose to waive those rights (the "*Miranda* form"). Special Agent Joseph retrieved

6

one from his vehicle, and returned to the room where Special Agent Correa was taking statements from the Defendant.[1]  Special Agent Correa then read the form to Alexander, after which he presented the form to Alexander for his review.  Alexander indicated that he understood the contents of the form, and then signed it and returned it to Special Agent Joseph so that he could fill out the remainder of the form.

The *Miranda* form that was given to Alexander has a number of blanks that must be filled in to indicate the time and date that the form is executed.  After Alexander was given the opportunity to review the form, Special Agent Joseph filled out these blanks.  The first two blanks on the form are for the time and date that the defendant filling out the form was taken into custody.  Special Agent Joseph listed "0600" as the time that Alexander was taken into custody and "02/09/2006" as the date.  The next two blanks on the form are for the time that the defendant waiving his or her rights signs the form.  Initially, Special Agent Joseph wrote "0930" in the first blank and the date "02/09/2006" in the second.  He then signed the form as a witness and handed the form to Special Agent Correa to sign.  Special Agent Correa then told Special Agent Joseph that he had filled the time out incorrectly, that the actual time was "0830," not "0930" as he had written.  Special Agent Joseph realized that he had misread his analog watch, was embarrassed to have made this mistake in front of a senior officer, and then quickly corrected the form and initialed the change.

Michael Fineman, Esq., Defendant's attorney, has made much of the change to the time the form was executed.  In his view, discussed at length *infra*, the time was changed to cover up

---

[1]While at the ICE office, Special Agent Joseph offered to get Alexander a drink, and testified that Alexander was comfortable enough to be joking with the agents at the interview's conclusion.  (Suppression Hr'g Tr. 135:23-24.)

the fact (that the agents supposedly realized afterwards) that "0930" could not have been the time that Defendant signed the form, because that time is after Defendant spoke with his attorney. Yet, Special Agent Correa testified that about thirty minutes passed between the time Defendant signed the *Miranda* form and when he called his attorney. That estimate lines up roughly with the records for Defendant's cell phone, which Special Agent Correa testified he had not seen. Moreover, the Court found Special Agent Joseph's explanation of the change of time to be entirely credible. Indeed, his testimony is bolstered by the fact that the same pen was used to write the initials next to the amended time ("0830") as was used to write Alexander's and Special Agent Correa's names, and a different pen was used to write Special Agent Joseph's signature and the corrections. This fact is fatal to Alexander's claim that the time was changed long after the interview, particularly in combination with Special Agent Correa's credible testimony that he did not initial the changes. The Court thus finds that: (1) the time change was made contemporaneously with Defendant's interview, with both Defendant and the agents signing the form; (2) all the changes were made in the presence of, and likely initialed by, Defendant; and (3) the form accurately reflects the timing of Defendant's written waiver of his *Miranda* rights.

After Alexander signed the written waiver, Special Agent Correa asked him to repeat his story from beginning to end, while Special Agent Correa took notes. Special Agent Correa then prepared a written statement for Alexander to sign. When presented with his written statement, Alexander told Special Agent Correa that he wanted to speak with an attorney prior to signing the written statement, which the agents promptly let him do. At approximately 9:00 a.m., Alexander made a call to his attorney. After speaking with his attorney, Alexander declined to sign the written statement. The interview ended at that point.

8

###### C. The Initial Discovery

By letter dated March 21, 2006, the Government notified Mr. Fineman that it would provide discovery specific to Alexander the next day.  (Gov't Mem. of Law in Opp'n to Def. Nathaniel Alexander's Omnibus Mot. ("Gov't Mem.") Ex. C.)  As promised, on March 22, 2006, the Government sent an overnight package to Mr. Fineman that contained twenty-two pages of discovery specific to Alexander, including Alexander's post-arrest statements and the signed *Miranda* form.  (*Id.*)  The Government also provided Mr. Fineman with the discovery material related to all defendants in this case, under separate cover.  (*Id.*)  This additional discovery consisted of approximately 2500 pages of documents.

###### D. The Proffer

Before the suppression hearing began on July 11, 2006, Mr. Fineman withdrew his request for a hearing (but not the motion itself) on his allegations of misconduct by Danya Perry, the Assistant United States Attorney ("AUSA") handling this case.  (Suppression Hr'g Tr. 26:7-9.)  Thus, the facts here are drawn from the sworn affidavits of the attorneys in this case and the documentary evidence submitted in connection with the motion.  The following represents the Court's findings of fact regarding the circumstances surrounding Alexander's proffer meeting with the Government.

After Alexander's arrest, the Government contacted Mr. Fineman to see if Alexander was interested in cooperating.  According to Mr. Fineman, Alexander maintained his innocence, and thus Mr. Fineman informed the Government that his client did not want to cooperate with the investigation.  AUSA Perry told Mr. Fineman that the Government was "not interested in prosecuting innocent people," and offered to let Alexander attempt to persuade the Government

of his innocence at a proffer session.  The purpose of this proposed proffer session would be to

provide the Government with additional information that, after further investigation, might

convince the Government of Alexander's innocence.  On March 29, 2006, Alexander and Mr.

Fineman chose to attend a proffer session.  As Mr. Fineman conceded, neither he nor his client

was forced to attend this session.

In addition to Alexander and Mr. Fineman, the proffer session was attended by AUSA

Perry, Special Agent Correa, the arresting officer, and Special Agent Erik Rosenblatt, the case

agent.  AUSA Perry informed Alexander that he was not required to speak with the Government,

but if he chose to do so, he must sign a standard "innocence proffer" agreement with the Office

of the United States Attorney for the Southern District of New York.  This agreement plainly and

clearly states, in relevant part:

> [Nathaniel Alexander] has requested the opportunity to provide
> information to the Government about his involvement in the
> charges contained in S2 05 Cr. 1067 (KMK) and to respond to
> questions, so that the Government may be in a position to evaluate
> [his] information and responses in making prosecutive decisions.
> In any prosecution brought against [Nathaniel Alexander], the
> Government may offer at any stage of the criminal proceeding for
> any purpose any statement made by [him] during the meeting.
> [Nathaniel Alexander] agrees that he shall assert no claim under
> the United States Constitution, any statute, Rule 11(e)(6) of the
> Federal Rules of Criminal Procedure, Rule 410 of the Federal
> Rules of Evidence, or any other federal rule, that such statements
> or any leads therefrom should be suppressed. [Nathaniel
> Alexander] understands that he is waiving any and all rights in the
> foregoing respects.

(Gov't Mem. Ex. C.)  The agreement was addressed to Mr. Fineman, and concluded by saying,

"Your signature on the line below will constitute your acknowledgment of having explained the

foregoing to [Nathaniel Alexander], and [his] signature on the line below will evidence

[Nathaniel Alexander's] acknowledgment and understanding of the foregoing." (*Id.*) The agreement was signed by both Alexander and Mr. Fineman.

Mr. Fineman claimed, in a sworn affidavit,[2] that he was unfamiliar with the agreement he signed and unprepared for the proffer session. Despite having had ample time to meet with his client, he stated that he "had not . . . had the opportunity to uncover all the circumstances under which [his client's post-arrest statement] was procured." (Def.'s Omnibus Mot. ¶ 26.) He alleges that, in signing the statement, he relied on his "belief that the government attorney was acting in good faith in her role as a quasi judicial [sic] officer with respect to her representations that she would investigate the information defendant [sic] Alexander was prepared to provide." (*Id*. ¶ 27.) These claims are just bizarre. Either Mr. Fineman believed his client was innocent or not. Given that Mr. Fineman acknowledges that he was never forced by AUSA Perry to attend the innocence proffer, it is clear that his effort to make it appear that he was tricked into going to this meeting, by things like a plain English proffer agreement, is pure folly. Despite Mr. Fineman's after-the-fact expressions of regret, Alexander made numerous statements at the proffer session, produced financial records of his corporation, and provided contact information for bank officials that were involved in the transaction. The Government conducted a follow-up investigation of Alexander's statements, even if not the one Mr. Fineman hoped it would conduct. Unpersuaded of his innocence, the Government filed a new Superseding Indictment on April 26, 2006 (S4 05 Cr. 1067), which included information that was based, in part, on his statements at the proffer session, pursuant to the agreement signed by Alexander and Mr.

---

[2]Defendant's motion was filed in the form of an affidavit from Mr. Fineman, which he affirmed "under the penalties of perjury." (Def.'s Omnibus Mot. 2.) It included both statements of fact and argument, with little delineation between the two.

Fineman.

    E.  The Charges in the April 26, 2006 Superseding Indictment

    The April 26, 2006 Superseding Indictment (S4 05 Cr. 1067) is charged in sixteen counts,

three of which include Alexander.  Count One of this Superseding Indictment charges Alexander

with conspiracy to commit bank fraud.  Count Five charges him with bank fraud for depositing

two fraudulent checks into his own accounts.  (*Id.* ¶¶ 87-88.)  Count Thirteen charges him with

conspiracy to commit money laundering, alleging that Alexander's depositing of the first

fraudulent check was part of a scheme to hide the proceeds of the bank fraud.  (*Id.* ¶¶ 94-97.)

This Superseding Indictment generally alleges that Alexander was part of a scheme to procure

fraudulent checks.  Members of the scheme are alleged to have procured stolen checks, or to have

illegally altered checks that they had legitimately received.  Other members would then deposit

those fraudulent checks into their own business and personal bank accounts, and return proceeds

of those checks to the members of the scheme who procured or created the fraudulent checks.

This Superseding Indictment alleges that Alexander personally deposited at least two counterfeit

checks into bank accounts that he controlled.  This Superseding Indictment also added an

additional charge of money laundering.

    The Superseding Indictment charges that on April 26, 2005, Alexander opened a new

bank account for his business, B&T Petroleum, into which he deposited a single $850,000.00

check, which was drawn on an American Express account at Wachovia Bank.  (April 26, 2006

Superseding Indictment ¶ 49.)  This Superseding Indictment alleges that this check had been

altered, from an original value of $31.40 to the much greater amount deposited by Alexander.

(*Id.* ¶ 48.)  The check initially cleared, and Alexander then wrote a series of starter checks on the

12

available funds which were eventually deposited by other members of the alleged conspiracy or their close relatives.  (*Id*. ¶¶ 50-55.)  The Superseding Indictment also alleges that on May 10, 2005, Alexander deposited a counterfeit $150,000.00 check drawn on Wachovia Bank into his personal account at BB&T Bank.  (*Id*. ¶ 57.)  That check failed to clear.  (*Id*.)

F.  The Additional Discovery

On June 1, 2006, Alexander filed the present motion.  In it, he accused the Government of misconduct for failing to turn over handwritten notes from Special Agent Correa's interview with Alexander on February 9, 2006.  AUSA Perry was unaware that any such notes existed.  Upon receipt of Alexander's motion, AUSA Perry asked all the agents involved in this case to search for handwritten notes of Alexander's post-arrest statements.  Special Agent Correa found a half-page of handwritten notes that was then promptly provided to Mr. Fineman.  (Perry Aff. ¶ 12.)

G.  Procedural History

The Government filed a Complaint in this action on August 5, 2005, followed by an Indictment on October 12, 2005.  A series of Superseding Indictments were filed, first on November 9, 2005, then February 8, 2006, and then April 26, 2006.  The February 8, 2006 Superseding Indictment was the first to name Alexander.  Alexander made the present motion, and the Court held a hearing, during which it heard testimony from Special Agent Correa and Special Agent Joseph.

## II.  Discussion

### A.  Motion to Dismiss the Indictment Due to Prosecutorial Misconduct

Alexander makes allegations of prosecutorial misconduct frequently and casually throughout his papers.  Due to the seriousness of these allegations, the Court will address them

13

first.  The first task is to determine whether, in fact, any prosecutorial misconduct occurred.

Alexander's allegations of prosecutorial misconduct include, in the order they appear in his

motion, that AUSA Perry:  (1) falsely promised deferred prosecution in exchange for

Alexander's participation at the innocence proffer; (2) failed to investigate Alexander's

statements made at the innocence proffer; (3) knowingly indicted Alexander without evidence;

(4) suppressed and covered up the knowingly unconstitutional procurement of additional

evidence by redacting the names of the agents involved and attempting to deceive Alexander into

producing additional evidence; and (5) re-indicted Alexander with knowledge that evidence used

as the basis for the superseding indictments was unconstitutionally procured.  Basically, Mr.

Fineman alleges that AUSA Perry indicted Alexander with no evidence, ordered an agent to go to

Virginia to illegally arrest Alexander so that he would make inculpatory statements, suppressed

information regarding the illegal confession, tricked Mr. Fineman into producing his client for an

innocence proffer in order to generate new evidence, and then used that evidence as the basis for

her new indictment against Alexander.[3]  Mr. Fineman asserts that this conduct violates no less

---

[3]The Court has not taken narrative license to miscast Defendant's allegations as a far-
fetched conspiracy theory.  If anything, the Court has toned them down.  Paragraph 34 of
Alexander's Omnibus Motion reads:

> It will be shown below that AUSA Perry misused her power as an
> Assistant United States Attorney in the grand jury in the first
> instance in order to indict the defendant [sic] with insufficient
> evidence.  Ms. Perry then sent the unidentified agent to Virginia,
> not only to arrest the defendant, but to try to get the defendant to
> make an inculpatory statement so that she could re-indict the
> defendant based on his own words.  When it became apparent that
> the statement was unconstitutionally procured, Ms. Perry was
> instrumental in suppressing and covering up that information.
> When Ms. Perry was informed by your affirmant that the defendant
> did not wish to cooperate with the government, Ms. Perry
> orchestrated the ruse that was the March 29, 2006 proffer.  Ms.

than four sections of the New York Lawyer's Code of Professional Responsibility Disciplinary Rule 1-102, as well as New York State Judiciary Law § 487(1), and is grounds for dismissing the Superseding Indictment and suppressing all of Alexander's statements.

