UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
UNITED STATES OF AMERICA,           :
                                    :
    -v.-                            :    S4 05 Cr. 1067 (KMK)
                                    :
NATHANIEL ALEXANDER,                :
                                    :
        Defendant.              :
------------------------------------------------------------x

Sentencing Memorandum

Nathaniel Alexander respectfully submits this Sentencing Memorandum in advance of the sentencing currently scheduled for December 12, 2007.

The Legal Standard for Sentencing

In sentencing Nathaniel Alexander, the Court should commence its thinking not by reference to the sentencing guidelines but instead by determining what sentence is sufficient but not greater than necessary to comply with the purposes of Title 18, United States Code, Section 3553(a)(2). While the guidelines are one factor in that calculus, in light of *Rita v. United States*, 127 S. Ct. 2456 (2007), they are entitled to no greater weight than any other 3553(a) factor. "While a district court is no longer required to impose a Guidelines sentence, it still has a duty to consider the applicable Guidelines range, in addition to the other factors listed in 18 U.S.C. § 3553(a), in determining the appropriate sentence." *United States v. Cuevas*, 496 F.3d 256, 265 (2d Cir. 2007).

Indeed, no presumption of reasonableness may be applied to the guidelines by a district court. Id. at 2465 citing *United States v. Booker*, 543 U. S. 220, 259-260 (2005)

("We repeat that the presumption before us is an *appellate* court presumption. . . . In determining the merits of these [sentencing] arguments, the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply.") *See United States v. Williams*, 475 F.3d 468, 476-77 (2d Cir. 2007) ("[A] district court's job is not to impose a 'reasonable' sentence. Rather, a district court's mandate is to impose 'a sentence sufficient, but not greater than necessary, to comply with the purposes' of section 3553(a)(2). Reasonableness is the *appellate* standard of review in judging whether a district court has accomplished its task"); *United States v. Conlan,* 500 F.3d 1167 (10th Cir. 2007)(reversing sentence at the low end of guidelines range where the sentencing court applied a presumption of reasonableness to the guideline range); *United States v. Wilms*, 495 F.3d 277 (6th Cir. 2007)(reversing sentence below the guidelines range where the sentencing court applied a presumption of reasonableness to the guidelines).

History and Characteristics

Nathaniel Alexander, Jr. is fifty years of age with no criminal record. He holds a Bachelor of Science degree from Virginia State University. He supports a 28 year-old daughter from a previous relationship who suffers from seizures due to epilepsy. She is unable to hold down a full-time job due to her disability but has resisted seeking SSI or other disability payments because of her commendable reluctance to accept state aid and her desire to be independent. Mr. Alexander has been married for nine years and supports his wife Robyn's son who is 18 years old and takes care of his 90 year-old father who is

in ill health due to his advanced age. Mr. Alexander was a high school teacher and coach in the mid-eighties. He went on to work in his mother's successful business. Mrs. Rosa Mae Alexander, the defendant's mother, led a real-life Horatio Alger story, all the more extraordinary because of the disadvantages she faced. The Alexander family became a real asset to the Virginia community and contributed in many ways to its well-being. Annexed hereto is a September 6, 2006 newspaper story written by Bill Burke of the *Virginian-Pilot* detailing Rosa Alexander's life in the context of Nathaniel's arrest in this case. Also annexed is Resolution of the Virginia Senate acknowledging Mrs. Alexander's exceptional citizenship. After working for his mother, Mr. Alexander started his own business, Mr. A's Professional Service, which was initially successful but unfortunately failed by 2003. He tried a variety of other businesses but ultimately settled on establishing a day care center, Vision Learning Center. The scandal associated with this case has hurt business at the day care center. After the jury's verdict, Mr. Alexander transferred ownership of Vision Learning Center to his wife because state regulations prohibit a convicted felon from owning a child care facility.

   Mr. Alexander may not be the businessperson his mother was, but he has always been a positive force in his family and his community. He is by nature a trusting man, given to put his trust in his friends, such as Steven Riddick, or his lawyers, such as Michael Fineman. The Court heard Reverend Marc Whitaker's testimony regarding his positive opinion of Mr. Alexander and describing his volunteer work as choir director at

the church. (T. 2556-2559)[1] William Ward, the former Norfolk mayor, has a similar positive view of Mr. Alexander as "an outstanding young man . . . [with a] reputation of integrity, hard working young man, certainly committed to his community, to his family and certainly to his God[.]" (T. 2710-11). Gordon Symonds, the CEO of Tires to Kilowatts, LLC testified that Mr. Alexander is a very honest and upright man but, significantly, declined to agree with the government's suggestions that he was a sophisticated or shrewd businessman. (T. 2713-2720) The defendant has been a positive force in his community and is well-regarded there despite his conviction. This one episode is a true aberration from the balance of Nathaniel Alexander's life. Imprisonment will likely mean the demise of the day care center, further financial hardship for the defendant's family, and a loss of assistance for the defendant's daughter and his father. Ultimately, the Court must determine what period of imprisonment will suffice to punish Mr. Alexander and provide adequate deterrence given his otherwise law-abiding life and good character. Given the circumstances, the range recommended by the probation department, 70-87 months, and the range advocated by the government, 87-108 months, are greater than necessary and far from parsimonious.

