UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA      :

                                 :

    -v.-                        :      S4 05 Cr. 1067 (KMK)

                                 :

ROBERTO MONTGOMERY,      :
NARESH PITAMBAR,          :
STEVEN RIDDICK, and         :
NATHANIEL ALEXANDER,    :

                                 :

            Defendants.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANTS' SUPPLEMENTAL POST-TRIAL MOTIONS

MICHAEL J. GARCIA
United States Attorney for the Southern
District of New York

E. DANYA PERRY
DANIEL W. LEVY
Assistant United States Attorneys
     - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| -v.- | :     S4 05 Cr. 1067 (KMK) |
| | : |
| ROBERTO MONTGOMERY, | : |
| NARESH PITAMBAR, | : |
| STEVEN RIDDICK, and | : |
| NATHANIEL ALEXANDER, | : |
| | : |
| Defendants. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' SUPPLEMENTAL POST-TRIAL MOTIONS

The Government respectfully submits this Memorandum of Law in opposition to the

supplemental Rule 29 and Rule 33 motions filed by defendants Naresh Pitambar ("Pitambar"),

Roberto Montgomery ("R. Montgomery"), and Steven Riddick ("Riddick"), and joined by

defendant Nathaniel Alexander ("Alexander").[1]  For the reasons set forth below, the defendants'

post-trial motions should be denied.

## I.    Facts

### A.    Fraudulent Checks Charged In The Shyne Indictment

On or about April 26, 2006, a grand jury sitting in this District returned superseding

Indictment S4 04 Cr. 1067 (the "Shyne Indictment") (attached hereto as Exh. A).  The Shyne

Indictment sets forth an elaborate scheme led by Douglas Shyne ("Shyne"), with the assistance of

his girlfriend Natasha Singh ("Singh"), to procure fraudulent checks by: (1) receiving stolen

checks; (2) altering checks that had been legitimately received, typically by changing the name of

---

[1] In an Order, dated June 12, 2007, the Court previously denied Riddick's Rule 29 motion.  By Order, dated November 14, 2007, the Court denied the Rule 29 motions filed by Pitambar and R. Montgomery.  Alexander did not previously file a post-trial motion.

the payee and grossly inflating the amount of the check; and (3) counterfeiting checks that had been provided to Shyne by bank insiders.  Exh. A at ¶ 4.  The Shyne Indictment further sets forth the second step of the scheme, the cashing of the fraudulently obtained checks, alleging that it occurred in at least the following ways:  (1) depositing the fraudulently obtained checks into bank accounts in the names of businesses of Shyne and Singh; (2) depositing the fraudulently obtained checks into accounts opened up under the names of people whose identities had been stolen; and (3) depositing the fraudulently obtained checks into the bank accounts of friends, relatives, and associates of Shyne and Singh, who would then, in turn, retain a commission and funnel the balance of the proceeds of such checks back to Shyne and Singh.  Exh. A at ¶ 5.

The Shyne Indictment also sets out the approximate minimum number of checks and the approximate minimum quantity of money involved in the scheme:

> From at least in or about December 2002 through in or about August 2005, DOUGLAS SHYNE, NATASHA SINGH, and their co-conspirators stole, altered and/or counterfeited at least approximately twenty checks, in the total aggregate amount of well over approximately five million dollars.

Exh. A at ¶ 6 (emphasis added).

The Shyne Indictment then describes the details regarding nineteen separate stolen, altered, or counterfeit checks, and various details concerning the manner in which these checks were obtained, deposited, and/or attempted to be cashed.  See Exh. A at ¶¶ 8-86.  The total amount of the fraudulently obtained checks described in the Shyne Indictment was $4,987,041.[2]

---

[2] Although she was not charged in the Shyne Indictment, Cynthia Montgomery was separately convicted of conspiracy to commit bank fraud based on her role in cashing out the $775,000 check referred to in paragraphs 14 through 18 of the Shyne Indictment.  See United States v. Cynthia Montgomery, Information 05 Cr. 1200 (PKC) (filed on Nov. 15, 2006); Exh. B (check no. 2).  Similarly, Evans Poindexter, a/k/a "Keith Duckworth," was separately convicted based on his role in depositing and cashing out the two counterefeit checks referred to in

A chart summarizing these checks is attached hereto as Exhibit B. Thus, while the Indictment alleges that the scheme involved at least approximately twenty checks and totaling well over approximately five million dollars, it specifically sets forth only nineteen counterfeit checks, totaling less than $5 million. The clear and obvious import from these allegations in the Shyne Indictment is that the Shyne Indictment itself does not, and does not purport to, describe every last check involved in the fraudulent check conspiracy.

Counts Two through Ten of the Shyne Indictment charge substantive bank fraud against particular defendants as to some, but not all, of the nineteen checks referred to in the Shyne Indictment. See Exh. A at ¶¶ 87-88; Exh. B (check nos. 2-3, 5-13, 15-16).

**B.    Fraudulent Checks Charged In The Bartee Indictment**

On September 20, 2006, a grand jury sitting in this District returned an indictment in United States v. Luvenia Bartee, et al., 06 Cr. 832 (KTD) (the "Bartee Indictment") (attached hereto as Exh. C). The Bartee Indictment charges, in essence, another series of individuals connected to Shyne with conduct substantially similar to that charged in the Shyne Indictment. Specifically, the Bartee Indictment charges Luvenia Bartee and several other defendants with conspiracy to commit bank fraud, substantive bank fraud, and conspiracy to commit money laundering. The Bartee Indictment describes the fraudulent checks scheme as follows:

> 9.    At all times relevant to this Indictment, Douglas Shyne and Natasha Singh were in the business of procuring stolen, altered, and/or counterfeit checks. Shyne and Singh also arranged for the fraudulently obtained checks to be cashed by, among other means, arranging for their deposit into the bank accounts of their friends, relatives, and associates, who would then, in turn, funnel proceeds of such checks back to Shyne and Singh, minus a

_____

paragraphs 81 through 83 of the Shyne Indictment. See United States v. Evans Poindexter, Information 05 Cr. 1136 (SWK) (filed on Oct. 31, 2005); Exh. B (check nos. 18-19).

commission.

10.     From at least in or about December 2002 through in or about August 2005,
Douglas Shyne, Natasha Singh, and their co-conspirators stole, altered
and/or counterfeited at least approximately thirty checks, in the total
aggregate amount of well over approximately six million dollars.

Exh. C at ¶¶ 9-10.

