

something wrong. And I point out to you, the records will show that money was drawn out of the account from only one check that was deposited in the account.

Listen to all of the evidence, as the Judge has told you, listen not only to the direct testimony, but to the cross-examination of every witness, to determine for yourselves where the truth lies in this case. And I'm sure you will then follow your oath and give Ebony Worthy a fair and just trial in this case. Thank you.

THE COURT: OK. Call your first witness.

MS. PERRY: Your Honor, the government calls Natasha Singh.

NATASHA SINGH,
called as a witness by the government,
having been duly sworn, testified as follows:

MS. PERRY: May I inquire, your Honor?

THE COURT: Yes.

DIRECT EXAMINATION
BY MS. PERRY:

Q. How old are you, Ms. Singh?
A. 32 years old.
Q. What do you do for a living?
A. Currently I'm in school.
Q. For what?
A. Nursing.

Q. Do you know a Douglas Shyne?
A. Yes. I was engaged to him.
Q. When did you first meet Douglas Shyne?
A. Around 2001.
Q. How did you meet him?
A. At my job, in Brooklyn, New York.
Q. What sort of job was that?
A. Insurance.
Q. In what capacity did you meet him?
A. He came into the office applying for insurance under an X5 BMW truck.
Q. Was that car in his name, insured in his name?
A. No. It was in a business name, a business that he owned.
Q. What was the name that he had?
I'm sorry. What was the name of that business?
A. Douglas New York Five Star Coffee.
Q. What type of business was that?
A. He told me it was a business that supplied vending machines to the tristate area offices.
Q. Did he lead you to believe that this was a profitable company?
A. Yes, very.
Q. At some point did you learn anything different about Douglas New York Five Star Coffee?
A. Yes. I learned that it was just a name, a made-up



business.
Q. Did that business conduct any business whatsoever? Any legitimate business whatsoever?
A. No, it did not.
Q. What did it do?
A. There was just like a shell corporation. He had a mailbox on Fifth Avenue in Manhattan. He had a telephone number, a 221 number supposedly for this office, but then it gets flashed to his cellphone if you were to call that 212 number.
Q. What did Douglas Shyne use the shell business for?
A. As a front to do his fraudulent activities.
Q. Did you know in 2001 that he was involved in fraudulent activity?
A. No.
Q. Did you begin dating him in 2001?
A. Yes, I did.
Q. How long did you date Mr. Shyne?
A. I dated him for a few months in 2001, and then again we started dating around 2003.
Q. Why was your relationship interrupted in 2001?
A. He was arrested.
Q. Do you know what he was arrested for?
A. At the time, no.
Q. Did you later learn what he was arrested for?
A. Yes.

Q. What was that?
A. Fraudulent activities.
Q. Did he return at some point?
A. I'm sorry?
Q. Did he -- was he in jail?
A. Yes. He was in jail from September of 2001 till May of 2002.
Q. Did you resume your relationship at that point?
A. In 2003 we did, late 2002, early 2003.
Q. Are you still engaged to Douglas Shyne?
A. No, I'm not.
Q. When did you terminate your engagement?
A. On August 10, 2005, when we both got arrested.
Q. At some point, you testified you became aware that Douglas Shyne was involved in criminal conduct?
A. Yes, I did.
Q. When did you become aware?
A. When we started back, our relationship, we started dating in 2003.
Q. And specifically what did you realize that he was doing?
A. He was in the business of remaking checks, getting a fraudulent check, depositing it and laundering money, things along that line.
Q. Did he ever have any legitimate source of income at this time in 2003, in all?



A. No, he did not.
Q. How was he supporting himself?
A. Through those fraudulent checks and fraudulent activity.
Q. What kind of a lifestyle did he have?
A. A very fancy lifestyle.
Q. Did he have any business ventures that were legitimate?
A. Yes. He, he was traveling back and forth from New York to Philadelphia trying to do construction for a cafe that he was trying to open up.
Q. Did he eventually open that up cafe?
A. Yes, he did.
Q. What was the name of it?
A. It was New York Cafe Lounge.
Q. Was it in Philadelphia?
A. Yes, it was in Philadelphia.
Q. Did you have any involvement with the New York Cafe Lounge?
A. Yes. Later in 2004, when I moved down to New Jersey, I started going there and opening house.
Q. Whose name was this business operating under?
A. It was under John McNair.
Q. Who is John McNair?
A. It's a person who he used their identification.
Q. It was an assumed identity that Douglas Shyne used?
A. Yes.
Q. Did he have any identification with that name?

A. Yes, he did.
Q. What type of business was New York Cafe Lounge?
A. It's a -- it was a coffee shop, started out as a coffee shop, and then later on it became other things.
Q. What else did it become?
A. It became like a lounge for poetry and soft rock-n-roll and had amateur singers.
Q. Did the business ever serve alcoholic drinks?
A. Yes, it did.
Q. Did you ever have a liquor license for it?
A. No, we did not. We applied for one and it was turned down.
Q. Who applied for one?
A. He applied in my name, actually. He filled out the forms with my name on it. And it was turned down because of the neighborhood. They wouldn't approve it.
Q. Was this business ever successful?
A. No, it was not.
Q. Why not?
A. I feel that he did not spend enough time because he was more after the checks and all the other activities he was doing. He did not put enough time into it.
Q. You mentioned earlier that when you first met Mr. Shyne, it was for the purpose of his insuring a car. Did he own any cars in 2004?
A. Yes, he did.

Q. Let me just backtrack. When he applied for insurance for that car, what was the name -- I may have asked you that question -- that he applied for?
A. It was under Douglas New York Five Star Coffee.
Q. And how about in 2004? Did he own any cars at that point?
A. In 2004, he had a Maserati Spider, a black Maserati spider.
Q. Did he own this car?
A. No. It was leased.
Q. Where was the lease account held for this Maserati?
A. Chase Manhattan Bank.
Q. Was it in under his own name or someone else's name?
A. It was under John McNair's name.
Q. Do you know what the monthly payment that was owed for this car was?
A. Somewhere between 16 and 17 hundred a month.
Q. Did he ever pay forward on his monthly allocations for the car?
A. Yes. He does that a lot.
Q. How did he pay for the car?
A. Through fraudulent proceeds.
Q. At some point, did you yourself become involved in Shyne's fraudulent activity?
A. Yes, I did.
Q. What did you do specifically?
A. I would call up banks to find out balances of accounts,

available amount. I would type names on the checks for him, things along that line.
Q. You mentioned that you had called banks. What was the purpose for doing that?
A. He will want to know like the balance or if a check has been cashed or money is available, things like that.
Q. How did you -- I'm sorry. Moneys available. What money would be available? What money was he looking to see if it was available?
A. Well, if he were to give someone -- if someone agrees to deposit a check into their account for him, he -- they will then exchange account information. Then he will give me that information with the bank to call up in a few days to see if the money is available, you know, the person is being truthful to him or not.
Q. So if a person agreed to deposit a fraudulent check into their account, that person would give their account information to Douglas Shyne?
A. Correct, or whoever -- whoever they coming through, if they coming through a friend of his or a family member of his, whoever the contact person was.
Q. What do you mean, "coming through a friend"?
A. Douglas, he had -- he had friends that would recruit other people to deposit checks into their account as well.
Q. Did Douglas ever recruit people himself?



A. Yes, family and friends of his.
Q. We'll get back to you, but when you would call a bank to find out account information, or balance information, how were you able to get that information? When you would call the bank?
A. It will be through the automated system. He would have the person's account information, PIN number, to access it through the automated system.
Q. And how would you get that information, the PIN number and the account information?
A. Douglas will get that information from the person or whomever he has recruited that person for him.
Q. You said he would call automated systems.
A. Yes.
Q. Specifically 800 numbers?
A. Yes.
Q. You mentioned also that you would at times write checks for him, I believe you said?
A. Yes.
Q. Could you please explain what that means.
A. If he gets a business, if someone in the business coming agrees to deposit a check for him and in return for him to get the money back, they will give him a check. Sometimes if it's a business, the checks are in type, just the person's name, so then he will have me then type, type the person's name or

whatever information to complete the check.
Q. So the depositing account holder would at times issue checks back to Mr. Shyne? Is that what I'm understanding?
A. Yes.
Q. And that payee information was to be left blank?
A. Correct, or sometimes the payee and the amount, yes, the amount.
Q. And at times you would be asked to fill in that information?
A. Correct.
Q. When did you begin to help Mr. Shyne in these activities?
A. Around 2003.
Q. Where were you living in 2003?
A. In Queens, New York.
Q. Do you still live in Queens?
A. No. I moved to Jersey.
Q. When did you move to New Jersey?
A. In 2004.
Q. And I don't mean a street address, but where specifically did you move to in New Jersey?
A. South Jersey.
Q. Did you -- and I'm sorry, when did you move there, please?
A. In 2004.
Q. Did you -- did you buy a home there? Did you rent a home?
A. Yes. I purchased a home in New Jersey.



Q. Was the house in your name?
A. Yes, it was in my name.
Q. I'm going to ask you some specific questions about those fraudulent checks that Mr. Shyne received. What were the different ways in which you would obtain bad checks?
THE COURT: You're moving on to a new topic right now?
MS. PERRY: Yes, your Honor.
THE COURT: OK. We'll wait.
OK, ladies and gentlemen. We'll take our break now. It's almost 3:30. I don't want you to have any problems with me. OK. You may not need it, but, see, when you get a little older... OK, kids.
(The jury left the courtroom)
(Jury not present)
MS. PERRY: Your Honor, is it acceptable to your Honor if our paralegal, Rob, sits over there to sort of drive the computer?
THE COURT: I don't care where he sits at.
MS. PERRY: OK. Just to let you know that's why he's over there.
(Jury present)
THE COURT: I assume those computer screens in front of you there are blank. Am I correct?
A VOICE: Yes.
THE COURT: This is my courtroom, except I don't get

to use it. And another judge has a, what do you call it, a computer-intensive trial coming up for which she's got a lot of things. So it's all set up for him, including at the back and all the things there and so on and so forth. Since he's had it all set up -- it's been set up now for a year. They don't try this case. All right. But every time I come in here, everyone's got to use it. And by the way, I don't believe anyone really knows how to, except for some people.
But go ahead.
MS. PERRY: Thank you, Judge.
THE COURT: Also, I see one person with water. Please understand, in there -- no, no. No, don't put it down. It's perfectly appropriate to bring water into my courtroom. Other people have other views. OK. So I suggest that you can maybe have a soda. But for God's sakes, don't spill it, all right. The guy who's borrowing it to use it will have a kitten.
All right. Go ahead.
But he's a nice guy.
BY MS. PERRY:
Q. Ms. Singh, how did Douglas Shyne obtain bad checks?
A. Through his -- he had two bank contacts. He had friends. He will get stolen checks. He had several different ways he will get checks.
Q. Let's start with, you said his bank contacts. Do you know which banks he had contacts at?



A. Wachovia and Commerce Bank.
Q. What do you mean by "contacts" with these banks?
A. Someone who works in there, in the bank, that would give him information on this account.
Q. What kind of information did he get from these people?
A. Everything he needs to access their account, like their Social Security number, account number, balance, sequence of checks, everything that he will need to have to access their account.
Q. Where were these bank insiders -- you said Wachovia and Commerce, but in what city?
A. Commerce was in Phil -- I'm sorry. Wachovia was in Philadelphia. Commerce, I'm not sure what his contact was.
Q. What would he do with the bank information, the bank account information, he would get from his bank insiders?
A. He will take it and then have his friend make a check just like a person's check for a high amount.
Q. Was there a specific friend who would make counterfeit checks?
A. Yes. He had a friend in Philadelphia. His name, he is called by "E."
Q. Do you know E's real name?
A. No, I don't know his real name.
Q. How would E get -- would E get actual checks through this insider, or just information with which he can make up checks?

A. He will get sometimes copies of their checks, like the person whose bank account it is. Sometimes he will just get the information and be able to make the checks up like that.
Q. Was E the person who had insiders at these banks?
A. Yes. It was E's contact, that they give to him.
Q. And would these insiders -- you said copies. Are you actually talking about photocopies of checks that he would provide to Douglas Shyne?
A. Correct.
Q. And once they had the photocopied check and all the bank account information, what did they do with all that information?
A. They will make a check up for a higher amount, to see how high they could go, what's the person's balance in their account, and they will of course recruit someone who is going to deposit it in their account.
Q. And with all that information, how did they physically make a check that looked counterfeit?
A. I think they, they printed on check paper, because it looks exactly like, like normal check. How was the process of them doing it, I don't know.
Q. Were you yourself specifically involved in counterfeiting checks?
A. No. I have not done that.
Q. I'd like to show you what's been marked for identification



as Government Exhibit 1312.
MS. PERRY: May I approach, your Honor?
THE COURT: Sure.
MS. PERRY: Your Honor, I have a number of exhibits. Can I just hand them all up at this time?
THE COURT: Yes.
Q. Do you recognize Government Exhibit 1312?
A. Yes, I do.
Q. What is that?
A. This is a copy of what he would get from this, his bank insider, a copy of a person's check that has all the information on it.
Q. Have you specifically seen this check before, that is, Government Exhibit 1312?
A. Yes. I've seen this check around.
MS. PERRY: Your Honor, the government offers Exhibit 1312.
MR. STOLAR: May I take a look at it, perhaps have a voir dire, Judge?
THE COURT: Sure. Go ahead.
VOIR DIRE EXAMINATION
BY MR. STOLAR:
Q. Ms. Singh, is this the particular check that you saw someplace?
A. Yes.

Q. Is there a photocopy of the check?
A. It's a photocopy of the check that I've seen.
Q. Do you know who Harvey Goldberg, M.D., or Rabbi Paula R. Goldberg, are?
A. No, sir.
Q. Do you know Dr. Placik?
A. No, sir.
Q. Also in the exhibit is an envelope with a name on it. Do you see that?
A. Yes, sir.
Q. Have you seen that before?
A. Yes.
Q. Where have you seen that before?
A. In my house on the counter-top.
Q. How is it connected to this counterfeit check?
A. That check was in this envelope.
Q. There's a name written on the envelope, is there not, and an address?
A. Yes.
Q. What is that?
A. It's a name of a relative of Douglas.
Q. Which relative?
A. His niece.
Q. Do you know how the government got ahold of this?
A. From, they did a search of my house.



MR. STOLAR: I have no objection, Judge.

MR. JACOBS: No objection, your Honor.

THE COURT: Marked in evidence.

(Government's Exhibit 1312 received in evidence)

MS. PERRY: Can you please publish Government Exhibit 1312.

THE COURT: You want to show it to the jury? Sure, go ahead.

DIRECT EXAMINATION (Cont'd)

BY MS. PERRY:

Q. Ms. Singh, what's been marked as Government Exhibit 1312, the original that you have there, is that a real check, or is that a photocopy?

A. It's a copy.

Q. And what you saw in your house, did you see this type of check? Did you see a photocopy or a real check?

A. I saw this same check in my house.

Q. You mean the photocopy, this photocopy?

A. This copy.

Q. So is this photocopy what you've been talking about, that Douglas Shyne will get from insiders of the bank? He'll get photocopies of the checks?

A. Yes.

Q. I just want to go through some of the information that's listed on this check. This is the Wachovia-issued check,

correct?

A. Correct.

Q. Have you seen other such checks, photocopies of checks in your house?

A. Yes.

Q. By the way, did Mr. Shyne live with you at any time?

A. Yes. We moved to Jersey. He lived in New York, in my house, and then moved to Jersey.

Q. The information at the top of the check, above the account holder's name, do you understand what that signifies?

A. The person's Social Security number and date of birth.

Q. And do you know how Mr. Shyne got that information?

A. From the person who works in the bank.

Q. And is that Mr. Shyne's handwriting?

A. Yes, it is.

Q. And to the right of that, do you recognize, do you understand what that number is?

A. Which number?

Q. There is a number to the right of the date of birth, handwritten in.

A. Oh. That, that is, is the person's balance in their account.

Q. And what would be the purpose for having that information on the check?

A. So he, he will decide how, how much they will do a



counterfeit check for.
Q. In other words, they would do the counterfeit check for less than the total balance in the account?
A. Yes, to make sure, correct.
Q. And do you see, is the check sequence number in the upper right-hand corner?
A. Yes.
Q. Do you know -- underneath that, there's a handwritten number.
A. Yes.
Q. Do you know what that number signifies?
A. That's the number given without a date where he would start his check number.
Q. In other words, for the counterfeit check, they would make it for a different sequence number?
A. Correct.
Q. And where would he get that information?
A. From the person who works in the bank.
Q. Ms. Singh, what would he do to the photocopies of checks such as the one that is Government Exhibit 1312?
A. I'm sorry. Can you repeat the question?
Q. What was done? Why did Douglas Shyne have documents in his possession such as the document that you hold in your hand as Government Exhibit 1312?
A. This is how he does his business. This is the information

he will collect so he could go ahead and plan, and making his counterfeit checks and recruiting people to deposit it into their account.
Q. Have you seen some of the counterfeit checks that were manufactured with this type of information?
A. Yes.
Q. Do they look to be real?
A. Yes, they do.
Q. Given that Mr. Shyne had insiders at banks, was there any limit to the number of checks that he was able to obtain?
A. No, there was no limit to the checks he could obtain, because he had somebody that makes them. But I guess that his limitation was planning the accounts to deposit in.
Q. We'll get to that in a moment. Did Douglas Shyne ever alter any checks that were received in the normal chain of Commerce?
A. Yes, he did, lots of them.
Q. Can you please describe how that happened.
A. Well, he altered a few checks that came back in my name for the business purposes of the business we had in Philadelphia. We were collecting credit cards, very small amount, on a monthly basis because of the coffee at that time, and it would be like $10 or so. So they would come and place it in my name. And he will give it --
Q. Sorry to interrupt you. What will come on a monthly basis?

A. The checks, it would come from like American Express, and he will then give the check and have it remade. It will still be American Express, but it will be remade for a higher amount and to a different payee.
Q. So American Express would issue a check to you or the business for a low dollar amount, and Mr. Shyne would take that check and have it remade for a higher dollar amount.
A. Correct, on a different payee.
Q. With a different payee?
A. Yeah.
Q. Are there other examples when that occurred?
A. Yes. His friend also, Frank, his wife, would receive a refund check. And he also had that remade for a higher amount.
Q. Whose friend?
A. Frank is a friend of his, of Douglas.
Q. I'm sorry?
A. Frank is a friend of Douglas.
Q. What's Frank's last name?
A. Rodriguez.
Q. How did they meet?
A. I was told by Douglas that they met in business in Philadelphia.
Q. Was that in 2001 or was that some other time?
A. 2001.
Q. What's Frank's wife's name.

