# Green & Willstatter
ATTORNEYS AT LAW
200 MAMARONECK AVENUE
SUITE 605
WHITE PLAINS, NEW YORK 10601

THEODORE S. GREEN                    (914) 948-5656
RICHARD D. WILLSTATTER          FAX (914) 948-8730          E-MAIL: WILLSTATTER@MSN.COM

December 7, 2007

Hon. Kenneth M. Karas
United States District Court
300 Quarropas Street
White Plains, New York 10601

        Re: *United States v. Nathaniel Alexander*
           S4 05 Cr. 1067 (KMK)

Dear Judge Karas:

  We write in reply to the December 3, 2007 letter submitted by the government arguing that Mr. Alexander should be sentenced on a loss figure of an amount greater than $2.5 million; that he should be subject to a two-point obstruction enhancement; that he should be denied a downward adjustment for a minor role; and should not be granted downward departures because the loss figure overstates the seriousness of his offense nor under U.S.S.G. § 5K2.20 for aberrant behavior.

<u>The Correct Loss Calculation</u>

  The government argues that loss figure for Mr. Alexander should include the money stolen by Riddick and Montgomery. The government asserts Nathaniel Alexander that could have easily foreseen that Riddick and Montgomery were depositing counterfeit checks. Although Mr. Alexander did learn that Riddick has deposited a $375,000 check, that check was deposited weeks before Mr. Alexander deposited the $850,000 check on April 26, 2005. There was no evidence Mr. Alexander joined the conspiracy prior to that date.

  Our opponents conspicuously ignore our argument to the effect that Riddick's criminal activity was not within the scope of the criminal activity Mr. Alexander agreed to jointly undertake, and accordingly, cannot form the basis of a Relevant Conduct calculation. *See* Alexander's Sentencing Memo at 5; U.S.S.G. § 1B1.3, comment., app. note 2. The sentencing guidelines provide that a defendant may be criminally responsible for jointly conducted criminal conduct he did not aid or abet when *two* requirements are met: that the conduct was within the scope of the defendant's criminal agreement *and* that

it was reasonably foreseeable. The government has focused on the easier argument, that is, that Riddick's conduct was reasonably foreseeable. We can see why: the question of what is reasonably foreseeable is almost entirely subjective. Yet, in this case, there is no evidence that Nathaniel Alexander agreed to participate in Riddick's conduct in depositing other checks, *e.g.,* the $375,000 check, or in helping Riddick obtain the proceeds of those checks.

The government's argument concerning Tim Montgomery is based on "facts" which have not been proven. First, the government asserts that because Mr. Alexander spoke with Montgomery by telephone, he must have known of the counterfeit checks deposited by Montgomery. The government argues that Alexander and Montgomery and Alexander had no other reason to speak to one another. This is simply false. Montgomery and Alexander knew each other through their mutual acquaintance, Steve Riddick. The proposition that the two calls between their phones must have related to the conspiracy is utter speculation and completely unsupported.

Next, the government asserts that Alexander wrote a check to Montgomery's then girlfriend, Marion Jones. The government ignores the evidence at trial that Alexander wrote out the checks, signed them, but left the payee lines blank. Further, an examination of the handwriting on the checks themselves reveals that someone other than Alexander filled in the payee lines.

In any event, whether Mr. Alexander had contact with other co-conspirators is not the issue. The question is whether he participated in crimes that those other conspirators committed or joined their scheme to commit those other crimes. He did not.

Alexander's Role

While it is true that for the counterfeit check scheme to work, someone had to deposit the check into an account, that act is the last and most easily executed of a series of illegal acts. After devising the scheme, locating targeted accounts large enough to allow for substantial withdrawals, stealing the checks, altering them, only then can those checks be deposited. That last step is necessary but clearly not sufficient for the scheme to work. Compared to Shyne, Prince and Riddick, Alexander was literally a pawn. As the jury verdict found, he may have been part of the conspiracy, but it is simply not accurate or just to assert that their roles in the conspiracy were equal. Alexander did not devise the scheme, make any decisions about how to execute the scheme, recruit others to participate in the scheme nor even exercise any discretion at all about how the conspiracy should operate. Alexander did not even have discretion how to execute his part of the conspiracy. He merely deposited the checks and then was instructed to write out other

checks in specific amounts and others decided who should receive those funds.

Obstruction

The government's argument in favor of increasing Mr. Alexander's sentence comes down to its insistence that Agent Correa was truthful when he said he gave the *Miranda* warnings and that Mr. Alexander's affidavit to the contrary was a deliberate lie.

The applicable application note, in pertinent part, states that:

> In applying this provision in respect to alleged false testimony or statements by the defendant, the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice.

U.S.S.G. § 3C1.1, app. note 2. The fact that two people differ as to whether the warnings were given does not necessarily mean one of them is lying. Agent Correa's trial testimony was replete with instances of claimed memory failure. The defendant has his own recollection which is at odds with that of the Agent. The affidavit was completed almost 90 days after the defendant's arrest. While we do not concede Mr. Alexander was orally read the warnings by Agent Correa, if he was mistaken as opposed to lying, the enhancement cannot apply.