Incredibly, prior to the determination of these issues by this Court, or any findings of fact in this case, Mr. Fineman referred AUSA Perry to the First Judicial Departmental Disciplinary Committee for this alleged conduct. It is difficult to cast many of the allegations in Alexander's motion as his own, as they are rife with personal anecdotes from Mr. Fineman's experience as an Assistant District Attorney. For instance, when attacking the personal integrity of the case agent in this case by insinuating that he improperly tampered with a witness at the suppression hearing, Mr. Fineman states:

> [A]ll Agent Rosenblatt had to do was to inform the U.S. Attorney that [the witness wanted to leave] . . . [t]hat is what I was trained to do as an Assistant District Attorney for Kings County, but perhaps I am holding the U.S. Attorney's office to a higher standard than necessary. Perhaps in the Kings County District Attorney's Office, we were trained to conduct ourselves above and beyond the minimum standards of prosecutorial integrity.

(Def.'s Mem. of Law in Further Supp. Def.'s [sic] Mot. for Suppression of Post Arrest Statements & In Reply to the Gov't Opp. ("Def.'s Post-Hr'g Reply Mem.") 16.) Ignoring the

---

Perry then used the information in the March 29, 2006 proffer to fill in the holes in the first indictment charging the defendant by using this information in the subsequent grand jury presentation which culminated in the last superseding indictment.

(Def.'s Omnibus Mot. ¶ 34.) It is notable and, in light of the seriousness of the allegations, shocking that the only evidence submitted to support these allegations, as discussed *infra*, is: (1) Special Agent Correa's typewritten report regarding the arrest that was produced to Alexander during discovery; (2) a sworn statement from Alexander stating that the changes to the *Miranda* form were not made in his presence; (3) phone records of Alexander from the day of his arrest; (4) the *Miranda* form which Alexander signed; and (5) copies of the Indictments.

blatant ad hominem nature of the arguments, and the additional smear of the prosecutor for the conduct of *someone else*, it is hard to attribute this argument to the Defendant. Additionally, when he submitted Defendant's papers, Mr. Fineman requested that the Court refer the allegations of misconduct within them to the relevant bar association and court disciplinary committees, which is normally the duty of an attorney. The Court has declined Mr. Fineman's request.

Mr. Fineman's allegations are rife with personal attacks, but the premise of his claim is that AUSA Perry indicted Alexander with no evidence, falsified documents, and deceived Mr. Fineman in an attempt to cover it up. After Mr. Fineman valiantly discovered that the incriminating evidence his client produced at the proffer (in Mr. Fineman's presence and with his permission) was illegally and unethically procured, Mr. Fineman now seeks to suppress it. As the Court rejects this premise, and Mr. Fineman has not produced a single morsel of evidence that would allow a rational trier of fact to come to that conclusion, Defendant's motion to suppress his statements and dismiss the indictment for prosecutorial misconduct is denied.

### 1. Did Prosecutorial Misconduct Occur?

The Government has requested specific findings of fact regarding Mr. Fineman's allegations of prosecutorial misconduct. Given the number and nature of these allegations, the Court agrees that such additional findings are appropriate. The following represents the Court's findings of fact and conclusions of law about AUSA Perry's conduct during the prosecution of this case.

### a. Initial Indictment Decision

Mr. Fineman argues that "defendant was indicted initially by insufficient evidence"

(Def.'s Omnibus Mot. ¶ 60), and that, since AUSA Perry should have known the evidence

presented was insufficient, her initial presentation to the Grand Jury amounted to misconduct.

Mr. Fineman has no evidence to support this argument, for the simple reason that he does not

know what evidence was presented to the Grand Jury.  He speculates that, if allowed to examine

the Grand Jury transcript (his motion for disclosure of the transcript is discussed *infra*), it will

show that there was insufficient evidence to support the charges in the initial indictment.  He also

argues that the evidence will be so deficient that the Court can infer that AUSA Perry knew her

case was inadequate but, for no reason, decided to charge Alexander maliciously.[4]  As this is

merely fanciful conjecture on the part of Mr. Fineman, there is no evidence in the record that any

sort of misconduct, let alone the blatant and malicious misconduct Mr. Fineman has alleged,

occurred.

　　Mr. Fineman bases his conclusion that misconduct must have occurred on a linguistic

change in the wording of one of the charges in the Superseding Indictment filed after Alexander's

arrest and proffer.  (Def.'s Omnibus Mot. ¶ 83.)  The February 8, 2006 Superseding Indictment

states that Alexander "caused the $850,000 Counterfeit Check to be deposited . . . " (Feb. 8, 2006

Superseding Indictment ¶ 3(dd)), while the April 26, 2006 Superseding Indictment states that

Alexander "deposited the $850,000 Counterfeit Check."  (April 26, 2006 Superseding Indictment

¶ 49.)  On the basis of this linguistic change, Mr. Fineman alleges that AUSA Perry violated her

oath as an Assistant United States Attorney and a member of the New York Bar.  Such a claim is

---

[4]Mr. Fineman has asserted a motive for AUSA Perry's decision to have Alexander
arrested, namely, to force Alexander into a custodial interrogation in order to make him produce
evidence against himself.  This explanation makes little sense, however, as it does not explain
why AUSA Perry had any interest in bringing the allegedly false Indictment in the first place.

ridiculous.  There was no substantive change to the charges, or even a significant change made to the sequence of events initially described in the February 8, 2006 Superseding Indictment.

Even if Mr. Fineman's speculation regarding the evidence the Government had in its possession prior to February 9, 2006, had merit, his argument is untenable as a matter of law.  It is decidedly not the province of the federal courts to police the sufficiency of the evidence in a prosecutor's presentation to the Grand Jury.  The Supreme Court rejected all such arguments in *United States v. Williams*, and its opinion is worth quoting at length:

> [I]t would run counter to the whole history of the grand jury institution to permit an indictment to be challenged on the ground that there was inadequate or incompetent evidence before the grand jury. . . . [W]e reaffirmed this principle recently . . . [when] we held that "the mere fact that evidence itself is unreliable is not sufficient to require a dismissal of the indictment," and that "a challenge to the reliability or competence of the evidence presented to the grand jury" will not be heard. [*Bank of Nova Scotia v. United States*, 487 U.S. 250, 261 (1988).]  It would make little sense, we think, to abstain from reviewing the evidentiary support for the grand jury's judgment while scrutinizing the sufficiency of the prosecutor's presentation.  A complaint about the quality or adequacy of the evidence can always be recast as a complaint that the prosecutor's presentation was "incomplete" or "misleading."  Our words in [*Costello v. United States*, 350 U.S. 359 (1956),] bear repeating: Review of facially valid indictments on such grounds "would run counter to the whole history of the grand jury institution[,] [and] [n]either justice nor the concept of a fair trial requires [it]."

504 U.S. 36, 54 (1992) (footnote omitted, alterations added and some alterations in original).[5]  A

-----

[5]Defendant argues it is within the power of the federal courts to police the grand jury, citing *United States v. Farrington*, 5 F. 343 (N.D.N.Y. 1881).  Although there are more recent cases that support this argument, *see, e.g.*, *United States v. Urso*, No. 03 Cr. 1382, 2006 WL 681204, at *7-8 (E.D.N.Y. Mar. 16, 2006), that supervisory power only extends to violations of the "few, clear rules which were carefully drafted and approved by [the Supreme] Court and by Congress to ensure the integrity of the grand jury's functions."  *Id.* at *7 (quoting *Williams*, 504 U.S. at 46 (internal quotations and citations omitted)).  Courts are uniform in their agreement that policing the sufficiency of the evidence presented to the grand jury is outside the realm of the

grand jury indictment carries with it a presumption of regularity. Alexander has produced absolutely no evidence that would undermine that presumption, and, as none of the alleged misconduct occurred until after the issuance of a grand jury indictment, it appears that Mr. Fineman's argument is simply that the evidence presented was insufficient to indict Alexander. Mr. Fineman's attempt to dress a sheep in wolf's clothing is unavailing; his allegations regarding the prosecutor's presentation of insufficient evidence before the grand jury are not allegations of misconduct, and they are not a basis to dismiss the indictment. *See Williams*, 504 U.S. at 54.

### b. The "Cover-up" of Illegally Procured Evidence

Mr. Fineman's next allegation of misconduct is that because AUSA Perry knew that she had indicted Alexander without evidence, she then embarked on a plan to illegally procure evidence from Alexander by: (1) sending an agent to Virginia to arrest Alexander with a specific directive to take an inculpatory statement (Def.'s Omnibus Mot. ¶ 34); and (2) failing to disclose to Alexander's counsel the unconstitutional acts of the agents during the arrest or produce discovery materials regarding the circumstances of Alexander's post-arrest statement that would have allowed those allegedly illegal acts to be discovered (*id.* ¶¶ 34, 49, 51-53). After the suppression hearing that both Parties requested regarding the circumstances of the arrest, no evidence has been introduced to support either of these allegations of misconduct. In fact, there never was any evidence that supported these eye-popping claims.

Initially, no evidence was introduced that Special Agent Correa went to New York at the direction of AUSA Perry, nor was their any evidence introduced that AUSA Perry told Special

---

federal courts. *See Urso*, 2006 WL 681204, at *9 (listing cases).

Agent Correa to procure statements, unconstitutionally or otherwise, from Alexander.[6]  In fact,

on cross-examination, when asked if he had any conversations with any person at the United

States Attorney's Office prior to going to arrest Alexander, Special Agent Correa said "no."

(Suppression Hr'g Tr. 53:4-6.)  Mr. Fineman does not argue that the agents' conduct should be

attributed to AUSA Perry; rather, he claims that her misconduct was "sen[ding] the unidentified

agent to Virginia, not only to arrest the defendant, but to try to get the defendant to make an

inculpatory statement so that she could re-indict the defendant based on his own words."  (Def.'s

Omnibus Mot. ¶ 34.)  As there is no evidence to support this allegation, and Mr. Fineman failed

even to press the point in his post-hearing papers, this allegation of misconduct on the part of

AUSA Perry is baseless.

    Mr. Fineman's second argument regarding the "cover-up" is that AUSA Perry

committed misconduct by failing to disclose the alleged constitutional violations of the agents

and by actively covering them up through manipulation of discovery material.  At various points

in Defendant's motion, Mr. Fineman argues that the agents engaged in coercive conduct to elicit

statements from Alexander, that the written *Miranda* form was fraudulent, and that Special

Agent Correa's post-arrest report was fiction.  At the time Mr. Fineman's affidavit was filed, he

had no evidence of any misconduct or of any knowledge of such misconduct by the agents on the

part of AUSA Perry.  Instead of providing evidence for his claims, Mr. Fineman stakes his claim

---

[6]Alexander argues in his post-hearing papers that evidence was introduced that Special Agent Correa was sent to Virginia with these instructions.  However, the evidence he cites relates to a conversation between Special Agent Correa and Special Agent Erik Rosenblatt, the case agent assigned to this case.  Mr. Fineman's argument that this is a basis for the suppression of his post-arrest statements will be discussed *infra*.  At this point, however, the only relevant fact is that any such conduct was not AUSA Perry's, and therefore cannot be evidence of prosecutorial misconduct on her part.

that AUSA Perry knew of the agents' alleged misconduct on his deductive skill.  Mr. Fineman

asserts, "[y]our affirmant [Mr. Fineman] respectfully submits that if I was able to uncover this

deception through the same documents that AUSA Perry is in possession of . . . how can AUSA

Perry not have been aware of this conduct, especially since Ms. Perry has access to the agent who

took the statement, and has been working with him throughout this investigation."  (*Id.* ¶ 52.)

The answer to this rhetorical question is somewhat academic (though the fact that it is the only

basis for a misconduct referral is deeply troubling), as after the suppression hearing it is clear that

Mr. Fineman's deductions regarding the events that transpired on February 9, 2006 were askew,

and Alexander's statements were not unconstitutionally obtained (discussed *infra*).  Even if these

allegations regarding the agents' misconduct were true, however, Mr. Fineman produced no

evidence that AUSA Perry had any knowledge of this conduct.  The fact that she may lack the

keen (though in hindsight, flawed) deductive prowess of Mr. Fineman is not grounds for attorney

misconduct.

Another problem with the first part of Mr. Fineman's allegations of misconduct

surrounding the "cover-up" is that *there is no set of facts where these allegations of misconduct

could have been true*.  The premise of Mr. Fineman's allegation is that AUSA Perry committed

misconduct by failing to disclose an unconstitutional act, namely that Alexander was not read his

rights prior to the taking of his post-arrest statements.  Even if true, however, this act is not

unconstitutional.  A defendant's constitutional rights are not violated by taking statements prior

to being read his or her rights.  A defendant's constitutional rights are violated when those

21

statements are introduced into evidence.[7]  *See United States v. Patane*, 542 U.S. 630, 641 (2004)

(plurality opinion) ("[A] mere failure to give *Miranda* warnings does not, by itself, violate a

suspects constitutional rights or even the *Miranda* rule . . . police do not violate a suspect's

constitutional rights (or the *Miranda* rule) by negligent or even deliberate failures to provide the

full panoply of warnings prescribed by *Miranda*.  Potential violations occur, if at all, only upon

the admission of unwarned statements into evidence at trial."); *see also Withrow v. Williams*, 507

U.S. 680, 691 (1993) (describing *Miranda* warnings as safeguarding a fundamental trial right

(citing *United States v. Verdugo-Urquidez*, 494 U.S. 259, 264 (1990))).  In addition, the

Constitution does not prohibit the use of evidence acquired in violation of Alexander's Fifth

Amendment rights before the grand jury.  *See Williams*, 504 U.S. at 49 ("And although the grand

jury may not force a witness to answer questions in violation of [the Fifth Amendment's]

constitutional guarantee against self-incrimination, our cases suggest that an indictment obtained

through the use of evidence previously obtained in violation of the privilege against

self-incrimination is nevertheless valid." (internal citations and quotations omitted)); *Lawn v.*

*United States*, 355 U.S. 339, 349 (1958) (noting that grand jury indictment, if valid on its face,

will not be dismissed even if possibly based on evidence taken in violation of defendant's Fifth

---

[7]This presumes, of course, that the unwarned statements were made voluntarily.  *See*
*Elstad v. Oregon*, 470 U.S. 298, 314 (1985) ("We must conclude that, absent deliberately
coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has
made an unwarned admission does not warrant a presumption of compulsion.").  Though not the
thrust of Mr. Fineman's argument, Mr. Fineman makes, in passing, an argument that his
statements were, in addition to being merely made without the benefit of having been read his
rights, involuntarily coerced.  There is no evidence to support this conclusion, and, again, there is
no evidence that AUSA Perry was aware of any coercive conduct.  *AUSA Perry was not in*
*Virginia when Alexander was arrested.*  Thus, this allegation does not support a finding that
AUSA Perry engaged in prosecutorial misconduct.