Guidelines Loss Calculation

      Paragraph 128 of the Pre-Sentence Investigation Report ("PSR") indicates that

---

[1] Parenthetical references commencing with HT refer to pages of the suppression hearing transcript while those commencing with "T" are references to pages of the trial transcript.

AUSA Perry asserted, without factual basis, that Nathaniel Alexander should be held accountable for 2.5 million dollars in intended loss. The intended loss properly attributable to Nathaniel Alexander, according to the jury's verdict and the facts proven at trial, was $1,000,000: the total face amount of the two checks deposited into the defendant's account. Mr. Alexander is not responsible for intended loss that was not aided or abetted by him and was not part of jointly conducted criminal activity reasonably foreseeable to him in furtherance of scope of the criminal activity in which the defendant joined within the meaning of U.S.S.G. § 1B1.3 (Relevant Conduct). The "scope of the criminal activity the particular defendant agreed to jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant agreement)" did not include bank fraud beyond the two checks attributable to Mr. Alexander. *See* U.S.S.G. § 1B1.3, comment., app. note 2.

PSR ¶ 133 should be corrected to reflect an intended loss of $1,000,000 so that 14 levels are added, not 18 levels as we indicate in our objection above. Moreover, even if the loss was "at least $2,500,000," the loss for that level would be 16 since the guidelines indicate that 18 levels are added when the loss is "More than $2,500,000." If for some reason, the Court determines over objection that the higher intended loss level may apply, in the context of the entire scheme the defendant's role should be viewed as a minor one, causing a reduction in two offense levels pursuant to U.S.S.G. § 3B1.2(b) as he was substantially less culpable than the other participants.

The evidence at revealed an elaborate scheme by the individuals unknown to Mr. Alexander.[2] His connection, if any, to the conspiracy was limited to his friend and office-mate, Steven Riddick. His role was to deposit two checks and he in turn wrote a handful of checks from his account to others. He was literally the last man on a very long chain of illegal acts that began with locating accounts to raid and stealing or forging checks from the targeted accounts.

<u>Restitution</u>

In addition, PSR ¶ 128 indicates that AUSA Perry seeks restitution from Wachovia Bank in the amount of $375,000. We assume this is a reference to the "$375,000 Riddick Counterfeit Check" to which ¶¶ 65-74 refers. This loss, if it was an actual loss, is not attributable to Mr. Alexander because (1) he was not convicted of the underlying offense, Count Four, for which Mr. Riddick was convicted which related to this check and (2) the defendant did not aid and abet such criminal activity. The fact that Mr. Riddick shared office space with the defendant and that Riddick allegedly caused Mr. Alexander's employee, Anthony Hockaday, to deposit the $375,000 check is an insufficient factual basis on which to attribute restitution to Mr. Alexander. Absent an agreement by the parties, the court may order restitution only for losses attributable to the offense of conviction, not for related conduct. *See United States v. Silkowski*, 32 F.3d 682, 688-89

---

[2] None of the cooperating witnesses called by the prosecutor even claimed to know Nathaniel Alexander.

(2d Cir. 1994); see also 18 U.S.C. § 3663A(a)(3). When the offense of conviction "involves as an element a scheme, conspiracy, or pattern of criminal activity," a convicted co-conspirator is liable to pay restitution to persons "directly harmed by the defendant's conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2); *see United States v. Boyd*, 222 F.3d 47, 50 (2d Cir. 2000) (per curiam). Here, although Mr. Alexander was convicted of conspiracy to commit bank fraud, Wachovia Bank was not directly harmed by Mr. Alexander's conduct. Finally, no affidavits of loss have been provided nor any other victim statement alleging that the bank lost a specific sum of money; from the information set forth in the PSR, it cannot be determined whether Wachovia recovered any of the $375,000 at issue. See 18 U.S.C. 3664(a).[3]