The Bartee Indictment then describes the details regarding six separate fraudulent checks,
as well as various details concerning the manner in which these checks were obtained, deposited,
and/or attempted to be cashed out. See Exh. C at ¶¶ 12-28. The total amount of the fraudulent
checks described in the Bartee Indictment was $530,945.52. See Exh. B (check nos. 21-25, 4).[3]
In addition, at the trial of United States v. Bartee, et al., see Part I.F, infra, the Government
proved four additional checks, totaling an additional $197,000, that were not specifically referred
to in the Bartee Indictment, but that were encompassed by the conspiracy charged in the Bartee
Indictment. Exh. B (check nos. 26-28, 17).[4]

## C.     Other Fraudulent Checks

In addition to the fraudulent checks described above, the Government is aware of two
additional checks that were part of the fraudulent check scheme directed by Shyne. Specifically,
Marion Smith-Ayres was convicted based on her role in depositing two counterfeit checks in the

---

[3] Of the six fraudulent checks described in the Bartee Indictment, one of these was
referred to in the Shyne Indictment. See Exh. A at ¶¶ 28-30; Exh. B (check no. 4).

[4] One of the four additional checks proven at the Bartee trial, but not specifically
described in the Bartee Indictment (for $75,000), was referred to in the Shyne Indictment. See
Exh. A at ¶ 75; Exh. B (check no. 17). Two of the four checks proven at the Bartee trial, but not
specifically described in the Bartee Indictment (totaling $97,000), were not known to the
Government until after the conclusion of the Riddick trial. See Perry Aff. at ¶ 9; Exh. B (check
nos. 26, 27).

amount of $250,000. See United States v. Marion Smith-Ayres, a/k/a "Marion Smith," a/k/a "Marion Ayres," Indictment 06 Cr. 831 (VM) (filed on Sept. 20, 2006). These two checks also are summarized on Exhibit B.

The total number of fraudulent checks contained in Exhibit B is 30 checks, totaling $6,354,776.52. Twenty-eight of these 30 checks, totaling $6,257,776.52, were known to the Government prior to the trial of Riddick, Alexander, R. Montgomery, and Pitambar (the "Riddick trial"). See Perry Aff. at ¶ 9; Exh. B. Copies of 20 of the 28 checks known to the Government at the time of the Riddick trial, totaling $5,537,041 of $6,257,776.52, were provided to Riddick, Alexander, R. Montgomery, and Pitambar prior to the April 2007 trial.

### D.    Singh's Guilty Plea

On March 19, 2007, pursuant to a cooperation agreement, Singh pled guilty to superseding Information S5 05 Cr. 1067 (KMK) (the "Singh Information") (attached hereto as Exh. D). The Singh Information charged Singh with, among other crimes, conspiracy to commit bank fraud. The Singh Information did not include the detailed allegations concerning the scope of the conspiracy and the means and methods by which the conspiracy occurred, allegations which were contained in the Shyne Indictment. Compare Exh. A at ¶¶ 1-86 with Exh. D at ¶¶ 1-3. The Singh Information also charged nine counts of substantive bank fraud. Singh pled guilty to all counts charged in the Singh Information, other than to Count Six, a substantive count of bank fraud relating to two checks totaling $775,000. As to Count Six and as made clear during Singh's guilty plea colloquy, Singh was aware of the conduct, but did not herself take any substantive actions that would make her guilty of bank fraud as to those checks. See 3/19/07 Tr. at 31-36 (relevant pages attached hereto as Exh. E).

5

### E.    Singh's Testimony At The Riddick Trial

The Riddick trial commenced on April 10, 2007.  During the trial, the Government introduced evidence relating to seven of the nineteen checks referred to in the Indictment and an additional check that was not specifically referred to in the Indictment, but that was encompassed by the conspiracy charged in the Indictment.[5]  On April 16 and April 17, Singh testified.  During Singh's testimony, she made clear that, between approximately 2003 and August 2005, Shyne obtained "a lot" of fraudulent checks, quantifying the relevant amount of money involved as "in the millions."  Tr. 209.  When asked the specific number of checks, Singh stated that it was more than 20.  Tr. 210; see also Tr. 197 (Singh testimony that she had seen "quite a few" "copies of checks").

On cross-examination, Singh stated that she did not remember the specific number of "big checks" in which she participated together with Shyne and Toybe Bennett ("Bennett"), another member of the conspiracy.  Tr. 499.  Singh was then asked whether she "pled guilty to all of them," to which she responded, "Yes.  But I don't remember the back of my head the total amount of the checks.  It's a lot.  I don't remember."  Tr. 499; see also Tr. 308-09 ("Q. Did you plead guilty in connection with your participation in the conduct that you have been describing today?  A.  Yes, I did.  Q.  What, specifically, did you plead guilty to?  A.  To -- I pled guilty to knowing everything that was going on and being a part of it, participating.  To all these crimes.").  Singh also estimated that between 2001 and the present, between $3 million and $5 million was actually stolen, but that she did not "get involved" until 2003.  Tr. 500.

---

[5] This additional check was the $550,000 check from Coldwell Banker Res. Brokerage to Vector Sports, which Tim Montgomery's agent, Charles Wells, deposited into one of his bank accounts (GX-65A).  This check is also included on Exhibit B.

In the cross-examination question as to whether Singh pled guilty to "all of them," there was no indication whether the reference to "them" in this question was to "big checks," which was the subject of the prior question, or to checks in general.  Nor was there any clarification as to whether the question about the conduct to which Singh had pled guilty was directed at: (1) whether Singh pled guilty to a substantive count of bank fraud for each separate check that she participated in depositing or cashing; (2) whether Singh pled guilty to a conspiracy count that encompassed the entire time frame of her involvement; or (3) something else.

Singh also testified on cross-examination about the number of iterations of the fraudulent check scheme:

> Q.  When you needed money during this whole time you and Mr. Shyne's fix was to counterfeit a check, right?
>
> A.  Correct.
>
> Q.  And to run this scheme, correct?
>
> A.  Correct.
>
> Q.  And you [sic] done this dozen's [sic] of times?
>
> A.  Yes.
>
> Q.  Hundreds of times?
>
> A.  I wouldn't say hundreds.

Tr. 345.

Singh further testified about her cooperation agreement, which was admitted into evidence as Defense Exhibit SR-N.  The text of her cooperation agreement makes abundantly clear that it represented the sum total of her arrangement with the Government:

> This Agreement supersedes any prior understandings, promises, or conditions

7

between this Office and Natasha Singh.  No additional understandings, promises, or conditions have been entered into other than those set forth in this Agreement, and none will be entered into unless in writing and signed by all parties.

### F.    Singh's Testimony At The Bartee Trial

The trial of Luvenia Bartee ("Bartee") and Ebony Worthy ("Worthy") on the charges contained in the Bartee Indictment occurred before the Honorable Kevin Thomas Duffy, between September 27, 2007, and October 4, 2007.[6]  The jury returned a guilty verdict as to both defendants on all counts.

The Bartee trial concerned ten counterfeit checks procured by Shyne.  Two of these counterfeit checks were deposited into, among other bank accounts, a bank account of UR Recovery, a credit repair business owned and operated by Bartee.  In or about November 2004, Bartee became involved in the scheme via her employee, Ayana Thomas ("Thomas"), and Thomas' husband, Raymond Pastures ("Pastures").  Pastures and Thomas had been recruited into the scheme by Bennett.  Thomas, Pastures, and Bartee all lived in the Richmond, Virginia area.