A. Tracey, I'm not sure. She doesn't have the same last name. She has a different name.
Q. You mentioned also that one of the ways Mr. Shyne got bad checks was, he would receive stolen checks. Is that correct?
A. Yes.
Q. Any specific stolen checks, do you recall?
A. Yes. There was a huge stolen check that he received from Toybe for $775,000.
Q. Who was Toybe?
A. Toybe is a long-time friend of Douglas.
Q. What's Toybe's last name?
A. Toybe Bennett.
Q. How did Douglas and Toybe know one another?
A. I was told by Douglas from prison.
Q. Was this in 2001 or some other time?
A. Some other time.
Q. Was Douglas in prison prior to 2001?
A. Yes.
Q. Do you yourself know Toybe Bennett?
A. Yes, I did.
Q. Were Douglas and Toybe close friends?
A. Yes. They were very close.
Q. When did you first meet Toybe Bennett?
A. In 2003.
Q. Were you friendly with Toybe Bennett?



A. Yes. I was very friendly with him.
Q. How big was that check that Toybe Bennett got his hands on?
A. 775,000.
Q. Where was that stolen from?
A. It was a company in Manhattan. It's no longer working in the middle of -- it was a friend of Toybe's that worked.
Q. Were Douglas and Toybe able to cash out that stolen check?
A. Yes. They were able to cash most of it out.
Q. And how did they do that?
A. They opened up an account in Philadelphia under the same payee's name. Like the check was made out to Column Financial. So they opened up a working standing account under the name Column Financial. And Toybe was the owner of the account.
MR. STOLAR: Did Toybe use -- the word is what Financial?
MS. PERRY: Column.
MR. STOLAR: C-o-l-u-m-n.
Q. Column Financial?
A. Column, C-o-l-u-m-n.
Q. In opening up that account at Morgan Stanley, did Toybe Bennett use his real name?
A. No. Tony Bennett used Dmitri Mackevich.
Q. Was that an alias that he used?
A. Yes, it was.
Q. Did E have identification in the name of Dmitri Mackevich?

A. Yes, he did.
Q. Did Toybe Bennett ever make any money legitimately at any time that you knew him?
A. No, he did not.
Q. How did he make money?
A. Through fraudulent checks and schemes that he and Douglas was involved in.

(Continued on next page)

Q. What type of lifestyle did he live?
A. He liked nice things, but not as flamboyant at Douglas.
Q. Where did Toybe Bennett live?
A. For the short period of time I knew him, he lived several places. He lived at my house. He lived at my mother's house. He lived at his cousin's house in Brooklyn. And he lived at his girlfriend's house.
Q. Who was his girlfriend?
A. He had more than one girlfriend.
Q. Do you know any of their names?
A. One was Donna and the second, Ebony.
Q. Do you know where he lived with Ebony?
A. It was somewhere upper Manhattan.
Q. Do you know Ebony's last name?
A. No, I don't.
Q. You said you were close with Toybe Bennett. Did you ever speak on the phone with him?
A. Yes, I did, a lot.
Q. Do you remember what his phone number was in 2004?
A. I think the last four is 3229. If I see something, I probably recognize it, the last four is 3229.
Q. Do you remember the prefix?
A. That was for his cell phone number.
Q. Is there something I could show you?
A. I'm sorry. It's (347)256-3229.

Q. What -- do you recall Douglas Shyne's phone number during 2004?
A. (914)433-3413, I think, or 3433.
Q. Did Douglas Shyne have his phone in his own name?
A. No. It was in my name. Everything he had was in my name.
Q. I'd like to show you what's been marked for identification as Government Exhibit 1309 and ask you if you recognize it.
MS. PERRY: May I approach, your Honor.
THE COURT: Sure. Do you recognize Government Exhibit 1309?
THE WITNESS: Yes. That's T-Mobile, with my information on it, and Douglas' telephone number.
Q. Does that refresh your recollection as to what phone number he used during 2004 and 2005?
A. Yes.
Q. What is that?
A. It's (914)433-3643.
Q. By the way, the number you gave for Toybe Bennett, (347)256-3229, did he use that number in 2004 and 2005?
A. I don't remember if he used it all along because they change phones a lot. But that was the number he used for the longest time.
Q. But you know he used that number in 2004?
A. Yes.
Q. What number did you use in 2004, 2005?



A. (917)941-6205.
Q. I want to get back to the stolen check that you mentioned that Toybe Bennett got from Column Financial Company in Manhattan.
Did you do anything to assist in cashing of this check?
A. Yes, I did.
Q. What did you do?
A. I called the person at the bank that Toybe was dealing with and pretended I was Toybe's wife to ask them to settle the stocks or something along that line, to liquidate the money.
Q. So that was to get funds released?
A. Yes.
Q. And you pretended to be Mrs. Mackevich?
A. Yes.
Q. By the way, I want to get back to -- earlier you were talking about calling banks to get balance information, and I just want to make sure it's -- that it's clear what exactly you did, you would call the automated systems.
This is different. When you called Morgan Stanley, did you speak with a person or was this an automated system?
A. When I called I spoke to a person.
Q. When you would call the 800 numbers on behalf of Douglas Shyne, could you just please, just describe exactly what you would do and why you would do it?

A. I would call -- I would call the 800 number. They would give me -- they will say put your account number in, the automated system. I put the account number in. It will ask you for a PIN number or your last four, whatever. He will give me all that information. I will put it in. Then it will say, like a normal automated system if you're checking your account, like you want to know the balance or you want to know last check cleared, things along that line, and it will give you that information.
Q. And what was the purpose for getting -- for calling the banks to get that information?
A. Douglas wanted to know if -- you know, he wanted to have some control. He wanted to know if the money is available in the person's account that, who is depositing the check for him. He would want to know if in other cases if the money was taken out of the account. So this way he knows what's going on and he's just not taking their word.
Q. So would you call both the depositing -- the bank where the check was deposited, that the bad check was deposited and also the bank where the bad check was issued from?
A. Yes, he would. Yes, I would.
Q. And you would do that too?
A. Yes.
Q. You mentioned that you and Douglas and Toybe were able to get money out of this Morgan Stanley account. How did you do

that?
A. Well, through deposited -- writing checks from the Morgan Stanley account to friends and family, girlfriends, everyone along that line, whoever agreed to deposit a check into their account, because of the fee.
Q. Who were some of those people who agreed to deposit proceeds of that stolen check into their accounts?
A. My mother, my brother, Douglas' brother, Toybe's cousins, and friends.
Q. What's your mother's name?
A. My mother is Christine Richardson.
Q. What's your brother's name?
A. Ephraem Richardson.
Q. You mentioned Toybe's cousins. Who were they?
A. Cynthia and Roberto Montgomery.
Q. And once these people, your mother, your brother -- what's Douglas Shyne's brother's name?
A. Nathaniel Shyne.
Q. Once all those individuals deposited proceeds of the stolen check into their account, what did they then do?
A. They would then return cash to Douglas and, or Toybe, less their commission or their fee that Douglas and Toybe agreed to give them.
Q. They would keep a fee for having done that service?
A. Yes, because they took some checks.

Q. By the way, do you know a person named Shannon Quintal?
A. Yes. I know Shannon, a friend of my sister's.
Q. Good friend?
A. Yeah, good friend.
Q. Is she involved in depositing proceeds?
A. Yes.
Q. Or I'm sorry, depositing bad checks?
A. Yes. I heard that she did some checks.
Q. So, on the topic of cashing out proceeds, when Douglas Shyne received bad checks, how would he typically get proceeds from the checks?
A. They would recruit people to deposit the checks into their account, and also he would have them send a check to a company that he has bills or a leased car to, he would get cash; so many different ways he would get proceeds.
Q. You said they would recruit people. Who would recruit people to deposit checks in their account?
A. Douglas and Frank and Toybe --
Q. This is Frank --
A. -- whoever they know.
Q. Frank Rodriguez?
A. Yes.
Q. And Toybe Bennett?
A. Yes.
Q. Did Douglas himself ever recruit people?



A. Yes, my family and his family.
Q. And when he would recruit people to deposit proceeds checks, did he deal with those people directly?
A. Yes.
Q. And when Toybe and Frank acted as a broker for him to recruit people, did he typically deal with the people that Toybe and Frank had arranged to deposit checks?
MR. JACOBS: Objection. Hearsay.
MS. PERRY: Your Honor, this is based on --
THE COURT: No. I'll permit it. It's all background. Go ahead. Answer the question. Do you want it read back to you?
THE WITNESS: No, thank you.
THE COURT: Go ahead.
THE WITNESS: No. He doesn't like to deal with them because they coming through Frank and Toybe, unless it's situation where, you know, he's getting a problem with getting the money, then he would. But no, he doesn't really like to deal with them.
Q. And when a person would deposit a proceeds check into their account, how would the money typically get back to Douglas Shyne?
A. If they depositing it through Frank or Toybe? Is that your question?
Q. Yes.

A. It will get back to Douglas through Frank or Toybe. If it's Toybe, they will give Toybe the money, it goes to Toybe, then it goes to Douglas.
Q. Would they write checks, or would they give cash, or both?
A. Both. However they would write it to a company to pay a bill for him or something.
Q. Did Douglas Shyne typically accept checks that were proceeds checks in his own name?
A. No. He never does that.
Q. Why not?
A. Because he doesn't want his name to show up on anything. He wants to keep himself clear.
Q. Were there other ways that you and he managed to cash out bad checks?
A. He -- paying -- by paying his bills, he would do that.
Q. Did you and he ever use stolen identities to open up bank accounts?
A. Yes, I did, and I know he did as well.
Q. Did you -- you mentioned the fake identity that he used earlier, John McNair. Did he ever use any other assumed identities, belonging to other people?
A. I know of two or three, and I know he had a lot more before I met him. But he used John McNair, Daniel Martinez and -- I can't remember all the ones right now on top of my head.
Q. Would he typically have forms of identification with these



people's names and his photograph?
A. Yes.
Q. Did -- for the most part, did you use your own identity or someone else's to conduct business?
A. I used my own identity to conduct business.
Q. Was there ever any occasion when you used anyone else's identity?
A. Yes. I used Beatrice Rodriguez's identity.
Q. Where did you get that identity?
A. From my old job.
Q. And what did you do with that identity?
A. I gave it to Douglas. He opened up an online account and credit card under Beatrice Rodriguez and I used it.
Q. And you used the credit card?
A. Yes, I did.
Q. So essentially you stole that money?
A. Yes.
Q. Did -- were bank accounts ever opened -- did Douglas ever open bank accounts in assumed identities to deposit fraudulent checks?
A. Yes.
Q. Did he ever use any with preexisting account without their knowledge?
A. No. He couldn't do that. He wouldn't do that because he need their information to have control to check their account,

he needs their account information.
Q. Now, you mentioned earlier there were other ways he would typically get proceeds from bad check was to agree with other people to put bad checks into their account and then to get checks back.
Did Douglas ever deposit these fraudulent checks into the accounts for these account holders?
A. Yes, he does.
Q. And would he sign their names when he did that?
A. Yes.
Q. Why did he do that?
A. He did it because of time issue. He feels that he needs to get it done right away. If they're not locally, or they're not where he could get to them, he will do it because of the timeframe from the time he gives him the check to get it deposited and get it cashed. They all have this time that they have to get it did done.
Q. When he did this, did he do this with the knowledge of the account holder?
A. Yes, because he needs their account information to deposit it.
Q. When did you stop being involved in the scheme with Douglas Shyne and others?
A. When I got arrested in 2005.
Q. From -- during the time that you and Douglas were both



involved in this fraudulent check scheme, do you know how much money was made from these bad checks?
A. Yes. He made a lot of money. Oh, in the millions.
Q. Ms. Singh, have you ever heard of a company called UR Recovery?
A. Yes, I did.
Q. How did you first hear about this company?
A. Well, I heard about it from Douglas. But I heard there was accounts in Virginia from Toybe when I first heard about.
Q. What did Toybe tell you?
A. Well, he didn't say exactly to me. He was helping me move and he and his cousin were having a conversation, and I was right there in the next room.
Q. Who was his cousin?
A. Roberto Montgomery.
Q. And is Roberto Montgomery someone that you mentioned earlier, someone that Toybe worked with in depositing bad checks?
A. Yes.
Q. And when was this conversation between Roberto Montgomery and Toybe Bennett?
A. It was around August of 2004, in my house, they were helping me move. And Roberto said to Toybe: All these things you have me doing for you, you really owe me.
And Toybe said to him that: Don't worry. I got you.

My deal is going to come through soon, and I'll take care of you.
Q. And what was the next thing you heard about this Virginia deal?
A. A few days later Douglas was talking to Toybe on the phone. And when he hang up, he said that ooh, Toybe is very happy that he got two good accounts from Virginia, and then he told me the names.
Q. And he told you the names of the two -- I'm sorry. Could you say that again. What did he tell you?
A. He said Toybe was very happy because he got two good accounts from Virginia.
Q. Did he tell you what those two accounts were?
A. Yes.
Q. And what were they?
A. It was UR Recovery and Moonlight Production.
Q. What was the expression he used, a good account?
A. Yes. He used that a lot.
Q. What does that mean, good account?
A. He found someone that's willing to deposit these checks in their name; and also if they have a business account, it's even better for them.
Q. Did Douglas tell you how Toybe Bennett knew these people in Virginia who had these good accounts?
A. Yes, through a friend of his, I understand it's a mutual



friend in Brooklyn.
Q. Did Douglas tell you what type of business UR Recovery is?
A. Yes.
Q. What kind of business was it?
A. A business that repairs credit, people's credit.
Q. Did you know what type of business Moonlight Productions was?
A. No.
Q. Did you learn who owned UR Recovery?
A. I learned it was a female.
Q. Do you recall the person's name?
A. No.
Q. How did you learn that the owner of UR Recovery was a female?
A. Because Douglas mentioned that he needs a fraudulent statement, a fake invoice to be sent to -- she's going to need a fake invoice to be sent.
Q. So he used a female pronoun?
A. Yeah. He said she.
Q. Did you learn who owned Moonlight Productions?
A. A couple.
Q. Did you know their names?
A. No.
Q. There was a couple. Did you know it was the wife, the same person that owned UR Recovery?

A. No. It was two different people.
Q. By the way, you said that the first time you heard about the two accounts in Virginia you thought was when?
A. From Toybe in September.
Q. September?
A. Mm-hmm.
Q. And then you later heard Douglas about the conversation?
A. Yes.
Q. Were you aware how many counterfeit checks the owner of UR Recovery agreed to deposit?
A. Yes.
MR. STOLAR: Objection. I object to the question.
THE COURT: She said yes.
MR. STOLAR: Well, it's the question. The owner agreed to deposit, and that presumes a fact that is not in the testimony.
THE COURT: Well, I'll permit anyway. Go ahead.
Q. Did Douglas tell you that the owner of UR Recovery agreed to deposit counterfeit checks?
A. Yes.
Q. Were you aware how many counterfeit checks that owner of UR Recovery agreed to deposit?
A. Yes.
Q. How many?
A. Two.



Q. Were you aware of how big those checks were?
A. Yes.
Q. Do you recall how big they are?
A. One is for 80 something thousand and one is a hundred and change -- a hundred and something thousand.
Q. Were you aware of where those two counterfeit checks were deposited by UR Recovery?
A. Yes.
Q. Where was that?
A. One in Philadelphia and one in New York.
Q. Who deposited those checks?
A. Toybe and Douglas.
Q. Who told you that?
A. Douglas.
Q. Did Douglas ever tell you whether he ever got any proceeds from these two checks deposited in UR Recovery's account?
A. Yes.
Q. What did he tell you about the proceeds?
A. He said to me that he needs these fake invoices to be made up because she does not want to release anymore money until she receives the fake invoices.
Q. I'm going to get back to the fake invoices. I'll ask you first, did you hold any accounts at Wells Fargo?
A. Yes, I did.
Q. What type of account?

A. It was a credit line under the business name.
Q. Which business name?
A. New York Cafe Lounge.
Q. How much was the line of credit for?
A. I believe it was 50,000; 45, 50,000.
Q. Who applied for the line of credit?
A. I did.
Q. Was Douglas Shyne on this account?
A. No. Douglas never applied for anything. He was never on --
Q. Did you have any credit cards on this account?
A. Yes. There was two credit cards. One would come out because I'm the applicant and I requested one for him, for Douglas, without him filling out any application for a credit check. He had a $45,000 or $40,000 credit spending limit off of the card that I applied for, and I had five thousand.
Q. Now, did you and he ever pay down this line of credit?
A. He told me that he was going to pay the line of credit because he had made a lot of purchases and he was going to pay it from proceeds from the Virginia deal. I don't know which one it was.
Q. Are you aware -- did he pay off this line of credit on other occasions besides during the course of this Virginia deal?
A. He's paid it off before. He run it up, and he keeps doing

that over and over.
Q. With what funds does he pay off the line of credit?
A. From fraudulent proceeds.
Q. Why does he use fraudulent proceeds to pay down this line of credit?
A. To have it not traced to him because the card is not in his name. It's in my name.
Q. There is a card in his name with you?
A. Yeah, he got a card in his name. But he didn't have to apply for it with a social security number or anything. So when he makes a payment, it goes because I'm the applicant. If he doesn't pay it, they coming after me.
Q. Did you hear about any problems that Douglas Shyne was having with UR Recovery?
A. Yes.
Q. In what context did you hear this?
A. The problem when he asked me for an invoices, when he said she wants the fake invoices sent to her before she release any further money.
Q. Who is the "she" that wanted the fake invoices?
A. He referred to the owner of UR Recovery.
Q. And he asked you to provide some fake invoices?
A. Yes.
Q. Did he tell you why the owner of UR Recovery wanted these fake invoices?

A. To cover herself, God forbid the checks come back, to show that she provided this service to whoever I would make up the fake invoices for.
Q. Was this the first time that you and Douglas Shyne had discussed invoices for UR Recovery?
A. No. A few days earlier he had mentioned to me that he would need these invoices for UR Recovery. And then later on he mentioned that she needs it because she's not going to send any additional funds.
Q. So to your understanding the checks had already been deposited and some of the funds were released but not all the funds?
A. Correct. And she's requesting the fake invoice to release the balance.
Q. I'd like to ask you to look at what's been marked for identification as Government Exhibit 402 and ask if you recognize that?