Despite national news of repeated instances of false confessions and calls for mandatory recording of custodial interrogation, federal law enforcement agencies continue to scrupulously avoid such recordings. When such recordings have been made, instances of *Miranda* violations have come to light sometimes resulting in the government deciding not to offer the statements made on its case in chief.[1] While such recordings are not constitutionally required, *see United States v. Tykarsky*, 446 F.3d 458, 477 (3rd Cir. 2007)(citing several such state constitutional rules), the fact that the Court is invited to rely on the Agent's testimony in support of the waiver and the substance of the

---

[1] For example, in a case in this Courthouse, *United States v. Mark McGlynn*, 07 Cr. 172 (CLB), detectives videotaped the defendant's custodial interrogation (to the surprise of the federal prosecutors). The videotape in that case showed a detective advising the defendant that he had to sign the waiver of rights form so the detective could explain the charges and urging him to go ahead and sign it so he could be told why he had been arrested. *See also* "Recorded on a Suspect's Hidden MP3 Player, a Bronx Detective Faces 12 Perjury Charges," *New York Times*, Dec. 7, 2007, p. B7, col. 1.

statements is cause for sufficient concern so that courts should encourage parties to hold *Miranda* hearings.

"Miranda warnings are intended 'to dissipate the compulsion inherent in custodial interrogation and, in so doing, guard against abridgment of the suspect's Fifth Amendment rights.'" *United States v. Rommy*, 2007 U.S. App. LEXIS 25732 *62 (2d Cir. November 5, 2007) quoting *Moran v. Burbine*, 475 U.S. 412, 425, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986). The Supreme Court found it necessary to require the warnings be given and knowingly waived as "a prophylactic employed to protect against violations of the Self-Incrimination Clause." *United States v. Patane*, 542 U.S. 630, 638-39 (2004)("in *Miranda*, the Court concluded that the possibility of coercion inherent in custodial interrogations unacceptably raises the risk that a suspect's privilege against self-incrimination might be violated"). Since custodial interrogations are inherently coercive, courts have an interest in assuring defendants' Fifth Amendment rights are not violated and in not chilling the assertion of those rights. In this case, the affidavit in question simply caused the Court to hold a pretrial evidentiary hearing so it did not obstruct the administration of justice. There was no effort to offer the affidavit at trial and Mr. Alexander did not testify either at the hearing or at trial.[2]

Aberrant Behavior

The government relies chiefly on the fact that there were two checks deposited by Alexander. First, the government ignores the fact that, until Alexander told them of the second check during the innocence proffer, they had no idea of it. Second, the depositing of the second check does not preclude departure for aberrant behavior. In this case, unlike those cited by the government at page 13 of its December 3 sentencing letter, Alexander's conduct was not violent, (*United States v. Harrell,* 207 F. Supp.2d 158 (S.D.N.Y. 2007), *United States v. Kelly*, 160 F. Supp.2d 171 (S.D.N.Y. 2001) and *United States v. Gurses*, 1996 WL 487954 (S.D.N.Y. Aug. 27, 1996), nor did it involve drug trafficking (*United States v. Gonzales,* 1993 WL 524795 (S.D.N.Y. Dec. 16, 1993) and *United States v. Arbelaez*, 2002 WL 750845 (S.D.N.Y. Apr. 26, 2002)). In those cases, district court did not apply the discretionary departure for aberrant conduct.

In contrast, before this Court is a man who by all accounts has lived an exemplary

---

[2] Counsel's review of the federal cases from around the nation reveal that it is primarily in this District that the government has often sought, and some district courts have applied, an obstruction enhancement for the mere submission of an affidavit in support of a *Miranda* hearing.

life. The Court has heard testimony and has received letters attesting to Nathaniel Alexander's good character in virtually every aspect of his life (religious, business, civic, social and from his family). In stark contrast to the rest of his life, he became embroiled with a scheme devised by lifelong criminals he never met. His connection to those criminals was through his former friend and office mate, Steve Riddick. He did not seek them out nor did he previously associate with such people. Not only is the conduct for which Alexander convicted aberrational, his association with people not of outstanding character themselves was likewise an aberration.

The defense respectfully submits that Alexander is precisely the type of defendant contemplated by the sentencing commission when it drafted the aberrant behavior departure. Even if the Court determines that a downward departure for aberrant conduct should not apply, the Court can and should take these circumstances into account in determining what sentence will be sufficient and determining whether to apply a *Booker* variance.

                          Very truly yours,

                          RICHARD D. WILLSTATTER

                          BARKET & ANGELI, P.C.

                  by:    BRUCE A. BARKET, ESQ.
                          Of Counsel

cc: E. Danya Perry/Daniel W. Levy
     Assistant U.S. Attorneys