Amendment right against self-incrimination); *Holt v. United States*, 218 U.S. 245, 247-48 (1910) (upholding indictment which was based partially on incompetent evidence of admissions made by defendant). When statements are involuntarily taken from a defendant, "[t]he exclusion of unwarned statements" from his or her trial "'is a complete and sufficient remedy' for any perceived *Miranda* violation." *Patane*, 542 U.S. at 641-42 (quoting *Chavez v. Martinez*, 538 U.S. 760, 790 (2003)). Not content just to bring a motion to suppress post-arrest statements he thinks were wrongly taken, Mr. Fineman has functionally turned his misunderstanding of the Fifth Amendment into a disciplinary action against AUSA Perry. This type of accuse first, investigate later approach to misconduct allegations is most troubling and never should occur. *See* Ass'n of the Bar of the City of N.Y. Comm. on Prof'l & Judicial Ethics Formal Op. 1990-3, at *1 ("Our prior opinions have recognized that a report to a disciplinary authority charging another lawyer with misconduct is a serious charge that should not be undertaken lightly." (internal quotations omitted)).

The second part of Mr. Fineman's allegation is that AUSA Perry attempted to cover-up the unconstitutional conduct of the agents by redacting their names from discovery material, burying Alexander's statements in excessive discovery material, and failing to disclose all of the agents' written notes. (Def.'s Omnibus Mot. ¶ 49-53.) Regarding the redactions, Mr. Fineman argues by implication. Without directly stating that it amounts to misconduct, Mr. Fineman queries, "[w]hat conceivable purpose or rationale can justify the redaction of the name of this agent?"[8] The answer Mr. Fineman provides to this rhetorical question is that this redaction is

---

[8]In his Memorandum of Law in Further Support Defendant's [sic] Omnibus Motion and In Reply to the Government's Opposition ("Def.'s Reply Mem."), Mr. Fineman argues more directly, with a point heading that states "Ms. Perry Redacted The Names Of The Agents To

evidence of a "cover-up."  The answer the Court comes to, based on common sense, the law, and

the record, is quite different.  As an initial matter, it is obvious that there was no attempt to

"cover-up" the identities of the arresting agents.  Special Agent Correa attended Alexander's

proffer session.  If AUSA Perry had intended to hide the identity of Special Agent Correa from

Alexander or Mr. Fineman, this was quite a blunder.  Regardless, there is simply no basis for

finding that AUSA Perry's redaction of the agents' names constituted misconduct.

Discovery in criminal cases is governed by Federal Rule of Criminal Procedure 16.  The

Second Circuit has held that "Fed. R. Crim. P. 16 does not require the Government to furnish the

names and addresses of its witnesses in general."  *United States v. Bejasa*, 904 F.2d 137, 139 (2d

Cir. 1990).  A defendant may request that a court order the disclosure of the identities of

Government witnesses, but it is an abuse of discretion for a court to do so without a specific

showing by the defendant that the disclosure is both reasonable in light of the circumstances and

material to the preparation of the defense.  *See United States v. Cannone*, 528 F.2d 296, 301-02

(2d Cir. 1975).  An "abstract, conclusory claim" that disclosure is necessary should be denied.

*Id.*; *see also United States v. Green*, No. 04 Cr. 424, 2004 WL 2985361, at *4 (S.D.N.Y. Dec. 23,

2004) (denying request for a government witness list based on abstract claim of potential

misconduct).  It is notable here that Mr. Fineman made no request of the Government for a

witness list.[9]  Nor do his papers demonstrate any "special need" for this information, other than

---

Cover Up Her Fraud."  (Def.'s Reply Mem. 6.)

[9]Mr. Fineman also argues, in his reply, that AUSA Perry did not know that the agents would be witnesses.  However, it is not misconduct for her to speculate that the arresting agents in a case might become Government witnesses.  This happens frequently in criminal cases.  Thus, even if AUSA Perry chose to redact the agents' names based on her speculation that they might become witnesses, which the Court does not find happened, there is no authority, and Mr.

an attempt to add color to his baseless allegations of cover-up and fraud.  Rather, it appears that

Mr. Fineman, instead of attempting to meet the legal requirements for witness disclosure, seeks

to circumvent the "specific need" requirement by filing misconduct charges against AUSA Perry.

Such conduct is manifestly unprofessional, and unsupported by the law.

The only legal support Mr. Fineman offers for his contention that the redaction of

potential Government witnesses' names constitutes misconduct is two cases, *People v. Frost*, 790

N.E.2d 1182 (N.Y. 2003), and *Garcia v. U.S. Dep't of Justice*, 181 F. Supp. 2d 356, 378

(S.D.N.Y. 2002).  In *Frost*, the New York Court of Appeals considered whether the exclusion of

the defendant and his counsel from ex parte hearings on a motion to close the courtroom violated

a defendant's rights under the confrontation clause and whether the closure of the courtroom

during the testimony of three trial witnesses was proper.  The Court is at a loss to understand how

this is relevant to the Government's discovery obligations, or AUSA Perry's conduct pursuant to

those obligations, as described in Fed. R. Crim. P. 16.  As Mr. Fineman has not cited any specific

portion of the opinion that would aide the Court in this inquiry, the Court must conclude that this

case is simply irrelevant to the issues at hand.[10]  *Garcia* is even less relevant.  *Garcia* concerns

--------

Fineman cites none, that such an act constitutes prosecutorial misconduct.

[10]The only possible sentence in the *Frost* decision that could be relevant to this case is this:  "Some Federal Circuits have also recognized that the defendant's right to disclosure of certain information, such as an informant's name or address, must be weighed against the personal safety of the witness."  *Frost*, 790 N.E.2d at 1187-88.  This is a correct statement of the law as it relates to information a *trial* witness might be required to give.  But this says nothing about the prosecution's obligations, before trial, regarding disclosure of witness identities.  Moreover, this quote speaks not at all to the Second Circuit's thirty-year-old ruling that a defendant must seek such disclosure of such information through the Court, and such a request should only be granted on a specific showing of need made by the defendant.  *See Cannone*, 528 F.2d at 301-02.

Exemption 7(F) to the Freedom of Information Act, which allows the Government to withhold information under that Act where that information "could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(F). How the Freedom of Information Act relates to AUSA Perry's discovery obligations is a mystery to the Court, and Mr. Fineman makes no attempt to explain it. As AUSA Perry's redaction of the agent's names from discovery material is consistent with the decisions of the Second Circuit and the practices in this district, she neither violated the criminal discovery rules nor committed misconduct.

Mr. Fineman next alleges AUSA Perry committed misconduct by burying important discovery materials, including the signed *Miranda* form, among voluminous discovery. He argues that this "was done to distract your affirmant and delay me from uncovering the truth about February 9, 2006." (Def.'s Omnibus Mot. ¶ 48.) This is an absurd claim. AUSA Perry produced discovery in two separate rounds. First, based on Alexander's request, the Government sent all subpoenaed documents to Mr. Fineman. (Gov't Mem. Ex. A.) Under separate cover, AUSA Perry sent, via overnight delivery, copies of Alexander's statements and other materials gathered incident to his arrest. (*Id.*) This second batch of materials was approximately twenty-two pages. (Perry Aff. ¶ 4.) Mr. Fineman received the box of subpoenaed materials and the envelope of his client's specific statements, including the signed *Miranda* form, at approximately the same time. (Suppression Hr'g Tr. 19:6-8.) Given that Mr. Fineman had requested all the documents produced, and AUSA Perry produced the most relevant documents specific to Alexander under separate cover with an explanation that the materials enclosed were the statements and materials collected incident to Alexander's arrest, there is simply no basis to find that AUSA Perry committed misconduct in her production of discovery materials. In fact, if it

26

was AUSA Perry's intent to bury the *Miranda* form in discovery, she did exactly what she should not have done – separate it from the large volume of subpoenaed materials. Indeed, AUSA Perry was not required to separate the discovery materials the way she did, *see* Fed. R. Crim. P. 16; *United States v. Nachamie*, 91 F. Supp. 2d 565, 568-70 (S.D.N.Y. 2000) (denying motion to identify case in chief documents as inappropriate given the plain language of Fed. R. Crim. P. 16), and the fact she did was commendable. Twisting her laudatory actions into an ethics referral is completely inappropriate.

Mr. Fineman also alleges misconduct in AUSA Perry's failure to produce a copy of the written statement that Alexander refused to sign while at the Norfolk, Virginia ICE office and additional handwritten notes made by the agents. He requests that she be ordered to answer, under oath, why she "withheld" these items. (Def.'s Omnibus Mot. ¶ 51.) This request appears to be nothing more than harassment. As Mr. Fineman properly concedes, Federal Rule of Criminal Procedure 16(a)(1)(B)(ii) states that, *upon request*, the Government must disclose "the portion of any written record containing the substance of any relevant oral statement made before or after arrest if the defendant made the statement in response to interrogation by a person the defendant knew was a government agent." Fed. R. Crim. P. 16(a)(1)(B)(ii). To prevent disputes over these requests, Local Criminal Rule 16.1 states that "[n]o motion addressed to . . . discovery . . . shall be heard unless counsel for the moving party files with the court simultaneously with the filing of the moving papers an affidavit certifying that said counsel has conferred with counsel for the opposing party in an effort in good faith to resolve by agreement the issues raised

by the motion . . . ." Local Crim. R. 16.1.[11]  Here, Mr. Fineman has submitted no affidavit

indicating that a request for this information was ever made.  Thus, there is no basis for finding

that AUSA Perry was in violation of any obligation to produce it.[12]

       In addition, Mr. Fineman does not dispute that AUSA Perry did produce all the

statements that were in her possession even without such a request being made.  AUSA Perry

submitted a sworn affidavit stating that she produced all of the notes that she received from the

agents.  (Perry Aff. ¶¶ 3-4.)  After receiving Mr. Fineman's motion papers, she asked the agents

to again search their files for any additional handwritten notes or documents that might contain

statements of Alexander.  The agents found a half-page of handwritten notes, which AUSA Perry

expeditiously turned over to Mr. Fineman.  (*Id.* ¶ 12.)  This conduct was entirely proper.  Indeed,

there is not even a whiff of impropriety surrounding the way that AUSA Perry conducted herself

during discovery.  In fact, her conduct in this regard was exemplary.

                        **c.  The Proffer Session**

       Mr. Fineman's next allegation of prosecutorial misconduct is that he was "enticed" to the

innocence proffer session by false promises made by AUSA Perry, namely a promise of deferred

prosecution and a promise to investigate the exculpatory information he would provide.

Although Mr. Fineman accused AUSA Perry of making numerous, and repeated, false promises,

---

    [11]Whether the Defendant's motion is substantively before the Court, or should be dismissed pursuant to Local Crim. R. 16.1, is discussed *infra*.  Here, the only question is whether it was misconduct for AUSA Perry not to have produced them, and the unequivocal answer is that it was not.

    [12]Mr. Fineman argues that because discovery was proceeding voluntarily in this case, AUSA Perry's failure to voluntarily disclose documents of which she was not aware, which she did not possess, and which had not been requested by Alexander, constitutes misconduct.  (Def.'s Reply Mem. 5-6.)  This proposition is rejected as baseless.

these were the only specific promises referenced in his papers or at oral argument.  (Suppression
Hr'g Tr. 13:20-25, 20:5-12.)  AUSA Perry submitted a sworn affidavit stating that she is certain
she did not make a promise of deferred prosecution.  (Perry Aff. ¶ 7.)  Mr. Fineman, in his sworn
affidavit/memorandum of law, repeatedly states that AUSA Perry did in fact promise deferred
prosecution.  (Def.'s Omnibus Mot. ¶¶ 20, 53, 57.)  Given that Mr. Fineman said that he wanted
no hearing on this issue (Suppression Hr'g Tr. 26:7-9), the Court must rely on the credibility of
the various affiants.  This is not a close call.  Given Mr. Fineman's repeated use of unsupported
hyperbole in his papers, his numerous baseless allegations of misconduct, and his penchant for
wild conspiracy theories, the Court finds AUSA Perry the more credible affiant.[13]  There is no
additional evidence of a promise of deferred prosecution.  In addition, even if there had been
such a promise, the written "innocence proffer" agreement, which stated that the Government
could use the statements made against Alexander in a criminal prosecution (Gov't Mem. Ex. C) ,
would have nullified any such promise.  *See United States v. Delvi*, No. S1201 Cr. 74, 2003 WL
23018790, at *2 (S.D.N.Y. Dec. 23, 2003) ("Whatever 'implicit agreement' [the defendant] may
have believed he had with the Government, that subjective belief is belied by the written proffer
agreement that *explicitly* states that no such agreement exists.").  That agreement specifically
stated that Alexander had requested the proffer session, and made no mention of any agreements

---

[13]Mr. Fineman himself conceded in his "Attorney's Affidavit in Further Support
Defendant's [sic] Omnibus Motion and In Reply to the Government's Opposition" ("Def.'s
Attorney's Reply Aff.") that his allegation of a promise for deferred prosecution was baseless.
(Def.'s Attorney's Reply Aff. ¶ 25 ("Ms. Perry very properly corrected me in her opposition
papers when she stated that the March 29, 2006 meeting was not for the purposes of procuring
deferred prosecution.").)  This error would be inconsequential if Mr. Fineman had not turned his
own errors into charges of misconduct on the part of AUSA Perry.  Indeed, to call the
inconsistency in Mr. Fineman's statements "error" is charitable.

between the Government and Alexander.  Mr. Fineman admitted this at oral argument.