Obstruction Enhancement

In PSR ¶ 129, the probation department notes that government claims the defendant obstructed justice such that he should receive a two-level upward adjustment pursuant to U.S.S.G. § 3C1.1. We maintain Mr. Alexander did not submit a wilfully false affidavit. The standard of proof for obstruction adjustments should be by clear and

---

[3]  That statutes provides: "(a) For orders of restitution under this title, the court shall order the probation officer to obtain and include in its presentence report, or in a separate report, as the court may direct, information sufficient for the court to exercise its discretion in fashioning a restitution order. The report shall include, to the extent practicable, a complete accounting of the losses to each victim, any restitution owed pursuant to a plea agreement, and information relating to the economic circumstances of each defendant. If the number or identity of victims cannot be reasonably ascertained, or other circumstances exist that make this requirement clearly impracticable, the probation officer shall so inform the court." 18 U.S.C. § 3664(a).

convincing evidence; no such proof has been adduced. *See United States v. Grimes*, 225 F.3d 254, 260 (2d Cir. 2000). "To justify an enhancement on the giving of perjured testimony, a sentencing court must find, by clear and convincing evidence, that 'the defendant 1) willfully 2) and materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter.'" *United States v. Binning*, 2007 U.S. App. LEXIS 19607, 231 Fed. Appx. 97 (August 16, 2007 2d Cir.) quoting *United States v. Zagari*, 111 F.3d 307, 329 (2d Cir. 1997).

In its November 13, 2007 letter, the government claims that Mr. Alexander obstructed justice by filing a false affidavit seeking suppression of statements made by him on February 9, 2006. First, the affidavit in question was drawn up by prior counsel for the defendant, Michael Fineman. Although Mr. Fineman advertised himself as experienced in representing defendants in federal courts and told Nathaniel Alexander he had vast federal experience, during the suppression hearing in this case Fineman revealed that this was his first federal case or at least first federal trial. This is unsurprising inasmuch as Fineman was only admitted to practice law in 2002 and left the Kings County District Attorney's Office in 2004. According to www.lawyers.com, Fineman worked as an Assistant District Attorney for all of three years, from 2001-2004. At the time he took Mr. Alexander's case, he had less than two years' experience as a criminal defense lawyer and a review of the Court's thorough decision denying Fineman's frivolous motions shows that his litigation style would be unacceptable in state court as

well. Mr. Alexander is not a sophisticated legal scholar and had very little knowledge of the criminal justice system; he hired Fineman from a yellow pages advertisement and could not know how off-base his attorney was until he saw the reaction to Fineman's pretrial motions. Mr. Fineman tried to make the affidavit in question as lurid as possible by stretching the defendant's claims as far as possible.

 First, the government says that Mr. Alexander's claim that some of the arresting officers had firearms drawn is false. Although Agent Correa denied drawing his handgun, there were numerous agents and officers present during the arrest. Correa could not definitively assert that the other officers did not draw their weapons at some point. All he claimed when asked if anyone else drew their weapon was "not that I saw." (HT: 31) Similarly, Joseph indicated "no ma'am. Not that I know of" when asked if he knew whether or not weapons were drawn. (HT: 127). Mr. Alexander recalls seeing drawn firearms at the sides of some of the law enforcement personnel. None of the agents called to testify were able to rule out that other agents or uniformed officers (there were at least 6 present in his home) had, for some period of time, drawn their weapon. Even if Mr Alexander were inaccurate on this point, such a minor detail would not be material to the Court's determination of the suppression issues. While there might be a weak argument that an agent holding a gun at his side when they first arrested Nathaniel Alexander somehow contributed to a coercive atmosphere, no court would be expected to suppress evidence on such a thin claim.

Second, the government says Mr. Alexander's statement that he was questioned in great detail is somehow false. The evidence at the hearing showed that Agent Correa did have several extensive conversations with the defendant. Whether Alexander also had questions for the agent and was himself talkative does not mean the agent did not engage in questioning.

Third, the government says Mr. Alexander's statement that he made statements to the agents as a result of "being intimidated by the conduct of the federal agents" is false. There is no doubt but that the prospect of being awoken by half a dozen armed officers at 6:00 a.m., being handcuffed and having your wife and child brought out to be guarded by strangers is itself intimidating. To say that Mr. Alexander was not intimidated would be wrong. Even if he made his statements voluntarily, he may also have felt cowed by the agents and thought that cooperating with them might help him. The same is true of the statement in Mr. Alexander's affidavit to the effect that he signed the waiver of rights form because he had "already answer all of the agents' questions under duress in my home." If Mr. Alexander personally felt compelled to explain himself under the threat of his impending detention and imprisonment, his subjective experience may have seemed coercive to him at the time. These claim cannot be deemed wilfully false, particularly given that Mr. Fineman wrote the affidavit and advised his client to sign it.