Beyond the two counterfeit checks deposited into Bartee's account, four other counterfeit checks at issue in the Bartee trial were deposited into accounts maintained by Pastures in the name of his business, Moonlight Productions.  One other counterfeit check was deposited into a bank account of Frank Rodriguez ("Rodriguez"), a friend of Shyne's from prison.  Also involved was Rodriguez's then-wife, Tracey Livingston, whose account received a large check representing the proceeds of one of the counterfeit checks deposited into Bartee's account.  Another counterfeit check was deposited into a bank account of Worthy, who was a girlfriend of Bennett's.  Finally, another counterfeit check was created based on a legitimate check sent to

---

[6] All other defendants named in the Bartee Indictment pled guilty prior to that trial.

8

Rodriguez.  That legitimate check was remade into a counterfeit check and deposited into a bank account of another person (Romell Cook).  A schematic representation of the connections among the principal persons involved in this part of the scheme is attached hereto as Exhibit F.

At the Bartee trial, Singh testified (transcript attached hereto as Exh. G) about, among other things:

- Her knowledge, based on conversations with Shyne, Bennett, and R. Montgomery in late 2004, that Bennett had found two "good accounts" in Virginia, i.e., bank accounts of people who were willing to deposit counterfeit checks, Exh. G at 194-95;

- Her knowledge, based on conversations with Shyne in late 2004, that the accounts were in the name of UR Recovery, which she learned was in the business of credit repair and was owned by a female, and Moonlight Productions, which she learned was owned by a couple, Exh. G at 195-96;

- Her knowledge, based on conversations with Shyne, that the owner of UR Recovery had agreed to deposit two counterfeit checks into her account, one in the amount of approximately $80,000 and the other in the amount of "a hundred and something thousand," Exh. G at 197-98;

- Her knowledge, based on conversations with Shyne, that Shyne had received proceeds of the counterfeit checks deposited into UR Recovery's bank account, Exh. G at 198;

- Her preparation, at Shyne's direction, of two fake invoices for the owner of UR Recovery, necessary because, according to Shyne, the owner of UR Recovery requested a document to "cover herself, God forbid the checks come back, to show that she provided this service to whoever I would make up the fake invoices for," Exh. G at 200-02; Bartee GX-402 (attached hereto as Exh. H);

- The timing of the request by Shyne for Singh to prepare the fake invoices, which occurred after at least one of the counterfeit checks had already been deposited, but before all of the proceeds had been withdrawn, Exh. G at 201, 246;

- The contents of the fake invoices, principally that the entries in the invoices make no sense as an explanation for services supposedly rendered by UR Recovery, but, according to what Shyne explained to her, that the

9

invoices were to correspond to the amounts of the two counterfeit checks deposited into UR Recovery's account, Exh. G at 236-46;

- Singh's awareness, based on overheard conversations between Bennett and Shyne in late 2004, that Bennett had involved a girlfriend of his, named Ebony, in depositing a counterfeit check into her account, Exh. G at 249-54;

- Singh's awareness, based on overheard conversations involving Shyne, that counterfeit checks had been deposited into a Moonlight Productions account, although she never saw such checks, Exh. G at 257-58;

- Singh's awareness, based on witnessing conversations between Shyne and Rodriguez, that Rodriguez had deposited a counterfeit check in the amount of approximately $85,000 into his account, Exh. G at 180-81, 258-59, 262;

- The receipt by Shyne, Singh, and Singh's brother of some proceeds from the approximately $85,000 counterfeit check, Exh. G at 258-62 (testimony regarding Bartee GX-202, 203, 204, and 205);[7]

- Singh's awareness, based on conversations with Shyne and Bennett, that Bennett had recruited a girlfriend, Worthy, to deposit checks into her bank account, Exh. G at 248-57; and

- The fact that Singh had never seen before two checks, representing proceeds of the counterfeit checks deposited into the UR Recovery bank account, Bartee GX-21A and Bartee GX-304, made payable to Worthy or a counterfeit check, Bartee GX-101, made payable Worthy, Exh. G at 302, 304.

Singh did not testify about having seen any of the ten counterfeit checks at issue in the Bartee trial because she never had. She did not testify about having herself deposited any of these checks because she never did. The only conduct in which Singh engaged that advanced the conspiracy was to prepare the two fake invoices described above and to receive some proceeds of one of the checks.

---

[7] The Riddick trial defendants were on notice of Singh's conduct in relation to this check as it was clearly referred to in the Shyne Indictment. See Exh. A at ¶¶ 28-30.

## II.    <u>Legal Standard</u>

As a preliminary matter, "a new trial based upon previously-undiscovered evidence is ordinarily not favored and should be granted only with great caution," <u>United States v. Wong</u>, 78 F.3d 73, 79 (2d Cir. 1996), and a new trial is warranted "only 'in the the most extraordinary of circumstances.'"  <u>United States v. Spencer</u>, 4 F.3d 115, 118 (2d Cir. 1993) (quoting <u>United States v. Imran</u>, 964 F.2d 1313, 1318 (2d Cir. 1992)).

In a criminal prosecution, the Government has a constitutional obligation to disclose evidence favorable to an accused when such evidence is material to guilt or punishment.  <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963).  Evidence or information is "material" only "'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"  <u>Kyles v. Whitley</u>, 514 U.S. 419, 433-34 (1995) (quoting <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985)).  Accordingly, "undisclosed evidence will be deemed material only if it 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'"  <u>United States v. Payne</u>, 63 F.3d 1200, 1209 (2d Cir. 1995) (quoting <u>Kyles v. Whitley</u>, 514 U.S. at 435); <u>see also</u> <u>United States v. Orena</u>, 145 F.3d 551, 557 (2d Cir. 1998).

This duty has been extended to cover information that could be used to impeach a Government witness.  <u>See</u> <u>Giglio v. United States</u>, 405 U.S. 150, 154-55 (1972).  "<u>Giglio</u> stands for the proposition that when the reliability of a given witness may be determinative of guilt or innocence, nondisclosure of impeachment material may be grounds for a new trial.  Impeachment evidence is evidence 'having the potential to alter the jury's assessment of the credibility of a significant prosecution witness.'"  <u>United States v. Madori</u>, 419 F.3d at 170 (internal citations

11

omitted).  To demonstrate a <u>Giglio</u> violation and, thereby, obtain a new trial, the Government must have "failed to disclose favorable evidence, and . . . the evidence it 'suppressed' was material."  <u>Payne</u>, 63 F.3d at 1208 (citing <u>Brady</u>, 373 U.S. at 87).