MS. PERRY: Your Honor, just to let you know, this will probably take a little while with this invoice. Should we go forward?

THE COURT: This is exhibit 402?

MS. PERRY: Yes, your Honor.

THE COURT: You can identify it.

Q. Can you identify Government Exhibit 402?
A. Yes.

Q. What is that?
A. This is an invoice I made up and give it to Douglas.
Q. Is this your handwriting on these two documents, that's Government Exhibit 402?
A. Yes, it is.
Q. When you prepared the fake invoices, I assume you prepared them -- let me -- withdrawn.
Government Exhibit 402 that's in front of you, is that an original document?
A. No. It's copies.
Q. But this is a copy of what you prepared?
A. Yes.
MS. PERRY: The government offers exhibit 402.
MR. STOLAR: Can I take a look?
THE COURT: Sure.
BY MR. STOLAR:
Q. On top of one of these copies there is some, what looks like pen language. Do you know what that is?
A. No.
Q. You didn't write that?
A. No.
MR. STOLAR: Judge, if we can get an agreement to block out the stuff that she doesn't recognize.
THE COURT: Sure.
MS. PERRY: Yes, your Honor.

(Witness excused)
MS. PERRY: Your Honor, the government calls Natasha Singh back to the stand.
THE COURT: Name.
MS. PERRY: Natasha Singh, who was on direct yesterday.
THE COURT: The lady who was here yesterday. I thought maybe you had some more out-of-turn witnesses.
Ms. Singh, you were sworn to tell the truth yesterday. That oath continues today. Sit down.
THE WITNESS: Yes, sir.
MS. PERRY: Your Honor may I hand up some exhibits that we're going to be showing Ms. Singh.
THE COURT: Sure.
(Continued on next page)



NATASHA SINGH, Resumed.

DIRECT EXAMINATION (Cont'd)

BY MS. PERRY:

Q. Ms. Singh, yesterday we were talking about some fake invoices that the owner of UR Recovery had requested of Mr. Shyne, and Government Exhibit 402 was admitted into evidence. Do you recognize Government Exhibit 402?

A. Yes, I do.

Q. And what is that?

A. This was the fake invoices that was made up, copies of it.

Q. And it contains your handwriting?

A. Yes.

MS. PERRY: Your Honor, we've redacted out the portion of 402 that was objected to. We would like to publish that to the jury.

THE COURT: Sure. Why not. You can.

Q. Ms. Singh, what's in front of you as Government Exhibit 402 is a copy of the original that you actually handwrote?

A. Yes. It's a copy.

Q. What did you do with the originals?

A. I gave them to Douglas.

Q. Did he tell you what he did with them?

A. Yes.

Q. What was that?

A. He Fedexed it to Virginia.

Q. Did he tell you where he was Fedexing the documents from?

A. From Manhattan.

Q. Is all the handwriting on this page, on the two pages of Government Exhibit 402, yours?

I'll direct you specifically, there are some signatures in the bottom left-hand corner of those pages. Are those your signatures?

A. No. Everything else except the signature is mine.

Q. You filled out the rest of the documents?

A. Yes.

Q. Did you leave the signature portions blank?

A. Yes.

Q. Do you know who filled those out?

A. No, I don't.

Q. The space at the bottom of the customer approval signature -- withdrawn. I'd like to go through Government Exhibit 402 with you. Can you read the top, first of all, under where it says Job Invoice --

A. Yes.

Q. Where did you get these two forms?

A. Douglas gave them to me.

Q. And they were blank when he gave them to you?

A. Yes.

Q. At the top, can you please read what that says in the top left-hand corner.

A. "First Funding Mortgage Company."



Q. Continue.
A. "Hillside Avenue, New York, and it was Winston Shillingford.
Q. What is that address and name supposed to signify?
A. The customer who they provided service to.
Q. Whom who has provided service to?
A. Who UR Recovery has provided service to.
Q. Who is Winston Shillingford?
A. It's just a name that I put in there. It has nothing to do with this, just a name I just put.
Q. You made that up?
A. Yes.
Q. How about the name "First Funding Mortgage Company"?
A. It's a company that is on Hillside Avenue that's called First Funding, but they had nothing do with this. I just, because I remembered the name, I just filled the name down there.
Q. And underneath that, there are some figures. It says "quantity, materials, and amounts." Can you please read that and tell the jury what that's supposed to -- meant to signify.
A. It says "20" and then it has "credit services, personal accounts, $67,400." That is -- I know it's silly, but at the time I did the best I could -- that is kind of like saying it's 20 people servicing their personal credit accounts, and it is $67,000.

Q. So this invoice was meant to signify that the company UR Recovery was providing credit services for 20 individuals?
A. Yes.
Q. At a cost of $67,400?
A. Yes.
Q. Did you have a discussion with Douglas Shyne or anybody about how much it cost for this type of credit services?
A. No.
Q. Did you just make that amount up?
A. Yes, because Douglas told me to, to make the invoice first checking the amount -- the total invoice for a certain amount. So I came up with the numbers to reflect that certain amount.
Q. What was that certain amount?
A. On the first invoice, it's $87,400.
Q. And was that number meant to correspond to a particular number?
A. Yes. This was for the amount of the check that was deposited.
Q. The amount of the counterfeit check, to your understanding, was for approximately that?
A. Yes.
Q. Did you see that counterfeit check for approximately $87,000?
A. No.
Q. Go on. You were reading after the "20 credit services for

personal accounts." What's underneath that?
A. "5 business service credit reports."
Q. For how much?
A. Looks like 20,000.
Q. And what does that mean?
A. Five business credit reports.
Q. And can you please explain what that is supposed to mean.
A. They provide services for businesses building credit report and it talks $25,000.
Q. If you look on the top right-hand corner, it says Date Ordered. What is the date on that?
A. 11/16/2004.
Q. And next to that, Order Taken By?
A. "Manager, Chris."
Q. Who is Chris?
A. Just a name I put in there.
Q. And then underneath that there's a phone number and a customer order number?
A. Yes.
Q. Can you read that, those numbers?
A. Customer order number 0915616. And the phone number is (804) 343-0033.
Q. Where did you get that phone number?
A. I got the phone numbers from Douglas.
Q. Do you know where he got that phone number?

A. The phone number 804, those numbers I got from Douglas. So other numbers that reflecting for the business, like in this case First Funding, I just put those numbers down.
Q. Starting Date, 11/16/04?
A. Yes.
Q. Then Terms, "six months"?
A. Yes.
Q. What was that supposed to mean?
A. In six months the credit reports are able to become completed.
Q. And underneath that it says Description of Work. Can you please read what that says.
A. "Help to clear credit report to obtain, to be able to get a mortgage."
Q. And underneath, under Miscellaneous Charges.
A. "Included in total price." "Total price."
Q. I'm sorry?
A. It says "included in total price."
Q. And underneath that?
A. "Total price."
Q. And what's the total price?
A. $87,400.
Q. And what's the total labor charges and also the grand total?
A. Yes.



Q. And then finally, there's an asterisk on the left-hand side, "Paid in full by check, company check"?
A. Yes.
Q. Did you have any discussion with Douglas Shyne about what -- about whether or not this invoice made any sense for the services it was supposed to reflect?
A. No. Actually, when I completed invoices and I gave it to him, he just took it, then went about his business, and I didn't ask because I, I really didn't know what I was doing. I had no clue how much credit offered and all that stuff, and I felt it was kind of silly. So I just did it for him not to be bothering with me once he had it.
Q. Would you turn to the second page. Who is the customer listed there?
A. Christopher Owens.
Q. CEO?
A. Yes.
Q. Is there a company name that you see?
A. H'm.
Q. There's just an address of Richmond, Virginia?
A. Yes.
Q. And zip code?
A. Yes.
Q. Where did you get that zip code?
A. Douglas.

Q. And again on the right-hand side next to that, it says Date Ordered, "11/27/04," taken by the manager?
A. Yes.
Q. The phone number on the customer order, are those the same numbers as on page 1 of Government Exhibit 402?
A. Correct.
Q. This was meant to be for a different company; is that correct?
A. Yes.
Q. Did you think about the fact that it was -- would be odd that there was the same customer number and phone number for a different company on the second invoice?
A. No. I didn't think anything about that.
Q. Did you give a lot of thought to these before you prepared them?
A. Um, not really, because I, I really didn't know much of what I was doing on this. If you look at it, it's really a silly, silly invoices comparing to the amounts and stuff like that. Like I said, I just really, basically wanted to get it over with, so to give it to him, to Douglas.
Q. Can you please read what's listed there under -- in the Materials section in the left-hand side.
A. It says "3, 3 businesses, supermarket, credit services with employees, total number, 95 people."
Q. What's the amount listed for them?



A. $15,000.
Q. So to your understanding, was that meant to reflect that UR Recovery was providing credit services for a supermarket with 95 employees?
A. Yes.
Q. And the total price for that would be $15,000?
A. Yes.
Q. Underneath that can you please read what that says.
A. "5 locations R&S Strauss. Credit services with managers and employees total 150, 150 clients."
Q. How much was that supposed to be?
A. 60,000.
Q. And what is R&S Strauss, if you know?
A. It's a company that does, um, car repairs.
Q. It's not a supermarket company.
A. No.
Q. So this would be for a different business?
A. This is right, yes.
Q. And UR Recovery, is this supposed to reflect that UR Recovery is providing credit services for 150 clients of R&S Strauss?
A. Correct.
Q. And then finally, underneath that, can you please read it.
A. "15 personal files for credit services. The owner of above companies, order total $160,000."

Q. And how much for the 15 personal files for the credit services for the owner of the two above companies?
A. 85,000.
Q. And the total for these three separate sections is 160,000?
A. Yes.
Q. And is that number, was that, to your understanding, meant to correspond to any -- to any particular number?
A. Yes. It's for an additional check for UR Recovery.
Q. That was a counterfeit check for $160,000?
A. Yes.
Q. Under Description of Work, can you please read that.
A. "Manager, C. Owens, date ordered 11/27/04, date completed 5/27/05."
Q. And was this supposed to -- it says at the top, "paid in full." Was this supposed to reflect that the company, or Christopher Owens, had paid in full ahead of time for future credit repair service?
A. Yes.
Q. And then at the top under Description of Work on the right-hand side, can you please just read that.
A. "Work taken by"?
Q. No. Under Description of Work on the right-hand side of the page.
A. Oh. "Repair credit reports, personal and business, help establish new credit for business and personal."



MR. STOLAR: And the last word?
Q. "For business and personal"?
A. Yes.
Q. And then just read what it says just down the page under Miscellaneous, "Charles."
A. Discounted and flat rates for commercial accounts," and then below Total Labor, 160,000.
Q. At the time that Douglas Shyne asked you to prepare these two false invoices, was it your understanding that the two counterfeit checks had already been deposited or were to be deposited? What was your understanding with respect to counterfeit checks?
A. It was my understanding that at least one was deposited already.
Q. Did Douglas tell you whether he had received any proceeds at this point that you prepared these invoices?
A. Yes.
Q. They had received some proceeds?
A. Yes. He said to me that he needs these invoices made out because she's requesting it before she release the balance of the money. She needs these fake invoices made up.
Q. You can put that aside, Ms. Singh.
On the subject of proceeds, do you know whether Toybe Bennett got any proceeds from the counterfeit checks that were deposited to these Virginia accounts you've been talking about?

A. Yes, he did.
Q. How do you know that?
A. Because this conversation occurred while we were at my house in Queens, when he said, my Virginia deal is going to come through soon, I'll take care of you. And when this conversation was over and Douglas got off the phone, he said that Toybe is very happy he got to go to Virginia account. That's when he told me the names.
Q. What was your understanding of Toybe Bennett's role in the deal involving the Virginia accounts?
A. He was a broker.
Q. Had he ever brokered deals before with bad checks?
A. All the time, yeah.
Q. Are you aware of whether Toybe Bennett ever had a bank account in a known name?
A. No, he never did. He, he just, the same reason like Douglas did, never take anything out in their names.
Q. And why is that?
A. Because they don't want anyone tracing it back to their names, to them.
Q. And by the way, yesterday you testified about a phone number Bennett used with a 347 prefix. Are you aware of whether he held that phone in his own name?
A. No. He doesn't have anything in his name. He didn't have the phone in his name.

Q. When Toybe Bennett would get proceeds from bad checks that he was involved in, how would he get his portion of the money?
A. He will get it through, through cash, or he will get a check, and he will then give friends or family or governments that check to deposit into their account.
Q. Would the check be made out to his own name?
A. Oh, no. That will be made out to whoever he -- to whoever agreed to have them in their name. Lots of times it's blank and they would put it in.
Q. Who would put it in?
A. It would be the person who's depositing the check for Douglas.
Q. And once that person he recruited would put in the proceeds for a bad check, how would Toybe go about getting his share of the proceeds?
A. Well, let's just say he would choose somebody to -- he find somebody to deposit the check. Then that person will in return give Toybe the cash, less whatever fee they agreed upon, whatever it was.
Q. The fee would be reflective of a commission they were owed for doing that service?
A. Yes.
Q. You spoke yesterday about a girlfriend of Toybe's named Ebony. Do you know Ebony's last name?
A. No.

Q. Do you know when Toybe Bennett started dating Ebony?
A. Around 2004, or later 2004.
Q. Towards the end of 2004?
A. Yes.
Q. Were you ever present for any discussions between Douglas Shyne and Toybe Bennett about any additional counterfeit checks during this same time period that we've been talking about, the end of 2004?
A. Yes, I was.
Q. Where was this conversation?
A. At home in New Jersey.
Q. At whose home?
A. My home in New Jersey.
Q. And what was the tone of the conversation?
A. Well, it started off angry, and then they calmed down and they came to an agreement.
Q. What was the conversation about?
A. Toybe was asking Douglas for an account of the check for his girlfriend, Ebony, to put into her account.
Q. You said the tone was angry. Was Douglas Shyne angry?
A. Yes, Douglas was angry. He said to Toybe, you know how I feel about this. You go, you get another girlfriend involved, and you know I don't like this, I don't like to be personal with your people. Toybe said to him that, don't worry, she's not going to say anything.



Q. Had Douglas Shyne ever met Ebony?
A. Yes.
Q. Do you know whether he had met her a number of times?
A. Yes, because Toybe was staying with Ebony and he's gone several times to pick Toybe up or pick him up in the city, and Ebony sometimes was with Toybe.
Q. Did Douglas say anything about why he was angry about Toybe getting Ebony involved in the counterfeit job?
A. Yes. He doesn't like anyone --
MR. JACOBS: Objection.
THE COURT: Sustained.
MR. JACOBS: What she's --
THE COURT: Sustained.
MS. PERRY: Your Honor, I'm asking specifically about what Douglas Shyne told her, said in this conversation, about why --
THE COURT: It's not even asked. Go ahead.
MS. PERRY: OK. I will rephrase.
Q. Did Douglas say why it was that he was angry about Toybe's getting Ebony involved in this counterfeit check?
A. Yes. He -- because he does not, he said he does not like anybody that he doesn't trust to get personal with him. It's a difference when he got my family involved or his family involved. He had a personal relationship with them. But Toybe's girlfriend he doesn't. And he -- it's a level of

trust.
Q. How did Toybe respond when Douglas expressed anger about his getting Ebony involved in the counterfeit check?
A. He tried to calm Douglas down and said, no, she's not going to say anything.
Q. Was there a resolution to this dispute?
A. Yeah. After that, he asked Toybe about the type of account, like what bank, how much.
Q. What type of -- whose account?
A. Ebony's account, what kind of bank she has activities in there, how long she's had it, things like that.
Q. And what did Toybe respond about that?
A. Toybe, I don't remember the name of the bank, but Toybe said to Douglas that she hadn't had it that long and not much money going in there but he just put some money in there.
Q. And why was Douglas asking these questions about the level -- did he say, when she was asking these questions --
THE COURT: Sustained.
MS. PERRY: I'm trying to rephrase it. I understand the objection.
Q. Did Douglas say at that time why he was asking the questions --
MR. JACOBS: Objection, leading.
THE COURT: It sure is.
Q. Did Douglas say anything -- withdrawn.

Did Toybe and Douglas discuss a specific amount for this counterfeit check that they were discussing?
A. Yes. Douglas said to Toybe that it would have to be for something small, under 50,000, because her account is not that strong.
Q. Did he say what he meant by "not that strong"?
A. Yes. Because she had -- she hadn't had it that long and she does not have that much activity in and out of it.
Q. Did you ever learn that a counterfeit check in fact was deposited into Ebony's bank account?
A. Yes.
Q. What did you learn and how did you learn it?
A. A conversation from Douglas. He was on the phone with Toybe. He got off the phone. He was angry. And he said, with an angry voice, that -- first, she agreed to deposit the check and now because there's a hold on it she's all scared about it. And, you know, he was very upset.
Q. Did he say what he meant by "hold on the account"?
A. No. He didn't say what he meant. But it was an account issue.
THE COURT: Don't go any further. He didn't say it. That's the answer to the question.
Q. Did you have any discussions with anybody else about this same issue?
MR. STOLAR: Judge, could we fix some dates on some of

these discussions.
THE COURT: I'm going to try eventually.
Q. Well, the conversation, just to try to establish a time frame, the conversation you had with -- or that you were present between Douglas and Toybe about the counterfeit check in Ebony's account, do you know when that conversation occurred?
A. It was around October. It was around late October.
Q. Of what year?
A. 2004.
Q. How do you recall specifically what the time frame was?
A. Because when they finished talking and they were in an OK mood, Toybe said to Douglas that, you know, I would like to bring her over for Thanksgiving, bring Ebony over for Thanksgiving.
Q. So this was at some point before Thanksgiving 2004?
A. Yes.
Q. Do you know specifically if it was October?
A. No. But I'm thinking of late October, early November, not too far apart.
Q. And the second conversation with Douglas Shyne that you heard that the account, that there was a problem with the account, do you know when that was relative to that earlier conversation?
A. About two or three weeks or so, after that.



Q. Do you know specifically?
A. No. I don't remember. It was around that area.
Q. OK.
THE COURT: OK. We'll take a break now, ladies and gentlemen, and pick up after the break, all right? Ten minutes.
(Recess)
(In open court; jury present)
THE COURT: All right. We're back on trial. Go ahead, Ms. Perry.
MS. PERRY: Thank you, your Honor.
BY MS. PERRY:
Q. Ms. Singh, we were speaking before the break about a conversation you had with Douglas Shyne about a counterfeit check deposited into Ebony's account. Did you have any discussions with anybody else about this counterfeit check?
A. Toybe.
Q. What was the discussion you had with Toybe about this check?
MR. JACOBS: Could we fix a time, please, your Honor?
THE COURT: We can, sure. What time was this?
A. This was around the same time Douglas had that conversation with Toybe, a few days after. Douglas -- Toybe and I was talking and he said, Ebony is scared to go into the bank because they have put a hold on her account and she's scared.