(Suppression Hr'g Tr. 13:20-25.)  Thus, there is simply no basis in fact or law for finding that

AUSA Perry improperly promised Alexander deferred prosecution in exchange for his proffer

statements.

Mr. Fineman next alleges that AUSA Perry's statements that the Government "was not

interested in prosecuting innocent individuals,"  (Def.'s Omnibus Mot. ¶ 63) and her expressions

of interest in exculpatory information in the possession of Alexander constituted misconduct.

That AUSA Perry made such statements, which Mr. Fineman goes so far as to allege are criminal

under the laws of New York State (*id.*), is not disputed.  (Perry Aff. ¶ 8.)  However, there was no

misconduct in making these statements.  It is undoubtedly a true statement that AUSA Perry does

not seek to prosecute innocent individuals, and a statement of that policy does not constitute any

type of false promise upon which Mr. Fineman could conceivably conclude that AUSA Perry

would forego prosecution of Alexander after the proffer session.  At the time these statements

were made, AUSA Perry had no idea what information Alexander would provide.  Mr. Fineman

appears to believe that merely because AUSA Perry did not come to the conclusion that

Alexander was innocent after the proffer session it was misconduct for her to have made these

statements.  Such an argument is baseless.  *See United States v. Heatley*, 39 F. Supp. 2d 287, 309

(S.D.N.Y. 1998) (holding that defendant's misinterpretation of prosecutor promises are not

grounds to bind prosecutor to defendant's interpretation).  At the time the statement was made,

AUSA Perry obviously did not believe Alexander was innocent – she had filed an indictment

naming him as a defendant.  But that did not mean that AUSA Perry would not listen to what

Alexander had to say.  The fact that AUSA Perry was not convinced of Alexander's statements at

30

the proffer session does not make her pre-proffer statement regarding prosecuting innocent individuals misconduct after the fact. Given this record, and Mr. Fineman's utter inability to provide otherwise, the Court properly accepts AUSA Perry's representation that she acted in good faith before, during, and after the proffer session and rejects this claim of misconduct. *See id.* at 305-06 (denying claim of bad faith refusal to provide defendant a cooperation agreement on basis of proffer statements because defendant "presented no evidence which contradicts the government's version on the issue of its good faith consideration" of the defendant's proffer).

Mr. Fineman also alleges that AUSA Perry falsely promised to investigate the allegedly exculpatory information that Alexander provided at the innocence proffer session. Despite having no evidence or knowledge, direct or otherwise, as to whether an investigation occurred, he states categorically that "no investigation of any sort was conducted." (Def.'s Omnibus Mot. ¶ 54.) This allegation is wholly speculative, and, as AUSA Perry states in her sworn affidavit, false. (Perry Aff. ¶ 11.) The proffer agreement signed by Alexander and Mr. Fineman stated explicitly that his statements would be evaluated by the Government for use in its prosecutive decisions. (Gov't Mem. Ex. C.) The Government did indeed evaluate and investigate Alexander's proffer statements. (Perry Aff. ¶ 11.) It came to a different conclusion than Alexander or Mr. Fineman, however, and found these statements to be more probative of guilt than innocence.[14] This determination is entirely proper. It is not the province of the Court to second guess AUSA Perry's decision under these circumstances. *See Heatley*, 39 F. Supp. 2d at

---

[14]Mr. Fineman's only "evidence" that the Government did not conduct an investigation of Alexander's statements is that the Government never contacted certain individuals related to Alexander's business that Alexander mentioned at the proffer session. (Suppression Hr'g Tr. 10:23-11:9.) Needless to say, the fact that the Government did not telephone some of the individuals Alexander mentioned is not conclusive evidence of a lack of investigation.

306 ("[W]hether a defendant's information is useful to the government is an assessment uniquely

available to the prosecution, for it rests on many considerations known only to the government . .

. . Not only is this an assessment which courts are patently not competent to make, even if they

were, to do so would represent a judicial invasion of Executive branch prerogatives that almost

certainly would be unconstitutional."); *see also Delvi*, 2003 WL 23018790, at *2 ("The Supreme

Court has made very clear that *generalized allegations* of bad faith or improper motive cannot be

a basis for a court to review prosecutorial decisions . . . ."). The Court's duty here is simply to

determine whether AUSA Perry made these statements in good faith, and there is no basis for

finding she did not. *See Healey*, 39 F. Supp. 2d at 306. It is simply not misconduct for AUSA

Perry to use Alexander's statements in accord with express provisions of the proffer agreement

which Alexander and Mr. Fineman signed.[15]

Mr. Fineman thinks differently. He argues in his reply brief that AUSA Perry's failure to

describe the "investigative methods" used to make this investigation is proof that the promises of

investigation were false. (Def.'s Attorney's Reply Aff. ¶ 26.) Even assuming that the allegation

of no follow-up investigation was based in fact or was credible, there would be no misconduct on

the part of AUSA Perry. The Government concluded, after the proffer session, that it would

continue to prosecute Alexander. Whether this was based on the prosecution team's

determination of Alexander's credibility during the proffer session, or a subsequent investigation

of the information provided by him is wholly irrelevant. As stated in the signed agreement

between the two parties, Alexander made his statements "so that the Government may be in a

---

[15]It must be noted that Alexander's valid waiver of his rights in the proffer agreement is
entirely lawful. *See United States v. Mezzanatto*, 513 U.S. 196, 202 (1995); *United States v.
Barrow*, 400 F.3d 109, 116-17 (2d Cir. 2005).

position to evaluate [his] information and responses in making prosecutive decisions." The Government did so. There is no evidence that AUSA Perry failed to abide by that agreement. The mere fact that AUSA Perry did not conclude that Alexander was innocent, or has not described her reasoning for rejecting Alexander's assertions of innocence, is not misconduct.

### d. Filing of the Superseding Indictment Based on Proffer Statements

Mr. Fineman's next allegation of misconduct is that AUSA Perry used Alexander's proffer statements, which she had fraudulently procured, in front of the grand jury when obtaining the April 26, 2006 Superseding Indictment. This claim of misconduct fails on three counts. First, as discussed *supra*, Alexander's statements were not fraudulently procured. Second, the use of Alexander's statements was in accord with the proffer agreement signed by Alexander and his counsel. *See Delvi*, 2003 WL 23018790, at *1-2 (rejecting claim that defendant's implicit agreement that he would receive a cooperation letter from the government overrode the explicit language of the proffer agreement); *see also Heatley*, 39 F. Supp. 2d at 306. Finally, even if the statements were procured in violation of Alexander's constitutional rights, which they clearly were not, introducing them in front of the grand jury is not misconduct. *See Williams*, 504 U.S. at 59; *Lawn*, 355 U.S. at 349; *Holt*, 218 U.S. at 247.

### e. Violations of New York's Ethical Rules Regarding Attorney Conduct

Mr. Fineman concedes that "no one act I accuse Ms. Perry of committing, standing alone, necessarily demonstrates misconduct." (Def.'s Reply Mem. 10.) In support of his contention that the numerous acts described above do constitute misconduct, Alexander argues that AUSA Perry's conduct has violated the New York Lawyer's Code of Professional Responsibility

Disciplinary Rule 1-102 and New York State Judiciary Law § 487(1).[16]  The Court will analyze each statute in turn.

i.  New York Lawyer's Code of Professional Responsibility
Disciplinary Rule 1-102

Disciplinary Rule 1-102 states, in relevant part, that a lawyer shall not "[e]ngage in illegal conduct that adversely reflects on the lawyer's honesty, trustworthiness or fitness as a lawyer;" "[e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation;" "[e]ngage in conduct that is prejudicial to the administration of justice;" or "[e]ngage in any other conduct that adversely reflects on the lawyer's fitness as a lawyer."  1-102(A)(1)-(7).  As discussed *supra*, it is clear that none of AUSA Perry's conduct violates these rules.  Alexander has not produced a shred of evidence that AUSA Perry engaged in dishonest conduct, that she engaged in dishonesty or misrepresentation, or that she engaged in conduct prejudicial to the administration of justice.  In fact, the Court finds that AUSA Perry's conduct throughout the prosecution of this case has been consistent with the rules described in the Code of Professional Responsibility, and the high standards to which this Court holds the United States Attorney's Office for the Southern District of New York.  What also is apparent is that Mr. Fineman's baseless allegations against AUSA Perry are in contravention of the reporting standards for disciplinary infractions established by the Second Circuit and the New York City Bar Association's Committee on Professional and

---

[16]Mr. Fineman referred AUSA Perry to the Disciplinary Committee of the First Judicial Department, and asked the Court, in a letter dated June 1, 2006, to forward a copy of his motion papers to the Committee on Grievances for the Southern District of New York.  Given the discussion *supra*, the Court has declined Mr. Fineman's request to forward his motion papers to the Committee on Grievances.

Judicial Ethics.[17]

A lawyer's duty to report misconduct is covered by Disciplinary Rule 1-103, which states:

> A lawyer possessing knowledge, (1) not protected as a confidence
> or secret, or (2) not gained in the lawyer's capacity as a member of
> a bona fide lawyer assistance or similar program or committee, of a
> violation of DR 1-102 [1200.3] that raises a substantial question as
> to another lawyer's honesty, trustworthiness or fitness as a lawyer
> shall report such knowledge to a tribunal or other authority
> empowered to investigate or act upon such violation.

N.Y. Lawyer's Code of Prof'l Responsibility DR 1-103(A).  Thus, a duty to report exists after

two requirements are met.  A lawyer (1) must possess knowledge of an act by another attorney

that (2) raises a "substantial question" about that lawyer's fitness as an attorney.  Neither

standard was met here.

An attorney is under no obligation to report, and, indeed, should not report, allegations of

disciplinary rule violations and misconduct on the basis of mere suspicion.  *See* Ass'n of the Bar

of the City of N.Y. Comm. on Prof'l & Judicial Ethics Formal Op. 1995-5, at *1 (1995) ("[A]

lawyer should not report a mere suspicion of misconduct."); N.Y. State Bar Ass'n Comm. on

Prof'l Ethics Op. 635, at *4 (1992) ("[A] mere suspicion of misconduct does not give rise to an

obligation to report."); N.Y. State Bar Ass'n Comm. on Prof'l Ethics Op. 480, at *2 (1978) ("The

---

[17]When the Government argued that Mr. Fineman's allegations of misconduct were
baseless, and that he had sought to only to impugn an attorney in an attempt to distract from the
substance of his motion, he responded that he was required to level these accusations at AUSA
Perry because (1) Disciplinary Rule 1-103 made referral to the state disciplinary committee
mandatory, and (2) a failure to refer AUSA Perry to the State Disciplinary committee would have
constituted disciplinable conduct on his part.  (Def.'s Attorney's Reply Aff. ¶ 1.)  Both these
contentions do not appear to have any basis in the rulings of the relevant New York ethics
committees, and Mr. Fineman's decision to refer a fellow member of the Bar to the disciplinary
committee prior to determining the proper standard for referral is once again exemplary of his
unfortunate accuse first, research later approach to this case.

Code, it will be noted, speaks in terms of 'knowledge of a violation' and does not expressly relate

to suspicions.  We believe this omission to be significant and conclude that the Code is intended

to require a lawyer to report only where he may reasonably be said to know that a violation has

been committed.").  Mr. Fineman's allegations of fraud and misconduct could not have been

more than suspicions, as they were leveled (and his referral to the state disciplinary committee

made) prior to the Court's suppression hearing regarding the events of February 9, 2006 and they

were otherwise unsupported by any evidence.[18]  Further, even assuming Mr. Fineman received

information from Alexander regarding the arrest, Alexander had no knowledge of AUSA Perry's

conduct, and therefore many of his allegations of that misconduct could only be based on

suspicion, if anything at all.

Such a cavalier approach to disciplinary referrals is inappropriate.  *See* N.Y. State Bar

Ass'n Comm. on Prof'l Ethics Op. 635, at *3 ("It bears emphasis that this right to report

misconduct . . . is unquestionably susceptible to abuse . . . [and] it would be patently improper for

a lawyer to make a report of misconduct and subject another lawyer to investigation without

having a reasonable basis for doing so or solely to gain a tactical advantage in a matter." (internal

citations omitted)); Ass'n of the Bar of the City of N.Y. Comm. on Prof'l & Judicial Ethics

---

[18]There is other evidence Mr. Fineman was simply acting on suspicion.  For instance, at the suppression hearing, when asked how Mr. Fineman knew that AUSA Perry had knowledge that the *Miranda* form had been nefariously altered, he replied: "On its face, the Miranda document was altered.  And that is a highly unusual circumstance, to say the least . . . ."  (Suppression Hr'g Tr. 6:20-24.)  A "highly unusual circumstance" is not knowledge of misconduct.  When asked why he believed AUSA Perry knew that the agents were lying about the circumstances under which Alexander's statements were made, he stated:  "The reason, I submit, your Honor, is that at the time of my client's first indictment . . . the government had insufficient evidence."  (*Id.* at 8:23-25.)  Again, this is merely a suspicion of something *that is not even misconduct*.  Mr. Fineman presented no evidence of misconduct in his papers, and declined to testify under oath to defend and substantiate his allegations of misconduct.

Formal Op. 1990-3, at *1 ("Our prior opinions have recognized that a report to a disciplinary authority charging another lawyer with misconduct is a serious charge that should not be undertaken lightly." (internal quotations omitted)).

Even assuming there was some evidence that informed Mr. Fineman's suspicions, it clearly did not rise to the level of "knowledge" required by Disciplinary Rule 1-103. Knowledge, in the context of Disciplinary Rule 1-103, does not require proof beyond an absolute certainty. *See* N.Y. State Bar Ass'n Comm. on Prof'l Ethics Op. 635, at *3-4 (1992). However, as the Association of the Bar of the City of New York Committee on Professional and Judicial Ethics has emphasized:

> Given the serious personal and professional consequences to the other lawyer of a report charging him or her with misconduct, the "knowledge" requirement in DR 1-103(A) should be construed to require a basis for clearly believing that misconduct has in fact occurred before the rule's reporting obligation is triggered . . . . Our prior opinions have relied on [Ethical Consideration 1-4] as support for the proposition that DR 1-103(A) requires "actual knowledge" of professional misconduct . . . . Useful guidance in giving meaning to the requirement of "knowledge" in DR 1-103(A) can be found in *Doe v. Federal Grievance Committee*, 847 F.2d 57 (2d Cir. 1988) . . . . The Second Circuit . . . stated that "proof beyond a moral certainty" was not required, but the lawyer "must clearly know, rather than suspect, that [misconduct has occurred.]" . . . While a lawyer is not free to turn a blind eye to reality, the Committee believes that *a lawyer must be in possession of facts that clearly establish a violation* of one or more Disciplinary Rules by another lawyer before an obligation arises under DR 1-103(A) to make a report.