Fourth, the government says that Mr. Alexander's claim that agents walked through his home without his permission is false. In fact, the security sweep was

10

undertaken without the defendant's permission. It is immaterial that he later consented to a search. The question of whether the agents had permission to search Alexander's house had no bearing on the motion to suppress statements. The Court's understandable reaction at the hearing was that this claim simply had no bearing on the issue of whether the statements should be suppressed.

Fifth, the government claims that Mr. Alexander's statement that the agents demanded he help them find Steven Riddick is false. Again, whether he volunteered his help or the agents called upon him to help them may be disputed but it is immaterial to the only issue litigated at the suppression hearing, that is, whether the defendant was informed of and waived his right against self-incrimination.

Sixth, in an effort in unjustified hyperbole, the government alleges that Mr. Alexander's recollection – that the time change on the waiver form was not made in his presence that day and that he was not informed of such a change– was a "lie." While the Court found no evidence at the hearing to support the defendant's view, this finding does not mean that the defendant lied. Mr. Alexander did not remember the form being altered in his presence but neither did Agent Correa. (HT: 47) Alexander did not learn of the alteration until much later. While what happened is disputed, it is possible that the defendant's recollection about the time change is honestly mistaken. Of course, it bears noting that the initials next to "8:30" were disclaimed by both Agent Correa and Agent Joseph. Those initials are not Nathaniel Alexander's. There is no reliable evidence to the

effect that the defendant initialed the document; those are not his initials. Even if the form was altered in the defendant's presence, there would be little reason for him to notice it at the time so the fact he did not recall the alteration later would not be surprising. The claim that the defendant falsely stated he did not know about the time change on the waiver form is overblown.

On the other hand, the hearing evidence did show that Agent Correa manipulated Mr. Alexander to get him to sign the waiver of rights form without due consideration. Agent Joseph recalled that it was his idea that the defendant be shown the waiver of rights form and that this concept did not come up until the agents had brought Alexander to the RAC office. Custodial interrogation had taken place before the agents arrived at the RAC office. Further, Agent Joseph remembered that Agent Correa presented the form to the defendant as a mere formality "something we have to go over . . . just paper-wise" after which it was "looked over" and signed. (HT: 137-138). It is evident that Correa did not present the waiver form as a serious matter which must be carefully considered but was attempting to obtain Alexander's signature without much deliberation.

<u>Departure: Loss Calculation Overstates the Seriousness of the Offense</u>

As concerns Mr. Alexander, a loss calculation of more than $2.5 million or, as the defense asserts one million dollars, substantially overstates the seriousness of the offense as far as our client is concerned given that there was no actual loss. See U.S.S.G. § 2B1.1 cmt. n.18 (C) ("There may be cases in which the offense level determined under this

guideline substantially overstates the seriousness of the offense"). The guidelines calculation of intended loss provides a harsh judgment without a view to the particulars of the individual case at bar. No funds were lost on account of the depositing of the two checks. In any event, these facts should be taken into account when the Court determines what sentence is sufficient but not greater than necessary pursuant to 18 U.S.C. 3553(a); the Court is urged to consider Mr. Alexander's limited role and the fact that there was no loss to the victim in considering a *Booker* variance or deviation.

Departure: Aberrant Behavior

As far as Mr. Alexander is concerned, this offense (1) was committed without significant planning; (2) was of limited duration; and (3) represents a marked deviation by the defendant from an otherwise law-abiding life. Accordingly, this is an exceptional case in which the departure for aberrant behavior applies pursuant to U.S.S.G. § 5K2.20. Mr. Alexander deposited two checks on April 26 and May 10, 2005 and allegedly wrote checks to Anthony Price and Marion Jones. There was no extensive planning and the conduct did not involve repetitive acts. Given that Mr. Alexander has lead an otherwise law-abiding life, his limited participation on this offense really is an aberration. In any event, these facts should be taken into account when the Court determines what sentence is sufficient but not greater than necessary pursuant to 18 U.S.C. 3553(a). In addition, the Court should consider these facts as a ground for a *Booker* variance or deviation.

Conclusion

For these reasons, the Court should find that the guidelines loss attributable to Nathaniel Alexander is $1,000,000, that he did not willfully obstruct the administration of justice, and that the term of imprisonment suggested by the guidelines is greater than necessary to satisfy the goals of the Sentencing Reform Act.

Dated: November 28, 2007
       White Plains, New York

Very truly yours,

RICHARD D. WILLSTATTER