Impeachment evidence is generally not "material" when the "testimony of the witness is corroborated by other testimony" or where it merely constitutes "an additional basis on which to impeach a witness whose credibility has already been shown to be questionable."  <u>Payne</u>, 63 F.3d at 1210 (internal quotations and citation omitted); <u>accord</u> <u>Wong</u>, 78 F.3d at 79; <u>United States v. Gambino</u>, 59 F.3d 353, 366 (2d Cir. 1995) (collecting cases).  Evidence of impeachment is material if the witness whose testimony is attacked "supplied the <u>only evidence</u> linking the defendant(s) to the crime," <u>United States v. Petrillo</u>, 821 F.2d 85, 90 (2d Cir.1987) (emphasis added), or "where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case."  <u>Payne</u>, 63 F.3d at 1210.  In sum, a new trial is warranted under Rule 33 only if the undisclosed evidence is "material, noncumulative, and would probably lead to an acquittal."  <u>United States v. Locascio</u>, 6 F.3d 924, 949 (2d Cir.1993) (internal quotation marks and citation omitted); <u>see also</u> <u>United States v. White</u>, 972 F.2d 16, 22 (2d Cir. 1992) (cumulative evidence is "routinely held insufficient to warrant a new trial").[8]

If a reviewing court determines that the contested evidence is not material, no <u>Brady</u> or <u>Giglio</u> violation can be discerned, and the reviewing court need not proceed to the determination of whether the evidence was "suppressed."  <u>See</u> <u>United States v. Gambino</u>, 59 F.3d at 366-67;

---

[8] The Government is aware of no circumstance under which a district court has granted a Rule 29 motion based on a <u>Brady</u> or <u>Giglio</u> violation.  <u>Cf.</u> <u>St. German v. United States</u>, No. 03 Civ. 8006 (CM), 99 Cr. 339 (CM), 2004 WL 1171403, *19 n.13 (S.D.N.Y. May 11, 2004).  Therefore, the prong of Riddick's motion, joined by Alexander, requesting relief under Rule 29 should be summarily denied.

accord United States v. Diaz, 173 F.3d 52, 108 (2d Cir. 1999); United States v. Gonzalez, 110 F.3d 936, 944 (2d Cir. 1997).

Beyond a Giglio violation, another basis on which a new trial may be granted is the Government's introduction of perjured testimony. A new trial based on "allegations of perjured testimony should be granted only with great caution and in the most extraordinary circumstances." United States v. Zichettello, 208 F.3d 72, 102 (2d Cir. 2000) (quotation marks and citations omitted). To prevail, a defendant must show "(i) the witness actually committed perjury; (ii) the alleged perjury was material; (iii) the government knew or should have known of the alleged perjury at [the] time of trial, and (iv) the perjured testimony remained undisclosed during trial." United States v. McCarthy, 271 F.3d 387, 399 (2d Cir. 2001).

Whether a new trial is appropriate "initially depends on the extent to which the prosecution was aware of the alleged perjury." United States v. Damblu, 134 F.3d 490, 493 (2d Cir. 1998). If the prosecution "knew or should have known of the perjury, a new trial is warranted if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." Wong, 78 F.3d at 81; accord United States v. Wallach, 935 F.2d 445, 456 (2d Cir. 1991). Where the government "knowingly permitted the introduction of false testimony reversal is 'virtually automatic.'" Wallach, 935 F.2d at 456 (quoting United States v. Stofsky, 527 F.2d 237, 243 (2d Cir. 1975)). However, "[e]ven assuming . . . that the government knowingly introduced the perjured testimony . . . where independent evidence supports a defendant's conviction, the subsequent discovery that a witness's testimony at trial was perjured will not warrant a new trial." Wong, 78 F.3d at 82; see also United States v. Reyes, 49 F.3d 63, 68 (2d Cir.1995) (affirming district court's alternative holding that newly discovered evidence

13

did not warrant new trial because new evidence did not directly refute a witness's testimony

against defendant and because another witness provided even greater inculpatory evidence).  On

the other hand, if the Government "was unaware of the perjury at the time of trial, a new trial is

warranted only if the testimony was material and the court [is left] with a firm belief that but for

the perjured testimony, the defendant would most likely not have been convicted."  Wong, 78

F.3d at 81 (internal quotation marks omitted and alteration in original); accord Wallach, 935 F.2d

at 456.

## III.    The Government Did Not Violate Its *Giglio* Obligations; Even If It Had, The Defendants Are Entitled To No Relief.

In support of their argument for a new trial, the defendants argue, inter alia, that the

Government "should have disclosed the existence of the Bartee Indictment, the checks involved

in that scheme and any subsequent doctored invoices in that case."  See Letter from Bryan H.

Hoss, Esq., at 3 (dated Oct. 26, 2007) ("Riddick Letter").  This argument is without force.

First, by virtue of the allegations in the Shyne Indictment and Singh's trial testimony, the

Government did provide general notice to the defense of the existence of additional checks

within the scope of the conspiracy beyond those specifically detailed in the Shyne Indictment.

Second, there are only three checks in the Bartee case in which Singh had any

involvement and only two checks of which counsel were not aware.[9]  And, as detailed below, the

_____

[9] As to the third check, in the amount of $85,210, which was deposited by Francisco
Rodriguez, the Riddick trial defendants were well aware of it and Singh's connection to it, given
that Singh's involvement in receiving proceeds of it was clearly described in the Shyne
Indictment. Exh. A ¶¶ 28-30.  Of the twelve checks (the ten checks at issue in the Bartee trial,
see Exh. B (check nos. 21-25, 4, 26-28, 17), and the two checks at issue in the Smith-Ayres case,
see Exh. B (check nos. 29-30)), the Riddick trial defendants were made aware of two of these
checks because details relating to them were alleged in the Shyne Indictment.  And, as set forth in
the accompanying Affirmation of E. Danya Perry, the Government was not aware of two of those

Government simply was not aware of Singh's involvement with these two checks in the Bartee case until well after the conclusion of the Riddick trial.

Finally, the allegedly undisclosed information was not "material" within the meaning of Second Circuit precedent and could not realistically have yielded any additionally useful impeachment material against Singh.  The lines of cross-examination that the defendants suggest they would have pursued could not remotely have made a difference at their trial.  Singh was cross-examined at length about her involvement in the check fraud scheme and, as a practical matter, further such examination would have added nothing to the mix.  At most, this cross-examination would have been "an additional basis on which to impeach a witness whose credibility has already been shown to be questionable," Payne, 63 F.3d at 1210, and, therefore, cannot result in relief to Riddick.

A.    **The Government Gave Prior Notice
      Of The Existence Of Additional Checks**

With respect to the claim that the Government should have turned over the Bartee Indictment and the checks involved in that case, the Government submits that it fully complied with its obligations.  As set forth above, the Government provided ample notice to the defendants in the Shyne Indictment that Shyne and Singh were involved with additional checks other than those that were specifically enumerated in the Shyne Indictment, and Singh admitted as much at trial.  The Shyne Indictment alleged that the scheme involved at least approximately twenty checks totaling well over approximately five million dollars, Exh. A at ¶ 6, but listed only

---

twelve checks prior to the Riddick trial and, therefore, could not have disclosed these. Aff. ¶ 9. As noted, of the twelve checks, Singh had some involvement in only three checks, and engaged in no conduct whatsoever with respect to nine of those checks.