Q. Did you have an understanding as to what that meant, "a hold on her account"?
A. Yes. They were not -- they freeze the account, not allow any transactions.
Q. Did he tell you why they had frozen her account?
A. No, he didn't tell me why because it was obvious.
MR. JACOBS: Objection, didn't tell her why.
THE COURT: Yes. Take "because" out, ladies and gentlemen. It's got no business here.
All right. Next question.
Q. Did he tell you why she was afraid to go into the bank?
A. No. Just she was scared.
Q. Just to make sure I understand the timing, the conversation you had with Toybe that you just described was shortly after you had the conversation with Douglas about the hold on the account?
MR. JACOBS: Objection, leading.
THE COURT: Yes.
MS. PERRY: I thought that's what she just said.
THE COURT: Well, then let it stand. Don't restate it for her.
Q. What was the conversation you had with Toybe about Ebony being scared to go to the bank?
A. It was shortly after the conversation with Douglas, a day or two after.

Q. Which conversation was that?
A. Saying when Douglas got off the phone upset saying that she agreed to deposit the check and now she's scared.
Q. Did you ever meet Ebony?
A. Yes. Once.
Q. Would you recognize her again if you saw her?
A. Yes.
Q. Do you see her in the courtroom?
A. Yes.
Q. Where is she?
A. She is on my right in the back with the white shirt.

MS. PERRY: Indicating -- your Honor, will the record reflect that she's indicating who she's indicating.

THE COURT: Yes. That is Ebony. Is that correct?

THE WITNESS: Yes, your Honor.

THE COURT: All right.

Q. When do you recognize -- I'm sorry. When did you meet Ebony?
A. In the fall in 2004.
Q. And where did you meet her?
A. In Manhattan around the 34th Street mall.
Q. Were you accompanied by anybody else?
A. Yes, myself, Douglas.
Q. And was she accompanied by anybody?
A. She and Toybe.

Q. What happened when you met her?
A. We, we were pulling into a side street by the mall area and Toybe and her walk across to the car. And Toybe introduced us, me and Ebony, and said, this is my girlfriend, Ebony, you know, I have been talking to you about her all the time. And then, you know, I said hi, all that again. And then Douglas stepped out of the car and was talking to Ebony and Toybe outside of the car.
Q. And you stayed in the car?
A. Yes.
Q. By the way, did she come to your home for Thanksgiving?
A. No, she didn't.
Q. We were talking yesterday about Moonlight Productions. Were you aware of whether any counterfeit checks were deposited into any bank accounts associated with Moonlight Productions?
A. Yes.
Q. Are you aware of what the amounts were?
A. No, I don't know.
Q. How did you become aware that counterfeit checks were deposited into Moonlight Productions' account?
A. Because I heard Douglas supposed to go in the house, somebody not agreeing to their original agreement.
Q. Can you say specifically what somebody wasn't agreeing to do?
A. That the husband just suddenly stepped in and now he wants



to demand more than what they agreed upon.
Q. Did you ever see the counterfeit checks that were deposited in the Moonlight Productions account?
A. No.
Q. Yesterday you testified about a friend of Douglas's named Frank Rodriguez?
A. Yes.
Q. Are you aware of any specific counterfeit checks that Frank Rodriguez deposited into accounts?
A. Yes.
Q. What were you aware of specifically?
A. He deposited, I think the amount was $85,000, into his Wachovia account in Philadelphia.
Q. How do you know that?
A. I was there. There was a discussion with Frank and Douglas.
Q. Did you and Douglas get any proceeds from that counterfeit check?
A. Yes, we did.
Q. I would like to ask you to turn to Government Exhibit 202, which is in front of you. Is Government Exhibit 220 --
MS. PERRY: The government offers this exhibit. It's a stipulation.
MR. STOLAR: Let me see what it is first.
OK.

MS. PERRY: No objection?
MR. STOLAR: No.
Q. Do you recognize what this check is?
A. Yes, I do.
Q. What is it?
A. This is the check received from Frank Rodriguez's bank account to my brother for $4,000.
Q. And your brother's Ephraim Richardson?
A. Yes.
Q. Do you recognize any of the handwriting on that check?
A. Yes.
Q. Whose handwriting?
A. Both their handwriting. We were testing basically if that's my brother's handwriting. And the amount line is Douglas, along with the $4,000 and the date as well.
Q. And the amount on the back that says "Ephraim Richardson," do you recognize that handwriting?
A. Yes, that's my brother.
Q. And do you recognize what this $4,000 check represents?
A. Yes. This is proceeds from the check that Frank deposited into his account.
Q. What did your brother do, if you know, with this $4,000 check?
A. Give it to Douglas.
Q. The entirety?

A. No. He -- less whatever amount he and Douglas agreed upon.
Q. What was the purpose for his getting a share of the proceeds, your brother getting a share of the proceeds?
A. For taking the risk of depositing the check.
Q. Was your brother also knowingly involved in other similar transactions where he had proceeds of checks?
A. Yes.
Q. Turning to Government Exhibit 203 and 204, do you recognize those two exhibits?
A. Yes, I do.
Q. What are they?
A. They're two checks issued to my name, from Frank's account.
MS. PERRY: The government also offers Exhibits 203 and 204 pursuant to a stipulation.
MR. STOLAR: No objection.
MR. JACOBS: No objection.
THE COURT: They are received.
(Government's Exhibits 203 and 204 received in evidence)
MR. STOLAR: No objection, just to be assured that they are photocopies of checks.
Q. These are photocopies of checks?
A. I'm sorry. Yes, it is.
Q. And what do 203 and 204, what do those exhibits represent?
A. Checks from the proceeds of the money that Frank deposited

into his account.
Q. Turning to Government Exhibit 205, do you recognize what that is?
A. Yes, I do.
Q. What is it?
A. This is a copy of a check that Douglas issued to pay the landlord in Queens for a studio apartment he was renting.
MS. PERRY: I will also offer Government Exhibit 205, according to the stipulation.
MR. STOLAR: Yes. That's no problem.
THE COURT: OK. 205 is received.
(Government's Exhibit 205 received in evidence)
Q. Who is Hanif Plummer?
A. That's the landlord for the place that Douglas was renting. He was renting a studio in that house.
Q. Was Douglas Shyne living in that studio?
A. No. He spent some time there, but basically that was more for his probation, because he was on probation in New York.
Q. Why did he have to keep a studio apartment in New York?
A. I think he was required to have an address in New York, by Probation.
Q. Where was he living at this time, in February of 2005?
A. With me in New Jersey.
Q. And do you recognize any of the handwriting on this check?
A. Where it had the amount, that's his handwriting, the date.

Q. How about -- OK. And it says on the bottom line "Natasha Singh, rent," several months. Do you recognize that handwriting?
A. No.
Q. Was that studio apartment rented in your name?
A. Yes.
Q. Are you aware of whether Frank or Francisco Rodriguez was involved in any other checks with Douglas Shyne?
A. Yes. There was a refund check sent to his wife, and Douglas and Frank remade the check for a larger amount and give his wife cash in place of the check that they altered.
Q. Who was Frank Rodriguez's wife?
A. Tracey, Tracey Livingston.
Q. Was Frank involved in additional other activity with, fraudulent activity with Douglas?
A. Yes, a lot.
Q. I'd like to ask you to turn to Government Exhibit 303, which is in front of you.
MS. PERRY: The government offers 303 pursuant to stipulation.
MR. STOLAR: No objection.
THE COURT: OK.
(Government's Exhibit 303 received in evidence)
Q. Do you recognize any of the handwriting on these checks?
A. Yes.

Q. Whose handwriting is that?
A. Douglas.
Q. And the payee is Christine Richardson. Who is that?
A. That's my mother.
Q. Are you aware of a check written to her for $49,000?
A. No. There were a lot of checks I don't remember the amounts and all that stuff, but I know there was a lot of checks written to her.
Q. Turning to Government Exhibit 304.
MS. PERRY: The government also offers Government Exhibit 304, pursuant to stipulation.
MR. STOLAR: No objection.
THE COURT: Admitted.
(Government's Exhibit 304 received in evidence)
Q. Do you recognize the handwriting on that check?
A. Yes, I do.
Q. Whose is it?
A. It's Douglas's.
Q. Do you recognize the name Ada Margoshes?
A. No.
Q. Or Romell Cook, do you recognize who that is?
A. No.
MS. PERRY: Turn to Government Exhibit 306, which the government also offers pursuant to stipulation.
MR. STOLAR: No objection.



THE COURT: 306.

MS. PERRY: Yes, your Honor.

THE COURT: All right. Admitted.

(Government's Exhibit 306 received in evidence)

Q. Do you recognize the street address 806 West Somerset Street in Philadelphia?

A. Yes, I do.

Q. What is that address?

A. That's Frank Rodriguez's mother's address.

Q. How do you recognize that address?

A. Because I know Douglas and they receive a lot of mails there and I see the address all time and Frank and Douglas talk about it because it's the mother's address. They discuss that in my presence.

Q. Do they discuss a kind of mail they receive at that address?

A. I know they order things by phone and all that kind of fraudulent stuff they receive at that address.

Q. Why do they receive it at that address?

A. So they wouldn't be traceable back to Frank or Douglas.

Q. If you could turn to page 1256 of that same exhibit.

Do you recognize the handwriting on that slip?

A. Yes, I do.

Q. What is that?

A. It's Douglas'.

Q. I want to ask you a quick follow-up question on the thick invoices that you gave to Douglas Shyne for UR Recovery. Did you prepare those at the same time or different times?

A. They were both prepared at the same time.

Q. Ms. Singh, you were talking yesterday about the home that you owned in New Jersey. How did you buy that home, with what funds?

A. With the money I sold -- I received from selling my house in Queens. I had a two-family house in Queens before I met Douglas.

Q. Was there anything fraudulent about that payment?

A. No. I owned that house my own; purchased it two, three years, way before I met Douglas.

Q. When you bought the home in New Jersey, under whose name did you buy the home?

A. Under my name.

Q. Was Douglas Shyne on any of the contract documents?

A. Initially when we went down to look at the house, Douglas filled out some paperwork with an identity that he had. I think it was Daniel Martinez, he filled out some contract paperwork.

Q. Did you take out a mortgage on the home?

A. Yes.

Q. Did you submit any fraudulent paperwork in connection with applying for that mortgage?



A. Yes, I did.
Q. What was that?
A. Tax paperwork, showing my income was more than what it was.
Q. And did you prepare those fraudulent tax returns?
A. No. Douglas prepared because he had some prior tax experience. He used to do taxes.
Q. But did you knowingly submit those to the mortgage company?
A. Yes.
Q. You testified about several identities that Douglas used. Do you know where he acquired those identities?
A. Well, two I stole from my previous job at Allstate; and the rest, I don't know where he got them from. He had several contacts.
Q. And the two that you stole from your job, did you know what those identities were used for?
A. One, I use -- one Douglas opened an account online and I used it, credit card; and another one he -- the second one he opened a bank account to deposit proceeds from fraudulent checks.
Q. When were you arrested -- withdrawn.
You testified yesterday you were arrested in August of 2005?
A. Yes, I was.
Q. What were you arrested for?
A. For the fraud activities with Douglas.

Q. Were others arrested at the same time?
A. I'm sorry?
Q. Were others arrested at the same time?
A. Yes, my mother and Douglas.
Q. Did there come a time not long after you were arrested when you and your attorney asked for a meeting with the government?
A. Yes.
Q. And at that meeting did you tell the government about the full extent of your involvement in the fraud you were charged with?
A. No. I lied to the government, said I didn't know anything about Douglas knowing anything about the check.
Q. And that was not true?
A. That was totally not true.
Q. Did you ever help your mother apply for Medicaid?
A. Yes, I did.
Q. Did you include -- did you make any false statements on the Medicaid application?
A. Yes, my mom was living with me originally.
MR. JACOBS: Objection. Calls for a yes-or-no answer.
THE COURT: Yes. You made false statements. Okay. Next question.
THE WITNESS: Yes, I did.
Q. What were the false statements that you made?
A. I said that she was living with me and she wasn't living



with me at the time.
Q. What was the purpose for making that false statement?
A. So she would get Medicaid to keep, for her to stay alive. She's very ill.
Q. At some point were you released on bail in this case, in your case?
A. Yes, I was.
Q. Were you ever accused of violating the conditions of bail?
A. Yes, I was.
Q. What did you do?
A. The day after I was sent home in a bracelet, I went to the supermarket to buy food for my babies and the probation officer did not want me to do that, but after being away in prison for three months I did that, and I told the probation officer I went to the pharmacy, thinking that was an emergency, and I got in trouble for it.
Q. Was there another time when you knowingly violated the conditions of your bail?
A. Yes, shortly after that I worked. I had cashing my paycheck to buy grocery and pay my car loan, and he did not want me to do that. I went ahead and I went and I lied to him.
Q. So you lied to the probation officer?
A. Yes, I did.
Q. Was Douglas Shyne ever released on bail?
A. No. He's still in prison.

Q. At some point did you become aware that Douglas was trying to do something from jail involving additional checks?
A. Yes, I was.
Q. How did you become aware of that?
A. Because he was telling me on the phone. He sent me letters that he needed a telephone number to get it for him. It was a sense of urgency to get it for him. And when I was brought back into court to have my, for the complaint from the probation officer, then I was told that I'm facing revoke of my bail because there was new charges against me.
Q. At the time that he was writing a letter and talking to you on phone, what was your understanding of what he was trying to do from jail?
A. He was trying to help the government, he was trying to set someone up to get benefits from the government.
Q. He was trying to cooperate with the government?
A. Yes.
Q. At some point did you gain a different understanding as to what he was actually trying to do?
A. Yes, the day I was in court.
Q. What did you learn?
A. He was trying to do another scheme, another check scheme.
Q. Prior to August of 2005, had you ever been arrested?
A. Yes, I was.
Q. When was that?



A. It was December of 2004.
Q. What were you arrested for?
A. For fraudulent check deposited into my account.
Q. Who had deposited that check?
A. Douglas.
Q. How do you know that?
A. Because we discussed it. He told me.
Q. Did he tell you at the time he deposited it?
A. No. He told me he was going to deposit it. He didn't tell me I'm doing it now.
Q. Did he tell you -- when was this that he deposited that check?
A. Around October of 2004.
Q. And into what bank account did he deposit this check?
A. Into a business account that had -- that I opened up.
Q. What bank?
A. Bank of America.
Q. Did you and he get proceeds from this counterfeit check deposited into the business account?
A. Yes.
Q. After were you arrested in connection with that counterfeit check, what happened with your court case?
A. It was dismissed.
Q. Were there any documents that were submitted in an effort to get the case dismissed?

A. Yes, it was, a fake invoice was submitted.
Q. Who did you submit that fake invoice to?
A. To my attorney at the time.
Q. And you submitted to your attorney knowing that he would give it to the police or to the court?
A. Yes.
Q. Based on that fraudulent invoice, the case was actually dismissed?
A. Yes.
Q. I'd like to ask you to turn to Government Exhibit 1311, which is right in front of you.
Do you recognize Government Exhibit 1311?
A. Yes, I do.
Q. What is that?
A. This is a copy of the fake invoice that was submitted to my attorney at the time.
Q. Whose handwriting appears on Government Exhibit 1311?
A. Douglas'.
Q. Does your handwriting appear at all on the document?
A. Yes, at the bottom where it says work ordered by, and my signature.
MS. PERRY: Government offers exhibit 1311.
MR. STOLAR: No objection.
MR. JACOBS: No objection.
THE COURT: Mark it in.



(Government's Exhibit 1311 received in evidence)

Q. Did you and Douglas prepare this invoice together?

A. I knew that Douglas was preparing it because when he told me about the check he was depositing into the account, he said, if you ever got caught, you're a victim, meaning that I sold coffee to Krief Medical and they give me a bad check.

Q. So that was the excuse that you and he had made up at the time that the check was deposited?

A. Yes.

Q. And after it was deposited and you were caught, you actually submitted a fake invoice in an effort to get out of the charges?

A. Yes.

Q. Who is this invoice -- I'm sorry, the business that the check was deposited into at Bank of America, was that the Douglas coffee account?

A. Yes, it was.

Q. So who does this invoice purport to be from?

A. It's showing that it's coming from us, Douglas and I, the business, and we sold these items listed to Krief Medical.

Q. And it lists a whole number of materials that supposedly are sold to Krief Medical?

A. Correct.

Q. And it adds up to what amount?

A. A hundred and -- I can't see the grand total at the bottom

but at the top it says 146.

Q. And then there's some tax at the bottom?

A. Yes, about twelve thousand and change. And the total amount I can't see at the bottom.

Q. That would be whatever 146,000 and 12,000 is?

A. Yes.

Q. And where is the original of this job invoice?

A. It was given to my attorney at the time.

Q. Is there a number listed on the top right-hand corner for job phone? Do you recognize that number (212)886-4519?

A. No. I don't recognize the number.

Q. Is that a number that Douglas put on there?

A. That's a number that he put on there.

Q. When was this invoice prepared?

A. It was prepared after I was arrested.

Q. When were you arrested?

A. I was arrested December of 2004.

Q. Was it prepared shortly after that or sometime after?

A. Yeah, shortly after that.

Q. What happened to your Bank of America account after the counterfeit check was deposited there in August of 2000 -- I'm sorry, in October of 2004?

A. It was close shortly after that.

Q. Did you have any other Bank of America accounts?

A. No.

Q. Did any business associated with you or Douglas Shyne have any other Bank of America accounts?
A. No.
Q. Did Douglas Shyne have any Bank of America accounts?
A. Douglas doesn't have any accounts.
Q. In connection with the case that you were arrested for, did you plead guilty to any charges?
A. Yes.
Q. What did you plead guilty to?
A. To money laundering, bank fraud, immigration. A number of charges. I can't remember them all at the moment.
Q. What did you plead guilty with, you said an immigration charge?
A. Well, when I filed for my citizenship there was a question on there that, was I committing any kind of crime, and I said no. And I was committing crime at the time that that was.
Q. Where are you from originally, by the way?
A. Guyana.
Q. Were you naturalized as an American citizen?
A. Yes.
Q. Did you file tax returns for 2004?
A. Yes, I did.
Q. Did you list all the illegal proceeds you had made for that year?
A. No, I did not.