Formal Op. No. 1990-3, at *1-2 (emphasis added). There is no doubt that Mr. Fineman has not been able to show that he was in possession of *facts that clearly establish* AUSA Perry's misconduct. Thus, he was not duty-bound to report, and may have been duty-bound not to

report, her to the relevant disciplinary committees.  Accordingly, Mr. Fineman's use of that

authority to bolster his claims that the Indictment against his client should be dismissed because

of AUSA Perry's misconduct was inappropriate.

ii.  New York State Judiciary Law § 487

Mr. Fineman also argues that AUSA Perry's conduct has violated New York

State Judiciary Law section 487, which states, in relevant part:

> [a]n attorney or counselor who . . . [i]s guilty of any deceit or
> collusion, or consents to any deceit or collusion, with intent to
> deceive the court or any party . . . [i]s guilty of a misdemeanor, and
> in addition to the punishment prescribed therefor by the penal law,
> he forfeits to the party injured treble damages, to be recovered in a
> civil action.

It does not appear that Mr. Fineman is actually raising a claim under section 487, rather, Mr.

Fineman argues that AUSA Perry's violation of the standards set forth in that statute is proof that

her misconduct was so egregious that the Superseding Indictment must be dismissed. Mr.

Fineman alleges that AUSA Perry engaged in five instances of deceit:  (1) failing to disclose

constitutional violations of the arresting agents; (2) failing to disclose all pertinent discovery

materials in violation of Fed. R. Crim. P. 16; (3) intentionally redacting the names of the

arresting agents "in order to prevent them from being called to testify at a suppression hearing;"

(4) making false promises that "she was not interested in prosecuting individuals" and that she

would investigate the information provided at the proffer; and (5) using unconstitutionally-

obtained information before the grand jury.

Section 487 requires a showing of deceit.  Here, that standard has not come close to being

met, as all of Mr. Fineman's allegations of deceit are false:  (1) the arresting agents did not

38

violate Alexander's constitutional rights, and therefore there was no agent misconduct for AUSA

Perry to disclose; (2) AUSA Perry's conduct was in full compliance with Fed. R. Crim. P. 16,

and there is no evidence that she, at any time, attempted to hide discovery materials or delay their

production; (3) it was not misconduct to redact the agents' names, and there was no intention to

prevent their testimony at a suppression hearing, as they were present and did in fact testify at the

suppression hearing; (4) no false promises were made, as AUSA Perry's statements were true

and the Government complied with its promises; and (5) there is no evidence that any

unconstitutionally-procured evidence was used in front of the grand jury, as Alexander's post-

arrest statements and his statements at the proffer session were procured in accord with

Alexander's constitutional rights.  Thus, there is no basis on which to conclude that AUSA

Perry's conduct was deceitful, and no basis for finding that she is in violation of section 487 of

the New York State Judiciary Law.  Even if there were such a basis, to establish liability under

section 487, a lawyer must act with an intent to deceive.  N.Y. Judiciary Law § 487.  There is no

evidence from which any rational trier of fact could infer such intent here.

## 2.  Legal Standard for Dismissal Based Upon Prosecutorial Misconduct

Mr. Fineman argues that because of AUSA Perry's alleged misconduct, the Superseding

Indictment must be dismissed.  Obviously, given that the Court finds, as a matter of fact, that

there has not been a single instance of misconduct, dismissal is not appropriate.  However, even

if some of AUSA Perry's actions somehow could be considered misconduct, dismissal would not

be appropriate.  Dismissal of an indictment due to Government misconduct is only appropriate

where the defendant can show demonstrable prejudice.  *See United States v. Morrison*, 449 U.S.

361, 365-66 (1981) ("[A]bsent demonstrable prejudice, or substantial threat thereof, dismissal of

the indictment [due to Government misconduct] is plainly inappropriate, even though the violation may have been deliberate . . . . The remedy in the criminal proceeding is limited to denying the prosecution the fruits of its transgression." (footnotes omitted)).  Alexander argues that AUSA Perry's misconduct resulted in the unconstitutional procurement of evidence against him.  The proper remedy for such a transgression is suppression of that evidence, not dismissal of the indictment.  *See United States v. Fields*, 592 F.2d 638, 648 (2d Cir. 1978) ("Even when a Prosecutorial arm of the government unlawfully obtains evidence, we normally limit the permissible sanction to suppression of the illegally obtained evidence.").  As the Second Circuit noted in *Fields*, "[i]t is only in the rare case, where it is impossible to restore a criminal defendant to the position that he would have occupied vis-a-vis the prosecutor, that the indictment may be dismissed."  *Id.*  This is not such a case.  Here, suppression of Alexander's post-arrest and proffer statements would put him in exactly the same position he was in prior to any misconduct.  *See Patane*, 542 U.S. at 641-42 (noting that exclusion of unwarned statements at trial is a complete and sufficient remedy for *Miranda* violations).

Mr. Fineman argues that suppression is insufficient because "the fruit of the prosecutor's transgression is the last superseding indictment itself."  This argument is based on the incorrect assumption that a prosecutor may not introduce evidence that was obtained in violation of a constitutional guarantee before the Grand Jury, a proposition that, as a matter of law, is incorrect. *See Williams*, 504 U.S. at 59; *Lawn*, 355 U.S. at 349; *Holt*, 218 U.S. at 247.  Alexander was indicted by the Government prior to his arrest or the proffer agreement.  Thus, it is clear that the grand jury found that there was sufficient evidence to indict Alexander prior to his arrest and proffer session.  *See Williams*, 504 U.S. at 49 (rejecting challenges to sufficiency of indictment).

40

Were his statements to be suppressed, the Government would simply have to go to trial on the other evidence it collected, but there is no reason to believe, nor has any evidence been produced that suggests, that evidence is tainted by any post-indictment prosecutorial misconduct. Although Alexander feels that evidence is insufficient to prove his guilt, that is a question for the jury to decide at trial. As Alexander has not produced any evidence of misconduct, his motions to suppress the statements made at the proffer session and to dismiss the indictment for prosecutorial misconduct are denied.

The Bar of this Court is among the finest in the country. This is so not just because of the quality of the advocacy, but the quality of the character of the advocates. The Court, therefore, presumes that each attorney will perform to the high standards that are customary in this District. The attorneys who practice here should presume the same, and accord their brothers and sisters in the Bar a commensurate level of respect. This means, among other things, learning the difference between zealous and irresponsible advocacy. The former allows an attorney to vigorously challenge an adversary's argument, the latter involves unnecessary and unfounded challenges to the advocate's character.

Of course, the Court recognizes that to every rule there is an exception. Occasionally, an attorney will fail to live by the rules of this Court, and even less often, an attorney will fail to abide by the ethical canons. When this happens, the misconduct should and will be addressed. If the misconduct involves an attorney for the United States, the need for particular scrutiny is reflective of that attorney's unique role to ensure that justice is done. *See Berger v. United States*, 295 U.S. 78, 88 (1935) ("The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as

compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done."). "As such," the Government's attorney, "is in a peculiar and very definite sense the servant of the law," who is just as duty bound "to refrain from improper methods calculated to produce a wrongful conviction as [she] is to use every legitimate means to bring about a just one." *Id.*

The Court says all of this because here, sadly, the line between the zealous and the irresponsible has been crossed as a series of wholly unsubstantiated allegations of misconduct have been made by one attorney against another. And, when such allegations are made, even when rejected by a court, it can be the case that residual doubt might remain about the character of the attorney accused of misconduct. In this case, there should be no such doubt. The Court finds on the basis of the record that AUSA Perry has fully complied with all applicable legal and ethical requirements and has simply done nothing wrong. This is not just a finding that there was insufficient evidence of misconduct by AUSA Perry, but a finding that it was wholly inappropriate for Mr. Fineman to have made these allegations and then to have summarily referred AUSA Perry to the disciplinary committee based on these speculative claims. To be sure, if there was any truth to these allegations, the Court would not have hesitated to impose appropriate sanctions, but there never was any truth to them. Simply put, these allegations were nothing but layers of speculative assumptions piled on top of one another. In fact, these claims were so devoid of merit that an argument could be made that referral to the disciplinary committee based on them was itself misconduct. However, the Court believes that a second referral to the disciplinary committee from this case is unnecessary, and presumes that all attorneys in this case will conduct themselves in accordance with high standards of the Bar of

this Court.

###### B.  Motion to Suppress Defendant's Post-Arrest Statements

###### 1.  Failure to Inform Alexander of His Rights

In addition to his allegations of prosecutorial misconduct, Alexander argues that his post-arrest statements must be suppressed because he was not informed of his rights, in violation of the Fifth Amendment of the Constitution.  Assuming the Court finds that Alexander waived these rights, he argues that such a waiver was not voluntary.  (Def.'s Omnibus Mot. ¶¶ 35-72; Def.'s Mem. of Law in Further Supp. Def.'s [sic] Mot. for Suppression of Post Arrest Statements ("Def.'s Post-Hr'g Mem.") 1-9; Def.'s Post-Hr'g Reply Mem. 17-22.)[19]

If a defendant has not been warned of the rights specified in *Miranda v. Arizona*, 384 U.S. 436 (1966), any custodial statements that result from that interrogation are inadmissible at trial.  *Id.* at 444 ("Our holding . . . is this:  the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.").  There is no dispute that Alexander's post-arrest statements, at times made while he was handcuffed and asked questions by Special Agent Correa, stem from custodial interrogation.  Thus, in order for Alexander's post-arrest statements to be admissible at trial, the Government must show, by a preponderance of the evidence, that Alexander knowingly and voluntarily waived his rights.  *See id.*; *see also Colorado v. Spring*, 479 U.S. 564, 573 (1987);

---

[19]At various places in his papers, Alexander also argues that the arresting agents engaged in an illegal search of his home.  (Def.'s Post-Hr'g Mem. 2-3.)  However, Defendant has not moved to suppress any evidence that was obtained as a result of this supposedly illegal search, nor has he explained how the circumstances regarding this search apply to his post-arrest statements.

*United States v. Male Juvenile*, 121 F.3d 34, 39 (2d Cir. 1997). "To prove a valid waiver, the Government must show (1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and all of the consequences of waiving that right." *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) (per curiam).

### a. Was Alexander Informed of His Rights Prior to the Time He Made Statements?

In support of his argument that he was not informed of his constitutional rights, Alexander submitted a sworn affidavit that stated that, during his arrest, "[a]t no time was I informed of my right against self incrimination, or my right to an attorney." (Def.'s Omnibus Mot. ¶ 5.) The Court held a hearing on the events surrounding Alexander's arrest. At that hearing, both Special Agent Correa and Special Agent Joseph, agents who were involved in Alexander's arrest and who were witnesses to his signing of the *Miranda* form, testified at that hearing. Special Agent Correa testified that he advised Alexander of his rights prior to each time he made statements or answered questions, a total of three different times. (Suppression Hr'g Tr. 32:18-33:23, 42:13-43:13, 45:11-19.) He also testified that the last time Alexander was read his rights, he signed the *Miranda* form. Special Agent Joseph testified that he witnessed Alexander sign the *Miranda* form. (*Id.* at 137:9-22.) Both Special Agent Correa and Special Agent Joseph testified that Alexander chose to waive his rights voluntarily. (Suppression Hr'g Tr. 35:20-21, 129:1-3, 137:22.)

Alexander disputes this. He argues that Special Agent Correa was sent with a specific directive to take a statement from Alexander, that he did so, and, knowing that he had violated Alexander's rights, he then falsified both the *Miranda* form and his post-arrest report to cover-up

his illegal activity.  The evidence he points to in support of this theory is his own sworn statement, alleged contradictions between the agents' testimony and Special Agent Correa's written post-arrest report, and the *Miranda* form, which he alleges was nefariously altered.  The credible evidence overwhelmingly favors the Government.

Alexander's first attack on Special Agent Correa's testimony is that he must have concocted a story regarding reading Alexander his rights because he was ordered by the case agent, Special Agent Rosenblatt, to take a statement from Alexander during his arrest.  (Def.'s Post-Hr'g Mem. 2-4.)  This argument hinges on a single half-sentence from Special Agent Correa's testimony.  When asked whether he was instructed to do anything besides arrest Alexander, he replied, "[n]o, other than take a statement if he wanted to give one."  (Suppression Hr'g Tr. 52:16.)  From this statement, Alexander concludes that Special Agent Correa created an atmosphere at the arrest intended to force Alexander to talk and then covered it up.  Needless to say, that conclusion is not the only one that may be drawn from Special Agent Correa's testimony.  The more probable response, and, indeed, the one the Court finds most credible, is the explanation given by Special Agent Correa himself:  he was told to arrest Alexander, but he had been prepared to take a statement, if Alexander wanted to give one.  In Special Agent Correa's experience, arrested defendants often make post-arrest statements, particularly when, as here, they ask about the charges against them.  (Suppression Hr'g Tr. 32:22-33:1.)  There is no reason that Special Agent Correa's preparation for this possibility undermines his credibility.