<u>nineteen</u> counterfeit checks, totaling <u>under</u> $5 million.  <u>See</u> Exh. B (check nos. 1-19).  Thus,

counsel who reviewed the Shyne Indictment were made aware that the scheme involved

additional checks other than those specifically enumerated in that document.  And Singh testified

to her involvement in "a lot" of fraudulent checks, quantifying the relevant amount of money

involved as "in the millions."  Tr. 209.  When asked the specific number of checks, Singh stated

that it was more than 20.  Tr. 210; <u>see also</u> Tr. 345 (Singh testimony that she was involved in

"dozens" of iterations of the fraudulent check scheme).

There is just no support for the notion that the Government was somehow required to

give specific notice of each and every additional check, particularly those of which Singh was

only vaguely aware and with respect to which she engaged in no conduct.  Accordingly, with the

exception of three checks discussed below, there was simply no <u>Giglio</u> information to disclose

because Singh engaged in no conduct with respect any of the counterfeit checks at issue in the

Bartee case.  The Government is unaware of any case holding that, where a witness knows of acts

undertaken by co-conspirators in further of a conspiracy, but does not undertake any of that

conduct herself, the witness' knowledge of conduct by others constitutes <u>Giglio</u> information of

that witness.

     **B.**    **The Government Could Not Have Given Notice**
               **Of Conduct As To Which It Was Unaware**

Singh did engage in conduct with respect to three of the counterfeit checks at issue in the

Bartee case.  As to one of these, the details relating to this check and Singh's connection to it

were alleged in the Shyne Indictment and, therefore, Riddick and Pitambar cannot complain that

they were not on notice of Singh's conduct.  <u>See</u> Exh. A at ¶¶ 28-30; Exh. B (check no. 4); Exh.

C at ¶¶ 26-28.

The other two checks with respect to which Singh engaged in any conduct were for $87,203.52 and $160,000 and were payable to Bartee's business, UR Recovery.  <u>See</u> Exh. B (check nos. 21-22); Exh. C at ¶¶ 12, 17.  Singh's conduct with respect to these checks came in the form of Singh's preparation two fake invoices, <u>see</u> Exh. H, for the recipient of these checks to use in case she were ever to be questioned about them.  As set forth in the accompanying Affirmation of E. Danya Perry, the Government was unaware – until several months <u>after</u> the Riddick trial – that Singh had any role in creating these invoices.  Specifically, prior to August 16, 2007, the Government was not aware that Singh herself had penned the fake invoices connected to the two counterfeit checks deposited into Bartee's business account.  <u>See</u> Perry Aff. at ¶ 8.  Prior to the Riddick trial, the Government was aware only that Singh had general knowledge, based on overheard conversations involving Shyne, Bennett, and others and on conversations she herself had with Shyne, that a number of counterfeit checks were to be deposited into business accounts maintained by UR Recovery and Moonlight Productions.  Perry Aff. at ¶ 6.  The Government simply was unaware that Singh had engaged in any conduct with respect to the counterfeit checks charged in the Bartee case, and, therefore, could not have turned that information over to counsel prior to the Riddick trial.

### C.    <u>The Alleged *Giglio* Violation Was In No Way Material</u>

Finally, none of the defendants can show that the allegedly undisclosed information would have been "material" sufficient to justify the "extraordinary" remedy of a new trial.  A quick review of the trial transcripts reveals that the cross-examination of Singh by the four defense attorneys stretched on for approximately <u>twice</u> as long as did her direct examination.  The Government turned over very significant (and indeed, much more significant) impeachment

17

material to the defense, including that: (1) Singh had lied to the Government in her early proffer sessions; (2) she had lied to her Pretrial Service Officer on several occasions while released on bail; (3) she had submitted a fake invoice and a false exculpatory to the police, via her attorney, in connection with a prior arrest for a counterfeit check;[10] (4) she had stolen several identities from her own clients at her job, which she and Shyne then used in the perpetration of the checks fraud scheme; (5) she had lied in connection with a mortgage application for her home; (6) she had lied on Medicare forms for her mother; and (7) she had not declared her fraudulent returns on her income tax returns, resulting in her fraudulently receiving a refund check from the Internal Revenue Service.  Armed with these disclosures, as well as the unbecoming facts of the case itself and numerous other impeachment points, defense counsel very effectively impeached her at great length and in great detail.  Even Riddick acknowledges that he "clearly had a decent amount of impeachment material to cross-examine Natasha Singh."  Riddick Letter at 4.  Any additional impeachment value of the specific checks enumerated in the Bartee case -- particularly in light of the fact that Singh had never seen them and testified generally to her involvement in "dozens" of iterations of the fraudulent check scheme, Tr. 345 -- would simply have been cumulative and, as such, cannot provide the basis for a new trial.  Locascio, 6 F.3d at 949 (new trial is warranted under Rule 33 only if "the evidence is material, noncumulative, and would probably lead to an acquittal."); White, 972 F.2d at 22 (cumulative evidence is "routinely held insufficient to warrant a new trial").  It cannot seriously be argued that any incremental

---

[10] Singh's admission that she had submitted a fake invoice (admitted as Exh. SR-R and attached hereto as Exh. I), knowing it was going to be used to perpetrate a fraud on the court in her own then-pending criminal case, was of particular significance.  Given those facts, any impeachment value relating to the fake invoices she had penned in connection with the Bartee checks pales in comparison and is the very definition of cumulative impeachment evidence.

impeachment value the actual checks at issue in the Bartee case (which Singh had never seen and would have been unable to identify) might have added to Singh's cross-examination would have made the remotest difference to the outcome of the trial.  See, e.g., Payne (impeachment evidence is not "material" where it merely constitutes "an additional basis on which to impeach a witness whose credibility has already been shown to be questionable").

Likewise, the allegedly undisclosed checks were not "material" to any impeachment of Singh because her testimony was corroborated in numerous important ways.  To take just a few examples: her testimony about the false exculpatories that Riddick and Pitambar had cooked up during the conspiracy was in fact the very excuses they ultimately gave to bank investigators and/or law enforcement agents; her testimony that Riddick put some of the proceeds into his wife's account was borne out by the other testimony and records in the case, showing just that; her testimony about Prince's involvement and role in the scheme was supported by the testimony of Willie Lashaun Robinson and Jeffrey Blue; her testimony about three-way conversations among Shyne, Prince, and Riddick was confirmed by the phone records presented at trial.  Due to all the support in the record for Singh's testimony, any failure to disclose these checks simply cannot be said to be "material" as a matter of law.  See, e.g., Payne, 63 F.3d at 1210.