Q. In connection with your guilty plea in your case, did you agree to forfeit any asset to the government?
A. Yes, I did.
Q. What did you forfeit?
A. Everything I worked for and everything that I got from fraudulent proceeds.
Q. Do you have any assets remaining?
A. Just myself and my kids.
Q. Do you still live in your house in New Jersey?
A. No, I don't.
Q. Was your guilty plea in your case pursuant to a cooperation agreement with the government?
A. Yes.
Q. Are you testifying today pursuant to that cooperation agreement?
A. No.
MR. STOLAR: I'm sorry?
Q. What's your understanding of what you had to do under the agreement, your cooperation agreement?
A. Tell the truth.
Q. And what's your understanding of what the government was required to do under the agreement?
A. Give a letter to the judge.
Q. A letter to the judge saying what?
A. Saying if I -- if they found me being truthful or not.



Q. And what's your understanding of what would happen if you were not to tell the truth, you were to not tell the truth?
A. The government will then rip the letter up, the agreement letter.
Q. Is it your understanding that you are required to tell the truth in all matters for the government?
MR. JACOBS: Objection, leading.
THE WITNESS: Yes.
THE COURT: Sure is.
Q. You're not testifying today, it's your understanding, pursuant to your cooperation agreement?
A. No.
Q. Why are you testifying today?
A. Because the government knows that I -- have knowledge of some information of this case and I have to tell the truth.
Q. Has the government made any promises to you about what sentence you might receive if they choose to write a letter to your sentencing judge?
A. No.
Q. Who decides what sentence you receive?
A. The judge.
THE COURT: This judge is not me, right?
THE WITNESS: No, sir.
MS. PERRY: Your Honor, may I just have one moment?
THE COURT: Sure.

(Pause)
Q. Redirecting your attention to Government Exhibit 1311, the fake invoices submitted to get out of your court case in New Jersey, there's a name listed on that invoice, Cecil Pena?
A. Yes.
Q. What name is that?
A. That's a name that Toybe used, an identity that Toybe uses.
Q. Did he also use several identities just like Douglas Shyne did?
A. Yes, he did.
Q. Did you submit any documentation to your attorney with the name Cecil Pena on it?
A. Yes, this fake invoice and a copy of the driver's license that Toybe was using with that fake name.
Q. And the signature at the bottom, it says authorized signature. Whose signature is that?
A. I don't know. I signed below that, my name.
Q. Was this customer approval signature, it says Cecil Pena, whose signatures is that?
A. I'm not sure.
Q. And underneath that, authorized signature?
A. That's mine.
MS. PERRY: Thank you. I have no further questions, your Honor.
THE COURT: We'll start tomorrow morning. All right.



(Trial resumed; jury present)

THE COURT: Okay, ladies and gentlemen. We are ready to start cross-examination.

MR. JACOBS: Your Honor, with your permission, I would start first.

THE COURT: All right, fine.

MR. JACOBS: Thank you.

NATASHA SINGH, resumed.

CROSS EXAMINATION

BY MR. JACOBS:

Q. Good morning, Ms. Singh.
A. Good morning, sir.
Q. Ms. Singh, I represent Ebony Worthy. My name is Howard Jacobs.

Ms. Singh, you testified you met Douglas Shyne in late 2001, is that right?
A. Summer of 2001.
Q. Until you met Douglas Shyne, were you an honest person?
A. Yes.
Q. You didn't lie to people?
A. I have lied, but I have never committed crime.
Q. How about your family -- your mother, your father, your brother -- they hadn't committed crimes until they met Douglas Shyne, had they?
A. Correct.

Q. So Douglas Shyne got all of you involved in criminal activity.
A. Correct.
Q. How long did you date Douglas Shyne before he went to prison in late 2001 or early 2002?
A. I dated him for about two months before he went to prison.
Q. Were you living together?
A. At that time, no.
Q. Did you visit him in prison?
A. Once, yes.
Q. Where was he in prison?
A. In Philadelphia.
Q. Did you speak to him on the phone while he was in prison?
A. A few times, yes.
Q. And when did he get out about?
A. Towards the end of 2002.
Q. And you started dating him again then?
A. I started dating him in 2003.
Q. How early in 2003?
A. January, February.
Q. Where were you living then?
A. In Queens.
Q. Where was he living?
A. I was told he was living in Westchester.
Q. Did there come a time when you began living together with



him?
A. Yes.
Q. When was that?
A. In 2003, after I became pregnant with our first child.
Q. Well, what month in 2003?
A. Around May, early? I don't remember.
Q. Now, at the time that you started living with Douglas Shyne, you had children at that time?
A. Yes.
Q. How many?
A. One.
Q. And you became pregnant from Douglas Shyne?
A. Yes.
Q. When was that?
A. In 2003.
Q. And when did you have your child?
A. March of 2004.
Q. During this period of time when you were with Douglas Shyne, did he propose marriage to you?
A. We were engaged, yes, while I was pregnant.
Q. Did you ever get married?
A. No, we did not.
Q. Would you say he deceived you about that?
A. I would say he deceived me about a lot of things.
Q. He was a very good liar, wasn't he?

A. Yes.
Q. He deceived a lot of people.
A. Yes.
Q. Now, when you started living with Douglas Shyne, were you working?
A. Yes, I was.
Q. What kind of work?
A. I was an insurance agent.
Q. The same insurance place that you worked in 2001?
A. The same company, but different office.
Q. And how long did you continue working there?
A. Just about two months before I gave birth.
Q. And when did you give birth?
A. I gave birth in March, and I stopped working at Allstate I think December of 2003.
Q. And from the time -- when did Douglas Shyne begin to support you?
A. When we moved to Jersey.
Q. When was that?
A. In 2004.
Q. Now, you owned the home in Queens?
A. Yes, I did.
Q. And how long did you own that.
A. Several years before Douglas.
Q. Now, while you lived with Douglas Shyne, from the period of

2003 until you were arrested in I believe August of 2005, is it fair to say that you and he defrauded people out of somewhere between 3 and $5 million?
A. Yes.
Q. And the money was spent in a lavish style.
A. Yes.
Q. You bought -- you and he bought or leased very expensive cars.
A. Yes, it was in my name. Everything was all in my name.
Q. You had a Maserati and a Ferrari?
A. Yes.
Q. And you bought jewelry?
A. Yes.
Q. Clothing.
A. Yes.
Q. And you took care of your children well that way.
A. Yes.
Q. And this home that you bought in New Jersey, how much did that cost?
A. It was about $300,000.
Q. Speak up, please.
A. It was about $300,000.
Q. 300,000. How much did you put into it?
A. I put $50,000 down at closing.
Q. So you had a $250,000 mortgage?

A. Yes.
Q. And the mortgage payments came from the money that you made illegally.
A. Yes.
Q. And it's fair to say that during this period of time, you and Douglas Shyne lied to numerous people.
A. Yes.
Q. And you continued lying until when?
A. Until I entered an agreement with the government.
Q. And that was in 2006.
A. Yes.
Q. Well, let's go back to your arrest in Pennsylvania. That was in December of 2004?
A. Yes, sir.
Q. And you hired a lawyer then.
A. Yes, sir.
Q. And you lied to the lawyer.
A. Yes, sir.
Q. You deceived the lawyer.
A. Yes, sir.
Q. And when you gave the lawyer this fraudulent document, you knew he was going to file it in court.
A. Yes, sir.
Q. And he was going to show it to the prosecutor.
A. Correct.



Q. So you were lying to the court and lying to the prosecutor.
A. Correct.
Q. And you didn't care about that, did you?
A. At the time I was just concerned about getting off.
Q. At the time you were what?
A. Concerned about getting off the charges.
Q. When you were arrested in Pennsylvania, did you spend any time in jail?
A. Just up until the time bail was posted.
Q. When were you arrested?
A. I don't remember the exact date, but I spent a few hours in jail.
Q. How many days were you in jail?
A. Not more than a night. I think I was arrested --
Q. Did you post bail?
A. Yes.
Q. And were the charges dismissed based upon your lies?
A. Yes, sir.
Q. And you thought that when you were arrested by the federal government, you would do the same thing, is that right?
A. Yes.
Q. You lied to the federal government; you would do it again, and you would get off again, is that right?
A. No.
Q. Well, didn't you go in and talk to the prosecutors several

times and lie to them?
A. Yes, I did.
Q. This lady that's sitting at the table here, wasn't she the lady you lied to?
A. Yes, I did.
Q. But you didn't get away with it.
A. Correct.
Q. She saw right through you.
A. Correct.
Q. You became a very good liar, is that right?
A. Yes.
Q. Douglas teach you how to lie?
A. Not per se, this is how you are going to tell a lie, no, but I did adopt a lot of his patterns being around him.
Q. You didn't know the difference between the truth and lying, did you?
A. I did.
Q. You lied so many times that you really didn't know the difference, did you?
A. I do.
Q. Douglas got your mother involved in his scheme.
A. Yes, he did.
Q. He had her deposit fraudulent checks in her bank account.
A. Yes, he did.
Q. And she made money that way.



A. Yes.
Q. And she was arrested.
A. Yes, she was.
Q. And has she pled guilty?
A. Yes, she did.
Q. Has she been sentenced?
A. Yes.
Q. Do you know what sentence she got?
MS. PERRY: Objection.
THE COURT: No. I will permit it. Go ahead. Answer. Do you know what sentence she got?
THE WITNESS: No, I don't.
BY MR. JACOBS:
Q. How long ago was she sentenced?
A. About a year ago.
Q. Did she spend any time in prison?
A. Yes, she did.
Q. Is she out of prison now?
A. Yes, she is.
Q. How about your father? Did he get any checks?
A. No, he did not.
Q. Did he do any criminal activity with Douglas?
A. No.
Q. How about your brother? Did he?
A. Yes, he did.

Q. What did he do?
A. He deposited checks for Douglas as well.
Q. And was he arrested?
A. Yes, he was.
Q. Was he prosecuted?
A. Yes, he was.
Q. He pled guilty?
A. Yes, he did.
Q. Did he spend any time in prison?
A. Yes.
Q. Did you approve of the activities of your parents -- of your mother and your brother getting involved with Douglas?
A. I didn't stop it.
Q. You didn't tell them that you shouldn't do this.
A. I told them it's up to them, it's their call.
Q. Now, Douglas had a good friend, Toybe Bennett, is that correct?
A. Correct.
Q. When did you first meet Toybe Bennett?
A. In 2003.
Q. About the same time you started dating Douglas again?
A. Yeah, a little after. I was pregnant when I met him.
Q. And Toybe Bennett had spent time in prison with Douglas?
A. Yes, that's what I was told.
Q. By whom?



A. Douglas.
Q. Was Toybe as good a lawyer as Douglas?
A. I would say so.
Q. He lied to many people?
A. Yes.
Q. Did he lie to you?
A. Yes.
Q. And you lied to him?
A. Yes.
Q. He lied to Douglas?
A. I don't know. I just know they had a good relationship. As far as their lying to each other, I don't know.
Q. Did they cheat each other?
A. Yes.
Q. Douglas cheated Toybe; Toybe cheated Douglas.
A. Yes.
Q. And they were very good friends with each other, weren't they?
A. Yes.
Q. When you were arrested, did they search your house?
A. Yes.
Q. This is in August of 2005.
A. Yes, sir.
Q. They found $37,000 in cash?
A. Yes, sir.

Q. And they found $50,000 in jewelry.
A. I was made to understand it was $50,000 in jewelry, appliances, combination of things.
Q. Whose jewelry was it?
A. Myself and Douglas.
Q. Did you and Douglas go out a lot to nice places?
A. Like average people we would go out.
Q. What did you say? Average people?
A. Yes.
Q. Did you consider you and Douglas average people?
A. Yes.
Q. You were criminals, weren't you?
A. Yes.
Q. Is the average person a criminal?
A. No.
Q. You were stealing from people and living the high life, is that right?
A. Yes.
Q. And that's an average person?
A. No, it's not.
Q. What did you steal from your job that you gave to Douglas?
A. Two identities.
Q. And when -- that was in 2003?
A. Yes.
Q. And these were people that you had met on your job?



A. No.
Q. Did you know these people that you stole their identities?
A. One I met; one I didn't know.
Q. And you knew that Douglas was going to use these ID's to defraud these people, is that right?
A. Yes.
Q. But you didn't care.
A. Correct.
Q. Did you care what would happen to your children if you got caught?
A. I didn't think of it that far.
Q. And, in fact, in August of 2005, you went to jail, isn't that right?
A. Correct.
Q. How long did you stay in jail?
A. Three months.
Q. And you were desperate, weren't you?
A. Yes, I was.
Q. Who took care of your children while you were in jail?
A. My 18-year-old brother in Miami.
Q. How long were you in jail?
A. Three months.
Q. At the MCC or the MDC?
A. MCC.
Q. That's here in Manhattan, right next to this courthouse.

A. Yes.
Q. Not a nice place, is it?
A. No.
Q. Not nice people in there, are there?
A. No.
Q. A lot of criminals.
A. Correct.
Q. And you were desperate to get out of jail, isn't that right?
A. Yes.
Q. So you met with the prosecutor and you lied to her in an attempt to get out of jail.
A. Yes.
Q. But you are telling these people today or yesterday what you told them is the absolute truth.
A. Yes.
Q. You have turned over a new leaf now, and you are now a truthful, good person. Is that right?
MS. PERRY: Objection, your Honor.
A. I don't consider myself good because of the wrong I have done, but I turned over a new leaf to live a better life, something close to what I was living before I met Douglas.
Q. And you want the jury to believe that you are telling the truth.
MS. PERRY: Objection.



THE COURT: Yeah. Okay. Go ahead.
Q. You told the jury yesterday that you remember Ebony Worthy. You met her once?
A. Yes.
Q. And when was that?
A. In 2004.
Q. When in 2004?
A. Fall of 2004.
Q. Do you know any time in the fall? Can you fix it any better than that?
A. It will be around November 2004.
Q. You have testified in court before involving the facts of your dealings with Douglas and Toybe. You have testified about that before.
A. Yes, I did.
Q. And there were other people sitting here, is that right?
A. Yes.
Q. You didn't testify about Ebony Worthy then because she wasn't in court, is that correct?
A. Correct.
Q. When was the first time that you recall telling the government about Ebony Worthy?
A. While I was visiting the government for our meetings prior to the last trial.
Q. Prior to the last trial.

A. Yes.
Q. Last trial was in April this year?
A. Yes.
Q. So you told them about -- how long before April did you tell them about that?
A. I don't know. There were several meetings. I did not say exactly Ebony Worth. I said Toybe's girlfriend.
Q. But before the last trial, you knew that that trial had nothing to do with Ebony Worthy.
A. Correct.
Q. Were you ever shown a photograph of Ebony Worthy?
A. No.
Q. When did you first tell the prosecution that you could identify Ebony Worthy?
A. When they asked me the question.
Q. You said you could identify her.
A. They asked me if I met her and if I could identify her, and I said yes.
Q. Without seeing her recently.
A. Correct.
Q. And how long was the time you met her -- when you met Ebony Worthy in November of 2004, how long were you together with her?
A. A couple of minutes.
Q. How long?



A. A few minutes.
Q. A few minutes.
You were seated in a car, and she was on the street.
A. Yes, she was by the car window when I got introduced to her.
Q. What seat were you in, driver's or passenger's?
A. Passenger side.
Q. Where was she?
A. She was on the driver's side.
Q. She was on the driver's side.
A. Yes.
Q. And what time of day was this?
A. During the day, bright, clear, daytime.
Q. What?
A. Clear, daytime.
Q. Daytime.
A. Yeah.
Q. 1:00, 2:00, 8 in the morning, what?
A. Early afternoon, 2:00.
Q. What were you doing over there on 34th Street near the mall?
A. I don't remember what the trip was all about, but part of it was coming along with Douglas.
Q. And was there a meeting arranged that you were supposed to meet Toybe?

A. Not that I know of.
Q. You just happened to see them in the street?
A. No, no. It didn't happen like that. I didn't know if Douglas had a meeting with Toybe, but I know for a fact that Toybe and Douglas always meet every time he comes to Manhattan.
Q. They always met in Manhattan?
A. Yes, or Brooklyn or wherever he is at. Most of the time in Manhattan.
Q. How long before Thanksgiving was this?
A. Maybe two weeks or so. I don't remember.
Q. So around the middle of November?
A. Maybe.
Q. Tell, to the best of your recollection, how long were you with Ebony Worthy?
A. Just a few minutes, just as long as they stayed to say hi.
Q. Two minutes, three minutes?
A. Three minutes.
Q. And this was three years ago?
A. Yes.
Q. Did you talk to her?
A. Yes, I said hi.
Q. You said hi.
A. Yes.
Q. You were introduced to her, you said.
A. Yes.

Q. What did Toybe say?
A. This is my girlfriend. This is Ebony, who I talk to you about all the time.
Q. Did you meet a lot of Toybe's girlfriends?
A. Since I met him, I met all of his girlfriends.
Q. How many girlfriends of his did you meet?
A. Two.
Q. Ebony and one other?
A. Yes.
Q. Didn't you say, testify that he had a lot of girlfriends?
A. Yes, he had a lot of girlfriends, but not -- two of them were actually his girlfriends that he introduced me to.
Q. What do you mean by "girlfriends"?
A. Girls he goes out with, girls he talks to. There was two serious ones. Those are the ones I was introduced to.
MS. PERRY: Can the witness just be permitted to finish her answers before a new question is asked?
THE COURT: He did. Okay. Go ahead.
Q. When you saw Ms. Worthy back three years ago, did she look the same as she looks now?
A. She looks a little different.
Q. She what?
A. She looks a little different. Her hair is colored differently.
Q. What color was it then?

A. It was between blondish reddish color.
Q. You testified that there was a conversation that you heard between Douglas and Toybe about Ebony, is that right?
A. Correct.
Q. Where was this conversation?
A. At my house in Jersey.
Q. In relation to your meeting Ebony in the middle of November, when was that conversation? Before or after?
A. Before.
Q. How long before?
A. A few weeks before.
Q. Two weeks before?
A. A few weeks before.
Q. What?
A. A few weeks before.
Q. A few weeks? It was about two weeks?
A. To be exact, a few is two, yes.
Q. So that would put it at the beginning of November.
A. Yeah.
Q. And am I correct Toybe said he wanted a counterfeit check for his girlfriend --
A. Yes.
Q. -- Ebony?
Is that what he said?
A. Yes.