In addition to attacking Special Agent Correa's motive for questioning him, Alexander argues that the Court should not credit Special Agent Correa's testimony because it contradicts his written report, contradicts the testimony of Special Agent Joseph, and is internally

contradictory.  Initially, Alexander argues that Special Agent Correa's testimony is contradicted by his written post-arrest report.  (Def.'s Omnibus Mot. Ex. A.)  That report states "[a]fter a security sweep of the residence, SA Correa advised NATHANIEL ALEXANDER of his Miranda Rights.  NATHANIEL ALEXANDER waived his rights and stated that he would answer questions."[20]  (Def.'s Omnibus Mot. Ex. A.)  Alexander argues that this contradicts Special Agent Correa's testimony at the suppression hearing because the post-arrest report does not state the contents of the statements that were made at that time.  (Def.'s Post-Hr'g Mem. 4-5.)  An omission is not a contradiction.  As Special Agent Correa included in his report a description of Alexander's statements made at the ICE Office (Def.'s Omnibus Mot. Ex. A), presuming Alexander told a consistent story, relating that he said the same thing earlier in the day would be redundant.  In addition, the report and Special Agent Correa's testimony are consistent on the only relevant fact at issue – whether Special Agent Correa actually advised Alexander of his *Miranda* rights.  Thus, Special Agent Correa's written report reinforces, rather than undermines, the credibility of his testimony.

Alexander also argues that inconsistencies between Special Agent Correa's and Special Agent Joseph's testimony show that Alexander could not have been orally advised of his rights. (Def.'s Post-Hr'g Mem. 5.)  The contradictions outlined by Alexander, however, are immaterial to the question of whether Alexander was read his rights.  Alexander claims that the two agents provided different testimony on:  (1) whether Alexander was wearing boxer shorts or pajama pants when he opened the door; (2) who asked Alexander for permission to search his home; and

---

[20]The version of this memo submitted with Alexander's papers had the names of the arresting agents redacted.  A non-redacted copy, however, was introduced at the suppression hearing.  The Court is quoting the non-redacted copy.

(3) whether Special Agent Correa ordered Special Agent Joseph to retrieve the written *Miranda*

form or whether Special Agent Joseph retrieved it on his own initiative.  (*Id.*)  The Court does

not find these minor contradictions, if they can be considered that, to be of any relevance to the

agents' overall credibility.  The agents agreed more than they differed, and some differences are

to be expected four months after the event occurred.  In addition, none of these alleged

"contradictions" speaks to the matter at issue, which is whether Alexander was informed of, and

waived, his rights.

Alexander also argues that Special Agent Correa contradicted himself by first testifying

that he had not spoken with anyone regarding a change made to the *Miranda* form, and later

testifying that he had spoken with AUSA Perry.  (Def.'s Post-Hr'g Mem. 5.)  Alexander points to

a series of answers which he alleges are contradictory.  (Suppression Hr'g Tr. 113:2-114:23.)  It

is clear from Special Agent Correa's entire testimony that his answers were not contradictory,

however; he was merely unclear as to what was being asked.  Immediately after the alleged

contradictions, once the Court had intervened to prevent counsel from talking over the witness,

Mr. Fineman asked Special Agent Correa to clarify his testimony.  He did so, stating

unequivocally that he had spoken with AUSA Perry regarding the change, but had spoken to no

one else about it.  (*Id.* at 114:15-17.)

Alexander's final attack on Special Agent Correa is an allegation that he illegally altered

the *Miranda* form to reflect that it was signed prior to Alexander's statements at the station

house, when in fact it was signed after they were given.  (Def.'s Post-Hr'g Mem. 6.)  Alexander

argues that this is proof that he was not orally read his rights, as there would be no reason to

doctor the *Miranda* form if the agents had followed the necessary procedures.  In short,

Alexander's theory is that Special Agent Correa intentionally took his statements in contravention of Alexander's constitutional rights, and then doctored both the *Miranda* form and the post-arrest report to hide this plot. Once again, the evidence is a marplot for Alexander's theory of the case.

Special Agent Joseph testified that it was he who initially filled out the *Miranda* form, and he admitted that he filled it out incorrectly. (Suppression Hr'g Tr. 138:15-22.) He remembered the error clearly, because Special Agent Correa, the more senior agent, scolded him for it at the time. (*Id.*) Special Agent Joseph also testified that he corrected the error and initialed it, all in the presence of the Defendant. (*Id.* at 139:23-140:3.) Occam's razor, a principle that is often paraphrased in English as "all things being equal, the simplest solution tends to be the best one," is apt here. Here, the simplest explanation of the events of February 9, 2006, is indeed the most credible one. That explanation was provided by Special Agent Joseph. There is simply not a shred of evidence that either Special Agent Joseph, Special Agent Correa, or some other unidentified party later altered the *Miranda* form.[21] Special Agent Joseph's testimony was specific, detailed, and credible, and because Alexander provided no basis to impugn his credibility, the Court finds him credible. Therefore, the overwhelming evidence shows that Alexander was advised of his rights three times, prior to each of his post-arrest statements.

_____

[21]In his Post-Hr'g Reply Mem., Alexander insinuated that Special Agent Rosenblatt was threatening Special Agent Joseph during a break in his testimony. (Def.'s Post-Hr'g Reply Mem. 15.) Special Agent Joseph stated at the hearing that their conversation concerned travel arrangements. (Suppression Hr'g Tr. 164:13-22.) Any suggestion of foul play on the part of Special Agent Rosenblatt is baseless.

<u>b.  Was Alexander's Waiver of His Rights Knowing and Voluntary?</u>

Alexander disputes that he knowingly waived his rights, however, the Court finds that the record indisputably indicates otherwise.  Special Agent Correa testified that he explained each of Alexander's rights to him, and asked him if he fully understood each of his rights.  (Suppression Hr'g Tr. 33:6-23.)  Special Agent Correa also testified that Alexander indicated that he did understand his rights.  Then, Special Agent Correa asked if Alexander was willing to waive his rights and speak to the agents.  Special Agent Correa testified that Alexander indicated that he was willing to waive his rights, and that he did wish to speak to the agents.  (*Id.*)  Each time Special Agent Correa informed Alexander of his rights, he asked Alexander if he understood them and if he wanted to waive them.  (*Id.* at 42:25-43:10, 45:11-19.)  As with the rest of Special Agent Correa's testimony, the Court finds this testimony credible.

This testimony was corroborated by the testimony of Special Agent Joseph.  Special Agent Joseph testified that at the time of his arrest, Alexander continually asked questions of the agents and sought information regarding his arrest.  (*Id.* at 129:1-3, 130:10-12.)  From this testimony, it is clear that Alexander had a desire to communicate with the agents, and a waiver of rights that comes from a genuine desire to cooperate is not involuntary.  *See United States v. Mitchell*, 966 F.2d 92, 100 (2d Cir. 1992).

<u>c.  Were Alexander's Post-Arrest Statements Voluntarily Made?</u>

Even if Alexander was read his rights and chose waive them, his statements are still inadmissible unless the Government can show that his statements were voluntarily made.  *See Elstad*, 470 U.S. at 309; *Parsad v. Greiner*, 337 F.3d 175, 183 (2d Cir. 2003).  The Supreme Court has long recognized that "custodial police interrogation, by its very nature, isolates and

pressures the individual." *Dickerson v. United States*, 530 U.S. 428, 435 (2000); *see also Miranda*, 384 U.S. at 439. Though all custodial interrogations involve "serious pressures," the voluntariness of a defendant's statements is evaluated by looking at the surrounding circumstances, specifically "1) the accused's characteristics, 2) the conditions of the interrogation, and 3) the conduct of the police." *See Parsad*, 337 F.3d at 183 (citing *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991)). A statement is made involuntarily if it has been "obtained by techniques and methods offensive to due process or under circumstances in which the suspect clearly had no opportunity to exercise a free and unconstrained will." *Elstad*, 470 U.S. at 304 (citations and quotations omitted). Although the Court must consider all of these circumstances, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986); *United States v. Romero*, 897 F.2d 47, 52 (2d Cir. 1990). Indeed, the Supreme Court has made clear that the "voluntariness of a waiver [of *Miranda* rights] has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word." *Connelly*, 479 U.S. at 170.

Alexander does not claim that any of his own characteristics demonstrate his statements were made involuntarily. Instead, he argues that his initial statements were not voluntary because he was intimidated by the conduct of the arresting agents, namely their questioning of him in his home and the allegedly overbroad security sweep they conducted. (Def.'s Post-Hr'g Mem. 7.) In addition, Alexander argues that his station-house statements were involuntary, or, at least, a product of his prior involuntary statements, because he already believed he had told the officers the information. (Def.'s Omnibus Mot. Ex. B.) Thus, Alexander argues that all his

statements must be suppressed.

Alexander points to numerous instances of Government conduct which he believes demonstrate that his statements were made involuntarily.  These are:  (1) the agents arrived at his home early in the morning; (2) the agents performed an unlawful security sweep of his residence; (3) the agents separated Alexander from his family, and did not allow his family to move about the home during the security sweep of his residence; (4) the agents remained at Alexander's home for approximately forty-five minutes to an hour, which he believes was longer than necessary; (5) the lack of a written waiver of rights form; (6) that there were approximately five agents who took part in the arrest; (7) Special Agent Correa's testimony that Alexander looked "anxious" when questioned; (8) that Special Agent Correa accompanied Alexander at all times; (9) that the agents enlisted Alexander's help to locate Steven Riddick; (10) that Special Agent Correa had been directed to obtain a statement from Alexander; and (11) that Alexander stopped cooperating after the execution of the written *Miranda* form.  (Def.'s Post-Hr'g Mem. 8.)

As Alexander's papers reflect, there is little law to support the proposition that these factors, even taken together, constitute conduct that is so coercive to justify suppression of Alexander's statements.  As an initial matter, none of the techniques used by law enforcement in this case were at all offensive to due process.  The Due Process clause does not require law enforcement agents to arrive at a suspect's house in the middle of the day, nor does it require that agents allow other family members to move about the house during a security sweep of a residence.  Going to Defendant's home early in the morning maximized the chance that he would be there.  The agents chose to remain in the home to allow Alexander to dress and to answer the questions Alexander was asking about his arrest.  Temporarily detaining other persons in the

home while officers conduct a security sweep is not uncommon, and certainly not *per se* coercive or improper. *See, e.g.*, *United States v. Paulino*, 299 F. Supp. 2d 332, 335 (S.D.N.Y. 2004) (noting defendant's family members were held in one room of residence while officers conducted a security sweep), *aff'd* 445 F.3d 211 (2d Cir. 2006). Even in cases where courts have found security sweeps unlawful, they have accepted that securing the occupants of a dwelling during such a sweep is a necessary part of maintaining officer safety. *Cf. United States v. Agapito*, 620 F.2d 324, 335-36 (2d Cir. 1980) (noting that security sweep includes "securing" premises to ensure that no threat to officer safety is present). There is also nothing offensive about some agents remaining inside a suspect's home while others perform such a security sweep. *Cf. United States v. Fullwood*, 86 F.3d 27, 30 (2d Cir. 1996) (waiver of *Miranda* rights was voluntary even though suspect was detained in his home while agents conducted a search pursuant to a warrant).

Here, the agents were in Alexander's home long enough to arrest him, answer his questions about the charges, and perform a search to which he voluntarily consented. Even at the long end of his estimate, one hour, there is no evidence that would justify finding this situation was coercive or overrode Alexander's will. Nor is the presence of a number of officers, in and of itself, coercive. *See United States v. Garcia*, 56 F.3d 418, 423 (2d Cir. 1995) (presence of six officers in home not coercive in obtaining consent to search). Furthermore, the Due Process clause does not require a written waiver of a suspect's rights. *See United States v. Silva*, 715 F.2d 43, 49 (2d Cir. 1983) ("An express written or oral waiver of constitutional rights is not necessary to establish a knowing and voluntary waiver of such rights."). Finally, it is not a violation of due process for an agent to accompany an arrested suspect throughout the post-arrest process. *See United States v. Hospedales*, 247 F. Supp. 2d 530, 542 (D. Vt. 2002) (holding

statements were voluntarily made even though agent accompanied suspect to the station house and questioned him).

The evidence also supports the conclusion that no Government conduct undermined Alexander's ability to exercise his free will.  There is no evidence that the agents in this case engaged in threatening behavior or intimidation tactics.  There is also no evidence that they engaged in aggressive interrogation or denied Alexander any type of food or drink.  *See United States v. Berkovich*, 932 F. Supp. 582, 587 (S.D.N.Y. 1996) (holding that comfortable interrogation space and lack of physical coercion go to voluntariness of defendant's statements), *aff'd on other grounds* 168 F.3d 64 (2d Cir. 1999); *Hospedales*, 247 F. Supp. 2d at 542 (noting that agent used no deception during arrest processing).  In addition, both Special Agent Correa and Special Agent Joseph testified that Alexander's demeanor was that of a willing cooperator. They testified Alexander was "very cooperative" (Suppression Hr'g Tr. 35:20), "wouldn't stop talking" (*id.* at 130:12-13), and that he cooperated without hesitation (*id.* at 130:25).  This is also evidenced by the numerous phone calls made by Alexander to assist the agents in their attempts to find co-defendant Steven Riddick.  By the conclusion of the interview at the office, Special Agent Joseph testified that Alexander was "even joking" with the agents (*id.* at 135:21-24). Although Alexander stated in his affidavit that he was "[i]ntimidated by the conduct of the federal agents" (Def.'s Omnibus Mot. Ex. B), the preponderance of the evidence indicates that he knowingly and willingly chose to make statements out of a genuine desire to learn about the indictment against him and cooperate with the arresting agents.  "Inculpatory statements are not involuntary when they result from a desire to cooperate . . . ."  *Mitchell*, 966 F.2d at 100.

Alexander's last argument concerning the voluntariness of his statements is an attempt to

bootstrap a Fourth Amendment claim, which was not made in his original motion, into his Fifth

Amendment claim by arguing that because the security sweep and search performed by the

officers violated his Fourth Amendment rights, these illegal searches "tainted" his waiver of his

rights.  There is no evidence that the search in this case was illegal, however, and even if the

security sweep and subsequent search of Alexander's home violated his Fourth Amendment

rights against unreasonable search and seizure, it would not be grounds for suppressing his

statements.