### 1.     The Evidence Against Riddick

Riddick argues that Singh's testimony in his case was critical, because "[s]he provided the only evidence linking direct conversations between Steve Riddick and Douglas Shyne," because she "was the only government witness who testified to a false-exculpatory that Mr. Riddick provided to both bank investigators and law enforcement," and because "she also testified to knowing that Steve Riddick's wife's account had been frozen following the deposit of

the $375,000 check and that Riddick's wife was upset."  Riddick Letter at 1.  These arguments

are utterly unavailing, as the evidence of the listed items was established in other ways (nor is it

clear why, even if Singh were the only source for the above-listed evidence, they were in any way

material in light of the mountain of additional evidence in the case).  The overwhelming evidence

of Riddick's involvement in the scheme included, among many other things:

- His own post-arrest statements in which he admitted, among other things, that "he didn't think the check was good and that the check wasn't right but he deposited it anyway." Tr. 1742[11]

- His false exculpatory statements to bank investigators and agents that he believed the checks in question had been sent to him from a Kuwaiti official, an excuse that was absurd on its face[12] and that was utterly obliterated by the deposition testimony of Mahmoud Abul and the other evidence in the case.

- The testimony of Willie Lashaun Robinson establishing that Anthony Prince had spoken to Riddick ("coach") and told him "the play," which "was basically that we have some counterfeit checks and if he deposits it," they would split the proceeds in half – and which is, in fact, the way in which the proceeds from the $375,000 check were distributed, Tr. 1252-53.

- The testimony of Charles Wells that: (1) Tim Montgomery ("Montgomery") had stated that he and Riddick had been involved in doing hundreds of thousands of dollars worth of "PR work" with Montgomery – which Wells well understood to be false – and that they were sharing in these monies, Tr. 906-07; (2) Riddick had refused to comment on these facts when expressly questioned about them by Wells, Tr. 907-08; and (3) Riddick had called Wells after Riddick's indictment and asked him if the two checks that he had deposited on behalf of Montgomery were "dead," Tr. 922-24.

---

[11] One of Riddick's own witnesses, Anthony Hockaday (the employee Riddick directed to deposit two of the three checks) testified that he, too, was "suspicious" of at least one the checks at the time it was deposited.  Tr. 2834, 2847

[12] This story was so absurd that his own prior counsel (who testified at trial on Riddick's behalf) described Riddick's explanation for his receipt of the checks as "ridiculous," Tr. 2535.

- The testimony of Jeffrey Blue established that he had no legitimate business relationship with Riddick or his business, Tr. 750-51, a fact which was devastating in light of the fact that Riddick's handwriting appeared on a check representing the proceeds of a counterfeit check that was written to Blue and on the FedEx slip enclosing that check, GX-6.

- The phone records indicated many three-way phone calls which apparently occurred among Prince, Shyne and Riddick, particularly clustered around the times in which checks were deposited into Riddick's accounts, GX 900.

- A hold slip for the $375,000 check was found in a search of Prince's residence, which only could have been given to Prince by Riddick, Tr. 1126-27, GX 15.

- The substantial profits Riddick kept for himself from the check proceeds, e.g., Tr. 1745, GX 12.

2.      The Evidence Against Alexander

Alexander perfunctorily joins in Riddick's motion.  Alexander is entitled to no relief on Riddick's motion.  As Alexander's attorney noted at trial, see, e.g., Tr. 3267, Singh did not give any testimony about Alexander, and impeaching her was in no way material to his defense. Accordingly, for the reasons stated above, and for that additional reason, the Government respectfully submits that Alexander's motion should likewise be denied.  If the Court were to consider seriously the claim that Alexander is entitled to relief on Riddick's motion, then the Court should consider the overwhelming evidence of Alexander's involvement in the bank fraud and money laundering scheme of which he was convicted, all of which was independent of Singh's testimony.  The overwhelming evidence of Alexander's involvement in the scheme included, among many other things:

- The oddities surrounding the checks themselves, including that they came from American Express Travel Related Services and the American

21

Insurance Association, entities with which Alexander had no business; that Alexander opened up a new account into which to deposit the first check and deposited a second check for a much lower amount into a different account; that Alexander issued a number of checks (or at least signed his name on a number of blank checks) to different individuals with whom he had no business, including Jason Watler in New York and Marion Jones in Virginia.

- The absurd story Alexander told following his arrest about selling his defunct business to an unknown buyer without benefit of any discussions or paperwork, and the material inconsistencies between that story and the stories he told a bank investigator and the Government at a later proffer.

- The admissions that Alexander made at an unimmunized proffer session, in which he admitted that, "at the time he deposited the checks," he was aware that there were "a number of tipoffs" that "he was involved in a fraud, that this was a fraudulent scheme that he was involved with," Tr. 1764; see also Tr. 3065-66 (Alexander's own attorney admitting that, at that proffer, Alexander stated that there were things about the transaction "that were unusual at the time" of the events).

- The documents found in Prince's house, including the document containing Alexander's bank account information and a dollar amount that is exactly half of the $850,00 deposited by Alexander into his bank account (which, according to the deal, was supposed to be funneled back to the New York conspirators), which information Prince only could have gotten from Alexander because it was a brand new account opened for the purpose of depositing that check, GX 260.

- The phone records indicating discussions between Alexander and Prince and Alexander and Montgomery right at the time when Alexander deposited the first check into his account, GX 900.

3.    The Evidence Against R. Montgomery

The evidence against R. Montgomery on the stolen goods conspiracy charge also was strong, quite independent of Singh's testimony. Indeed, Singh provided little incriminating testimony against him with respect to that count, and therefore her the materiality requirement is not met. Separate and apart from Singh's testimony, the overwhelming evidence of R. Montgomery's involvement included, among many other things:

- Montgomery and Toybe Bennett spent a great deal of time together and were extremely close (indeed, contrary to Montgomery's testimony, see Tr. 2396, they referred to themselves as "cousins," Tr. 2479, GX 1005). Bennett was unemployed, never had legitimate employment, Tr. 211, 2398, and, as Montgomery well knew, Tr. 2397, had served prison time for fraud-related offenses. Tr. 211, 212.

- When Montgomery arrived at Euro Motor Sports, he referred to the fictitious Dmitriy Makarevich as his "partner." Tr. 1506. Montgomery signed the bill of sale for the Porsche Cayenne car in the presence of Morales. Tr. 1504, 1512-14, GX 96. For each of the four bills of sale that Montgomery signed – including the one signed in Morales's presence – Montgomery's signature appears directly adjacent to the signature of "Dmitriy Makarevich." See GX 96-99.

- Montgomery handed to Morales an envelope containing two more counterfeit checks – for $243,000 and $250,000 – representing the purchase price of additional cars to be purchased by "Dmitriy Makarevich" and Montgomery. Morales opened the envelope and looked at the checks in Montgomery's presence. In Morales's presence, Montgomery signed paperwork for the purchase of additional cars at that time. Tr. 1517, 1557, 1559, 1561.