Q. And you testified that there was an argument at that point.
A. Yes.
Q. Douglas didn't want to give a check to Toybe to give to Ebony, is that correct?
A. Correct.
Q. He didn't want to give a counterfeit check?
A. No, it's not about a counterfeit check, it is about the person, it's about Toybe's girlfriend.
Q. He didn't want to give it to Toybe's girlfriend because he liked to give it to -- he didn't want to have any sort of relationship with this woman who he had never met.
A. No, he met her before.
Q. Oh, he met her before.
When did he meet her? Do you know?
A. From times picking up Toybe from her house, meeting Toybe in Manhattan. Toybe and her spent a lot of time together.
Q. Ms. Shyne, I show you what's been marked as Defense Exhibit A.
MR. JACOBS: May I approach, your Honor?
Q. Do you recognize who this is?
A. Yes.
Q. Who is that?
A. This is Toybe there.
MR. JACOBS: I offer it in evidence, your Honor.
MS. PERRY: No objection.

THE COURT: Mark it in.
(Defendant's Exhibit A received in evidence)
BY MR. JACOBS:
Q. I now show you what's been marked Government Exhibit 21A. Do you recognize -- have you seen this before?
A. No, no.
Q. Do you recognize any of the handwriting on that check?
A. Yes, I do.
Q. Well, can you tell me do you recognize who wrote the date 11 --
A. 23/04.
Q. Excuse me?
A. 11/23/04.
Q. Yes. Who wrote that, if you know?
A. Douglas.
Q. Who?
A. Douglas.
Q. Douglas.
And the name Ebony Worthy on the check, do you know who wrote that?
A. No, I don't.
Q. The amount, $11,000?
A. Douglas' handwriting.
Q. Are you talking also about the written-out portion, "eleven thousand dollars"?



A. Correct.
Q. That's also Douglas?
A. Yes.
Q. And the signature, whose handwriting is that?
A. I don't know.
Q. You don't know.
A. (Shaking head).
Q. You have never seen this check before.
A. No.
Q. Is this a counterfeit check?
MS. PERRY: Objection.
Q. If you know.
A. I don't know.
Q. Well, look at the account. Do you see the account, Luvenia Bartee, UR Recovery, do you know that account?
A. I know, yes, UR Recovery.
Q. And you see Bank of America, and the address in Richmond, Virginia?
A. Yes.
Q. And you don't know that this is not a counterfeit check?
A. No, sir, because the checks, they look like real when Douglas have the checks made.
Q. Have you ever seen any other checks drawn on this account?
A. No.
Q. I show you what's been marked Government Exhibit 63, a copy

of it. Have you ever seen this check before?
A. No, I have not.
Q. Do you recognize any of the handwriting on that check?
A. No, I don't.
Q. Do you recognize the account of that check?
A. Moonlight Production, yes.
Q. Have you ever seen Moonlight Production checks before?
A. No.
Q. This is not, to your recollection, not either Douglas' handwriting or Toybe's handwriting, is that right?
A. I know it's not Douglas' handwriting. I can't say it was Toybe or not. I really don't know Toybe's handwriting.
Q. I show you what's been marked a copy of Government Exhibit 101, and I ask you whether you recognize -- have you ever seen this check before?
A. No, I have never seen this check before.
Q. Do you recognize any of the handwriting on this check?
A. Yes.
Q. What handwriting do you recognize?
A. Where it spells out the sum and where it has the sum written out and the date.
Q. And whose handwriting is that?
A. That's Douglas' handwriting.
Q. Now, you say that when Douglas and Toybe had the conversation about giving Toybe a counterfeit check for Ebony



Worthy, Toybe calms Douglas down by saying: She is not going to say anything, is that right?
A. Correct.
Q. And Toybe said she didn't have the account long, and there is not much in there, is that right?
A. Correct.
Q. And this is all around the 1st of November?
A. Yes. I'm not sure exactly, the late part of October/early November.
Q. Well, what if I told you that the Ebony Worthy account was opened up on November 19?
A. Okay. But Toybe said that there was already an account with money in it. That's what he said.
Q. Maybe he was lying to Douglas, is that right?
A. I don't know, sir.
Q. Now, you testified about a later conversation where Toybe -- where Douglas is at your house talking on the phone to Toybe and then he gets off the phone and talks to you, is that right?
A. Correct.
Q. When was that conversation?
A. I would say late November.
Q. Well, you told us the first conversation was when?
A. The first conversation was end of October/early November.
Q. So we are now in the middle of November?

A. I would say late November. I'm not sure.
Q. And what did Douglas tell you that Toybe had said?
A. He said that -- he didn't say Toybe had said anything. He just said that he don't get this before she agrees, Ebony agrees to put the check in her account, and now she is scared to go into the bank.
Q. So in the middle of November she is scared of going to the bank, is that right?
A. Sorry. You keep saying middle of November, I don't know middle of November, end of November, I don't remember --
Q. Let's put it --
MS. PERRY: Your Honor, can she please finish her responses?
THE COURT: Sure.
Q. When were you arrested in Pennsylvania?
A. In December.
Q. In December.
A. Yes.
Q. These conversations are before then, isn't that right?
A. Yes.
Q. How long before?
A. I don't know. Weeks? I don't know. But it was around that time.
Q. But it was definitely before you were arrested in Pennsylvania, is that correct?

MS. PERRY: Objection: Asked and answered.

THE COURT: Okay. It has been. Go ahead. Next question.

Q. Was it before you were arrested in Pennsylvania?

MS. PERRY: Same objection.

THE COURT: Yes, same ruling. He asked. She said it was before then. Go ahead. Next question.

Q. Did you remain in Pennsylvania after you were arrested?
A. Well, until bail was posted, yes.
Q. Can you repeat that, please?
A. Until bail was posted, yes.
Q. And then where did you go?
A. Home.
Q. Back to New Jersey.
A. Yes.
Q. Do you know what a con man is?
A. Yes.
Q. Did you consider Douglas a con man?
A. Yes.
Q. How about Toybe? Also a con man?
A. Yes.
Q. They were very good at convincing people to do things, right?
A. Yes.
Q. They deceived many people.

A. Yes.
Q. Did you once get a check that was a refund with regard to some college?
A. Yes, sir.
Q. And that was a refund for whom? Who was the check made out to?
A. I don't remember who, myself or my daughter. I don't remember who it was made out to.
Q. It was your daughter, right?
A. It was for my daughter.
Q. And you gave that check to Douglas, and he then altered the check?
A. Yes, he took the check. I knew --
Q. It was like a check for --

MS. PERRY: Your Honor, she was in the middle of an answer.

Q. Finish your answer.
A. He took the check. I knew he took the check. I did not give it to him. He got it in the mail and told me about it.
Q. And it was like a check for $99?
A. Yes.
Q. And he made it a much larger amount?
A. Yes.
Q. And you didn't care whether your daughter got into trouble about that check, did you?



A. Of course not. I cared if she got into trouble.
Q. How old was your daughter then?
A. She was eight or nine years old.
Q. While you were out on bail in this case, you were still in touch with Douglas on the telephone?
A. Yes, for a period of time.
Q. And, in fact, you learned that he was committing a new fraud.
A. Yes.
Q. And at first you thought he wasn't committing a fraud, but he was cooperating with the government.
A. Correct.
Q. But then you learned it was a fraud.
A. Correct.
Q. And he asked to you help him?
A. Correct.
Q. And did you help him?
A. No, I didn't.
Q. Did you tell the government about what he was doing?
A. I told the government what I knew at the time about a check, something about a check out there.
Q. But you didn't tell them right away. You waited some time before you told them, right?
A. Yeah, because I didn't know what was going on. I didn't have enough information.

Q. How many times did you lie to the prosecutor before you finally told her the truth?
A. I think about two times.
Q. Now you have entered into a cooperation agreement, is that right?
A. Yes.
Q. And before you entered into that cooperation agreement, you were told by your lawyer that you were facing a long sentence, right?
MS. PERRY: Objection, your Honor, attorney/client privilege.
THE COURT: Just change it. You knew that you were facing a long sentence, same thing. Go ahead.
Did you know that?
THE WITNESS: Yes, sir.
BY MR. JACOBS:
Q. And did you also know that one of the ways to get a shorter sentence was to cooperate with the government?
A. Yes, I have learned that.
Q. And you know that you are relying on the prosecution to write a letter for you to the judge.
A. Yes, I was.
Q. Do you know the name of the judge who is going to sentence you?
A. I don't remember his name right now.



Q. Is it Judge Buchwald?
A. Kenneth Karas, I believe. I'm not pronouncing his last name correctly.
Q. And if you don't get that letter, you are going to face a much longer sentence.
A. Correct.
Q. The attorney who has been representing you in this case, is he retained or assigned by the court?
A. Assigned by the court.
Q. And that's because you didn't have money to hire a lawyer.
A. Correct.
Q. Now, you told us yesterday that you must tell the truth, is that right?
A. Correct.
Q. Otherwise you violated the agreement.
A. What agreement, sir?
Q. And the determination as to who decides whether you are telling the truth are the prosecutors sitting at that table, isn't that correct?
A. Yeah.
Q. So you want to please the prosecutors, isn't that correct?
MS. PERRY: Objection.
THE COURT: I will allow it. Go ahead.
A. No, sir.
Q. You don't want to please the prosecutors?

A. No.
Q. You don't want to please Ebony Worthy. You are not here to do that, are you?
MS. PERRY: Objection.
THE COURT: I will let it go. Go ahead. Answer.
A. Sir, at this point I am not here to please anybody. I am just here because of the fact that the government knows I have some knowledge of about this case and I am told if I don't come, they will subpoena me to be here.
Q. You have to come and testify pursuant to your agreement, isn't that correct?
A. No.
MR. JACOBS: Can I have the agreement, please?
Q. I show you and read to yourself page three, the last paragraph. See if that refreshes your recollection whether you are obligated to testify under your agreement with the government.
MS. PERRY: Your Honor, there has been no failure of recollection, so I object to the question.
THE COURT: Does the agreement require that you show up and testify?
THE WITNESS: Your Honor, from my understanding this agreement was for my case that was when I was arrested in August 2005. My understanding is this case has totally nothing to do with my agreement from my August --



THE COURT: Go ahead.

BY MR. JACOBS:

Q. If you refuse to testify at this trial, wouldn't you be violating your agreement with the government?

A. Not to my understanding. I did not understand it like that.

MR. JACOBS: Is this in evidence? I offer the agreement into evidence your Honor.

MS. PERRY: No objection.

THE COURT: Hearing no objection, it is in evidence.

MR. STOLAR: Do you want to mark it as Defendant' B?

MR. LEVY: We have already marked it as Government Exhibit 1314.

MR. STOLAR: It is being offered by the defense.

THE COURT: I don't care. I don't care who it is being marked by.

(Government's Exhibit 1314 received in evidence)

MR. JACOBS: May I read a short portion to the jury, your Honor?

THE COURT: Sure. Go ahead.

MR. JACOBS: Page three, last paragraph: "It is understood that Natasha Singh shall truthfully and completely disclose all information with respect to the activities of herself and others concerning all matters about which this office inquires of her, which information can be used for any

purpose."

And I will go down to E: "Shall truthfully testify before the grand jury and in all trials and other court proceedings with respect to any matters about which this office may request her testimony."

Q. Do you recall that?

A. Yes.

Q. So you are obligated to testify here.

A. The reason why I am saying that, sir, is because I know I signed that paperwork for my August 10th arrest and that court trial. I didn't sign anything since I started speaking with the government about this. So that is why I am thinking that this has nothing to do with my plea agreement. I never signed anything for this case.

Q. Do you know what it means when it says "and any and all trials and all court proceedings?" Do you know what that means?

A. Yes, now that you are reading it aloud, yes.

Q. Is it limited to the old trial? Is it limited?

A. If it says all trials, sir, it could be this. I did not think of it that way. I did not understand it that way.

Q. And if the government wants you next month to testify at another case, don't you have to testify?

A. Now that you have made that clear to me, yes.

Q. And do you know what happens to you if you refuse to



testify?
A. Now that you made that clear to me, yes.
Q. Tell me what happens to you if you refuse to testify at this trial?
A. Under that agreement, they will rip the agreement up.
Q. They would tear it up.
A. Yes.
MR. JACOBS: No further questions.
MR. STOLAR: I will go, unless you want to break now, Judge.
THE COURT: No.
CROSS EXAMINATION
BY MR. STOLAR:
Q. Good morning, Ms. Singh.
A. Good morning, sir.
Q. My name is Martin Stolar. The woman who is sitting right in front of me, do you recognize her?
A. No, sir.
Q. Never seen her before in your life?
A. No, sir.
Q. I represent her. I am her lawyer.
A. Okay.
Q. You figured that out because I was sitting next to her.
A. Yes.
Q. You are 32 years old?

A. Yes, I am.
Q. And how far did you go in school?
A. Completed high school, did training school, vocational school.
Q. At the time that you were doing stuff with Douglas, how far had you gone in school?
A. High school, vocational school, had my agent's license.
Q. Where did you go to high school.
A. In my country.
Q. When did you come to the U.S.?
A. 16.
Q. Sorry?
A. 16 years old.
Q. When you were 16?
A. Yes.
Q. Did you come with your parents?
A. Yes, my father.
Q. You had finished high school in Guyana already?
A. Yes, I had just finished.
Q. What did you do when you got here?
A. I worked, went to work shortly after that. I went -- took some classes at LaGuardia College and worked and went to school.
Q. What kind of work did you do?
A. I worked in McDonald's, I worked in a garment factory, I

worked in a supermarket, and then I went to work as a secretary at Allstate and I have been working there since. I got my license.
Q. When did you start at Allstate?
A. Around 17, 18. I have worked there for nine years.
Q. You have worked there for nine years. And you worked your way up from being a secretary to being a licensed broker?
A. Yes, because at the time they were sending you to school, giving you the opportunity if you wanted to become an agent.
Q. How many children do you have now?
A. I have three kids now.
Q. And what are their ages now?
A. I have my baby boy is a year and a half, my daughter, she is three, and I have an 11-year-old from my previous marriage.
Q. Have you ever been in the military?
A. No, sir.
Q. Are you a religious person?
A. Somewhat.
Q. Somewhat?
A. Somewhat.
MS. PERRY: Your Honor, this is not relevant.
Q. You met Doug Shyne when he was a customer of Allstate, is that right?
A. Yes.
Q. Do you remember when it was?

A. 2001.
Q. Sorry?
A. 2001.
Q. In 2001. Do you remember the month, roughly?
A. End of July/August.
Q. And he wanted insurance for a car that was registered to New York Five Star Coffee?
A. Yes.
Q. Were you his broker, assigned to him?
A. I was the selling agent at the time, at the time he came into the office.
Q. And how did he identify himself? What name did he use?
A. Douglas.
Q. Douglas Shyne?
A. Yes.
Q. Did he have a nickname?
A. Not at the time, no, I didn't -- he didn't say that.
Q. How long after he first came in did you start going out with him?
A. About a month after.
Q. Now, at the time you started going out with him, did you know that he was an ex con?
A. No.
Q. When did you first find out he had been to jail?
A. After he went to jail 2001.

Q. So in the first few months that you were dating him, you didn't know that he had been in jail already?
A. No.
Q. And you didn't -- was he doing illegal things, fraudulent things during the time you were dating him?
A. Yes.
Q. Did you know about it?
A. No.
Q. How did you know he was doing it then if you didn't know about it?
A. Because after the fact, now I know all the things he was doing.
Q. When he went to jail in -- after you started dating him, what did he go to jail for?
A. Something fraudulent.
Q. Bank fraud, tax fraud?
A. I think it was bank fraud, check fraud.
Q. Did that bother you, that the person that you had been dating went to jail?
A. Well, it did bother me, and then he claimed that he was innocent all along until he came out. We started back dating, and as we were dating, and began more serious, I fell in love with him, and that's when a lot of stuff started coming out that wasn't adding up.
Q. After he got out of jail, he was on supervised release?

A. I don't know.
Q. Did he go to state jail or federal jail?
A. He went to federal jail.
Q. And you know that after you are finished a jail term in the federal courts, you are placed on a period of supervised release, don't you know that?
A. No, I know that now.
Q. You knew it when you signed your plea agreement, your cooperation agreement, didn't you?
A. Yes, I know that now.
Q. And that means he was under the supervision of a probation officer, correct?
A. Correct.
Q. And after he got out, you started dating him again, did he tell you that he had to report to a probation officer?
A. He told me that someone is going to come and visit him at the house to see where he is living, because he had moved from Westchester to our house. I said, okay. But he didn't say and explain that they are a probation officer and all that stuff. And, in fact, someone did come by and I opened the door.
Q. Did they identify himself or herself as a United States probation officer?
A. I think so. I can't remember exactly what he said. It was like 5:00 in the morning, and he complained I was rude to him. I was very pregnant and grumpy.

Q. After Douglas got out of jail, when did you learn that he was involved in illegal activities?
A. Shortly after we started dating again, bits and pieces started coming out.
Q. How did they come out?
A. Through conversation, things he would say, what he is doing in the course of a day.
Q. What types of things would he say?
A. Conversation with other people. I can't remember exactly, but just things that it didn't sound right to me.
Q. So it became apparent to you that he was involved in illegal activities?
A. Correct.
Q. Didn't you, with your background, decide that maybe you should not be involved with that?
A. I was pregnant already with him --
Q. Well --
A. -- and we talked about it, and he came in front, he said things to me what he wanted me to know, and he said, Of course, he promised that, you know, it's going to stop and this and all that stuff, everything that a woman would want to hear to make her feel better.
Q. And by then you were pregnant?
A. Yes.
Q. And he said it was going to stop --

A. Yes.
Q. -- eventually?
A. He said he would stop soon, that he just needed the business in Philadelphia to be up, and he is going to run that, he is going to take care of us and all of the promises.
Q. But it didn't stop, did it?
A. No, it didn't.
Q. And you became deeply involved in it, did you not?
A. Correct.
Q. The amount of fraud that was involved could have reached even up to $6 million, couldn't it?
A. I don't know numbers, but I know it is in the millions.