       As an initial matter, the security sweep and search of Alexander's home did not violate

his Fourth Amendment rights.  Alexander was arrested in the foyer of his home, pursuant to a

valid arrest warrant.  (Suppression Hr'g Tr. 28:23-24; 127:17-20.)  An arrest warrant carries with

it the authority to enter a person's home to execute it provided there is reason to believe the

person is home.  *See Payton v. New York*, 445 U.S. 573, 603-04 (1980); *United States v.*

*Lovelock*, 170 F.3d 339, 343 (2d Cir. 1999).  The agents had reason to believe Alexander was in

the residence, because they had previously driven by his residence and, when they knocked, he

came to the door.  (Suppression Hr'g Tr. 145:11-13.)  As he was being placed under arrest, the

officers asked him if there were any weapons or other persons in the home.  (*Id.* at 28:23-24,

127:17-20.)  He told them his wife and daughter were there.  At that point, the agents had a

reasonable basis to conduct a security sweep of the home, because they were aware of a specific

fact that there may be others in the residence.  *See United States v. Oguns*, 921 F.2d 442, 446-47

(2d Cir. 1990) (security sweep of suspect's residence did not violate the Fourth Amendment even

though suspect was arrested outside his residence and even though defendant said his brother was

not in the residence, because officers had reason to believe there were others in the apartment

who might jeopardize their safety).

After the security sweep was concluded, the agents remained in the home because they were given permission to search it. Although Alexander stated in his affidavit that he did not give consent to search his home (Def.'s Omnibus Mot. Ex. B), Special Agent Joseph and Special Agent Correa testified otherwise. Special Agent Joseph testified that after the initial security sweep of the home, he took Alexander to a bedroom in the home to allow him to dress. (Suppression Hr'g Tr. 128:14-129:21.) Special Agent Joseph then took him to the room where he was questioned by Special Agent Correa. The agents asked Alexander for his permission to search his home, which was given.[22] (*Id.* at 130:18-25.) Given that the Court credits both agents' testimony regarding Alexander's demeanor and the circumstances surrounding his arrest, the evidence supports a conclusion that this consent was a product not of coercion but of Alexander's own free will, and therefore voluntary. *See United States v. Moreno*, 897 F.2d 26, 33 (2d Cir. 1990) ("A person placed in official custody is not thereby rendered incapable of giving his free and voluntary consent to a warrantless search.").

Alexander argues that this Court should find that his consent was not voluntary, and he urges the Court to follow the reasoning of the court in *United States v. Isiofia*, No. 02 Cr. 520, 2003 WL 21018853, at *1 (S.D.N.Y. May 5, 2003), *aff'd* 370 F.3d 226 (2d Cir. 2004). In *Isiofia*, federal agents and the New York Police Department performed a controlled delivery of a package to the defendant. When he arrived at his door and signed for the package, the agents arrested him. They had no arrest warrant, no anticipatory arrest warrant, and no search warrant. *See*

---

[22]Both Special Agent Correa and Special Agent Joseph recall asking Alexander for permission to search the home. (Suppression Hr'g Tr. 36:1-21, 130:18-131:14.) Each one testified that he granted permission. (*Id.*)

*Isiofia*, 2003 WL 21018853, at *1. They arrested the defendant, handcuffed him to a table, and proceeded to remain in his apartment while filling out paperwork. *Id.* While the defendant sat at the table, the agents proceeded to obtain his consent to search various parts of his apartment, including his briefcase, his home, his car, and his computer. *Id.* at *4. The district court suppressed the evidence from these searches. It held both that the defendant's consent to the search was involuntary and the "fruit" of an illegal entry. *Id.*

A number of facts distinguish *Isiofia* from the present case. First, the district court's opinion in *Isiofia* rested heavily on the fact that government agents may not enter a person's home, absent exigent circumstances, without a warrant, and, because the agents in that case had no warrant, their decision to remain in the defendant's apartment was particularly egregious. *See Isiofia*, 2003 WL 21018853, at *5, *9. Here, the agents did have a warrant, and they remained in Alexander's home only to allow him to dress and to discuss with him, at his request, the basis for that warrant. Second, the circumstances surrounding the defendant's consent in *Isiofia* were entirely different. The court in *Isiofia* found that the defendant had been drinking, had little command of the English language, and that he was not informed of the charges against him or of his rights. *Id.* at *7-9. Finally, the court held that the fact that the agents in *Isiofia* should have known that their entry into the defendant's apartment was illegal was the most important factor in finding that his consent was involuntary. *Id.* Here, however, none of these factors is present, and there is simply no evidence that Alexander's consent to search was coerced.

Even if the consent to search was not given, however, it is not a basis for finding that Alexander's statements, given after a knowing and voluntary wavier of his *Miranda* rights, should be suppressed. Alexander argues that because the scope of the search violated his Fourth

Amendment rights, the unconstitutional "taint" from the search means that the waiver of his Fifth Amendment rights was thereby invalid. He relies on two cases to make his point. In *Elstad*, the Supreme Court stated, in *dicta*: "Where a Fourth Amendment violation 'taints' the confession, a finding of voluntariness for the purposes of the Fifth Amendment is merely a threshold requirement in determining whether the confession may be admitted in evidence. Beyond this, the prosecution must show a sufficient break in events to undermine the inference that the confession was caused by the Fourth Amendment violation." 470 U.S. at 306 (citation omitted). The Supreme Court in *Elstad*, however, was talking about the "taint" that arises from an illegal arrest. The Court was discussing the doctrine derived from *Wong Sun v. United States*, 371 U.S. 471 (1963), which states that "'a confession obtained through custodial interrogation after an illegal arrest should be excluded unless intervening events break the causal connection between the illegal arrest and the confession so that the confession is sufficiently an act of free will to purge the primary taint.'" *Elstad*, 470 U.S. at 306 (quoting *Taylor v. Alabama*, 457 U.S. 687, 690 (1982)).

Although numerous cases discuss the "taint" that arises when a consent to search is given after an illegal entry to an apartment, *see, e.g.*, *Isiofia*, 2003 WL 21018853, at *5, or after an illegal arrest, *see Elstad*, 470 U.S. at 306, the Supreme Court has never held, and the Court is aware of no other court that has held, that a security sweep, even if unlawful in scope, is sufficient to "taint" a suspect's voluntary waiver of his or her *Miranda* rights. Even if this proposition was supported by the *Wong Sun* doctrine, there is insufficient evidence to find that *this* security sweep was sufficiently overbroad to taint Alexander's waiver of his constitutional rights. An arrest is an inherently startling event; a security sweep of one's home, even if a

common (and necessary) component of many in-home arrests, is also an unsettling event. In this case, however, there is no evidence that Alexander was intimidated by the agents' security sweep. Thus, there is no reason to believe that the allegedly overbroad security sweep had any additional coercive effect on Alexander's choice to waive his *Miranda* rights.

Alexander's final argument for suppression is that his statements at the ICE office, both those after he was orally read his rights and after he signed the written *Miranda* form, were "tainted" by the involuntary waiver that occurred at his home. As an initial matter, the conditions at the ICE office were not coercive. Alexander was uncuffed (Suppression Hr'g Tr. 134:19-21), offered refreshments (*id.* at 135:4-5), and treated in a civil manner. *See Berkovitch*, 932 F. Supp. at 587 (holding that comfortable interrogation space and lack of physical coercion go to voluntariness of defendant's statements). In addition, as the Court has found that Alexander's waiver of his rights at his home was voluntary, there is no unconstitutional "taint" that must be cured before the statements made at the ICE office can be admitted. Finally, even if there was such a "taint," however, the passage of time between Alexander's statements at his home and his statements at the station house was sufficient to dissipate that taint. *See Tankleff v. Senkowski*, 135 F.3d 235, 245 (2d Cir. 1998) (holding that statements made after *Miranda* warnings were admissible, even though defendant had been held in custody and continually interrogated in violation of his Fifth Amendment rights for approximately five hours).[23]

---

[23]*Tankleff* concerns whether police interrogation, prior to any *Miranda* warning, may be so coercive as to preclude a finding that a later waiver of *Miranda* rights was knowing and voluntary. The Second Circuit panel in that case held that, at least under the circumstances of the interrogation in *Tankleff* (which were arguably more egregious than those here), it did not. In 2004, the Supreme Court decided *United States v. Fellers*, 540 U.S. 519 (2004), where it held that the Eighth Circuit had erroneously determined that because statements made at the defendant's home were not a product of custodial interrogation, they did not violate the

## 2.  Questioning of Alexander Without Counsel

Alexander also argues that his post-arrest statements should be suppressed because he was questioned without counsel present, in violation of the Sixth Amendment of the Constitution.  The Sixth Amendment right to counsel attaches at the time judicial proceedings are initiated against the individual defendant, here, the moment of indictment.  *See Fellers*, 540 U.S. at 523.  This right is violated when the Government "deliberately elicits" statements from a defendant, a standard that is broader than the Fifth Amendment standard of "custodial interrogation."  *Id.* at 523-24.  However, like the Fifth Amendment protection against self-incrimination, an indicted defendant may waive the right to counsel, provided that waiver is knowing and voluntary.  *See Patterson*, 487 U.S. at 292.  In general, evidence that an indicted defendant was informed of his right to counsel during the traditional *Miranda* warnings is sufficient evidence to support a finding that a defendant's waiver of his or her Sixth Amendment right to counsel was knowing and voluntary.  *Id.* at 296.

Alexander argues, based on *United States v. Rosa*, 11 F.3d 315, 329 (2d Cir. 1993), that

---

defendant's Sixth Amendment right to counsel.  The Court did not order a remedy, however, but remanded that case to the Eighth Circuit to determine whether the defendant's statements, made knowingly and voluntarily but taken in violation of his Sixth Amendment right to counsel, sufficiently tainted later, post-*Miranda* warning statements, so as to require suppression of both the pre-warning and post-warning statements.  *See id.* at 525.  The Eighth Circuit held that it did not.  *See Fellers v. United States*, 397 F.3d 1090, 1097-98 (8th Cir. 2005), *abrogated on other grounds by United States v. Thorpe*, 447 F.3d 565, 569 n.3 (8th Cir. 2006).  The Court will evaluate whether Defendant's statements in his home were taken in violation of his Sixth Amendment rights, as it must under *Fellers*, *infra*.  The Second Circuit has not yet decided this issue; however, the Court has no reason to believe that the holding in *Tankleff* was undermined or superseded by the Supreme Court's decision in *Fellers*.  Indeed, as the Supreme Court has held that the necessary showing required for a knowing and voluntary waiver of the Sixth Amendment right to counsel is identical to that required for a waiver of Fifth Amendment rights, *see Patterson v. Illinois*, 487 U.S. 285, 290-91 (1988), there is no reason that the Second Circuit's analysis in *Tankleff* would be undermined by the Supreme Court's decision in *Fellers*.

59

the Government has an affirmative obligation not to deliberately elicit remarks from a defendant without counsel present.  This is a proper statement of one holding in *Rosa*; however, the Government does not violate that obligation if a defendant chooses to waive his Sixth Amendment rights.  The Supreme Court specifically rejected both the argument that the Sixth Amendment bars the Government from initiating contact with an indicted defendant in the absence of counsel, *see Patterson*, 487 U.S. at 290-91 (holding that police questioning must stop after an indicted defendant exercises right to counsel), and the idea that a defendant's Sixth Amendment right to counsel requires a greater showing to demonstrate waiver, *see id.* at 297-98 ("[W]e have never suggested that one right is 'superior' or 'greater' than the other, nor is there any support in our cases for the notion that because a Sixth Amendment right may be involved, it is more difficult to waive than the Fifth Amendment counterpart.").  Thus, before the Court may admit the post-arrest statement of an indicted defendant, it need only find that the indicted defendant was appraised of his right to counsel and that he knowingly and voluntarily waived that right.  *Id.*

As the Court has found that Alexander was informed of his rights, including his right to counsel, prior to the making of any statements, and that he waived his rights knowingly and voluntarily, there is no basis for finding that the agents violated Alexander's Sixth Amendment right to counsel, or any of his Fifth Amendment rights.  Thus, Alexander's motion to suppress his post-arrest statements is denied.

### C.  Motion to Disclose the Grand Jury Minutes

Alexander has requested that the Court order disclosure of the grand jury minutes, or, in the alternative, that the Court review them in camera.  Alexander alleges that because Special

Agent Rosenblatt may have perjured himself in front of the grand jury, because AUSA Perry may have knowingly suborned perjury in front of the grand jury and withheld exculpatory information from it, and because Special Agent Rosenblatt may have introduced excessive hearsay testimony in front of the grand jury, disclosure of the grand jury minutes is justified.  (Def.'s Omnibus Mot. ¶¶ 93-107.)  The Court disagrees.

The grand jury's proceedings are presumed to be valid, *see United States v. Mechanik*, 475 U.S. 66, 75 (1986) (O'Connor, J., concurring), and should presumptively remain secret, *see United States v. Proctor & Gamble Co.*, 356 U.S. 677, 682 (1958).  "[A] party seeking disclosure of grand jury minutes must show a particularized need that outweighs the need" for grand jury secrecy.  *United States v. Dunn*, No. 05 Cr. 127, 2005 WL 1705303, at *1 (S.D.N.Y. July 19, 2005) (internal quotations and citations omitted).  In general, "[a] review of grand jury minutes is rarely permitted without specific factual allegations of government misconduct."  *United States v. Torres*, 901 F.2d 205, 233 (2d Cir. 1990); *see also Dunn*, 2005 WL 1705303, at *1.  Here, Alexander has made no such allegation and demonstrated no such need.