- Montgomery deposited two checks from Euro Motor Sports into his bank account, one in the amount of approximately $15,000 and the other in the amount of approximately $5,000, both of which reference "sales tax." GX 81, 82. At trial, Montgomery testified that he believed that Bennett worked for a car dealership in Florida and that the approximately $15,000 check that Montgomery deposited from Euro Motor Sports was a "commission" check, Tr. 2239: this is incredible, given that the check was made out to Montgomery and that Montgomery admitted that he had carefully studied the check and observed that the memo line said "sales tax." See Tr. 2485, GX 81, 82. Montgomery's testimony that he believed Bennett worked for a car dealership in Florida was further belied by his own testimony on cross-examination that he never knew Bennett to have any legitimate employment, Tr. 2398, which was supported by Singh's testimony to the same effect, Tr. 212.

- Montgomery lied about his alleged "victimization" by Bennett. In order to distance himself from Bennett and to make it appear that Montgomery had been victimized by Bennett, Montgomery testified that after his release on bail in November 2005, he spoke with Bennett on the phone only three or four times and that he made sure Bennett could not get his new phone number. Tr. 2414. Yet between April and September 2006 (the only records the Government had), there were approximately 30 calls from Bennett to Montgomery, a great many of which were approximately 15 minutes in length (the maximum allowed by the Bureau of Prisons at one time). See GX 1001. When confronted with this evidence,

23

Montgomery at first continued to deny that he was having conversations with Bennett. Montgomery then denied that his phone was active during that period. Finally, when confronted with the phone record evidence that the last call from Bennett to Montgomery's number was on September 15, 2006, and that his phone was in his name until September 22, 2006, Montgomery acknowledged that his phone in fact had been active until that time. Tr. 2422. Further contrary to his earlier testimony on direct, Montgomery was also forced to admit on cross examination that, in the presence of a Deputy U.S. Marshal, he had provided a new phone number to Bennett on March 1, 2007, at a court conference in this case. Tr. 2423.

> 4.    The Evidence Against Pitambar

Singh did testify about Pitambar's involvement in the conspiracy; however, impeachment of her was not "material" in the sense that her testimony was corroborated and supported by other independent evidence in the case, including the following:

- To begin, the circumstances of the checks themselves were highly suspicious – both the $20,000 check from Riddick's company to Pitambar's company and the checks that Pitambar wrote off of his bank account or obtained from the bank. The evidence was clear that Riddick's company had no relationship with Pitambar's company. And the check that Pitambar wrote off his account is clearly one where he left the payee line blank.

- The fact that Pitambar was being paid $3,000 simply for having a check deposited into his account and allowing most of the money to be withdrawn was additionally highly suspicious.

- Pitambar's false statements, made upon his arrest, were further incriminating. Initially upon his arrest, Pitambar lied about his involvement in the conduct charged in the Indictment. Specifically, he gave the same excuse that he had concocted with his co-conspirators, to which Singh had testified. Tr. 271-72. Pitambar stated that his relative, Christine Richardson, had asked him to do some refurbishment on the kitchen and bathroom of her rental apartment. He stated that he agreed and gave her an estimate of $20,000 for the work, to which she in turn agreed. Tr. 1734-35. Pitambar stated that after he had deposited the $20,000 check Richardson had hand-delivered to him, Richardson changed her mind and wanted a refund, in the form of two checks – one for $10,000 made out to her personally and another for $10,000, with the payee left blank. Id. He did indeed sign an otherwise blank check (an act that is, at best, highly irregular). Pitambar admitted that these statements were lies. Tr. 1655-57, 1662.

- Pitambar also made highly inculpatory post-arrest statements to other agents. Among other things, Pitambar then admitted the falsity of his initial explanation that the check was for a construction job in Richardson's apartment, and explained that this was a false "scenario that was told to him by Richardson if he was asked by anyone to say that [] she had given him the $20,000 to fix up her apartment." Tr. 1657. He further stated that Richardson had called him and then stopped by his house to request that he do her a "favor"; specifically, "she asked him if he would deposit a check in the amount of $20,000 into his business account." Id. Pitambar also stated that of the $20,000 he deposited into his account, "he was going to be able to keep $3,000 of that." Tr. 1657-58. He further stated that "when Christine Richardson initially came to him with this proposal," he had "discussed it with his wife" and "she didn't want him to do it." Tr. 1658. However, he stated that he "was going to try to help his family out." Id. Pitambar further stated that after he stopped payment on the wire transfer, "Richardson [] contacted him from Florida by phone because she had since moved there and questioned him as to why he stopped payment on the [] . . . wire because she needed to pay people." Id. He then "was instructed by Richardson at the time to send [her] another check for $6,400," and in fact he stated that he did write her a check for that amount, which he personally deposited into her bank account. Tr. 1661-62.

Given the foregoing, it simply can not be said that the Government violated its <u>Giglio</u> obligations. In addition, the evidence complained of – which amounts to no more than evidence that Singh had some involvement in two additional checks on top of all the ones as to which she admitted involvement – is in no sense material. Accordingly, the defendants' motions based on an alleged <u>Giglio</u> violation should be denied.

## IV.    <u>The Government Did Not Present Perjured Testimony At Trial.</u>

Riddick and Pitambar also argue that Singh somehow perjured herself – and the Government somehow suborned that perjury – when she testified <u>(on cross-examination)</u> that she had "pled guilty to all of them" (referring either to "checks" or "big checks" in which she had "participate[d]" with Shyne and Bennett). Riddick Letter at 2 (citing Tr. 499); Pitambar Memo at

7-8.[13]  This argument is frivolous.

Singh did in fact plead guilty to the full extent of her conduct because she pled guilty to

an overarching conspiracy charge encompassing conduct from at least in or about December

2002 through in or about August 2005, a time period that entirely embraces the time frame at

issue in the Bartee case.  Furthermore, the bank fraud conspiracy to which Singh pled guilty was

described as follows:

> the defendant and her co-conspirators defrauded Wachovia Bank, Bank of America, and Community Bank of Broward, among other banks, by depositing stolen, altered and counterfeit checks drawn on accounts at such banks, as well as proceeds from such checks, into accounts at numerous banks

Exh. D at ¶ 2.  In order for a defendant under the circumstances present in this case to fully

accept responsibility for her criminal conduct – such that a defendant could truthfully testify that

she pled guilty to "all of them" (be they simply "checks" or "big checks," see Tr. 499) – there is

---

[13] Riddick also cites testimony on pages 478 and 479 of the trial transcript to support his contention that Singh testified that she had pled guilty to all of the checks in which she was involved.  See Riddick Letter at 2.  The cited testimony is not remotely in response to a question directed at whether Singh had pled guilty to all of the checks in which she was involved.  The specific colloquy that resulted in the testimony cited by Riddick is:

> Q.    Did you have a chance prior to speaking to the government on September 15th to look at the charging document that had you arrested?
>
> A.    Yes. I looked at some of the document. I did not read it through because it made me sick.
>
> Q.    It made you sick that you got caught?
>
> A.    No. It made me sick that I did all these things.
>
> . . .
>
> Q.    Tell me what you are sick about?
>
> A.    No.  It makes me sick with everything on paper, everything together during the whole years that I have been doing it.  It makes me sick to see -- I know better why this is -- I can't believe it was me.

Tr. 478-79.

simply no requirement that a defendant have pled guilty to a substantive count for each separate check, each separate bank defrauded, or otherwise. Nowhere does either Pitambar or Riddick suggest to the contrary. Nor did any defendant seek to ask Singh whether she had pled guilty to a substantive count regarding each and every check in which she participated, which perhaps would have clarified what defense counsel meant when he asked Singh whether she "pled guilty to all of them," Tr. 299, and what Singh meant when she agreed that she had. Nor does the existence of substantive bank fraud counts on some, but not all, of the checks with which Singh was involved take away from the breadth of the bank fraud conspiracy and money laundering conspiracy charges to which Singh did plead guilty. Given the broad conspiracy charges to which Singh pled guilty, it is simply correct – as a matter of fact – that Singh fact pled guilty to "all of them."[14]

---

[14] Nor, indeed, could Singh have allocuted to the required elements in order to plead guilty to substantive counts involving each of the checks in the Bartee case. As is clear from her plea colloquy, she was willing, but unable, to plead guilty to one particular substantive count because, while she generally had knowledge of the counterfeit checks contained in that count, she had not herself committed any act in furtherance of that conduct. Thus, the only substantive count to which she theoretically could have entered a legally sufficient guilty plea would have involved the two Bartee counterfeit checks for which she penned the fake invoices. It is difficult to see how a plea to one or two more substantive counts, on top of the eight to which she pled, could have conceivably affected the jury's verdict.

The defendants suggest that the Government must have given Singh some sort of sweetheart deal or "a pass" on the Bartee checks. As the defense in this case repeatedly conveyed to the jury, Singh faces 365 years in prison under her cooperation agreement. As she testified, she does not expect to live that long and it is impossible to imagine that the jury might have acted differently had she instead faced an even longer sentence, such as 395 or 425 months. Even more outlandish is the suggestion that there is some sort of unwritten "side deal" between the Government and Singh. See Riddick Letter at 3 ("the simple fact that the government did not require her to plead guilty to the Bartee checks begs the question, what deal did she actually have with the government?"); Pitambar Letter at 9. In fact, the only agreement that the Government has with Singh is her cooperation agreement. See Perry Aff. at ¶ 10.

In asserting that Singh committed perjury, Pitambar claims that:

> As we now know from the Bartee trial, Singh created fake invoices with respect to the two checks that are the subject of the Bartee indictment, but she never pled guilty to her involvement <u>in that scheme</u> with those invoices and checks.

Pitambar Memo. at 7.  The suggestion, of course, is that the checks relating to the Bartee case are somehow part of a scheme <u>separate</u> from the one to which Singh pled guilty.  However, that is simply not a fair interpretation of the charge contained in the Information to which Singh pled guilty (and indeed, this is not the way the Bartee Indictment was framed).  More importantly, defense counsel never remotely suggested in his question about whether Singh pled guilty to "all of them" that he was asking only about the checks that were charged in the Shyne indictment.  Instead, the question was directed at "checks . . . big checks you participate[d] with Shyne and Toybe."  Tr. 299.

Even if Singh's statement somehow could be construed as perjurious, a new trial would be warranted "only if the testimony was material and the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted."  <u>Wong</u>, 78 F.3d at 81 (internal quotation marks omitted and alteration in original); <u>accord</u> <u>Wallach</u>, 935 F.2d at 456.  Given the strength of the proof against the defendants, including the corroboration of crucial elements of Singh's testimony, and the short amount of time in which the jury deliberated before returning its verdict, the Government respectfully submits that this snippet of testimony in no way affected the outcome of the trial.  Accordingly, the testimony was not material and a new trial is not warranted on this basis.

**V.**     <u>**Conclusion**</u>

For the reasons set forth above, the Court should deny the defendants' supplemental Rule

29 and Rule 33 motions.

Dated:  December 3, 2007
          New York, New York

                              Respectfully submitted,

                              MICHAEL J. GARCIA
                              United States Attorney


                    By: _____/s/_____
                              E. Danya Perry/Daniel W. Levy
                              Assistant United States Attorneys
                              Telephone:  (212) 637-2434/-1062

## <u>AFFIRMATION OF SERVICE</u>

E. DANYA PERRY, pursuant to 28 U.S.C. § 1746, declares under the penalty of perjury:

I am employed in the Office of the United States Attorney for the Southern District of New York.

On December 3, 2007, I caused the foregoing GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' SUPPLEMENTAL POST-TRIAL MOTIONS with the exhibits attached thereto and the AFFIDAVIT OF E. DANYA PERRY to be served via Clerk's Notice of Electronic Filing upon the following attorneys, who are filing users in this case:

Thomas H. Nooter, Esq.
Freeman Nooter & Ginsberg
30 Vesey Street, Suite 100
New York, New York 10007

Counsel to defendant Roberto Montgomery

Denis P. Kelleher, Jr., Esq.
Kelleher & Dunne LLP
17 Battery Place, 11th Floor
New York, New York 10004

Counsel to defendant Naresh Pitambar

Bryan H. Hoss, Esq.
Davis & Hoss, PC
508 E. 5th Street
Chattanooga, Tennessee 37403

Counsel to defendant Steven Riddick

Bruce A. Barket, Esq.
Bruce A. Barket, P.C.
666 Old Country Road, Suite 600
Garden City, New York  11530

Richard D. Willstatter, Esq.
Green & Willstatter
200 Mamaroneck Avenue, Suite 605
White Plains, New York 10605

Counsel to defendant Nathaniel Alexander

I declare under penalty of perjury that the foregoing is true and correct.  Executed on December 3, 2007, at New York, New York.


_____/s/_____
E. Danya Perry

## <u>List of Exhibits</u>

A.   <u>United States v. Douglas Shyne, *et al*.</u>, Indictment S4 04 Cr. 1067 (KMK)

B.   Chart of Checks

C.   <u>United States v. Luvenia Bartee, *et al*.</u>, Indictment 06 Cr. 832

D.   <u>United States v. Singh</u>, Information S5 05 Cr. 1067 (KMK)

E.   Transcript of Proceedings, dated 3/19/07 (relevant pages)

F.   Schematic Representation of persons involved in <u>United States v. Bartee, *et al.*</u>

G.   Transcript of Proceedings, dated 9/24/07 and 9/25/07 (relevant pages)

H.   Bartee GX-402