(Continued on next page)

Q. So far, you've told us that you were involved, that Douglas was involved, that Toybe Bennett was involved.
Did Bennett have a nickname, by the way?
A. Just Toybe.
Q. Just Toybe?
A. Oh, Panama. I'm sorry.
Q. Panama. At least the three of you are involved, right?
A. I'm sorry. What did you say?
Q. You were involved in the fraud during the period of time that we're talking about?
A. Yes.
Q. And there are more people involved, however, right?
A. Yes.
Q. Nathaniel Shyne?
A. Yes.
Q. Douglas' brother?
A. Yes.
Q. Roberto Montgomery?
A. Yes.
Q. Who is Roberto Montgomery?
A. Toybe's cousin.
Q. Where did he live?
A. In Brooklyn, Flatbush.
Q. How was he involved?
A. By depositing checks into his account.

Q. Into his account or was he involved in recruiting other people to deposit checks into their accounts?
A. I don't know if he was involved recruiting.
Q. How about a fellow named Ephraim Richardson?
A. That's my brother.
Q. You got him involved?
A. No.
Q. Who got him involved?
A. Douglas. He worked with Douglas late nights in the cafe.
Q. What did Ephraim do?
A. Deposit checks in his account.
Q. Pardon?
A. Deposit checks in his account as well.
Q. Did he recruit people?
A. Not that I know of.
Q. Do you know how much money went through Ephraim's account's?
A. I'm sorry.
Q. How much money went through Ephraim's accounts?
A. No.
Q. Huh?
A. I don't know how much, if that's what you're saying.
Q. Do you know what his percentage was? What was his fee?
A. I don't know what anybody's fee is. That's something Douglas decides. He doesn't discuss it with me.



Q. How about a fellow name Naresh Pitambar?
A. Yes.
Q. He was involved?
A. Yes.
Q. Where was he living?
A. He was living in Queens, Richmondville, I think.
Q. What was his role?
A. Depositing checks in his account as well.
Q. How about a fellow named Jason Watler?
A. Yes, he was involved.
Q. Where was Jason?
A. I don't know where he is now, but I knew he lived in Staten Island, I believe.
Q. What was his role?
A. Depositing checks. He was Toybe's cousin.
Q. Do you know how many checks these fellows deposited?
A. A lot.
Q. Thousands?
A. I wouldn't say that.
Q. Well if we're getting up to six million dollars it would be close, wouldn't it?
MS. PERRY: Objection, your Honor. That was not the witness' testimony.
THE COURT: Yeah. Next question.
Q. If we're up to five million dollars, that would be an

awful --
MS. PERRY: Same objection.
THE COURT: Same ruling.
Q. How about a fellow named Steve Riddick, R-I-D-D-I-C-K?
A. Yes.
Q. Was he involved?
A. Yes.
Q. Where was he?
A. (No response).
Q. Where did he live?
A. In Virginia.
Q. What was his role?
A. Depositing checks.
Q. How about a fellow named Timothy Montgomery? Was he involved?
A. Yes.
Q. What was his role?
A. Depositing checks.
Q. Is where did he live?
A. Virginia.
Q. Timothy Montgomery was a world famous sprinter, was he not?
A. Yes.
Q. But he got involved in depositing checks?
A. Yes.
Q. Did you ever meet him?



A. No.
Q. How did you know his name?
A. Through the charges and coming to court for trial.
Q. Nathaniel Alexander. Did you know that person?
A. No.
Q. How about Raymond Pastures, a fellow known as Moon? Did you know him?
A. No.
Q. How about a woman named Ayana Thomas? Did you know her?
A. No.
Q. When checks were counterfeited, who is the person that did the counterfeiting of the check?
A. Douglas' friend in Philadelphia named E.
Q. E like the letter E?
A. Yes.
Q. Did you ever meet that person?
A. Yes.
Q. Could you describe him?
A. Tall, dark skin, bald head.
Q. Age?
A. I don't know. I don't think I'm good at guessing people's age. Black guy. That's it. Dark skin.
Q. Have you ever been shown pictures of him by the government?
A. No.
Q. Did they ask you about him?

A. Yes.
Q. They were very interested in him, weren't they?
A. I don't know their degree of interest in him.
Q. What did he do? Do you know what method he used to make counterfeit checks?
A. I don't know.
Q. Did he use a computer?
A. I don't know.
Q. A scanner?
A. I don't know.
Q. A printer?
THE COURT: Oh, stop. Next question.
Q. When you involved your family, did you ever have any second thoughts about doing that?
MS. PERRY: Objection to form.
THE COURT: No. I'll permit it. Go ahead. Answer it if you can.
THE WITNESS: I know my family was involved, like I said, it was totally on their call. If I say no, they will say yes, but I never said no to them. And Douglas had the initial conversation with them. I just never said no to them.
Q. Douglas had the initial conversation with your mother?
A. Yes.
Q. Were you present?
A. Not in the room. I was in her house but not next to her.

Q. What did he tell her? What did he tell anybody who he recruited? What was his line?
A. I don't know. I was never there to really listen to what he's saying to recruit somebody.
Q. Now, the illegal conduct that you were involved in was not limited to forged checks and counterfeit checks, was it?
A. No, it was not.
Q. It also involved fraud on the mortgage company?
A. Yes, by submitting a false tax return.
Q. Did you know whether or not Douglas himself had been -- previously done -- been jailed for tax fraud?
A. Yes.
Q. Maybe that's why he knew a lot about how to figure out the tax return?
A. Yes.
Q. And you went right along with that, didn't you?
A. Yes.
Q. The invoice that was prepared for your Pennsylvania arrest dealt with a counterfeit check that you tried to deposit in the amount of $150,000, didn't it?
A. Yes. That was deposited, the check.
Q. What account was that deposited to?
A. Business account in my name.
Q. What business?
A. New York Five Star Coffee.

Q. That was the Philadelphia operation?
A. Yes.
Q. And you deposited that check in Philadelphia?
A. No. It was in New York.
Q. When did you get arrested? Do you remember?
A. In December.
Q. How did you get arrested?
A. Myself and attorney went in to see the detective.
Q. How did you know to go see the detective?
A. He called at the cafe for me, and then he went by and I wasn't there, and I spoke to him on the phone. He called from the cafe and I spoke to him on the phone, my cell phone, and he said he was there, he has a warrant for my arrest. And that afternoon me and an attorney went in to see him.
Q. That would be detective Gregory Young?
A. Yes.
Q. And then you went and you got an attorney named F. Emmett Fitzpatrick; is that right?
A. Yes.
Q. Had you did you find Mr. Fitzpatrick, if it's a Mister?
A. From Douglas.
Q. From Douglas?
A. Yes.
Q. Did you pay Mr. Fitzpatrick to represent you?
A. Yes.

Q. And were you aware then, that shortly after you retained him, you gave him that phony invoice, correct?
A. Correct.
Q. And he wrote a letter -- actually, after he got the invoice he had his investigator go to work to try to track down the phone number, the name of the company that was on the check, right?
A. Correct.
Q. So, he had his investigator go to work. Based on his investigator going do work, the phony invoice, and the Cecil Pena license, right, he wrote a letter to Detective Young asking him to please drop the case, correct?
A. Correct.
Q. And the case was dropped, right?
A. Correct.
Q. You perpetrated a fraud on the Pennsylvania police, correct?
A. Correct.
Q. And you perpetrated a fraud on the Pennsylvania courts?
A. Correct.
Q. Now, did it occur to you, after this -- after you got arrested in the Pennsylvania case in December that maybe you should stop doing this business?
A. Yes.
Q. But you didn't, did you?

A. Correct, I didn't.
Q. Why not?
A. Because, again, Douglas said that these checks he has in the works and that's it, that's it. We had a lot of problems and we were having a lot of problems.
Q. You realize that with all these checks and all these credit cards that you were using when you still had these, that you were stealing from people, right?
A. Yes.
Q. And when it came to the banks, who would suffer the loss? The customer?
A. I'm not sure who suffers the loss, but Douglas told me that the bank suffers the loss and they get a tax writeoff.
Q. How about the Federal Deposit Insurance Corporation?
A. Yes, I understand.
Q. They would cover the losses, right?
A. Yes.
Q. Up to a certain amount?
A. I don't know what amount.
Q. Do you know who funds the Federal Deposit Insurance Corporation?
A. I'm sorry?
Q. Isn't the FDIC actually, who eventually took the hit for a lot of these checks, funded by us taxpayers?
MS. PERRY: Objection.



THE COURT: If you know. Do you know?
THE WITNESS: Yes.
MR. STOLAR: Judge, could we take a morning break?
THE COURT: Sure. Take ten, Ladies and Gentlemen.
(Jury excused)
(Recess)
(Jury present)
THE COURT: All right, counsel.
BY MR. STOLAR:
Q. Ms. Singh, you indicated that Douglas, as you called him, had used different names at different times; is that right?
A. Yes.
Q. How many different names did he use, to your knowledge?
A. Several.
Q. Did he ever use the name Douglas Bey, B-E-Y?
A. Not that I know.
Q. Ever use the name Douglas Santiago?
A. He mentioned something about Santiago to me.
Q. Ever use the name Trevor King?
A. No.
Q. Ever use the name Douglas Shyer?
A. No.
Q. How many times did Douglas tell you he had been convicted of crimes?
A. I think twice, but I've learned it's different.

Q. You've learned it's more?
A. Yes.
Q. Now, did Toybe Bennett also use fake names?
A. Yes.
Q. How many did he use?
A. I knew of two, but -- I knew of two that I heard, and I knew, but I don't know.
Q. Did you ever know him to use the name Carlos Bennett?
A. No.
Q. Ivan Bennett?
A. No.
Q. Mike Carlos?
A. No.
Q. Ernesto Donaldson?
A. No.
Q. Smiley Bennett?
A. No.
Q. Ernesto Davidson?
A. No.
Q. Did you know that Mr. Bennett had also done time in jail?
A. Yes.
Q. How many times did he go to jail, do you know?
A. I knew of one -- one time prior to August 10 arrest.
Q. Of course, now he's in jail on this case -- on the case that you testified in before, right?



A. Yes.
Q. I believe you testified on direct examination that you first heard about UR Recovery from overhearing conversation with Mr. Bennett and Roberto Montgomery?
A. Yes.
Q. When they were helping you move, right?
A. Yes.
Q. And that was in August of 2004?
A. Late August, September, around that time.
Q. In that initial conversation was the name UR Recovery mentioned?
A. No.
Q. Well, in this conversation that you testified Roberto said to Toybe: All these things you had me doing for you, you really owe me, what did you understand that to mean?
A. He owed him, to give him money, do him a favor, something along that line.
Q. And you say Toybe said: Don't worry I got you -- I got you; my deal is to come through soon and I'll take care of you?
A. My Virginia deal is to come through soon.
Q. Oh, he said the Virginia deal?
A. Yes.
Q. And then how long after that did you actually hear the name UR Recovery?
A. A few weeks after that.

Q. So that would be sometime at the end of September, maybe?
A. Or October.
Q. Or October?
And what was said to you about UR Recovery and who said it to you?
A. Douglas said to me that Toybe's very happy because he got himself two good accounts, and that he give me the name, he said it's Virginia accounts.
Q. Did he give you the names?
A. Yes.
Q. Did he describe the businesses to you?
A. No, not at that time.
Q. So you first heard of UR Recovery and Moonlight Productions sometime in October, you figure?
A. Yeah.
Q. And what were the circumstances of him saying that to you?
A. He had just gotten off the phone from previously talking to Toybe, and Toybe apparently was happy for what he said. And then he hang up the phone. He said: Your boy Toybe is very happy, he got himself two Virginia deals.
Q. Did he say he's got two Virginia deals or he has a connection to two Virginia deals?
A. He said he got two Virginia deals.
Q. When was the next time you heard about UR Recovery?
A. Then I heard, Douglas told me that he's going to need two



fake invoices for UR Recovery, that she's requesting two fake invoices.
Q. Well, did you hear about UR Recovery being a credit repair business prior to the invoice discussion?
A. Prior to me actually writing the invoice up, that conversation was said to -- Douglas had that conversation with me and that's what he said, they are a credit repair company.
Q. And that's the very first time you found out that UR Recovery was a credit repair company?
A. Yeah.
Q. Do you know where Douglas go that information from?
A. I would say Douglas -- um, Toybe.
Q. To your knowledge, did Douglas have any direct dealings with UR Recovery?
A. No.
Q. How about with Moonlight Productions?
A. Not that I know.
Q. And when he told you about UR Recovery, did he tell you that they were going to take -- have two checks deposited?
A. No, not at that time. I only knew of two checks when he asked me to do the invoice.
Q. You testified, I believe, on direct examination that the UR Recovery checks were deposited in Philadelphia and New York; is that right?
A. Yeah.

Q. How do you know that?
A. Because Douglas told me so.
Q. Did he tell you who deposited them?
A. No.
Q. Did he tell you what banks they were deposited into?
A. No.
Q. Did he tell you who filled out the deposit slip?
A. No.
Q. Did he tell you who endorsed the check?
A. No.
Q. Did you find it unusual that UR Recovery, which was based, as far as you knew, in Virginia, would have checks deposited in Philadelphia and New York?
A. No.
Q. At the time he told you about the checks being deposited, did you know what the amounts?
A. No, only when I did the invoice.
Q. On direct examination you were asked this question: Were you aware how many counterfeit checks that owner of UR Recovery agreed to deposit:
Your answer was: Yes.
The question was: How many?
Your answer was: Two.
A. Correct.
Q. So, prior to your doing these invoices, was there -- did

you learn that the owner of UR Recovery only wanted to do two checks?
A. I don't know if she only wanted to do two checks. I was just told two checks, this is the amount, create an invoice to reflect this amount.
Q. But the impression that you gave in your testimony the other day was that the owner agreed to deposit two checks.
MS. PERRY: Objection, form.
Q. Correct?
THE COURT: Yes. Sustained. The jury was here. They heard the testimony. Go ahead.
Q. Did Douglas tell you that both Toybe and himself had deposited the UR Recovery checks?
MS. PERRY: Asked and answered, your Honor.
MR. STOLAR: Sorry?
MS. PERRY: Asked and answered.
THE COURT: No. Go ahead. Answer it if you can.
THE WITNESS: No. He did not tell me who deposited the checks.
Q. Did you not say on your direct examination in answer to the question: Who deposited those checks?
"A. Toybe and Douglas."
That's your testimony?
A. Yes.
Q. Was that mistaken?

A. No. That's my -- what I assumed. No one told me that they deposited the checks.
Q. So that was an assumption, not a statement of fact?
A. Correct.
Q. When were these checks deposited? When did you learn these checks were deposited?
A. After -- after -- before I did the invoices.
Q. And when would that be?
A. When I was asked to do the invoices, Douglas said to me that the woman from UR Recovery, she needs these invoices before she release the balance of the money. So I learned at that time that the checks were deposited.
Q. You didn't know the checks were deposited prior to that?
A. No.
Q. And in that same conversation did he tell you that the checks had been deposited in Virginia -- I mean in Pennsylvania and New York?
A. Yes.
Q. The invoices that you made up, they talk a lot about credit repair services, credits services for personal accounts and business accounts. Who gave you the information to write that on the invoice?
A. Douglas told me that UR Recovery did repairs of people's and businesses' credit. And I took that and tried to put an invoice together the best I could.



Q. So you made up the language that appears on the invoices all by yourself?
A. Yes.
Q. And on these invoices you've got people paying six months in advance for work that hasn't been done yet, correct?
A. Well, to my understanding credit takes a couple of months to clear on your account, to get repaired. So that's why it was six months.
Q. So, for example, one of the invoices that was to Christopher Owens, the CEO, for the $160,000?
A. Mm-hmm.
Q. That was paid fully at the time of the invoice, according to what you wrote on the invoice, and that the work was to be completed in May of 2005?
A. Correct.
Q. Did you think that an invoice would hold up -- that some company would pay six months in advance $160,000 for work that hasn't been done yet?
A. Sir, it wasn't much thought given to this invoice. I did it to the best I could. It's silly, I understand that, but I did it to the best I could. I wasn't an expert in really writing invoices.
Q. The telephone number that you put on the invoices, (804)343-0033, where did you get that number?
A. One of the numbers I got from Douglas. I don't know

what -- it's the second number. I think it's -- it's the second number.
Q. Well that number appears on both invoices, does it not?
A. I don't have the invoice in front of me so I don't --
Q. Could we put the invoice in front of her.
Either the piece of paper or on the computer. I don't care.
Do you have it in front of you?
A. Yes, I do.
Q. Do you see in the upper right-hand corner?
A. Yes.
Q. The same number appears on both, right?
A. Yes.
Q. Where did you get that number from?
A. I believe Douglas.
Q. Do you know if Douglas ever called that number?
A. I don't know whether he called it or not.
Q. Do you know if it was a real number?
A. I'm sorry?
Q. Do you know if it was a real number or not?
A. I don't know.
Q. Did Douglas provide any of the other information that appears on either one of these invoices other than the phone number?
A. Yes, the amount.



 Q. Anything else?
A. And a date.
Q. Now, he told you to put November 16 on one and November 27 on the other?
A. Yes.
Q. And when did you actually write up these invoices?
A. I don't remember exactly when.
Q. Was it around November 16 or around November 27?
A. I don't know. I don't think so.
Q. Was it after that?
A. I don't remember.
Q. Well, had you ever done invoices before aside from your Pennsylvania case?
MS. PERRY: Objection -- sorry.
THE WITNESS: The Pennsylvania invoice was done after these two, that I know for sure. The Pennsylvania invoice was prepared after I was arrested.
Q. Right. Now, these two invoices, had you ever prepared other invoices that were similar in connection with your fraudulent scheme?
A. No.
Q. So, these are the only two you prepared?
A. Yes.
Q. Can you now fix on the date when they were prepared?
A. No, sir, because it was -- it was something I just wanted

to do to get Douglas stop asking me for it. There was no significance for me. It was nothing around that I could remember when I did it, but I know for a fact it was done before I got arrested. That's what stands out.
Q. When you -- the dates that they ordered that you put on this, November 16, November 27 on the other one, were those dates probably the dates around when you wrote this up?
A. I don't know.
MS. PERRY: Objection, your Honor.
THE COURT: She said I don't know. I'll let it stand.
Q. On the one that's Christopher Owens, who told you to put Christopher Owens on that invoice?
A. Douglas must have given me that name because I don't know anyone by that name.
Q. Douglas must have given that to?
A. Must have. I don't know anyone by that name.
Q. The name on the other invoice, First Funding Mortgage?
A. I did that.
Q. You did that yourself?
A. Because I knew of a company called First Funding Mortgage.
Q. Now, after you filled out these invoices, what did you do with them?
A. I gave it to Douglas.
Q. Do you know what he did with them?
A. Yes.



Q. What?
A. He Federal Expressed it to Virginia.
Q. Do you know to whom he addressed his Federal Express?
A. No, sir.
Q. Do you know what address he used?
A. No.
Q. Did he ever tell you?
A. No.
Q. In early December, 2004, did you find out that there was a problem with the UR Recovery checks?
A. I found out there was a problem with the UR Recovery checks when Douglas was insisting that I make these invoices up.
Q. The invoices were to get the money released, right?
A. Correct.
Q. And that the woman -- the owner of the place would release the money when she got the invoices, correct?
A. Yes.
Q. That was your understanding?
A. Yes.
Q. Did you ever hear that the account, the UR Recovery account was frozen in early December and the 160,000-dollar check was returned as counterfeit?
A. No.
Q. That never made it back to you?
A. No.

Q. Did you ever overhear any conversations between Douglas and Toybe about: Where is my money from the 160,000-dollar check? Douglas saying that to Toybe?
A. No.
Q. The checks that were the -- the counterfeit checks that were made payable to UR Recovery, did you have anything to do with creating them?
A. No.
Q. Is it your understanding that E in Philadelphia was the person who did the funny business with the checks?
A. Yes.
Q. At the time they were deposited, you didn't know the amounts, correct?
A. Correct.
Q. Did you ever find out whether or not your invoices actually worked to get money from the UR Recovery account?
A. No, sir. I didn't want to ask because I know I didn't do a good job. So I didn't want to ask for him to ask me to redo it or something like that.
Q. But you knew it was -- in order to get the money released, correct?
A. Correct.
Q. Did you ever find out that the money, in fact, was released?
A. No.



Case 7:05-cr-01067-KMK Document 267-8 Filed 12/03/2007 Page 77 of 86

Q. Did you ever find out that the money was not released?
A. No.
Q. Did you ever have any discussions with Douglas or Toybe about UR Recovery after you filled out these invoices?
A. No.
Q. Not one?
A. No.
Q. Did you ever do any checks with Moonlight Productions?
A. No.
Q. Were you aware of any checks that were being deposited to Moonlight Productions' account?
A. Yes.
Q. When did you become aware of that?
A. Around the same time.
Q. Were you aware of any amounts?
A. No.
Q. Were you aware of any numbers?
A. No.
Q. Were you aware of where the checks were deposited?
A. No.
Q. Who was it that was handling the checks with Moonlight Productions?
A. From my understanding it was Toybe who was the broker.
Q. And Moonlight Productions was also in Virginia?
A. Yes.

Q. You indicated on direct there was a bit of a problem with Moonlight Productions?
A. Yes.
Q. What was the problem?
A. Well, Douglas was fussy that the husband -- apparently they had made a certain kind of agreement with the wife and then the husband stepped in and wanted to demand more money than what they were giving to her, so he was fuming. That's how I knew that check had been deposited.
Q. They had made the agreement with the wife; is that right?
A. He did not say that to me but from what he was fussing, I understand, that apparently they had made an agreement, but he said that the husband now stepped in and wants to demand more.
Q. When did this conversation take place?
A. All this was around the same time.
Q. In November? December?
A. I would say maybe November.
Q. Around the time you prepared the invoices?
A. No. I think after.
Q. Who was it who was relating the conversation about the husband stepping in and wanting more?
A. Douglas.
Q. And he said that he heard that from Toybe?
A. I'm sorry?
Q. He said he had heard that from Toybe, or did he have direct



knowledge?
A. No. He hang up the phone. He was talking to Toybe. And that's what he said when he hang up the phone.
MR. STOLAR: You can take down the invoices, gentlemen. Thank you.
Q. Now, you pled guilty in connection with a cooperation agreement to a number of charges, correct?
A. Yes, sir.
Q. Among them were conspiracy to commit bank fraud?
A. Yes, sir.
Q. For which you can get a maximum of 30 years in jail?
A. Yes, sir.
Q. You also pled guilty to a number of counts of bank fraud, the substantive crime?
A. Yes, sir.
Q. And each one of which, of those can get you 30 years in jail?
A. Yes, sir.
Q. You also pled guilty to conspiracy to launder money, correct?
A. Yes.
Q. A number of counts of that, correct?
A. Yes.
Q. And you could get up to 20 years maximum on each one of those money laundering counts, couldn't you?

A. Yes.
Q. And you also pled guilty to making false statements in connection with your immigration status, correct?
A. Yes.
Q. And that was lying on your application to become a citizen?
A. Yes.
Q. Altogether, you pled guilty to one count of conspiracy to commit bank fraud, right?
A. Sir, I don't remember to identify each one. I know I pled guilty to a number of charges and I'm facing three hundred something years. I know it's not things that I'm proud of that I should remember each one of them.
Q. Well there is one count of conspiracy to commit bank fraud that you pled to, correct?
A. I'm sorry?
Q. One count of conspiracy to commit bank fraud?
A. Okay.
Q. Ten counts of actual bank fraud, right?
A. Okay.
Q. Three counts of -- three counts of money laundering conspiracy, right?
A. I said, sir, I do not remember each -- I don't try to memorize it. It's not good memories that I have.
I know I pled guilty to a lot of charges and I'm facing a lot of time. That's what I remember.

Q. Well, let's see if we can refresh your recollection. I will show you what's marked as 3512B and see if it refreshes your recollection as to how many counts of each of the various things you pled guilty to. Does that help?
A. Yes.
Q. One count of conspiracy to commit bank fraud?
A. Yes.
Q. Ten counts of bank fraud?
A. Yes.
MS. PERRY: Objection.
Q. Three counts of conspiracy to commit money laundering?
THE COURT: No. I'll permit it.
THE WITNESS: Yes.
Q. And one count of lying on your immigration application?
A. Yes.
Q. A total of 14 counts?
A. Yes.
Q. The maximum that you could get in jail is 365 years, correct?
A. Yes.
Q. But you don't expect to get that, do you?
A. I don't expect to live that long.
Q. Sorry?
A. I don't expect to live that long.
Q. You certainly -- one of the reasons that you're testifying

as a cooperating witness is that you're hoping the government will write a letter to your sentencing judge, correct?
A. I did, yes.
Q. Hopefully the government will write a letter saying: Judge, this witness has provided substantial assistance to the government. And that way the judge can give you a vastly reduced sentence; isn't that right?
A. Sir, like I said earlier, it was my understanding that that was for the case in August of 2005. That's why I testified.
Q. Now you know that's what's called a 5K1 letter?
A. Yes.
Q. Do you think that if the government writes a 5K1 letter for you they will not include your help in this case -- one way or the other, whatever the verdict in this case -- do you think they won't include the fact that you testified as a witness here?
A. I don't know. All I could go by is the fact that when I sign something that's what holds up. And I did not sign anything for this. So, I don't know, the goodness of their heart or if they feeling emotional. I don't know. I've done a lot of crimes. I don't know.
Q. Well, Mr. Jacobs I think convinced you that your cooperation agreement does apply for your testimony in this case.
A. Yes. That's what he said, yes.



Q. So you do expect that the government, in writing the 5K1 letter, will include your testimony here?
A. Yes, considering what Mr. Jacobs said.
Q. Now, in order to get this cooperation agreement, you had to go through a series of meetings with the government, which you understood to be called proffer sessions, correct?
A. Yes, sir.
Q. And the very first proffer session you had with the government, you lied, right?
A. Yes, sir.
Q. How about in the second proffer session?
A. I don't remember what happened the second proffer session.
Q. January 17, 2006. Was that the second time you went and talked to them?
A. I don't remember the date.
Q. I show you what's marked as 3512B and see if it refreshes your recollection.
A. Yes.
Q. And how many other sessions did you have with them?
A. Several of them.
Q. What dates? Do you remember?
A. February 2, 2007, February 14.
MS. PERRY: Objection to reading from the document not in evidence. If it refreshes --
THE COURT: No. Go ahead.

THE WITNESS: February 14, '07, March 5 '07, and several other times that's not here.
Q. In these proffer sessions, the one that you had on January 15 -- I'm sorry.
The first one was September 15, 2005, right?
A. Yes.
Q. And that's the one where you went in and you lied, right?
A. Correct.
Q. And in that proffer session you didn't mention anything about UR Recovery or Virginia, did you?
A. Correct.
Q. The next session you had was January 17, 2006, correct?
A. Correct.
Q. And the ground rules for these sessions with the government, where you're meeting to try to earn a cooperation agreement are -- was it explained to you, that basically you have to tell the truth, yes?
A. Correct.
Q. About everything that you know, correct?
A. Correct.
Q. About all the crimes that you have committed and that you know that other people have committed, correct?
A. Correct.
Q. In this January 17 session, did you talk about people in Virginia, do you recall?



A. I don't recall every session. The conversation was very long. It was very long. It was very intense. I don't remember.
Q. In the February 2 session where you were agreeing to tell the whole truth, you didn't say a word about UR Recovery, did you?
A. Sir, I did not remember what the conversation was, what date. It was a few times -- several times, sometimes all day, sometimes -- very long. I don't remember.
Q. Is it not true that in the January 17 session you didn't say a word about UR Recovery?
A. Sir, I said I don't know.
Q. How about in the February 2? You didn't say a word about UR Recovery, did you?
A. I don't remember what date I said what. But I do know and I do remember I mentioned it to the government.
Q. How about on the February 14 session, you didn't mention UR Recovery, did you?
A. Sir, I don't remember.
Q. Or on the March 5 session, you didn't mention UR Recovery, did you?
A. Sir, I don't remember what date I mentioned it, but I did mention it to the government.
Q. I'm going to ask you to read 3512F, 3512G, 3512H, and 3512I and ask you the question I'm going to ask you at the end, does

this refresh your recollection that you did not say anything about UR Recovery in those sessions?
(Pause)
A. No, sir. It doesn't have anything here about that.
Q. You did not mention about UR Recovery, did you, in those sessions?
A. Not in these sessions, but I did mention it to the government.
Q. All right. You mentioned people in Virginia in those sessions, didn't you?
A. Yes, sir. Whatever questions they asked -- the government asked me at the time, they were in charge. They were asking me the question. I answered it to the best of my ability.
Q. Didn't they ask you open-ended questions about: Tell us everybody you know, who is involved, and what they did. Didn't they ask open-ended questions about that?
A. I can't remember. Whatever questions they asked me, I answered them.
Q. Didn't the session work that they wanted you to tell them stuff, correct?
A. They asked me specific questions and I answered them.
Q. Didn't they ask you open-ended questions: Tell us what you know?
A. I don't know. I don't remember. They could ask me: Tell me what you knew about Douglas. Tell me what you knew about



Toybe. You know, things like that. I don't remember specifically: Tell me what you know about -- I don't remember.
Q. You signed your cooperation agreement on March 13, 2007, approximately?
A. (No response).
Q. March 19?
A. Correct.
Q. Up until March 19, 2007, you hadn't said a word about UR Recovery, had you?
A. I said to the government. I don't remember when I said it. From what I just read, there is no notes in there. Whether they took it or not, I don't remember, sir, but I mentioned it to them.
Q. So prior to your signing the agreement and pleading guilty you had not mentioned UR Recovery; is that correct?
MS. PERRY: Objection. That's not what she just said.
THE COURT: They were here to hear it. Next question.
MR. STOLAR: There are no further questions, Judge.
THE COURT: Okay. Call your next witness.
MS. PERRY: Your Honor, I do have some redirect. I don't know if you'd like me to do it --
THE COURT: Short, I hope.
MS. PERRY: It's fairly short, your Honor. Should I do it now?
THE COURT: Yes.

REDIRECT EXAMINATION
BY MS. PERRY:
Q. You were asked a number of questions on cross-examination, Ms. Singh, about precise dates of conversations that you had with Toybe Bennett, with Douglas Shyne, and conversations that you heard.
Are you able to recall some three years later, with precision, precise names?
A. No, I'm not.
Q. The discussions that you had and that you overheard about UR Recovery and about Ebony Worthy, approximately when did those conversations occur?
A. I would say everything started from late August, early September onwards, of 2004.
Q. Did they continue on for some time?
A. Yeah, for a few months.
Q. When were you arrested in connection with the counterfeit check deposited into your account?
A. It was in December of 2004, around the 23rd, somewhere along there, a few days before Christmas.
Q. And prior to that date you had already written, I believe you testified, the fake invoices requested by the owner of UR Recovery?
A. Yes. Those was already made up.
Q. Did you know the name of the owner of UR Recovery?



A. No.
Q. Did you know the names of the owners of Moonlight Productions?
A. No.
Q. You were asked a question by Mr. Jacobs about sort of a hypothetical, if Ebony Worthy had opened an account November 19, could the conversation that -- I'm sorry. Withdrawn.
You testified -- you've testified about a conversation between Douglas and Toybe about putting a counterfeit check into Ebony Worthy's account?
A. Correct.
Q. And Douglas asked Toybe what her account was like?
A. Correct.
Q. And what did Toybe say in response?
A. She hasn't had it for very long, not much money in there, he just put some money in there.
Q. What kind of money did Toybe Bennett put into Ebony Worthy's account?
A. I don't know.
Q. What kind of money did Toybe Bennett have access to?
A. Fraudulent money.
Q. Did he have any access to legitimate money that you're aware of?
A. No. He didn't have a job.

Q. So, that conversation between Toybe and Bennett -- between Toybe and Douglas happened after she opened --
MR. JACOBS: Objection, leading.
THE COURT: It's terribly leading and I have no idea where it's going.
Q. Did the government show you, or have you ever seen any documents about Ebony's -- Ebony Worthy's bank account?
A. No.
Q. Did the government show you any checks that were deposited in there?
A. Yes. I saw Ebony's name on it.
Q. You saw the check that Mr. Jacobs just showed you?
A. Correct.
Q. Had the government shown you any checks relating to her -- that were put in her bank account, or her account opening documents, or anything like that?
A. No.
Q. The dates that you've been testifying on today, are those just based on your own memory?
A. Correct.
Q. Where is Toybe Bennett now?
A. He's still in prison.
Q. Did he plead guilty in a separate case?
MR. JACOBS: Objection.
THE COURT: Sustained.

MR. JACOBS: Nothing to do with cross.

THE COURT: Sustained.

MS. PERRY: Well, Mr. Jacobs asked a question about --

THE COURT: No.

MS. PERRY: I'll move on.

THE COURT: No. No.

Q. You testified on cross about numerous individuals associated with Toybe Bennett who had deposited checks into their account. You talked about a Jason Watler, Roberto Montgomery. You testified on direct about a girlfriend of his, Donna.

Are these all people who put proceeds of counterfeit checks, or did they put counterfeit checks themselves, if you know?

A. Both.

Q. To your knowledge, did these people do so knowing that the checks were bad?

MR. JACOBS: Objection.

THE COURT: Sustained.

Q. Did Toybe ever tell you whether his girlfriend, Donna, knew that she was putting bad checks in for him?

MR. JACOBS: Objection. Improper redirect.

THE COURT: Yes. Has nothing to do with the cross.

Q. You were just asked some questions by Mr. Stolar about what you told the government and when you told them. How many

meetings have you had with the government?

A. Several.

Q. And do you know whether notes were taken at each of these meetings?

A. No. A lot of times they didn't take notes.

Q. And the documents that he showed you and asked if they refresh your recollection, do you know what those are?

MR. STOLAR: Objection.

THE COURT: No. Does she know.

THE WITNESS: Yes.

Q. What are they?

A. Those are the notes from our meeting in our early stage.

Q. Did you take those notes?

A. No.

Q. Had you ever seen those notes before?

A. No.

Q. Do you know whether they contained everything that was discussed in that meeting?

A. I don't know. I was talking. Somebody was writing. I don't know if they could write as fast. I don't know.

Q. Prior to signing a cooperation agreement with the government in March of 2007, had you told the government about fraudulent activity relating to UR Recovery?

A. Yes.

Q. Had you told the government about fraudulent activity



relating to people associated with Toybe Bennett?
A. Yes.
Q. Did you tell the government specifically and did you mention any names?
A. I told the government about UR Recovery.
MR. JACOBS: Objection. The answer is did you mention any names. Yes or no.
THE COURT: Yes. And she said yes.
THE WITNESS: Yes.
THE COURT: Okay. Next question.
Q. What names did you tell the government?
A. I mentioned to the government that they did deals with UR Recovery, Moonlight, and also I mentioned about Toybe involving friends, family, and girlfriends.
Q. When you were asked specific questions by the government about people's names, did you answer those questions at that point?
A. Yes, whatever the government asked me, whatever name, I gave, yeah.
Q. Whether or not -- withdrawn.
MS. PERRY: I think I'm done, your Honor, just one minute.
(Pause)
MS. PERRY: No further questions, your Honor.
MR. JACOBS: No recross, your Honor.

RECROSS EXAMINATION
BY MR. STOLAR:
Q. You entered your plea of guilty on March 19; is that right?
A. Yes, sir.
Q. And the last proffer that you had before you entered the cooperation agreement and entered your plea was on February 5 of '07, correct?
MS. PERRY: Objection.
MR. STOLAR: March 5.
MS. PERRY: Objection.
THE COURT: '07?
MR. STOLAR: I guess that's a typo. It should be '05 -- '06 -- no, '07.
THE COURT: Everybody is getting confused by dates.
Q. All right. The plea agreement was in March of '07?
A. Yes, sir.
Q. And the plea of guilty was in March of '07?
A. Yes, sir.
Q. March 19.
And the last meeting that you had with the government was March 5 of '07?
MS. PERRY: Objection.
Q. The last meeting prior to your entering the plea?
MS. PERRY: Objection.
THE COURT: Was it?

MR. STOLAR: Was it.

THE COURT: Was it the last meeting?

THE WITNESS: Should I answer?

THE COURT: Yeah. Was it the last meeting?

THE WITNESS: I don't know, sir. I don't believe so.

Q. Prior to your entering a plea of guilty to the 14 counts that you pled guilty to, you had not mentioned UR Recovery to the government, had you?

A. Sir, I mentioned it to the government. Around what time, I don't know. But I also noticed several times I met with the government and they don't have it written there, that paper that you gave me.

Q. But the notes that you read here make no mention of UR Recovery, did they?

A. No, I did not read anything on it.

Q. Even though UR Recovery is the company that had you done the invoices for, right?

A. Correct, and I mentioned it to the government.

Q. But you didn't see it in the notes, did you?

A. No. Maybe they were just writing down what they had interest in. I don't know.

MR. STOLAR: Thank you.

THE COURT: Okay. All right.

(Witness excused)

THE COURT: Do you have your next witness? Yes? No?