Initially, Alexander argues disclosure is necessary because "[u]pon information and belief, while testifying before the grand jury, Special Agent Erik Rosenblatt and possibly others made material statements about defendants' [sic] participation in the alleged conspiracy which were false, deceptive, and incomplete, and known to the government to be false, deceptive, and incomplete."[24]  (Def.'s Omnibus Mot. ¶ 101.)  Alexander points to no evidence of such perjury in his papers, but merely refers back to the sections of his motion which discuss Alexander's arrest

---

[24]This is the entirety of Alexander's allegations of perjury.  The Court has omitted no statements of fact or other portions of his papers which discuss this allegation.

and his specious and unsupported allegations of misconduct on the part of AUSA Perry. Yet, speculation is insufficient to meet Defendant's burden of showing a particularized need. *See United States v. Jailall*, No. 00 Cr. 069, 2000 WL 1368055, at *3 (S.D.N.Y. Sept. 20, 2000) ("[The defendant] offers only the conclusory statement of his attorney that the evidence was legally insufficient to support an indictment, and the speculation that the Government may not have properly instructed the grand jury as to the legal effect of such evidence. Thus, he falls far short of the stringent standards for disclosure of grand jury materials."). Indeed, there is no part of Alexander's allegations that is not speculative. Even Alexander's unsupported belief that Special Agent Rosenblatt committed perjury is insufficient to warrant disclosure of the grand jury minutes. *See United States v. Stein*, 429 F. Supp. 2d 633, 640 & n.31 (S.D.N.Y. 2006) (listing cases); *United States v. Tochelmann*, No. 98 Cr. 1276, 1999 WL 294992, at *3 (S.D.N.Y. May 11, 1999) ("Allegations based on belief, such as Defendants' allegations here, provide no reason to disregard the presumption of regularity of grand jury proceedings, and do not even warrant an in camera review of the grand jury minutes." (internal quotation marks and citations omitted)).

Alexander next argues that the grand jury minutes must be opened to determine whether AUSA Perry suborned perjury in front of the grand jury and "withheld information from the grand jury concerning the above-described malfeasance effectuated by the agents involved." (Def.'s Omnibus Mot. ¶ 101.) Alexander's suspicion that AUSA Perry suborned perjury is baseless, as he has no evidence to support his allegation of perjury against Special Agent Rosenblatt. In addition, assuming *arguendo* that AUSA Perry did not present potentially exculpatory evidence to the grand jury, this alleged failure is not misconduct, and the fact that

AUSA Perry did not present potentially exculpatory evidence to the grand jury is not a basis for opening the grand jury minutes. *See Stein*, 429 F. Supp. 2d at 640 ("Nor does the government's alleged failure to present exculpatory evidence to the grand jury justify [dismissing the indictment or opening up the grand jury transcripts]. As the Supreme Court has explained, prosecutors are not required to present exculpatory evidence to the grand jury." (footnote omitted) (citing *Williams*, 504 U.S. at 52)).

Finally, Alexander argues that if (1) Special Agent Rosenblatt was the only witness before the grand jury, and (2) he relied on excessive hearsay, then Alexander's rights may have been violated. (Def.'s Omnibus Mot. 20.) This is, again, utterly speculative. Even if it were not, hearsay testimony is admissible before the grand jury. *See Costello v. United States*, 350 U.S. 359, 363-64 (1956). Alexander contends that the Government excessively relied on hearsay, but offers nothing to support this speculation. Even "double-hearsay" is admissible before the grand jury, and the use of such testimony is not sufficient evidence of Government misconduct to justify review of the grand jury minutes. *See United States v. Carter*, No. 04 Cr. 594, 2005 WL 180914, at *5-6 (S.D.N.Y. Jan. 25, 2005) (rejecting motion to open grand jury minutes where grand jury testimony was based on double-hearsay testimony of a single witness); *see also United States v. Lester*, No. S1 95 CR. 216, 1995 WL 656960, at *9-10 (S.D.N.Y. Nov. 8, 1995) (denying defendant's motion to inspect grand jury minutes even though defendant alleged indictment was based on hearsay testimony of confidential informant).

As Alexander has failed to make a specific showing of misconduct that would justify opening the grand jury minutes, or even *in camera* review, Alexander's motion to open the grand jury minutes is denied.

D.  Motion to Dismiss the Indictment For Failing to State a Crime

_____Alexander argues that, pursuant to Fed. R. Crim. P. 12(b)(3)(B), the April 26, 2006

Superseding Indictment must be dismissed for "failure to state a crime for which he can be

prosecuted."  (Def.'s Omnibus Mot. ¶ 108.)  Alexander alleges one primary defect in the

indictment, namely a failure to plead that he knew of the bank fraud conspiracy or money

laundering operation.[25]

_____"An indictment returned by a legally constituted and unbiased grand jury . . . if valid on

its face, is enough to call for trial of the charge on the merits."  *Costello*, 350 U.S. at 363

(footnote omitted).  Fed. R. Crim. P. 7(c)(1) simply requires that an indictment "must be a plain,

concise, and definite written statement of the essential facts constituting the offense charged."

As the Second Circuit noted in *United States v. Stavroulakis*, this burden is not great:

> An indictment is sufficient when it charges a crime with sufficient
> precision to inform the defendant of the charges he must meet and
> with enough detail that he may plead double jeopardy in a future
> prosecution based on the same set of events.  We have often stated
> that an indictment need do little more than to track the language of
> the statute charged and state the time and place (in approximate
> terms) of the alleged crime.

952 F.2d 686, 693 (2d Cir. 1992) (internal quotations and citations omitted).  In considering

---

[25]Alexander's actual problems with the Superseding Indictment are somewhat unclear, as
he vacillates between arguing that the Government has failed to allege certain elements of the
crimes charged and that the Government has insufficient evidence to prove some of the elements
charged.  As discussed at length *supra*, allegations that the Government's proof was insufficient
for indictment are inadequate to overcome the presumption of grand jury validity.  *See Williams*,
504 U.S. at 50-54.  To the extent that Alexander speculates that the Government's proof will be
insufficient at trial (Def.'s Omnibus Mot. ¶ 113), such a challenge is more suitable after the
Government has actually introduced its evidence.  At that point, Alexander may move for a
directed verdict.  *See* Fed. R. Crim. P. 29; *United States v. Cassese*, 273 F. Supp. 2d 481, 484-85
(S.D.N.Y. 2003).

whether an indictment has sufficiently stated a crime, courts will not look past the four corners of

the indictment to weigh the sufficiency of the evidence. *See United States v. Percan*, No. 98 Cr.

392, 1999 WL 13040, at *3 (S.D.N.Y. Jan. 13, 1999).

Here, Alexander argues that the Government has failed to plead that Alexander knew of

the conspiracy in which he is charged with participating. (Def.'s Omnibus Mot. ¶ 112.) The

April 26, 2006 Indictment plainly states that Alexander "unlawfully, willingly, and knowingly"

conspired to commit bank fraud. (April 26, 2006 Indictment ¶ 84.) It repeats that phrase in each

count that names Alexander (*id.* ¶¶ 85, 95-96.) This is sufficient to put Alexander on notice of

the charges he must meet. *See Stavroulakis*, 952 F.2d at 693 ("When an indictment delineates

the elements of a charged offense, however concisely, the underlying concerns of proper pleading

- notice of the charge to be met and protection against double jeopardy - may be further promoted

by a bill of particulars or pre-trial discovery.").[26] Thus, Alexander's motion to dismiss the

indictment for failing to state a crime against him is denied.

     E.  Request for Additional Discovery

Alexander's next argument in his omnibus motion is a demand for additional written

---

[26]Alexander also argues that the Government's failure to produce sufficient evidence that he knew about the conspiracy violates his due process rights. He claims that the Government's conspiracy charges are based on the doctrine of vicarious liability described in *Pinkerton v. United States*, 328 U.S. 640 (1946), and, citing a dissenting opinion from the Fifth Circuit, argues that the doctrine as applied in this instance violates his due process rights, because the indictment holds him liable for crimes committed by others. (Def.'s Omnibus Mot. ¶ 112 (citing *Park v. Huff*, 506 F.2d 849, 864 (5th Cir. 1975) (Thornberry, J., dissenting)).) The April 26, 2006 Indictment, however, charges Alexander with participating in the conspiracy through his own acts, not those of his alleged co-conspirators. The April 26, 2006 Indictment charges Alexander with depositing fraudulent checks into his own bank accounts. Thus, Alexander's concerns regarding potential due process concerns from *Pinkerton* liability are chimerical at best. If Alexander's concerns materialize at trial, the Court will address them then.

records of his own pre- and post-arrest statements. (Def.'s Omnibus Mot. ¶¶ 117-119.) After

receipt of Defendant's moving papers, AUSA Perry requested that the agents involved in

Alexander's arrest scour their files for any additional statements. (Perry Aff. ¶ 12.) She then

promptly produced those notes, and the written report produced after Alexander's proffer session,

by attaching them to her motion papers. (Gov't Mem. Ex. C, D.) Alexander did not continue to

press the point in his reply papers, or any of his post-suppression hearing papers. The Court

concludes that Alexander received the documents he requested. Thus, Alexander's motion to

require their production is denied as moot.[27]

      F.  Motion for a Separate Hearing to Determine the Existence of a Conspiracy

      Alexander has requested a separate hearing to determine the admissibility of any co-

conspirator statements that might be used against him. (Def.'s Omnibus Mot. ¶ 120.) As with all

admissibility questions, it is the job of the Court to determine the admissibility of co-conspirator

statements. "Before admitting a co-conspirator's statement over an objection that it does not

qualify under Rule 801(d)(2)(E), a court must be satisfied that the statement actually falls within

the definition of the Rule. There must be evidence that there was a conspiracy involving the

declarant and the nonoffering party, and that the statement was made 'during the course and in

furtherance of the conspiracy.'" *Bourjaily v. United States*, 483 U.S. 171, 175 (1987). The

---

[27]Even if it were not moot, Alexander's motion violates Local Criminal Rule 16.1, which states that no motion for discovery will be heard unless the "party [seeking discovery] files with the court simultaneously with the filing of the moving papers an affidavit certifying that said counsel has conferred with counsel for the opposing party in an effort in good faith to resolve by agreement the issues raised by the motion." Local Crim. R. 16.1. Alexander's attorney did not submit such an affidavit. Thus, Alexander's motion, were it not moot, would be denied. *See United States v. Ahmad*, 992 F. Supp. 682, 683 (S.D.N.Y. 1998).

Government must make this showing by a preponderance of the evidence.  *Id.*

A trial court need not, however, make these determinations prior to trial.  The Second Circuit permits courts to conditionally admit such statements.  "Under the *Geaney* rule, [*United States v. Geaney*, 417 F.2d 1116, 1120 (2d Cir. 1960),] statements proffered as coconspirator statements may be admitted in evidence on a conditional basis, subject to the later submission of the necessary evidence of those four prerequisites."  *United States v. Tracy*, 12 F.3d 1186, 1199 (2d Cir. 1993).  If the Government meets its burden of proof at trial, the statements may be sent to the jury.  If it does not, a court may either provide a limiting instruction, or, if the statements "were 'so large a proportion of the proof as to render a cautionary instruction of doubtful utility,'" the court may declare a mistrial.  *Id.* (quoting *Geaney*, 417 F.2d at 1120).

At this point, Alexander has given the Court no reason to conclude that the Government's case will be so based on unsupported co-conspirator statements that a mistrial looms.  Thus, Alexander's request "would require this Court to undertake a mini-trial, significantly prolonging the proceedings in the case and affording the defendants a complete preview of the government's evidence."  *United States v. Ianniello*, 621 F. Supp. 1455, 1478 (S.D.N.Y. 1985); *see also United States v. Labate*, No. S1 00 Cr. 632, 2001 WL 533714, at *21 (S.D.N.Y. May 18, 2001).  This is unnecessary.  Therefore, Alexander's request for a separate hearing on the existence of a conspiracy is denied.

### G.  Motions in Limine Precluding Introduction of Evidence Regarding Defendant Alexander's Financial Situation and Precluding the Government from Arguing Deliberate Ignorance

Alexander, in one sentence, argues that the Government should be precluded from introducing evidence of his financial situation because it is "irrelevant and prejudicial."

67

(Def.'s Omnibus Mot. ¶ 126.)  Federal Rule of Evidence 402 provides that "all relevant evidence

is admissible."  Relevant evidence may be excluded if its prejudicial value outweighs its

probative effect.  Fed. R. Evid. 403.  Details of a defendant's financial history are often relevant

to the motive of a defendant to commit a crime, especially if that crime involves pecuniary gain.

The Second Circuit has long recognized that evidence of indebtedness is admissible in a criminal

case to establish motive.  *See United States v. Hernandez*, 588 F.2d 346, 348-49 (2d Cir. 1978)

(listing cases).  Here, however, the Court is simply not in a position to make a relevancy

determination.  Alexander's argument consists of a single sentence, which states a conclusion.

Thus, Alexander's motion to exclude evidence of his financial situation is denied without

prejudice.  If, at trial, Alexander is able to make a more persuasive case for the exclusion of

evidence offered by the Government, he may revisit the issue at that time.

Alexander also argues that the Court should preclude the Government from arguing

"deliberate ignorance" to prove the knowledge element of the offenses with which he is charged.

This motion is premature.  The "deliberate ignorance" argument described by Alexander in his

motion typically refers to a court's jury instruction regarding a defendant's "conscious

avoidance" of a fact at issue.  "Courts in this Circuit commonly give the jury a conscious

avoidance instruction 'when a defendant claims to lack some specific aspect of knowledge

necessary to conviction but where the evidence may be construed as deliberate ignorance.'"

*United States v. Reyes*, 302 F.3d 48, 55 (2d Cir. 2002) (quoting *United States v. Gabriel*, 125

F.3d 89, 98 (2d Cir. 1997)).  Alexander argues that "the Government will not be entitled to a jury

instruction on 'deliberate ignorance' because the evidence in this case will show either that

defendant [sic] knew about the fraud, or that he did not know. . . . There is no evidence that the

defendant [sic] deliberately ignored anything." (Def.'s Omnibus Mot. ¶ 123.)  As the Court has

not been presented with all of the evidence in the case, this argument is premature.  Thus,

Alexander's motion to preclude the Government from arguing "deliberate ignorance," which the

Court construes as a request for the Court not to give a "conscious avoidance" instruction, is

denied without prejudice.  Alexander may renew his motion at the charging conference, if he so

chooses.

### III.  Conclusion

For the reasons stated in this Opinion, Alexander's Omnibus Motion is DENIED.

The *in limine* motions contained within Alexander's Omnibus Motion are denied without

prejudice.


SO ORDERED.

Dated:        April 4 , 2007
              New York, New York


KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE